UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| **X CORP.**, a Nevada corporation,<br><br>      Plaintiff,<br><br>    v.<br><br>**MEDIA MATTERS FOR AMERICA**, a Washington, D.C. non-profit corporation, and **ERIC HANANOKI**,<br>      Defendants. | Case No. 4:23-cv-1175<br><br><u>**JURY TRIAL DEMANDED**</u> |

# COMPLAINT

1. Defendant Media Matters for America ("Media Matters") is a self-proclaimed media watchdog that decided it would not let the truth get in the way of a story it wanted to publish about X Corp. Looking to portray X's social networking platform as being dominated by "white nationalist and anti-Semitic conspiracy theories," Media Matters knowingly and maliciously manufactured side-by-side images depicting advertisers' posts on X Corp.'s social media platform beside Neo-Nazi and white-nationalist fringe content and then portrayed these manufactured images as if they were what typical X users experience on the platform. Media Matters designed both these images and its resulting media strategy to drive advertisers from the platform and destroy X Corp.

2. Plaintiff X Corp. operates the X social media platform with over 500 million active monthly users. X facilitates free expression and open discourse by enabling its users to create and share their own content and to message and comment on other users' posts. These posts appear

sequentially to users in "feeds," which occasionally include paid advertisements—the overwhelming source of X Corp.'s revenue.

3. Users shape their own experiences on X. Users curate the content on their own feeds by choosing to "follow" other users, thereby determining which posts are presented to them. Most users are served a variety of content based on an algorithm that takes account of who that user follows and what that user engages with. But X also provides its users the option to forgo algorithmically suggested posts altogether, thereby enabling a user to view only the content that user chooses to view.

4. As the most prominent online platform dedicated to hosting free speech, X and its predecessor Twitter have long been the target of Media Matters. In just the last year, Media Matters has published a series of articles threatening X's relationships with massive multinational advertisers and global publishers, including Amazon, eBay, Major League Baseball, New York Times Co., Samsung, Sports Illustrated, The Wall Street Journal, USA Today, Office Depot, Nokia, Dish, Bayer, Tyson Foods, Honeywell, Discovery, FanDuel, Thermo Fisher, National Women's Soccer League, the Pittsburgh Steelers, the Atlanta Falcons, Manchester City, DraftKings, FanDuel, T-Mobile, and The Athletic.[1]

5. This November alone Media Matters released over twenty articles (and counting) disparaging both X Corp. and Elon Musk—a blatant smear campaign.

6. For the last several years, Media Matters has falsely portrayed Twitter, now X, as a risky, unsafe platform for advertisers. Contrary to these efforts, 99% of X's measured ad placement

---

[1] *See, e.g.*, Eric Hananoki, *X is placing ads for Amazon, NBA Mexico, NBCUniversal, and others next to content with white nationalist hashtags*, MEDIA MATTERS FOR AMERICA, (Nov. 17, 2023, 12:16 PM), https://www.mediamatters.org/twitter/x-placing-ads-amazon-nba-mexico-nbcuniversal-and-others-next-content-white-nationalist.

2

in 2023 has appeared adjacent to content scoring above the Global Alliance for Responsible Media's brand safety floor.

7.  Undeterred by the truth, Media Matters has opted for new tactics in its campaign to drive advertisers from X. Media Matters has manipulated the algorithms governing the user experience on X to bypass safeguards and create images of X's largest advertisers' paid posts adjacent to racist, incendiary content, leaving the false impression that these pairings are anything but what they actually are: manufactured, inorganic, and extraordinarily rare.

8.  Media Matters executed this plot in multiple steps, as X's internal investigations have revealed. First, Media Matters accessed accounts that had been active for at least 30 days, bypassing X's ad filter for new users. Media Matters then exclusively followed a small subset of users consisting *entirely* of accounts in one of two categories: those known to produce extreme, fringe content, and accounts owned by X's big-name advertisers. The end result was a feed precision-designed by Media Matters for a single purpose: to produce side-by-side ad/content placements that it could screenshot in an effort to alienate advertisers.

9.  But this activity *still* was not enough to create the pairings of advertisements and content that Media Matters aimed to produce.

