## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

**X CORP.**, a Nevada corporation,
        Plaintiff,

    vs.

**MEDIA MATTERS FOR AMERICA**, a
Washington, D.C. non-profit corporation,
**ERIC HANANOKI**, and **ANGELO
CARUSONE**,
        Defendants.

Case No. 4:23-cv-01175-O

JURY TRIAL DEMANDED

## FIRST AMENDED COMPLAINT

1.      Since Elon Musk acquired Plaintiff X Corp., the company has taken extensive steps to reduce legacy censorship on the X platform while maintaining important safety protocols to preserve and grow advertiser relationships. One immediate and broadly recognized consequence is that X is now the most significant online platform that permits users to share their views without aggressive censorship measures implemented to provide a partisan or ideological advantage to one faction or another.

2.      These changes have prompted an extended, ideologically driven crusade against X by Defendants Media Matters for America ("Media Matters"), its President, Angelo Carusone, and its reporters, including, as relevant here, Eric Hananoki. Media Matters describes itself as "a progressive research and information center dedicated to comprehensively monitoring, analyzing, and correcting conservative misinformation in the U.S. media."[1] Since its launch in 2004, Media

---

[1] About Us, MEDIA MATTERS FOR AMERICA (2023), https://www.mediamatters.org/about-us.

Matters has engaged in an all-out campaign of "guerilla warfare and sabotage" on conservative news sources.[2] In this context, X Corp. is a critical target for Media Matters: having opened the X platform to conservative and liberal speech alike, X Corp. has weakened Media Matters' ability to censor its ideological enemies.

3.      Defendants have not taken the rejection of their preferred censorship regime lightly. Media Matters is well aware of the importance of advertising revenue to X Corp.—paid advertising being the overwhelming source of X Corp.'s revenue—and is likewise aware that X Corp. obtains that revenue through contracts with many prominent businesses to advertise on the X platform. In just the last year, Media Matters has published a series of articles designed to threaten X Corp.'s relationships with massive multinational advertisers and global publishers, including Amazon, eBay, Major League Baseball, New York Times Co., Samsung, Sports Illustrated, The Wall Street Journal, USA Today, Office Depot, Nokia, Dish, Bayer, Tyson Foods, Honeywell, Discovery, FanDuel, Thermo Fisher, National Women's Soccer League, the Pittsburgh Steelers, the Atlanta Falcons, Manchester City, DraftKings, FanDuel, T-Mobile, and The Athletic.[3]

4.      Last November alone, Media Matters released over twenty articles disparaging X Corp.—a blatant smear campaign. And these articles are only the latest salvo. Since the first news of Musk's interest in the company, Media Matters has falsely portrayed Twitter, now X, as a risky, unsafe platform for advertisers. Contrary to Media Matters' malicious and fabricated narrative,

---

[2] Ben Smith, *Media Matters' war against Fox*, POLITICO (Mar. 26, 2011 7:23 AM), https://www.politico.com/story/2011/03/media-matters-war-against-fox-051949.

[3] *See, e.g.*, Eric Hananoki, *X is placing ads for Amazon, NBA Mexico, NBCUniversal, and others next to content with white nationalist hashtags*, MEDIA MATTERS FOR AMERICA (Nov. 17, 2023, 12:16 PM), https://www.mediamatters.org/twitter/x-placing-ads-amazon-nba-mexico-nbcuniversal-and-others-next-content-white-nationalist.

99% of X's measured ad placement in 2023 appeared adjacent to content scoring above the Global Alliance for Responsible Media's brand safety floor.

5.      Defendants have therefore undertaken a smear campaign constituting business disparagement and tortious interference with X Corp.'s business relationships in an attempt to force X Corp. to impose left-wing censorship policies on the X platform.

6.      This campaign has consisted of the long-term and repeated attempts to destroy X Corp.'s relationships with its advertising base through false and malicious claims about the platform. Indeed, Media Matters publicly represents that "[n]o advertiser is safe while Elon Musk controls X."[4]

7.      Defendants' attempts to destroy the relationships that X Corp. has built with its advertisers have been anything but subtle. Last November, looking to portray X's social networking platform as being dominated by "white nationalist and anti-Semitic conspiracy theories," Media Matters knowingly and maliciously manufactured side-by-side images depicting advertisers' posts on X Corp.'s social media platform beside Neo-Nazi and white-nationalist fringe content and then portrayed these manufactured images as if they were what typical X users experience on the platform. Media Matters designed both these images and its resulting media strategy to drive advertisers from the platform and destroy X Corp.

8.      These images and the resulting November 2023 articles were a deception campaign: Media Matters created utterly extraordinary and manufactured circumstances that no organic user would undertake, deliberately misused the X platform to induce the algorithm to pair racist content with popular advertisers' brands, and then passed off the results as typical of an X user's

---

[4] Matt Gertz, *It's the Antisemitism, Stupid*, MEDIA MATTERS FOR AMERICA (Nov. 17, 2023, 11:00 AM), https://www.mediamatters.org/elon-musk/its-antisemitism-stupid.

experience. This manipulation was designed to create, and did create, the false impression that these pairings are anything but what they actually are: manufactured, inorganic, and extraordinarily rare. It likewise harmed X Corp.'s business relationships and advertising contracts with numerous companies, as Media Matters itself gloated: IBM, Apple, Lionsgate Entertainment, Sony, and more.[5]

9.      Media Matters executed this plot in multiple steps, as X's internal investigations have revealed. First, Media Matters accessed accounts that had been active for at least 30 days, bypassing X's ad filter for new users. Media Matters then exclusively followed a small subset of users consisting *entirely* of accounts in one of two categories: those known to produce extreme, fringe content, and accounts owned by X's big-name advertisers. The end result was a feed precision-designed by Media Matters for a single purpose: to produce side-by-side ad/content pairings that it could screenshot in an effort to alienate advertisers.

