**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| X CORP.,<br>    Plaintiff,<br><br>  v.<br><br>MEDIA MATTERS FOR AMERICA,<br>et al.,<br>    Defendants. | Civil Action No. 4:23-cv-01175-O |

**DEFENDANTS' BRIEF IN SUPPORT OF
MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

ARGUMENT ...................................................................................................................... 4

    **I.   This Court lacks personal jurisdiction over Defendants.** ................................ 4

        A.  Jurisdiction is unavailable because Media Matters operates a passive website ........... 5

        B.  Jurisdiction is unavailable because Defendants did not direct their statements to Texas. .......................................................................................................... 6

        C.  Exercise of personal jurisdiction here would not be fair and reasonable. ................... 10

    **II.  This Court is an inappropriate venue for this dispute.** ................................ 11

    **III. The amended complaint fails to state a claim.** ............................................. 13

        A.  X has not stated a claim for interference with contract. ............................................. 14

        B.  X has not stated a claim for business disparagement .................................................. 19

        C.  X has not stated a claim for interference with prospective economic advantage. ...... 24

**CONCLUSION** ................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACS Invs., Inc. v. McLaughlin*,
  943 S.W.2d 426 (Tex. 1997) ................................................................17

*Adidas Am. Inc. v. Shoebacca Ltd.*,
  No. 3:20-CV-03248-N, 2021 WL 4399745 (N.D. Tex. Sept. 27, 2021) ................................16

*Admar Int'l, Inc. v. Eastrock, L.L.C.*,
  18 F.4th 783 (5th Cir. 2021) ................................................................5, 6, 7

*Ambraco, Inc. v. Bossclip B.V.*,
  570 F.3d 233 (5th Cir. 2009) ................................................................2

*Amey v. Barrera*,
  No. 13-01-00130-CV, 2004 WL 63588 (Tex. App.—Corpus Christi
  Jan. 15, 2004, no pet.) ................................................................15

*Antero Res. Corp. v. C & R Downhole Drilling, Inc.*,
  No. 4:16-CV-668-Y, 2021 WL 9969511 (N.D. Tex. June 8, 2021) ................................15

*Arias-Benn v. State Farm Fire & Cas. Ins. Co.*,
  495 F.3d 228 (5th Cir. 2007) ................................................................2

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................13, 14

*Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*,
  571 U.S. 49 (2013) ................................................................11

*Baty v. ProTech Ins. Agency*,
  63 S.W.3d 841 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) ................................25

*BDO Seidman LLP v. Alliantgroup, L.P.*,
  No. H-08-905, 2009 WL 1322555 (S.D. Tex. May 11, 2009) ................................22

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................13, 24

*Blacks in Tech. Int'l v. Greenlee*,
  No. 3:20-CV-3008-X, 2023 WL 4186376 (N.D. Tex. June 26, 2023) ................................16

*Broughton v. Livingston Indep. Sch. Dist.*,
  2010 WL 3056862 (E.D. Tex. July 29, 2010) ................................................................19, 20, 21

ii

*C.E. Servs., Inc. v. Control Data Corp.*,
   759 F.2d 1241 (5th Cir. 1985) ..........................................................................17

*Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*,
   No. 4:23-CV-0206-P, 2023 WL 2975164 (N.D. Tex. Apr. 17, 2023) ....................11

*Danziger & De Llano, L.L.P. v. Morgan Verkamp, L.L.C.*,
   24 F.4th 491 (5th Cir. 2022) .................................................................................4

*El Paso Healthcare Sys., Ltd. v. Murphy*,
   518 S.W.3d 412 (Tex. 2017).........................................................................16, 17

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
   238 F. Supp. 3d 799 (S.D. Tex. 2017), *aff'd sub nom. Lampkin v. UBS Fin.*
   *Servs., Inc.*, 925 F.3d 727 (5th Cir. 2019).............................................................25

*Fidrych v. Marriott Int'l, Inc.*,
   952 F.3d 124 (4th Cir. 2020) .................................................................................8

*Fillyaw v. Cmty. Nat'l Bank & Tr.*,
   No. 3:22-CV-1112-N (BH), 2023 WL 6797540, *report & recommendation*
   *adopted*, 2023 WL 6797496 (N.D. Tex. Oct. 13, 2023) ........................................14

*Forbes Inc. v. Granada Biosciences, Inc.*,
   124 S.W.3d 167 (Tex. 2003)....................................................................20, 21, 22

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
   141 S. Ct. 1017 (2021)..................................................................................4, 5, 9

*Funes v. Villatoro*,
   352 S.W.3d 200 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) ................17

*Funk v. Stryker Corp.*,
   631 F.3d 777 (5th Cir. 2011) ...............................................................................19

*Georgiou v. Battery Junction Corp.*,
   646 F. Supp. 3d 781 (N.D. Tex. 2022) ...................................................................5

*GoLabs, Inc. v. Hangzhou Chic Intelligent Tech. Co.*,
   No. 3:19-CV-1019-N, 2020 WL 1325209 (N.D. Tex. Mar. 20, 2020)...................16

*Harmon v. City of Arlington*,
   16 F.4th 1159 (5th Cir. 2021) (en banc) .........................................................16, 18

*Hart v. Manriquez Holdings, LLC*,
   661 S.W.3d 432 (Tex. App.—Houston [14th] 2023, no pet.)................................17

iii

*Hellmuth v. Efficiency Energy, L.L.C.*,
No. CV H-14-2945, 2016 WL 642352 (S.D. Tex. Feb. 18, 2016) .........................................21

*Hurlbut v. Gulf Atl. Life Ins. Co.*,
749 S.W.2d 762 (Tex. 1987)........................................................................................19, 22

*Immobiliere Jeuness Establissement v. Amegy Bank Nat'l Ass'n*,
525 S.W.3d 875 (Tex. App.—Houston [14th Dist.] 2017, no pet.).........................................18

*John Paul Mitchell Sys. v. Randalls Food Markets, Inc.*,
17 S.W.3d 721 (Tex. App.—Austin 2000, pet. denied)........................................................16

*Johnson v. TheHuffingtonPost.com, Inc.*,
21 F.4th 314 (5th Cir. 2021) ..................................................................................... *passim*

*Landry's, Inc. v. Animal Legal Def. Fund*,
631 S.W.3d 40 (Tex. 2021)........................................................................................23, 24

*Lazer Spot, Inc. v. Hiring Partners, Inc.*,
387 S.W.3d 40 (Tex. App.—Texarkana 2012, pet. denied) .................................................18

*McDonald Oilfield Operations, LLC v. 3B Inspection, LLC*,
582 S.W.3d 732 (Tex. App.—Houston [1st Dist.] 2019, no pet.) .........................................14

*Mikhail v. Maritz*,
189 F.3d 468 (5th Cir. 1999) ...................................................................................................17

*Monkton Ins. Servs., Ltd. v. Ritter*,
768 F.3d 429 (5th Cir. 2014) ...........................................................................................4, 5

*Moser v. Omnitrition Int'l Inc.*,
2018 WL 1368789 (N.D. Tex. Mar. 16, 2018) .....................................................................22

*Nat'l Indus. Sand Ass'n v. Gibson*,
897 S.W.2d 769 (Tex. 1995)...................................................................................................8

*New York Life Ins. Co. v. Miller*,
114 S.W.3d 114 (Tex. App.—Austin 2003, no pet.) ............................................................17

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964)...........................................................................................................20, 21

*Nix v. Major League Baseball*,
62 F.4th 920, 934 (5th Cir. 2023), *cert. denied*, 144 S. Ct. 165 (2023).......................14, 16, 18

*Phoneternet, L.L.C. v. LexisNexis Risk Sols., Inc.*,
816 F. App'x 909 (5th Cir. 2020) .........................................................................................25

