# UNITED STATES DISTRICT COURT FOR
# THE NORTHERN DISTRICT OF TEXAS
# FORT WORTH DIVISION

| | |
|---|---|
| **X CORP.**, a Nevada corporation, <br> Plaintiff, <br><br> vs. <br><br> **MEDIA MATTERS FOR AMERICA**, a Washington, D.C. non-profit corporation, **ERIC HANANOKI**, and **ANGELO CARUSONE**, <br> Defendants. | Case No. 4:23-cv-01175-O |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION, IMPROPER VENUE, AND FAILURE TO STATE A CLAIM

JUDD E. STONE II
CHRISTOPHER D. HILTON
ARI CUENIN
**STONE | HILTON PLLC**
1115 W. Slaughter Lane
Austin, TX 78748
Telephone: (737) 465-7248
judd@stonehilton.com
chris@stonehilton.com
ari@stonehilton.com

JOHN C. SULLIVAN
**S|L Law PLLC**
610 Uptown Boulevard
Suite 2000
Cedar Hill, TX 75104
Telephone: (469) 523-1351
john.sullivan@the-sl-lawfirm.com

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................... ii

TABLE OF AUTHORITIES ........................................................................................... iii

STATEMENT OF THE CASE .......................................................................................... 2

LEGAL STANDARD ....................................................................................................... 3

ARGUMENT AND AUTHORITIES ................................................................................ 4

    I.    This Court Has Personal Jurisdiction over Defendants. ........................................ 4

        A.    Defendants purposefully availed themselves of Texas. ................................... 4

        B.    Personal jurisdiction is in the interest of substantial justice. ......................... 9

    II.    Venue Is Proper in the Northern District of Texas. ........................................... 9

    III.    X Plausibly Alleged that Defendants Are Liable for Their Unlawful Conduct ........... 13

        A.    X has plausibly alleged a claim for tortious interference with existing contracts. ....... 13

            1.    X has sufficiently alleged the existence of contracts subject to interference. ..................... 14

            2.    X has alleged acts of intentional interference. ..................................................... 15

            3.    X plausibly alleged that Media Matters proximately caused its harm. ............................... 20

        B.    Nothing renders Plaintiff's business disparagement claim subject to dismissal ........... 21

        C.    X adequately pleaded its claim for tortious interference with economic advantage. ... 24

PRAYER ......................................................................................................................... 25

CERTIFICATE OF SERVICE ....................................................................................... 27

## TABLE OF AUTHORITIES

CASES

*Accresa Health LLC v. Hint Health Inc.*,
No. 4:18-CV-00536, 2020 WL 4644459 (E.D. Tex. Mar. 19, 2020), *rep. & rec. adopted*,
No. 4:18-CV-00536, 2020 WL 2610908 (E.D. Tex. May 22, 2020) ...................................... 14

*ACS Investors, Inc. v. McLaughlin*,
943 S.W.2d 426 (Tex. 1997) ............................................................................................... 17

*Acumen Enterprises, Inc. v. Morgan*,
No. 3:11-CV-619-L, 2011 WL 5822252 (N.D. Tex. Nov. 15, 2011) ................................ 11-12

*Admar Int'l, Inc. v. Eastrock, L.L.C.*,
18 F.4th 783 (5th Cir. 2021) ............................................................................................. 3, 9

*Ambraco, Inc. v. Bossclip B.V.*,
570 F.3d 233 (5th Cir. 2009) ............................................................................................... 3

*Aschroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................................................ 4

*Axcess Mktg. Grp. v. W. Creative, Inc.*,
No. 3:09-CV-2107-B, 2011 WL 611630 (N.D. Tex. Feb. 16, 2011) .................................. 24

*Batzel v. Smith*,
No. CV 00-9590 SVW(AJWX), 2001 WL 1893843 (C.D. Cal. June 5, 2001) ....................... 12

*Bear Stearns Cos. Inc. v. Lavalle*,
No. Civ.A. 300CV1900-D, 2001 WL 406217 (N.D. Tex. 2001) ............................................ 13

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................................................ 4

*Ben E. Keith, Co. v. Dining All., Inc.*,
No. 4:20-CV-133-A, 2021 WL 951021 (N.D. Tex. Mar. 12, 2021) ....................................... 16

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985) ............................................................................................................ 9

*Chain Elec. Co. v. Joubert*,
No. 2:15CV24-KS-MTP, 2015 WL 13821636 (S.D. Miss. July 23, 2015) ............................ 3-4

*Christopher V. Perry Fam. Ltd. P'ship v. Whatever, L.L.C.*,
No. CV H-08-1387, 2008 WL 11389239 (S.D. Tex. Aug. 11, 2008) ...................................... 12

*City of Clinton v. Pilgrim's Pride Corp.*,
632 F.3d 148 (5th Cir. 2010) ............................................................................................... 15

*Cohly v. Miss. Inst. of Higher Learning*,
No. 23-60232, 2024 WL 65432 (5th Cir. Jan. 5, 2024) ........................................................ 18

*Coinmach Corp. v. Aspenwood Apartment Corp.*,
417 S.W.3d 909 (Tex. 2013) ............................................................................................... 25

*Cooper v. Harvey*,
No. 3:14-CV-4152-B, 2016 WL 4427481 (N.D. Tex. Aug. 21, 2016) ................................... 25

*Cummins v. Lollar*,
No. 4:12-CV-560-Y, 2014 WL 12585644 (N.D. Tex. July 22, 2014) ................................... 24

*Dagel v. Resident News, LLC*,
No. 3:11-CV-00663-L, 2011 WL 3518281 (N.D. Tex. Aug. 10, 2011) .................................. 11

*Daniel v. Am. Bd. of Emergency Med.*,
428 F.3d 408 (2d Cir. 2005) ............................................................................................. 10

*Danziger & De Llano, L.L.P. v. Morgan Verkamp, L.L.C.*,
24 F.4th 491 (5th Cir. 2022) ......................................................................................... 5, 6

*Deuell v. Tex. Right to Life Comm., Inc.*,
508 S.W.3d 679 (Tex. App.—Hous. [1st Dist.] 2016, pet. denied) ........................................ 20

*Doe v. Boys Clubs of Greater Dall., Inc.*,
907 S.W.2d 472 (Tex. 1995) ........................................................................................... 20

*Dunbar v. Evine Live, Inc.*,
No. 17CV1527, 2018 WL 382027 (W.D. Pa. Jan. 11, 2018) ............................................... 11

*Dupree v. Valero Energy Corp.*,
No. CIV.A. 03-1834, 2003 WL 22466234 (E.D. La. Oct. 29, 2003) ..................................... 10

*Eagle Metal Prods., LLC v. Keymark Enters., LLC*,
651 F. Supp. 2d 577 (N.D. Tex. 2009) .................................................................................. 6

*Feline Instincts, LLC v. Feline Future Cat Food Co.*,
No. 4:09-CV-644-Y, 2010 WL 4942188 (N.D. Tex. Dec. 6, 2010) ...................................... 10

*Fielding v. Hubert Burda Media*,
415 F.3d 419 (5th Cir. 2005) ............................................................................................. 5

*Flu Shots of Tex., Ltd. v. Lopez*,
No. 3:13-CV-144-O, 2013 WL 2449175 (N.D. Tex. June 5, 2013) ...................................... 11

*Forbes v. Granada Biosciences, Inc.*,
124 S.W.3d 167 (Tex. 2003) ........................................................................................... 21

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
592 U.S. 351 (2021) .................................................................................................... 4, 8

*Founders Ins. Co. v. Billy's Bar & Grill, LLC*,
No. 3:18-CV-00367-M, 2019 WL 5425478 (N.D. Tex. Oct. 23, 2019) ........................... 10, 11

*Funes v. Villatoro*,
352 S.W.3d 200 (Tex. App.—Hous. [14th Dist.] 2011, pet. denied) ................................... 18

*Galderma Lab'ys, L.P. v. Teva Pharms. USA, Inc.*,
290 F. Supp. 3d 599 (N.D. Tex. 2017) .................................................................................. 4

*GoForIt Entertainment, LLC v. DigiMedia.com L.P.*,
750 F. Supp. 2d 712 (N.D. Tex. 2010) ................................................................................ 17

iv

*Hamilton v. Advo, Inc*,
   No. CV H-07-4017, 2009 WL 10692678 (S.D. Tex. Jan. 14, 2009) ....................................... 16

