UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| **X CORP.**, a Nevada corporation,<br><br>    Plaintiff,<br><br>  vs.<br><br>**MEDIA MATTERS FOR AMERICA**, a Washington, D.C. non-profit corporation, **ERIC HANANOKI**, and **ANGELO CARUSONE**,<br><br>    Defendants. | **Case No. 4:23-cv-01175-O** |

**REPLY IN SUPPORT OF MOTION TO COMPEL**

Defendants' trickle of document production, indefensible privilege assertions, boilerplate objections, and open-ended timelines have, unfortunately, compromised X's ability to comply with the Court's scheduling order. X takes seriously its obligation to work with opposing counsel to narrow discovery disputes and has gone to great lengths to do so. Counsel for X participated in four separate conferences with Defendants' attorneys over a two-month window; a dozen email exchanges accompanied those conversations. But despite these good-faith efforts to avoid involving the Court, Defendants refused to inform X when they would complete their production and declined to drop improper boilerplate objections until *after* X filed its motion. This concession came with new objections and purported limits—all of which Defendants have waived.

Although Defendants claim to have been "diligent" in discovery by "enlist[ing] nearly 50 people to review documents," they produced *nothing* until after this Court denied Defendants' motion to stay and have only produced 2,000 documents since then—despite admitting that there are terabytes of potentially responsive data. Resp. Decl. ¶¶ 24, 25; ECF No. 54. Worse, because of Defendants' categorical assertion of a vague "First Amendment" privilege, combined with a refusal to produce documents responsive to many of X's requests, the documents that Defendants *have* produced are insufficient for X to move this case forward through depositions or retention of expert witnesses. These issues are ready for prompt judicial resolution.

## ARGUMENT AND AUTHORITIES

### I. X's Motion Raises Issues Ripe for Resolution.

#### A. Defendants concede that the Court can resolve whether the First Amendment privilege covers donor information and reporter's notes.

Defendants have categorically refused to produce documents that they believe are covered by a First Amendment privilege. *E.g.*, Mot. Appx. 47 (Obj. to RFP 3). They nonetheless insist that X cannot move to compel at this juncture because no specific document has been placed on a

1

privilege log. Resp. 4-5. It is difficult to take that assertion seriously. X served its initial requests for production on February 5. It is now the end of May. Defendants should not be rewarded for dragging their feet to disclose purportedly privileged documents so late in the discovery period that X would have no meaningful time or ability to challenge the designations.

Shifting course, Defendants blame X for their obstructionism, claiming that the parties should have agreed on an ESI protocol and a confidentiality order first. *Id.* But the presence (or lack thereof) of those orders has no effect on whether the Court can rule on the categorical application of the First Amendment in a case between private parties involving no state action. Defendants concede as much. *Id*. at 5.

**B.      Defendants' new objections and arguments are waived as untimely.**

"The party resisting discovery must show specifically how each discovery request is not relevant or otherwise objectionable." *Gondola v. USMD PPM, LLC*, 223 F. Supp. 3d 575, 578 (N.D. Tex. 2016). Despite this longstanding rule, Defendants initially lodged a host of boilerplate objections followed by a promise to produce "any responsive, nonprivileged documents." *E.g.*, Mot. Appx. 52 (RFP 7). These generic objections were insufficient under Rule 26. *See Heller v. City of Dall.*, 303 F.R.D. 466, 483, 486–87 (N.D. Tex. 2014) (Horan, Mag. J.). Defendants withdrew those objections, and X agrees that this issue is largely resolved.

But rather than simply withdrawing their meritless objections and producing in accordance with their obligations, Defendants have sought to introduce *new* objections. *See generally* Resp. Appx. Exs. 1-3 (new objections to RFPs 7-9, 19, 24-29, 40). On this basis, they claim the parties' discovery dispute is "unripe" and should be decided by "separate motion." Resp. 3. This would not only add additional delay and waste this Court's time, but it would all but guarantee the parties cannot comply with the Court's current scheduling order. X cannot prepare experts and take

depositions with only a fraction of the documents to which it is entitled. Defendants' claim also ignores that their original "[g]eneral, boilerplate, and unsupported objections preserve nothing." *Lopez v. Don Herring Ltd.*, 327 F.R.D. 567, 583 (N.D. Tex. 2018) (Horan, Mag. J.). Thus, the Court should deem Defendants' new objections untimely and overrule them as well.

