# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# FORT WORTH DIVISION

| | |
|---|---|
| X CORP.,<br><br>                Plaintiff,<br><br>     v.<br><br>MEDIA MATTERS FOR AMERICA,<br>et al.,<br><br>                Defendants. | Civil Action No. 4:23-cv-01175-O |

# DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO COMPEL CORRECTED CERTIFICATE OF INTERESTED PERSONS

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 3

I.      Elon Musk exercises total control over X, putting him and his conduct at the
        heart of this lawsuit. ................................................................................................ 3

II.     Musk exercises extraordinary personal control over Tesla. ................................... 4

III.    Musk has blurred many lines between Tesla and X. ............................................... 6

IV.     Tesla's stock price and brand image consistently respond to Musk's
        X-related activities. ................................................................................................ 9

V.      The Court appears to have a financial stake in Tesla. .......................................... 11

ARGUMENT ................................................................................................................... 12

I.      Musk has intertwined X, Tesla, and his personal brand to such a degree
        that the case's outcome will affect Tesla's reputation, resources, and share price .......... 13

II.     The Court will need to adjudicate disputes about Musk's testimony, with broad
        ramifications for Tesla. ......................................................................................... 18

III.    The Court will be asked to resolve disputes about evidence damaging
        to Musk and, by extension, Tesla. ........................................................................ 21

CONCLUSION ................................................................................................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cleary v. Am. Airlines, Inc.*,
  No. 4:21-CV-135-P, 2021 WL 3721457 (N.D. Tex. Feb. 18, 2021) .......................................12

*Nieves v. John Bean Techs. Corp.*,
  No. 3:13-CV-4059-D, 2014 WL 2587577 (N.D. Tex. June 10, 2014) ...........................1, 3, 12

*Prudential Ins. Co. of Am. v. Fin. Rev. Servs., Inc.*,
  29 S.W.3d 74 (Tex. 2000) ....................................................................................................21

*SEC v. Musk*,
  No. 23-MC-80253-LB, 2024 WL 1511903 (N.D. Cal. Feb. 10, 2024) ...................................18

*Sollenbarger v. Mountain States Tel. & Tel. Co.*,
  706 F. Supp. 776 (D.N.M. 1989) .........................................................................................22

*Steel Erectors, Inc. v. AIM Steel Int'l, Inc.*,
  312 F.R.D. 673 (S.D. Ga. 2016) ...........................................................................................12

*Tesla, Inc. v. Monserratt*,
  No. 4D2023-2075, 2024 WL 24813 (Fla. Dist. Ct. App. Jan. 3, 2024) .................................18

*Tornetta v. Musk*,
  310 A.3d 430 (Del. Ch. 2024) .......................................................................................4, 5, 6

*United States v. Musk*,
  719 F.3d 962 (8th Cir. 2013) ...............................................................................................18

*United States v. Twitter, Inc.*,
  No. 22-CV-03070-TSH, 2023 WL 8007994 (N.D. Cal. Nov. 16, 2023) ...............................19

**Statutes**

28 U.S.C. § 455(a) ..................................................................................................................2

28 U.S.C. § 455(b)(4) .............................................................................................................2

**Other Authorities**

Fed. R. Civ. P. 7.1 .................................................................................................................12

L.R. 3.1(c) .....................................................................................................................1, 3, 12

L.R. 3.2(e) ..........................................................................................................................1, 12

## INTRODUCTION

This Court requires each plaintiff to file a "certificate of interested persons" setting forth "a *complete* list" of all persons or entities that are "financially interested in the outcome of the case." L.R. 3.1(c) (emphasis added); *see also* L.R. 3.2(e). This rule is not a mere procedural nicety—it protects fundamental fairness by ensuring that judges have information sufficient "to determine whether recusal is required based on the judge's financial self-interest." *Nieves v. John Bean Techs. Corp.*, No. 3:13-CV-4059-D, 2014 WL 2587577, at *2 n.5 (N.D. Tex. June 10, 2014).

Plaintiff X Corp.'s certificate of interested persons is deficient because it fails to disclose that Tesla and its shareholders have a financial interest in this case. In recent months, investigative reporting and judicial fact-finding have made public the remarkable degree to which Elon Musk has blurred the lines between Tesla and X in the year and a half since he acquired the latter. At Musk's direction, X has routinely used Tesla employee time, resources, and even office space as its own—with documented consequences to Tesla stock. Because of this commingling, and in light of the public's reasonable perception that both X and Tesla are stand-ins for Musk, Tesla's financial interest in this lawsuit is clear. X's victory or defeat will necessarily impact Tesla, including the price of its stock.

It is important for this Court to be aware of Tesla's financial interest in this case because the Court's most recently available disclosures indicate that it may own between $15,001 and $50,000 of Tesla stock. Throughout this litigation, the Court will be called upon to make decisions that will impact Tesla's stock price. For instance, any decisions regarding Defendants' outstanding request for Musk's deposition—including resolution of objections, whether any portions of the transcript may be sealed, and whether to allow it in the first place—are likely to have an impact on Tesla stock, as Musk's testimony will shed light on Musk's management choices, public statements, private views, and the division of his time and allocation of resources between Tesla

1

and X. Musk has a track record of resisting depositions and fighting disclosure of deposition transcripts, no doubt because of the impact that his statements have on his businesses, including Tesla. The Court will also be asked to referee disputes—both in discovery and at any trial—regarding the extent to which Defendants may elicit and introduce evidence about Musk's business judgment, erratic behavior, and other topics damaging to Musk. Such evidence has the potential to directly harm investor confidence in Musk—and thereby drive down Tesla's share price. This is not speculation: History has shown that when Musk speaks, Tesla's stock price responds.

Had X properly disclosed that Tesla and its shareholders are "financially interested" in the outcome of this case under Local Rule 3.1(c), this Court would have had the information necessary to allow it to make an informed recusal decision. Federal law requires that a judge must recuse whenever "[h]e knows that he . . . has a financial interest in the subject matter in controversy or in a party to the proceeding, or any other interest that could be substantially affected by the outcome of the proceeding." 28 U.S.C. § 455(b)(4). Congress has further instructed judges to avoid even the appearance of partiality, by disqualifying themselves whenever their "impartiality might reasonably be questioned." *Id.* § 455(a). Because of X's failure to disclose all individuals and entities who maintain a financial interest in this case, this Court could not have "know[n]" that its financial interest in Tesla "could be substantially affected by the outcome of the proceeding," let alone the extent to which its impartiality "might reasonably be questioned." *Id.* § (a), (b)(4).[1]

---

[1] Defendants' counsel requested that X amend its deficient certificate during a telephonic conference on June 13, 2024. Counsel for X indicated that X would evaluate the issue. Counsel for X then indicated by email on June 17 that X opposes this motion, and that while it may amend its certificate to provide slightly more detail, it would not list Tesla as an interested party.

