# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| X CORP.,<br><br>            Plaintiff,<br><br>      v.<br><br>MEDIA MATTERS FOR AMERICA,<br>et al.,<br><br>            Defendants. | Civil Action No. 4:23-cv-01175-O |

## DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DONOR-RELATED DOCUMENTS

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 3

   I.  Defendants have not waived any First Amendment protections ......................................... 3

  II.  The donor information that X demands is privileged by the First Amendment ................. 8

     A.  First Amendment protections extend to discovery disputes between
        private parties ................................................................................................................ 9

     B.  The First Amendment privilege applies to organizational membership and
        donor lists ................................................................................................................... 13

     C.  There is a reasonable probability that compelled disclosure of Media Matters's donors
        will subject the donors to threats, harassment, and reprisals ...................................... 14

     D.  X cannot show that donor names are "highly relevant" to its claims. ........................ 16

  III.  X's harassing requests for irrelevant donor information fall outside the proper scope of
      discovery ........................................................................................................................... 19

  CONCLUSION .................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ams. for Prosperity Found. v. Bonta*,
   594 U.S. 595 (2021)..................................................................................13, 16, 18

*Anderson v. Hale*,
   No. 00 C 2021, 2001 WL 503045 (N.D. Ill. May 10, 2001) ....................................9

*Brady v. Klentzman*,
   515 S.W.3d 878 (Tex. 2017)....................................................................................18

*Britt v. Super. Ct. of San Diego Cnty.*,
   574 P.2d 766 (Cal. 1978) ........................................................................................10

*Buckley v. Valeo*,
   424 U.S. 1 (1976)................................................................................................8, 14

*Carrier v. Ravi Zacharias Int'l Ministries, Inc.*,
   No. 1:21-CV-3161-TWT, 2023 WL 2355891 (N.D. Ga. Mar. 3, 2023) ...................9

*Cuomo v. Clearing House Ass'n, LLC*,
   557 U.S. 519 (2009)................................................................................................20

*Familias Unidas v. Briscoe*,
   544 F.2d 182 (5th Cir. 1976) ..................................................................................13

*Flynn v. Square One Distrib., Inc.*,
   No. 6:16-mc-25-Orl-37TBS, 2016 WL 2997673 (M.D. Fla. May 25, 2016)............9

*Grandbouche v. Clancy*,
   825 F.2d 1463 (10th Cir. 1987) ................................................................................9

*Gueye v. Mike Bloomberg 2020 Inc.*,
   Nos. 4:20-cv-00487-BP through 4:20-cv-00490-BP, 2021 WL 3910341 (N.D.
   Tex. Mar. 12, 2021) ...........................................................................................10, 11

*Hamilton v. Geithner*,
   No. 1:08cv1112 (JCC), 2009 WL 2240358 (E.D. Va. July 23, 2009)....................20

*Hardy v. Gissendaner*,
   508 F.2d 1207 (5th Cir. 1975) ................................................................................12

*Hastings v. N. E. Indep. Sch. Dist.*,
   615 F.2d 628 (5th Cir. 1980) ..............................................................................2, 13

*Henry v. First Nat'l Bank of Clarksdale,*
    444 F.2d 1300 (5th Cir. 1971) ................................................12

*Hickman v. Taylor,*
    329 U.S. 495 (1947)................................................................20

*Int'l Soc'y for Krishna Consciousness, Inc. v. Lee,*
    No. 75 Civ. 5388 (MJL), 1985 WL 315 (S.D.N.Y. Feb. 28, 1985)................10

*Johnson v. TheHuffingtonPost.com,*
    21 F.4th 314 (5th Cir. 2021) ................................................17

*La Union Del Pueblo Entero v. Abbott,*
    No. SA-21-CV-00844-XR, 2022 WL 17574079 (W.D. Tex. Dec. 9, 2022)................4, 10, 14

*Media Matters for Am. v. Bailey,*
    No. 24-CV-147 (APM), 2024 WL 3924573 (D.D.C. Aug. 23, 2024)....................1

*Media Matters for Am. v. Paxton,*
    No. 24-cv-147 (APM), 2024 WL 1773197 (D.D.C. Apr. 12, 2024) ........................1

*Mize v. McGraw-Hill, Inc.,*
    82 F.R.D. 475 (S.D. Tex. 1979)................................................11, 12

*In re Motor Fuel Temperature Sales Pracs. Litig.,*
    641 F.3d 470 (10th Cir. 2011) ................................................9

*NAACP v. State of Ala. ex rel. Patterson,*
    357 U.S. 449 (1958)................................................8, 10, 13

*Ohno v. Yasuma,*
    723 F.3d 984 (9th Cir. 2013) ................................................12

*Owens-Corning Fiberglas Corp. v. Malone,*
    972 S.W.2d 35 (Tex. 1998)................................................18

*Perry v. Schwarzenegger,*
    591 F.3d 1147 (9th Cir. 2010) ................................................9, 11, 16

*Pulte Home Corp. v. Montgomery County,*
    No. GJH-14-3955, 2017 WL 1104670 (D. Md. Mar. 24, 2017)................................9

*Samsung Elec. Am., Inc. v. Chung,*
    321 F.R.D. 250 (N.D. Tex. 2017) ................................................17

*Sharp Corp. v. Hisense USA Corp.,*
    292 F. Supp. 3d 157 (D.D.C. 2017) ................................................12

*Shelley v. Kraemer*,
   334 U.S. 1 (1948) ................................................................................................10

