# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# FORT WORTH DIVISION

| | |
|---|---|
| **X CORP.,** <br>         **Plaintiff,** <br><br>     **v.** <br><br> **MEDIA MATTERS FOR AMERICA,** <br> **et al.,** <br>        **Defendants.** | **Civil Action No. 4:23-cv-01175-O** |

# DEFENDANTS' BRIEF IN SUPPORT OF MOTION
# TO CERTIFY AN IMMEDIATE APPEAL

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

LEGAL STANDARD......................................................................................................... 3

ARGUMENT ..................................................................................................................... 3

I.  The Court's ruling that it has personal jurisdiction over Defendants meets the criteria
    for certification............................................................................................................. 3

    A.  Whether Texas has personal jurisdiction over Defendants is a controlling
        question of law............................................................................................................ 4

    B.  There are substantial grounds to disagree that Texas has jurisdiction over claims
        arising from D.C.- and Maryland-based reporting about a California company that
        happened to be running ads for Texas-based companies............................................. 4

    C.  An immediate appeal may materially advance the ultimate termination of
        the litigation. ........................................................................................................... 14

II. The Court's ruling that venue is proper in Texas also meets the criteria for
    certification. ................................................................................................................. 15

III. The Court should exercise its discretion to certify the appeal. ............................................. 18

CONCLUSION.................................................................................................................. 22

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Akerly v. Red Barn Sys., Inc.*,
  551 F.2d 539 (3d Cir. 1977) ............................................................................ 14, 18

*All. Health Grp., LLC v. Bridging Health Options, LLC*,
  No. 1:06CV1267HSO-JMR, 2007 WL 3355641 (S.D. Miss. Nov. 8, 2007) ................. 15, 18

*Bantam Books, Inc. v. Sullivan*,
  372 U.S. 58 (1963) .............................................................................................. 20

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*,
  582 U.S. 255 (2017) ............................................................................................ 14

*Burger King Corp. v. Rudzewicz*,
  471 U.S. 462 (1985) ............................................................................................ 11

*Calder v. Jones*,
  465 U.S. 783 (1984) ..................................................................................... *passim*

*In re Chinese Manufactured Drywall Prod. Liab. Litig.*,
  742 F.3d 576 (5th Cir. 2014) ................................................................................ 4

*Coastal Labs., Inc. v. Jolly*,
  502 F. Supp. 3d 1003 (D. Md. 2020) ...................................................................... 16

*Conaway v. Chambers*,
  823 S.W.2d 331 (Tex. App. 1991) .......................................................................... 10

*CoreCivic, Inc. v. Candide Grp., LLC*,
  46 F.4th 1136 (9th Cir. 2022) ............................................................................... 22

*Diece-Lisa Indus., Inc. v. Disney Enters., Inc.*,
  943 F.3d 239 (5th Cir. 2019) ................................................................................. 8

*Fielding v. Hubert Burda Media, Inc.*,
  415 F.3d 419 (5th Cir. 2005) ................................................................................. 9

*Goosehead Ins. Agency, LLC v. Williams Ins. & Consulting, Inc.*,
  533 F. Supp. 3d 367 (N.D. Tex. 2020) .................................................................... 18

*Henry v. Lake Charles Am. Press, L.L.C.*,
  566 F.3d 164 (5th Cir. 2009) ................................................................................ 22

*Herman v. Cataphora, Inc.*,
  730 F.3d 460 (5th Cir. 2013) ................................................................................. 9

*Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement,*
  326 U.S. 310 (1945) ................................................................................................4

*Johnson v. TheHuffingtonPost.com,*
  21 F.4th 314 (5th Cir. 2021) ........................................................................... *passim*

*Klocke v. Watson,*
  936 F.3d 240 (5th Cir. 2019) ................................................................................22

*Lipsett v. Univ. of Puerto Rico,*
  740 F. Supp. 921 (D.P.R. 1990) ...........................................................................14

*Media Matters for Am. v. Bailey,*
  No. 24-CV-147 (APM), 2024 WL 3924573 (D.D.C. Aug. 23, 2024) ..............19, 20

*Media Matters for Am. v. Paxton,*
  No. 24-CV-147 (APM), 2024 WL 1773197 (D.D.C. Apr. 12, 2024) ....................19

*Sangha v. Navig8 ShipManagement Private Ltd.,*
  882 F.3d 96 (5th Cir. 2018) ...........................................................................8, 10

*SEC v. Stanford Int'l Bank, Ltd.,*
  112 F.4th 284 (5th Cir. 2024) ................................................................................4

*In re Space Expl. Techs., Corp.,*
  96 F.4th 733 (5th Cir. 2024) ................................................................................17

*In re Space Expl. Techs., Corp.,*
  99 F.4th 233 (5th Cir. 2024) ................................................................................17

*Space Expl. Techs. Corp. v. NLRB,*
  No. 1:24-CV-00001, 2024 WL 974568 (S.D. Tex. Feb. 15, 2024) ......................17

*Thompson v. Chrysler Motors Corp.,*
  755 F.2d 1162 (5th Cir. 1985) .............................................................................12

*Thompson v. Shaw Grp. Inc.,*
  No. CIV.A. 04-1685, 2006 WL 2038025 (E.D. La. July 18, 2006) ......................15

*Time, Inc. v. McLaney,*
  406 F.2d 565 (5th Cir. 1969) ............................................................................2, 19

*United States v. LaRouche Campaign,*
  841 F.2d 1176 (1st Cir. 1988) ..............................................................................20

*Walden v. Fiore,*
  571 U.S. 277 (2014) ........................................................................................6, 10

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980)................................................................................20

*Wyatt v. Kaplan*,
    686 F.2d 276 (5th Cir. 1982) ..............................................................12

**Statutes**

28 U.S.C. § 1292(b) ..............................................................................1, 3, 9

28 U.S.C. § 1391(b)(2) ..............................................................................15

28 U.S.C. § 1406 ..................................................................................18

Cal. Civ. Proc. Code § 425.16 .....................................................................21

D.C. Code Ann. § 16-5501(1) ......................................................................21

Md. Code Ann., Cts. & Jud. Proc. § 5-807(c).........................................................21

Nev. Rev. Stat. Ann. § 41.650 .....................................................................21

Tex. Civ. Prac. & Rem. Code § 27.003 ..............................................................22

Tex. Civ. Prac. & Rem. Code § 27.004 ..............................................................22

Tex. Civ. Prac. & Rem. Code § 27.005 ..............................................................22

## INTRODUCTION

The Court should certify its order denying Defendants' motion to dismiss, ECF No. 82 ("Order"), for immediate appeal. The Court's determination that it has personal jurisdiction in this case meets the statutory criteria for interlocutory appeal: personal jurisdiction is a "controlling question of law"; there is "substantial ground" for reasonable judges to disagree about whether Texas has personal jurisdiction of a California company's business tort claims against D.C. and Maryland journalists; and immediate appeal may "materially advance" the case by resolving it outright. 28 U.S.C. § 1292(b). For many of the same reasons, the Court's determination that venue is proper in the Northern District of Texas also meets the standards for immediate appeal.

