# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| **X CORP.,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 4:23-cv-01175-O** |
| **MEDIA MATTERS FOR AMERICA, et al.,** | |
| **Defendants.** | |

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS WITHHELD ON SHIELD-LAW PRIVILEGE GROUNDS

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

I.    Statutory Framework ............................................................................................. 2

II.   Procedural Background .......................................................................................... 3

ARGUMENT .................................................................................................................. 10

I.    X failed to confer in good faith about the instant dispute.................................... 10

II.   Defendants are entitled to invoke the Texas Press Shield Law because X chose
      to sue in Texas. .................................................................................................... 11

III.  The Texas Press Shield Law applies in this case................................................. 14

      A.   Media Matters and its journalists and management are covered by the
           Shield Law. ................................................................................................. 14

      B.   The Shield Law applies to compelled party discovery. .............................. 15

      C.   The Shield Law applies to the logged documents. ..................................... 19

CONCLUSION............................................................................................................... 22

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abraham v. Greer*,
    509 S.W.3d 609 (Tex. App. 2016)....................................................................9, 17, 18

*In re Avantel, S.A.*,
    343 F.3d 311 (5th Cir. 2003) ..................................................................................12

*Bilney v. Evening Star Newspaper Co.*,
    406 A.2d 652 (Md. Ct. Spec. App. 1979) ..............................................................13

*In re CenterPoint Energy Hous. Elec., LLC*,
    629 S.W.3d 149 (Tex. 2021).....................................................................................17

*City of San Antonio v. Summerglen Prop. Owners Ass'n Inc.*,
    185 S.W.3d 74 (Tex. App. 2005) ............................................................................18

*Dondi Props. Corp. v. Com. Sav. & Loan Ass'n*,
    121 F.R.D. 284 (N.D. Tex. 1988) .....................................................................10, 21

*Duhon v. Union Pac. Res. Co.*,
    43 F.3d 1011 (5th Cir. 1995) ..................................................................................13

*Exxon Mobil Corp. v. Drennen*,
    452 S.W.3d 319 (Tex. 2014)...................................................................................14

*Goodyear Tire & Rubber Co. v. Rogers*,
    538 S.W.3d 637 (Tex. App. 2017)..........................................................................16

*Green v. United States*,
    355 U.S. 184 (1957)................................................................................................12

*Grunseth v. Marriott Corp.*,
    868 F. Supp. 333 (D.D.C. 1994) ............................................................................13

*Jolivet v. Compass Grp. USA, Inc.*,
    340 F.R.D. 7 (N.D. Tex. 2021) ...............................................................................21

*Kaufman v. Islamic Soc'y of Arlington*,
    291 S.W.3d 130 (Tex. App. 2009)....................................................................12, 14

*In re Levien*,
    No. 03-18-00079-CV, 2018 WL 2170825 (Tex. App. May 11, 2018)....................12

*Nelson v. Pagan*,
    377 S.W.3d 824 (Tex. App. 2012)..........................................................................18

*Prentice v. McPhilemy*,
    27 Med. L. Rptr. 2377 (D.C. Super. Ct. 1999) ........................................................13

*Randol Mill Pharmacy v. Miller*,
    465 S.W.3d 612 (Tex. 2015)........................................................17

*Tex. Health & Hum. Servs. Comm'n v. Est. of Burt*,
    689 S.W.3d 274 (Tex. 2024)........................................................16

*West v. Am. Tel. & Tel. Co.*,
    311 U.S. 223 (1940)........................................................19

**Statutes**

Act of May 13, 2009, ch. 29, 2009 Tex. Gen. Laws 49........................................................17

D.C. Code § 16-4702 ........................................................13

D.C. Code § 16-4703 ........................................................13

Md. Cts. & Jud. Proc. Code § 9-112 ........................................................1, 13

Tex. Civ. Prac. & Rem. Code § 22.021 ........................................................*passim*

Tex. Civ. Prac. & Rem. Code § 22.023 ........................................................2, 15, 16

Tex. Civ. Prac. & Rem. Code § 22.024 ........................................................3, 20

Tex. Code Crim. Proc. art. 38.11 ........................................................2, 17

**Other Authorities**

*Compulsory*, American Heritage Dictionary (5th ed. 2022)........................................................16

## INTRODUCTION

X buries the lede. Reading the opening pages of its brief, one would assume this dispute concerns Defendants' failure to produce "Hananoki's notes, drafts of the articles, [or] communications between Hananoki and his editors." Pl.'s Br. in Supp. of Mot. to Compel ("Br.") at 3, ECF No. 96. Nothing could be further from the truth. The reality is that X has burdened the Court with a premature dispute about whether sensitive but plainly peripheral documents may be withheld as privileged under the Texas Press Shield Law. Those documents include, for instance:

- Redlines and comments on draft articles unrelated to this case, not written by Hananoki, and which Defendants have provided to X in final form.

- Redacted internal emails about research into topics unrelated to this case.

- Internal chat messages about pitches for stories unrelated to this case.

Such documents are privileged under the Shield Law, a broad statutory privilege that protects journalistic work-product from discovery in Texas judicial proceedings except where the material in question is both "relevant" and "essential" to a claim or defense.

X has no real argument that it needs such documents, so it implausibly contends the Shield Law should not apply at all. But X has elected to sue a media organization, its president, and one of its reporters. And every jurisdiction relevant here—D.C., Maryland, and Texas—has enacted strong legal protections for journalists' notes, drafts, and sources, *particularly* when journalists are party defendants.[1] X's outrage at the suggestion that it may not rifle through all Defendants' papers without any showing of need is misplaced; that is not how suing journalists works in this country. For that reason, and those set out below, the Court should deny the motion to compel.