10.  Media Matters therefore resorted to endlessly scrolling and refreshing its unrepresentative, hand-selected feed, **generating between 13 and 15 times more advertisements per hour than viewed by the average X user** repeating this inauthentic activity until it finally received pages containing the result it wanted: controversial content next to X's largest advertisers' paid posts.

11.  Media Matters omitted mentioning any of this in a report published on November 16, 2023 that displayed instances Media Matters "found" on X of advertisers' paid posts featured

next to Neo-Nazi and white-nationalist content. Nor did Media Matters otherwise provide any context regarding the forced, inauthentic nature and *extraordinary rarity* of these pairings.

12. However, relying on the specious narrative propagated by Media Matters, the advertisers targeted took these pairings to be anything *but* rare and inorganic, with all but one of the companies featured in the Media Matters piece withdrawing all ads from X, including Apple, Comcast, NBCUniversal, and IBM—some of X's largest advertisers. Indeed, in pulling all advertising from X in response to this intentionally deceptive report, IBM called the pairings an "entirely unacceptable situation."[2] Only Oracle did not withdraw its ads.

13. The truth bore no resemblance to Media Matters' narrative. In fact, IBM's, Comcast's, and Oracle's paid posts appeared alongside the fringe content cited by Media Matters for **only one** viewer (out of more than 500 million) on all of X: **Media Matters**. Not a single authentic user of the X platform saw IBM's, Comcast's, or Oracle's ads next to that content, which Media Matters achieved only through its manipulation of X's algorithms as described above. And in Apple's case, only two out of more than 500 million active users saw its ad appear alongside the fringe content cited in the article—at least one of which was Media Matters.

14. Media Matters could have produced a fair, accurate account of users' interactions with advertisements on X via basic reporting: following *real users*, documenting the *actual, organic* production of content and advertisement pairings. Had it done so, however, it would not have produced the outcome Media Matters so desperately desired, which was to tarnish X's reputation by associating it with racist content. So instead, Media Matters chose to maliciously misrepresent the X experience with the intention of harming X and its business.

---

[2] Hannah Murphy, *IBM pulls adverts from X after report finding they ran next to Nazi Content*, FINANCIAL TIMES (Nov. 16, 2023), https://www.ft.com/content/647b4c4d-f4d5-46cd-bc26-8c943b6995e7.l.

## PARTIES

15. Plaintiff X Corp. is a corporation organized and existing under the laws of the State of Nevada, with its principal place of business in San Francisco, California. Plaintiff conducts significant business in Texas, including maintaining significant offices in Texas. It operates the social media platform "X" (formerly "Twitter"), an internet-based service that enables users to create and share their own content, interact with other users, and curate feeds of content.

16. Defendant Media Matters is a web-based publisher incorporated under the laws of the District of Columbia with its principal place of business at 800 Maine Avenue SW, Suite 400, Washington, D.C. 20024. The organization's purpose is "to systematically monitor" conservative media and publish reports based on this purported reporting.

17. Defendant Eric Hananoki is a writer for Defendant Media Matters and is domiciled in Maryland.

## JURISDICTION & VENUE

18. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there exists complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds $75,000.00.

19. This Court has personal jurisdiction over Media Matters because Media Matters' campaign against X Corp. was purposefully directed at, among others, relationships with advertisers who are located in, have a significant presence in, or transact substantial business in Texas. Likewise, this Court has personal jurisdiction over Media Matters because its attempts to harm X Corp.'s reputation potentially threatened X Corp.'s relationships with its hundreds of millions of users, including millions of Texas users. This Court has personal jurisdiction over Hananoki for substantially the same reasons.

20. Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred herein, because a substantial part of the property that is subject of the action—that is, X's business and advertising—is situated in the district, and because all Defendants are subject to personal jurisdiction in this District.

## GENERAL ALLEGATIONS

I. **X is a Safe Platform for Users and Advertisers, Despite Media Matters' Deceptions.**

21. X is a social media platform that remains in operation due to its loyal users and advertisers. X Corp. invests heavily in technologies that work in tandem to facilitate safe and effective interactions between users and advertisers—technologies that, under normal, organic conditions operate seamlessly.

22. As a first layer of protection for advertisers, X applies default protections to all posts. These protections are designed to prevent advertisements from being placed next to content that violates community guidelines. When users operate within X's community guidelines, these default mechanisms are effective and have a long history of successfully protecting X's advertisers from undesirable interactions with fringe content.