10.      But this activity *still* was not enough to create the pairings of advertisements and content that Media Matters aimed to produce.

11.      Media Matters therefore resorted to endlessly scrolling and refreshing its unrepresentative, hand-selected feed, ***generating between 13 and 15 times more advertisements per hour than viewed by the average X user***, and repeating this inauthentic activity until it finally received pages containing the result it wanted: fringe content next to X's largest advertisers' paid posts.

12.      Media Matters omitted mentioning any of this in a report published on November 16, 2023, that displayed instances Media Matters "found" on X of advertisers' paid posts featured

---

[5] Media Matters Staff, *Here Are the Companies Pulling Ads from X*, MEDIA MATTERS FOR AMERICA (Nov. 17, 2023, 4:45 PM), https://www.mediamatters.org/twitter/here-are-companies-pulling-ads-x.

next to Neo-Nazi and white-nationalist content. Nor did Media Matters otherwise provide any context regarding the forced, inauthentic nature and extraordinary rarity of these pairings.

13.     Indeed, Media Matters insisted that their manipulated and false article was authentic. As Defendant Angelo Carusone claimed in an interview on MSNBC on November 26, 2023: "You know, we didn't place the ads. We didn't, you know, photoshop in the pictures of the ads. What we did was use Twitter *the way a normal user would* and then log the advertisements that were received. And that's the issue—no matter how you slice it, the fact is their brand safety tools were not operating in the way that they claim they should have been." (emphasis added). Media Matters continues to publish this false statement on its website today.[6]

14.     Relying on the false and malicious narrative propagated by Media Matters, the advertisers targeted took these pairings to be anything *but* rare and inorganic, with all but one of the companies featured in the Media Matters piece withdrawing all ads from X, including Apple, Comcast, NBCUniversal, and IBM—some of X's largest advertisers. Indeed, in pulling all advertising from X in response to this intentionally deceptive report, IBM called the pairings an "entirely unacceptable situation."[7] Only Oracle did not withdraw its ads.

15.     The truth bears no resemblance to Media Matters' narrative. In fact, IBM's, Comcast's, and Oracle's paid posts appeared alongside the fringe content cited by Media Matters for *only one* viewer (out of more than 500 million) on all of X: *Media Matters*. Not a single authentic user of the X platform saw IBM's, Comcast's, or Oracle's ads next to that content, which

---

[6] *Angelo Carusone discusses Elon Musk and X on MSNBC*, Media Matters (Nov. 26, 2023), https://www.mediamatters.org/angelo-carusone/angelo-carusone-discusses-elon-musk-and-x-msnbc-no-matter-how-you-slice-it-fact.

[7] Hannah Murphy, *IBM pulls adverts from X after report finding they ran next to Nazi Content*, FINANCIAL TIMES (Nov. 16, 2023), https://www.ft.com/content/647b4c4d-f4d5-46cd-bc26-8c943b6995e7.l.

Media Matters achieved only through its manipulation of X's algorithms as described above. And in Apple's case, only two out of more than 500 million active users saw its ad appear alongside the fringe content cited in the article—at least one of which was Media Matters.

16.     Media Matters could have produced a fair, accurate account of users' interactions with advertisements on X via basic reporting: following *real users*, documenting the *actual, organic* production of content and advertisement pairings. Had it done so, however, it would not have produced the outcome Media Matters so desperately desired, which was to tarnish X's reputation by associating it with racist content. So instead, Media Matters chose to maliciously misrepresent the X experience with the intention of harming X and its business.

17.     Unsatisfied with the initial financial consequences of Media Matters' blatantly false reporting, Media Matters President Angelo Carusone appeared on broadcast television to personally repeat and reiterate the false and malicious coverage that Media Matters had falsely and maliciously manufactured. As Carusone put it: "Why does it seem like there's so much more Nazi content, why does it seem like that platform is getting more extreme, why does it seem like the tools they are promising us, the brand safety tools are not working the way they should. It's because when you look at it through the lens of the key decision-maker there Elon Musk, he doesn't really see a problem or at least seemingly, with a lot of this content because it's also a reflection of his own worldview."[8]

---

[8] Media Matters Staff, *On MSNBC, Angelo Carusone Explains Why Elon Musk's Own Behavior Will Keep Advertisers Away from X*, MEDIA MATTERS FOR AMERICA (Nov. 25, 2023, 8:01 PM), https://www.mediamatters.org/angelo-carusone/msnbc-angelo-carusone-explains-why-elon-musks-own-behavior-will-scare-advertisers.