*Protective Life Ins. Co. v. Jones,*
    No. 4:19-CV-179-Y, 2019 WL 7943638 (N.D. Tex. Aug. 19, 2019) ...................................17

*Renoir v. Hantman's Assocs., Inc.,*
    No. CIV.A. H-05-4152, 2006 WL 1007481 (S.D. Tex. Apr. 18, 2006),
    *aff'd* 230 F. App'x 357 (5th Cir. 2007)...................................................................................8

*Revell v. Lidov,*
    317 F.3d 467 (5th Cir. 2002) ...................................................................................4, 7, 8, 10

*Rimkus Consulting Grp., Inc. v. Cammarata,*
    688 F. Supp. 2d 598 (S.D. Tex. 2010) .......................................................................15, 20, 22

*Seiferth v. Helicopteros Atuneros, Inc.,*
    472 F.3d 266 (5th Cir. 2006) ......................................................................................................10

*Small Bus. Assistance Corp. v. Clear Channel Broad., Inc.,*
    210 F.3d 278 (5th Cir. 2000) ......................................................................................................24

*Sonnier v. State Farm Mut. Auto Ins. Co.,*
    509 F.3d 673 (5th Cir. 2007) ......................................................................................................14

*Space Exploration Tech. Corp. v. NLRB,*
    No. 1:24-cv-00001, 2024 WL 974568 (S.D. Tex. Feb. 15, 2024)...........................................12

*Stuart v. Spademan,*
    772 F.2d 1185 (5th Cir. 1985) ......................................................................................................2

*Tabletop Media, LLC v. Citizen Sys. Am. Corp.,*
    No. 3:16-CV-1304-C, 2016 WL 11522083 (N.D. Tex. Sept. 21, 2016) ................................13

*Teel v. Deloitte & Touche LLP,*
    No. 3:15-CV-2593-G, 2015 WL 9478187 (N.D. Tex. Dec. 29, 2015).....................................19

*United Biologics, L.L.C. v. Allergy & Asthma Network/Mothers of Asthmatics, Inc.,*
    819 F. App'x 204 (5th Cir. 2020) ............................................................................................17

*USPlabs Jack3d, LLC v. MMRNV, LLC,*
    No. 3:12-CV-1605-O, 2012 WL 12893435 (N.D. Tex. Oct. 31, 2012) ........................8, 9, 10

*Wal-Mart Stores, Inc. v. Sturges,*
    52 S.W.3d 711 (Tex. 2001).........................................................................................................25

*Walden v. Fiore,*
    571 U.S. 277 (2014).......................................................................................................................9

*WickFire, L.L.C. v. Laura Woodruff; TriMax Media, L.L.C.,*
    989 F.3d 343, 354 (5th Cir. 2021) ...........................................................................................16

**Statutes & Court Rules**

28 U.S.C § 1391(a) ................................................................................................11

28 U.S.C § 1391(b) .......................................................................................11, 12, 13

Fed. R. Civ. P. 8 .................................................................................................13, 19

Fed. R. Civ. P. 12(b) ...............................................................................................2

**Other Authorities**

Eric Hananoki, *As Musk endorses antisemitic conspiracy theory, X has been
    placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi
    content*, Media Matters for America (Nov. 16, 2023) ...........................................24

Hannah Murphy, *IBM pulls adverts for X after reporting finding they ran next to
    Nazi Content*, Financial Times (Nov. 16, 2023) ...............................................19, 23

Restatement (Third) of Torts: Liab. for Econ. Harm § 17 (2020) .........................15, 17

*Terms of Service*, X.com (Sept. 29, 2023), https://twitter.com/en/tos
    [https://perma.cc/Q69W-8E6C] ..................................................................3

## INTRODUCTION

This Court lacks personal jurisdiction over Defendants Media Matters for America ("Media Matters"), a Washington, D.C.-based media organization; Angelo Carusone, its D.C.-based president; and Eric Hananoki, its Maryland-based investigative reporter. Plaintiff X Corp. ("X") sues over statements made by Mr. Hananoki in an article published on the Media Matters website. But it is blackletter law that a statement made on a passive website—one that just posts information that people can see—cannot support specific jurisdiction in Texas simply because readers in Texas could access the statement as easily as readers in other states.  And X's newly minted allegations (in response to Defendants' Rule 12 motion) that Defendants specifically targeted Texans for newsletter readership, X-related donations, or comments on the disputed article are flat-out false. X has no good-faith basis for alleging these Texas contacts, and every allegation or reasonable inference therefrom is contradicted by sworn declarations.

Venue is also improper in this Court. None of the Defendants is a Texas resident; no substantial part of the events giving rise to X's claim occurred in this district; and no Defendant is subject to personal jurisdiction in Texas. Because neither the parties nor the cause of action has any connection to Texas, dismissal is required.

In addition to these threshold defects, X's amended complaint fails to state a claim. X alleges that Defendants committed interference with contract—but never alleges that Defendants induced a breach of any contract, as that tort requires. X alleges that Defendants committed business disparagement—but fails to plausibly allege false statements made with the requisite degree of fault, and fails to explain how it was Defendants' statements (as opposed to the many other controversies of public record affecting X's and Elon Musk's reputations) that caused any special damages. Finally, X alleges that Defendants committed interference with prospective economic advantage—but that claim is not available under Texas law, and even if X meant to

1

allege that Defendants committed interference with prospective business relations (a related tort),

X has not plausibly alleged any *independently* tortious act, as that tort requires.

In short, X's complaint fails in just about every way that a complaint can fail—no

jurisdiction; no venue; no claims. *See* Fed. R. Civ. P. 12(b)(2)–(3), (6). The Court should dismiss.

## BACKGROUND[1]

Media Matters is a web-based, nonprofit research and information center dedicated to

monitoring, analyzing, and correcting misinformation in U.S. media. Decl. of Cynthia Padera

("Padera Decl."), App. 5, ¶ 5; *see also id.*, App. 7–8, ¶ 18. Media Matters is incorporated, and has

its principal place of business, in Washington, D.C., where it maintains its sole office and is

registered to conduct business. *Id.*, App. 6, ¶¶ 7–9. Media Matters is not registered in Texas, does

not have any physical presence in Texas, and does not employ any staff who live or work in Texas.

*Id.*, App. 6–7, ¶¶ 10–17.

Mr. Hananoki is Media Matters's Senior Investigative Reporter. Decl. of Eric Hananoki

("Hananoki Decl."), App. 11, ¶ 2. His work focuses on extremism—including white nationalism,

antisemitism, and Islamophobia—in the public square. *Id.*, App. 11, ¶ 4. He has written numerous

articles about X and its owner Elon Musk. *Id.*, App. 11–12, ¶ 5. On November 16, 2023, Media

Matters published on its website an article (the "November 16 article") by Mr. Hananoki that

documented Mr. Musk's apparent endorsement of an antisemitic conspiracy theory, as well as

---

[1] For purposes of this motion, the background facts relevant to X's claims are drawn from X's amended complaint, and the facts relevant to jurisdiction and venue are drawn from the declarations that accompany this motion. *See Arias-Benn v. State Farm Fire & Cas. Ins. Co.*, 495 F.3d 228, 230 (5th Cir. 2007) (accepting as true well-pleaded facts in complaint to determine whether plaintiff stated a claim sufficient to avoid dismissal); *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985) (recognizing courts may determine jurisdictional issue by receiving declarations and similar evidence); *Ambraco, Inc. v. Bossclip B.V.*, 570 F.3d 233, 238 (5th Cir. 2009) (recognizing courts may determine venue by receiving declarations and similar evidence).

instances of third-party advertisements appearing next to extremist messages on X. *Id.*, App. 12, ¶ 6; Am. Compl. ¶ 46, ECF No. 37. Media Matters published a similar article the next day (the "November 17 article"), where Mr. Hananoki reported on additional instances of advertisements appearing next to hateful content on X. Hananoki Decl., App. 12, ¶ 6; Am. Compl. ¶ 3 n.3. Links to these articles were included in Media Matters's November 22, 2023 newsletter, which is distributed periodically to anyone in the world who supplies an email address through Media Matters's website. Padera Decl. App. 7–9, ¶¶ 18, 21–22; Am. Compl. ¶ 29. The articles—which were researched and written in Maryland, Hananoki Decl., App. 12, ¶ 9—never mention Texas. *Id.*, App. 11, ¶ 11. In preparing the articles, Mr. Hananoki neither spoke with any Texas residents or businesses, nor traveled to Texas. *Id.*, App. 12–13, ¶¶ 8–10, 12–13. Media Matters's website does not permit visitors to comment on these (or any other) articles. Padera Decl., App. 8, ¶ 19.