*Hart v. Manriquez Holdings, LLC*,
   661 S.W.3d 432 (Tex. App.—Hous. [14th Dist.] 2023, no pet.) ............................................. 18

*Herman v. Cataphora, Inc.*,
   730 F.3d 460 (5th Cir. 2013)............................................................................................... 5

*Hurlbut v. Gulf Atl. Life Ins. Co.*,
   749 S.W.2d 762 (Tex. 1987) ............................................................................................. 24

*In re Bill of Lading Transmission & Processing Sys. Patent Litig.*,
   681 F.3d 1323 (5th Cir. 2012).......................................................................................... 21

*Johnson v. TheHuffingtonPost, Inc.*,
   21 F.4th 314 (5th Cir. 2021)................................................................................ 4, 6, 7, 12

*Kamel v. Ave. Insights & Analytics LLC*,
   No. 6:18-CV-422-JDK-KNM, 2020 WL 4679574 (E.D. Tex. May 5, 2020), *rep. & rec.
   adopted*, N No. 6:18-CV-422-JDK-KNM, 2020 WL 5939052 (E.D. Tex. Oct. 7, 2020) ........ 25

*Kingsbery v. Phillips Petroleum Co.*,
   315 S.W.2d 561 (Tex. App.—Austin 1958, writ ref'd n.r.e.) ................................................ 17

*Kwik-Kopy Corp. v. Byers*,
   37 F. App'x 90 (5th Cir. 2002)........................................................................................... 9

*Lawson v. U.S. Dep't of Justice*,
   527 F. Supp. 3d 894 (N.D. Tex. 2021).................................................................................. 3

*Lazer Spot, Inc. v. Hiring Partners, Inc.*,
   387 S.W.3d 40 (Tex. App.—Texarkana 2012, pet. denied)..................................................... 16

*Lexxus Int'l, Inc. v. Loghry*,
   512 F. Supp. 2d 647 (N.D. Tex. 2007).............................................................................. 14

*Matrix Warranty Sols. v. Staunton Grp. LLC*,
   No. 3:21-CV-3111-K, 2022 WL 1813606 (N.D. Tex., June 2, 2022) ....................................... 6

*McDonald Oilfiled Ops. LLC v. 3B Inspection, LLC*,
   582 S.W.3d 732 (Tex. App.—Hous. [1st Dist.] 2019, no pet.)........................................... 14-15

*Moser v. Omnitrition Int'l Inc.*,
   2018 WL 1368789 (N.D. Tex. Mar. 16, 2018) ..................................................................... 23

*Moser v. Omnitrition Int'l, Inc.*,
   No. 3:16-CV-2558-L, 2017 WL 1957084 (N.D. Tex. Feb. 28, 2017), *rep. & rec. adopted*,
   No. 3:16-CV-2558-L, 2017 WL 1957026 (N.D. Tex. May 10, 2017)...................................... 19

*Mullins v. TestAmerica, Inc.*,
   564 F.3d 386 (5th Cir. 2009)............................................................................................... 5

*NDX Advisors, Inc. v. Advisory Fin. Consultants, Inc.*,
   No. 11 C 517, 2011 WL 2200623 (N.D. Ill. June 6, 2011)...................................................... 10

*Nielsen Audio, Inc. v. Clem*,
  No. 815CV02435T27AAS, 2017 WL 3412097 (M.D. Fla. Aug. 7, 2017).............................. 20

*Nix v. Major League Baseball*,
  62 F.4th 920 (5th Cir. 2023) cert. denied, 144 S. Ct. 165 (2023) ............................................ 13

*Off. Brands, Inc. v. Roc Nation Sports, LLC*,
  No. 3:15-CV-2199-B, 2015 WL 8915804 (N.D. Tex. Dec. 15, 2015) .................................... 15

*PrevMED, Inc. v. MNM-1997, Inc.*,
  2017 WL 785656 (S.D. Tex. Feb. 28, 2017).......................................................................... 17

*Prudential Ins. Co. of Am. v. Fin. Rev. Servs., Inc.*,
  29 S.W.3d 74 (Tex. 2000) ..................................................................................................... 13

*Raybourne & Dean Consulting, Ltd. v. Metrica, Inc.*,
  No. CV SA-14-CA-918-OLG, 2016 WL 7486726 (W.D. Tex. Jan. 13, 2016), *rep. & rec.
  adopted*, No. SA-14-CV-00918-OLG, 2016 WL 7496196 (W.D. Tex. Feb. 17, 2016) ........... 24

*Revell v. Lidov*,
  317 F.3d 467 (5th Cir. 2002)............................................................................................... 8, 9

*Rimkus Consulting Grp., Inc. v. Cammarata*,
  688 F. Supp. 2d 598 (S.D. Tex. 2010) ................................................................................... 15

*Sangha v. Navig8 ShipManagement Private Ltd.*,
  882 F.3d 96 (5th Cir. 2018).................................................................................................. 4, 9

*Small Bus. Assistance Corp. v. Clear Channel Broad., Inc.*,
  210 F.3d 278 (5th Cir. 2000)................................................................................................. 24

*Spencer v. Overpeck*,
  No. 04-16-00565-CV, 2017 WL 993093
  (Tex. App.—San Antonio Mar. 15, 2017, pet. denied)........................................................... 16

*Stampley v. RCNI Freight, LLC*,
  No. 3:23-CV-1625-B, 2023 WL 5333273 (N.D. Tex. Aug. 18, 2023).................................... 10

*Sterner v. Marathon Oil Co.*,
  767 S.W.2d 686 (Tex. 1989).................................................................................................. 16

*Tabletop Media, LLC v. Citizen Sys. Am. Corp.*,
  No. 3:16-CV-1304-C, 2016 WL 11522083 (N.D. Tex. Sept. 21, 2016)................................. 11

*Travelhost, Inc. v. Brady*,
  No. 3:11-CV-454-M-BK, 2013 WL 4475057 (N.D. Tex. Aug. 21, 2013) .............................. 18

*Trois v. Apple Tree Auction Ctr., Inc.*,
  882 F.3d 485 (5th Cir. 2018)................................................................................................... 5

*Tutus, L.L.C. v. JLG Indus., Inc.*, No. 21-20383, 2022 WL 1517044 (5th Cir. May 12, 2022) ..... 5

*United Biologics, L.L.C. v. Allergy & Asthma Network/Mothers of Asthmatics, Inc.*,
  819 F. App'x 204 (5th Cir. 2020)...................................................................................... 16, 25

*United States ex rel. Univ. Loft Co. v. Avteq, Inc.*,
    No. SA-14-CA-528-OLG, 2015 WL 13548950 (W.D. Tex. Dec. 22, 2015), *rep. & rec.*
    *adopted*, No. 14-CV-528-OLG, 2016 WL 9461763 (W.D. Tex. Jan. 8, 2016) ........................ 19

*Vendever LLC v. Intermatic Mfg. Ltd.*,
    No. 3:11-CV-201-B, 2011 WL 4346324 (N.D. Tex. Sept. 16, 2011)...................................... 21

*Walden v. Fiore*,
    571 U.S. 277 (2014) ...................................................................................................... 5, 8

*Ward v. Rhode*,
    544 F. App'x 349 (5th Cir. 2013)......................................................................................... 5

*Young Conservatives of Tex. Found. v. Univ. of N. Tex.*,
    No. 4:20-CV-973-SDJ, 2022 WL 2901007 (E.D. Tex. Jan. 11, 2022) ...................................... 9

**STATUTES**

28 U.S.C. § 1391(b)(2) ....................................................................................................... 3, 10, 13

**OTHER AUTHORITIES**

32 Am. Jur. 2d Federal Courts § 335 .......................................................................................... 15

Contact us, ORACLE.COM, https://www.oracle.com/corporate/contact............................................ 7

Resources, ATT.COM, https://investors.att.com/resources/contacts ............................................... 7

*Transactional Venue*, 14D FED. PRAC. & PROC. JURIS. § 3806 (4th ed.)................................. 12-13

Plaintiff X Corp. ("X") files this response in opposition to the Motion to Dismiss for Lack of Personal Jurisdiction, Improper Venue, and Failure to State a Claim filed by Defendants Media Matters for America ("Media Matters"), Angelo Carusone, and Eric Hananoki (together, "Defendants") (ECF 40, 41). The motion raises no defect in exercising personal jurisdiction in Texas, poses no obstacle to venue in the Northern District of Texas, and fails to negate the sufficiency of the allegations regarding Defendants' unlawful conduct.