**II.     Defendants' Privilege Objections Should Be Overruled.**

   **A.     Defendants' privilege objections lack the necessary specificity.**

As X detailed in its motion, Defendants asserted a catchall objection to X's requests for production for attorney-client privileges, work-product protections, "and/or any other applicable privilege or shield law, and/or constitute trial preparation material within the meaning of Rule 26." *See, e.g.*, Mot. Appx. 45. Those vague objections were insufficient, but Defendants still fail to assert their privilege objections with specificity. Instead, they rely on a purported "First Amendment privilege," without bothering to articulate which cognizable evidentiary privileges are encompassed by a vague, sweeping reference to the First Amendment. Thus, their privilege claims should be disregarded. *See In re Santa Fe Int'l Corp.*, 272 F.3d 705, 710 (5th Cir. 2001); Fed. R. Civ. P. 26(b)(5)(A)(ii). Furthermore, Defendants' tenuous promise to provide a privilege log at some undefined future point in the litigation is no excuse for non-compliance. Resp. 9 n.5.

   **B.     Defendants' privilege arguments should be rejected.**

      **1.     Defendants have abandoned reliance on any "reporter's privilege," which was never available to them in the first place.**

Defendants cannot rely on a purported "reporter's privilege" to avoid discovery. Mot. 13 (citing *In re Selcraig*, 705 F.2d 789, 792–93 (5th Cir. 1983); *Karem v. Priest*, 744 F. Supp. 136, 137 (W.D. Tex. 1990)). Any arguable qualified privilege from divulging a confidential source's identity can be asserted only by *reporters*, not by third parties like employers. *Id.* (citing *Selcraig*, 705 F.2d at 798; *United States v. Smith*, 135 F.3d 963, 970 (5th Cir. 1998)). And when, as here, a

3

self-described reporter is defending claims involving his *own* publication of assertedly public observations, the so-called privilege would not apply since there "is no intrusion into newsgathering or special functions of the press." Mot. 14 (quoting *Kitzmiller v. Dover Area Sch. Dist.*, 379 F. Supp. 2d 680, 687 (M.D. Pa. 2005) (citations omitted)).

Defendants do not even bother to address these arguments, let alone refute X's authorities. The Court may thus deem Defendants to have abandoned any reliance on an asserted "reporter's privilege," or may overrule any such objection as unopposed. *Cf., e.g.*, *Rutila v. United States Dep't of Transp.*, No. 3:16-CV-2911-B-BK, 2020 WL 2552944, at *1 (N.D. Tex. May 20, 2020) (Boyle, J.). Defendants cannot avoid that result by vaguely promising to produce a privilege log, no "reporter's privilege" exists here in the first place, and no conclusory assertions of privilege are "insufficient to carry out the proponent's burden of establishing" a privilege. *EEOC v. BDO USA, L.L.P.*, 876 F.3d 690, 696 (5th Cir. 2017). Privilege "may not be tossed as a blanket over an undifferentiated group of documents." *United States v. El Paso Co.*, 682 F.2d 530, 539 (5th Cir. 1982). Moreover, Defendants do not even address X's authority indicating that X is necessarily entitled to information from the only person who could arguably hold such a privilege, Hananoki, given that he is both a party and a witness and his so-called reporting is both central to the jurisdictional and merits issues in this case. Mot. 14.* Insofar as Defendants invoke vague "First Amendment" protections, they fail to explain how or why they cover (let alone extend beyond) the type of source-identity information to which a "reporter's privilege" could arguably apply under *Selcraig*.

---

* A "reporter's privilege" makes particularly little sense in the context of this case, because the falsity of and intent behind what Hananoki published is at the very heart of the claims at issue. Allowing Hananoki or Media Matters to claim a reporter's privilege here would allow any individual or organization that labels itself a reporter to use the privilege as both a sword and shield by defaming others at will while protecting itself from discovery related to its own defamatory statements.