This Court should compel X to file an accurate and complete certificate of interested persons that discloses the financial interest of Tesla and its shareholders in this matter, as well as any other previously undisclosed persons or entities with a financial interest in this case.[2]

## BACKGROUND

### I. Elon Musk exercises total control over X, putting him and his conduct at the heart of this lawsuit.

Plaintiff X is under Elon Musk's direct and personal control. Musk holds X privately, meaning he is not answerable to shareholders, partners, or securities regulators.[3] Musk made the decisions that led to a rise in extremism and a collapse in brand safety on X. And Musk directed X to bring this case after Defendants reported on Musk's endorsement of an antisemitic conspiracy theory and a continued failure to protect brand safety on the platform. Indeed, nearly as soon as the article was published, Musk threatened a "thermonuclear lawsuit" against Media Matters.[4] X filed this lawsuit just two days later. X's operative complaint invokes Musk's leadership of X as the supposed rationale for Defendants' alleged business torts, Am. Compl. ¶¶ 1–6, ECF No. 37, and relies on Musk's purported ties to Texas to justify the choice of this Court as venue, *id.* ¶ 27. Defendants, in turn, will make Musk's conduct a cornerstone of their defense. *See, e.g.*, Defs.' Br. Supp. Mot. to Dismiss Pl.'s Am. Compl. 18, ECF No. 41.

---

[2] Defendants have not, at this juncture, filed a motion to recuse under 28 U.S.C. § 455 because the oversight at issue is X's failure to notify the Court of Tesla's financial interest, disclosure of which would have enabled the Court to make a recusal decision *sua sponte. See Nieves*, 2014 WL 2587577, at *2 & n.5 (by mandating "a complete list" of all persons and entities "that are financially interested in the outcome of the case," L.R. 3.1(c) "enables the judge" to make an informed decision of "whether recusal is required based on the judge's financial self-interest").

[3] *See* Kate Conger & Lauren Hirsch, *Elon Musk Completes $44 Billion Deal to Own Twitter*, N.Y. Times (Oct. 27, 2022), https://perma.cc/2J2Z-J7E6.

[4] Harry Tailor, *Elon Musk to File 'Thermonuclear Lawsuit' as Advertisers Desert X*, The Guardian (Nov. 18, 2023), https://perma.cc/N3RL-S47U.

From start to finish, Musk and his conduct are at the heart of this lawsuit's subject matter.

## II.     Musk exercises extraordinary personal control over Tesla.

Musk also exercises near-total control over Tesla. He is Tesla's largest shareholder, former chairman, chief executive, and—as his Tesla biography puts it—its self-appointed "Technoking."[5] Tesla's own Form 10-K warns investors about the company's dependence on Musk: "We are highly dependent on the services of Elon Musk, Technoking of Tesla and our Chief Executive Officer. . . . Although Mr. Musk spends significant time with Tesla and is highly active in our management, he does not devote his full time and attention to Tesla."[6] The 10-K then cites Musk's work at X as a risk factor for Tesla.[7] The 10-K also cautions that Musk's personal stake in Tesla is so large that if he "were forced to sell shares of our common stock . . . such sales could cause our stock price to decline."[8] And it warns that "Mr. Musk from time to time may commit to investing in significant business or other ventures"—such as X—"and as a result, be required to sell shares of our common stock in satisfaction of such commitments."[9]

According to one court's recent factfinding, Musk leverages Tesla's dependence on him to command "managerial authority over all aspects of Tesla and often without regard to Board authority." *Tornetta v. Musk*, 310 A.3d 430, 504 (Del. Ch. 2024). The court cited an "avalanche of evidence" to that effect:

- "Tesla and Musk are intertwined . . . . Musk is Tesla's public face, and he describes Tesla as 'my company.'" *Id.*

- "Tesla's entire corporate strategy is Musk's brainchild[.]" *Id.*

---

[5] Tesla, *Elon Musk*, https://perma.cc/345W-F3MD (archived June 3, 2024).

[6] Tesla, Inc., Annual Report (Form 10-K) at 21 (Jan. 26, 2024), https://perma.cc/ARH2-EUBG.

[7] *Id.*

[8] *Id.* at 28.

[9] *Id.*

- "Musk has admitted that he has 'the power to direct operational decisions at Tesla.'" *Id.* at 505 (alteration accepted).

- "Musk is extremely involved in financial planning and supplies inputs for models and plans. All financial plans must be approved by Musk." *Id.* (footnotes omitted).

- "Musk has made up positions and titles for himself. In 2021, without first consulting with the Board, Musk appointed himself 'Technoking'—a position he compared to being a monarch." *Id.* (footnotes omitted).

- "Musk operates as if free of Board oversight," has "ignored specific Board directives," and has made "surprise announcements" about billion-dollar plans "without Board knowledge." *Id.* at 506.

Many other sources confirm Musk's near-total authority at Tesla,[10] including several articles published in just the last month.[11]

---

[10] *See, e.g.*, Rahul Kapoor, *Why Tesla Needs Elon Musk*, CNN Business (Mar. 20, 2019), https://perma.cc/84UM-D436; Camila Domonoske, *Elon Musk is Synonymous with Tesla. Is that Good or Bad for Shareholders?*, NPR (Feb. 9, 2024), https://perma.cc/S7VM-MYST; *see also infra* Section C.

[11] *See, e.g.*, Lora Kolodny, *Elon Musk Ordered Nvidia to Ship Thousands of AI Chips Reserved for Tesla to X and xAI*, CNBC (June 4, 2024), https://perma.cc/7M5C-J8AT (reporting that Musk rerouted thousands of chips meant for Tesla to X and xAI); Matt Levine, *Musk Chose Who Got Chips*, Bloomberg (June 4, 2024), https://perma.cc/H4LC-XEVS (suggesting that Musk is sending the message that if Tesla shareholders "don't give him the money, he's going to focus less on Tesla and prioritize his other companies instead"); Dana Hull & Kurt Wagner, *Elon's Orbit*, Bloomberg (May 29, 2024), https://perma.cc/R5LD-RR9W (documenting the many blurred lines between Musk entities); Kate Conger & Jack Ewing, *Elon Musk Lobbies on X for His $46.5 Billion Tesla Pay Package*, N.Y. Times (May 31, 2024), https://perma.cc/84PU-62FN (reporting that "Tesla's board chair, Robyn Denholm, has posted to a company-backed website advocating for [Musk's] pay package"); Felix Almon, *Why Musk is Tied to Tesla*, Axios (June 11, 2024), https://perma.cc/925T-L8AM (reporting that "Tesla chair Robyn Denholm has told shareholders that the pay award is necessary 'to keep Elon focused on Tesla'"); Andrew Griffin, *Elon Musk Says He Will Ban iPhone and Other Apple Devices*, The Independent (June 11, 2024), https://perma.cc/CPQ7-L7BK (reporting that Musk plans to ban Apple devices at his companies, including Tesla); Tom Krisher, *Future of Elon Musk and Tesla Are on the Line This Week as Shareholders Vote on Massive Pay Package*, ABC News (June 11, 2024), https://perma.cc/4FEN-QMRH ("If Tesla shareholders vote against restoring Elon Musk's $44.9 billion pay package Thursday, the CEO could deliver on threats to take artificial intelligence research to one of his other companies.").