*Sierra Club v. Energy Future Holdings Corp.*,
   No. 5:10CV156, 2013 WL 12244352 (E.D. Tex. Dec. 30, 2013) ..........................9, 11, 14, 18

*Sierra Club v. Union Elec. Co.*,
   No. 4:14-cv-00408-AGF, 2015 WL 9583394 (E.D. Mo. Dec. 31, 2015).................................9

*Whole Woman's Health v. Smith*,
   896 F.3d 362 (5th Cir. 2018) ....................................................................................9, 10, 13

*Young Conservatives of Tex. Found. v. Univ. of N. Tex.*,
   No. 4:20-CV-973-SDJ, 2022 WL 2901007 (E.D. Tex. Jan. 11, 2022)...................................14

**Other Authorities**

Fed. R. Civ. P. 26(b)(1)...........................................................................................19, 20

Fed. R. Civ. P. 26(b)(2)(C) ..........................................................................................19

## INTRODUCTION

X's motion to compel asks this Court to order unfettered disclosure of core privileged information protected by the First Amendment. To deflect the obvious constitutional prohibition against such compelled disclosure, X makes up a claim of waiver that is belied by the record and foreclosed by precedent. There is no serious waiver argument here, and an unbroken line of authority confirms that the donor information X demands is protected by the First Amendment. The Court should reject X's bid to trample upon the constitutional rights of Media Matters and its donors.

In reporting on misinformation and hate speech in the U.S. media, Defendants Media Matters for America, its President and CEO Angelo Carusone, and its Senior Investigative Reporter Eric Hananoki (collectively, "Media Matters") have made a lot of enemies. Their reporting on content moderation and brand safety deficiencies on X resulted in this lawsuit by one of the world's richest men, two abusive investigations by state attorneys general,[1] and a deluge of vitriolic, vulgar, and violent online threats. These threats have gotten worse since X filed this action. Shortly after the complaint was filed, one harasser sent Mr. Hananoki an image of a noose. Another emailed a Media Matters reporter a photograph of him and his wife and wrote, "We know where you live. Expect a visit." A voicemail received at Media Matters's office threatened "if you keep pushing things it will get to a point where there will be violence." And when the names of persons believed to be donors to Media Matters became public earlier this year, an avalanche of

---

[1] The U.S. District Court for the District of Columbia has enjoined Texas and Missouri investigations arising out of the Media Matters articles at issue here, finding that the investigations were likely retaliatory in violation of the First Amendment and that Media Matters's reporting was likely not defamatory. *See Media Matters for America v. Bailey*, No. 24-CV-147 (APM), 2024 WL 3924573, at *10 (D.D.C. Aug. 23, 2024); *Media Matters for America v. Paxton*, No. 24-cv-147 (APM), 2024 WL 1773197, at *18–19 (D.D.C. Apr. 12, 2024).

vicious attacks quickly followed. "You pedophiles won't be roaming free for too long," one poster wrote on the X platform. Another said, "I want to see the death penalty served on all of them."

No one should be subject to these vile threats merely for supporting a cause and organization they believe in. If X's motion to compel is granted, the inevitable result will be an even more expansive chill of the associational rights of Media Matters and its donors. The First Amendment is meant to protect against exactly this result, by guaranteeing the right to associate privately—free from interference and harassment—in furtherance of shared civic goals. *See Hastings v. N. E. Indep. Sch. Dist.*, 615 F.2d 628, 632 (5th Cir. 1980).

X cannot identify any caselaw requiring organizations to hand over full, unredacted donor lists to litigation opponents in analogous situations. Instead, it relies heavily on procedural arguments, urging the Court to skip the substantive question and instead find waiver. But Media Matters has waived nothing. It asserted First Amendment objections in its very first responses to X's requests for donor information, and then refined those objections at X's own urging. Media Matters also complied with its privilege log obligations, as set by this Court and as *agreed to by X*. Nor can X complain that Media Matters's first (of five) privilege logs deprived it of a ripe controversy for motions practice. Media Matters explained to X in July that the dispute was ripe for judicial resolution; it was X who chose to wait six weeks before presenting its arguments to the Court.

The reason that X leans so hard on procedural waiver is that Media Matters prevails on the substantive merits of its First Amendment defense. As the overwhelming weight of authority shows, the Constitution's protections apply in suits between private parties. Courts—including the Fifth Circuit—have been clear that private litigants may not commandeer the judiciary to order advocacy organizations to turn over private membership and donor lists. The application of the

privilege here is similarly straightforward. As Media Matters explains in the accompanying declaration, the organization has been the target of reprehensible threats of violence, with employees and donors subject to harassment. Thus, the privilege is at its zenith. Meanwhile, X is unable to identify *any* need to discover the personal identities and residential addresses of Media Matters's donors sufficient to overcome the privilege.

Finally, it is not just the First Amendment that X's discovery requests violate. Because the requests seek irrelevant information and perpetuate a campaign of harassment against Media Matters and their donors, they run contrary to the Federal Rules of Civil Procedure.

The motion to compel should be denied.

## ARGUMENT

### I.   Defendants have not waived any First Amendment protections.

X spends half of its brief searching for an argument that Media Matters waived its objections to identifying donors, but those objections have been carefully preserved—and exhaustively explained to X—over the entire course of discovery. X's retelling of the background to this dispute distracts from the *substantive* impasse that merits this Court's attention.