The Court's Order stretches the boundaries of personal jurisdiction well beyond those firmly established by Fifth Circuit and Supreme Court precedent. None of the cases cited in the parties' briefing or the Court's Order allowed the exercise of jurisdiction over a non-forum plaintiff's claim against a non-forum defendant based on the plaintiff's forum connections with third parties to the litigation. And even if the Court's rule of law were correct, X Corp.'s ("X") allegations cannot support the inordinate weight the Order places on two Texas-based advertisers—AT&T and Oracle—to justify personal jurisdiction in Texas. X's claims do not "arise out of" its contacts with either company—the November articles on which this lawsuit is based do not mention AT&T at all and X admits in its Amended Complaint that Oracle did *not* suspend advertising on X. Moreover, the Court's extension of personal jurisdiction will have harmful, chilling consequences for journalists in the internet age, exposing them unpredictably to jurisdiction in any state that is home to any third-party individual or entity that is simply *mentioned* in any article. That invasion of Defendants' liberty interests does not comport with due process.

In light of these substantial grounds for disagreeing with the Court's extension of Texas's personal jurisdiction to claims between non-forum parties, the Court has good reason to exercise

its discretion to certify. The Court has previously noted the substantial strain on the Fort Worth Division's docket, and trying to verdict a case that may turn out to be without jurisdiction will only deepen that strain. Moreover, the case implicates Defendants' First Amendment rights, a settled basis for interlocutory appeal in the Fifth Circuit. *Time, Inc. v. McLaney*, 406 F.2d 565, 566 (5th Cir. 1969). For these reasons, the Court should assure itself that jurisdiction and venue are proper sooner rather than later by certifying an immediate appeal.[1]

## BACKGROUND

In November 2023, Defendant Media Matters for America, an online-only media organization, published two articles reporting on Elon Musk's apparent endorsement of an antisemitic conspiracy theory and the appearance of major brand advertisements alongside antisemitic and pro-Nazi content on the X social media platform, which Musk owns. On November 20, 2023, X filed suit in this Court alleging several tort claims against Media Matters and Eric Hananoki, the author of the November articles. ECF No. 1. On February 27, 2024, X amended its complaint to add Media Matters President Angelo Carusone as a Defendant. ECF No. 37 ("Am. Compl."). The Amended Complaint makes plain that none of the parties are Texas residents: X is incorporated in Nevada and headquartered in California; Media Matters is headquartered in Washington, D.C.; and Carusone and Hananoki reside in D.C. and Maryland, respectively. Am. Compl. ¶¶ 18–21.[2]

Defendants moved to dismiss the Amended Complaint on March 8, 2024. ECF No. 41. Defendants argued that Texas lacked personal jurisdiction over California-based X's intentional tort claims against D.C.- and Maryland-based Defendants; that venue was not proper in this

---

[1] Counsel for Defendants conferred with Counsel for X on September 20, 2024. X opposes certification.

[2] The Amended Complaint incorrectly alleges that Carusone resides in New York.

District because no "substantial part of the events" giving rise to X's claims occurred here; and that each of X's three counts failed to state a claim. *Id.* at 1, 4–13.

The Court denied the motion to dismiss on August 29, 2024. Order at 1. The Court held that personal jurisdiction was proper under *Calder v. Jones*, 465 U.S. 783, 789 (1984), because all three Defendants took "alleged tortious acts which targeted harm in, among other places, Texas." Order at 7. The Court's ruling hinged in particular on Defendants' alleged "target[ing]" of Texas-based advertisers AT&T and Oracle. *E.g.*, *id.* at 8–9, 11. Notably, AT&T was not mentioned in either of the November articles. And X's First Amended Complaint admitted that "Oracle did not withdraw its ads." Am. Compl. ¶ 14.

The Court further held that venue was proper in this district because "the gravamen of Plaintiff's claims are that Defendants intended to negatively impact Plaintiff's blue-chip clients, including a client based in this district." Order at 12. The Court was presumably referring to AT&T, which is based in Dallas.

## LEGAL STANDARD

A district court may exercise its discretion to certify an interlocutory order for immediate appeal upon finding that the order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).

## ARGUMENT

**I.    The Court's ruling that it has personal jurisdiction over Defendants meets the criteria for certification.**

The Court's order denying Defendants' motion to dismiss satisfies § 1292(b)'s criteria for certification. Whether the Court has personal jurisdiction is necessarily a controlling question of law that may advance the case's resolution. And there are substantial grounds for differences of

opinion about the answer: Texas is hardly the natural jurisdiction for a California company's lawsuit against a D.C. media organization and its Maryland-based journalist.

A.   **Whether Texas has personal jurisdiction over Defendants is a controlling question of law.**

"Personal jurisdiction is a question of law[.]" *SEC v. Stanford Int'l Bank, Ltd.*, 112 F.4th 284, 292 (5th Cir. 2024) (quoting *Admar Int'l, Inc. v. Eastrock, LLC*, 18 F.4th 783, 786 (5th Cir. 2021)). Indeed, even "[a] district court's determination of the legal significance of the facts [related to personal jurisdiction] is . . . subject to *de novo* review" on appeal. *In re Chinese Manufactured Drywall Prod. Liab. Litig.*, 742 F.3d 576, 584 (5th Cir. 2014). And personal jurisdiction is necessarily a controlling question: the Constitution prohibits this Court from making "binding a judgment in personam against an individual or corporate defendant with which [Texas] has no contacts, ties, or relations." *Int'l Shoe Co. v. State of Wash., Off. of Unemployment Comp. & Placement*, 326 U.S. 310, 319 (1945).