---

[1] *See* D.C. Code §§ 16-4701 *et seq.*; Md. Cts. & Jud. Proc. Code § 9-112; Tex. Civ. Prac. & Rem. Code §§ 22.021 *et seq.*; *see also infra* Argument §§ II, III.B.

## BACKGROUND

### I.      Statutory Framework

The 2009 Texas Free Flow of Information Act established two qualified privileges for journalists: a broad shield law privilege that applies in civil litigation, *see* Tex. Civ. Prac. & Rem. Code §§ 22.021 *et seq.* (the "Shield Law"), and a narrower privilege that applies in criminal litigation, *see* Tex. Code Crim. Proc. art. 38.11, §§ 4–6.

The civil Shield Law's protections extend to any person "acting as a journalist." Tex. Civ. Prac. & Rem. Code § 22.023. A "journalist" is any person who "for a substantial portion of the person's livelihood or for substantial financial gain, gathers, compiles, prepares, collects, photographs, records, writes, edits, reports, investigates, processes, or publishes news or information that is disseminated by a news medium." *Id.* § 22.021(2). A person who "supervises" these activities also qualifies as a "journalist." *Id.* § 22.021(2)(A). A "news medium" includes any "Internet company" that "disseminates news or information to the public by any means." *Id.* § 22.021(3).

Substantive application of the Shield Law proceeds in two steps. At step one, the journalist opposing discovery must make out a prima facie case that the Shield Law applies by showing that the testimony or material sought falls in either of two covered categories:

> (1) any confidential or nonconfidential information, document, or item obtained or prepared while acting as a journalist; or
> (2) the source of any information, document, or item described by Subdivision (1).

Tex. Civ. Prac. & Rem. Code § 22.023(a)(1)–(2). Insofar as the journalist makes such a showing, no "judicial . . . body with the authority to issue a subpoena or other compulsory process" may "compel [the] journalist to testify regarding or to produce or disclose [the material in question] in an official proceeding." *Id.* The Law defines an "[o]fficial proceeding" to be "any type of

administrative, executive, legislative, or judicial proceeding that may be conducted before a public servant." *Id.* § 22.021(4).

At step two, the party seeking discovery may overcome the Shield Law only if it satisfies each of the six criteria set out in § 22.024. Most importantly for present purposes, the party seeking discovery must show that "compulsory process is not being used to obtain peripheral, nonessential, or speculative information," *id.* § 22.024(5), and that "the information, document, or item is relevant and material . . . and is *essential* to the maintenance of a claim or defense of the person seeking the testimony, production, or disclosure," *id.* § 22.024(6) (emphasis added).

## II.    Procedural Background[2]

From the start of discovery, Defendants made clear that they would be invoking shield-law privileges as and when appropriate. Specifically, in March and April, in their Responses and Objections to X's First and Second Requests for Production, Defendants put X on notice that Defendants would be asserting privilege over documents protected by any "applicable . . . shield law." *E.g.*, App'x 31 (Defendants' Responses and Objections to Plaintiff's 1st Requests for Production at 3); App'x 64 (Defendants' Responses and Objections to Plaintiffs' 2nd Requests for Production at 3).[3]

After X expressed concerns that Defendants were limiting search and review based on generalized privilege assertions, Defendants reassured X that they were not. Supp. App'x 7 (May

---

[2] Contrary to X's off-topic Introduction and Background, the instant dispute has nothing to do with Defendants' refusal to "search for" any documents. Br. 1. It is undisputed that Defendants in fact searched for and logged every document X's instant motion seeks to compel. Nor is this dispute about any failure to produce "Hananoki's notes, drafts of the articles, [or] communications between Hananoki and his editors," *id.* at 3—categories of documents which Defendants have produced and are producing.

[3] Citations to "App'x" refer to X's Appendix, ECF No. 97. Citations to "Supp. App'x" refer to Defendants' Supplemental Appendix, filed herewith.

2, 2024, Email from A. Ahmed) ("We will produce all responsive, nonprivileged documents that we identify as part of our search. For privileged documents that we withhold, we will send X a privilege log explaining what was held back and why."). To avoid any confusion, Defendants agreed to amend their Responses and Objections to remove general mentions of privilege, with the understanding that the parties would instead assert privileges document-by-document on privilege logs. Supp. App'x 3 (May 24, 2024, Email from A. LeGrand) ("Defendants also clarified that they are not withholding documents based on general objections. Plaintiff asked whether Defendants can formalize that in the form of amended responses. We can commit to providing amended responses by Tuesday, May 28."); *see also, e.g.*, Supp. App'x 28 (Defendants' Second Amended Responses and Objections to Plaintiff's 1st Requests for Production at 2) (reserving the right to assert privileges "on a document-by-document basis"); Supp. App'x 10 (Defendants' Amended Responses and Objections to Plaintiff's 2nd Requests for Production at 1) (same).