23. As a second layer of protection, X provides advertisers with opt-in options. These options allow advertisers to further address any specific concerns they may have about their advertisements being seen next to specific content. Here, advertisers can specify which key words and user handles they *do not* want their posts to appear by.

24. These protections and others create a safe environment for advertisers that allow them to reach their target audiences while protecting their brands, as Media Matters well knows.

**II.     Media Matters Systematically Manipulated the X User Experience to Defame X.**

25.     On November 16, 2023, Media Matters published a false, defamatory, and misleading article with the headline, "*X has been placing ads* for Apple, Bravo, IBM, Oracle, and Xfinity[3] next to pro-Nazi content," claiming that X was responsible for anti-Semitic content being paired with X's advertisers' paid posts.[4] This statement was not true, and Media Matters knew it. As explained below and displayed in an X internal review, this title is false in that Media Matters itself—not X—was responsible for placement of the content it identified through its willful exploitation of X's user features—a result it *specifically intended* to bring about. X in fact has many default safeguards that *prevent* the platform from displaying content in the manner artificially achieved by Defendant.

26.     Further, in the body of the piece, Media Matters falsely claims that it "recently *found* ads for Apple, Bravo, Oracle, Xfinity, and IBM next to posts that tout Hitler and his Nazi Party on X."[5] Media Matters did not *find* pairings that X passively allowed on the platform. Media Matters *created* these pairings in secrecy, to manufacture the harmful perception that X is at best an incompetent content moderator (a harmful accusation for any social media platform), or even worse that X was somehow indifferent or even encouraging to Nazi and racist ideology.

27.     On X, users can control the content on their feeds. When users show interest in particular topics, ads will generate that relate to those topics. Media Matters exploited these

---

[3] XFinity is a Comcast service.

[4] *See* Eric Hananoki, *As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*, MEDIA MATTERS FOR AMERICA, (Nov. 16, 2023, 10:05AM), https://www.mediamatters.org/twitter/musk-endorses-antisemitic-conspiracy-theory-x-has-been-placing-ads-apple-bravo-ibm-oracle.

[5] *See id.* (emphasis added).

features by creating a secret X account precision-designed to evade normal safeguards, manipulating every aspect of the system through which posts and advertisements appear, ultimately creating the side-by-side images of objectionable content and advertisements.

28. X's internal user data tells the story of just how far Media Matters went to manufacture an inorganic user experience strictly aimed at creating an interaction between controversial content and big-name advertisers that was seen only by the Media Matters account and then published broadly.

29. First, Media Matters set out on their attempt to evade X's content filters for new users by specifically using an account that had been in existence for more than thirty days.

30. Next, Media Matters set its account to follow only 30 users (far less than the average number of accounts followed by a typical active user, 219), severely limiting the amount and type of content featured on its feed. *All* of these users were either already known for posting controversial content or were accounts for X's advertisers. That is, *100% of the accounts* Media Matters followed were either fringe accounts or were accounts for national large brands. In all, this functioned as an attempt to flood the Media Matters account with content only from national brands and fringe figures, tricking the algorithm into thinking Media Matters *wanted* to view both hateful content and content from large advertisers.

31. Even this did not produce Media Matters' intended result. An internal review by X revealed that Media Matters' account started to alter its scrolling and refreshing activities in an attempt to manipulate inorganic combinations of advertisements and content. Media Matters' excessive scrolling and refreshing generated between 13 and 15 times more advertisements per hour than would be seen by a typical user, essentially seeking to force a situation in which a brand ad post appeared adjacent to fringe content.

32. Eventually, through intentionally evading X's multiple safeguards by curating the content on its feed and then repeatedly attempting to create pairings of advertisements for major brands with controversial content, Media Matters finally achieved its goal. Accordingly, it took screenshots of posts from IBM, Apple, Bravo, Xfinity, and Oracle that Media Matters engineered to appear adjacent to inflammatory, fringe content.

### III. To Defame X, Media Matters Hid Its Manipulation from Readers and Advertisers.

33. Media Matters generated a specific, intended result that was not only inorganic, but exceedingly (and demonstrably) rare, all while taking specific steps to obscure this in its November 16, 2023 article. The overall effect on advertisers and users was to create the false, misleading perception that these types of pairings were common, widespread, and alarming. Media Matters hid its manipulations through omissions, deceptive image selections, misrepresentations, and secrecy settings.