**PARTIES**

18.     Plaintiff X Corp. is a corporation organized and existing under the laws of the State of Nevada, with its principal place of business in San Francisco, California. Plaintiff conducts significant business in Texas, including maintaining significant offices in Texas. X Corp. operates the social media platform, "X" (formerly "Twitter"), an internet-based service that enables users to create and share their own content, interact with other users, and curate feeds of content.

19.     Defendant Media Matters is a web-based publisher incorporated under the laws of the District of Columbia with its principal place of business at 800 Maine Avenue SW, Suite 400, Washington, D.C. 20024. The organization's purpose is "to systematically monitor" conservative media and publish reports based on this purported reporting.

20.     Defendant Angelo Carusone is the President of Media Matters and is domiciled in New York.

21.     Defendant Eric Hananoki is a writer for Defendant Media Matters and is domiciled in Maryland.

**JURISDICTION & VENUE**

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there exists complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds $75,000.00.

23.     This Court has personal jurisdiction over all Defendants. Upon information and belief, Media Matters routinely contacts numerous Texans to invite them to subscribe to Media Matters' content. In particular, the November 22, 2023, Media Matters newsletter that contains the false, malicious, and disparaging statements at the heart of this case, was, on information and belief, emailed to hundreds or thousands of Texans, including numerous individuals living in the

Northern District of Texas. Media Matters likewise seeks donations from individuals in Texas in order to fund its campaign against X Corp. These actions indicate that defendants purposefully avail themselves of Texas in seeking to advertise to and fundraise from Texan audiences specifically based on the false, malicious, and disparaging statements at issue here.

24.     Media Matters, its officers, reporters, agents, or employees, including, on information and belief, Eric Hananoki or Angelo Carusone, contacted advertisers headquartered in Texas in order to communicate the false and malicious assertions contained in their November article and in earlier Media Matters coverage of X Corp. These communications represent a purposeful availment of Texas because they were willful and knowing efforts to influence businesses headquartered or incorporated in Texas, including Oracle and AT&T, to discontinue ongoing contractual relationships entered into in Texas, by decision-makers in Texas, with X Corp.

25.     Upon information and belief, defendants' campaign to destroy X Corp. by discouraging advertisers from using the X platform caused at least several businesses located in, headquartered in, or with a substantial presence in Texas (including in the Northern District) to re-examine, reduce, or suspend their advertising relationships with X Corp. These effects were calculated and deliberate and further underscore the propriety of this Court's exercise of personal jurisdiction over all defendants.

26.     It is common journalistic practice to contact the subjects of an article. Indeed, Eric Hananoki has previously noted that he or Media Matters sought comments from one or more subjects of previous stories, implying that he and Media Matters at least follow this practice when it advances their agenda.[9] It is implausible that neither Hananoki, Carusone, nor Media Matters

---

[9] Eric Hananoki, *A QAnon Grifter Was Selling Colloidal Silver as a Supposed Coronavirus Treatment and Cure*, MEDIA MATTERS FOR AMERICA (April 8, 2020, 2:36 PM),

contacted potential or actual sources or subjects of their stories regarding their coverage of X Corp. while those sources or subjects were located in Texas. This, too, constitutes purposeful availment of Texas sufficient to establish personal jurisdiction over all defendants.

27.     Defendants' targeting of Elon Musk individually likewise supports the exercise of personal jurisdiction by this Court. Musk has been a resident of Texas throughout the relevant period of defendants' misinformation campaign; many of Musk's decisions regarding X Corp. took place while Musk was physically within Texas; many of Musk's personal and professional relationships are with other individuals also in Texas. Texas is plainly a geographic center of the effects of defendants' attempts to disparage and injure X Corp. And as the owner of Plaintiff X Corp., Defendants' smears against Musk both necessarily harm and were designed to harm X Corp. itself.

28.      This Court may likewise exercise personal jurisdiction over all defendants because defendants' malicious and wrongful conduct was designed to damage relationships with both advertisers in Texas and tens of thousands of Texas users, including thousands of users in this district alone.

29.     Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in the Northern District of Texas. Aside from Media Matters' false, malicious, and disparaging content being accessible throughout the Northern District of Texas on its website, Media Matters affirmatively transmitted that content into the Northern District of Texas through thousands of copies of its November 22, 2023, newsletter, which repeated and linked to the disparaging statements at issue in this litigation. Furthermore, on

---

https://www.mediamatters.org/coronavirus-covid-19/qanon-grifter-dustin-nemos-was-selling-colloidal-silver-supposed-coronavirus

information and belief, Defendants or their officers, employees, or agents reached out to businesses headquartered in this district or with significant property in this district—for example, AT&T Corp.—to draw those businesses' attention to defendants' false, malicious, and disparaging statements in order to destroy X Corp.'s relationships with those businesses. Likewise, thousands of X users are located within the Northern District of Texas.