Mr. Carusone is Media Matters's CEO and President. Decl. of Angelo Carusone ("Carusone Decl."), App. 15, ¶ 3. Mr. Carusone was not involved in ideating, researching, drafting, editing, or contacting sources for the November 16 or November 17 articles. *Id.* App. 16, ¶ 5. He did not contact any X advertisers in relation to the articles. *Id.* App. 16, ¶ 6. And he did not seek donations from individuals or organizations in Texas in connection with the articles or, for that matter, to fund *any* of Media Matters's investigative journalism related to X Corp. *Id.* App 15, ¶ 4.

X is organized under Nevada law and maintains its principal place of business in San Francisco, California, where its own terms of service require users of its platform to litigate any disputes. Am. Compl. ¶ 18; *Terms of Service*, X.com (Sept. 29, 2023).[2] X alleges that it has offices in Texas, but it does not allege that its Texas offices are in this District. Am. Compl. ¶ 18. X admits that its content moderation efforts *do not*, in fact, fully prevent advertisements running on the

---

[2] Available at https://twitter.com/en/tos [https://perma.cc/Q69W-8E6C].

platform from appearing next to incendiary user posts. *Id.* ¶¶ 4, 8, 15, 55–57 (noting these pairings do sometimes happen). X originally sued Media Matters and Mr. Hananoki in this District on November 20, 2023. Compl., ECF No. 1. After Defendants moved to dismiss the complaint with declarations explaining that the events at issue did not arise out of any Texas contacts, X amended its complaint on February 26, 2024 to add Mr. Carusone as a Defendant and to allege upon "information and belief" scattershot Texas ties that are either contradicted by the earlier filed declarations or inapposite to the jurisdictional inquiry required here. Am. Compl. ¶¶ 23–26.

## ARGUMENT

### I.      This Court lacks personal jurisdiction over Defendants.

The amended complaint must be dismissed because X has failed to satisfy its "burden to make a prima facie showing that personal jurisdiction is proper." *Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 431 (5th Cir. 2014). Personal jurisdiction extends only as far as constitutional due process allows. *See Danziger & De Llano, L.L.P. v. Morgan Verkamp, L.L.C.*, 24 F.4th 491, 495 (5th Cir. 2022) (recognizing Texas long-arm statute extends to limits of federal due process). The Fourteenth Amendment's Due Process Clause permits this Court to exercise personal jurisdiction over nonresident defendants, like Media Matters, Mr. Carusone, and Mr. Hananoki, only where "(1) that defendant has purposefully availed himself of the benefits and protections of the forum state by establishing minimum contacts with the forum state; and (2) the exercise of jurisdiction over that defendant does not offend traditional notions of fair play and substantial justice." *Revell v. Lidov*, 317 F.3d 467, 469–70 (5th Cir. 2002) (cleaned up).

In the context of general jurisdiction, due process is satisfied where a defendant is "essentially at home" in the forum state. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct.

1017, 1024 (2021) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S 915, 919 (2011)). That is plainly not the case here, and X does not allege otherwise.[3]

Specific jurisdiction is also lacking in this case. Specific jurisdiction must satisfy three conditions: "*First*, the defendant must purposefully avail itself of the privilege of conducting activities in the forum State." *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 317 (5th Cir. 2021) (cleaned up). "*Second*, the plaintiff's claim must arise out of or relate to those purposeful contacts." *Id.* at 317–18 (cleaned up). *Third*, exercise of the court's jurisdiction "must be 'fair and reasonable' to the defendant." *Id.* at 318.[4]  X does not plausibly allege any of these elements.

### A.    Jurisdiction is unavailable because Media Matters operates a passive website.

It is fundamental that a defendant is not subject to jurisdiction in a forum simply because it operates a website that can be accessed from that forum. "The analysis applicable to a case involving jurisdiction based on the Internet should not be different at its most basic level from any other personal jurisdiction case." *Georgiou v. Battery Junction Corp.*, 646 F. Supp. 3d 781, 789 (N.D. Tex. 2022). In other words, a defendant whose conduct takes place online must still purposefully avail itself of the forum to justify the exercise of personal jurisdiction. *See Admar Int'l, Inc. v. Eastrock, L.L.C.*, 18 F.4th 783, 786 (5th Cir. 2021). For "cases in which a defendant's

---

[3] The paradigmatic examples of contacts sufficient to confer general jurisdiction are where an individual is domiciled and where a corporation has its place of incorporation or principal place of business. *Ford*, 141 S. Ct. at 1024. As the amended complaint acknowledges, Media Matters is "incorporated under the laws of," and has its principal place of business in, the District of Columbia. Am. Compl. ¶ 19. Mr. Hananoki is domiciled in Maryland. Am. Compl. ¶ 21. Mr. Carusone is domiciled in the District of Columbia. Carusone Decl., App. 15, ¶ 2. Defendants do not have continuous and systematic contacts with Texas, and X does not allege any.

[4] If X were able to "successfully establish the first two prongs, then the burden shifts to [Defendants] to show that exercising jurisdiction would be unfair or unreasonable." *Monkton Ins. Servs., Ltd.*, 768 F.3d at 433. X has failed to establish either prong here, but Defendants demonstrate for good measure that the exercise of jurisdiction would also be unfair and unreasonable. *See infra* Section I.C.

website is the claimed basis for specific jurisdiction vis-à-vis an intentional tort," this Court "first look[s] to the website's interactivity" in determining the existence of minimum contacts with the forum. *TheHuffingtonPost.com*, 21 F.4th at 318. "If the site is passive—it just posts information that people can see—jurisdiction is unavailable, full stop." *Id.* "Between those extremes, purposeful availment turns on the level of interactivity and commercial nature of the exchange of information that occurs on the Web site." *Admar*, 18 F.4th at 786 (cleaned up).

Media Matters's website is not interactive and, critically, X does not allege otherwise. The website strictly limits what visitors can do. Other than reading articles, which is the website's primary offering, visitors may apply for jobs, donate, subscribe to email updates and newsletters, sign up for campaigns or petitions, and view Media Matters's contact information. Padera Decl., App. 7–8, ¶ 18. Media Matters specifically disabled visitor comment sections in 2023—well before the events of this case. *Id.*, App. 8, ¶ 19. Thus, the articles at issue provide no avenue for viewer interaction. *Id.* X has cited no facts or caselaw in support of a finding of interactivity here, and Defendants are not aware of any. This alone defeats jurisdiction, "full stop." *TheHuffingtonPost.com*, 21 F.4th at 318.

### B.   Jurisdiction is unavailable because Defendants did not direct their statements to Texas.

Even if X had alleged interactivity, a website's "interactivity isn't enough," on its own, to subject its creator to personal jurisdiction in a foreign forum. *Id.* at 320. Once interactivity is established, the plaintiff "also must show that [Defendants'] story targeted Texas in some way." *Id.* "The key question . . . is whether the forum state was 'the focal point both of the [alleged tort] and of the harm suffered.'" *Id.* at 318 (quoting *Calder v. Jones*, 465 U.S. 783, 789 (1984)) (alteration in original). That is obviously not the case here.