Media Matters engaged in an ideologically driven campaign to destroy X's business relationships. It targeted X's relationships with its advertisers—which Media Matters itself describes as brand-conscious, blue-chip companies—to harm X, the X platform, and its owner, Elon Musk. Its attempts to sabotage X's advertising relationships dramatically escalated on November 16, 2023, when Defendants maliciously published a false story claiming that advertiser safety standards on the X platform failed to prevent users from seeing ads paired with antisemitic content. A substantial number of advertisers ended, paused, or reduced their advertising relationships with X because of that false article. Media Matters persisted, publishing additional reporting naming more companies that subsequently paused or suspended advertising on X. All the while, Media Matters echoed the false narrative that X's brand-safety measures could not be trusted and that advertising on X would never be safe with Mr. Musk as its owner.

Media Matters designed its false reporting and resulting media strategy to drive advertisers from the platform and, Defendants hope, destroy X. Their deliberate scheme interfered with X's advertising contracts, disparaged X, and interfered with X's business by trumpeting false claims to mislead advertisers into believing that advertising on X was unsafe. Media Matters did so while intentionally targeting readers and X advertising customers located in the Northern District of Texas, where thousands of X users also reside. Accordingly, Defendants' motion should be denied.

## STATEMENT OF THE CASE

As alleged in the First Amended Complaint, Media Matters has waged a years-long campaign to alienate X from its paying advertisers. Am. Compl. (ECF 37) ¶¶ 1-17, 30-64. To that end, Media Matters has claimed that the X platform displays advertiser content next to hateful content, asserted in numerous public statements that the X platform cannot be "safe" while it is owned by Elon Musk, disparaged Elon Musk in order to harm X by falsely associating him with hateful content, and contacted advertisers on X's platform to encourage them to end their relationships with X or to drive public frenzy about the advertisers' refusal to do so. *Id.* ¶¶ 46-64.

In November 2023, Media Matters escalated its campaign against X's commercial relationships. *Id.* ¶ 46. It created an account on the X platform, manipulated the platform to maximize the likelihood that the platform would pair prominent advertisers' content with antisemitic posts, and then scrolled through an exceptionally large amount of content to induce the desired pairing. *Id.* ¶¶ 47-54. Then, on November 16, 2023, it maliciously published a false, defamatory, and misleading article claiming that X was responsible for antisemitic and hateful content being paired with advertisers' posts. *Id.* ¶ 46. This article asserted that X's platform displayed prominent advertisers' paid content alongside antisemitic and other highly unsavory user content, falsely and maliciously depicting these results as representative of the typical user experience on the X platform. *Id.* ¶¶ 7-8, 60. In reality, the November 16 article was manufactured through the deliberate, sophisticated manipulation of the platform to support a false narrative regarding the content filtering available to advertisers. But neither Media Matters nor its reporter Eric Hananoki disclosed either their deceptive behavior or the extremely manipulated and artificial conditions through which Media Matters generated the posts. *Id.* ¶¶ 48-60. As a result of their scheme, numerous advertisers paused or reduced advertising on X or left the X platform, both domestically and internationally, because they incorrectly believed Media Matters' false and

misleading reporting. Media Matters' President, Angelo Carusone, amplified his outlet's false claims by appearing on broadcast television to personally repeat and reiterate the disparaging reporting that Media Matters had falsely and maliciously manufactured. *Id.* ¶ 17.

In response to this tortious conduct, X Corp. sued Media Matters, Hananoki, and Carusone to recover damages and correct the public misperceptions caused by the article. *Id.* ¶¶ 65-88. X sued in the Northern District of Texas, Fort Worth Division, where Media Matters solicited subscribers and emailed hundreds or thousands of Texans with a newsletter that contains the false, malicious, and disparaging statements at the heart of this case. *Id.* ¶¶ 23, 29. Defendants also caused at least several businesses based in Texas (including in the Northern District) to reexamine, reduce, or suspend their advertising relationships with X. *Id.* ¶¶ 14, 29.

## LEGAL STANDARD

As "a matter of due process, courts may exercise personal jurisdiction over a nonresident defendant only if (1) that defendant has purposefully availed himself of the benefits and protections of the forum state by establishing minimum contacts with the forum state; and (2) the exercise of jurisdiction does not offend traditional notions of fair play and substantial justice." *Admar Int'l, Inc. v. Eastrock, L.L.C.*, 18 F.4th 783, 786 (5th Cir. 2021) (cleaned up).

Venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b)(2). A court "must accept as true all well-pleaded allegations in the complaint and resolve all conflicts in the plaintiff's favor," and, in doing so, is "permitted to look at evidence in the record beyond simply those facts alleged in the complaint and its proper attachments." *Lawson v. U.S. Dep't of Justice*, 527 F. Supp. 3d 894, 896 (N.D. Tex. 2021) (quoting *Ambraco, Inc. v. Bossclip B.V.*, 570 F.3d 233, 238 (5th Cir. 2009)). "[I]f there are disputed facts relevant to a venue determination . . . it may be appropriate for the district court to hold an evidentiary hearing." *Chain Elec. Co. v. Joubert*, No. 2:15CV24-KS-MTP, 2015

3

WL 13821636, at *2 (S.D. Miss. July 23, 2015) (cleaned up). If so, the court will make findings on the venue allegations. *Galderma Lab'ys, L.P. v. Teva Pharms. USA, Inc.*, 290 F. Supp. 3d 599, 605-06 (N.D. Tex. 2017).

Claims must be dismissed unless a plaintiff pleads "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Aschroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). The plaintiff's grounds for entitlement to relief "require[] more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The factual allegations in the complaint need only "be enough to raise a right to relief above the speculative level." *Id.*

## ARGUMENT AND AUTHORITIES

### I.   This Court Has Personal Jurisdiction over Defendants.

X sufficiently alleged personal jurisdiction. Media Matters relies on *Johnson v. TheHuffingtonPost, Inc.*, 21 F.4th 314 (5th Cir. 2021), which it asserts establishes that Media Matters is not subject to personal jurisdiction in Texas. Media Matters also argues that even if its contacts with Texas were sufficient, substantial justice disfavors the exercise of personal jurisdiction. Media Matters is wrong on both counts.

### A.   Defendants purposefully availed themselves of Texas.

Media Matters purposefully availed itself of Texas. As X does not invoke general personal jurisdiction over Defendants, X need establish only that the exercise of specific personal jurisdiction is proper. *Sangha v. Navig8 ShipManagement Private Ltd.*, 882 F.3d 96, 102 (5th Cir. 2018). Specific personal jurisdiction requires only that Media Matters have "purposefully directed its activities" at Texas in some meaningful way, allowing the exercise of jurisdiction over claims "deriving from, or connected with," those activities. *Id.* The claim need only "arise out of or relate to" the activities. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021).

**1.** For tortious interference and similar claims, the court "determine[s] whether the alleged tortfeasor expressly aimed his out-of-state conduct at the forum state by examining the nexus between the forum and the injured . . . relationship." *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 402 (5th Cir. 2009) (intentional interference with contract); *see also Sangha*, 882 F.3d at 102-04 (performing substantially similar analysis for tortious interference with current and prospective business relationships and interference with economic advantage claims). Because suffering an injury in a state, without more, is insufficient to establish personal jurisdiction there, a plaintiff must connect a defendant's conduct to the state. *Danziger & De Llano, L.L.P. v. Morgan Verkamp, L.L.C.*, 24 F.4th 491, 496-97 (5th Cir. 2022) (citing *Walden v. Fiore*, 571 U.S. 277, 290 (2014)).

Additional considerations arise for defamation claims. In a libel action, for example, a plaintiff may establish personal jurisdiction by demonstrating either that a "publication [possesses] adequate circulation in the state" or that "an author or publisher [has] 'aim[ed]' a story at the state knowing that the 'effects' will be felt there." *Fielding v. Hubert Burda Media*, 415 F.3d 419, 425 (5th Cir. 2005). To make this second alternative showing, a defamation plaintiff may allege "that (1) the subject matter of and (2) the sources relied upon for the article" were in, or at least "in some way connect with," Texas. *Id.* at 426. The Fifth Circuit has generalized this test by asking where the "focal point" of a story is. *Herman v. Cataphora, Inc.*, 730 F.3d 460, 465-66 (5th Cir. 2013).