4

### 2. Defendants' reliance on the First Amendment fails absent state action.

The Court should also reject Defendants' suggestion that they are exempt from the rule that applying the Constitution here requires state action. X has no governmental function and is not a state actor. Defendants never claim otherwise. Instead, they contend that the First Amendment's freedom of association is excused from the state-action requirement. This argument is hard to square with the rest of the First Amendment. After all, the "guarantees of free speech and equal protection guard only against encroachment by the government and 'erec[t] no shield against merely private conduct.'" *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 566 (1995) (quoting *Shelley v. Kraemer*, 334 U.S. 1, 13 (1948)). Defendants cannot explain why freedom of association warrants treatment different from the rest of the First Amendment.

Relying on *Shelley*, Defendants argue that "the action of 'courts and of judicial officers in their official capacities is to be regarded as action of the State within the meaning of' the Constitution's state action requirements." Resp. 6 (quoting 334 U.S. at 14–15). But the Fifth Circuit has repudiated the notion that merely invoking the judicial process constitutes state action. *E.g.*, *Hardy v. Gissendaner*, 508 F.2d 1207, 1210–11 (5th Cir. 1975). Defendants attempt (at 8) to distinguish these Fifth Circuit cases as arising outside of "the First Amendment privilege or discovery disputes." But, of course, so did the discrimination in *Shelley*—an Equal Protection case.

Given that Fifth Circuit precedent already repudiates Defendants' attempt to extend *Shelley* beyond the Equal Protection context, that should end the matter. But that precedent is all the more reason to reject Defendants' reliance (at 5-6) on non-binding out-of-circuit authority. Defendants cite only one circuit-court holding, *In re Motor Fuel Temperature Sales Pracs. Litig.*, 641 F.3d 470, 481 (10th Cir. 2011), which itself relied on dicta in *Grandbouche v. Clancy*, 825 F.2d 1463, 1466 (10th Cir. 1987), that a court order "compelling discovery and the trial court's enforcement

5

of that order provide the requisite governmental action that invokes First Amendment scrutiny." *Grandbouche* has rightly been called into doubt since "it has the effect of creating government action every time a magistrate simply signs, and a trial judge enforces, a discovery order." *Cyber Promotions, Inc. v. Am. Online, Inc.*, 948 F. Supp. 436, 445 (E.D. Pa. 1996). Other courts have rejected similar reliance on the First Amendment where "the part[ies] seeking the discovery" were "private parties, 'not police, law enforcement, or any other type of Government entity.'" *Dakota Energy Coop., Inc. v. E. River Elec. Power Coop., Inc.*, No. 4:20-CV-04192-LLP, 2021 WL 3862131, at *2 (D.S.D. Aug. 30, 2021). That reasoning follows the admonishment that "[t]he First Amendment constrains *governmental actors*." *Id.* (quoting *Manhattan Community Access Corp. v. Halleck*, 587 U.S. 802, 804 (2019)) (emphasis in original). Any notion that courts uniformly flout that Supreme Court precedent is wrong.

Nor does Fifth Circuit precedent support Defendants' claimed blanket "privilege assertion among private parties." Resp. 7. Even Defendants' own authority states that "[u]nlike cases involving the disclosure of membership lists," parties resisting discovery are never "entitled to assert a blanket privilege by virtue of their status as associations." *La Union Del Pueblo Entero v. Abbott*, No. 5:21-cv-00844, 2022 WL 17574079, at *9 (W.D. Tex. Dec. 9, 2022). At most, a qualified privilege may protect certain *internal* communications of an organization in limited factual circumstances. *Whole Woman's Health v. Smith*, 896 F.3d 362, 372 (5th Cir. 2018). But the Fifth Circuit has never recognized a privilege to forestall discovery into donors altogether.

### III.     Defendants Seek Relevant Information Well Within the Scope of Rule 26.

Defendants maintain relevance-based objections to four categories of documents: (1) "irrelevant donor information" (*id.* at 10); (2) "harassing and disproportionate requests for irrelevant financial information" (*id.* at 13); (3) "harassing requests for irrelevant information

about Media Matters employees" (*id.* at 18); and (4) "harassing request[s] for irrelevant information about Media Matters's personnel matters" (*id.* at 21). These objections are meritless.