In his most recent show of authority, Musk demanded that Tesla move its place of incorporation from Delaware to Texas because the Delaware court of chancery invalidated Musk's $55 billion pay package.[12] Tesla shareholders were asked to ratify a renewed pay package and the move to Texas in votes that concluded on June 13.[13] Musk prevailed, claiming victory before the vote had even concluded.[14] As one high-profile Tesla investor and supporter of the pay package put it: "Our answer is clear, loud and unequivocal: Tesla is better with Elon. Tesla *is* Elon[.]"[15]

### III.   Musk has blurred many lines between Tesla and X.

As Tesla's "Technoking," Musk often blurs the lines between Tesla and his other endeavors—particularly, according to recent revelations, between Tesla and X. The *Tornetta* court highlighted one such instance: "Musk regularly uses Tesla resources to address projects at other companies he owns. For example, after Musk acquired Twitter, he asked approximately 50 Tesla engineers to 'volunteer' to help him evaluate Twitter's engineering team." *Tornetta*, 310 A.3d at 506. Those "volunteers" were not just rank-and-file coders: they included, among other high-profile Tesla employees, Tesla's director of software development; its director of Autopilot engineering (*i.e.*, self-driving technology); and its senior director of software engineering.[16] Musk also reassigned at least one senior finance employee from Tesla to Twitter on a permanent basis.[17]

---

[12] Mike Ives, *SpaceX Is Now Incorporated in Texas, Elon Musk Says*, N.Y. Times (Feb. 15, 2024), https://perma.cc/XK24-CXFN.

[13] Ginger Adams Otis, *Tesla Shareholders Advised to Vote Against Elon Musk's Pay Package*, Wall St. J. (May 26, 2024), https://perma.cc/APK9-3H46.

[14] Faiz Siddiqui & Trisha Thadani, *Tesla shareholders approve Elon Musk's massive compensation package*, Wash. Post (last updated June 13, 2024, 7:28 p.m.), https://perma.cc/5T95-PVBG.

[15] *Id.* (emphasis added).

[16] Lora Kolodny, *Elon Musk has pulled more than 50 Tesla employees into his Twitter takeover*, CNBC (Oct. 31, 2022), https://perma.cc/BPE5-38F8.

[17] Lora Kolodny, *Why Tesla investors should care about Elon Musk's multiplying ventures*, CNBC (July 20, 2023), https://perma.cc/H7SK-GYVU.

The companies are also sharing office space—at least two X employees whom Defendants have identified as potential custodians, Lead Client Partners Matt Madrazo and Jonathan Phelps, are reported to be "[w]orking occasionally out of Tesla's D.C. offices."[18] Musk has even mulled placing X and Tesla under a common holding company.[19]

Commercial lines, too, have blurred at Musk's direction. X is spending millions of dollars on goods or services purchased from Tesla, although "Tesla hasn't said what, exactly, Twitter is buying from the company."[20] After Musk launched his latest endeavor—xAI—he announced that its artificial intelligence products would "use Twitter data for training" and would then be deployed in Tesla vehicles.[21] X CEO Linda Yaccarino has confirmed this blending is purposeful, telling X staff they are part of a broader "constellation" of companies:

> X sits in a one-of-a-kind constellation of companies that are changing the world – from helping to conserve the planet through Tesla's electric vehicles, to exploring new planets with SpaceX, to the seamless global connectivity of Starlink, to the potential of transforming lives with Neuralink, to responsibly reimagining the benefits of AGI through xAI.[22]

A recent series of Bloomberg investigations—titled *Elon's Orbit*—has shed new light on the extent to which Musk has integrated Tesla's resources into X. Among other things:

---

[18]  Max Tani, *Twitter Bets Big on . . . CEO's Son*, Semafor (Nov. 19, 2023), https://perma.cc/7NRE-RLJU.

[19] Sean O'Kane, *Musk Forms 'X Holdings' After Hints at a Parent Company for Tesla, SpaceX*, Bloomberg (Apr. 21, 2022), https://perma.cc/KZJ8-86KS.

[20]  *Why Tesla investors should care about Elon Musk's multiplying ventures*, *supra* n.18.

[21]  Lora Kolodny, *Elon Musk plans Tesla and Twitter collaborations with xAI, his new startup*, CNBC (July 14, 2023), https://perma.cc/YN83-ST7B.

[22] *See* Shannon Thaler, *Read Linda Yaccarino's memo to X staff after Elon Musk's interview where he told advertisers 'go f-k yourself'*, N.Y. Post (Dec. 1, 2023), https://perma.cc/UG4X-WS2P.

- "Musk fired Twitter's executive team and cut thousands of jobs, sometimes replacing them with employees from his other businesses. Droves of engineers from Tesla and SpaceX showed up to review Twitter's code and help manage the engineering team."[23]

- "X made approximately $200,000 in advertising revenue from Tesla, according to the automaker's proxy. The ads are meant to boost car sales, but they also help support the social network as it struggles to keep its biggest advertisers."[24]

- "Potential investors in Elon Musk's new artificial intelligence startup, xAI, are focusing on two key selling points: access to the billionaire's constellation of companies — referred to as the 'Muskonomy' — and the early success of one of its biggest competitors, OpenAI."[25]

The report concludes that Musk treats Tesla and X as two components in an integrated "Muskonomy" or, as Bloomberg puts it, "Elon Inc., a shape-shifting conglomerate where few people have traditional titles but everyone knows exactly to whom they ultimately answer."[26] Indeed, "[e]mployees of [Musk's] ever-expanding galaxy know that no one really works solely for any single company. Rather, they answer to Elon Musk—or, more broadly, Elon Inc. where there's frequent overlap between various parts of his businesses."[27] Bloomberg pointed to Musk's purchase of Twitter in particular "as a good reminder that working for Musk at one of his companies can oftentimes mean working for Musk at all of his companies."[28] Musk also has "a penchant for bringing executives from one of his companies to another—often at the same time."[29] In fact, Bloomberg's reporting reveals that X and Tesla have often relied upon the same officers:

---

[23] *Elon's Orbit*, *supra* n.11.