Media Matters preserved its First Amendment privilege objections. X admits that Media Matters's initial responses to X's requests for production objected to disclosing documents that would identify donors because the requests were harassing, because the underlying information is irrelevant to X's claims, and because the requests sought "disclosure of sensitive financial and associational information protected by the First Amendment privilege, the production of which would chill Defendants' exercise of their First Amendment speech and associational rights." X App. 47–49, ECF No. 85 (citing *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 611–13 (2021); *NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 460 (1958); *Whole Woman's Health v. Smith*, 896 F.3d 362, 372 (5th Cir. 2018); *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160

3

(9th Cir. 2010)); *see also* X App. 51–52, 69–70 (same). After X asked Media Matters to remove "generalized" objections, Media Matters agreed to instead assert these privilege objections on a document-by-document basis, *see La Union Del Pueblo Entero v. Abbott*, No. SA-21-CV-00844-XR, 2022 WL 17574079, at *9 (W.D. Tex. Dec. 9, 2022), but was explicit that it was maintaining its objections that the requests are inappropriately harassing and sought irrelevant information. *See* X App. 128–30; 201–06.

When X moved in May to compel the production of these documents, Media Matters explained that X's efforts to overcome Media Matters's assertions of privilege were premature because—again, consistent with X's own assertions about its understanding of the law and consistent with Fifth Circuit precedent—Media Matters was reserving claims of privilege until it identified *specific* documents that were protected by specific privileges. *See* ECF No. 62 at 4–5. Media Matters separately argued that the requests for donor-identifying documents were inappropriate and harassing grasps for irrelevant information. *Id.* at 10–13. As to X's request for donor identities in particular, Media Matters stated that it was "virtually certain to implicate privilege," but proposed that "this Court can avoid altogether the need to adjudicate those anticipated [privilege] disputes by recognizing that requests for donor identities are inappropriately harassing and irrelevant." *Id.* at 11. The Court did not address Media Matters's categorical objections based on harassment and relevance, and—rather than crediting any of X's arguments about waiver—it deferred ruling on the anticipated privilege assertions until a privilege "protocol is established and responsive documents have been identified." ECF No. 65 at 2.

The Court initially ordered Defendants to deliver a privilege log to X by June 14, 2024, given that, at the time, discovery was scheduled to close in July. *Id.* Recognizing that the expedited schedule was unsuited to this case, however, X filed a joint motion on June 10 seeking to extend

the discovery window. ECF No. 66. As the motion explained, the parties agreed "that the requested extension of deadlines is necessary to allow each side time to comply with the Court's order" on X's motion to compel, and the parties "jointly propose[d] to allow additional time for the review of documents for potential privilege assertions and production of privilege logs." *Id.* at 3 & n.3. The Court extended discovery by five months and, as the parties had requested, set a June 28 deadline for Media Matters's *first* privilege log. ECF No. 69 at 1. The parties subsequently negotiated a privilege protocol and agreed to a mutual exchange of privilege logs on September 6, October 11, November 15, and December 17. Defs.' App. at 4–5, 7–11.

As promised, Media Matters served its first privilege log on June 28. As contemplated by the parties' joint motion, that log did not include every single privileged document conceivably responsive to X's many broad requests. Such an approach would have been impossible, and plainly inconsistent with both the Court's order extending discovery and the parties' protocol establishing additional privilege log exchanges through the rest of the year. Instead, consistent with its agreement with X, Media Matters logged the documents that it had identified and determined to be privileged as of the service date. Defs.' App. at 14 ("With respect to the June 28 'Deadline for Defendants to Provide First Privilege Log and Associated Documents,' the parties understand that on June 28 Defendants will produce a log of any privileged documents identified to date, along with copies of any redacted documents referenced therein, with additional document productions and privilege logs to follow in accordance with the parties' forthcoming Privilege Log Agreement."). While this first assembly of privileged documents did not include any communications *specifically with donors*, that is simply because X's broad requests (seeking, for instance, "All documents and communications related to or reflecting [Media Matters's] involvement in or knowledge of X and any related entities, individuals, and platforms," X App.

14) have swept in enormous quantities of documents for review that, as X agreed in the parties'
joint motion, require far more time and resources to review and log than the original case schedule
provided. *See* ECF 66 at 2 ("The scope of written discovery and the volume of document review
and collection is significantly exceeding that which the parties anticipated at the time they
conferred for the Joint Report regarding the schedule (ECF No. 13) and pursuant to Rule 26(f).").[2]

Moreover, the present dispute over donor-related discovery was ripe for resolution six
weeks before X filed its motion. *Cf.* Br. Supp. Mot. to Compel at 2, ECF No. 84 ("Br.")
(recognizing that "[a]ll parties agree that this issue presents a legal dispute ripe for resolution,"
notwithstanding Media Matters's first privilege log); *see also* Defs.' App. at 29–30. Indeed, the
issue became ripe as early as July 19, when Media Matters served responses and objections to X's
first set of interrogatories. In response to X's second interrogatory, which asked Media Matters to
identify its "top 20 funding sources," Media Matters objected that the request was harassing,
sought irrelevant information, and "represent[ed] a fishing expedition for highly sensitive and
privileged information, the production of which would chill Defendants' exercise of their First
Amendment speech and associational rights." Defs.' App. at 42–43. Thus, as Media Matters
explained to X in subsequent conferrals, there was no need for Media Matters to sift through the
haystack of collected documents to find a donor communication that it could log as privileged to
trigger X's ability to file a motion on this issue—it could do so based on Media Matters's objection

---

[2] The privilege log did, however, include many entries for documents protected by the First
Amendment associational privilege—thus, X's repeated assertions that Media Matters has "failed"
or "refused" to "log responsive documents withheld on privilege grounds," Br. at 1, 3, 6–8, is false.

to X's interrogatories. Defs.' App. at 29–30.[3] X nevertheless waited over six weeks to file the present motion.