B.   **There are substantial grounds to disagree that Texas has jurisdiction over claims arising from D.C.- and Maryland-based reporting about a California company that happened to be running ads for Texas-based companies.**

On the most fundamental level, Defendants did not exercise "the privilege of conducting activities within" Texas. *Int'l Shoe*, 326 U.S. at 319. Rather, Defendants conducted activities in D.C. and Maryland that are alleged to have caused harm to X's business in California. Any ties to Texas are those between X and advertisers with whom X happens to have business dealings—not as a result of any purposeful choices by Defendants—and are thus too incidental to support personal jurisdiction. A reviewing court would accordingly have several substantial grounds to disagree with the Order. *First*, the Court's exercise of jurisdiction entails a novel and unprecedented extension of *Calder* rather than an application of settled law to the facts at issue. *Second*, the Court's application of that novel doctrinal innovation assumed that X's claims arise

4

from advertising by AT&T and Oracle—the only Texas companies mentioned in the Amended Complaint—but the Amended Complaint does not support that assumption. *Third*, the Court's treatment of personal jurisdiction sets a dangerous precedent for litigation in the internet age.

### 1. There are substantial grounds to disagree with the Court's extension of *Calder*.

The Court's exercise of personal jurisdiction over Defendants entails a novel and unprecedented extension of *Calder*. *See* Order at 7; *see also id.* at 8, 10–11. The Court held that under *Calder*, Defendants purposefully availed themselves of Texas, and therefore subjected themselves to the personal jurisdiction of its courts, by "target[ing]" X's Texas-based advertisers— namely, Oracle and AT&T. *Id.* at 8, 10–11.

But *Calder* does not support any such rule. In *Calder*, the Supreme Court held that California had personal jurisdiction over a California resident's libel claim against a Florida-based reporter and a Florida-based editor working for the *National Enquirer*. 465 U.S. at 785–86. The allegedly libelous story "concerned the California activities of a California resident," "was drawn from California sources," and "the brunt of the harm, in terms both of [the California resident's] emotional distress and the injury to her professional reputation, was suffered in California." *Id.* at 788–89. On these facts, the Supreme Court affirmed exercise of personal jurisdiction because "California [was] the focal point both of the story and of the harm suffered," *id.*, and because the reporter and editor's "intentional conduct in Florida" was "calculated to cause injury to respondent *in California*," *id.* at 791 (emphasis added). The Supreme Court emphasized in particular that the reporter and editor knew the story "would have a potentially devastating impact," "the brunt" of which "would be felt by respondent *in the State in which she lives and works.*" *Id.* at 790–91 (emphasis added). By its plain terms, *Calder* authorizes jurisdiction in a plaintiff's *home* state over

claims arising from intentional torts directed at that plaintiff.  It does not extend to allegations of targeting a nonparty in a state that is foreign to both plaintiff and defendant.

Defendants' purported "targeting" of advertisers in Texas has nothing in common with the *Calder* defendants' targeting of a libel plaintiff in California. First, X is not a Texas resident. Like the *Calder* plaintiff, X is a California resident—but unlike the *Calder* plaintiff, X has elected not to sue at home. Second, the articles at issue were not "drawn from [Texas] sources." To the contrary, Mr. Hananoki attested that he did not contact any Texas sources, Texas residents, or Texas-based businesses in preparing the November articles, Decl. of Eric Hananoki in Supp. of Mot. to Dismiss ("First Hananoki Decl.") ¶¶ 8, 12, ECF No. 42, a representation the Court accepted as true, Order at 9 n.15. Finally, California is "the State in which [X] lives and works," so, under *Calder*, "the brunt" of any intentional tort "would be felt" in that forum, not Texas.  X's California headquarters (or perhaps Nevada, where X is incorporated) is where X's balance sheet suffered any loss of revenue traceable to the alleged torts, regardless of where its advertisers are located.

The Court's reliance on the Texas connections of X's advertisers also runs headlong into the Supreme Court's more recent decision in *Walden v. Fiore*, 571 U.S. 277 (2014), which limited *Calder*. Under *Walden*, it is error to shift "the analytical focus from [a defendant's] contacts with the forum to his contacts with [the plaintiff]." *Id.* at 289. "Such reasoning improperly attributes a plaintiff's forum connections to the defendant and makes those connections 'decisive' in the jurisdictional analysis." *Id.* (citation omitted). Here, the Court "improperly attribute[d]" X's forum connections—namely, X's happenstance decisions to do business with Texas-based advertisers— to Defendants, none of whom purposefully dealt with Texas in any way. *Walden* confirms that *Calder* does not allow the jurisdictional reach the Court exercised here—yet the Order does not discuss *Walden* at all.

Binding, on-point Fifth Circuit precedent construing *Calder* further undermines the rule the Court adopted here. In *Johnson v. TheHuffingtonPost.com*, 21 F.4th 314, 318 (5th Cir. 2021), the Fifth Circuit read *Calder* to rest personal jurisdiction on three facts: that the article at issue there (i) "discussed 'the California activities of a California resident,'" (ii) that it was "'was drawn from California sources'" and (iii) that "'the brunt of the harm' to the plaintiff 'was suffered in California.'" *Id.* (quoting *Calder*, 465 U.S. at 788–89). Looking to these facts, the Fifth Circuit took *Calder*'s "key question" to be "whether the forum state was 'the focal point *both* of the alleged libel and of the harm suffered.'" *Id.* (quoting *Calder*, 465 U.S. at 789) (emphasis added and alteration accepted). Undertaking that inquiry, the Fifth Circuit held that Texas courts lacked jurisdiction over a Texas resident's libel claim against a New York online-only publication.

Here, the answer to the "key question" is that Texas was not "the focal point" of anything. The focal point of the alleged tortious activity was either D.C. or Maryland—where the articles were written, edited, and published. The focal point of the articles themselves was California— where X is headquartered. *See Calder*, 465 U.S. at 788–89 (noting the allegedly tortious story "concerned the California activities of a California resident"). Even if the articles were more broadly "directed at the entire world, or perhaps just concerned U.S. citizens," "that d[oes] not suffice" to trigger jurisdiction in Texas. *Johnson*, 21 F.4th at 318. Like the article at issue in *Johnson*, Defendants' articles here "said nothing about Texas, nor did [they] rely on sources based in Texas or recount conduct that occurred in Texas." *Id.* at 316; *see also Calder*, 465 U.S. at 788 (noting that article was "drawn from" the forum state). Finally, the focal point of the harm allegedly suffered was California, where X operates its business, keeps its books, and plans and executes its business strategy. Indeed, in *Johnson* the Fifth Circuit found Texas jurisdiction lacking over a *Texas* resident who alleged that he had been harmed *in Texas* by online reporting. 21 F.4th at 316.

7

Here, by contrast, *California*-based X has not made and cannot make such an allegation—yet the Court still found jurisdiction proper in Texas.