Per this Court's June 13 Order, ECF No. 69, Defendants served their First Privilege Log and Associated Documents on X on June 28. *See* App'x 183 (June 28, 2024, Email from J. Shelly); App'x 216–28 (Defendants' June 28, 2024 Privilege Log). Defendants logged 40 documents as privileged in whole or part under the Texas Press Shield Law: 10 redacted emails, 10 withheld emails, 7 withheld draft articles, 1 withheld meeting agenda, and 12 withheld Slack chats. The basis for the Shield Law's application was, for each document, clearly explained. For instance, Defendants logged and withheld "[c]omments and revisions" on draft articles—heartland journalistic work product—that were "not at issue in this case" and concerned "subject matter that is not at issue in this case." App'x 216. In each such instance, Defendants indicated that the final version of the article in question was "public and either has been or will be produced in discovery." *Id.*

X raised several complaints about the June 28 Log. *See* App'x 182 (July 12, 2024, Email from A. Dvorscak). Substantively, X asserted that Defendants' invocation of the Press Shield Law—in Defendants' very first privilege log—was "untimely and therefore waived," and that the Shield Law was "substantively inapplicable" on the theory that it "applies only to 'subpoenaing . . . information.'" *Id.* (quoting Tex. Civ. Prac. & Rem. Code § 22.024(4)). X cited no authority to support the waiver argument and selectively quoted the Shield Law's *exceptions* provision, not its privilege provision, to support the subpoena argument. *Id.* X also objected that the log was "insufficiently specific." *Id.*

Defendants responded that they had raised the Shield Law at precisely the point the parties had agreed to raise privileges—in the first privilege log. App'x 180 (July 19, 2024, Email from A. Khanna). Defendants explained that their assertion of the privilege "could not have been both *premature* when raised in their initial R&Os"—as X had argued—"and yet also *too late* when raised in their first privilege log." *Id.* Regarding applicability, Defendants explained that Federal Rule of Evidence 501 entitled them to "assert privileges provided by Texas law." *Id.* And Defendants pointed out that the Shield Law's privilege provision extends the privilege to any order by "a judicial . . . body" compelling a journalist's testimony or production for use "in an official proceeding." *Id.* (quoting Tex. Civ. Prac. & Rem. Code § 22.023). Defendants explained that the provision X had quoted to argue that the Shield Law's protections are limited to subpoenas, far from "limiting the Shield Law's scope," instead set "the high bar that Plaintiff must clear to overcome" the Shield Law. *Id.* (citing Tex. Civ. Prac. & Rem. Code § 22.024).

The parties conferred on July 19. At that meeting, Defendants asked for any authority "suggesting that a party waives a privilege by identifying it on their first privilege log." App'x 179 (July 24, 2024, Email from A. Khanna) (summarizing the meeting). X declined to provide any

such authority. *Id.* At the same meeting, X explained—for the first time in this litigation—that it was seeking certain "core documents" somewhere among its sweeping discovery requests and complained that it had not yet received them. *Id.* Defendants understood X to be referring to five categories of documents:

- drafts of the November 16 and 17 articles;
- communications about the November 16 and 17 articles;
- communications about ad placement on X;
- communications about Musk's statements and behavior; and
- communications with X's advertisers about their relationship with X or Musk.

Defendants responded that X's discovery requests made no distinction between "core" documents in those categories and other documents, and instead sought every document in Defendants' possession mentioning a long list of broad terms and concepts (*e.g.*, "content moderation"). *Id.*; *see also, e.g.*, App'x 25 (request for production seeking "[a]ll materials" discussing or mentioning "Elon Musk, Linda Yaccarino, X, Twitter, or the Platform"). Defendants invited X to serve revised requests for production tailored to these documents "to expedite the review and logging of responsive documents." App'x 179.

In a good faith effort to resolve X's specificity concerns about the June 28 Log, Defendants also provided an amended log. *See* App'x 174 (August 2, 2024, Email from A. Khanna); App'x 229–43 (Defendants' Amended June 28, 2024 Privilege Log). Although X quotes from the original Log in its Brief, *e.g.* Br. 4 (quoting App'x 216), the *Amended Log* is the operative log for this dispute. And the Amended Log is even more specific than the original Log in several important respects. For instance, where a draft article has been withheld, the log provides the title of the final published article, allowing X to assess whether the article has anything to do with its claims. *See, e.g.*, App'x 230 (Defendants' Amended June 28, 2024 Privilege Log at 1) ("The final version of this article is public, titled 'Tucker Carlson has been defending Alex Jones for years,' and can be

6

accessed on MMFA's website."); *see also* Nikki McCann Ramirez & Alicia Sadowksi, *Tucker Carlson has been defending Alex Jones for years*, Media Matters for Am. (updated Apr. 22, 2022).[4] The Amended Log also specifies for each entry the precise statutory provision under which Shield Law privilege is asserted. *See, e.g.*, App'x 230 (Defendants' Amended June 28, 2024 Privilege Log at 1) (citing Tex. Civ. Prac. & Rem. Code § 22.023(a)(1)).

On July 26, X threatened to file a motion to compel premised mainly on its theory that Defendants had waived the Shield Law. App'x 178 (July 26, 2024, Email from A. Dvorscak). Defendants responded that any dispute about waiver of the Shield Law was not ripe because X had yet to provide any authority that might support such a motion. Defendants also reminded X of this Court's instruction not to needlessly involve it in disputes that could be resolved by conferral. App'x 177 (July 29, 2024, Email from A. Khanna). X then provided three citations to district court cases, two from outside this Circuit. App'x 176 (July 29, 2024, Email from Alex Dvorscak) (citing *Janvey v. Alguire*, No. 3:09-cv-00724-N-BQ, 2018 WL 11362638 (N.D. Tex. Oct. 17, 2018); *Eureka Fin. Corp. v. Hartford Acc. & Indem. Co*., 136 F.R.D. 179 (E.D. Cal. 1991); and *Burch v. Regents of the Univ. of Cal*., No. CIV. S-04-0038 WBS GGH, 2005 WL 6377313 (E.D. Cal. Aug. 30, 2005)). Defendants in turn pointed out that none of the cited cases found waiver "where a privilege was noted on a timely privilege log," and indicated that if X had "no better authority" then its proposed motion was "frivolous." App'x 176 (July 30, 2024, Email from A. Khanna).