34. Media Matters omitted in its entirety its process of manufacturing these ad pairings. It did not include in its article that it created a user that *only* followed 30 accounts that either belonged to fringe figures or major national brands. Neither readers nor advertisers had any way of knowing that the entire feed was orchestrated to generate the remarkably rare combinations. Media Matters also omitted mentioning in its entirety its excessive scrolling and refreshing, allowing users to believe (falsely) that the "report" was produced under circumstances that were organic and unmanipulated.

35. Media Matters also omitted and made no attempt to clarify the rarity of these pairings. The representation put forth by Media Matters constituted 0.0000009090909 percent of impressions served on the day in question. Most or all of these pairings were not seen by literally

9

anyone besides Media Matters' own manipulated account, and no authentic user of the platform has been confirmed to have seen any of these pairings.

36. Media Matters' image choice in its smear also functioned to hide the true nature of its report. All images selected contained *only* the ad and the controversial content, with all other posts absent from view. That is, had readers been able to see the posts above and below the pairings, they would have easily gleaned the highly-specific nature of the small number of accounts Media Matters chose to follow. Media Matters chose to show *every* pairing in its article using this deceptive technique—hiding its deceit through even more deceit.

37. Tellingly, Media Matters used X's privacy features in order to hide its methodology from its readers. That is, Media Matters set this account to "private," blocking anyone from seeing which accounts Media Matters actually followed, thus disallowing anyone from understanding how its feed was manipulated. Indeed, Media Matters at no point includes images *with any information about the account that was exposed to these images*; the cropped nature of Media Matters' deceptive screenshots leaves its profile picture out of frame.

38. Accordingly, Media Matters created the impression that these pairings were organic, accurate, and representative of the typical X user's experience, which actually and demonstrably misled users and advertisers, causing harm to X Corp.

**V.    Media Matters Caused Advertisers to Believe the Pairings Were Organic.**

39. After the publication of Media Matters' false smear on November 16, 2023, advertisers pulled their ads from the site, which, as Media Matters admits, only happened after it reported that X was placing ads alongside white nationalist and pro-Nazi content. Included in these companies, which all referenced antisemitic content in their withdrawal from X, are:

**Comcast.** After Media Matters' November article featured a contrived, misleading, and inflammatory image showing an ad for Xfinity next to a pro-Nazi post, its parent company Comcast decided to pull *all* ads for Comcast entities from X.

**NBCUniversal.** As the parent company of Bravo and a subsidiary of Comcast, NBCUniversal pulled all advertising from X after publication of the article.

**Apple.** The day after publication of the article, which also featured an Apple ad contrived to be placed next to fringe content, Apple—one of X's largest clients—pulled all of its ads from the platform.

**IBM.** As previously discussed, IBM pulled all ads immediately after the publication of the article.

40. Media Matters' manipulation was so severe that companies not even featured in the article also pulled ads from X. These companies include Lionsgate, Warner Bros. Discovery, Paramount, and Sony.

**VII.  Media Matters Intended to Harm X's Revenue Stream.**

41. Media Matters represents itself as "a progressive research and information center dedicated to comprehensively monitoring, analyzing, and correcting *conservative misinformation* in the U.S. media."[6] Since its launch in 2004, it has engaged in an all-out campaign of "guerilla warfare and sabotage" on conservative news sources.[7] In this context, X Corp. and Elon Musk are a critical Media Matters target because X is the most prominent online platform that permits users to share all viewpoints, whether liberal or conservative, and Mr. Musk is the most prominent voice

---

[6] About US, MEDIA MATTERS FOR AMERICA (2023), https://www.mediamatters.org/about-us (emphasis added).

[7] Ben Smith, *Media Matters' war against Fox*, POLITICO (Mar. 26, 2011 7:23AM), https://www.politico.com/story/2011/03/media-matters-war-against-fox-051949.

11

on the platform and a passionate supporter of free speech. In taking down two forces it already found objectionable, Media Matters had the chance to starve X of ad revenue and thereby silence *all* of the voices on X. Nothing in Media Matters' campaign was coincidental or accidental. And, its guerilla attack on X is working, driving away X's advertisers and revenue precisely as intended.