## **GENERAL ALLEGATIONS**

### I.      **Media Matters Targets X Corp. Because of the Changes to Its Policies.**

30.      Under previous management, then-Twitter engaged in extensive ideological censorship designed to broadly promote left-wing views and speakers while marginalizing right-wing views and speakers. Defendants expected that Elon Musk would end that censorship and opposed Musk's acquisition of Twitter from the start. As Carusone ranted on one MSNBC segment prior to the consummation of Musk's acquisition of Twitter, when "Elon . . . says free speech, what he really means is free for all. That's all you need to know about what Twitter will look like. So the cesspool that everyone sort of recognized that Twitter kind of can be sometimes and the reactionary aspects to it, that cesspool is going to flood over . . . [and] it's actually going to have an effect on the entire information landscape."[10]

31.      Indeed, when it appeared that Musk would not purchase then-Twitter, Carusone was ecstatic. Media Matters issued a press release containing Carusone's declaration that "If Musk was to acquire Twitter . . . Twitter would become a supercharged engine of radicalization." Per Carusone, Musk was a "madman" that "significantly harmed [Twitter's] shareholder value" by

---

[10] Media Matters Staff, *On MSNBC, Angelo Carusone: Fox News Supports Elon Musk Buying Twitter Because His Vision for Twitter "Empowers Their Lies and It Enables Their Politics,"* MEDIA   MATTERS   FOR   AMERICA   (Apr.   29,   2022,   8:17   PM), https://www.mediamatters.org/msnbc/angelo-carusone-fox-news-supports-elon-musk-buying-twitter-because-his-vision-twitter.

mere association. Ultimately, Carusone projected that it was advertisers who scuttled the deal: "Advertisers took notice, largely as the result of pressure from activists and community leaders, and made it clear they would not pay for Musk's ideological fantasy."[11]

32.     A few days before Musk's acquisition of then-Twitter Inc., Media Matters unapologetically began lobbying then-Twitter's sponsors "to pull their support" from the platform "if Musk's acquisition results in a new deluge of unmoderated right-wing hatred and misinformation." And the sort of support Media Matters expected advertisers to pull was clear: Media Matters acknowledged "that ads reportedly accounted for 90% of Twitter's revenue," and concluded "it is clear that the power to hold Musk accountable if he rolls back the platform's protections against harassment, abuse, and disinformation"—Media Matters' euphemistic way of describing then-Twitter's ideologically driven censorship—"lies in the hands of Twitter's top advertisers." That article identified what Media Matters believed to be then-Twitter's top 20 advertisers, which Media Matters believed had paid Twitter "an estimated $358 million combined" across most of 2022. Media Matters' list included Home Box Office Inc., Amazon, IBM, Apple, Coca-Cola, Comcast, Meta, and Google, among others.[12]

33.     Musk acquired Twitter Inc. nonetheless. Mere hours after consummating the acquisition, Media Matters organized an open "coalition letter" to contact what it believed were the platform's 20 largest advertisers. That letter "call[ed] on [the companies] to notify Musk and

---

[11] Media Matters Staff, *Angelo Carusone: Elon Musk's Twitter deal is collapsing because of Musk's own erratic behavior, embrace of extremists, and bad business decisions*, MEDIA MATTERS FOR AMERICA (Jul. 8, 2022, 6:58 PM), https://www.mediamatters.org/twitter/angelo-carusone-elon-musks-twitter-deal-collapsing-because-musks-own-erratic-behavior.

[12] Alex Paterson & Natalie Mathes, *These Top Advertisers Can Stop Musk's Twitter From Supercharging Online Radicalization*, MEDIA MATTERS FOR AMERICA (Oct. 27, 2022, 5:43 PM), https://www.mediamatters.org/twitter/these-top-advertisers-can-stop-musks-twitter-supercharging-online-radicalization.

publicly commit that [they] will cease all advertising on Twitter globally if he follows through on his plans to undermine brand safety and community standards including gutting content moderation." This letter proved one of the earliest examples of Media Matters' dishonest and calculated equation of a reduction in censorship on the platform with a concern for "brand safety."

34.     Carusone made Media Matters' strategy plain: pressure advertisers into leaving the platform if Twitter, now X, did not capitulate to Media Matters' censorship demands. As Carusone put it contemporaneously with Musk's acquiring Twitter, "Twitter is different. They really just need blue-chip advertisers. And because they really need blue-chip advertisers, there's a very small set of them that actually have disproportionate influence. I don't think they need to run away right now, although I would be happy if they wanted to send a message. But the easiest message they can send is to call and say, here's our red lines. What are you doing about brand safety and community safeguards? And if you're planning on rolling them back, we're walking."[13]

35.     Carusone's repeated statements announcing his campaign indicated his and Media Matters' understanding of the value of X Corp.'s important advertising contracts with major companies, how interference with those contracts and the underlying business relationships giving rise to those contracts could inflict serious harm on X Corp., and that Media Matters and Carusone had every intention of harming X Corp., the platform, those contracts, and those business relationships if X Corp. did not maintain Media Matters' preferred censorship regime.

---

[13] Media Matters Staff, *On MSNBC, Angelo Carusone Explains Why Twitter and Elon Musk Need to Listen to Blue-Chip Advertisers*, MEDIA MATTERS FOR AMERICA (Oct. 30, 2022, 7:41 PM), https://www.mediamatters.org/angelo-carusone/msnbc-angelo-carusone-explains-why-twitter-and-elon-musk-need-listen-blue-chip.

36.     After Musk acquired then-Twitter Inc., now X Corp., the company terminated many of the individuals responsible for this censorship regime and ended many of the policies responsible for its ongoing implementation on the platform.