The Fifth Circuit applies this test strictly. In *TheHuffingtonPost.com*, the plaintiff, a Texas citizen, sued an online publisher for libel after the publisher reported that the plaintiff was a "noted Holocaust denier and white nationalist." 21 F.4th at 316. The Fifth Circuit affirmed the dismissal for lack of personal jurisdiction, notwithstanding allegations that the publisher's website was visible in Texas; that the website marketed ad-free browsing and merchandise to all visitors, including Texans; that advertisers from Texas contracted with the publisher; and that the publisher collected information about its viewers, including their location. *Id.* at 317. Jurisdiction was unavailing, the court explained, because the disputed story "has no ties to Texas," "does not mention Texas," recounts events "that took place outside Texas," and "used no Texan sources." *Id.* at 319. Because the publisher "did not aim the alleged libel at Texas or reach into Texas to share it there," the court could not hear the claim. *Id.* at 323.

The Fifth Circuit reached a similar conclusion in *Revell*, where the Texan plaintiff complained of a Columbia University web publication that accused him specifically of complicity in a terrorist attack. 317 F.3d at 469. Again, the Fifth Circuit affirmed the dismissal for lack of personal jurisdiction because "the article never mentioned Texas, never discussed [plaintiff's] activities there, and was not aimed at Texans any more than at residents of other states." *TheHuffingtonPost.com*, 21 F.4th at 318 (summarizing *Revell*). In fact, the court explained, the article "was presumably directed at the entire world, or perhaps just concerned U.S. citizens. But certainly it was not directed specifically at Texas, which ha[d] no especial relationship to" the terrorist attack. *Revell*, 317 F.3d at 475; *see also Admar*, 18 F.4th at 787 (dismissing for lack of personal jurisdiction even where—unlike here—the defendant's website was interactive, because "a defendant does not have sufficient minimum contacts with a forum state just because its website is accessible there").

The same is true here. Even if Media Matters's website were interactive (and it is not), none of the facts that give rise to X's claims has anything to do with Texas. Mr. Hananoki conducted all activities related to the preparation, writing, and publication of the articles in his home in Maryland. Hananoki Decl., App. 11–12, ¶¶ 3, 9. Neither he nor any other Media Matters employees involved in the articles conducted any related activities in Texas. *Id.*, App. 12, ¶ 8; *see also* Padera Decl., App. 6–7, ¶¶ 14–16; *see also* Carusone Decl., App. 15–16 ¶¶ 4–6. Nor have Defendants, "through the[ir] Internet postings, manifest[ed] an intent to *target* and *focus* on [Texas] readers." *Revell*, 317 F.3d at 475 (quoting *Young v. New Haven Advocate*, 315 F.3d 256, 262 (4th Cir. 2022)); *see also* Hananoki Decl., App. 13, ¶ 13. Media Matters's content is generally accessible to all users of the internet, both in and out of Texas. But "[a]ccessibility alone cannot sustain [personal] jurisdiction. If it could, lack of personal jurisdiction would be no defense at all." *TheHuffingtonPost.com*, 21 F.4th at 320; *see also Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 143 (4th Cir. 2020) (explaining "general availability of [a] website" in a state "does not create substantial connection . . . necessary to support the exercise of jurisdiction"); *USPlabs Jack3d, LLC v. MMRNV, LLC*, No. 3:12-CV-1605-O, 2012 WL 12893435, at *3–4 (N.D. Tex. Oct. 31, 2012) (statements made over local radio in Nevada and republished to a nationwide audience online were not directed at Texas).

Nor does Media Matters's nationwide newsletter establish minimum contacts with Texas. Am. Compl. ¶¶ 23, 29. "An organization that mails national newsletters" to Texas recipients "has not purposefully established minimum contacts" supporting jurisdiction. *Nat'l Indus. Sand Ass'n v. Gibson*, 897 S.W.2d 769, 774 (Tex. 1995); *see also Renoir v. Hantman's Assocs., Inc.*, No. CIV.A. H-05-4152, 2006 WL 1007481, at *9 (S.D. Tex. Apr. 18, 2006), *aff'd* 230 F. App'x 357 (5th Cir. 2007) (finding email, mail, and phone communications from Maryland to Texas did not

establish personal jurisdiction in Texas). Even if Texas subscriptions were relevant (and they are not), Texas subscribers comprise a disproportionately small percentage of Media Matters's newsletter recipients. *Compare* Am. Compl. ¶ 23 *with* Padera Decl., App. 8–9, ¶ 22 (In November 2023, only a small percentage of Media Matters's newsletter subscribers had provided address information indicating that they were based in Texas).

X's remaining efforts to concoct claim-related Texas contacts amount to a series of shots in the dark, uninformed guesses, and irrelevant tangents. Am. Compl. ¶¶ 23–28. Defendants do not target Texans to subscribe to Media Matters content. Padera Decl., App. 8, ¶ 20. Defendants do not solicit Texas donors to fund Media Matters's journalism concerning X. Carusone Decl. App. 15, ¶ 4. Defendants have not contacted any X advertisers based in Texas about the subject matter of the November 16 and November 17 articles. *Id.*, App. 16, ¶ 6; Hananoki Decl., App. 13, ¶ 12. Nor have Defendants contacted any Texas-based sources about the articles. Carusone Decl., App. 13, ¶ 5; Hananoki Decl., App. 13, ¶ 12. And Mr. Musk's own personal Texas ties, and those of third-party advertisers, cannot substitute in for *Defendants'* demonstrated lack of Texas contacts. Both the Supreme Court and the Fifth Circuit have "consistently rejected attempts to satisfy the *defendant-focused* 'minimum contacts' inquiry by demonstrating contacts between the *plaintiff (or third parties)* and the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (emphases added); *see also Ford Motor Co.*, 141 S. Ct. at 1031 ("[T]he place of a plaintiff's injury and residence cannot create a defendant's contact with the forum state[.]"); *USPlabs*, 2012 WL 12893435, at *3 (statements not directed at Texas where defendant merely "would know that the effects" of the statements "would cause injury in Texas").

Just like the plaintiffs in *TheHuffingtonPost.com*, *Revell*, and *USPlabs*, X has altogether failed to allege that Defendants' statements *purposefully targeted* the State of Texas.[5] The Due Process Clause would be a dead letter if a media company could be haled into federal court anywhere in the several states simply for mentioning a third-party company with nationwide operations and advertisers. Because the only Texas connections that X alleges are its own or those of third parties—but not Defendants'—the amended complaint fails to satisfy X's burden of identifying a prima facie case for personal jurisdiction.

### C.     Exercise of personal jurisdiction here would not be fair and reasonable.

Courts consider several factors to determine a forum's reasonableness:

> (1) the burden on the nonresident defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in the most efficient resolution of controversies; and (5) the shared interests of the several states in furthering fundamental social policies.

*Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 276 (5th Cir. 2006). Litigating this action would unreasonably burden Defendants, who operate far from Texas and do not regularly travel there for work. Padera Decl., App. 6–7, ¶¶ 7–16; Hananoki Decl., App. 12, ¶ 8. "None of the alleged ties with Texas gives [Media Matters] fair warning that it should expect a libel suit there." *TheHuffingtonPost.com*, 21 F.4th at 320. Even X lacks any notable connection to Texas—X is incorporated under the laws of Nevada and has its principal place of business in California. Am. Compl. ¶ 18. In fact, X's own terms of service disclaim any interest in resolving disputes in Texas. *See supra* n.2 ("All disputes related to these Terms or the Services will be brought solely in the federal or state courts located in San Francisco County, California[.]").