The Fifth Circuit has not yet determined whether a business disparagement claim is subject to the same personal jurisdiction analysis as libel; Fifth Circuit panels have applied different tests. *E.g.*, *Tutus, L.L.C. v. JLG Indus., Inc.*, No. 21-20383, 2022 WL 1517044, at *2-3 (5th Cir. May 12, 2022) (per curiam) (analyzing business disparagement and tortious interference similarly); *Ward v. Rhode*, 544 F. App'x 349, 353 (5th Cir. 2013) (applying a libel analysis); *Trois v. Apple Tree Auction Ctr., Inc.*, 882 F.3d 485, 490-91 (5th Cir. 2018) (analogizing to torts committed by

reaching into Texas by phone). Cases in the Northern District apply different rubrics as well. *Compare Matrix Warranty Sols. v. Staunton Grp. LLC*, No. 3:21-CV-3111-K, 2022 WL 1813606, at *8 (N.D. Tex., June 2, 2022) (concluding *Danziger*, a tortious-interference case, controlled), *with Eagle Metal Prods., LLC v. Keymark Enters., LLC*, 651 F. Supp. 2d 577, 588-89 (N.D. Tex. 2009) (grouping business-disparagement claim with defamation claims for personal-jurisdiction rubric). This Court, however, need not reach that issue in this case. Personal jurisdiction exists because X can satisfy either the tortious-interference or defamation tests for the reasons below.

**2.** Defendants cardinally object to jurisdiction by comparison to *Johnson*. MTD at 5-6. In *Johnson*, the Fifth Circuit modified the libel test when "a defendant's website is the claimed basis for specific jurisdiction vis-à-vis an intentional tort." 21 F.4th at 318. There, the Fifth Circuit applies a threshold test as to whether the "virtual contacts" of the website matter for personal-jurisdiction purposes: when relying on a website's availability to establish personal jurisdiction, if "the site is passive—it just posts information that people can see—jurisdiction is unavailable, full stop. But if the site interacts with its visitors, sending and receiving information from them," the Court "must then apply [its] usual tests to determine whether the virtual contacts" suffice. *Id.*

The facts of *Johnson* illustrate the inquiry. There, the Huffington Post allegedly libeled Charles Johnson, a Texan, by calling him a white nationalist and Holocaust denier. *Id.* at 316. Johnson's live "complaint ma[de] clear that the only link between the alleged libel and HuffPost's virtual contacts with Texas [was] that the libel was published on the same" site on which the Huffington Post engaged in various commercial activities, such as displaying advertisements and selling merchandise. *Id.* at 319 (cleaned up). Johnson's jurisdictional misstep was that he argued "that HuffPost's interactivity is all that matters"—in other words, that if "a website exchanges information with its users . . . [the court] must have personal jurisdiction." *Id.* In other words, he

mistook the site's interactivity—a necessary condition to make a website's availability jurisdictionally relevant— as a sufficient condition to establish personal jurisdiction. *Id.* at 318.

*Johnson* is irrelevant here even on its own terms. Unlike the plaintiff there, X asserts far more than Media Matters' website's availability in Texas to establish personal jurisdiction. Defendants' outlets for their tortious content are not limited to the Media Matters Website. For example, MMFA distributed its newsletter to hundreds or thousands of readers in the Northern District, and Media Matters' president, Angelo Carusone, substantially repeated Media Matters' false claims on cable television at least three separate times, among many other repeated Texas-directed communications by the organization. Am. Compl. ¶¶ 17, 23-29. X also alleged that Defendants targeted Texas-based companies with false attacks on brand safety, which caused them to reevaluate their X advertising relationships, indicating not only conduct that occurred in Texas, but also conduct that extended far beyond the mere existence of a website or its features.

Defendants next dispute the extensive communications alleged in the complaint, which likewise go far beyond the fact that Media Matters' website is visible in Texas as a basis for jurisdiction. To begin, Media Matters has described its mid-November coverage as a continuation of a number of similar stories since August 2023. The November 16 article targeted five advertisers in particular: Apple, IBM, Bravo, Comcast, and Oracle, which is headquartered in Austin.[1] AT&T is headquartered in Dallas.[2] X alleges that Media Matters targeted both of these Texas-based companies (among others) with its long-running campaign to sabotage X's relationships with its paying advertisers. Am. Compl. ¶ 24. Media Matters' relentlessly negative coverage of X virtually always attributes faults in X's platform to Elon Musk, who is domiciled in Texas and makes numerous critical business decisions about X while in Texas. *Id.* ¶ 27. Commentary on Mr. Musk

---

[1] Contact us, ORACLE.COM, https://www.oracle.com/corporate/contact (last visited Mar. 29, 2024).
[2] Resources, ATT.COM, https://investors.att.com/resources/contacts (last visited Mar. 29, 2024).

establishes a nexus of Media Matters' stories in Texas, which "is plainly a geographic center of the effects of defendants' attempts to disparage and injure X Corp." *Id.* Defendants try to downplay Mr. Musk's "personal Texas ties" as insufficiently "'*defendant-focused.*'" MTD at 9 (quoting *Walden*, 571 U.S. at 284). But Defendants ignore that they "aim[ed]" their attacks at Mr. Musk, *Revell v. Lidov*, 317 F.3d 467, 472 (5th Cir. 2002), as well as additional "reputation-based 'effects'" of their unlawful conduct, *Walden*, 571 U.S. at 287 (citation omitted), which were designed to harm X in Texas specifically, Am. Compl. ¶ 27.

Furthermore, like many nonprofits, every page of Media Matters' website solicits donations and email addresses for various causes. It is implausible that Media Matters never used these email addresses and the resulting contact information to contact individuals in Texas to republish their false, malicious stories regarding X, or to solicit donations from p across the country, including Texas. *Id.* ¶ 23. Soliciting money from Texans in Texas, or otherwise "fostering an ongoing relationship" with such individuals, is a paradigmatic example of Media Matters purposefully availing itself of Texas, regardless whether it used such funds for "journalism concerning X" specifically. MTD at 9; *Ford*, 592 U.S. at 356 (finding personal jurisdiction in a state where Ford sold cars, regardless whether a specific sale or accident occurred there).

Finally, X plausibly alleged jurisdiction based on Media Matters' interactions with subscribers and communications with advertisers, especially Texas-based advertisers Oracle and AT&T. Defendants' standard journalistic practice suggests that Media Matters would have directed communications relevant to its coverage of such companies to individuals in Texas. Am. Compl. ¶ 26. And Media Matters claims it received numerous tips substantiating its coverage, the sources of which are plainly relevant to jurisdiction.[3]

---

[3] Relatedly, Media Matters claims a First Amendment associational privilege to resist discovery in its entirety (ECF 43), which this Court should likewise reject. Media Matters cannot claim that it

### B.  Personal jurisdiction is in the interest of substantial justice.

Because X carried its burden of establishing purposeful availment, this Court need only find that exercising personal jurisdiction in Texas comports with "substantial justice." *Revell*, 317 F.3d at 469-70. Media Matters "must make a 'compelling case'" against jurisdiction once X identifies the requisite minimum contacts. *Sangha*, 882 F.3d at 102 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)). Media Matters must show that the exercise of jurisdiction "would prove unfair or unreasonable." *Admar*, 18 F.4th at 786.

Defendants cannot show that the exercise of personal jurisdiction is unjust—let alone make a compelling case to that effect. The "inquiry into fairness captures the reasonableness of hauling a defendant from his home state before the court of a sister state; in the main a pragmatic account of reasonable expectations—if you are going to pick a fight in Texas, it is reasonable to expect that it be settled there." *Revell*, 317 F.3d at 476. Even "a single act" directed to Texas is enough. *Kwik-Kopy Corp. v. Byers*, 37 F. App'x 90, at *5 (5th Cir. 2002) A defendant who repeatedly targets relationships with "blue-chip advertisers" in a state—as Media Matters did when it identified Oracle, a Texas-based corporation, by name in its coverage—cannot claim surprise at being held to answer for its conduct in Texas. Indeed, a defendant who targets Texas relationships by pressuring decision-makers in Texas based on false assertions about a business and its Texas-resident owner surely cannot quail in shock that he might be haled into a Texas court.