  **A. X's requests for donor information (Request Nos. 11, 17-18, 21, and 35) are relevant to jurisdiction, venue, and the merits of X's claims.**

  X requests donor information because it is directly relevant to the threshold questions of jurisdiction and venue. Mot. 4. And even if that were not enough, donor information is likely to be probative of Defendants' motive, intent, and malice. First, jurisdiction and venue: in their motion to dismiss, Defendants claimed that they "do not solicit Texas donors to fund Media Matters's journalism concerning X." ECF No. 41 at 16. The qualifications in that statement are telling. By framing the issue as whether Defendants solicit Texas donors for their "journalism concerning X," Defendants leave the door open to them either (1) soliciting Texans to support other journalistic endeavors, or (2) soliciting Texans for general funding purposes. Either scenario would bear on whether Defendants have purposely availed themselves of Texas. For similar reasons, specific information about potential Texas donors might matter for venue purposes. Unless Defendants are willing to concede jurisdiction and venue—and to date, they have given no indication that they intend to do so—discovery is necessary to parse out Defendants' Texas connections. Indeed, in a footnote, Defendants all but concede that discovery into whether Media Matters solicited donors in Texas would be relevant to the jurisdictional inquiry. Resp. 13 n.9.

  Next, the merits: Donor information is also probative of Defendants' motive (including whether Defendants acted with malice), which X may prove through circumstantial evidence. *E.g.*, *Bentley v. Bunton*, 94 S.W.3d 561, 596 (Tex. 2002). Thus, a jury could properly take account of who funded Defendants' tortious conduct. To take one obvious example, if a donor wrote a large check to Media Matters conditioned on the publication of an article—or even multiple articles— defaming X, that communication would be relevant, if not dispositive, to establishing Defendants'

intent. But even without a smoking gun, donor information is relevant. If Defendants solicited donations from individuals publicly known to be antagonistic to X or Elon Musk immediately prior or subsequent to the publication of defamatory articles, that connection would be evidence supporting X's claim that Defendants acted with malice and intended to cause the harm that they did. In all events, X seeks information squarely relevant to its claims.

B.     **X's requests for financial discovery (Request Nos. 13-16) are relevant.**

Defendants' frontline objection to X's requests for financial information is that Media Matters's IRS Form 990s are sufficient. *E.g.*, Resp. 14 n.11. Not so. First, Hananoki and Carusone are also defendants; X seeks punitive damages against both individually, and thus, both must produce their tax returns and bank statements. Defendants do not even try to argue otherwise. Second, with respect to Media Matters' financials, Defendants are wrong to claim that the Form 990s are sufficient. Courts routinely order production of financial statements and other documents in addition to tax returns when punitive damages are sought. *See, e.g.*, *Alvarez v. Aldi (Tex.) LLC*, No. 3:13-CV-4122-L, 2014 WL 3624929, at *3–4 (N.D. Tex. July 22, 2014). More granular detail is necessary to flesh out crucial questions of motive and intent. For instance, if Media Matters' expenses show Hananoki was financially rewarded for writing the tortious articles, that would be compelling circumstantial evidence of malice. Any unusual spending on devices, software, subscriptions, or other technical expenses could also provide evidence supporting Defendants' manipulation of the X algorithm. Abstract data in Media Matters's 990s is also insufficient to capture all pertinent information. A jury might decide to punish an individual differently who obtained no profit from a tort compared with someone who committed a tort and used the profits to support a collection of expensive cars. Finally, X requests documents related to any third-party obligors who may be indemnifying Defendants' tortious conduct or paying their legal fees and

8

thereby financing Defendants' torts. These documents would not be covered by either mandatory disclosures of insurance contracts or the IRS Form 990s.

### C. X seeks targeted information about Media Matters' employees (Request Nos. 23, 37-38, 43) that is likely to substantiate X's claims.