[24] *Id.*

[25] Layan Odeh et al., *Musk's Track Record, OpenAI Success Are Focus of Potential xAI Investors*, Bloomberg (Feb. 5, 2024), https://perma.cc/8ZQ5-QT5B.

[26] *See Elon's Orbit*, *supra* n.11.

[27] *See* Bernadette Walker, *The Key Executives and Fixers Keeping Elon Musk's Empire Running*, Bloomberg (May 30, 2024), https://perma.cc/C3J5-ZTV6.

[28] Kurt Wagner, *Musk's Trusted Lieutenants Bounce Across his Galaxy of Companies*, Bloomberg (May 30, 2024), https://perma.cc/SP95-UEMC.

[29] Reyhan Harmanci, *Who Is Most Likely to Succeed at Elon High?*, Bloomberg (May 29, 2024), https://perma.cc/Q9Z5-9W9K.

Adam Mehes, X Corp.'s legal director, "joined Tesla shortly after Musk tweeted that he was 'building a hardcore litigation department,' then quickly jumped to X to help handle the many legal disputes the social media site is facing," and Dhruv Batura, X's comptroller, "joined in 2023 after almost a decade at Tesla."[30]

## IV.   Tesla's stock price and brand image consistently respond to Musk's X-related activities.

Because of Musk's total control of X, his near-total control of Tesla, and his demonstrated disregard for the boundaries between the two entities, Tesla's brand image and stock price have closely tracked Musk's activities at X—including Musk's activities pertaining to this case.

Tesla's stock price has responded to Musk's Twitter (and now X) involvement from the start. In particular, in November 2022, Musk was forced to sell nearly $4 billion in Tesla stock to finance his acquisition of Twitter.[31] That sale, which represented a substantial proportion of all Tesla stock, contributed to a 52 percent decline in the stock's value.[32] Widespread concern among investors about whether Musk could steward Twitter and Tesla at the same time compounded the slump.[33] Similarly, over the six months from April to November 2022, during which Musk was

---

[30] *Elon's Orbit*, *supra* n.11 (to view quotes, click "View the live page," then mouse over "Adam Mehes" and "Dhruv Batura" in the interactive graphic).

[31] That sale—made shortly before Tesla reported disappointing earnings results—is now subject to a derivative lawsuit brought on behalf a class of Tesla shareholders—including the Court— alleging that Mr. Musk sold Tesla shares based on inside knowledge that Tesla was unlikely to achieve his sales forecasts. *See Perry v. Musk*, Case No. 2024-0560 (Del. Ch. May 30, 2024).

[32] *See, e.g.*, Rebecca Falconer & Hope King, *Musk Sells $3.95 Billion of Tesla Shares After Twitter Takeover*, Axios (Nov. 8, 2022), https://perma.cc/TKD2-5R8F; Esha Dey, *Tesla's Post-Twitter Selloff Pushes Stock to a 17-Month Low*, Bloomberg (Nov. 7, 2022), https://perma.cc/NC5K-M9ME; Dan Primack, *Tesla Stock Sags on Twitter Financing Fears*, Axios (Oct. 19, 2022), https://perma.cc/KS2F-6NRN.

[33] *See, e.g.*, Rebecca Elliot & Micah Maidenberg, *Elon Musk's Twitter About-Face Would Add to Hefty Tesla, SpaceX Workload*, Wall St. J. (Oct. 4, 2022), https://perma.cc/SW38-P9C7; *Wall Street Asks if Musk Can Manage Twitter, Tesla, and More*, Reuters (Oct. 28, 2022),

litigating whether he would be required to complete his purchase of Twitter, Tesla stock reacted time and again to news about Musk's on-again–off-again Twitter deal. In November 2022, Bloomberg published a chart illustrating the remarkably tight correlation between developments related to that deal—particularly Musk's sale of Tesla stock to finance the acquisition—and Tesla's stock price:[34]



Analysts also predicted that Musk's post-acquisition reforms to the Twitter platform—reforms which feature prominently in X's allegations, *see* Am. Compl. ¶¶ 1, 30—would damage Tesla's brand image and sales performance. The Wall Street Journal, for instance, reported in a story titled *Elon Musk's Twitter Politics Add to Pressure on Tesla's Brand Image*, that "Tesla's reputation remains closely tied to that of Mr. Musk," and observed that Tesla's "brand image in the U.S. ha[d] fallen" in the wake of Musk "wad[ing] further into politics in his bid to turn around Twitter Inc."[35]

---

https://perma.cc/3FWE-KPXA; Peter Eavis & Isabella Simonetti, *Elon Musk's Twitter Role Puts Tesla Board Under New Scrutiny*, N.Y. Times (Nov. 22, 2022), https://perma.cc/SFF4-Q9EF.

[34] Esha Dey, *Elon Musk's Twitter Quest Turns Tesla's Edge Into a Risk*, Bloomberg (Nov. 16, 2022), https://perma.cc/587M-E7N9.

[35] Patrick Coffee & Rebecca Elliott, *Elon Musk's Twitter Politics Add to Pressure on Tesla's Brand Image*, Wall St. J. (Nov. 29, 2022), https://perma.cc/BCT5-LWGT.

Such concerns proved correct. Reuters reported in April 2024 that Musk's personal favorability rating declined after he "disclosed his stake in Twitter" in April 2022, and that Tesla's brand image had, in turn, declined due to "strong associations between Tesla's reputation and that of Musk."[36] That decline in reputation has been stark: In the annual Axios Harris Poll of Americans' views of the reputation of America's 100 most visible brands, Tesla tumbled fifty spots from 2022 to 2023, dropping from 12th to 62nd.[37] As of last month, Tesla ranks 63rd, making it the second least-trusted major car brand in the country.[38] X, for its part, now ranks 99th out of 100—making it the second least-trusted brand of any sort.[39]

## V.     The Court appears to have a financial stake in Tesla.

The Court's most recent publicly available annual financial disclosure is for the 2022 calendar year and was prepared on August 11, 2023. *See* Ex. A, Financial Disclosure Report for Calendar Year 2022. It reports that the Court purchased stock in Tesla in November and December 2022, and held between $15,001 and $50,000 in such stock, marked to market, at the close of the 2022 calendar year:

| A | B | | C | | D | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Description of Assets (including trust assets) | Income during reporting period | | Gross value at end of reporting period | | Transactions during reporting period | | | | |
| Place "(X)" after each asset exempt from prior disclosure | (1) Amount Code 1 (A-H) | (2) Type (e.g., div., rent., or int.) | (1) Value Code 2 (J-P) | (2) Value Method Code 3 (Q-W) | (1) Type (e.g., buy, sell, redemption) | (2) Date mm/dd/yy | (3) Value Code 2 (J-P) | (4) Gain Code 1 (A-H) | |
| 732. Tesla Inc | | None | K | T | Buy | 11/21/22 | J | | |
| 733. | | | | | Buy (addl) | 12/21/22 | J | | |

---

[36] Hyunjoo Jin & Nick Carey, *Would-be Tesla buyers snub company as Musk's reputation dips*, Reuters (Apr. 1, 2024), https://perma.cc/LYM9-3UAB.