X does not make any mention of this background (or even seek to compel a substantive response to Interrogatory No. 2), but it firmly establishes that X's waiver arguments are without merit: Media Matters did not waive the First Amendment privilege in its first objections, which explicitly identified the First Amendment privilege. X App. 47–49, 51–52, 69–70. That assertion of privilege was sufficiently particularized. It explained at length that the requested documents were sensitive and their disclosure would chill First Amendment speech and associational rights—with citations to two Supreme Court decisions, a Fifth Circuit decision, and a landmark Ninth Circuit decision recognized as persuasive by courts across the country, where each decision describes and applies that privilege that Media Matters identified. X App. 47–49, ECF No. 85 (citing *Americans for Prosperity Found. v. Bonta*, 594 U.S. 595, 611–13 (2021); *NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 460 (1958); *Whole Woman's Health v. Smith*, 896 F.3d 362, 372 (5th Cir. 2018); *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010)); *see also* X App. 51–52, 69–70 (same). Media Matters also did not waive the First Amendment privilege by failing to describe the documents withheld because, as of the date of its first privilege log, it had not identified any donor-related documents that it was withholding based on privilege. App. Ex. 3 at 14; App. Ex. 4 at 30. And Media Matters did not waive the First Amendment privilege by failing

---

[3] X is also wrong to assert that because Media Matters has objected to separately searching for donor-related documents, Media Matters "therefore [has] refused to log documents that are responsive to X's requests for production seeking those documents." Br. at 3. As Media Matters explained to X during conferrals, documents *already* collected would likely be responsive to X's donor-related requests, and Media Matters assured it would log those privileged documents as they surfaced in the review process. Indeed, during the more than two months of review since it submitted its first privilege log, Media Matters has identified several donor-related documents that are included in its second privilege log.

to submit a timely privilege log because it *did serve* a privilege log by the agreed to June 28 deadline, and it will *continue to serve* privilege logs in accordance with the remaining deadlines.[4] The only purported "deficiency" that X has identified with this log is that it failed to include an exhaustive list of every responsive document in Media Matters's control that could be subject to privilege, but such an approach would be nonsensical in light of the discovery extension ordered by this Court and the privilege protocol negotiated and agreed to by X.

## II.    The donor information that X demands is privileged by the First Amendment.

As X concedes, the First Amendment associational privilege protects against compelled disclosure that would adversely affect an organization by "induc[ing] members to withdraw . . . and dissuad[ing] others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure." *NAACP*, 357 U.S. at 463; *cf.* Br. at 15. To be protected from disclosure, a movant "need show only a reasonable probability that the compelled disclosure of [an organization's] contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties." *Buckley v. Valeo*, 424 U.S. 1, 74 (1976). "The proof may include, for example, specific evidence of past or present harassment of members due to their associational ties, or of harassment directed against the organization itself. A pattern of threats or specific manifestations of public hostility may be sufficient." *Id.* Once this prima facie showing is made, the burden shifts to the party seeking the discovery to demonstrate "an interest in obtaining the disclosures it seeks which is sufficient to justify the deterrent effect on the free exercise of the constitutionally protected right of

---

[4] To the extent X's core concern is that it wants to receive certain categories of documents that it deems essential to its claims as early as possible, Media Matters proposed a discovery protocol on August 2 that would frontload the search and production (or logging) of these documents. Defs.' App. at 25. More than a month later, X still has not responded.

association." *Perry*, 591 F.3d at 1161 (citation omitted). "[T]he party seeking the discovery must show that the information sought is highly relevant to the claims or defenses in the litigation—a more demanding standard of relevance than that under Federal Rule of Civil Procedure 26(b)(1)." *Id.*; *accord Whole Women's Health*, 896 F.3d at 372–74 (applying "the *Perry* balancing test"). Under this framework, X is not entitled to discover the identities of Media Matters's donors.

### A.   First Amendment protections extend to discovery disputes between private parties.

The nationwide consensus remains the same as it was the last time the parties briefed this issue: "the First Amendment privilege applies to discovery orders issued in litigation involving only private parties." *In re Motor Fuel Temperature Sales Pracs. Litig.*, 641 F.3d 470, 481 (10th Cir. 2011). This is because a court order "compelling discovery and the trial court's enforcement of that order provide the requisite governmental action that invokes First Amendment scrutiny." *Grandbouche v. Clancy*, 825 F.2d 1463, 1466 (10th Cir. 1987); *see also Carrier v. Ravi Zacharias Int'l Ministries, Inc.*, No. 1:21-CV-3161-TWT, 2023 WL 2355891, at *4 (N.D. Ga. Mar. 3, 2023) (recognizing, in dispute between private parties, that "courts have consistently recognized a qualified associational privilege in the discovery context"); *Pulte Home Corp. v. Montgomery County*, No. GJH-14-3955, 2017 WL 1104670, at *3 (D. Md. Mar. 24, 2017) (holding, in dispute between private parties, that "First Amendment protections apply in the context of discovery orders"); *Flynn v. Square One Distrib., Inc.*, No. 6:16-mc-25-Orl-37TBS, 2016 WL 2997673, at *2 n.4 (M.D. Fla. May 25, 2016) (similar); *Sierra Club v. Union Elec. Co.*, No. 4:14-cv-00408-AGF, 2015 WL 9583394, at *2 (E.D. Mo. Dec. 31, 2015) (similar); *Sierra Club v. Energy Future Holdings Corp.*, No. 5:10CV156, 2013 WL 12244352, at *3 (E.D. Tex. Dec. 30, 2013) (similar); *Anderson v. Hale*, No. 00 C 2021, 2001 WL 503045, at *3 (N.D. Ill. May 10, 2001) ("This same balancing test [for the government to overcome the associational privilege] equally applies to cases