The Court's exercise of personal jurisdiction is grounded in its novel interpretation of binding precedent in *Calder* and *Johnson*. It could not have sprung from any other authority: The remaining cases cited in the Court's discussion of personal jurisdiction either concern pleading standards, *see* Order at 8 (citing *Halliburton Energy Servs., Inc. v. Ironshore Specialty Ins.*, 921 F.3d 522, 539 (5th Cir. 2019)), or hold personal jurisdiction to be *absent*—including on facts similar to those at issue here.[3] In particular, *Sangha v. Navig8 ShipManagement Private Ltd.* affirmed *denial* of personal jurisdiction over a tortious interference claim made by a Texas resident who claimed to have been injured in Texas. 882 F.3d 96, 102–04 (5th Cir. 2018); *see also* Order at 9 (citing *Sangha*, 882 F.3d at 101). *Sangha* stands for the rule that allegations that electronic "communications were targeted at a contract formed in Texas" do *not* create a *prima facie* case for personal jurisdiction. 882 F.3d at 103–04. And *Diece-Lisa Industries, Inc. v. Disney Enterprises, Inc.*, the only other case the Court cited that discusses the contacts necessary for personal jurisdiction, *see* Order at 6, likewise affirmed denial of personal jurisdiction (over a trademark dispute), where the defendant was granting "licenses to third-party licensees who conduct business in Texas and exerting quality control over those licensees." 943 F.3d 239, 244, 249 (5th Cir. 2019); *see also id.* at 253 ("[S]omething more than a non-exclusive licensor-licensee relationship is required to support the exercise of personal jurisdiction over the licensor."). In short, *Calder* is the only case the Court cited in which the exercise of personal jurisdiction was found to be proper. Because the Order marks a significant extension of *Calder*, and because no other settled rule of

---

[3] X, for its part, failed to direct the Court to any cases that might have supported such a holding. In fact, of the eight precedential Fifth Circuit cases X invoked to support its arguments for jurisdiction, *seven* found jurisdiction lacking. ECF No. 51 at 6 & n.1 (collecting cases).

law authorizes invading Defendants' due-process rights by subjecting them to jurisdiction in Texas, there is "substantial ground," 28 U.S.C. § 1292(b), for the appellate courts to disagree with the Court's exercise of jurisdiction over Defendants.[4]

### 2. There are substantial grounds to disagree with the Court's reliance on Oracle and AT&T to ground personal jurisdiction.

Even accepting, for a moment, the Court's unprecedented extension of *Calder*, there are substantial grounds to disagree with the Court's reliance on Oracle and AT&T to ground jurisdiction, as neither of those advertisers could give rise to X's claims as alleged in the Amended Complaint.

Start with AT&T. Neither the November 16 article nor the November 17 article mentions AT&T even once.[5] Nor did Defendants contact AT&T about either article. Order at 9 n.15. On

---

[4] In passing, the Order mentions Media Matters's emailing of its newsletter to a small number of Texas residents. Order at 11. But that fact cannot ground jurisdiction. Most fundamentally, X's claims do not "arise out of or relate to" the newsletter. *Johnson*, 21 F.4th at 317. X does not, for instance, allege that AT&T or any other advertiser reduced or ceased advertising because its executives subscribe to the newsletter and learned about the articles from it. And even if X alleged or proved such facts, they would not support jurisdiction because Defendants did not purposefully direct activity at Texas—newsletter subscribers opt in themselves, and the newsletter is sent to anyone who signs up nationwide. Decl. of Cynthia Padera in Supp. of Mot. to Dismiss ¶¶ 20–21, ECF No. 42; *see Johnson*, 21 F.4th at 321 (finding "another barrier" to personal jurisdiction where "[t]he place from which a person visits [Defendants'] site is entirely beyond [Defendants'] control"). In any event, absent a specific showing by X of "disproportionately high . . . readership" in the forum state, such de minimis contacts do not create personal jurisdiction over an online publication—particularly where a plaintiff is not suing in its home forum. *Herman v. Cataphora, Inc.*, 730 F.3d 460, 466 (5th Cir. 2013); *see also, e.g.*, *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 426–27 (5th Cir. 2005); *cf. Calder*, 465 U.S. at 785 (noting that National Review sent 600,000 print copies of its magazine into California, its highest circulation in any state).

[5] Hananoki has never written about AT&T's advertising on X in any of his reporting. Media Matters has published stories about that topic only twice, but neither story mentioned Texas or reported that AT&T advertisements were appearing alongside extremist, racist, or otherwise-objectionable content. The first article, published in November 2022—shortly after Musk acquired Twitter, and a year before the events giving rise to X's claims—reported that AT&T had ceased advertising on the platform after Musk's takeover. Sharon Kann & Angelo Carusone, *In less than a month, Elon Musk has driven away half of Twitter's top 100 advertisers*, Media Matters for Am.

those conceded facts, Defendants did not initiate any forum contacts with Texas-based AT&T, and Texas is merely incidental to X's claims as the happenstance location of one of its advertisers. Even if reporting about a nonparty Texas advertiser may sometimes give rise to personal jurisdiction in Texas, *not* reporting about such an advertiser plainly cannot. To accept such a premise would mean that journalists may be haled into court based only on unforeseen third parties who happened to *read* their reporting and then act upon it—precisely the sort of "fortuitous" contacts *Walden* foreclosed as a basis for jurisdiction. 571 U.S. at 286.[6]

As for Oracle, X itself concedes *in its Amended Complaint* that "Oracle did not withdraw its ads." Am. Compl. ¶ 14. Accordingly, X has no tort claim of any sort based on Defendants' alleged targeting of Oracle. *See Conaway v. Chambers*, 823 S.W.2d 331, 334 n.1 (Tex. App. 1991) ("A tort does not occur until there are some damages, however slight."). And because "claim-specific jurisdiction . . . may arise only from the defendant's forum ties that *relate to the plaintiff's*

---

(Nov. 22, 2022), https://www.mediamatters.org/elon-musk/less-month-elon-musk-has-driven-away-half-twitters-top-100-advertisers. The second article, published in October 2023, reported that AT&T had not substantially resumed advertising. Kayla Gogarty, *Linda Yaccarino again claims advertisers are returning to X. Here are the facts.*, Media Matters for Am. (Oct. 5, 2023), https://www.mediamatters.org/twitter/linda-yaccarino-again-claims-advertisers-are-returning-x-here-are-facts ("AT&T . . . has spent just $781 in the last 12 weeks — 99.96% less than the more than $1.77 million it spent during the 12 weeks before Musk's acquisition."). Thus, it is a matter of public record that at the time Defendants wrote and published the articles giving rise to X's claims, they believed that AT&T had not engaged in significant advertising on X in *nearly a year*. The suggestion that AT&T was the "target" of the November articles is therefore wholly implausible.