X then abruptly changed its tune. Instead of filing its threatened motion to compel, X requested another meet-and-confer, which occurred on August 2. *See* App'x 174 (August 2, 2024, Email from A. Khanna) (summarizing the meeting). That meeting focused not on X's waiver

---

[4] Available at https://www.mediamatters.org/fox-news/tucker-carlson-has-been-defending-alex-jones-years-0.

argument—which has not resurfaced in any form since X's July 26 email—but on how the parties could reach discovery terms that served all parties' needs. *Id.* In particular, Defendants pointed out that the Shield Law itself provided a roadmap: because it limits production of covered materials to only items "essential to the maintenance of a claim," the Shield Law provides a mechanism to home in on the "core documents" X desires. *See id.* Defendants accordingly proposed that the parties should (i) "identify the set of document requests that are essential to the maintenance of X's claims," (ii) "modify their search and review parameters to target these categories of documents," and (iii) "agree that Defendants will no longer need to review, produce, or log the documents that fall outside of these categories." *Id.*[5]

When the parties conferred on Friday, August 2, X initially indicated that it would review Defendants' proposal and latest production and respond by Monday, August 5. It did not. Instead, on August 9, X indicated that it would respond "next week." Supp. App'x 58 (August 9, 2024, Email from A. Dvorscak). Again, it did not. Nor did it respond later in August. In early September, Defendants reached out to ask whether a response was forthcoming. Supp. App'x 70 (Sept. 6, 2024, Email from A. Khanna). When X finally responded—over a month after its self-imposed deadline to do so—it failed to engage with any of the substance of Defendants' Shield Law analysis. Supp. App'x 69 (Sept. 9, 2024, Email from C. Hilton). Instead, X asserted—

---

[5] At the August 2 conference, Defendants also assured X that Defendants were not withholding any unlogged documents, were not categorically invoking the Shield Law or any other privilege to withhold what X had identified as "core" documents, and would continue producing documents X considered "core" in the biweekly productions to which Defendants had committed. In fact, Defendants produced a number of such documents—including drafts of Hananoki's November 16 and 17 articles—in a scheduled production that same day. Defendants have continued to produce such documents on a rolling basis. X's insinuation that Defendants are not producing such documents, *see* Br. 4 n.2, is inaccurate.

inaccurately—that Defendants' proposal "essentially restated Defendants' position that Plaintiff must narrow its discovery requests" and summarily rejected the proposal. *Id.*

On September 24, X informed Defendants that it intended to file the instant motion to compel by close of business that day. Supp. App'x 74 (September 24, 2024, Email from M. Abrams). The email attached a draft brief making several arguments that X had never at any point proffered in the parties' conferrals. For instance, although X has otherwise consistently argued that Texas substantive law applies in this case, *e.g.* ECF No. 45 at 16, the draft brief suggested for the first time in this litigation—and four months after X first objected to Defendants' invocation of the Shield Law—that Texas privileges are unavailable to Defendants because their documents were not created or received in Texas. Similarly, although X had never once proposed that *in camera* review might be necessary, let alone discussed with Defendants what it should entail, the draft brief asked this Court to undertake such review. And although X's draft brief abandoned the frivolous waiver argument it had made during months of conferrals, it continued to press its argument that the Shield Law does not apply to party discovery at all—citing various authorities that X had never previously provided to Defendants. Notwithstanding the novelty of both its arguments and its attempts to support them, X asserted that the parties had "sufficiently conferenced this motion." Supp. App'x 74 (September 24, 2024, Email from M. Abrams).

Defendants quickly responded to dispute X's suggestion that the value of conferral had been exhausted. Among other things, Defendants pointed out that X's draft brief failed to cite *Abraham v. Greer*, 509 S.W.3d 609, 614–17 (Tex. App. 2016), a decision of the Texas Court of Appeals that makes extremely clear that the Shield Law applies to party discovery. Supp. App'x 72–73 (September 24, 2024, Email from A. Khanna). Defendants also pointed out that the suggestion of *in camera* review was both brand new and premised on a fundamental

misunderstanding of the sorts of documents to which Defendants are applying the Shield Law. *Id.* In general, Defendants objected that X's bad-faith approach to conferral—"asserting implausible arguments . . . backed up with no authority," refusing to timely respond to reasonable compromise proposals, then running to the Court with "all-or-nothing" disputes—was making progress toward any "compromise extremely difficult." *Id.*

X declined to confer further and instead filed the instant motion, with no apparent revisions to its supporting brief, a few hours later.[6]

### ARGUMENT

### I.    X failed to confer in good faith about the instant dispute.

In its first discovery ruling in this case, the Court found that the parties had "demonstrated they are capable of resolving discovery disputes through meaningful conferrals as required in Federal Court." ECF No. 65 at 1 (citing *Dondi Props. Corp. v. Com. Sav. & Loan Ass'n*, 121 F.R.D. 284, 289 (N.D. Tex. 1988)). The Court then instructed the parties to engage in "good faith conferral" about ongoing disputes before bringing them to the Court. This District has long instructed that such conferral should entail "a frank exchange between counsel to resolve issues by agreement or to or at least narrow and focus the matters in controversy before judicial resolution is sought." *Dondi Props.*, 121 F.R.D. at 289.