### FIRST CAUSE OF ACTION

### Interference With Contract

42. X Corp. re-alleges and incorporates by reference the above allegations.

43. At all relevant times, Defendants were aware that Plaintiff contracted with various third parties, including but not limited to Apple, NBCUniversal, Comcast, Bravo, Apple, and IBM, to sell ads on the X platform, as clearly demonstrated by the many articles written by Defendants on the topic.

44. Defendant Media Matters intentionally interfered with contracts between X Corp. and its advertisers, including but not limited to Apple, NBCUniversal, Comcast, Bravo, Apple, and IBM—all clients with existing advertisement agreements that were casualties of Defendant's misrepresentations and ceased advertising on the X platform as a direct result.

### SECOND CAUSE OF ACTION

### Business Disparagement

45. X Corp. re-alleges and incorporates by reference the above allegations.

46. Defendant Media Matters made statements that disparaged the quality of X Corp.'s product, X.

47. Defendant Media Matters made these statements as statements of fact, not opinion. Defendant Media Matters represented that X "has been placing" advertisements next to anti-Semitic and racist materials. It represented that it "found" these materials next to advertisements.

48. As extensively explained above, these statements made by Defendant Media Matters were false.

49. Defendant Media Matters intentionally made these statements with clear malice, well aware of their falsity.

50. X Corp. suffered monetary loss as a result of these statements: companies mentioned in Defendant's false and misleading article pulled their advertising from X indefinitely.

## THIRD CAUSE OF ACTION

### Interference with Prospective Economic Advantage

51. X Corp. re-alleges and incorporates by reference the above allegations.

52. X Corp. was engaged in economic relationships that would have resulted in an economic benefit to X Corp. X Corp. had relationships with advertisers that pulled their spending in light of Defendant Media Matters' article and had every reason to suspect that these relationships would continue.

53. At all relevant times, Defendant Media Matters knew of these relationships, as they were described in its "reporting."

54. Defendant Media Matters engaged in wrongful conduct that disrupted X Corp.'s economic relationships. Through extensive deception and misrepresentation, Defendant Media Matters caused advertisers to lose faith in X Corp.'s abilities to monitor and curate content, thereby leading them to break off these lucrative relationships and any future continued relationships.

55. Defendant Media Matters acted with the intent to disrupt these relationships. Media Matters' actions continued its expressly declared "guerilla war" on media it dislikes and its systematic, harassing attacks on X Corp. and Elon Musk.

56. X Corp. was harmed as a result of Defendant Media Matters' actions: it lost advertisers as a result of Defendant's interference.

57. Defendant Media Matters' actions were undoubtedly a substantial factor in causing this harm, with Defendant's website even noting that X Corp.'s relationships fell apart *after* Media Matters released its maliciously false piece.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff X Corp. prays for judgment in its favor and the following relief:

1. Actual and consequential damages caused by Defendants' misconduct, including but not limited to all general and special damages;

2. A preliminary and permanent injunction ordering Defendants to immediately delete, take down, or otherwise remove the article entitled "As Musk Endorses Antisemitic Conspiracy Theory, X Has Been Placing Ads for Apple, Bravo, IBM, Oracle, and Xfinity Next to Pro-Nazi Content From Its Web" from all websites and social media accounts owned, controlled, or operated, directly or indirectly, by Defendants;

3. X Corp.'s costs and attorneys' fees to litigate this action; and

4. For such other and further relief as the Court may deem just and proper.

November 20, 2023

Respectfully submitted,

<u>/s/ John C. Sullivan</u>
John C. Sullivan
Texas Bar No. 24083920
**S|L LAW PLLC**
610 Uptown Boulevard, Suite 2000
Cedar Hill, TX 75104
Telephone: (469) 523-1351
Facsimile: (469) 613-0891
john.sullivan@the-sl-lawfirm.com


<u>/s/ Judd E. Stone II</u>
Judd E. Stone II*
Texas Bar No. 24076720
Christopher D. Hilton*
Texas Bar No. 24087727
**STONE | HILTON PLLC**
1115 W. Slaughter Lane
Austin, TX 78748
Telephone: (737) 465-7248
judd@stonehilton.com
chris@stonehilton.com

* Admission pending

*Counsel for Plaintiff*

15