37.     Media Matters' and Carusone's statements regarding the X platform became increasingly vitriolic and malicious. For example, Carusone used a discussion regarding media personality Tucker Carlson's move to the X platform to slur Carlson and disparage X. Carusone described Carlson as "an evangelizer of white supremacy. Probably the biggest advocate. . . . So I actually think Twitter is going to become a much meaner, nastier, racist place because, for sure, as we've already seen the way the algorithm is playing out, it's not like you know Elon Musk is going to be a passive participant here. He's going to have his thumb on the scale to make sure that Tucker's reach is getting prioritized and amplified, probably to the same degree that his own does."[14]

38.     These knowingly false and actually malicious statements harmed X Corp.'s reputation and business relationships: several long-term advertisers decreased their advertising spending on the platform, while others suspended or terminated their relationships with the platform altogether.

## II.     X is a Safe Platform for Users and Advertisers, Despite Media Matters' Deceptions.

39.     Defendants' campaign did not initially yield the full scope of economic harms they sought because X Corp.'s platform is, at bottom, a safe place for users and advertisers to communicate.

---

[14] Media Matters Staff, *On MSNBC, Angelo Carusone Explains Why Tucker Carlson's Power "Will Be Greatly Diminished" If He Takes His Show to Twitter*, MEDIA MATTERS FOR AMERICA (Oct. 30, 2022, 7:41 PM), https://www.mediamatters.org/angelo-carusone/angelo-carusone-explains-why-tucker-carlsons-power-will-be-greatly-diminshed-if-he.

40.     X Corp. operates the X social media platform with over 500 million active monthly users. X facilitates free expression and open discourse by enabling its users to create and share their own content and to message and comment on other users' posts. These posts appear sequentially to users in "feeds," which occasionally include paid advertisements—the overwhelming source of X Corp.'s revenue.

41.     Users shape their own experiences on X. Users curate the content on their own feeds by choosing to "follow" other users, thereby determining which posts are presented to them. Most users are served a variety of content based on an algorithm that takes account of who that user follows and what that user engages with. But X also provides its users the option to forgo algorithmically suggested posts altogether, thereby enabling a user to view only the content that user chooses to view.

42.     X is a social media platform that remains in operation due to its loyal users and advertisers. X Corp. invests heavily in technologies that work in tandem to facilitate safe and effective interactions between users and advertisers—technologies that operate seamlessly under normal, organic conditions.

43.     As a first layer of protection for advertisers, X applies default protections to all posts. These protections are designed to prevent advertisements from being placed next to content that violates community guidelines. When users operate within X's community guidelines, these default mechanisms are effective and have a long history of successfully protecting X's advertisers from undesirable interactions with fringe content.

44.     As a second layer of protection, X provides advertisers with opt-in options. These options allow advertisers to further address any specific concerns they may have about their

advertisements being seen next to specific content. Here, advertisers can specify which key words and user handles they *do not* want their posts to appear by.

45.     These protections and others create a safe environment for advertisers that allow them to reach their target audiences while protecting their brands, as Media Matters well knows.

## III.     Media Matters Systematically Manipulated the X User Experience to Disparage X.

46.     Because its campaign of disparaging X Corp. as well as pressuring advertisers had not forced X Corp. to capitulate to Media Matters' demands, on November 16, 2023, Media Matters and Eric Hananoki published a false, disparaging, and misleading article with the headline, "*X has been placing ads* for Apple, Bravo, IBM, Oracle, and Xfinity[15] next to pro-Nazi content," claiming that X Corp. was responsible for anti-Semitic content being paired with X's advertisers' paid posts.[16] This statement was not true, and both Media Matters and Hananoki knew it. As explained below and displayed in an X internal review, this title is false in that Media Matters itself—not X—was responsible for placement of the content it identified through its willful exploitation of X's user features—a result it *specifically intended* to bring about. X in fact has many default safeguards that *prevent* the platform from displaying content in the manner achieved by Defendants.

47.     Further, in the body of the piece, Media Matters falsely claimed that it "recently *found* ads for Apple, Bravo, Oracle, Xfinity, and IBM next to posts that tout Hitler and his Nazi

---

[15] Xfinity is a Comcast service.

[16] *See* Eric Hananoki, *As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*, MEDIA MATTERS FOR AMERICA, (Nov. 16, 2023, 10:05AM), https://www.mediamatters.org/twitter/musk-endorses-antisemitic-conspiracy-theory-x-has-been-placing-ads-apple-bravo-ibm-oracle.

Party on X."[17] Based on this false claim, Media Matters falsely stated that it "certainly isn't the case" that "brands are now 'protected from the risk of being next to' potentially toxic content."[18] Media Matters intentionally and maliciously made these false statements to poison advertiser relationships: the piece expressly states that X leadership had "been trying to bring advertisers back to the platform by claiming it's safe for business."[19]

48.    In reality, Media Matters did not *find* pairings that X passively allowed on the platform. Media Matters *created* these pairings in secrecy to manufacture the harmful perception that X is at best an incompetent content moderator (a harmful accusation for any social media platform), or that X Corp. encourages Nazi and racist posts.

49.    On X, users can control the content on their feeds. When users show interest in particular topics, ads will generate that relate to those topics. Media Matters exploited these features by creating a secret X account precision-designed to evade normal safeguards, manipulating every aspect of the system through which posts and advertisements appear, ultimately creating the side-by-side images of objectionable content and advertisements.