---

[5] This case is even clearer because unlike the plaintiffs in those cases, X is not a Texas resident. *Compare TheHuffingtonPost.com*, 21 F.4th at 316 (Texas plaintiff), *Revell*, 317 F.3d at 469 (Texas plaintiff), and *USPlabs*, 2012 WL 12893435, at *3 (Texas plaintiff), *with* Am. Compl. ¶ 18 (California plaintiff).

Nor does the State of Texas have any particular interest in the resolution of this dispute—the alleged conduct did not take place in Texas or have a significant impact in Texas. Indeed, both the interest of the interstate judicial system in efficient resolution of controversies and the shared interests of the several states undermine the exercise of personal jurisdiction here. "Exercising jurisdiction over [Media Matters] would collapse the distinction between specific and general jurisdiction" and "would vitiate the sovereign interests of the states where defendants like [Media Matters] are 'at home.'" *TheHuffingtonPost.com*, 21 F.4th at 323–24. Taken together, these factors clearly show that Texas is not a fair or reasonable forum for this lawsuit.

## II.    This Court is an inappropriate venue for this dispute.

In addition to, and independent from, the amended complaint's fatal jurisdictional defect, dismissal is also required for lack of venue under the plain dictates of 28 U.S.C § 1391(a). "Put simply, if a plaintiff cannot defend its choice of venue, the case does not belong there in the first place." *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, No. 4:23-CV-0206-P, 2023 WL 2975164, *1 (N.D. Tex. Apr. 17, 2023). That is the case here.

Plaintiffs may bring suit only in: (1) a district in which any defendant resides, if all defendants are residents of the State the district is in; (2) a district where a substantial part of the events underlying the claim took place, or a substantial part of property that is subject to the action is situated; or (3) if there is no such district, any judicial district in which any defendant is subject to personal jurisdiction as to the action. 28 U.S.C § 1391(b). When defendants successfully challenge venue, "the case *must* be dismissed or transferred." *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 55–56 (2013) (emphasis added). X cannot satisfy its "burden to prove that venue is proper." *Career Colls. & Schs. of Tex.*, 2023 WL 2975164, *1.

*First*, Section 1391(b)'s first prong does not apply because, as X concedes, Am. Compl. ¶¶ 19–21, none of the Defendants resides, is incorporated, or operates in Texas. *See also* Padera Decl., App. 6–7, ¶¶ 7–16; Hananoki Decl., App. 11, ¶ 3; Carusone Decl., App. 15, ¶ 2.

*Second*, the Northern District of Texas is not "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b)(2); *see also* Order Granting Defs.' Mot. to Transfer Venue, *Space Exploration Tech. Corp. v. NLRB*, No. 1:24-cv-00001, 2024 WL 974568 (S.D. Tex. Feb. 15, 2024) (holding "incidental effects" in Texas of open letter written in California insufficient to support venue in Texas). As explained, all of Defendants' reporting, writing, and publishing activities related to the disputed statements occurred outside of Texas, *supra* at I.B, and the unremarkable fact that some fraction of newsletter subscribers or X platform users reside in the Northern District does not support a finding that a "substantial part" of the events giving rise to X's claim occurred in this district. X identifies two advertisers—Oracle and AT&T—as being "headquartered or incorporated in Texas," Am. Compl. ¶ 24, but those facts do not create venue. By X's own admission, "Oracle did not withdraw its ads" from X, *id.* ¶ 14, and thus has nothing to do with the alleged harmful events giving rise to X's claim. AT&T, in turn, is never mentioned in the challenged articles, so any investigation AT&T did into its ad placement on X was of its own volition and is not plausibly connected to Media Matters (as opposed to the many other publications that similarly have reported on the rise of extremist content on X). Ultimately, the decision of some multinational advertisers to cease all advertising (not just Texas-based advertising) on X, which itself is not based in Texas, could have had no more than an incidental effect here—a far cry from the "substantial" connection that venue

12

law requires.[6]

*Finally*, for all the reasons discussed above, Defendants are also not subject to personal jurisdiction in the Northern District of Texas. *See* 28 U.S.C. § 1391(b)(3). Further, Section 1391(b)'s third prong is an option for venue only "*if* there is *no district*" that satisfies either the first or second prong of the statute. 28 U.S.C § 1391(b)(3). But there are judicial districts where this case could properly be brought under Section 1391(b)(2). These include the districts where the articles were written and published—in Maryland and Washington, D.C. In addition, Defendants would not dispute venue in the Northern District of California, where X's headquarters are located, Am. Compl. ¶ 18, and which is ordinarily X's own preferred choice of forum, *see supra* n.2.

## III.    The amended complaint fails to state a claim.

The amended complaint should be dismissed for a third independent reason: X fails to plead "enough facts to state a claim to relief that is plausible on its face," as required by Rule 8. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). In reviewing a motion to dismiss on these

---

[6] Nor is the Northern District of Texas a judicial district in which "a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(b)(2). This clause is applicable only to "'suits involving property disputes or in rem actions,' and not 'to suits alleging financial damages to a corporation.'" *Tabletop Media, LLC v. Citizen Sys. Am. Corp.*, No. 3:16-CV-1304-C, 2016 WL 11522083, at *2 (N.D. Tex. Sept. 21, 2016) (quoting *Falcoal, Inc. v. Turkiye Komur Isletmeleri Kurumu*, 660 F. Supp. 1536, 1542–43 (S.D. Tex. 1987)).

13

grounds, the Court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mut. Auto Ins. Co.*, 509 F.3d 673, 675 (5th Cir. 2007). The same is not true of legal conclusions, and only a complaint that states a plausible claim for relief can survive. *Iqbal*, 556 U.S. at 678–79.  X does not state a claim for any of its three counts.

### A.     X has not stated a claim for interference with contract.

X's amended complaint wholly fails to plead—never mind plausibly allege—basic elements of its claim for interference with contract. *See* Am. Compl. ¶¶ 65–72. Under Texas law, "[t]he elements of tortious interference with existing contractual relations are '(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss.'" *Nix v. Major League Baseball*, 62 F.4th 920, 934 (5th Cir. 2023) (quoting *Prudential Ins. Co. of Am. v. Fin. Rev. Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000)), *cert. denied*, 144 S. Ct. 165 (2023). X fails to adequately plead at least the first three elements.

Off the bat, X fails to adequately allege "an existing contract subject to interference." *Nix*, 62 F.4th at 934. X's original complaint conspicuously failed to even use the word "contract" in describing its relationship with its advertisers. *See* Compl., ECF No. 1. Its amended complaint now vaguely refers to generic "advertising contracts" with various third-party advertisers, Am. Compl. ¶ 8, but never actually describes the terms of such "contracts," including whether they obliged specific advertisers to continue placing ads on X for a specified term or up to a minimum spend. That is not enough: "A general statement that a contract with a customer exists, without details about the specific terms of the contract, is insufficient to maintain a tortious-interference-with-contract claim." *McDonald Oilfield Operations, LLC v. 3B Inspection, LLC*, 582 S.W.3d 732, 752 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (op. on reh'g)) (citations omitted); *see also Fillyaw*

14

*v. Cmty. Nat'l Bank & Tr.*, No. 3:22-CV-1112-N (BH), 2023 WL 6797540, at *6 (N.D. Tex. Aug. 22, 2023) (collecting cases), *report & recommendation adopted*, 2023 WL 6797496 (N.D. Tex. Oct. 13, 2023). Because X has "not identified a written or an enforceable oral contract with" any advertiser sufficient to infer that the advertiser "had a contractual obligation to continue using [X's] services," *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 675 (S.D. Tex. 2010), it cannot sustain this claim, *see id.* at 674 ("A cause of action for tortious interference with a contract will not lie in the absence of a contract." (collecting cases)).