## II.  Venue Is Proper in the Northern District of Texas.

Venue is proper in the Northern District of Texas "because a substantial part of the events giving rise to the claims occurred" there. Am. Compl. ¶ 29. X has properly alleged that

---

may shield that information as a matter of law, given that the Fifth Circuit has not even "adopted a specific framework for evaluating a claim of associational privilege," *Young Conservatives of Tex. Found. v. Univ. of N. Tex.*, No. 4:20-CV-973-SDJ, 2022 WL 2901007, at *2 (E.D. Tex. Jan. 11, 2022), let alone how to balance the competing interests at stake in such privilege claims.

"'substantial' activities took place in [the Northern District]." *Feline Instincts, LLC v. Feline Future Cat Food Co.*, No. 4:09-CV-644-Y, 2010 WL 4942188, at *4 (N.D. Tex. Dec. 6, 2010) (citation omitted). "Courts have provided the plaintiff with the benefit of the doubt when determining the governing facts," *Dupree v. Valero Energy Corp.*, No. CIV.A. 03-1834, 2003 WL 22466234, at *1 (E.D. La. Oct. 29, 2003), and "tend to liberally construe the 'substantial part of the events' option for proper venue," *Founders Ins. Co. v. Billy's Bar & Grill, LLC*, No. 3:18-CV-00367-M, 2019 WL 5425478, at *6 (N.D. Tex. Oct. 23, 2019).

Media Matters misconstrues the federal venue rules in its focus on conduct that occurred in other districts. "The question is not whether a substantial part of the events took place elsewhere; rather, the question is whether 'a substantial part of the events or omissions giving rise to the claim occurred'" in this judicial district. *Stampley v. RCNI Freight, LLC*, No. 3:23-CV-1625-B, 2023 WL 5333273, at *1 n.2 (N.D. Tex. Aug. 18, 2023) (citing 28 U.S.C. § 1391(b)(2)). "[V]enue may be proper in a judicial district even if a substantial part of the events or omissions giving rise to the claim occurred elsewhere." *Id.* (citation omitted). Because section 1391(b)(2) "contemplates that venue can be appropriate in more than one district," it "does not restrict venue to the district in which the 'most substantial' events or omissions giving rise to a claim occurred." *Id.* (quoting *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 432 (2d Cir. 2005)); *accord NDX Advisors, Inc. v. Advisory Fin. Consultants, Inc.*, No. 11 C 517, 2011 WL 2200623, at *2 (N.D. Ill. June 6, 2011). Applying that principle here, the fact that certain reporting activities may have taken place outside of Texas is not fatal to establishing the Northern District as a proper venue.

Regardless, X alleged several connections to the Northern District. For example, X alleged that Defendants waged a campaign against X's "blue-chip advertisers," including AT&T, headquartered in the Northern District. Am. Compl. ¶¶ 24, 29, 34. And at least one other advertiser,

mentioned in Media Matters' own reporting (Oracle), is headquartered in Austin. Those allegations alone defeat any argument that venue is improper because this case lacks a connection to Texas generally. And the communications directed to the Northern District also support venue. "[C]ommunications to the district can constitute a substantial part of the events giving rise to a plaintiff's claims, if the claims derive directly from those communications." *Founders Ins. Co.*, 2019 WL 5425478, at *6 (citation omitted). "This includes telephone communications and electronic transmissions." *Id.* Venue is proper in the Northern District because X has alleged (A) that Defendants' "communications [were] directed into [the Northern District]" and (B) that X's claims derive directly from those communications." *Tabletop Media, LLC v. Citizen Sys. Am. Corp.*, No. 3:16-CV-1304-C, 2016 WL 11522083, at *2-3 (N.D. Tex. Sept. 21, 2016).

Defendants certainly communicated with readers in the Northern District by posting Hananoki's article to Media Matters' website. *See, e.g.*, *Flu Shots of Tex., Ltd. v. Lopez*, No. 3:13-CV-144-O, 2013 WL 2449175, at *3 (N.D. Tex. June 5, 2013) (defendants posted the plaintiff's trademark on their website "that was accessible to consumers in the Northern District" and was "doing business in the Northern District"). X alleged that Defendants' Internet websites was "accessible in the Northern District of Texas," and "Plaintiff, who is doing business in the Northern District of Texas, was allegedly injured in this district." *Dagel v. Resident News, LLC*, No. 3:11-CV-00663-L, 2011 WL 3518281, at *8 (N.D. Tex. Aug. 10, 2011). There is no dispute that Media Matters' website is accessible to readers in the Northern District or that X does business in the Northern District, and Media Matters "clearly intended for [its] website[] to reach residents of [that] District." *Dunbar v. Evine Live, Inc.*, No. 17CV1527, 2018 WL 382027, at *2 (W.D. Pa. Jan. 11, 2018). X has thus "alleged tortious internet activity that was directed toward [X], its customers and business contacts in the Northern District of Texas." *Acumen Enterprises, Inc. v.*

*Morgan*, No. 3:11-CV-619-L, 2011 WL 5822252, at *5 (N.D. Tex. Nov. 15, 2011).

Media Matters believes that venue cannot be based on whether a website is accessible in the district—but that merely reiterates their *Johnson*-based arguments, which sound in personal jurisdiction, not venue. Defendants err in "[c]onflating the tests for venue and personal jurisdiction." *Christopher V. Perry Fam. Ltd. P'ship v. Whatever, L.L.C.*, No. CV H-08-1387, 2008 WL 11389239, at *1 (S.D. Tex. Aug. 11, 2008). Moreover, Media Matters' website is not the *sole* basis for venue, as with personal jurisdiction in *Johnson*, but rather only one of multiple relevant facts about the case—and Defendants cannot persuade the Court that it must blind itself to Media Matters' readership and solicitation of donors in the Northern District, either under *Johnson* or for any other reason.

The allegations against Media Matters also extend far beyond merely creating a website. Here, X alleges that Media Matters went even further, soliciting subscribers in the Northern District who were interested in Media Matters' content, sending its newsletter to hundreds or thousands of readers in the Northern District, and targeting Texas-based advertisers with false claims about brand safety on X. Am. Compl. ¶¶ 23-29; *Batzel v. Smith*, No. CV 00-9590 SVW(AJWX), 2001 WL 1893843, at *3 (C.D. Cal. June 5, 2001). Defendants cannot credibly argue that, as a matter of law, its conduct merely had an "incidental effect," MTD at 12, on the Texas-based "'brand-conscious blue chip companies'" it knowingly targeted with its deliberate, malicious smear campaign against X's business with its paying advertisers, Am. Compl. ¶ 66.

Finally, to the extent that the personal jurisdiction and venue inquiries overlap, if "the defendant is amenable to personal jurisdiction under the relevant jurisdictional statute and the constitutional minimum contacts analysis, then . . . venue is proper because a substantial part of the claim arose in the forum district." *Transactional Venue*, 14D FED. PRAC. & PROC. JURIS. § 3806

(4th ed.) (citing, *inter alia*, *Bear Stearns Cos. Inc. v. Lavalle*, No. Civ.A. 300CV1900-D, 2001 WL 406217, \*5 (N.D. Tex. 2001)). If a "defendant's contacts satisfy personal jurisdiction," then they would "ipso facto show that the claim is sufficiently related to the forum to justify venue under Section 1391(b)(2)." *Id.* Media Matters has not argued otherwise.

### III.    X Plausibly Alleged that Defendants Are Liable for Their Unlawful Conduct.

Moreover, X plausibly alleges claims for tortious interference with existing contracts, business disparagement, and tortious interference with economic advantage.

#### A.  X has plausibly alleged a claim for tortious interference with existing contracts.

X plausibly alleged tortious interference with existing contracts. The "elements of tortious interference with existing contractual relations are '(1) an existing contract subject to interference, (2) a willful and intentional act of interference with the contract, (3) that proximately caused the plaintiff's injury, and (4) caused actual damages or loss.'" *Nix v. Major League Baseball*, 62 F.4th 920, 934 (5th Cir. 2023) (quoting *Prudential Ins. Co. of Am. v. Fin. Rev. Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000)), *cert. denied*, 144 S. Ct. 165 (2023). MTD at 14. Media Matters does not dispute that X plausibly alleged that it suffered damages. Instead, Media Matters attacks X's claim on three grounds: (1) failure to allege existence of a contract; (2) failure to allege (i) a breach and (ii) knowing inducement thereof; and (3) failure to allege that Media Matters proximately caused harm, specifically failure to allege cause-in-fact, otherwise known as but-for causation.