As X explained in its brief (at 5) X has requested: (1) communications with Hananoki and Matthew Gertz (a senior fellow at Media Matters) for a period of time starting immediately before Elon Musk's purchase of X and through the tortious conduct, (2) records of Hananoki's travel during the relevant time, and (3) Defendants' subsequent "reporting" coverage after their initial tort. Defendants reassure X that they need not comply with these requests because Hananoki did not travel "in relation to his research or drafting of the November 16, 2023 article." Resp. Appx. 27. That is not how X framed its requests, and for good reason: Hananoki may, for example, have traveled to publicize the tortious articles or to solicit donations (as opposed to for research or drafting). All of this would be relevant to Defendants' intent and malice. Indeed, Defendants' carefully worded response regarding Hananoki's travel—limited to "research or drafting"—suggests that relevant travel did in fact occur.

To be clear, X is obviously not seeking all communications about Hananoki's personal life, contrary to Defendants' dramatic parade of horribles; X merely seeks those communications relevant to the claims at issue. The meet-and-confer process could have, and should have, eliminated any such misunderstanding. Litigation counterparties typically handle requests for communications by negotiating search terms, but on May 1, Defendants' counsel flatly refused to disclose their chosen search terms and custodians *to any request*. Mot. Appx. 155. Only after X filed its motion to compel did Defendants even offer to tell X who its proposed custodians were, but even so X still has not received that information and at no point have Defendants offered to confer on appropriate search terms.

Lastly, Defendants characterize X's requests for communications with Gertz as being "far afield" because he had "no role" in this dispute. Resp. 20. That is a remarkable claim. In discussing causes for harm to X, Gertz proclaimed in no uncertain terms that "It's the Antisemitism, Stupid" in an article expressly incorporated in the Amended Complaint. *See* ECF No. 37 ¶¶ 6, 66. He also stated that "[n]o advertiser is safe while Elon Musk controls X." *Id.* Gertz's reporting on its face is evidence that Defendants knew advertisers were sensitive to perceived safety issues and would stop advertising with X after Defendants published the November 16 and 17 articles. Thus, any communications with Gertz will likely show a coordinated effort to sabotage X's contracts, operations, reputation, or business relationships.

### D.   X seeks relevant documents related to Defendants' past behavior (Request Nos. 46, 47).

X also requests documents showing instances in which Defendants lied, discriminated, or otherwise defamed. Defendants have agreed to produce publicly available legal filings but otherwise objected to discovery. This is problematic because documents related to accusations, complaints, and internal investigations against Defendants for discrimination based on a person's protected class (Request No. 46) are probative of intent and malice with respect to Defendants' ability to discern truth from falsity. To give just one example, Defendants have repeatedly insisted that X condones antisemitism. If Defendants themselves have been accused of—or investigated—antisemitism at Media Matters, the way that Defendants resolved those accusations could be powerful evidence of pretext, or at least lead to evidence probative of the recklessness with which Media Matters treated any allegations of antisemitism against X.

### CONCLUSION

The Court should grant X's motion to compel production of documents. A revised proposed order reflecting the matters currently in dispute accompanies this reply.

<table>
<tr><td>Dated: May 31, 2024.</td><td>Respectfully submitted,

*/s/ Christopher D. Hilton*
Judd E. Stone II
Texas Bar No. 24076720
Christopher D. Hilton
Texas Bar No. 24087727
Ari Cuenin
Texas Bar No. 24078385
Alexander M. Dvorscak
Texas Bar No. 24120461
**STONE | HILTON PLLC**
1115 W. Slaughter Lane
Austin, TX 78748
Telephone: (737) 465-3897
judd@stonehilton.com
chris@stonehilton.com
ari@stonehilton.com
alex@stonehilton.com

John C. Sullivan
Texas Bar No. 24083920
**S|L Law PLLC**
610 Uptown Boulevard, Suite 2000
Cedar Hill, TX 75104
Telephone: (469) 523-1351
Facsimile: (469) 613-0891
john.sullivan@the-sl-lawfirm.com

*Counsel for Plaintiff*</td></tr>
</table>

11

## CERTIFICATE OF SERVICE

    I hereby certify that on May 31, 2024, a copy of this document was served on all counsel of record through the Court's CM/ECF system in accordance with the Federal Rules of Civil Procedure.

                                                */s/ Alexander M. Dvorscak*
                                                Alexander M. Dvorscak