[37] *The 2023 Axios Harris Poll 100 Reputation Rankings*, Axios (May 23, 2023), https://perma.cc/H9XZ-CUC2 (to view full rankings, click "View the live page").

[38] *The 2024 Axios Harris Poll 100 Reputation Rankings*, Axios (May 22, 2024), https://perma.cc/9UFK-K8VE (to view full rankings, click "View the live page").

[39] *Id.*

*Id.* at 47.[40] The Court has filed ten subsequent periodic transaction reports in 2023 and 2024, none of which reported a sale of any Tesla stock.[41]

**ARGUMENT**

This Court's Local Rules require a plaintiff's complete and accurate disclosure of interested persons to ensure that judges can make informed recusal decisions. *See* L.R. 3.1(c), 3.2(e); *see also Nieves*, 2014 WL 2587577, at *2 & n.5. Federal Rule of Civil Procedure 7.1 imposes a similar, but narrower, disclosure requirement. Recusal decisions, of course, "are matters of utmost public concern." *Steel Erectors, Inc. v. AIM Steel Int'l, Inc.*, 312 F.R.D. 673, 675 n.3 (S.D. Ga. 2016). As a result, this Court demands strict compliance with L.R. 3.1(c). *See, e.g., Cleary v. Am. Airlines, Inc.*, No. 4:21-CV-135-P, 2021 WL 3721457, at *1–2 (N.D. Tex. Feb. 18, 2021) (dismissing a case as a penalty for the plaintiff's failure to comply with L.R. 3.1(c)). Here, Defendants seek an order compelling Plaintiff to file an accurate and complete certificate that discloses the interest of Tesla and its shareholders. Overwhelming evidence establishes the existence and substantial nature of that interest. And X's failure to disclose Tesla's financial interest in this case has undermined this Court's ability to evaluate potential conflicts for purposes of determining whether recusal is necessary, particularly given that the Court's most recent disclosures indicate that it owns Tesla stock.

The Court's decisions in this case will have a direct, material impact on Tesla—including on its share price—in at least three discrete ways as the case unfolds.

*First*, Tesla stands to gain if X prevails at trial—and to lose if X does not. Musk has consistently blurred the boundaries between his personal brand, X, and Tesla to such a degree that

---

[40] In the disclosures, Value Code K indicates a value of $15,001 to $50,000, Value Code J indicates a value of $15,000 or less, and Value Method Code T indicates "Cash Market" valuation.

[41] *See* Exs. I–R.

harms and benefits to X and Musk are often imputed to Tesla by the investing public, as reflected by the reactions of the market. In particular, any damages awarded, and any boost to X's enterprise value resulting from a favorable verdict, would increase Musk's bottom line, bolster investor confidence in him and his companies, and decrease Musk's need to sell off Tesla stock to sustain X. Defeat, in contrast, may cause yet more advertisers to leave X, undermine investor confidence in Musk's management, and increase the likelihood that X will continue to rely on Musk and Tesla to cover the gaps in its own cashflow.

*Second*, Musk's testimony about matters of concern to Tesla's shareholders—including for example, the extent to which his time and attention are devoted to X at the expense of Tesla—will be central to this case. Public markets are notoriously responsive to everything Musk says or does. His testimony about such matters is sure to affect Tesla's share price. The Court's decisions about disputes related to Musk's testimony—including whether to allow it at all—will thus directly and materially affect Tesla's public standing and valuation.

*Third*, Defendants intend as part of their defense to establish that Musk's behavior and business decisions caused advertisers' flight from the X platform. Defendants' evidence to that effect will impeach Musk's business judgment with respect to all his businesses, including Tesla. As with Musk's testimony, the Court's decisions about the limits of that defense and supporting evidence will have plain implications for the value of Musk's most recognizable brand.

## I.  Musk has intertwined X, Tesla, and his personal brand to such a degree that the case's outcome will affect Tesla's reputation, resources, and share price.

Musk has so thoroughly blurred the lines between his private interests, Tesla's corporate interests, and X's interests that benefits to X can be imputed directly to Musk and Tesla. The market, certainly, has shown that it will treat them as one and the same. Tesla stock has responded to, among other things, the Musk tweet that precipitated this lawsuit, the lawsuit itself, and a

follow-on remark that Musk directed to X's advertisers—to say nothing of Musk's repeated sales of Tesla stock to fund his activities at X. Add that pattern to Musk's commingling of various Tesla resources with Twitter, and the overall picture is plain: Tesla has much to gain or lose from this litigation.

For starters, take the event that catalyzed the whole lawsuit: Tesla shares fell *nearly four percent* the day after Musk endorsed an antisemitic conspiracy theory on X.[42] That tweet was the topic of the article that prompted this litigation. *See* Am. Compl. ¶ 46 n.16; *id.* at 26 (demanding as relief that Defendants be compelled to remove the article). And that tweet substantially harmed Tesla's value: As one headline at the time put it: "Elon Musk backs antisemitic claim; Tesla shares tumble."[43] Dozens of stories in the financial press noted the same correlation.[44]

Tesla's market climate worsened further when Musk filed the suit. One November 21, 2023 article from Barron's cited concern among Tesla investors that "negative publicity at X could hurt Tesla's brand."[45] Another Barron's article published a few days later tied such concerns directly

---

[42] *See, e.g.*, Kit Norton, *Did Elon Musk's Apparent Antisemitism Trip Up Tesla's Rebound?*, Investor's Business Daily (Nov. 17, 2023), https://perma.cc/3HZH-H8V6; Benjamin Lindsay, *Advertisers Flee X, Tesla Shares Drop 4% as Elon Musk Retweets Antisemitic Post*, The Wrap (Nov. 16, 2023), https://perma.cc/ZPR2-YUQX.

[43] Dan Primack, *Elon Musk backs antisemitic claim; Tesla shares tumble*, Axios (Nov. 16, 2023), https://perma.cc/WH53-D2XU.