9

involving two private parties."); *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, No. 75 Civ. 5388 (MJL), 1985 WL 315, at *9 n.16 (S.D.N.Y. Feb. 28, 1985) (rejecting argument that First Amendment privilege does not apply in discovery disputes between private parties); *cf. Britt v. Super. Ct. of San Diego Cnty.*, 574 P.2d 766, 774 (Cal. 1978) (en banc) (holding "the threat to First Amendment rights may be more severe in a discovery context, since the party directing the inquiry is a litigation adversary who may well attempt to harass his opponent and gain strategic advantage by probing deeply into areas which an individual may prefer to keep confidential").

The principle that discovery orders implicate state action follows directly from Supreme Court precedent. In *Shelley v. Kraemer*, 334 U.S. 1, 14–15 (1948), the Court recognized that the action of "courts and of judicial officers in their official capacities is to be regarded as action of the State within the meaning of" the Constitution's state action requirements. Similarly, in *NAACP*, where the Supreme Court reviewed a state court order requiring a private organization to disclose its membership lists, the Court recognized "[i]t is not of moment that the State has here acted solely through its judicial branch, for whether legislative or judicial, it is still the application of state power which we are asked to scrutinize." 357 U.S. at 463. Since then, the Fifth Circuit and courts within it have taken the First Amendment privilege as a given, reviewing and adjudicating privilege assertions among private parties as a matter of course. *See, e.g.*, *Whole Woman's Health*, 896 F.3d at 369–70 (favorably reviewing First Amendment privilege claim by private third party in response to discovery requests from private plaintiffs); *Abbott*, 2022 WL 17574079, at *9 ("Private Plaintiffs must establish a substantial need for the withheld documents that outweighs the intrusion into the [private] Defendant Intervenors' constitutional rights."); *Gueye v. Mike Bloomberg 2020 Inc.*, Nos. 4:20-cv-00487-BP through 4:20-cv-00490-BP, 2021 WL 3910341, at *2 (N.D. Tex. Mar. 12, 2021) (adjudicating First Amendment privilege dispute between private

parties); *Energy Future Holdings Corp.*, 2013 WL 12244352, at *3 ("Defendants have not demonstrated an interest in the membership list that is sufficient to justify a potential deterring effect such a disclosure may have on the free exercise by [Plaintiff's] members of their constitutionally protected right of association."); *Mize v. McGraw-Hill, Inc.*, 82 F.R.D. 475, 478 (S.D. Tex. 1979) (recognizing invocation of First Amendment privilege was sufficient to defeat motion to compel in suit between private parties).

Faced with this one-sided caselaw, X misrepresents key authority. In discussing *Perry*, for example, the seminal Ninth Circuit case that recognized the First Amendment privilege in a discovery dispute between private parties, X contends "the governmental action in that case was unmistakable" because "litigants included government officials" defending a challenge to a state law. Br. at 11. Equally unmistakable, however, is that none of those government officials were involved in the discovery dispute at issue—private plaintiffs sought the production of private defendant-intervenors' internal campaign communications. *Perry*, 591 F.3d at 1152. X further tries to distinguish *Gueye* as a case where the assertion of privilege was unsuccessful, Br. at 13, but the mere fact that litigants may not win on every conceivable assertion of privilege does not suggest that the privilege is altogether unavailable in private litigation. Instead, the court's careful application of the *Perry* test in that case indicates the opposite. *Gueye*, 2021 WL 3910341, at *2–3. Finally, X seeks to distinguish *Mize* as a case applying the reporter's privilege "by reference to criminal grand-jury proceedings." Br. at 13. But the reporter's privilege is derived from the same First Amendment at issue here, and X does not provide any explanation of why the state action analysis would differ. Further, *Mize* was not a criminal case, and its holding was not contingent on criminal cases. There, a private plaintiff suing a publisher for defamation sought to compel disclosure of the identity of a confidential source used in preparing a challenged article, and the

11

motion to compel was denied because the information was privileged under the First Amendment. 82 F.R.D. at 476. There is no material distinction from the present case.