[6] In *Sangha*, the Fifth Circuit applied *Walden* to reject personal jurisdiction in Texas based solely on a plaintiff's Texas-based business relationships. 882 F.3d at 102–03. The plaintiff alleged that his tortious-interference claims stemmed from the defendant's communications to his employer that were "directed toward the State of Texas" because he was working in Texas at the time and the effects of those intentional torts were felt in Texas. *Id.* But the court found that the plaintiff's presence in Texas was "largely a consequence of his relationship with the forum, and not of any actions [the defendant] took to establish contacts with the forum," and—citing *Walden*—underscored that a defendant's "contacts with the state have to be purposeful and not merely fortuitous." *Id.* (citation omitted). The same reasoning should control here because the geographic location of X's advertisers has nothing to do with Defendants' activities.

claim," *Johnson*, 21 F.4th at 323 (emphasis added), Oracle fails to supply the jurisdictional hook. Even assuming that Defendants have ties to Oracle in this forum, *but see supra* at 6–7, where X does not have a viable tort claim relating to Oracle on the face of its own pleading, those ties do not "relate to [X]'s claim[s]."

In fact, the Amended Complaint fails to base any one of X's three claims on advertising by Oracle or AT&T. There is no specific allegation that Defendants interfered with a contract with either company, *see* Am. Compl. ¶ 67, meaning that neither company can form the basis for specific jurisdiction over Count I. And the only allegation supporting an inference that either company even knew of the article, as would be required for specific jurisdiction over Counts II and III, was X's claim "on information and belief" that Defendants contacted them. *Id.* ¶ 24. But the Court expressly rejected those allegations, Order at 9 n.15, 10 n.20. There is no other mention of AT&T in the complaint, and thus no other alleged basis for jurisdiction stemming from AT&T. And the only other mention of Oracle concedes that it did not pull ads, Am. Compl. ¶ 14—a requisite for liability on each of X's claims. Given these defects in X's pleadings, even a jurist who agreed with the Court's premise—that an alleged harm to a non-forum plaintiff based on the plaintiff's connections to in-forum third-party advertisers may sometimes ground jurisdiction— would have reasonable, substantial grounds to disagree with the Court's holding that such a principle applies here. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (purposeful availment requirement ensures that a defendant will not be subjected to state court jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts or of the "unilateral activity of another party or a third person" (citations omitted)).

Finally, the Court's treatment of Hananoki's declaration also marked a departure from settled law. On a motion to dismiss for lack of personal jurisdiction, a complaint's allegations

11

"must be taken as true" only to the extent that they are not "controverted by opposing affidavits." *Thompson v. Chrysler Motors Corp.*, 755 F.2d 1162, 1165 (5th Cir. 1985); *see also, e.g.*, *Wyatt v. Kaplan*, 686 F.2d 276, 283 n.13 (5th Cir. 1982). Hananoki's declaration necessarily controverted any allegations about targeting Oracle, AT&T, or any other Texas-based companies. Hananoki attested that "[n]o element of [his] work over the past year covering the X platform or Musk has involved speaking with any Texas residents or Texas-based businesses," First Hananoki Decl. ¶ 8, an uncontroverted claim which the Court credited, Order at 9 n.15. And Hananoki attested that "[i]n preparing, researching, writing, and editing the November 16 and November 17 articles, [he] was not aware of any connection . . . to Texas, Texas residents, Texas users of X, or X's alleged operations in Texas." First Hananoki Decl. ¶ 10. The Court discounted this statement as "conclusory," but it cited no authority that permits a court to discount a journalist's unrebutted, first-hand attestation about his own reporting, sources, and state of mind when writing an article. Order at 8.

The Court then determined that even "if not conclusory, these attestations do not disclaim that Hananoki knew Oracle and AT&T were based in Texas, as alleged in the complaint." *Id.* But Hananoki necessarily *did* disclaim such knowledge. If Hananoki "was not aware of *any* connection" to Texas or Texas residents, as he testified, First Hananoki Decl. ¶ 10 (emphasis added), then he necessarily was not aware that "Oracle . . . [was] based in Texas," because—as the Court itself emphasized—"Hananoki included Oracle in the headline," Order at 7–8. As for AT&T, Hananoki had no reason to mention it by name in his declaration because *it was not one of the advertisers mentioned in either article*—in this respect, the articles speak for themselves. *Cf. supra* n.5. Thus, in addition to the substantial grounds for disagreement with the Court's invention and application of a novel rule expanding personal jurisdiction, there is substantial ground for

12

disagreement with the Court's interpretation of the Fifth Circuit's rules for evaluating personal jurisdiction evidence.

### 3. There are substantial grounds to doubt that the Court's approach to jurisdiction is workable in internet-era media litigation.

The Court's order sets an untenable precedent for litigation in the internet age. "The defense of personal jurisdiction exists to ensure fairness to defendants and to protect federalism." *Johnson*, 21 F.4th at 320. As the Fifth Circuit has repeatedly cautioned, applying these principles "to a case involving jurisdiction based on the Internet should not be different at its most basic level from any other personal jurisdiction case." *Id.* at 324 n.19 (quoting *Admar Int'l Inc. v. Eastrock, L.L.C.*, 18 F.4th 783, 786 (5th Cir. 2021)). Yet here, the Court held that Texas's exercise of personal jurisdiction was fundamentally fair because an internet-only publication that "targets a Texas company with tortious activity has fair warning that it may be sued there." Order at 11. The problem, of course, is that Defendants did not target AT&T, Oracle, or any other Texas company with their allegedly tortious reporting, and X does not allege that they did; instead, X alleges that Defendants "[t]arget[ed] *X Corp.*," Am. Compl. at 10—a *California* company.

If such reporting *also* constitutes targeting the home state of any entity that transacts business with X, the jurisdictional consequences will be stark. Due process demands that defendants must have "fair warning" and "some chance to limit or avoid [their] exposure to the courts of a particular state." *Johnson*, 21 F.4th at 320 (citing *Ford Motor Co. v. Mont. Eight Jud. Dist. Ct.*, 592 U.S. 351, 359–60 (2021)). The Court's reasoning in this case would deprive many defendants of both protections. By the Order's logic, a journalist's mere mention of a person or entity in a story, without more, suffices to create jurisdiction wherever that person or entity resides, even where that person or entity is not the one alleging harm. (Indeed, given the Court's reliance

13

on AT&T, an *explicit* mention may not even be necessary.) Such an interpretation leaves those publishing online with little ability to limit their exposure to foreign courts.