X's approach to the instant dispute falls woefully short of the Court's instructions. As set out above, X at first refused to provide any meaningful authority to support its maximalist initial

---

[6] Although X does not specify, it appears to seek to overcome every assertion of the privilege, regardless of log. Defendants served their Second Privilege Log on September 6, 2024, and their Third Privilege Log on October 11, 2024 (after this motion was filed). The Second Privilege Log invokes the Shield Law to redact six documents and withhold three documents. App'x 244–340 (Defendants' Second Privilege Log). The Third Privilege Log invokes the Shield Law to withhold three documents. Supp. App'x 75–108 (Defendants' Third Privilege Log).

position—that the Shield Law was both waived and facially inapplicable. When X finally did provide a few authorities on waiver, Defendants quickly showed those cases to be so obviously inapposite that X abandoned them—none is cited in X's as-filed brief, and the waiver argument is nowhere to be found.[7] X then promised to evaluate a proposed compromise over a weekend but instead took over a month to respond, and then too only when pressed. And in rejecting the proposal outright, X mischaracterized it and refused to engage with any of the substance that Defendants offered to support it. Then, after again falling silent for several weeks, X abruptly provided Defendants with a draft brief containing a host of arguments and proposals that the parties had never discussed. X then refused any further conferral even though, in the scant few hours that X allowed for review, Defendants identified several areas where further discussion would have been productive.

## II. Defendants are entitled to invoke the Texas Press Shield Law because X chose to sue in Texas.

As a direct result of X's failure to confer in good faith, the discovery dispute it has brought to the Court is a mess. Although Defendants agree that the question whether the Texas Shield Law substantively applies is ripe, X's lead argument creates a dispute that the parties have never discussed. Specifically, X opens its Argument by taking the remarkable position that *Texas privileges do not apply to Defendants' documents at all.* Br. 6 (suggesting that the Court should apply the substantive privilege law of the state or states "where the documents in question were received").[8]

---

[7] *Compare* App'x 176, 178 (July 26, 2024, Email from A. Dvorscak), *with* Br. at ii.

[8] X suggested in conferral in July that, rather than being protected by the Shield Law, "Defendants are instead subject to the Federal Rules of Civil Procedure governing disclosure and production of documents." App'x 182 (July 12, 2024, Email from A. Dvorscak) (citing Fed. R. Civ. P. 26 & 34). Defendants promptly responded that under Federal Rule of Evidence 501, Defendants were

X is incorrect. Federal Rule of Evidence 501 "provides that in cases where state law supplies the rule of the decision, such as this diversity-jurisdiction matter, 'the privilege of a witness, person, government, State, or political sub-division thereof shall be determined in accordance with State law.'" *In re Avantel, S.A.*, 343 F.3d 311, 323 (5th Cir. 2003) (quoting Fed. R. Evid. 501). "Accordingly," in this case, "the Texas law of privilege controls." *Id.* Texas privilege law includes the Texas Press Shield Law, which is a "testimonial privilege for journalists" who are subject to a Texas court's compulsion. *Kaufman v. Islamic Soc'y of Arlington*, 291 S.W.3d 130, 142 (Tex. App. 2009). The Shield Law therefore applies insofar as its threshold requirements are satisfied.

The case X cites to claim that privilege follows the law of the state where a written statement "was received" concerns attorney-client privilege, not the Shield Law. *In re Levien*, No. 03-18-00079-CV, 2018 WL 2170825, at *5 (Tex. App. May 11, 2018). X provides no basis to invoke common law rules tailored to the "nature and purpose of the attorney client privilege," *id.*, where a Texas statute supplies the basis and parameters for the Shield Law privilege Defendants assert here. That statute expressly protects journalists from compelled testimony in any "judicial proceeding" in this state—nothing in the statute limits its reach to documents sent from or to Texas. Of course, Defendants continue to dispute that Texas has personal jurisdiction over X's claims,

---

permitted "to assert privileges provided by Texas law." App'x 180 (July 19, 2024, Email from A. Khanna) (citing *Miller v. Transamerican Press, Inc.*, 621 F.2d 721, 724 (5th Cir.), *opinion supplemented on denial of reh'g*, 628 F.2d 932 (5th Cir. 1980)). X thereafter focused its arguments against the applicability of the Shield Law on (i) waiver and (ii) the statutory text. *See* App'x 179 (July 24, 2024, Email from A. Khanna) (summarizing a meet-and-confer). X's brief marks the first occasion since its July 12 email on which it has questioned whether Texas substantive privileges are, in general, available, and the first time it has *ever* made that argument on the theory that privilege depends on where the documents "were received." Indeed, X's previous insistence that Defendants had "waived" the Shield Law indicates that it understood the privilege was available at some point. *See, e.g.*, *Green v. United States*, 355 U.S. 184, 191 (1957) (explaining that waiver "connotes some kind of voluntary knowing relinquishment of a right").

but insofar as Defendants are being compelled to defend against those claims in Texas, they are entitled to stand on Texas privileges.

But even if X were correct, then some other state's privileges *would apply*—D.C.'s or Maryland's, where the documents and communications in dispute were created or received. X seems to believe that if Texas privileges do not apply then neither do privileges recognized by other states. But that is not how a "choice-of-law" dispute is resolved—*some* state's law must apply. *See, e.g.*, *Duhon v. Union Pac. Res. Co.*, 43 F.3d 1011, 1013 (5th Cir. 1995) (explaining that the purpose of a choice-of-law analysis is "to determine *which state's* substantive law will apply" (emphasis added)). And notably, D.C. and Maryland have press shield laws that are even more expansive than Texas's. D.C.'s Shield Law provides an *absolute* privilege against source disclosure as well as a qualified privilege against disclosure of unpublished materials, and to overcome even the qualified privilege the party seeking discovery must show an "overriding public interest." D.C. Code §§ 16-4702, 4703; *see also Grunseth v. Marriott Corp.*, 868 F. Supp. 333, 336 (D.D.C. 1994) (noting that the D.C. law "accords total protection to news sources, whether confidential or not, and whether disclosed to others or not"). The materially identical Maryland Shield Law provides the same protections. *See* Md. Cts. & Jud. Proc. Code Ann. § 9-112. And it is settled that both privileges apply to journalists as parties. *See Prentice v. McPhilemy*, 27 Med. L. Rptr. 2377, 2381 (D.C. Super. Ct. 1999) (Supp. App'x 114); *Bilney v. Evening Star Newspaper Co.*, 406 A.2d 652, 658 (Md. Ct. Spec. App. 1979).