50.    X's internal user data tells the story of just how far Media Matters went to manufacture an inorganic user experience strictly aimed at creating an interaction between controversial content and big-name advertisers that was seen only by the Media Matters account and then published broadly.

51.    First, Media Matters set out on their attempt to evade X's content filters for new users by specifically using an account that had been in existence for more than thirty days.

---

[17] *See id.* (emphasis added).

[18] *See id.*

[19] *See id.*

52.     Next, Media Matters set its account to follow only 30 users (far less than the average number of accounts followed by a typical active user, 219), severely limiting the amount and type of content featured on its feed. *All* of these users were either already known for posting controversial content or were accounts for X's advertisers. That is, *100% of the accounts* Media Matters followed were either fringe accounts or were accounts for national large brands. In all, this functioned as an attempt to flood the Media Matters account with content only from national brands and fringe figures, tricking the algorithm into thinking Media Matters *wanted* to view both hateful content and content from large advertisers.

53.     Even this did not produce Media Matters' intended result. An internal review by X revealed that Media Matters' account started to alter its scrolling and refreshing activities in an attempt to manipulate inorganic combinations of advertisements and content. Media Matters' excessive scrolling and refreshing generated between 13 and 15 times more advertisements per hour than would be seen by a typical user, attempting to forcibly generate a pairing of fringe content and paid advertisements by massive repetition unlike anything that any normal user would encounter under typical, or even extraordinary, conditions.

54.     Eventually, through intentionally evading X's multiple safeguards by curating the content on its feed and then repeatedly attempting to create pairings of advertisements for major brands with controversial content, Media Matters finally achieved its goal. Accordingly, it took screenshots of posts from IBM, Apple, Bravo, Xfinity, and Oracle that Media Matters engineered to appear adjacent to inflammatory, fringe content.

**IV.     To Disparage X, Media Matters Hid Its Manipulation from Readers and Advertisers.**

55.     Media Matters generated a specific, intended result that was not only inorganic, but exceedingly (and demonstrably) rare, all while taking specific steps to obscure these facts in its

November 29, 2023, article. These deliberate, malicious omissions generated in advertisers and users the false, misleading impression that these types of pairings were common, widespread, and alarming. Media Matters hid its manipulations through omissions, deceptive image selections, misrepresentations, and secrecy settings.

56.     Media Matters omitted in its entirety its process of manufacturing these ad pairings. It did not include in its article that it created a user that *only* followed 30 accounts that either belonged to fringe figures or major national brands. Neither readers nor advertisers had any way of knowing that the entire feed was orchestrated to generate the remarkably rare combinations. Media Matters also omitted mentioning in its entirety its excessive scrolling and refreshing, allowing users to believe (falsely) that the "report" was produced under circumstances that were organic and unmanipulated.

57.     Media Matters also omitted and made no attempt to truthfully disclose the rarity of these pairings. The representation put forth by Media Matters constituted 0.0000009090909 percent of impressions served on the day in question. Most or all of these pairings were not seen by literally anyone besides Media Matters' own manipulated account, and no authentic user of the platform has been confirmed to have seen any of these pairings.

58.     Media Matters' image choice in its smear also functioned to hide the true nature of its report. All images selected contained *only* the ad and the controversial content, with all other posts absent from view. That is, had readers been able to see the posts above and below the pairings, they would have easily gleaned the highly specific nature of the small number of accounts Media Matters chose to follow. Media Matters chose to show *every* pairing in its article using this deceptive technique—hiding its deceit through even more deceit.

59.    Tellingly, Media Matters used X's privacy features in order to hide its methodology from its readers. That is, Media Matters set this account to "private," blocking anyone from seeing which accounts Media Matters actually followed, thus disallowing anyone from understanding how its feed was manipulated. Indeed, Media Matters at no point includes images *with any information about the account that was exposed to these images*; the cropped nature of Media Matters' deceptive screenshots leaves its profile picture out of frame.

60.    Accordingly, Media Matters created the impression that these pairings were organic, accurate, and representative of the typical X user's experience, which actually and demonstrably misled users and advertisers, causing harm to X Corp.

**V.    Media Matters Caused Advertisers to Believe the Pairings Were Organic.**

61.    After the publication of Media Matters' false smear on November 16, 2023, advertisers pulled their ads from the site, which, as Media Matters admits, only happened after it reported that X was placing ads alongside white nationalist and pro-Nazi content. Included in these companies, which all referenced antisemitic content in their withdrawal from X, are:

**Comcast.** After Media Matters' November article featured a contrived, misleading, and inflammatory image showing an ad for Xfinity next to a pro-Nazi post, its parent company Comcast decided to pull all ads for Comcast entities from X.

**NBCUniversal.** As the parent company of Bravo and a subsidiary of Comcast, NBCUniversal pulled all advertising from X after publication of the article.

**Apple.** The day after publication of the article, which also featured an Apple ad contrived to be placed next to fringe content, Apple—one of X's largest clients—pulled all of its ads from the platform.

19

**IBM.** As previously discussed, IBM pulled all ads immediately after the publication of the article.

62.     Media Matters' manipulation was so severe that companies not even featured in the article also pulled ads from X. These companies include Lionsgate, Warner Bros. Discovery, Paramount, and Sony.