Merely alleging that certain advertisers had "contracted" for advertising space on X in the past, Am. Compl. ¶ 66—and anticipating they would continue to do so in the future—is not enough to plead an interference with contract claim under Texas law. *See Amey v. Barrera*, No. 13-01-00130-CV, 2004 WL 63588, at *10 (Tex. App.—Corpus Christi Jan. 15, 2004, no pet.) (concluding "there were no contracts subject to interference" where third parties could "continue buying" products from a vendor so long as they wished but "could change vendors at any time"). X has made no allegation that it had "a legal right to future performance" from its advertisers under a contractual obligation; instead, it "just [had] a hope" that advertisers "will continue" to purchase from it in the future. Restatement (Third) of Torts: Liab. for Econ. Harm § 17 (2020); *see also Rimkus*, 688 F. Supp. 2d at 675. But X cannot state an interference with contract claim for "benefits that [X] hoped to receive but on which [X] had no right to insist." Restatement (Third) of Torts: Liab. for Econ. Harm § 17 (2020); *see also Antero Res. Corp. v. C & R Downhole Drilling, Inc.*, No. 4:16-CV-668-Y, 2021 WL 9969511, at *3 (N.D. Tex. June 8, 2021) (dismissing complaint that failed to "specify any contractual provision that obligated" future performance).

X also fails to allege the second element of this claim—"a willful and intentional act of interference with contract"—which "requires demonstration that the defendant knowingly induced

one of the contracting parties to *breach its obligations* under a contract." *Nix*, 62 F.4th at 934 (emphasis added) (quotation marks omitted). The Texas Supreme Court has held that "[t]o prevail on" such a claim, a plaintiff must "present evidence" that a defendant "induced [another entity] to 'breach the contract,'" *El Paso Healthcare Sys., Ltd. v. Murphy*, 518 S.W.3d 412, 421–22 (Tex. 2017); *see also John Paul Mitchell Sys. v. Randalls Food Markets, Inc.*, 17 S.W.3d 721, 730–31 (Tex. App.—Austin 2000, pet. denied); *Adidas Am. Inc. v. Shoebacca Ltd.*, No. 3:20-CV-03248-N, 2021 WL 4399745, at *2 (N.D. Tex. Sept. 27, 2021).

X's original complaint altogether failed to allege such breach. Its amended complaint does little better, alleging, in full relevant part, that "Defendants' acts of interference include . . . knowingly inducing one or more of the contracting parties to breach its obligations." Am. Compl. ¶ 72. Such a "threadbare" allegation of breach—without *any* corresponding facts or details—is precisely the sort of rote recitation of an element that this Court "does not . . . presume true" *Harmon v. City of Arlington*, 16 F.4th 1159, 1162–63 (5th Cir. 2021) (en banc) (quoting *Iqbal*, 55 U.S. at 678). Moreover, even taking that bare statement as true, simply asserting that some unspecified party breached some unspecified contractual provision falls woefully short of plausibly alleging that an "obligatory provision of a contract ha[s] been breached," without which a "tortious interference claim is infirm as a matter of law." *WickFire, L.L.C. v. Laura Woodruff; TriMax Media, L.L.C.*, 989 F.3d 343, 354 (5th Cir. 2021) (quoting *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 749 (5th Cir. 2019)). This deficiency requires dismissal under Texas law. *See, e.g., Blacks in Tech. Int'l v. Greenlee*, No. 3:20-CV-3008-X, 2023 WL 4186376, at *10 (N.D. Tex. June 26, 2023) (granting judgment on pleadings where plaintiff's "alleged injuries cannot support" claim for interference with contract because "there was no breach"); *GoLabs, Inc. v. Hangzhou Chic Intelligent Tech. Co.*, No. 3:19-CV-1019-N, 2020 WL 1325209, at *2 (N.D. Tex. Mar. 20,

16

2020) (dismissing interference with contract counterclaim for failure to allege breach); *Protective Life Ins. Co. v. Jones*, No. 4:19-CV-179-Y, 2019 WL 7943638, at *2 (N.D. Tex. Aug. 19, 2019) (finding "claim for tortious interference with contractual relation fails" because plaintiff "failed to allege any breach"). Simply put, X's interference with contract "claim fails for lack of any indication . . . that [its advertisers] breached their contracts" with X. *C.E. Servs., Inc. v. Control Data Corp.*, 759 F.2d 1241, 1248 (5th Cir. 1985); *see also Murphy*, 518 S.W.3d at 422 (holding "tortious-interference claim must fail" where there was no breach of contractual obligation).[7]

Furthermore, X's anemic complaint contains *no* plausible allegations that Defendants "knowingly induced one of the contracting parties to breach its obligations under a contract." *Funes v. Villatoro,* 352 S.W.3d 200, 213 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). To start, X fails to plausibly allege Defendants had actual or constructive knowledge of any relevant *contractual obligation*, as is required. *See Hart v. Manriquez Holdings, LLC*, 661 S.W.3d 432, 439 (Tex. App.—Houston [14th] 2023, no pet.). X's bare allegation that, "[u]pon information and belief," Media Matters "desired to interfere with such contracts or believed that interference was substantially certain to result from their actions," Am. Compl. ¶ 69, is precisely the sort of

---

[7] Texas law is unambiguous that "merely inducing a contract obligor to do what it has a right to do is not actionable interference." *ACS Invs., Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997) (collecting cases); *see also New York Life Ins. Co. v. Miller*, 114 S.W.3d 114, 125 (Tex. App.—Austin 2003, no pet.) (same); *accord* Restatement (Third) of Torts: Liab. for Econ. Harm § 17 (2020) ("Liability does not arise under this Section when the defendant's interference causes the termination of a contract at will—in other words, a contract that either party has the right to end at any time."). The Fifth Circuit has repeatedly recognized the same. *E.g.*, *C.E. Servs.*, 759 F.2d at 1248 (explaining that inducing "another to exercise his right to dissolve a contract at will or to terminate contractual relations on notice does not constitute tortious interference with contract under Texas law"); *Mikhail v. Maritz*, 189 F.3d 468 (5th Cir. 1999) (similar); *United Biologics, L.L.C. v. Allergy & Asthma Network/Mothers of Asthmatics, Inc.*, 819 F. App'x 204, 210 (5th Cir. 2020) (similar). Accordingly, even if X alleged that its advertisers exercised their rights to withdraw from a contract due to Defendants' reporting—and it nowhere makes such an allegation—it would still fail to plausibly allege this second element. !

threadbare recitation of a claim element that requires dismissal, *see Harmon*, 16 F.4th at 1162–63, and it falls far short of alleging constructive knowledge. Indeed, the amended complaint fails to identify *any* advertiser with an *ongoing* contractual obligation to advertise on X—knowledge of such a contractual obligation can hardly be imputed to Plaintiffs when X itself fails to plausibly allege such an obligation existed. *See Lazer Spot, Inc. v. Hiring Partners, Inc.*, 387 S.W.3d 40, 52 n.22 (Tex. App.—Texarkana 2012, pet. denied) (plaintiff failed to show defendant had knowledge of allegedly breached contractual provision).