Each of Media Matters' arguments fails. X alleges that "[a]t all relevant times, Defendants were aware that X Corp. contracted with various third parties, including but not limited to Apple, NBCUniversal, Comcast, Bravo, and IBM, to sell ads on the X platform, as clearly demonstrated by the many articles written by Defendants on the topic. Defendants are aware that such businesses are 'brand-conscious blue chip companies' who pay to advertise on the X platform." Complaint ¶ 66. X alleges further that "Defendants intentionally interfered with contracts between X Corp.

and its advertisers, including but not limited to Apple, NBCUniversal, Comcast, Bravo, and IBM—all clients with existing advertisement agreements that were casualties of Defendant's misrepresentations and ceased advertising on the X platform as a direct result." *Id.* ¶ 67. These allegations more than suffice to survive dismissal, as X has plausibly alleged the existence of contracts subject to interference, intentional acts of interference, and proximate causation.

### 1.   X has sufficiently alleged the existence of contracts subject to interference.

Media Matters has moved to dismiss the Amended Complaint on the grounds that X failed to allege the terms of contracts subject to interference. There is no dispute that a claim regarding tortious interference with a contract requires "an existing contract subject to interference." *Lexxus Int'l, Inc. v. Loghry*, 512 F. Supp. 2d 647, 669-70 (N.D. Tex. 2007). Courts have dismissed such claims where the plaintiff "has not identified a written or an enforceable oral contract with a client with which [the defendant] interfered." *Accresa Health LLC v. Hint Health Inc.*, No. 4:18-CV-00536, 2020 WL 4644459, at *54 (E.D. Tex. Mar. 19, 2020), *rep. & rec. adopted*, No. 4:18-CV-00536, 2020 WL 2610908 (E.D. Tex. May 22, 2020). But X identified several such contracts with corporate advertisers, as indicated in Media Matters' own reporting. It is common knowledge and hardly a revelation to Media Matters that X contracts with advertisers—providing X's primary revenue source. Am. Compl. ¶¶ 3, 32. Indeed, the premise of the November 16 article is that X was paid by companies to serve ads to X's "normal user[s]" subject to "brand safety tools." *Id.* ¶ 13. Defendants assert the truth of those statements in defense of Media Matters' disparaging reporting. MTD at 20. Either that position estops Media Matters from denying the existence of X's advertising contracts, or it is a concession that Media Matters' own reporting was in fact false.

Defendants have further argued that "[a] general statement that a contract with a customer exists, without details . . . is insufficient." MTD at 14 (quoting *McDonald Oilfiled Ops. LLC v. 3B*

*Inspection, LLC*, 582 S.W.3d 732, 751 (Tex. App.—Hous. [1st Dist.] 2019, no pet.)). So, they say, since the Amended Complaint does not show that any advertiser "had a contractual obligation to *continue using* [X's] services," the allegations are insufficient. *Id.* at 15 (quoting *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 675 (S.D. Tex. 2010)) (alteration in original) (emphasis added). This argument fails for multiple reasons. First, "state pleading requirements, so far as they are concerned with the degree of detail to be alleged, are irrelevant in federal court even as to claims arising under state law" and "the sufficiency of the pleadings in a diversity case is determined by federal procedure." 32 Am. Jur. 2d Federal Courts § 335 (citing, inter alia, *City of Clinton v. Pilgrim's Pride Corp.*, 632 F.3d 148 (5th Cir. 2010)). Second, Defendants ignore that X had contractual obligations to serve paid ads (the subject of Media Matters' own stories) and that Media Matters interfered with those contractual obligations. At a minimum, Media Matters' own reporting indicates numerous "details" about X's contracts, MTD at 14, including its obligations to serve ads to its users, the identities of various advertisers, and numerous safety measures that governed how ads were served, Am. Compl. ¶¶ 7-16, 46-47. Third, as explained below, arguing that terminable-at-will contracts cannot be tortiously interfered contravenes Texas law, which does not limit tortious interference to cases in which parties were contractually obliged to "continue using" services. MTD at 14.

### 2.  X has alleged acts of intentional interference.

Defendants seek dismissal on the ground that X has not alleged that any contracts were breached. That argument fails from the outset, as it conflates *breach* and *interference*. The "termination of an at-will contract can give rise to a tortious interference claim, even if that termination was not a breach." *Off. Brands, Inc. v. Roc Nation Sports, LLC*, No. 3:15-CV-2199-B, 2015 WL 8915804, at *4 (N.D. Tex. Dec. 15, 2015). "Terminable-at-will contracts" are thus "no

defense to a cause of action for tortious interference with contract." *Hamilton v. Advo, Inc*, No. CV H-07-4017, 2009 WL 10692678, at *3 (S.D. Tex. Jan. 14, 2009) (citing *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 689 (Tex. 1989)). And at least one Texas court has also "stated the contract need not have been breached so long as the plaintiff incurred damages." *Spencer v. Overpeck*, No. 04-16-00565-CV, 2017 WL 993093, at *5 (Tex. App.—San Antonio Mar. 15, 2017, pet. denied); *see also Lazer Spot, Inc. v. Hiring Partners, Inc.*, 387 S.W.3d 40, 51 (Tex. App.—Texarkana 2012, pet. denied) (explaining that *Sterner* is good law and at-will contracts are protected).

Moreover, tortious interference exists either "when the defendant (a) 'knowingly induce[s] one of the contracting parties to breach its obligations," ***or*** (b) makes 'performance more burdensome or of less or no value to the one entitled to performance.'" *United Biologics, L.L.C. v. Allergy & Asthma Network/Mothers of Asthmatics, Inc.*, 819 F. App'x 204, 210 (5th Cir. 2020) (emphasis added) (citations omitted); *see, e.g.*, *Ben E. Keith, Co. v. Dining All., Inc.*, No. 4:20-CV-133-A, 2021 WL 951021, at *3 (N.D. Tex. Mar. 12, 2021) (wrongfully misdirecting manufacturer rebates that should have gone to the tortious-interference claimant supported an interference claim). Media Matters doesn't even dispute that X alleged the latter method of establishing interference, specifically that Media Matters made performance of X's advertising services more difficult or less valuable for the companies who paid to advertise on X—X amply alleged a coordinated campaign to con "brand-conscious blue chip companies" into thinking that advertising on X was "'unacceptable'" because it equated endorsement of antisemitic beliefs or that X could not be trusted to keep advertisers safe. Am. Compl. ¶¶ 14, 66. At a minimum, X was not required to establish an *additional* breach by a contracting business based on these allegations. Media Matters altogether ignores the negative effect of its unlawful acts on *X's* own performance.

Defendants erroneously cite *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426 (Tex. 1997) as supposedly insulating allegedly at-will contracts from interference. Defendants offer nothing to support their baseless assertion that X's advertising contracts were terminable at will—at least some were not. In any case, defamatory interference with an at-will contract is actionable under Texas law. *See, e.g.*, *PrevMED, Inc. v. MNM-1997, Inc.*, 2017 WL 785656, at *10 (S.D. Tex. Feb. 28, 2017). And *ACS* is distinguishable. There, a plaintiff claimed that a competitor interfered with its purchase option when the competitor negotiated a purchase of its own; but the contract expressly allowed the seller to negotiate with third-party competitors. 943 S.W.2d at 430. In *GoForIt Entertainment, LLC v. DigiMedia.com L.P.*, 750 F. Supp. 2d 712 (N.D. Tex. 2010), for instance, the court distinguished *ACS* and cases that rely on it as "generally involve[ing] situations where the claimed tortious interference was within the *defendant's* own contractual rights." *Id.* at 738-39. The *ACS* counter-defendant was not "acting to serve a legitimate purpose of its own as a third party competitor," and was "not in the position of a bona fide competitor seeking the third party's services, who induced an efficient breach from the third party by outbidding others in fair competition." *Id.* at 739 (cleaned up).