[44] *See, e.g.*, Rebecca Elliott, *Elon Musk's Social-Media Comments Spark Tesla Investor Backlash*, Wall Street J. (Nov. 22, 2023), https://perma.cc/MFP8-FMXD; Esha Dey & Saijel Kishan, *Musk Endorsement of Antisemitic Post Draws Shareholder Criticism*, Bloomberg (Nov. 17, 2023), https://perma.cc/8LMD-296K; Al Root, *Tesla Shareholders Question Musk's Leadership as Outrage Grows Over Controversial Tweets*, Barron's (Nov. 17, 2023), https://perma.cc/NH8B-E5RC; Ananya Bhattacharya, *What Musk's latest antisemitic post is costing X—and Tesla*, Quartz (Nov. 17, 2023), https://perma.cc/DHL6-FQSW; Akiko Fujita & Luke Carberry Mogan, *Tesla: Musk's antisemitic tweets cast shadow on EV maker*, Yahoo Finance (Nov. 17, 2023), https://perma.cc/64MK-5UVH.

[45] Al Root, *Musk Files Lawsuit Against Media Matters. What Happens Next.*, Barron's (Nov. 21, 2023), https://perma.cc/9JBC-7SDH.

to this lawsuit.[46] And at least one prominent institutional investor in Tesla publicly came out against Musk's choice to file, arguing that this lawsuit was keeping the "firestorm" alive when the "smartest strategy is to let this controversy die out."[47]

Just one week after the coverage noting this suit's impact on Tesla, Musk responded to questions about advertisers who had left X after his antisemitic tweet by telling those advertisers to "go f*** yourself."[48] *Tesla's* shares again fell in response.[49] Musk's antagonism of X's advertisers is a key fact in this suit, and illustrates how even a flippant remark made by Musk—including one about X rather than Tesla—can move Tesla's price. As one Tesla investor put it in the wake of Musk's comment: "The impact of erratic, racist, and antisemitic speech from a CEO directly affects Tesla's brand and bottom line in significant ways."[50]

This case's effect on Tesla's public standing and valuation is a trend sure to continue. The correlation between X's fortunes and Musk's sales of Tesla stock is firmly established. For example, shortly after coming to terms with Twitter, Musk sold over $8.5 billion of Tesla stock to fund the acquisition.[51] At the time, Musk promised panicked retail investors in Tesla that he would not make any future sales of Tesla stock to finance the deal—but his regulatory filings in August

---

[46] Al Root, *Tesla CEO Musk in Israel to Address Fallout from Controversial Tweet*, Barron's (Nov. 27, 2023), https://perma.cc/V5TV-VP34.

[47] Al Root, *Musk Strategy to Contain X Anti-Semitism Fallout Is to Go 'Thermonuclear,'* Barron's (Nov. 20, 2023), https://perma.cc/TFR5-YTSD.

[48] Andrew Ross Sorkin, et al., *The Fallout from Musk's Profanity-Laden Attack on Advertisers Isn't Over*, Dealbook (Dec. 1, 2023), https://perma.cc/R4UL-K2UC; *Elon Musk to advertisers who are trying to 'blackmail' him: 'Go f--- yourself'*, CNBC (Nov. 29, 2023), https://perma.cc/6A8F-KVEQ.

[49] *The Fallout from Musk's Profanity-Laden Attack on Advertisers Isn't Over*, *supra* n.48.

[50] Dana Hull, *Backlash Spreads Over Musk's Endorsement of Antisemitic Post*, Bloomberg (Nov. 16, 2023), https://perma.cc/44ZA-UQCH.

[51] Max Zahn, *A Timeline of Elon Musk's Tumultuous Twitter Acquisition,* ABC News (Nov. 11, 2022), https://perma.cc/BQ2H-L73N.

2022 revealed that he had sold an additional $6.9 billion worth of Tesla stock.[52] Musk was fighting in court to get out of the deal, and explained after the filings came to light that the sale was necessary to "avoid an emergency sale of Tesla stock" in the event a court mandated that the sale proceed.[53] Musk also promised that he would buy the stock back if the Twitter deal did not close.[54]

This case will affect whether and to what extent Musk recoups his investment in X. Musk owns X and its cashflows outright, owns over 13 percent of Tesla, and has repeatedly sold Tesla shares to cover X-related cash needs. If X prevails and obtains damages from Defendants, that will directly increase Musk's wealth and decrease his propensity to sell Tesla stock. A win for X, in short, would be a win for Tesla's shareholders.

More broadly, this case is a referendum on Musk's tenure as X's owner. Musk claims that the calamitous fall in X's revenues—and with it, its enterprise value—has been caused by Defendants' reporting. Defendants intend to prove that reporting was truthful, and that *Musk* is the cause of advertisers' flight from the platform. No matter which side prevails, the implications for X's long-term prospects as an advertising platform will be stark. Analysts have recognized as much, reporting that further losses at X "stemming from less advertising revenue [] could lead to Musk selling Tesla stock," which Tesla's own disclosures make clear would harm its stock price.[55] Indeed, a central issue in this case is *why* advertisers have been leaving X, and "an advertising crisis at X could force Musk to sell Tesla stock to cover shortfalls at the social-media platform."[56]

---

[52] Hyunjoo Jin & Akriti Sharma, *Musk Sells Tesla Stock Worth $6.9 bln as Possibility of Forced Twitter Deal Rises*, Reuters (Aug. 10, 2022), https://perma.cc/6JHR-R252.

[53] *Id.*

[54] *Id.*

[55] *Tesla CEO Musk in Israel to Address Fallout from Controversial Tweet*, *supra* n.46.

[56] Al Root, *Tesla Shareholders Question Musk's Leadership as Outrage Grows Over Controversial Tweets*, Barron's (Nov. 17, 2023), https://perma.cc/K3LT-2C8L.

Past experience establishes that such a sale will drive down Tesla's value, decrease investor confidence, and so harm the financial interests of Tesla's shareholders.

Musk's repeated cannibalization of Tesla's resources to support X compounds these concerns. At Musk's direction, X has borrowed Tesla's staff, run Tesla's advertisements, and is now training an artificial intelligence system for deployment in Tesla's vehicles. *See supra* Background, Section III. This lack of corporate formality between X and Tesla has often had implications for Tesla's stock. Just recently, reporting revealed that Musk had "diverted a sizable shipment of AI processors that had been reserved for Tesla" to X.[57] Tesla shares "slipped as much as 1% on the news."[58] X's own CEO admits that X is a component in an integrated "constellation of companies" run by Musk.[59] And when promoting his newest venture—xAI—Musk has characterized all his companies as part of an integrated "Muskonomy."[60] Given this overlap, whether X prevails in this case—and recovers damages and reputational benefits—will tend to affect how much X needs to lean on Tesla for basic resources and human capital.