Next, X presses cases that have nothing to do with the First Amendment privilege or discovery disputes at all. *See* Br. at 11–12 (citing cases). *Henry v. First National Bank of Clarksdale*, 444 F.2d 1300, 1312 (5th Cir. 1971), held that the mere filing of a state court antitrust suit was not "state action" for purposes of civil rights statutes. *Hardy v. Gissendaner*, 508 F.2d 1207, 1210–11 (5th Cir. 1975), held that Alabama's holder-in-due-course statute did not justify mortgagors' constitutional claim where the statute was applied without discrimination. *Sharp Corp. v. Hisense USA Corp.*, 292 F. Supp. 3d 157, 163 (D.D.C. 2017), upheld a Singaporean arbitral commission's order that one Asian television manufacturer could not disparage another Asian television manufacturer while the arbitration was pending. And in *Ohno v. Yasuma*, 723 F.3d 984, 987 (9th Cir. 2013), the Ninth Circuit held that enforcement of a Japanese damages award under California's Uniform Foreign–Country Money Judgments Recognition Act did not transform the underlying foreign court's judgment into domestic state action. None of these cases illuminate the parties' discovery dispute.[5]

After all of this, X finally admits the obvious: The on-point authority compiled by Media Matters "supports a qualified privilege and a case-by-case analysis of the disputed materials." Br. at 14. That analysis cannot be avoided here and, as discussed below, it requires denial of X's motion to compel.

---

[5] Other out-of-circuit district court decisions that X cites are insufficient to overcome the uniform consensus within the Fifth Circuit.

**B.    The First Amendment privilege applies to organizational membership and donor lists.**

Courts have consistently applied the First Amendment privilege to shield the identities of an organization's members and donors. In *NAACP*, the Supreme Court noted that "[i]t is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy" may effectively restrain the freedom of association, and it emphasized "the vital relationship between freedom to associate and privacy in one's associations." 357 U.S. at 462. X's assertion that the Court has limited this protection to "people combatting state-enforced segregation," Br. at 16, is simply wrong. In *Bonta*, for example, the Supreme Court held that the First Amendment guaranteed a right of anonymity to the major donors of nonprofit organizations that were dedicated to values such as free markets and religious freedom. 594 U.S. at 602.

The Fifth Circuit has also applied this privilege far beyond the context of racial discrimination. In *Hastings*, for example, the court held that an order compelling disclosure of a teacher federation's membership list abridged associational and privacy rights guaranteed by the First Amendment. 615 F.2d at 631. Based on the federation's claims that "members have been harassed," the court concluded that "[t]o direct disclosure of the membership list would subject the other members to the very retaliatory measures they seek to avoid." *Id.* at 632; *see also Whole Woman's Health*, 896 F.3d at 373 (recognizing as especially "disturbing" the prospect that an organization could be forced "to turn over *to a public policy opponent* its internal communications, setting a precedent that may be replicated in litigation anywhere"); *Familias Unidas v. Briscoe*, 544 F.2d 182, 192 (5th Cir. 1976) (reversing district court decision to dismiss case based on parent association's refusal to disclose its membership information).

It is similarly common for district courts in this circuit to deny motions to compel advocacy organizations to produce confidential information (including names and home addresses) about

their members. In *Energy Future Holdings Corp.*, for example, the court held that the party moving to compel had "not demonstrated an interest in the membership list that is sufficient to justify a potential deterring effect such a disclosure may have on the free exercise by [the organization's] members of their constitutionally protected right of association." 2013 WL 12244352, at *3. In *Abbott*, the court recognized Republican Party committees' assertion of associational privilege and found it allowed them to fully "redact the names of any individual Committee members or volunteers from all discovery they are required to produce in this litigation." 2022 WL 17574079, at *7. And in *Young Conservatives of Texas Foundation v. University of North Texas*, No. 4:20-CV-973-SDJ, 2022 WL 2901007 (E.D. Tex. Jan. 11, 2022), the court recognized that members of the Young Conservatives of Texas Foundation have "been harassed and threatened with physical violence due to their associational affiliation," which supported a finding that discovery into the Foundation's "members' names and contact information will chill associational rights." *Id.* at *3. Thus, there can be no dispute that X's discovery requests implicate the First Amendment privilege.

### C.   There is a reasonable probability that compelled disclosure of Media Matters's donors will subject the donors to threats, harassment, and reprisals.

Media Matters's employees and donors have suffered the same manner of abuse that courts have long recognized creates a right to *private* association under the First Amendment. This string of past and present "harassment of members due to their associational ties" and of "harassment directed against the organization itself" confirms that the privilege applies to Media Matters. *Buckley*, 424 U.S. at 74.

As Mr. Carusone explains in a sworn declaration, threats against Media Matters have exploded in both number and intensity since X initiated this lawsuit. Carusone Decl. ¶¶ 5–7. Mr. Hananoki has received messages laced with profanity, racism, and violent threats, including in one instance an image of a noose. *Id.* ¶ 8. Another Media Matters reporter received an email with a

photograph of himself and his wife, with the message, "We know where you live. Expect a visit." *Id.* ¶ 10. Media Matters's main office, meanwhile, received an email threatening, "[We] know where your offices are at. We're coming for you keep looking over your shoulder." *Id.* ¶ 12. And the office has received voicemails referencing this lawsuit and warning, "I think if you keep pushing it things will get to a point where there will be violence. And I think you're right near the top of the list for the baddest fucking motherfuckers on this continent." *Id.* ¶ 14; *see also id.* ¶ 15 (another voicemail threatening, "I may be one of the people that you really don't want to come up and visit your offices"). Just last week, Media Matters received an email stating, "Looks like I can track your funding. Home addresses and bank accounts are next. . . . Every employee at, media matters is considered an enemy to the USA and will be executed." *Id.* ¶ 22.