As for federalism, the Court's order never discusses it at all. *See* Order at 11–12. Yet that "interest carries enormous weight." *Johnson*, 21 F.4th at 323. So much so, in fact, that it may preclude jurisdiction "even when all other factors—the burden on the defendant, the forum state's interest in applying its own law, and the convenience of the forum—strongly favor . . . jurisdiction." *Id.* As the Supreme Court has explained, "restrictions on personal jurisdiction 'are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States.'" *Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 582 U.S. 255, 263 (2017) (quoting *Hanson v. Denckla*, 357 U.S. 235, 251 (1958)). Here, the Court's order "vitiate[s] the sovereign interests of the states where defendants like [Media Matters] are 'at home,'" *Johnson*, 21 F.4th at 324—or at least, so a reasonable jurist could conclude. Certification of an immediate appeal is therefore appropriate.

### C.    An immediate appeal may materially advance the ultimate termination of the litigation.

Immediate appeal of the personal jurisdiction issue may advance the ultimate termination of this matter. If the Court of Appeals disagrees with this Court's novel extension of *Calder* and finds personal jurisdiction lacking, the case will be over. In that event, the Court will have spared itself and the parties the burden and expense of dispositive motions—and possibly a trial—by certifying the appeal. Section 1292(b) exists to allow for precisely that result: "one of the purposes of the section 1292(b) procedure is the avoidance of unnecessary trials, and . . . immediate review of all potentially reversible rulings furthers this goal." *Akerly v. Red Barn Sys., Inc.*, 551 F.2d 539, 543 (3d Cir. 1977); *see also Lipsett v. Univ. of Puerto Rico*, 740 F. Supp. 921, 923 (D.P.R. 1990) ("the purpose of the appeal is . . . to avoid harm to litigants or to avoid unnecessary or repeated

14

protracted proceedings"). Because "a ruling favorable to Defendants on [personal jurisdiction] would render [months] of discovery, enormous expenses incurred by the parties, and a trial on the merits unnecessary," the Court has good reason to certify. *Thompson v. Shaw Grp. Inc.*, No. CIV.A. 04-1685, 2006 WL 2038025, at *1 (E.D. La. July 18, 2006). Moreover, "if the case were tried on the merits and ultimately reversed on appeal" on jurisdictional grounds, "this Court would have wasted substantial resources in administering and hearing a full-blown trial on the merits." *Id.*

## II.    The Court's ruling that venue is proper in Texas also meets the criteria for certification.

For similar reasons, the Court's venue ruling also satisfies the 28 U.S.C. § 1292(b) criteria, providing a second, independent basis to certify the Order for immediate appeal.

*First*, venue is indisputably a controlling question of law. *See, e.g.*, *All. Health Grp., LLC v. Bridging Health Options, LLC*, No. 1:06CV1267HSO-JMR, 2007 WL 3355641, at *1 (S.D. Miss. Nov. 8, 2007) (granting § 1292(b) motion to certify order denying motion to dismiss for improper venue). Venue is, in general, a question of law, and here it is controlling because if venue is improper the case must be dismissed. *See id.*

*Second*, there are substantial grounds for disagreeing with the Court's holding that venue is proper. For venue to be proper, "a substantial part of the events or omissions giving rise to the claim" must have occurred in the Northern District of Texas. 28 U.S.C. § 1391(b)(2). The Court held this standard to be satisfied because "Defendants intended to negatively impact Plaintiff's blue-chip clients, including a client based in this district." Order at 12.

15

But even if an "intent" formed and acted upon in D.C. and Maryland, could trigger venue in this District,[7] the Amended Complaint does not allege that AT&T or another company in the Northern District was in fact "negatively impact[ed]." *Id.* at 12. To the contrary, X alleges that *it and it alone* was negatively impacted in the form of lost revenue, Am. Compl. ¶ 63, an allegation that would, if true, permit venue in California, not Texas. It is far from clear what it would mean for Defendants to "negatively impact [X's] blue-chip clients" in the context of this case—those businesses are alleged only to have pulled ads (which means they stopped spending on ads), not to have suffered business harms of their own. And even if non-harms to nonparties could somehow ground venue, neither AT&T nor Oracle would fit that bill. AT&T was not mentioned in either article and the Amended Complaint does not specifically allege that it pulled ads, and Oracle is headquartered in Austin—which is not in this District—and is expressly alleged *not* to have pulled ads.[8]

---

[7] The Order cites a single out-of-circuit district court opinion to support its use of Defendants' alleged "intent" to ground venue. *See Coastal Labs., Inc. v. Jolly*, 502 F. Supp. 3d 1003, 1023 (D. Md. 2020). But that case concerned several direct actions "aimed at" Maryland, including, in particular, attempts "to solicit Plaintiffs' Maryland-based customers," *id.* Here, Defendants did not contact X's Texas customers at all. Order at 9 n.15. Moreover, in *Jolly*, venue rested substantially on plaintiffs' allegation that they had "felt . . . harm in Maryland *because that is where Plaintiffs operate their business*." 502 F. Supp. 3d at 1023 (emphasis added); *see also id.* at 1011 (noting that plaintiffs' "principal places of business [are] in Annapolis, Maryland"). X, of course, operates its business in California, Am. Compl. ¶ 18, so *Jolly* is distinct. The Court's reliance on a single, distinct out-of-state district-court opinion is in itself reason to certify—in the face of such scant authority, the Court of Appeals certainly has substantial ground to reach a different conclusion about venue.

[8] Nor is there any argument that venue is proper because Defendants sent links to the articles to a small number of Texas-based newsletter subscribers. *Cf.* Order at 13 (citing cases about email contacts without expressly holding that venue is proper based on such contacts). As with personal jurisdiction, *see supra* n.4, X has never alleged that the newsletter "gave rise to" its claims by, for instance, alleging that one or more executives located in this District learned of the articles through the newsletter, then pulled its company's ads as a result.