Thus, if X would prefer to apply the privilege laws of the location "where the documents in question were received," all documents in dispute in this motion would be privileged, and Defendants can agree to proceed under that law going forward. In the likely event that X does not wish to follow its argument to that logical conclusion, however, Defendants are also willing to

stipulate that, with respect to Shield Law privileges in this case, Texas substantive privilege law applies—as the parties had assumed until X shared its "draft brief" on September 24. *Cf. Exxon Mobil Corp. v. Drennen*, 452 S.W.3d 319, 324 (Tex. 2014) ("Texas law recognizes the 'party autonomy rule' that parties can agree to be governed by the law of another state.").

### III.    The Texas Press Shield Law applies in this case.

#### A.    Media Matters and its journalists and management are covered by the Shield Law.

Defendants satisfy the straightforward criteria to invoke the Shield Law. Media Matters's reporters, including Hananoki, are without question "journalist[s]." Tex. Civ. Prac. & Rem. Code § 22.021(2). They earn their livelihoods reporting, investigating, writing, and publishing "news and information," *see id.*—in Hananoki's case, for instance, news and information about extremism and hate speech in the media, ECF No. 42 at 11; ECF No. 93-1 ¶¶ 2, 6–13. It follows that Carusone, as Media Matters's President, is also a "journalist" for purposes of the Shield Law because he supervises these activities. Tex. Civ. Prac. & Rem. Code § 22.021(2)(A). And Media Matters is a paradigmatic "news medium"—it is an "Internet company" that "disseminates news or information" to its readers or subscribers. *Id.* § 22.021(3); ECF No. 42 at 7 ("The Media Matters website publishes articles written by Media Matters employees in furtherance of the organization's mission to expose misinformation in the media, and in keeping with our internal guidelines for news coverage, which reflect ordinary journalistic standards."). Defendants thus satisfy all the baseline requirements to invoke the Shield Law. *See Kaufman*, 291 S.W.3d at 142 ("Front Page Magazine is clearly both electronic and accessible to the public; it would therefore qualify as a 'news medium' under the statute, and Kaufman would qualify as a contributor to that medium.").

**B.    The Shield Law applies to compelled party discovery.**

X invites the Court to "guess" about whether the Shield Law applies to party discovery. Br. 7. But there is nothing to guess about: The statutory text makes very clear that it does, and decade-old Texas appellate case law puts the question beyond any legitimate dispute. X's contrary argument borders on frivolous—which no doubt explains why much of X's brief is devoted to its request for *in camera* review.

***Statutory text.*** The textual evidence that the Shield Law applies to discovery is incontrovertible. By its plain terms, the Shield Law is a qualified privilege that prevents any "*judicial . . . body* with the authority to issue a subpoena or other compulsory process" from "compel[ling] a journalist to testify regarding or *to produce or disclose*" covered materials in *any* "official proceeding." Tex. Civ. Prac. & Rem. Code § 22.023(a) (emphasis added). "Official proceeding," in this case, is a defined term encompassing "*any* type of administrative, executive, legislative, or *judicial proceeding* that may be conducted before a public servant." *Id.* § 22.021(4) (emphasis added).

To confirm that the Shield Law reaches party discovery in this case, the Court thus needs to ask only two questions:

(1) Is the Court a judicial body "with the authority to issue a subpoena or other compulsory process?"

(2) Is this case a "judicial proceeding" being conducted "before a public servant"?

If the answer to both questions is affirmative—as it obviously is here—then the Court "may not compel a journalist . . . to produce or disclose" materials covered by § 22.023 except insofar as the party seeking those materials satisfies § 22.024. By its plain text, the Shield Law applies to all forms of compelled production in any judicial proceeding—including compelled party discovery.

To argue against this inescapable conclusion, X focuses myopically on the phrase "a subpoena or other compulsory process." Br. 8. But X misunderstands that phrase's function in the statute. Rather than limiting the mechanism of *compulsion* to which the Shield Law applies, the phrase operates to define the sort of *proceeding* in which the Shield Law applies: namely, any "official proceeding" in front of any judicial or other body "*with the authority* to issue a subpoena or other compulsory process." Tex. Civ. Prac. & Rem. Code § 22.023(a) (emphasis added). What matters is that the Court has the authority to issue such process, not whether such process is in fact being used to compel the disputed discovery. X's attempt to extract the clause "a subpoena or other compulsory process" from its context to transform it into a limiting provision is flatly at odds with Texas's rules of statutory interpretation. *See Goodyear Tire & Rubber Co. v. Rogers*, 538 S.W.3d 637, 651 (Tex. App. 2017) (noting a court must "consider the statute as a whole, reading all its language in context, and not reading individual provisions in isolation").

Although the Court need not reach the question—the statute's scope plainly is not limited to "subpoenas or other compulsory process," as X assumes—X is also wrong that a motion to *compel* is not a form of *compulsory* process. To state this argument is to refute it. Unlike the term "official proceeding," the Shield Law does not define "compulsory process." *See* Tex. Civ. Prac. & Rem. Code § 22.021. Thus, under Texas rules of statutory construction, the Court should look to the "plain and ordinary meaning of the term," particularly its "dictionary definitions." *Tex. Health & Hum. Servs. Comm'n v. Est. of Burt*, 689 S.W.3d 274, 280–81 (Tex. 2024) (quotation marks and citations omitted). "Compulsory" means "obligatory; required," or "employing or exerting compulsion; coercive." *Compulsory*, American Heritage Dictionary (5th ed. 2022). An order granting X's motion to compel would necessarily be "compulsory" process in this sense—it would be backed up by the coercive enforcement mechanism of the threat of contempt.