63.     The result of this November 2023 article—the culmination of over a year's worth of disparagement of X Corp. and a long campaign pressuring advertisers to cut ties with the X platform if Media Matters' demands were not met—was severe. As described above, numerous advertisers reduced their advertising spending under ongoing contracts with X Corp. Others suspended or ended their relationships with X Corp. altogether.

64.     X Corp. has lost millions of dollars through this forgone advertising and undoubtedly millions more in lost brand equity with its advertisers and user base. These economic harms were directly caused by the November 2023 article, the campaign of disparagement waged against X Corp., or both.

## FIRST CAUSE OF ACTION

### Tortious Interference with Contract

65.     Plaintiffs re-allege and incorporate by reference the above allegations.

66.     At all relevant times, Defendants were aware that X Corp. contracted with various third parties, including, but not limited to Apple, NBCUniversal, Comcast, Bravo, and IBM, to sell ads on the X platform, as clearly demonstrated by the many articles written by Defendants on the topic. Defendants are aware that such businesses are "brand-conscious blue chip companies" who pay to advertise on the X platform.[20]

---

[20] Gertz, *It's the Antisemitism, Stupid*, *supra*.

67.     Defendants intentionally interfered with contracts between X Corp. and its advertisers, including but not limited to Apple, NBCUniversal, Comcast, Bravo, and IBM—all clients with existing advertisement agreements that were casualties of defendants' misrepresentations and ceased advertising on the X platform as a direct result.

68.     Defendants also intentionally interfered with contracts between X Corp. and such advertisers by making performance of X's advertisement agreements more burdensome or of less or no value to the businesses entitled to performance under advertising contracts with X Corp.

69.     Defendants' own statements and "reporting" demonstrate that they willfully, intentionally, and knowingly interfered with contracts between X Corp. and such advertisers, including but not limited to persuading advertisers to end their relationships with X due to manufactured concerns about advertising safety and antisemitism on the X platform. Upon information and belief, defendants desired to interfere with such contracts or believed that interference was substantially certain to result from their actions.

70.     Defendants' campaign to falsely depict the X platform as unsafe for advertisers proximately caused harm to X's revenue from its contracts with such paying advertisers. Defendants' false statements about safety on the X platform and antisemitism were substantial factors in bringing about this harm because they undermined advertisers' faith in X Corp.'s abilities to monitor and curate content.

71.     By and through their actions, Defendants have interfered and continue to interfere with existing contractual relationships involving X Corp.

72.     X Corp. had existing contractual relationships at all relevant times with corporate advertisers for the sale of advertisements on the X platform. Defendants were aware of those obligations and willfully and intentionally interfered with those contracts by falsely portraying the

X platform as unsafe for advertisers and falsely associating X Corp. and the X platform with antisemitism. Defendants' acts of interference include, but are not limited to, knowingly persuading advertisers to end or suspend advertising on the X platform, knowingly inducing one or more of the contracting parties to breach its obligations, or knowingly making X Corp.'s performance of its advertisement sales more burdensome or of less or no value to the advertisers entitled to performance. Defendants' actions are the proximate cause of X Corp.'s injury. And at a minimum, X Corp. has been and continues to be injured by being stripped of advertising revenue and brand equity and by incurring the significant legal burden of combatting Defendants' wrongful actions toward X Corp.'s contractual obligations. *See, e.g.*, *United Biologics, L.L.C. v. Allergy & Asthma Network/Mothers of Asthmatics, Inc.*, 819 F. App'x 204, 210 (5th Cir. 2020); *Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 689 (Tex. 2017); *Travelhost, Inc. v. Brady*, No. 3:11-CV-454-M-BK, 2013 WL 4475057, at \*5 (N.D. Tex. Aug. 21, 2013).

## <u>SECOND CAUSE OF ACTION</u>

### Business Disparagement

73.     X Corp. re-alleges and incorporates by reference the above allegations.

74.     Business disparagement is actionable under Texas law if "'(1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, (4) resulting in special damages to the plaintiff.'" *Vendever LLC v. Intermatic Mfg. Ltd.*, No. 3:11-CV-201-B, 2011 WL 4346324, at \*4 (N.D. Tex. Sept. 16, 2011) (quoting *Forbes v. Granada Biosciences, Inc.,* 124 S.W.3d 167, 170 (Tex. 2003)).

75.     Defendants made false and disparaging statements regarding the quality of X Corp.'s product, X, including, but not limited to, that a typical user using the platform in an ordinary manner would receive major advertiser content paired next to fringe content; that X

Corp.'s brand-safety protocols were malfunctioning or otherwise defective; and that X Corp.'s policies were implemented to advance an anti-Semitic or racist agenda.

76.     Defendants made these statements as statements of fact, not opinion. Among other statements described above, defendants represented that X "has been placing" advertisements next to anti-Semitic and racist materials. It represented that it "found" these materials next to advertisements. Based on these false representations, defendants also falsely stated that it "certainly isn't the case" that "brands are now 'protected from the risk of being next to' potentially toxic content."

77.     Defendants intentionally made these statements with actual malice. Defendants made them either knowing that they were false or without regard to their falsity because they were made as part of an ongoing campaign to inflict economic harm on X Corp. in retaliation for X Corp. not hewing to their preferred policies regarding the X platform. Defendants either subjectively intended to make false statements regarding the "risk" to advertisers or were recklessly indifferent to the truth.