X also fails to plausibly allege that Defendants "proximately caused" any alleged injury—the third element. *Nix*, 62 F.4th at 934. Proximate cause "requires proof of both cause-in-fact and foreseeability." *Immobiliere Jeuness Establissement v. Amegy Bank Nat'l Ass'n*, 525 S.W.3d 875, 880 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (quoting *Doe v. Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d 472, 477 (Tex. 1995)). "The test for cause-in-fact is whether the tortious conduct was a substantial factor in bringing about the alleged injury, *i.e.*, a factor without which the injury would not have occurred." *Id.* But X cannot plausibly allege that Defendants' reporting was a but-for factor of any alleged injury. To the contrary, X's complaint itself introduces public reporting from the *Financial Times*, as well as Media Matters itself, showing that—immediately prior to the withdrawal of various advertisers—Mr. Musk publicly endorsed an antisemitic conspiracy theory that Jewish people are trying to replace native-born white Americans with "hordes of minorities." *See* Am. Compl. ¶ 14 n.7; *see also id.* ¶¶ 2 n.3; 6 n.4; 46 n.16. X's handpicked article in its complaint reports that many advertisers were "concerned about posts made by Musk himself," including one in which he "appeared to agree with a post espousing an antisemitic theory," and "wary of being placed next to toxic content, pulled their advertising" from the platform in growing numbers ever since Mr. Musk's acquisition in 2022—well before the November 2023 articles at

issue in this case. Hannah Murphy, *IBM pulls adverts for X after reporting finding they ran next to Nazi Content*, Financial Times (Nov. 16, 2023) (cited at Am. Compl. ¶ 14 n.7).[8] And while X alleges that the various advertisers that withdrew from the platform "referenced antisemitic content in their withdrawal from X," Am. Compl. ¶ 61, it fails to acknowledge that it was *Mr. Musk's own remarks* that were the subject of advertiser concerns. At most, the amended complaint assumes a causal effect between Defendants' reporting and advertisers' decisions to stop advertising on X. But such ipso facto inferences do not scale the hurdle from possible to plausible, as is required to sustain a complaint under Rule 8, and do not sufficiently allege proximate causation.

### B.    X has not stated a claim for business disparagement.

X's amended complaint also fails to plausibly allege a cognizable claim for business disparagement. *See* Am. Compl. ¶¶ 73–79. To prevail on this claim in Texas, plaintiffs must show defendants published false and disparaging words—with malice and without a privilege defense— that caused special damages. *See Hurlbut v. Gulf Atl. Life Ins. Co.,* 749 S.W.2d 762, 766–67 (Tex. 1987); *see also Teel v. Deloitte & Touche LLP*, No. 3:15-CV-2593-G, 2015 WL 9478187, at *3– 4 (N.D. Tex. Dec. 29, 2015). The disputed statements *must* be false; the claim cannot survive if statements are true or substantially true. *Broughton v. Livingston Indep. Sch. Dist.*, 2010 WL 3056862, at *10 (E.D. Tex. July 29, 2010). Similarly, claims cannot survive against statements of opinion. *Teel*, 2015 WL 9478187, at *7. Whether defendants' statements "are disparaging is a question of law," and the statements must, at a minimum, be defamatory. *Broughton*, 2010 WL 3056862 at *10. Allegedly defamatory statements must be viewed in context; "they may be false,

---

[8] X incorporated various public reports—including Defendants'—about Mr. Musk's apparent endorsement of an antisemitic conspiracy theory into the amended complaint *See* Compl. ¶¶ 3, 14 n.7, 46 n.16. The Court may, of course, consider any "documents incorporated into the [amended] complaint by reference." *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.* 551 U.S. 308, 322 (2007)).

abusive, unpleasant, or objectionable to the plaintiff and still not be defamatory in light of the surrounding circumstances." *Id.* (cleaned up). Moreover, plaintiffs *must* show defendants knew their "statements were false or acted with reckless disregard for their falsity" because business disparagement claims always require actual malice. *Rimkus*, 688 F. Supp. 2d at 671 (citing *Hurlbut,* 749 S.W.2d at 766). Actual malice is a "relatively demanding standard" and is doubly required where, as here, a plaintiff is a public figure suing a media defendant. *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 171 (Tex. 2003); *see also New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). Reckless disregard is a subjective standard established by evidence that the defendant had serious doubts as to the truth of their statements at the time of publication. *Forbes*, 124 S.W.3d at 171. Here, X has failed to allege facts sufficient to sustain this claim.

### 1. *Defendants' statements were true.*

X's business disparagement claim cannot survive because X cannot plausibly allege that Defendants' statements are false. *Broughton*, 2010 WL 3056862, at *11. X never claims that Defendants fabricated the images reproduced in their articles. Far from it: X expressly acknowledges (as it must) that it is *possible* for the platform to display advertisements next to extremist content, even as it claims these pairings are "rare." *See* Am. Compl. ¶¶ 8, 55–57; *see also* ¶ 4 (indicating that one percent "of X's measured ad placement in 2023 appeared adjacent to content [*not*] scoring above the Global Alliance for Responsible Media's brand safety floor").

X's only quarrel appears to focus on *how often* these pairings occurred and whether they are "organic," but nothing in the amended complaint—let alone the disputed articles—suggests that Defendants opined on the overall quantity of pairings. The amended complaint extrapolates Mr. Carusone's statements in a November 26, 2023 interview about how normal users engage with X as evidence that the challenged November 16 article misled advertisers about the frequency of X's ad pairings. Am. Compl. ¶¶ 13–14. But Mr. Carusone's statements were opinions dependent

on the context of the interview in which they were made. *Hellmuth v. Efficiency Energy, L.L.C.,* No. CV H-14-2945, 2016 WL 642352 at *2 (S.D. Tex. Feb. 18, 2016). The purpose of the interview was for Mr. Carusone to opine on the reasons X brought this action and the quality of the content moderation policies implemented by X since Mr. Musk's acquisition. *Angelo Carusone discusses Elon Musk and X on MSNBC*, Media Matters (Nov. 26, 2023) (cited at Am. Compl. ¶ 13, n.6) (hereinafter "November 26, 2023 interview"). This included opining based on his understanding of Media Matters's reporting of what content X users on the platform might confront. Furthermore, if X's supposed safeguards worked, Am. Compl. ¶ 46, it would have been impossible for Defendants to "exploit[] . . . X's user features" to bring about the pairings, *id.*, since Defendants have no authority or control over X, its algorithm, or its advertisement placement. X's allegation, therefore, that Defendants "created" the pairings, *id.* ¶ 48 (emphasis omitted), is simply not plausible.

In short, X alleges that Defendants reported that advertisements appeared next to extremist content on X. *See id.* ¶ 12. But X also concedes that advertisements do, in fact, sometimes appear next to extremist content on X. *See id.* ¶¶ 4, 8, 55–57. Because X's own pleadings admit that the gist of the reporting is substantially true—even if X finds it to be unpleasant or objectionable, *Broughton*, 2010 WL 3056862, at *10—its business disparagement claim must be dismissed.

### 2. *Media Matters, Mr. Hananoki, and Mr. Carusone did not act with actual malice.*

X also fails to plausibly allege that Defendants acted with actual malice. Actual malice "'is a term of art.' It is not ill will, spite, or evil motive." *Forbes*, 124 S.W.3d at 171 (quoting *Huckabee v. Time Warner,* 19 S.W.3d 413, 420 (Tex. 2000)). It requires proof that the defendant made a statement "with knowledge that it was false or with reckless disregard of whether it was true or not." *New York Times,* 376 U.S. 254 at 279–80. Even where statements are "not strictly true," if

they are "substantially so and not made with reckless disregard of the truth," there is no actual malice. *BDO Seidman LLP v. Alliantgroup, L.P.*, No. H-08-905, 2009 WL 1322555, at *12 (S.D. Tex. May 11, 2009).

Given that X does not plausibly allege that Defendants' statements were false, it necessarily follows that X cannot plausibly allege that Defendants "knew [their] statements were false." *Rimkus*, 688 F. Supp. 2d 598 at 671. But even beyond that truism, X fails to allege any facts that could plausibly support a finding that Defendants acted with actual malice; instead, X relies on nothing more than conclusory statements, contending, for example, that Defendants' statements were "not true and, both Media Matters and Hananoki knew it," Am. Compl. ¶ 46. But this recitation does "not allow the court to infer more than the mere possibility of wrongdoing" and is not enough to state a proper claim. *Moser v. Omnitrition Int'l Inc.*, 2018 WL 1368789, at *2 (N.D. Tex. Mar. 16, 2018) (quoting *Iqbal*, 556 U.S. at 678).