The same is true here. Media Matters was not acting as a competitor seeking ad revenue from X's advertisers or seeking to outbid X for their business. Media Matters had no "equal right to compete for the [advertisers'] services." *Id.*; *see also Kingsbery v. Phillips Petroleum Co.*, 315 S.W.2d 561, 576 (Tex. App.—Austin 1958, writ ref'd n.r.e.) ("[I]t was entirely legitimate [for] a *business competitor* . . . to persuade [a third party] by *lawful means* to exercise its right to cancel the contract with [the plaintiff]." (emphasis added)). Defendants cannot avoid liability merely because contracts may have been terminable by the advertisers, as Defendants' defamatory stories had no legitimate business purpose—Defendants' defamation of X is necessarily illegitimate, as it

17

peddled malicious falsehoods. *Cf. Cohly v. Miss. Inst. of Higher Learning*, No. 23-60232, 2024 WL 65432, at *5 (5th Cir. Jan. 5, 2024) (faulting a failure to allege falsity).

Next, Defendants dispute that they *knowingly* induced any breach in advertising contracts. This argument is hard to take seriously. Media Matters has a years-long record of publishing open letters and articles and going on broadcast television to pressure advertisers to demand that X comport with Media Matters' preferred censorship regime or otherwise face lost advertising revenue. Am. Compl. ¶¶ 17, 33. It is sufficient to allege that a defendant knowingly induced a breach when it "can reasonably be inferred" that the defendant was "involved in persuading advertisers . . . to end their relationship with [the plaintiff] and pursue" other relationships. *Travelhost, Inc. v. Brady*, No. 3:11-CV-454-M-BK, 2013 WL 4475057, at *5 (N.D. Tex. Aug. 21, 2013). "At a minimum," such evidence would "raise[] a factual question as to [the defendant's ] actions, if any, in encouraging advertisers . . . to move to [another platform], which is directly relevant to [a] tortious interference claim." *Id.*

Defendants' argument here is weak, even in view of their own authorities. For example, in *Funes v. Villatoro*, 352 S.W.3d 200, 213-14 (Tex. App.—Hous. [14th Dist.] 2011, pet. denied), the defendant "could not name the advertisers" he allegedly caused to "drop[] off and quit doing business," so the record did not establish that the defendants "knew any of the advertisers who advertised on the show and in the magazine or that advertisement contracts even existed." The allegations require at least constructive knowledge, meaning "knowledge of facts and circumstances that would lead a reasonable person to conclude that a contract existed." *Hart v. Manriquez Holdings, LLC*, 661 S.W.3d 432, 439 (Tex. App.—Hous. [14th Dist.] 2023, no pet.). A mere "suspicion" that a contract exists with a third party may not rise to the level of constructive knowledge, *id.* at 440, 442, but Defendants' article itself displayed X ads, showing actual

knowledge of contractual advertising relationships with companies named in their own reporting.

X's allegations also raise a plausible inference that Defendants intentionally interfered with X's business relationships. A defendant is liable if it acts "with a conscious desire to prevent the relationship from occurring" or if "defendants knew their acts were certain or substantially certain to interfere with the prospective business relationship between the plaintiff and [the prospective purchaser]." *United States ex rel. Univ. Loft Co. v. Avteq, Inc.*, No. SA-14-CA-528-OLG, 2015 WL 13548950, at *16 (W.D. Tex. Dec. 22, 2015), *rep. & rec. adopted*, No. 14-CV-528-OLG, 2016 WL 9461763 (W.D. Tex. Jan. 8, 2016). Intentional or knowing conduct can be inferred from a "specialized business industry." *Id.* In *Avteq*, plaintiff was defendant's "common competitor for government contracts"; defendant "would have known" that plaintiff "was substantially certain to submit bids for student housing and military installation bids." *Id.* "Through its participation in alleged tortious or unlawful acts, defendants 'surely knew of the substantial likelihood that [plaintiff] would lose prospective business' from the government because plaintiff was a frequent direct competitor" for specific government contracts. *Id.* A plaintiff likewise plausibly alleged a valid claim where defendants "blocked [plaintiffs] from company controlled Facebook pages," "sent messages to discourage any distributor or customer from associating with Plaintiffs in the future," and "purposefully interfered to prevent the formation of future business relationships"; plaintiffs "allege[d] that these messages were 'purposefully designed to interfere' with Plaintiffs' future business opportunities" and suffered damages because "their organizations were 'cannibalized,' thus reducing their value." *Moser v. Omnitrition Int'l, Inc.*, No. 3:16-CV-2558-L, 2017 WL 1957084, at *5 (N.D. Tex. Feb. 28, 2017), *rep. & rec. adopted*, No. 3:16-CV-2558-L, 2017 WL 1957026 (N.D. Tex. May 10, 2017). At a minimum, through their extensive coverage of advertising on X, Defendants knew their actions would sabotage the value of advertising on X.

### 3.  X plausibly alleged that Media Matters proximately caused its harm.

Finally, Media Matters contends that X has not plausibly alleged that it proximately caused the alleged harm. Rather, Media Matters maintains that the loss of advertisers is due to actions of Elon Musk versus any reporting on the X platform by Defendants. The key question is whether the tortious conduct "was a substantial factor in bringing about the alleged injury." *Doe v. Boys Clubs of Greater Dall., Inc.*, 907 S.W.2d 472, 477 (Tex. 1995).

Such disputes simply present a fact question to be resolved at trial. Texas courts demand "clear and specific evidence that the allegedly interfering act caused . . . actual damage or loss," which may be shown through direct or circumstantial evidence. *Deuell v. Tex. Right to Life Comm., Inc.*, 508 S.W.3d 679, 689 (Tex. App.—Hous. [1st Dist.] 2016, pet. denied). The record need only "support a rational inference that the advertisements were discontinued as a result of [the disputed] communications." *Id.* In *Deuell*, communications sufficiently supported causation because they threatened suit unless advertisements were pulled, the broadcasters thereafter refused to resume airing those ads, and the Committee suffered harm as a result because it had to produce replacement ads. *Id.* at 688-89. In another advertising case, data-marketer Nielsen allegedly misrepresented that a radio show's listener statistics were inflated. *Nielsen Audio, Inc. v. Clem*, No. 815CV02435T27AAS, 2017 WL 3412097, at *3 (M.D. Fla. Aug. 7, 2017). The show "identif[ied] McDonalds and Omaha Steaks as business relationships with which Nielsen" interfered and alleged that "[d]ue to Nielsen's public exposition of [its] alleged manipulation of listener statistics," the show "c[ould ]not compete, advertisers no longer want to conduct business with them." *Id.* And the show alleged that its "relationships with [its syndicator] and its advertisers" were damaged "as a result of Nielsen's interference." *Id.* Like the ad-based claim here, the allegations "sufficiently pled each element for a prima facie case for tortious interference." *Id.*

At most, Media Matters' argument suggests that there are two inferences that could be drawn regarding the advertisers' reason for withdrawing from X—it was either Defendants' reporting or Musk's public statements that induced the third-party conduct. But at this phase, it is not for the Court to "choose among competing inferences." *In re Bill of Lading Transmission & Processing Sys. Patent Litig.*, 681 F.3d 1323, 1340 (5th Cir. 2012). So long as the complaint contains factual allegations that would permit a reasonable inference that the defendants' actions were the but-for cause of the harm wrought on X, the complaint must survive—even if it could be reasonable to conclude otherwise at trial. X's allegations easily support a favorable inference; at a minimum, IBM, one of the advertisers directly named by Media Matters, expressly referenced the November 16 article when it pulled its advertising. Am. Compl. ¶ 14 & n.7. And X has alleged— and will prove—that notwithstanding Mr. Musk's years as a public figure, the exodus of advertisers coincided directly with Media Matters' defamatory and malicious reporting.

### B.  Nothing renders Plaintiff's business disparagement claim subject to dismissal.

X has plausibly alleged that Defendants are liable for business disparagement. Business disparagement is actionable under Texas law if "'(1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, (4) resulting in special damages to the plaintiff.'" *Vendever LLC v. Intermatic Mfg. Ltd.*, No. 3:11-CV-201-B, 2011 WL 4346324, at *4 (N.D. Tex. Sept. 16, 2011) (quoting *Forbes v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003)). Media Matters acknowledges that these are the elements of a business disparagement claim under Texas law. MTD at 19.