In sum, Musk's statements and actions—including those concerning his management of X—have a direct and material impact on Tesla, the public's view of Tesla, and Tesla's stock price. As one prominent business scholar—known as the "dean of valuation"—put it, owning Tesla stock means "that you're no longer buying a company. . . In a sense, what you're getting here is a bet

---

[57] *Elon Musk Ordered Nvidia to Ship Thousands of AI Chips Reserved for Tesla to X and xAI, supra* n.11.

[58] *Id.*

[59] *See Read Linda Yaccarino's memo to X staff after Elon Musk's interview where he told advertisers 'go f-k yourself'*, *supra* n.23.

[60] *See Elon's Orbit*, *supra* n.11.

for or against Elon Musk."[61] It follows that this case will likely affect any Tesla shareholder who has made that bet. While the full extent of the overlap between X and Tesla continues to be revealed to the public day by day, X was certainly aware of its reliance on and relationship with Tesla when this case was filed, and thus should have disclosed Tesla and its shareholders in its certificate of interested persons.

## II.  The Court will need to adjudicate disputes about Musk's testimony, with broad ramifications for Tesla.

X's certificate is also defective because the nature of X's claims makes it inevitable that the Court will be asked to resolve disputes about Musk's testimony. To defend against X's business-tort claims, Defendants are entitled to solicit Musk's testimony about, among many things, his management choices, public statements, and private views. And such testimony is liable to affect Tesla's reputation and stock price. That effect is well-documented: Musk's prior testimony has often led to the release of harmful information about his businesses, even when those businesses were not parties to the cases in question.

To start, assuming that X resists any deposition of Musk, this Court will have to determine whether Musk should be required to sit at all.[62] Whether Musk must testify is a recurring point of dispute in the myriad lawsuits he has been involved in. *See, e.g.*, *United States v. Musk*, 719 F.3d 962, 967 (8th Cir. 2013) (rejecting argument that Musk's testimony was improperly compelled); *Tesla, Inc. v. Monserratt*, No. 4D2023-2075, 2024 WL 24813, at *3 (Fla. Dist. Ct. App. Jan. 3, 2024) (reversing trial court's order to compel Musk's testimony); *SEC v. Musk*, No. 23-MC-

---

[61] Matthew Fox, *Tesla needs to separate itself from Elon Musk's personality to win back investors after 75% crash, NYU's 'dean of valuation' says,* Business Insider (Jan. 6, 2023), https://perma.cc/F4K2-JDKB.

[62] Defendants requested Musk's availability for a deposition on May 9. On May 10, Plaintiffs' counsel indicated that they would "get back to" Defendants on the request but have yet to do so.

80253-LB, 2024 WL 1511903, at *3, 5 (N.D. Cal. Feb. 10, 2024) (compelling Musk to sit for deposition in response to administrative subpoena after he failed to appear at previously scheduled deposition); *cf. United States v. Twitter, Inc.*, No. 22-CV-03070-TSH, 2023 WL 8007994, at *7 (N.D. Cal. Nov. 16, 2023) (denying request to stay Musk's deposition). Just recently, a Texas state court compelled Musk's deposition testimony, over Musk's opposition, in a libel lawsuit brought by a 22-year-old Jewish man whom Musk had accused on X of being a neo-Nazi. *See* Ex. B, Order on Plaintiff's Motion for Discovery, *Brody v. Musk*, Case No. D-1-GN-23-006883 (Travis Cnty. Dist. Ct. Feb. 21, 2024) (compelling Musk's deposition).[63] Any deposition of Musk would be likely to have a significant impact on Tesla stock, as it will involve questioning about a range of topics germane to Tesla investors: Musk's management practices, his division of time and allocation of resources between Tesla and X, his relationships with advertisers, and his history of making offensive comments.

The Court will also have to resolve ancillary disputes about Musk's testimony, such as whether any portions of that testimony may be sealed. Again, Musk has a track record of fighting such disclosure. For instance, after the Travis County District Court compelled his testimony in *Brody*, Musk strenuously resisted public release of the transcript, filing at least *three* motions for a protective order in quick succession. *See* Ex. C, Register of Actions at 2, *Brody v. Musk*, Case No. D-1-GN-23-006883 (Travis Cnty. Dist. Ct.).[64] That Court ruled against Musk, leading to the release of a deposition transcript where Musk acknowledged he was "guilty of many self-inflicted wounds" and further admitted that he "may have done more to financially impair" X than to help

---

[63] *See also* Brian Bushard, *Billionaire Musk Seeks to Quash Deposition In $1 Million Defamation Suit*, Fortune (Feb. 13, 2024), https://perma.cc/7W6S-V9YY.

[64] *See also* Sebastian Murdock, *Elon Musk Didn't Want His Latest Deposition Released. Here It Is.*, HuffPost (Apr. 8, 2024), https://perma.cc/LE75-ZC8J.

it.[65] The transcript also revealed that Musk operated "burner" X accounts—accounts potentially used by Musk to make market-moving material statements in his capacity as chief executive of Tesla.[66] After the *Brody* transcript was released, Barron's promptly published a story titled *Elon Musk's Libel Deposition is Out. 3 Things for Tesla Investors.*[67] It noted that the deposition further confirmed that "X has taken Musk's time away from Tesla" and concluded that "[i]nvestors will have to get used to reading these depositions for Tesla tidbits."[68] In short, even when Musk testifies in cases in which Tesla is not a party, Tesla investors and the financial press take note when his testimony becomes public.

Furthermore, the Court will have to rule—both in discovery and at any trial—about the *scope* of Musk's testimony. Again, such rulings will have clear implications for Tesla's share price. Among other things, Defendants intend to inquire into whether Musk's communications shed further light on his support for what the Anti-Defamation League labeled a "highly toxic, antisemitic campaign";[69] whether Musk has made important business decisions under the influence of drugs or intoxicants;[70] and what proportion of Musk's time and attention has been devoted to X versus his other enterprises, including Tesla.

---

[65] *See* Ariel Zilber, *Elon Musk says he 'may have done more to financially impair' X than to help it*, New York Post (Apr. 9, 2024), https://perma.cc/V6EM-TANA.

[66] *See* Io Dodds, *Elon Musk admits he has two burner Twitter accounts in bizarre, popcorn-worthy libel deposition*, The Independent (Apr. 10, 2024), https://perma.cc/KV9C-MDML.

[67] *See* Al Root, *Elon Musk's Libel Deposition is Out. 3 Things for Tesla Investors*, Barron's (Apr. 9, 2024), https://perma.cc/LV9B-FETZ.

[68] *Id.*

[69] ADL, *Statement on X/Twitter* (Sept. 5, 2023), https://perma.cc/EZB8-FNYH; *see also* Mike Wendling, *White House Criticises Elon Musk Over 'Hideous' Antisemitic Lie*, BBC (Nov. 17, 2023), https://perma.cc/J8GE-SJ7M.