Posts on the X platform directed at Media Matters and its affiliates have been especially horrific. On May 23, 2024, for example, after a former Media Matters employee posted about the toll that this lawsuit has been taking on Media Matters, one user posted, "I'm starting a woodchipper manufacturing company and need some testers, and I think your colleagues would be qualified." *Id.* ¶ 19. Referencing the conspiracy theory that culminated in a man opening fire on a Washington, D.C. pizza restaurant, another posted, "Fuck you @mmfa. . . . #pizzagate never concluded. We are coming for you, we never forgot, and we will never forgive." *Id.* ¶ 17.

Similar threats have also been aimed at Media Matters's donors. After the Free Beacon posted an alleged "leaked donor list" of Media Matters's "five largest contributors," there was an eruption of violent and hateful threats. One user posted a picture of Musk firing a .50 caliber weapon and edited the photo to look as though Musk was shooting at Media Matters's logo; others posted antisemitic harassment and slurs. *Id.* ¶ 26. X users repeatedly called for arrests, treason trials, and the "death penalty" for these donors. *Id.* ¶ 29. This abuse has gotten so bad that some

"donors and potential donors have [already] expressed concerns for their own privacy and personal safety," *id.* at ¶ 32,  and MMFA expects donors will "discontinue their support for and affiliation with Media Matters if they expected their identities could be shared with X,". *id.* ¶ 35. Indeed, "[c]ash flows to MMFA have already been affected by the threats and risks associated with the potential that some donors' identities will be disclosed because of this litigation." *Id.* ¶ 33.

Media Matters has done what it can to protect the physical safety of its employees working in its Washington, D.C. office, including by reimbursing the costs of home security systems, and placing security guards at the reception of its office when threats spike. *Id.* ¶ 31. But it is not feasible to offer similar protections to donors nationwide. Like the members of the American Foundation for Prosperity who were at the center of the controversy in the Supreme Court's First Amendment decision in *Bonta*, Media Matters's donors depend on the First Amendment privilege to avoid retaliatory threats to their safety and livelihood. *See* 594 U.S. at 617. As the Supreme Court recognized, the risks of protests, stalking, and physical violence "are heightened in the 21st century and seem to grow with each passing year, as 'anyone with access to a computer [can] compile a wealth of information about' anyone else, including such sensitive details as a person's home address or the school attended by his children." *Id.* Media Matters's donors similarly have an overwhelming interest in maintaining the privacy of their affiliation with the organization, and Media Matters has a reciprocal interest in protecting its association with the very people who fund its First Amendment-protected journalism.

### D.    X cannot show that donor names are "highly relevant" to its claims.

X cannot carry its burden to "show that the information sought is highly relevant" to its claims. *Perry*, 591 F.3d at 1161. Instead, X's interests in the identities of Media Matters's donors are entirely nonexistent.

To justify its demand for these maximally sensitive documents, X has settled on three possible bases for relevance. First, X says that the information is relevant "to see how Defendants have availed themselves of Texas." Br. at 14. But X has not identified any reason why it needs the *names and home addresses* of Media Matters's donors to determine the extent of Media Matters's availment. Further, those contacts would be relevant to personal jurisdiction only to the extent that X's claims "arise out of or relate to" Media Matters's purposeful contacts with the forum state. *Johnson v. TheHuffingtonPost.com*, 21 F.4th 314, 317 (5th Cir. 2021). Thus, X's first purported justification for donor-related information would extend only to documents and communications showing, at most, how often and in what ways Media Matters has solicited donations from Texans in preparing and publishing the challenged articles. Far from claiming privilege over this information, however, Media Matters has provided it—confirming that *no such documents exist*. *See* App. Supp. Mot. to Dismiss, Ex. B ¶ 13, ECF No. 42 (Mr. Hananoki did not solicit Texas donors for Media Matters in connection with the articles); *id.* Ex. C ¶ 4 (Mr. Carusone has not sought any donations from individuals or organizations in Texas earmarked to fund Media Matters's work related to X Corp.). Because "a party cannot produce what it does not have . . . the court cannot compel a party to produce non-existent documents." *Samsung Elecs. Am.*, 321 F.R.D. at 299 (cleaned up).

X's other two purported bases for seeking donor-related documents—"to see how Defendants funded their tortious conduct" and "to see if they are profiting or seeking to improve their financial condition from their disparagement," Br. at 14—also are not sufficient to overcome the First Amendment privilege. X conspicuously makes no effort to explain how the identities and addresses of all donors nationwide are relevant to these supposed justifications; nor does it explain how either of these justifications is relevant to their claims. X merely recites a conclusory assertion

that the information is relevant to "compensatory damages" and "punitive damages," *id.*, but neither is correct.

"Compensatory damages in defamation cases must compensate for 'actual injuries' and cannot merely be 'a disguised disapproval of the defendant.'" *Brady v. Klentzman*, 515 S.W.3d 878, 887 (Tex. 2017) (citation omitted). If X succeeds on its claims, the amount of compensatory damages will turn on what X can prove about its own lost advertising revenue and reputational injury within the relevant community; not on *who* donated to Defendants. Likewise, the appropriate amount of punitive damages depends on (1) the degree of reprehensibility of the defendant's misconduct, with conduct that endangers a person's health or safety meriting more punishment than merely economic harm; (2) the amount of actual damages; and (3) a comparison to other penalties that could be awarded for similar misconduct. *See Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 45 (Tex. 1998). Again, none of these factors require identification of Media Matters's donors. If X has some other relevancy hook in mind—or any legal support for its cursory insinuations—no such explanation has been provided and Media Matters cannot be required to guess at it.