A recent Fifth Circuit decision about venue makes yet more clear that there is substantial ground to disagree with the Court's venue analysis. Earlier this year, the court declined to grant a writ of mandamus blocking transfer of an improperly venued lawsuit to California. *In re Space Expl. Techs. Corp.*, 96 F.4th 733, 733 (5th Cir. 2024) ["*SpaceX*"]. The underlying case, like this case, was brought by a Musk-controlled entity—SpaceX. *See Space Expl. Techs. Corp. v. NLRB*, No. 1:24-CV-00001, 2024 WL 974568, at *1 (S.D. Tex. Feb. 15, 2024). The Musk-entity plaintiff there, like the Musk-entity plaintiff here, was headquartered in California yet chose to file its lawsuit in Texas. *Id.* And the venue dispute there, like the venue dispute here, turned on whether "a 'substantial part of the events or omissions giving rise to the claim occurred' in [Texas]." *Id.* at *2 (quoting 28 U.S.C. § 1391(e)(1)(B)). The district court said that it did not, *id.* at *3, the Fifth Circuit agreed, *SpaceX*, 96 F.4th at 733, and the full Fifth Circuit denied rehearing *en banc*, *In re Space Expl. Techs., Corp.*, 99 F.4th 233 (5th Cir. 2024). Clearly, at least the two circuit judges who declined to grant the writ—and likely several of the eight who voted to deny rehearing—have doubts about the strategy Musk's California-based companies have adopted: suing in Texas whenever it suits their purposes. And this case involves a far *more* expansive concept of venue than *SpaceX*. There, SpaceX sought to sue the NLRB for, among other things, seeking "to regulate SpaceX's conduct in the Southern District of Texas." *SpaceX*, 96 F.4th at 736 (Elrod, J., dissenting). Here, by contrast, the Court's venue holding rested on nothing more than X's allegations about what Defendants "intended" with respect to third party advertisers—X does not allege that it is suffering any equivalent harm in Texas.

*Third*, as with personal jurisdiction, immediate appeal of the venue issue may advance the ultimate termination of this matter—"the outcome of an appeal would resolve the threshold issue

of whether or not the instant case can proceed to trial in this court." *All. Health Grp.,* 2007 WL 3355641, at *1.

### III.   The Court should exercise its discretion to certify the appeal.

Defendants acknowledge that the Court has "unfettered discretion" about whether to certify an immediate appeal even where—as here—the § 1292(b) criteria are clearly satisfied. *Goosehead Ins. Agency, LLC v. Williams Ins. & Consulting, Inc.*, 533 F. Supp. 3d 367, 385 (N.D. Tex. 2020). The Court has good reason to exercise its discretion to certify, for at least two reasons.

*First*, certifying an appeal would be sound docket management. The Court has previously noted that "the Fort Worth Division features one of the busiest dockets in the nation based on filings per judge." ECF No. 54 at 12. It has also noted that "Fort Worth's case numbers per judgeship far exceed those in Dallas." *Id.* at 14. And, compounding matters, "this Court also manages an *additional* division—Wichita Falls—which increases its overall case numbers." *Id.* Given these notable burdens on the Court's docket, the Court should endeavor to avoid deciding summary judgment motions and, quite possibly, conducting a lengthy trial in this case before it has confirmed that it has jurisdiction. The Court no doubt believes that its personal jurisdiction analysis was correct. As the above arguments illustrate, however, this is certainly a case where other judges may take a different view. The Court's busy docket will not be served by trying a case to verdict only for it to turn out, on appeal, that the whole trial was a nullity. Section 1292(b) exists to permit district courts to certify orders in precisely such circumstances. *Akerly*, 551 F.2d at 543.

Although a venue defect, unlike a personal jurisdiction defect, would not nullify a trial and judgment, immediate appeal of the venue issue would nonetheless alleviate the burden on the Court's docket. Defendants are entitled to renew their challenge to venue on several different grounds as the evidentiary record develops and the case progresses. *See, e.g.*, 28 U.S.C. § 1406. A decision from the Fifth Circuit will facilitate the Court's quick and accurate adjudication if and

when such challenges arise—and, if the Court's Order is affirmed, may foreclose such a challenge outright.

*Second*, certifying an appeal would serve an important First Amendment interest. Under Fifth Circuit precedent, § 1292(b) certification of "the failure to dismiss a libel suit" is particularly appropriate to address "the very serious and timely question of how far the First Amendment guarantee of freedom of the press may still be impinged upon by actions for libel." *Time, Inc.*, 406 F.2d at 566. In *Time, Inc.*, the Fifth Circuit "concluded that it would be appropriate to grant the request for an interlocutory appeal" because of the risk of "long and expensive trial proceedings, which, if not really warranted, would themselves offend" First Amendment principles through "the chilling effect of such litigation." *Id.*

The same principle applies here. X is seeking to hold Media Matters, Hananoki, and Carusone liable for reporting about one of the country's largest social media platforms and the world's richest person. Such reporting is heartland First Amendment–protected activity. Indeed, the U.S. District Court for the District of Columbia has already found as much twice over in cases related to the same articles that are the basis of X's claims here—and did so in a preliminary injunction posture, meaning Media Matters bore the evidentiary burden. *See Media Matters for Am. v. Paxton*, No. 24-CV-147 (APM), 2024 WL 1773197, at *17. (D.D.C. Apr. 12, 2024) ("Plaintiffs' reporting on matters of public concern are core First Amendment activities"); *Media Matters for Am. v. Bailey*, No. 24-CV-147 (APM), 2024 WL 3924573, at *10 (D.D.C. Aug. 23, 2024) (noting defendant's agreement that "Media Matters' reporting is heartland First Amendment protected expression," that "Media Matters is a 'media company,'" and that "'core First Amendment protections would apply to [it]'"); *see also id.* at *10–11 ("X did not deny that advertising in fact had appeared next to the extremist posts on the day in question. . . . X called

19

these 'contrived experiences,' but did not deny the basic premise of the article: that X's platform was delivering ads of major brands next to extremist content. Many other media outlets, as recently as April 2024, have published similar findings. . . . Defendant's evidence thus does not undermine the likelihood of Plaintiffs proving their reporting was protected by the First Amendment.").

This litigation threatens Defendants' First Amendment activities because even the mere "threat of invoking legal sanctions" is sufficient to deter speech. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963). So, too, is the "threat of administrative and judicial intrusion into newsgathering and editorial process" that arises from "compelled disclosure"—such as invasive civil discovery of the sort X has sought here. *United States v. LaRouche Campaign*, 841 F.2d 1176, 1182 (1st Cir. 1988) (quotation marks omitted). Indeed, the D.C. court has already found that Media Matters and Hananoki have "in fact been chilled" by other litigation aiming to punish them for the November reporting. *Bailey*, 2024 WL 3924573, at *11. This case is having the same effect. Ex. A, Second Decl. of Eric Hananoki ("Second Hananoki Decl."), ¶¶ 18–27.