X argues, contrary to common sense and settled Texas principles of statutory construction, that "compulsory process" is a "term of art" referring to "writs of attachment in criminal cases." Br. 8. There are many problems with that theory, but the most important is that the Shield Law is not a privilege in criminal litigation at all. The statute X purports to be construing with this argument, § 22.022, is part of the *Civil* Practice and Remedies Code, and so does not apply to criminal matters. And the same Act that created the Shield Law's civil privilege also separately created Art. 38.11 of the Code of Criminal Procedure—a more limited testimonial privilege for journalists in criminal proceedings. *See* Act of May 13, 2009, ch. 29, 2009 Tex. Gen. Laws 49, 52–54 (H.B. 670); *see also* Tex. Code Crim. Proc. art. 38.11, §§ 4–6. X's construction would therefore render the phrase "compulsory process" in the civil Shield Law pure surplusage, as no journalist will ever need to resist a criminal writ of attachment in a civil matter. It follows that the Court should reject X's construction; a court construing Texas law "may not interpret a statute in a way that renders any part of it meaningless." *Randol Mill Pharmacy v. Miller*, 465 S.W.3d 612, 617 (Tex. 2015); *see also, e.g.*, *In re CenterPoint Energy Hous. Elec., LLC,* 629 S.W.3d 149, 159 (Tex. 2021) ("We must give effect to all words of a statute and not treat any language as surplusage").

**Case law.** X's argument runs headlong into precedent as well as text: The Texas Court of Appeals has confirmed that the Shield Law applies to party discovery. *See Abraham*, 509 S.W.3d at 615. In *Abraham*, as here, the plaintiff sued an online publication and its leadership, claiming that the publication had published damaging falsehoods. *Id.* at 611. And as here, the plaintiff sought discovery in an attempt to show actual malice, but the defendants successfully invoked the Shield Law. *Id.* at 615–16. The plaintiff then argued on appeal that the Shield Law violates the Texas Constitution's "open courts provision" by depriving defamation plaintiffs of the opportunity

17

to obtain proof of a required element. *Id.* Rejecting that argument, the Court of Appeals explained that "the contention that '[the Shield Law] makes the disclosure of evidence of the necessary element of proof of malice undiscoverable, even if any discovery is allowed or permitted' is inaccurate." *Id.* at 616 (quoting the plaintiff's brief). Rather, "*[d]iscovery could occur* even though *the target of discovery* invoked a privilege." *Id.* (emphasis added). Plainly, this analysis recognizes that a party may invoke the Shield Law to resist "discovery"—as had in fact occurred in *Abraham*. *See id.*; *cf. Nelson v. Pagan*, 377 S.W.3d 824, 829 n.2 (Tex. App. 2012) (assuming that the Shield Law would apply to party discovery but finding the communications in dispute predated the Shield Law's enactment).

Defendants provided the *Abraham* citation to X shortly after receiving the draft brief, yet X elected not to revise the brief to address it. Supp. App'x 72 (Sept. 24, 2024, Email from C. Hilton). Judging from its carefully worded insistence that *Abraham* "does not *analyze* the question of whether the privilege applies to party discovery," *id.* (emphasis added), X presumably plans to argue that *Abraham* simply *assumed* it applied and answered only the question the parties briefed. But that is not how Texas state courts handle constitutional questions. If the answer to the charge of unconstitutionality were that the Shield Law is unavailable to resist party discovery, the Court of Appeals would have said that: Texas courts "will not rule on a constitutional question, although properly presented by the record, if there is some other ground upon which the case may be disposed." *City of San Antonio v. Summerglen Prop. Owners Ass'n Inc.*, 185 S.W.3d 74, 87 (Tex. App. 2005). To accept X's argument, the Court would need to conclude that the Texas Court of Appeals settled a constitutional dispute about the use of the Shield Law in discovery even though the Shield Law does not apply in discovery. That is not a plausible reading of *Abraham*.

18

It follows that *Abraham* forecloses X's suggestion that the Court take an unconstrained "*Erie* guess," Br. 7, about when the Shield Law applies. "Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which *is not to be disregarded by a federal court* unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940) (emphasis added). By failing to so much as mention "other persuasive data" limiting or rejecting *Abraham*, X has waived the opportunity to explain why the Court should "disregard[]" *Abraham*.

## C.     The Shield Law applies to the logged documents.

X briefly fires off a few drive-by arguments against the Shield Law's applicability to the specific documents at issue, *e.g.*, Br. 9, but those arguments ignore the nature of the documents that Defendants have actually logged. X argues, for instance, that the logged material was not prepared while Defendants were acting as "journalist[s]," *id.* (quoting Tex. Civ. Prac. & Rem. Code § 22.023(a)(1)), on the theory that Defendants' reporting at issue in this case concerned matters publicly viewable to anyone on the X platform, not reporting of facts otherwise unknown to the public. X's argument rests on a faulty premise, as a quick glance at Defendants' logs reveals: the logged documents *do not concern Defendants' reporting at issue in this case*. There is thus no tension between Defendants' reporting that extremist content was publicly viewable next to major brand advertising on X and its invocation of the Shield Law to withhold documents that relate neither to that reporting nor to its subject matter. In any case, nothing in the Shield Law ties its definition of "journalist" to whether a member of the public *could* independently obtain the information in question; rather, the Shield Law defines a journalist to be anyone who writes, edits, or publishes "news *or information* that is disseminated by a news medium." Tex. Civ. Prac. & Rem. Code § 22.021(2) (emphasis added); *see also supra* Section III.A.