78.     Defendants made these false, disparaging, and malicious statements without any legally recognized privilege entitling them to do so. They are responsible for their "'falsehoods concerning the condition or quality of" X Corp.'s "products or services that [were] intended to, and d[id] in fact, cause financial harm.'" *Smith v. Textile Rental Servs. Ass'n*, No. 3:20-CV-3178-B, 2021 WL 3565578, at *7 (N.D. Tex. Aug. 12, 2021) (quoting *Innovative Block of S. Tex., Ltd. v. Valley Builders Supply, Inc.*, 603 S.W.3d 409, 417 (Tex. 2020)).

79.     X Corp. suffered financial harm as a result of these statements. X Corp's special damages—their "'direct, pecuniary loss attributable to the false communications of the defendants,'" *Johnson v. Hosp. Corp. of Am.*, 95 F.3d 383, 391 (5th Cir. 1996) (citing *Hurlbut v.*

*Gulf Atlantic Life Ins.*, 749 S.W.2d 762, 767 (Tex. 1987))—included lost revenue from businesses suspending, reducing, or re-examining their advertising with X Corp. as well as lost brand equity. Defendants' false and disparaging statements about advertising-safety measures on the X platform further inflicted financial harms on X Corp. by undermining advertisers' faith in X Corp.'s abilities to monitor and curate content. Defendants are liable for these losses.

### THIRD CAUSE OF ACTION

### Interference with Prospective Economic Advantage

80.     X Corp. re-alleges and incorporates by reference the above allegations.

81.     X Corp. was engaged in economic relationships that would have resulted in an economic benefit to X Corp. X Corp. had relationships with advertisers that pulled their spending in the light of defendants' article and had every reason to suspect that these relationships would continue.

82.     At all relevant times, defendants knew of these relationships, as they were described in their "reporting."

83.     Defendants engaged in wrongful conduct that disrupted X Corp.'s economic relationships. Through extensive deception and misrepresentation, defendants caused advertisers to lose faith in X Corp.'s abilities to monitor and curate content, thereby leading them to break off these lucrative relationships and any future continued relationships.

84.     Defendants' false, malicious, and disparaging statements were independently tortious.

85.     Defendants acted with the intent to disrupt these relationships. Media Matters' actions continued its expressly declared "guerilla war" on media it dislikes and its systematic, harassing attacks on X Corp.

86.     X Corp. was harmed as a result of defendants' actions: it lost advertisers as a result of defendants' interference.

87.     Defendants' actions were undoubtedly a substantial factor in causing this harm, with defendants' website even noting that X Corp.'s relationships fell apart *after* Media Matters released its maliciously false piece.

88.     As stated above, Defendants' conduct is independently tortious or unlawful. Defendants' conduct described herein is the proximate cause of the ongoing injury to X Corp. because, at a minimum, Defendants knowingly and intentionally took actions to discourage any advertiser from associating with X Corp., which were purposefully designed to interfere with X Corp.'s business opportunities. And X Corp. has been and continues to be injured by, at a minimum, incurring significant burden and expense to combat Defendants' actions in order to maintain its economic and bargaining position with respect to its prospective business relations related to advertisement sales on the X platform and by incurring the significant legal burden of combatting Defendants' wrongful actions. *See, e.g.*, *Moser v. Omnitrition Int'l, Inc.*, No. 3:16-CV-2558-L, 2017 WL 1957084, at *5 (N.D. Tex. Feb. 28, 2017), *report and recommendation adopted sub nom. Moser v. Omnitron Int'l Inc.*, No. 3:16-CV-2558-L, 2017 WL 1957026 (N.D. Tex. May 10, 2017); *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment in its favor and the following relief:

1.      Actual and consequential damages caused by defendants' misconduct, including but not limited to all general and special damages;

2.      Punitive damages in an amount to be proven at trial;

3.      A preliminary and permanent injunction ordering defendants to immediately delete, take down, or otherwise remove the article entitled "As Musk Endorses Antisemitic Conspiracy Theory, X Has Been Placing Ads for Apple, Bravo, IBM, Oracle, and Xfinity Next to Pro-Nazi Content From Its Web," and any other false, malicious, and disparaging articles as may be demonstrated to the Court, from all websites and social media accounts owned, controlled, or operated, directly or indirectly, by defendants;

4.      Plaintiffs' costs and attorneys' fees to litigate this action; and

5.      For such other and further relief as the Court may deem just and proper.

February 27, 2024                                Respectfully submitted.

*/s/ Judd E. Stone II*
Judd E. Stone II
Texas Bar No. 24076720
Christopher D. Hilton
Texas Bar No. 24087727
Ari Cuenin
Texas Bar No. 24078385
**STONE | HILTON PLLC**
1115 W. Slaughter Lane
Austin, TX 78748
Telephone: (737) 465-7248
judd@stonehilton.com
chris@stonehilton.com
ari@stonehilton.com

John C. Sullivan
Texas Bar No. 24083920
**S|L LAW PLLC**
610 Uptown Boulevard, Suite 2000
Cedar Hill, TX 75104
Telephone: (469) 523-1351
Facsimile: (469) 613-0891
john.sullivan@the-sl-lawfirm.com