Finally, both the U.S. and Texas Supreme Courts have "repeatedly held" that a media defendant's mere "choice of words or content," even where they are misleading, "do[] not [alone] amount to actual malice." *Forbes*, 124 S.W.3d at 174–76 (summarizing and distinguishing Texas and Supreme Court cases where media defendants were accused of actual malice). This is because courts are wary of "the risk of undue self-censorship and the suppression of truthful material," and thereby afford media defendants protection from being haled into court and baselessly accused of wrongdoing, as X has done here. *Forbes*, 124 S.W.3d at 176 (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 513 (1984)).

### 3.    *X has failed to allege special damages.*

X has failed to plausibly allege another "essential part" of its claim for business disparagement—that it incurred special damages caused by Defendants' conduct. *Hurlbut*, 749 S.W.2d at 767. X's claim is based entirely on the timing of when some unknown number of

advertisers declined to continue advertising on X (*i.e.*, after the November 16 article) and an amorphous "campaign of disparagement" Media Matters allegedly engaged in. *See, e.g.*, Am. Compl. at ¶¶ 62–64. But Texas law is clear that where multiple explanations could exist for lost business, the plaintiff claiming business disparagement must allege facts showing that allegedly defamatory statements—as opposed to *other* factors—actually caused the lost business. *See Landry's, Inc. v. Animal Legal Def. Fund*, 631 S.W.3d 40, 54–55 (Tex. 2021) (granting motion to dismiss under TCPA for failure to allege facts connecting alleged defamation to lost business).

The timing of the complained-of advertiser flight from X is easily explained both by Mr. Musk's own erratic conduct and a year's worth of reporting by other media outlets about the rise of hate speech on the platform, which led dozens of other advertisers (not identified in the amended complaint) to abandon X long before the challenged article was published. *See* Hannah Murphy, *IBM pulls adverts for X after reporting finding they ran next to Nazi Content*, Financial Times (Nov. 16, 2023) (cited at Am. Compl. ¶ 14 n.7) (noting that "[m]any brands, wary of being placed next to toxic content, pulled their advertising" after Musk acquisition). Indeed, X concedes that some advertisers "referenced antisemitic content in their withdrawal from X." Am. Compl. ¶ 61. Given that Mr. Musk's own apparently antisemitic remarks were widely publicized at the time of the article, and given the breadth of reporting by various news sources about X and Musk's controversial behavior over the year following Musk's 2022 takeover, there is simply no way to know which of the many controversies surrounding X and its owner persuaded advertisers to part company with them. "A 'jury cannot reasonably infer that defamation caused cancellations when the cancellations could have occurred for any number of reasons.'" *Landry's*, 631 S.W.3d at 55 (quoting *Burbage v. Burbage*, 447 S.W.3d 249, 262 (Tex. 2014) (brackets omitted)). Nor does anything in the amended complaint explain why sophisticated Fortune 500 companies (Apple,

NBCUniversal, IBM, Am. Compl. ¶ 61) would not come to their own conclusions about the continued value of their advertising relationships with X. It is thus no surprise that X fails to make any allegations "that anyone at [the advertising companies] ever read the [Media Matters] stories about [X], much less based their decision to cancel on statements in those stories attributed to the defendants." *Landry's*, 631 S.W.3d at 54–55.

Moreover, the amended complaint itself shows that there is no nexus between Mr. Carusone's November 26, 2023 interview statements and the withdrawal of X's advertisers. Mr. Carusone's interview took place ten days after the challenged article's publication and almost a week after X publicly filed its initial complaint blaming the November 16 article for losing its advertisers. And as the interview itself highlights, advertisers began to leave the X platform months before Mr. Carusone's comments. *Angelo Carusone discusses Elon Musk and X on MSNBC*, Media Matters (Nov. 26, 2023) (cited at Am. Compl. ¶ 13, n.6); *see also* Eric Hananoki, *As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*, Media Matters for America (Nov. 16, 2023) (cited at Am. Compl. ¶ 46 n.16).

By failing to account for these public facts—which are repeatedly mentioned in articles that X itself cites in its complaint—the amended complaint fails to exclude the "obvious alternative explanation," *Twombly*, 550 U.S. at 567, for advertisers' decisions: in the aftermath of Mr. Musk's inflammatory remarks and a year of negative reporting about Twitter's extremist content, they independently decided to terminate their relationships with X.

### C.   X has not stated a claim for interference with prospective economic advantage.

X also fails to state a claim for interference with prospective economic advantage. *See* Am. Compl. ¶¶ 80–88. The Fifth Circuit has expressed strong "reservations that tortious interference with prospective economic advantage exists, as such, under Texas law." *Small Bus. Assistance*

*Corp. v. Clear Channel Broad., Inc.*, 210 F.3d 278, 280 n.1 (5th Cir. 2000); *see In re Enron Corp.*

*Sec., Derivative & "ERISA" Litig.*, 238 F. Supp. 3d 799, 814 (S.D. Tex. 2017) ("Dismissal under

Rule 12(b)(6) is proper . . . where the plaintiff fails to allege a cognizable legal theory."), *aff'd sub*

*nom. Lampkin v. UBS Fin. Servs., Inc.*, 925 F.3d 727 (5th Cir. 2019).[9]

The allegations in the amended complaint's third cause of action would also fail to state a

claim for any seemingly related common law tort, such as interference with prospective business

relations. Among other elements, this tort requires "an independently tortious or unlawful act by

the defendant that prevented [a business] relationship from occurring." *Baty v. ProTech Ins.*

*Agency*, 63 S.W.3d 841, 860 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). The third cause

of action does not plausibly allege any *independently* tortious or unlawful act committed by

Defendants. *See Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001) (explaining

that "independently tortious" means "conduct that would violate some *other* recognized tort duty"

(emphasis added)). X simply rehashes its interference with contract and business disparagement

allegations under another name, but the allegations remain defective for all the same reasons. *See*

*supra* Section III.A, B. The Court should dismiss this claim as well. *Cf. Phoneternet, L.L.C. v.*

*LexisNexis Risk Sols., Inc.*, 816 F. App'x 909, 914 (5th Cir. 2020) (affirming dismissal of tortious

interference with prospective business relations claim where plaintiff "failed to allege adequately

an independent tort or any other meritorious claim").

## CONCLUSION

For any and all of these reasons, the Court should dismiss X's complaint with prejudice.

Respectfully submitted,                                    Dated: March 8, 2024.

*/s/ Andrew LeGrand*

---

[9] Neither of the cases that X cites for this cause of action so much as mentions interference with prospective economic advantage. *See* Am. Compl. ¶ 88.

**GIBSON, DUNN & CRUTCHER LLP**
Andrew LeGrand (TX 24070132)
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
T: (214) 698-3100
F: (214) 571-2960
alegrand@gibsondunn.com

Theodore J. Boutrous, Jr.** (CA 132099)
333 South Grand Avenue
Los Angeles, CA 90071
T: (213) 229-7000
F: (213) 229-7520
tboutrous@gibsondunn.com

Amer S. Ahmed** (NY 4382040)
200 Park Avenue
New York, New York 10166
T: (212) 351-4000
F: (212) 351-4035
aahmed@gibsondunn.com

**ELIAS LAW GROUP LLP**
Abha Khanna* (WA 42612)
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
T: (206) 656-0177
F: (206) 656-0180
akhanna@elias.law

Jacob D. Shelly* (DC 90010127)
Daniela Lorenzo* (NY 5780457)
250 Massachusetts Avenue NW, Suite 400
Washington, DC 20001
T: (202) 968-4490
F: (202) 986-4498
jshelly@elias.law
dlorenzo@elias.law

* Admitted *pro hac vice*
** *Pro hac vice* application forthcoming

*Counsel for Defendants Media Matters for America, Angelo Carusone, and Eric Hananoki*

## CERTIFICATE OF SERVICE

On March 8, 2024, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Andrew LeGrand*
Andrew LeGrand