Defendants dispute that their statements are "false." *Id.* at 21. Defendants characterize their statements as substantially true opinions about ad pairings, and therefore *per se* non-defamatory. Defendants, however, take the position that "if X's supposed safeguards worked, it would have been impossible for Defendants to 'exploit[] . . . X's user features' to bring about the pairings,

21

since Defendants have no authority or control over X, its algorithm, or its advertisement placement. X's allegation, therefore, that Defendants 'created' the pairings is simply not plausible." *Id.* (quoting Am. Compl. ¶¶ 46, 48). While this view of the facts may be one conceivable, though implausible, possibility, the Court must construe the facts in the light most favorable to X. At a minimum, this issue is a fact question about the extent to which Media Matters manufactured the disputed ad pairings. For all but possibly the Apple ad pairing (which was served to at most one other user), not a single other X user besides Media Matters (out of more than 500 million users) was served the pairings in question. Thus, the likelihood that Media Matters viewed the posts at issue due to chance—as opposed to its own artificial, manipulative activity—was akin to the likelihood of a person getting repeatedly struck by lightning. That is more than enough evidence to make its conduct plausibly deceptive, and such fact issues do not warrant dismissal. Notably, Defendants do not even respond to allegations that specific statements were false, including statements that Media Matters "represented that it 'found' these materials next to advertisements" and "[b]ased on these false representations, defendants also falsely stated that it 'certainly isn't the case' that 'brands are now "protected from the risk of being next to" potentially toxic content." Am. Compl. ¶ 76. Defendants fail to even respond to all of X's relevant allegations.

Defendants dispute that they acted with actual malice. But for Rule 12(b)(6) purposes, X sufficiently alleged that Defendants made "false, disparaging, and malicious statements without any legally recognized privilege entitling them to do so," making them "responsible for their falsehoods concerning the condition or quality of X Corp.'s products or services that were intended to, and did in fact, cause financial harm." *Id.* ¶ 78 (cleaned up). Defendants disagree in two respects. First, Defendants argue, if their statements were true, they are *per se* not malicious falsehoods because X cannot plausibly allege that any defendant knew any statement was false.

MTD at 22. But even Defendants identify this argument as mere "truism." The assertion that true statements aren't false is useless, as X has plausibly alleged that Media Matters' reporting *is* false; Media Matters' claim otherwise is, at most, the paradigmatic factual dispute that precludes dismissal. Second, Media Matters argues that allegations that "Defendants' statements were 'not true and, both Media Matters and Hananoki knew it,'" do "'not allow the court to infer more than the mere possibility of wrongdoing' and [are] not enough to state a proper claim." MTD at 22. (quoting *Moser v. Omnitrition Int'l Inc.*, 2018 WL 1368789, at *2 (N.D. Tex. Mar. 16, 2018)). Media Matters argues that the mere "choice of words or content," cannot show actual malice. *Id.*

That authority does not support Defendants' argument. *Moser* dismissed a business disparagement claim on damages grounds, not for lack of allegations supporting an inference of malice. 2018 WL 1368789, at *3. The court *favorably* described allegations of new facts supporting the maliciousness of "specific disparaging statements," including that the statements were part of a "scheme" to harm a business and that their "tone" made sure "no one would trust in Plaintiffs in future business endeavors." *Id.* (citations omitted). The frequency and tenor of Media Matters' statements disparaging X and the safety of advertising on the X platform support similar inferences. Although Defendants attempt to downplay the dispute as one over a mere "choice of words or content," the Court must reject that unfavorable characterization at the pleading stage in view of additional allegations concerning the intent and tenor of Defendants' statements.

Finally, Defendants dispute special damages. X alleged that its "special damages—their 'direct, pecuniary loss attributable to the false communications of the defendants'—included lost revenue from businesses suspending, reducing, or re-examining their advertising with X Corp. as well as lost brand equity. Defendants' false and disparaging statements about advertising-safety measures on the X platform further inflicted financial harms on X Corp. by undermining

23

advertisers' faith in X Corp.'s abilities to monitor and curate content." Am. Compl. ¶ 79. Defendants do not even respond to loss of brand equity. If nothing else, that claim may proceed— though all special damages have been sufficiently pleaded.

Media Matters suggests that X cannot plausibly allege special damages because the loss of advertisers could be explained by "other factors" including "many controversies surrounding X and its owner." MTD at 23. This argument presents a fact question that is inappropriate for resolution on the pleadings. For instance, Media Matters grossly downplays its role in *creating* such "controversies," and it does not appear to address allegations that Media Matters harmed X's advertising-safety efforts. Am Compl. ¶¶ 30-38. Such disputes are resolved at the summary-judgment stage, not at the pleading stage based on disputed allegations that the defendant's actions "played a substantial part in inducing" a company "not to deal with the plaintiff." *Axcess Mktg. Grp. v. W. Creative, Inc.*, No. 3:09-CV-2107-B, 2011 WL 611630, at *8 (N.D. Tex. Feb. 16, 2011) (citing *Hurlbut v. Gulf Atl. Life Ins. Co.*, 749 S.W.2d 762, 767 (Tex. 1987)).

### C.  X adequately pleaded its claim for tortious interference with economic advantage.

Finally, the claim for tortious interference with economic advantage is not subject to dismissal. Media Matters suggests that Texas law does not recognize a claim for interference with prospective economic advantage. MTD at 23-24 (citing *Small Bus. Assistance Corp. v. Clear Channel Broad., Inc.*, 210 F.3d 278, 280 n.1 (5th Cir. 2000)). But Media Matters misses the mark. Courts construe such claims as actionable under a theory of tortious interference with prospective business relations. *See, e.g.*, *Cummins v. Lollar*, No. 4:12-CV-560-Y, 2014 WL 12585644, at *2 (N.D. Tex. July 22, 2014); *Raybourne & Dean Consulting, Ltd. v. Metrica, Inc.*, No. CV SA-14-CA-918-OLG, 2016 WL 7486726, at *7 (W.D. Tex. Jan. 13, 2016), *rep. & rec. adopted*, No. SA-14-CV-00918-OLG, 2016 WL 7496196 (W.D. Tex. Feb. 17, 2016).

Media Matters thus contends that X fails to state a claim for tortious interference with

prospective business relations. MTD at 24. The elements of that claim are that: (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result. *E.g.*, *United Biologics*, 819 F. App'x at 211; *Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013). Media Matters argues only that X has not alleged an independently tortious act that prevented a business relationship from occurring. MTD at 24.

Media Matters is wrong. Business disparagement is independently tortious, so stating an "actionable defamation or business disparagement claim" can establish "the sort of independently tortious conduct necessary to establish tortious interference with business relations." *Cooper v. Harvey*, No. 3:14-CV-4152-B, 2016 WL 4427481, at *15 (N.D. Tex. Aug. 21, 2016) (ultimately dismissing claim on other grounds). A plaintiff need only allege that the defendant has "do[ne] something independently unlawful or tortious," meaning something that is "'actionable under a recognized tort.'" *United Biologics*, 819 F. App'x at 211. It is unnecessary for X to *prevail* on the claim: "'Independently tortious does not mean that the plaintiff must be able to prove an independent tort; rather, a plaintiff must 'prove that defendant's conduct would be actionable under a recognized tort.'' *Cooper*, 2016 WL 4427481, at *13 (cleaned up); *accord Kamel v. Ave. Insights & Analytics LLC*, No. 6:18-CV-422-JDK-KNM, 2020 WL 4679574, at *11-12 (E.D. Tex. May 5, 2020), *rep. & rec. adopted*, No. 6:18-CV-422-JDK-KNM, 2020 WL 5939052 (E.D. Tex. Oct. 7, 2020)). The alleged business disparagement is thus actionable.

## PRAYER

The Court should deny Defendants' Motion to Dismiss in its entirety.

March 29, 2024

Respectfully submitted.

*/s/ Judd E. Stone II*
Judd E. Stone II
Texas Bar No. 24076720
Christopher D. Hilton
Texas Bar No. 24087727
Ari Cuenin
Texas Bar No. 24078385
**STONE | HILTON PLLC**
1115 W. Slaughter Lane
Austin, TX 78748
Telephone: (737) 465-7248
judd@stonehilton.com
chris@stonehilton.com
ari@stonehilton.com

John C. Sullivan
Texas Bar No. 24083920
**S|L LAW PLLC**
610 Uptown Boulevard, Suite 2000
Cedar Hill, TX 75104
Telephone: (469) 523-1351
Facsimile: (469) 613-0891
john.sullivan@the-sl-lawfirm.com

**CERTIFICATE OF SERVICE**

I hereby certify that this document was served on all counsel of record via CM/ECF on March 29, 2024.

*/s/ Judd E. Stone II*
Judd E. Stone II