[70] Emily Glazer & Kirsten Grind, *Elon Musk Has Used Illegal Drugs, Worrying Leaders at Tesla and SpaceX*, Wall St. J. (Jan. 6, 2024), https://perma.cc/4WUD-A4E2.

Musk's testimony about such matters will influence investors in all his companies—Tesla included. That is not speculation—as shown above, Musk's apparent endorsement of an antisemitic conspiracy theory and his profane remarks directed at X's advertisers both caused Tesla's stock to fall. *See supra* Argument, Section I. In resolving disputes arising from Musk's testimony about those and similar statements, the Court would therefore control the parties' and the public's access to information that will directly affect Tesla's value.

Tesla and its shareholders thus plainly have a financial interest in this case, disclosure of which significantly implicates the Court's recusal analysis.

## III. The Court will be asked to resolve disputes about evidence damaging to Musk and, by extension, Tesla.

Defendants are also entitled to seek, and intend to introduce, extensive evidence about Musk's chaotic management practices and his poor business judgment, all of which are in dispute. *See Prudential Ins. Co. of Am. v. Fin. Rev. Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000) (noting that causation is an element both of liability and damages for business tort claims). In particular, Defendants will show that Musk drastically cut X's workforce, gutted its content moderation team, and abandoned rudimentary content-moderation practices, triggering a drastic increase in hate speech and other offensive content on the X platform.

Many of Defendants' pending discovery requests concern Musk's management choices, as well as his own personal statements, to obtain evidence showing the impact that Musk's actions have on X's potential advertisers. Evidence responsive to these requests is likely to harm investor confidence in Musk and drive down Tesla's share price. This includes:

- Evidence about Musk's rash decisionmaking, volatile leadership practices, and offensive and bigoted statements, which will cause shareholders to doubt Musk's capacity to lead Tesla. *See, e.g.*, Ex. D, Defendants' First Set of Requests for Production ("RFPs") 3–5, 7, 12, 18, 22–24, 26, 29; Ex. E, Defendants' First Set of Interrogatories ("ROGs") 5–6; Ex. F, Defendants' First Set of Requests for Admission ("RFAs") 3–5, 8.

21

- Evidence revealing the extent to which Musk's acquisition of X has taken his focus away from Tesla—a topic that is already of substantial concern to Tesla investors. *See, e.g.*, RFPs 12, 23, 26, 29.

- Evidence about Musk's longstanding blurring of the lines between his various endeavors with respect to leadership, staffing, and finances—including between X and Tesla. *See, e.g.*, RFPs 15–16.

- Evidence about the collapse in consumer and advertiser confidence in X, and an accompanying and correlated collapse in confidence in other Musk entities, including Tesla. *See, e.g.*, RFPs 7, 14, 17, 22, 29; ROGs 1, 3–6; RFAs 3–8.

And it is only a matter of time before the Court will be asked to rule on such requests: Disputes about the scope of permissible Musk-related discovery have already emerged. Just last week, X served its responses and objections to Defendants' document requests, indicating that it would not produce documents in response to requests regarding "Elon Musk's activity on the X platform, including Musk's engagement with Disputed Content on the Platform," and "public statements made by Musk . . . as to Jewish people." Ex. G, Plaintiff's Responses & Objections to Defendants' First Set of Requests for Production at 19–21; *see also id.* at 11 (refusing to "search for or produce documents responsive" to request regarding preservation of Musk's cell phone because "Elon Musk is not a plaintiff or defendant in this litigation, and any cell phone that he possesses or did possess has no bearing on the claims or defenses asserted here"). *But see* Ex. H, Plaintiff's First Set of Requests for Production at 9 (X's own production request seeking "all documents and communications discussing or mentioning . . . Elon Musk . . . that were sent out via any email, text, phone, social media, or other distribution list").

As with Musk's own testimony, the Court will be called upon to make determinations about discoverability, scope, relevance, and admissibility of such evidence. "Every ruling made by the court on discovery motions, evidence or jury instructions would have an impact on the course of the case whether favorable or adverse to either party." *Sollenbarger v. Mountain States Tel. & Tel. Co.*, 706 F. Supp. 776, 783 (D.N.M. 1989) (explaining the court's decision to recuse). Similar

discovery disputes in past cases involving Musk have given "the world . . . a look inside Elon Musk's phone," resulting in the public release of "hundreds of text messages and emails sent to and from Musk."[71] Any such releases here plainly have the potential to move Tesla's stock price. These aspects of the litigation confirm X's delinquency in failing to disclose Tesla's financial interest in this matter.

## CONCLUSION

For the foregoing reasons, the Court should order Plaintiff X Corp. to file a certificate of interested persons that identifies Tesla, Inc. and its shareholders as interested persons, as well as any other persons or entities having a financial interest in this matter that X Corp. has not previously disclosed.


Dated: June 17, 2024.

Respectfully submitted,
*/s/ Andrew LeGrand*

---

[71] Charlie Warzel, *Elon Musk's Texts Shatter the Myth of the Tech Genius*, The Atlantic (Sept. 30, 2022), https://perma.cc/7ATK-REE3.

GIBSON, DUNN & CRUTCHER LLP
Andrew LeGrand (TX 24070132)
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
T: (214) 698-3100
F: (214) 571-2960
alegrand@gibsondunn.com

Theodore J. Boutrous, Jr.* (CA 132099)
333 South Grand Avenue
Los Angeles, CA 90071
T: (213) 229-7000
F: (213) 229-7520
tboutrous@gibsondunn.com

Amer S. Ahmed* (NY 4382040)
200 Park Avenue
New York, New York 10166
T: (212) 351-4000
F: (212) 351-4035
aahmed@gibsondunn.com

ELIAS LAW GROUP LLP
Abha Khanna* (WA 42612)
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
T: (206) 656-0177
F: (206) 656-0180
akhanna@elias.law

Aria C. Branch* (DC 1014541)
Christopher D. Dodge* (DC 90011587)
Jacob D. Shelly* (DC 90010127)
Samuel T. Ward-Packard** (DC 9005484)
250 Massachusetts Avenue NW, Suite 400
Washington, DC 20001
T: (202) 968-4490
F: (202) 986-4498
abranch@elias.law
cdodge@elias.law
jshelly@elias.law
swardpackard@elias.law

* Admitted *pro hac vice*
** *Pro hac vice* application forthcoming

*Counsel for Defendants Media Matters for America, Angelo Carusone, and Eric Hananoki*

**CERTIFICATE OF SERVICE**

On June 17, 2024, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Andrew LeGrand*
Andrew LeGrand