Finally, the existence of a protective order does not defeat Media Matters's privilege. As the Supreme Court recognized in *Bonta*, the right to anonymity remains paramount even where the proposed recipients of donor information are required by law to keep donor identities confidential. 594 U.S. at 616 ("Our cases have said that disclosure requirements can chill association even if there is no disclosure to the general public." (cleaned up)); *see also Energy Future Holdings Corp.*, 2013 WL 12244352, at *3 ("[A]ssuming the requested information is relevant, the Court is not convinced the protective order would insulate [the advocacy organization's] members against the risk of public disclosure."). Here, as described above, donor

18

identities are not relevant—let alone essential—to X's claims, and the volume and intensity of violent threats hurled at everyone affiliated with Media Matters since the inception of this lawsuit requires full application of the First Amendment privilege.

### III.    X's harassing requests for irrelevant donor information fall outside the proper scope of discovery.

If this Court determines that the First Amendment privilege does not apply, the motion to compel should still be denied because the requests are harassing and seek irrelevant information. The Federal Rules limit the scope of discovery to nonprivileged matters that are "relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). Applying this test, courts are to consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." *Id.* Courts "must limit the frequency or extent of discovery otherwise allowed" if "the proposed discovery is outside the scope permitted by Rule 26(b)(1)." Fed. R. Civ. P. 26(b)(2)(C).

By X's own telling, "the central allegation that X raises in its amended complaint [is] Defendants' tortious interference with X's advertisers through the publication of two deeply misleading articles about the company's social media platform." ECF No. 60 at 1. As explained above, X's requests for donor-related documents have nothing to do with this subject matter. And to the extent Media Matters's donor solicitations could bolster X's attempt to trigger jurisdiction in Texas, X can offer no reason why such a request would require disclosure of donor identities (and, as X has already been informed, Mr. Hananoki did not solicit Texas donors for Media Matters in connection with the articles and Mr. Carusone has not sought any donations from individuals or organizations in Texas earmarked to fund Media Matters's work related to X Corp.). In short, X's

19

donor-related requests constitute naked harassment. *See Hickman v. Taylor*, 329 U.S. 495, 507–08 (1947) ("[D]iscovery, like all matters of procedure, has ultimate and necessary boundaries," and may not be "conducted in bad faith or in such a manner as to annoy, embarrass or oppress the person subject to the inquiry.").

Donor identities are not "important[t to] the issues at stake in the action," and the burden of the proposed discovery—on Media Matters, and, given the invitation to harassment, on the donors themselves—clearly "outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). Here, a deep-pocketed litigant is striking at the financial jugular of a nonprofit organization, threatening its very existence through abusive discovery. Musk has made the harassment explicit, using the X platform to decry Media Matters as "an evil propaganda machine [that] can go to hell" and declaring that "we will pursue not just [Media Matters], but anyone funding that organization. I want to be clear about that. Anyone funding the organization, we will pursue them."[6] X's motivation to target donors for harassment does not need to be inferred—it has been openly admitted.

"Judges are trusted to prevent 'fishing expeditions' or an undirected rummaging through . . . records for evidence of some unknown wrongdoing." *Cuomo v. Clearing House Ass'n, LLC*, 557 U.S. 519, 531 (2009). Because X's requests for donor identities are based on no more than a "purely speculative hope that" they will "reveal a long-running and intricately-planned conspiracy," the motion to compel should be denied. *Hamilton v. Geithner*, No. 1:08cv1112 (JCC), 2009 WL 2240358, at *2 (E.D. Va. July 23, 2009).

## CONCLUSION

The Court should deny X's motion to compel.

---

[6]   @TheChiefNerd, X.com (Dec. 10, 2023, 4:24 PM) https://x.com/thechiefnerd/status/1733960832571122115?s=46&t=PN52ydwTvFusTeuJ-h77RA [https://perma.cc/6L3M-SHX3]

Dated: September 6, 2024.

Respectfully submitted,
*/s/ Andrew LeGrand*

GIBSON, DUNN & CRUTCHER LLP            ELIAS LAW GROUP LLP
Andrew LeGrand (TX 24070132)          Abha Khanna* (WA 42612)
2001 Ross Avenue, Suite 2100          1700 Seventh Avenue, Suite 2100
Dallas, TX 75201                      Seattle, WA 98101
T: (214) 698-3100                     T: (206) 656-0177
F: (214) 571-2960                     F: (206) 656-0180
alegrand@gibsondunn.com               akhanna@elias.law

Theodore J. Boutrous, Jr.* (CA 132099)   Jacob D. Shelly* (DC 90010127)
333 South Grand Avenue                Daniela Lorenzo* (NY 5780457)
Los Angeles, CA 90071                 250 Massachusetts Avenue NW, Suite 400
T: (213) 229-7000                     Washington, DC 20001
F: (213) 229-7520                     T: (202) 968-4490
tboutrous@gibsondunn.com              F: (202) 986-4498
                                      jshelly@elias.law
Amer S. Ahmed* (NY 4382040)           dlorenzo@elias.law
200 Park Avenue
New York, New York 10166              * Admitted *pro hac vice*
T: (212) 351-4000
F: (212) 351-4035
aahmed@gibsondunn.com

*Counsel for Defendants Media Matters for America, Angelo Carusone, and Eric Hananoki*

## CERTIFICATE OF SERVICE

On September 6, 2024, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Andrew LeGrand*
Andrew LeGrand