Moreover, litigation costs impose a grave burden on small media organizations like Media Matters—never mind an individual reporter like Hananoki. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980) (burden on a defendant is "always a primary concern" of the due process analysis). The extraordinary upfront expenses of wide-ranging discovery, months of motion practice, and trial preparation mean that even a meritless claim can yield a de facto win for X. X and Musk are plainly aware that they can silence their critics through litigation without needing to prevail on the merits. Not only has Mr. Hananoki ceased any reporting critical of X or Musk, Second Hananoki Decl. ¶¶ 28–31, Media Matters has had to lay off over a dozen employees

20

in the wake of this lawsuit[9]—an outcome that Musk celebrated by tweeting "Karma is real."[10] And just last month, the Global Alliance of Responsible Media (GARM), a committee that sets industry standards for advertising, announced that it would shut down within a few days of another lawsuit brought by X, *see* Complaint, *X Corp. v. World Fed'n of Advertisers*, No. 7:24-cv-00114 (N.D. Tex. Aug. 6, 2024), citing the nonprofit's limited resources to continue operating while fighting X in court.[11] Once again X celebrated the news as a victory: X CEO Linda Yaccarino called it an "important acknowledgement," chalking the organization's disbandment up as a win for X without having proved anything at all.[12]

Recognizing the threat cases like this one pose to free speech and the free press, a supermajority of states have adopted anti-SLAPP laws to protect defendants from having to spend time and money defending themselves in court when lawsuits are brought to silence or intimidate them.[13] Notably, X's home states of California and Nevada are among those. *See* Cal. Civ. Proc. Code § 425.16; Nev. Rev. Stat. Ann. § 41.650. So are Defendants' home jurisdictions. *See* D.C. Code Ann. § 16-5501(1); Md. Code Ann., Cts. & Jud. Proc. § 5-807(c).

---

[9] *See* Freedom of the Press Foundation, *Media Matters layoffs underscore need to crack down on SLAPPs* (May 24, 2024), https://freedom.press/news/media-matters-layoffs-underscore-need-to-crack-down-on-slapps/ (identifying 34 states with anti-SLAPP laws).

[10] @elonmusk, X.com (May 23, 2024, 8:03 PM ET) https://x.com/elonmusk/status/1793794871548858798 [https://perma.cc/YA92-2UV5; https://perma.cc/KAU9-F3KR].

[11] *See* Kate Conger & Tiffany Hsu, *Advertising Coalition Shuts Down After X, Owned by Elon Musk, Sues*, N.Y. Times (Aug. 8, 2024), https://www.nytimes.com/2024/08/08/technology/elon-musk-x-advertisers-boycott.html.

[12] @lindayaX, X.com (Aug. 8, 2024, 1:10 PM ET) https://x.com/lindayaX/status/1821594759187853395 [https://perma.cc/P3AH-JFK8].

[13] *See* Reporters Committee for Freedom of the Press, *Anti-SLAPP Legal Guide*, https://www.rcfp.org/anti-slapp-legal-guide/ (identifying 34 states with such laws, as well as the District of Columbia).

Texas, too, has safeguarded freedom of speech by means of an anti-SLAPP provision: Under the Texas Citizens Participation Act, defendants in Texas state court have a special remedy in the form of a speedy motion to dismiss lawsuits like this one that are brought "based on or . . . in response to a party's exercise of the right of free speech." Tex. Civ. Prac. & Rem. Code § 27.003(a). Such a motion suspends "all discovery in the legal action . . . until the court has ruled," *id.* § 27.003(c); must be heard in most cases no more than 60 days, and in "no event more than 90 days," after the motion is served, *id.* § 27.004(a); and must be ruled upon no more than 30 days following the hearing, *id.* § 27.005(a). To defeat an anti-SLAPP motion, a plaintiff must establish with "clear and specific evidence a prima facie case for each essential element of the claim." *Id.* § 27.005(c). To be sure, Texas's anti-SLAPP provision is not enforceable in this court under current Fifth Circuit precedent. *See Klocke v. Watson*, 936 F.3d 240, 248–49 (5th Cir. 2019); *but see Henry v. Lake Charles Am. Press, L.L.C.*, 566 F.3d 164, 181–83 (5th Cir. 2009) (reversing the district court and enforcing Louisiana's anti-SLAPP law).[14] But the consensus among lawmakers in Texas and every state relevant to this action speaks loudly: Lawsuits like this one pose a severe threat to press freedom. The Court should not run the risk of subjecting Defendants to years of chill of their First Amendment rights, coupled with millions of dollars of litigation expense, without making sure of its jurisdiction.

## CONCLUSION

The Court should enter an amended order denying Defendants' motion to dismiss that certifies the order for immediate appeal.

---

[14] Texas's anti-SLAPP law would, however, be enforceable in federal court in X's home jurisdictions, as would California's or Nevada's robust anti-SLAPP laws. *See CoreCivic, Inc. v. Candide Grp., LLC*, 46 F.4th 1136, 1139–44 (9th Cir. 2022).

Dated: September 20, 2024.

Respectfully submitted,
*/s/ Andrew LeGrand*

GIBSON, DUNN & CRUTCHER LLP
Andrew LeGrand (TX 24070132)
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
T: (214) 698-3100
F: (214) 571-2960
alegrand@gibsondunn.com

Theodore J. Boutrous, Jr.* (CA 132099)
333 South Grand Avenue
Los Angeles, CA 90071
T: (213) 229-7000
F: (213) 229-7520
tboutrous@gibsondunn.com

Amer S. Ahmed* (NY 4382040)
200 Park Avenue
New York, New York 10166
T: (212) 351-4000
F: (212) 351-4035
aahmed@gibsondunn.com

ELIAS LAW GROUP LLP
Abha Khanna* (WA 42612)
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
T: (206) 656-0177
F: (206) 656-0180
akhanna@elias.law

Aria C. Branch* (DC 1014541)
Christopher D. Dodge* (DC 90011587)
Jacob D. Shelly* (DC 90010127)
Samuel T. Ward-Packard* (DC 90005484)
250 Massachusetts Avenue NW, Suite 400
Washington, DC 20001
T: (202) 968-4490
F: (202) 986-4498
abranch@elias.law
cdodge@elias.law
jshelly@elias.law
swardpackard@elias.law

* Admitted *pro hac vice*

*Counsel for Defendants Media Matters for America, Angelo Carusone, and Eric Hananoki*

23

**CERTIFICATE OF SERVICE**

On September 20, 2024, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Andrew LeGrand*
Andrew LeGrand