X also complains at several points that Defendants' logs are not specific enough to allow it to assess the privilege assertion. But the logs sufficiently demonstrate that each logged document is privileged journalistic work-product irrelevant to this case. For instance, the Amended June 28, 2024 Privilege Log describes MMFA_013715 as an internal communication "pertaining to strategies and methods for tracking right wing media content unrelated to research for the November 16 and 17, 2023 articles or advertisement placement on Twitter." App'x 233 (Defendants' Amended June 28, 2024 Privilege Log at 4). Internal communications between journalists about how to conduct research are heartland journalistic materials; X musters no serious argument to the contrary. In fact, X's brief fails to identify *any* specific entry on either the First Amended Log or the Second Log as insufficiently detailed—a telling omission. Nor does it ever explain why any specific redaction is inappropriate.[9]

Under the pretext of arguing for *in camera* review, X claims that it is entitled to all of Defendants' documents for the purpose of "establishing malice and punitive damages." Br. 12. X fails to explain the purported connection. To the extent X contends that it needs access to *all* of Media Matters's internal communications about *any topic* to determine whether it treated X differently from other subjects of its reporting, *id.*, this suggestion makes a mockery of the Shield Law's text and purpose. The Texas legislature made the policy judgment that the Shield Law should be overcome only by a specific, nonspeculative showing of need, not conjecture: Compulsory process may not be used "to obtain peripheral, nonessential, or speculative information." Tex. Civ. Prac. & Rem. Code § 22.024(5). X's proposal that it be allowed to root

---

[9] X similarly fails to argue that it overcomes other privileges that apply to the documents in dispute. For instance, MMFA_043596, logged on page 7 of Defendants' Second Log, is also attorney-client privileged. X has not contested any of Defendants' assertions of attorney-client privilege, so has no argument to compel MMFA_043596 and other documents identified as attorney-client privileged even if it overcomes the Shield Law.

through whatever it wants in search of evidence of differential treatment entails a speculative fishing expedition into peripheral documents. X has many possible options for investigating its claim of malice, including publicly available articles published by Defendants and documents created in connection with the articles that form the basis of X's claims; there is no argument that redlines or comments on unrelated articles are "essential" to that element. And X's logic would render the Shield Law a dead letter; a similar argument could be made to compel disclosure of any document whenever any journalist or media outlet is sued for their reporting.

X has not justified imposing the "enormous burden" of *in camera* review on this Court— indeed, it seems "blissfully unconcerned" about that burden. *Jolivet v. Compass Grp. USA, Inc.*, 340 F.R.D. 7, 22 (N.D. Tex. 2021) (quoting *In re Allen*, 106 F.3d 582, 600 (4th Cir. 1997)). In particular, X never specifies *which* documents it thinks merit *in camera* review, never explains whether such review should be one-off or ongoing as Defendants continue to produce and log documents, and never grapples with the descriptions on the face of the Logs that indicate *all* of the documents being withheld are far afield from the subject matter of this case. Where X has eschewed any document-specific analysis that would provide a basis to believe that any particular documents are being improperly withheld—relying instead on categorical arguments against the privilege in general—it cannot foist upon the Court the onus of playing discovery referee for an indeterminate period by combing through Defendants' privileged documents. *Cf. Dondi Props.*, 121 F.RD. at 289 ("[I]n general the rules dealing with discovery in federal cases are to be self-executing.")

That said, Defendants have no principled objection to X's proposal that the Court conduct *in camera* review to assess the logged documents case-by-case. Defendants are confident that, under the Shield Law's plain text, which permits X to overcome the privilege only when a

document is "essential," the Court's review would confirm that the logged documents fall well outside the scope of X's claims and thus well within the Shield Law's protections.

***

Defendants satisfy the threshold criteria to invoke the Shield Law. X's facial arguments against its availability are meritless, and its perfunctory attempts to challenge its application to specific documents fail.

**CONCLUSION**

The Court should deny X's motion to compel.


Dated: October 15, 2024.

Respectfully submitted,
*/s/ Andrew LeGrand*

GIBSON, DUNN & CRUTCHER LLP          ELIAS LAW GROUP LLP
Andrew LeGrand (TX 24070132)          Abha Khanna* (WA 42612)
2001 Ross Avenue, Suite 2100          1700 Seventh Avenue, Suite 2100
Dallas, TX 75201                      Seattle, WA 98101
T: (214) 698-3100                     T: (206) 656-0177
F: (214) 571-2960                     F: (206) 656-0180
alegrand@gibsondunn.com               akhanna@elias.law

Theodore J. Boutrous, Jr.* (CA 132099)   Jacob D. Shelly* (DC 90010127)
333 South Grand Avenue                Samuel T. Ward-Packard* (DC 90005484)
Los Angeles, CA 90071                 250 Massachusetts Avenue NW, Suite 400
T: (213) 229-7000                     Washington, DC 20001
F: (213) 229-7520                     T: (202) 968-4490
tboutrous@gibsondunn.com              F: (202) 986-4498
                                      jshelly@elias.law
Amer S. Ahmed* (NY 4382040)           swardpackard@elias.law
200 Park Avenue
New York, NY 10166                    * Admitted *pro hac vice*
T: (212) 351-4000
F: (212) 351-4035
aahmed@gibsondunn.com

*Counsel for Defendants Media Matters for America, Angelo Carusone, and Eric Hananoki*

22

**CERTIFICATE OF SERVICE**

On October 15, 2024, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Andrew LeGrand*
Andrew LeGrand