# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | |
|---|---|
| X CORP., | |
| Plaintiff, | |
| v. | Civil Action No. 4:23-cv-01175-O |
| MEDIA MATTERS FOR AMERICA, et al., | |
| Defendants. | |

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO COMPEL DISCOVERY RESPONSES

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 2

ARGUMENT ...................................................................................................................... 3

I.    X's objections to discovery about Elon Musk should be overruled. .................................... 3

      A.    Musk is central to this litigation.............................................................................. 4

      B.    The Court should overrule X's objections to RFP No. 26 and
            Interrogatory No. 6............................................................................................... 7

      C.    The Court should overrule X's objections to RFA Nos. 82 and 83........................... 10

II.   X's objections to discovery about content moderation on X's platform should
      be overruled. ......................................................................................................... 12

III.  X's objections to authenticating posts on its own platform should be overruled. .............. 14

      A.    The Court should overrule X's objections to RFA No. 5. .......................................... 15

      B.    The Court should overrule X's objections to RFA Nos. 9(A)–73(B)......................... 17

IV.   X's objections to discovery about advertisers that discontinued their relationship
      with X should be overruled.......................................................................................... 20

      A.    The Court should overrule X's objections to RFP Nos. 7, 17, and 33, and
            Interrogatory No. 8............................................................................................... 20

      B.    The Court should overrule X's objections to RFP No. 9........................................... 22

CONCLUSION.................................................................................................................... 22

CERTIFICATE OF SERVICE ............................................................................................. 24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atlas Truck Leasing, Inc. v. First NH Banks, Inc.*,
 808 F.2d 902 (1st Cir. 1987)............................................................................22

*United States ex rel. Bibby v. Mortg. Invs. Corp.*,
 323 F.R.D. 424 (N.D. Ga. 2017)......................................................................10

*Broughton v. Livingston Indep. Sch. Dist.*,
 No. 9:08-CV-175, 2010 WL 3056862 (E.D. Tex. July 29, 2010) ..........................15

*Dynamic CRM Recruiting Sols., L.L.C. v. UMA Educ., Inc.*,
 31 F.4th 914 (5th Cir. 2022) ..............................................................................9

*Earl v. Boeing Co.*,
 515 F. Supp. 3d 590 (E.D. Tex. 2021) ...............................................................14

*Falcone v. Speedway LLC*,
 No. CV 14-2188, 2017 WL 220326 (E.D. Pa. Jan. 19, 2017) ...................................9

*Girl Scouts of Middle Tenn., Inc. v. Girl Scouts of the U.S. of Am.*,
 No. 3:21-CV-00433, 2022 WL 18638748 (M.D. Tenn. Jan. 14, 2022) ..................13

*House v. Giant of Md., LLC*,
 232 F.R.D. 257 (E.D. Va. 2005) ........................................................................11

*Langley v. Dep't of Interior*,
 No. 99-2653, 2001 WL 946367 (E.D. La. Aug. 20, 2001).....................................11

*Luzar v. Dolan*,
 No. 12-2267-JWL, 2012 WL 13024724 (D. Kan. Oct. 12, 2012) ...........................8

*People's Cap. & Leasing Corp. v. McClung*,
 No. 5:17-CV-484-OLG, 2017 WL 8181529 (W.D. Tex. Sept. 22, 2017)..............19

*PrinterOn Inc. v. BreezyPrint Corp.*,
 93 F. Supp. 3d 658 (S.D. Tex. 2015) ...................................................................9

*SEC v. Brady*,
 238 F.R.D. 429 (N.D. Tex. 2006) ........................................................................8

*Teel v. Deloitte & Touche LLP*,
 No. 3:15-CV-2593-G, 2015 WL 9478187 (N.D. Tex. Dec. 29, 2015)....................12

*Thalheim v. Eberheim*,
    124 F.R.D. 34 (D. Conn. 1988)...................................................................................11

*VeroBlue Farms USA Inc. v. Wulf*,
    345 F.R.D. 406 (N.D. Tex. 2021) ........................................................................10, 11

*Zaccaro v. 50 E. 196th Assocs., L.P.*,
    No. 96CIV.5119(JSR)(HBP), 1997 WL 661905 (S.D.N.Y. Oct. 23, 1997)...........................8

**Other Authorities**

Fed. R. Civ. P. 26(b)(1)...................................................................................................11

Fed. R. Civ. P. 36(a)(4)............................................................................................10, 20

Fed. R. Civ. P. 36(a)(5)...................................................................................................17

**INTRODUCTION**

X has failed to comply with its discovery obligations by withholding documents that would tend to show that allegations in the amended complaint are false, by refusing to admit incontrovertible facts on grounds expressly disallowed by the Federal Rules, and by unilaterally rewriting interrogatories to avoid providing complete and candid answers. In short, X has objected to all manner of requests that would tend to support the defenses of Defendants Media Matters for America, Angelo Carusone, and Eric Hananoki ("Media Matters"), jamming the wheels of discovery and sabotaging its truth-seeking function.

While the parties continue to confer about a full range of X's discovery deficiencies, four categories of disputes are ripe for judicial resolution. *First*, in response to requests for production ("RFPs") and requests for admission ("RFAs"), X refuses to answer discovery about statements by Elon Musk, X's Executive Chairman and Chief Technology Officer, even though his responsibility for the platform's deteriorating moderation of extremist content and his contribution to the estrangement of X's relationships with advertisers are directly at issue in this litigation. X may not, in its operative complaint, accuse Media Matters of making false statements about Musk's role in rendering the platform unsafe for advertisers, and then, in discovery, refuse to produce requested documents that would reveal the true nature of his role.

*Second*, X refuses to produce documents that would shed light on X's content moderation practices. Again, X has alleged in a formal pleading that Media Matters's statements on this issue were "false." X must either amend its complaint to remove those allegations or produce the relevant documents, including those that may support Media Matters's defense that its statements about content moderation on X were true.

*Third*, X refuses to respond to RFAs seeking admissions about whether advertisements have appeared next to extremist content on its social media platform, as specifically documented

by Media Matters and by non-Media Matters platform users alike. That is the primary factual question posed by this case, and X has already explained that it has the tools to quickly authenticate these advertisement-and-content pairings. Indeed, through other statements X has made clear that it has *already authenticated* the pairings reported by Media Matters. Accordingly, X lacks any non-frivolous basis to refuse to answer the RFAs at issue.

*Fourth*, X refuses to fully answer discovery about the reasons that advertisers have fled its platform and any damages that may have resulted. X has identified six advertisers whose alleged departure it attributes to Media Matters, but its evidence of causation is limited to the coincidence of timing between the publication of Media Matters's articles and the advertisers' alleged decisions to sever their relationships with X. Media Matters is entitled to rebut any inference that X seeks to draw from that timing by showing that other advertisers that also left the platform during this period did so for reasons unrelated to Media Matters. Similarly, to the extent X seeks to recover lost profits—which it refuses to confirm or deny—it must provide information about its total advertising revenue so that Media Matters can verify X's calculations.

The Court should overrule X's many meritless objections and compel amended responses and full productions that comply with the rules of discovery.

## BACKGROUND

Media Matters served its first set of discovery requests on May 6, 2024, a second set of requests on May 9, and a third set of requests on July 26. *See generally* App'x 3–33, 76–182, 367–89.[1] In response, X has largely refused to search for or produce responsive documents and refused to answer interrogatories and requests for admission. *See generally* App'x 34–75, 183–366, 390–

---

[1] Citations to "App'x" refer to Defendants' Appendix in Support of Motion to Compel, filed herewith.

413. Media Matters identified serious deficiencies in over 100 of X's responses to Media Matters's first two sets of discovery requests, and it requested a response by August 21. App'x 427. On that date, X promised that "next week's production will address some of the concerns that you have raised in the letter." App'x 494. But X's subsequent production did not address *any* of the concerns that Media Matters had raised. After waiting another two-and-a-half weeks, on September 6 Media Matters again inquired into X's response and highlighted additional deficiencies in X's objections to Media Matters's third set of discovery requests. App'x 449–54. Later that day, X responded to part of Media Matters's August 16 letter and promised to address the remainder "by follow-up correspondence." App'x 456. Three more weeks passed without any follow-up correspondence from X. On September 25, Media Matters explained by letter that X's partial defense of its discovery responses was substantively inadequate, and that X's failure to respond to many of the issues in dispute was "unexplained and unjustifiable" and operated only to prevent a ripe dispute for judicial resolution. App'x 462. In letters provided on September 27 and October 9, X responded that it was standing on many of its objections. App'x 467–79, 481–84. On October 14, Media Matters previewed the issues it believed were ripe for motions practice. App'x 486–89. The night of October 18, X responded that it would not make further changes to the discovery responses at issue here absent a court order. App'x 491–92.

## ARGUMENT

### I.    X's objections to discovery about Elon Musk should be overruled.

Despite Musk's boasts that discovery in this case "will be glorious to behold,"[2] X has sought to block Media Matters from discovery into Musk's own role in issues that are at the heart

---

[2]        @elonmusk,       X.com       (Nov.      18,      2023,      2:21      ET), https://twitter.com/elonmusk/status/1725776174918283678 [https://perma.cc/RQ9B-7PSC].

of this case. Discovery obligations, however, are reciprocal. Through this lawsuit, X has maligned Media Matters's reporting on Musk as false. In response, Media Matters has a right to defend itself by gathering evidence to show that its statements were true.

### A.    Musk is central to this litigation.

When Elon Musk purchased Twitter in 2022 and installed himself as Executive Chairman and Chief Technology Officer, he promised to "transform[]" the popular social media website,[3] and he quickly delivered. As was widely reported at the time, Musk decimated the workforce dedicated to content moderation[4]; eliminated user verification tools on the Platform[5]; reinstated nearly all user accounts that had previously been suspended for inflammatory content[6]—a move he recognized "will be bad for X financially" and "will probably cause us to lose a lot of advertisers"[7]; and publicized his hatred for advertising.[8] The result was predictable: As a range of publications chronicled, under Musk's leadership, X repeatedly failed to prevent advertisements

---

[3]   Twitter Inc., Amendment No. 2 to Schedule 13D/A (Apr. 13, 2022), https://www.sec.gov/Archives/edgar/data/1418091/000110465922045641/tm2212748d1_sc13da.htm.

[4] Barbara Ortutay & Matt O'Brien, *Musk's latest Twitter cuts: Outsourced content moderators*, AP (Nov. 13, 2022), https://apnews.com/article/elon-musk-twitter-inc-technology-misinformation-social-media-a469130efaebc8ed029a647a149c5049.

[5] *See* @elonmusk, X.com (Apr. 11, 2023, 2:55 PM ET), https://perma.cc/AJ2ZT6BD.

[6]  Robert Hart, *Elon Musk Is Restoring Banned Twitter Accounts—Here's Why The Most Controversial Users Were Removed And Who's Already Back*, Forbes (Nov. 25, 2022) https://www.forbes.com/sites/roberthart/2022/11/25/elon-musk-is-restoring-banned-twitter-accounts-heres-why-the-most-controversial-users-were-suspended-and-whos-already-back/

[7] *See*    @elonmusk,    X.com    (Dec.    9,    2023,    12:13    PM    ET), https://x.com/elonmusk/status/1733535277119918116    [https://perma.cc/VY4W-J3YN]; @elonmusk,    X.com    (May    2,    2024,    2:05    PM    ET), https://x.com/elonmusk/status/1786094688207773991 [https://perma.cc/7KS5-AYLW].

[8] Tiffany Hsu & Kate Conger, *Elon Musk Hates Ads. Twitter Needs Them. That May Be a Problem.*, N.Y. Times (May 5, 2022), https://www.nytimes.com/2022/05/05/business/media/elon-musk-twitter-ads.html?smid=tw-nytimes&smtyp=cur.

4

from appearing adjacent to hateful and extremist content,[9] and advertisers increasingly abandoned the platform.[10]

Media Matters was also monitoring this maelstrom. As a nonprofit research and information center dedicated to tracking and reporting on extremism and misinformation in the U.S. media, Media Matters joined the chorus of concern about Musk's threats to radicalize the platform, and it corroborated reporting that advertising was appearing next to antisemitic and other racist content. Specifically, Media Matters published a pair of articles on November 16 and 17, 2023, reporting that Musk had publicly endorsed white nationalist and antisemitic conspiracy theories, and that, while X's CEO had promised that advertising brands are "protected from the

---

[9] *See, e.g.*, *Advertisers react to Twitter's new ownership*, Reuters (Nov. 18, 2022) https://www.reuters.com/technology/advertisers-react-twitters-new-ownership-2022-11-03/; Faiz Siddiqui, *Amazon, Uber ads appear on Twitter pages of white nationalists restored by Musk*, Wash. Post (Dec. 7, 2022), https://www.washingtonpost.com/technology/2022/12/06/twitter-ads-elon-musk/; Ashley Belanger, *Twitter running major brands' ads with extremist tweets—until they get flagged*, ARS Technica (Dec. 7, 2022), https://arstechnica.com/tech-policy/2022/12/amazon-among-brands-whose-ads-appeared-in-white-nationalist-twitter-feeds/; Jon Porter, *Twitter advertisers aren't happy with ads appearing on pages of white nationalists,* The Verge (Dec. 7, 2022), https://www.theverge.com/2022/12/7/23497928/twitter-advertisers-brand-safety-unbanned-accounts-white-nationalists; *Toxic Twitter*, CCDH (Feb. 9, 2023), https://counterhate.com/research/toxic-twitter/; Taylor Lorenz, *Extremist influencers are generating millions for Twitter, report says*, Wash. Post (Feb. 9, 2023), https://www.washingtonpost.com/technology/2023/02/09/twitter-ads-revenue-suspended-account/; Jonathan Shorman, *Mizzou ad appears on racist X page as social media site faces concerned advertisers*, The Star (Oct. 10, 2023), https://www.kansascity.com/news/politics-government/article280309284.html; Katherine Tangalakis-Lippert, *Advertisers are returning to Twitter after Linda Yaccarino calmed fears over content moderation. But now brands like Disney, Microsoft, and the NBA have ads placed next to neo-Nazi propaganda*, Business Insider (June 18, 2023), https://www.businessinsider.com/disney-microsoft-nba-twitter-ads-next-to-neo-nazi-propaganda-2023-6; Shannon Thaler, *Disney, Microsoft ads on Twitter show up next to neo-Nazi propaganda as advertisers return: report*, N.Y. Post (June 19, 2023) https://nypost.com/2023/06/19/disney-microsoft-ads-on-twitter-show-up-next-to-neo-nazi-propaganda-report/.

[10] Shirin Ghaffary, *Why advertisers aren't coming back to Twitter*, Vox (Mar. 24, 2023), https://www.vox.com/technology/2023/3/23/23651151/twitter-advertisers-elon-musk-brands-revenue-fleeing

risk of being next to" toxic posts on the platform, X's controls nonetheless failed to prevent advertisements for various corporate brands from appearing next to posts celebrating Adolf Hitler, the Nazi Party, and other white-supremacist content.[11]

Rather than express concern about the proliferation of virulent racism on his platform, Musk aimed his fury at the messenger. On November 17 he promised a "thermonuclear lawsuit against Media Matters,"[12] gloated that "the discovery and depositions will be glorious to behold,"[13] and bashed "the largest advertisers" as "the greatest oppressors."[14] Musk followed through on his litigation threat, and the operative amended complaint places him at the center of the story. The first paragraph touts policy changes that the social media platform implemented to reduce the "censorship" of controversial views after "Elon Musk acquired" it. Am. Compl. ¶ 1, ECF No. 37. And the complaint repeatedly challenges as "false" and "malicious" various statements that Media Matters has made about Musk, including Defendants' opinions that "[n]o advertiser is safe while Elon Musk controls X," and "Elon Musk, he doesn't really see a problem or at least seemingly, with a lot of this content because it's also a reflection of his own worldview." *Id.* ¶¶ 6, 17.

---

[11] Eric Hananoki, *As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content*, Media Matters for Am. (Nov. 16, 2023), https://www.mediamatters.org/twitter/musk-endorses-antisemitic-conspiracy-theory-x-has-been-placing-ads-apple-bravo-ibm-oracle ("Nov. 16 Article"); Eric Hananoki, *X is placing ads for Amazon, NBA Mexico, NBCUniversal, and others next to content with white nationalist hashtags*, Media Matters for Am. (Nov. 17, 2023), https://www.mediamatters.org/twitter/x-placing-ads-amazon-nba-mexico-nbcuniversal-and-others-next-content-white-nationalist ("Nov. 17 Article").

[12] @elonmusk, X.com (Nov. 18, 2023, 2:01 ET), https://perma.cc/X4HN-PLJ4.

[13] @elonmusk, X.com (Nov. 18, 2023, 2:21 ET), https://twitter.com/elonmusk/status/1725776174918283678 [https://perma.cc/RQ9B-7PSC].

[14] @elonmusk, X.com (Nov. 17, 2023, 9:48 ET) https://x.com/elonmusk/status/1725707584555143602 [https://perma.cc/9MZY-QBHV].

X further relied on Musk's personal contacts with Texas in alleging jurisdiction in Texas, which was not the home of any party, stating that "many of Musk's decisions regarding X Corp. took place while Musk was physically within Texas." *Id.* ¶ 27.[15] The remedy that X requests is similarly tethered to Musk—X seeks to recoup lost advertising revenue and reputational damages allegedly resulting from Media Matters's "narrative that X's brand-safety measures could not be trusted and that advertising on X would never be safe with Mr. Musk as its owner." Pl.'s Resp. to Defs.' Mot. to Dismiss at 1, ECF No. 45. And Musk's personal salience to this action has continued since the pleadings. When the parties exchanged initial disclosures, X incorporated by reference Media Matters's identification of Musk as a person likely to have discoverable information. App'x 416, 422. X's first discovery requests sought "[a]ll documents and communications discussing or mentioning . . . Elon Musk." ECF No. 60-1 at 12. And this Court's order on X's first motion to compel limited several discovery requests to documents "related to X Corp, Elon Musk, or the November 2023 articles." Order at 2, ECF No. 65. X's sudden, 180-degree heel-turn objecting to Musk's relevance is impossible to reconcile with X's First Amended Complaint or the way that it has litigated its claims.

### B.   The Court should overrule X's objections to RFP No. 26 and Interrogatory No. 6.

Media Matters is entitled to discovery to show the truth of the allegedly defamatory statements that extremist content "seemingly" reflects Musk's own worldview, and that advertisers

---

[15] During conferrals about this dispute X purported to disavow Musk's Texas-residency as a basis for jurisdiction, App'x 459, but its recent brief opposing Defendants' motion to certify an immediate appeal again highlighted the importance of "Elon Musk, a Texas domiciliary who regularly controls X from Texas." ECF 110 at 12.

are not "safe while Elon Musk controls X." Am. Compl. ¶¶ 17, 6.[16] To that end, RFP No. 26 requests "[a]ll documents and communications related to Elon Musk's activity on the X platform, including Musk's engagement with Disputed Content on the Platform, and any allegations that Musk has violated X's user agreement, terms of service, rules and policies, or content moderation policies." App'x 22. Interrogatory No. 6 similarly asks X to "[i]dentify all accounts on the X platform, including any corresponding usernames or handles, which Elon Musk currently controls, accesses, or uses, or has controlled, accessed, or used in the past, to engage in any activity, including posting, commenting, messaging, or following or viewing accounts, on the X platform since April 14, 2022." App'x 32. X refuses to respond to either request on the bases that the requests seek irrelevant information and that Musk is not a plaintiff. App'x 63, 73–74. Those objections should be overruled.

First, the requests are tailored to produce relevant information. Requests for discovery are considered relevant if there is "'any possibility' that the information sought may be relevant to the claim or defense of any party." *SEC v. Brady*, 238 F.R.D. 429, 437 (N.D. Tex. 2006) (citation omitted). There is such a possibility—indeed, there is an overwhelming likelihood—that Musk's activity on the platform, through public or unknown accounts, would tend to elucidate Musk's worldview, which X has put in dispute. If, for example, Musk has interacted approvingly with antisemitic posts—including in the ways that Media Matters has reported, *see* Nov. 16 Article (documenting that Musk endorsed the antisemitic conspiracy theory that Jewish people are

---

[16] While Defendants dispute that these statements of opinion can give rise to liability, until X concedes (or the Court orders) as much, Defendants have a right to prepare a full factual defense. *Cf. Zaccaro v. 50 E. 196th Assocs., L.P.*, No. 96CIV.5119(JSR)(HBP), 1997 WL 661905, at *1 (S.D.N.Y. Oct. 23, 1997) (granting motion to compel production of "files [that] may contain information relevant to an alternative [] defense"); *Luzar v. Dolan*, No. 12-2267-JWL, 2012 WL 13024724, at *3 (D. Kan. Oct. 12, 2012) (similar).

supporting "hordes of minorities" who are "flooding" into the country to replace white people)—then Media Matters's statement that Musk "doesn't really see a problem or at least seemingly, with a lot of this [antisemitic] content," Am. Compl. ¶ 17, would be corroborated. Likewise, to the extent Musk has contributed to or amplified extremist content on X, that fact could explain why advertisers may not feel "safe" on the platform, *id.* ¶ 6, and it could supply reasons separate from Media Matters's reporting for why advertisers reduced their ad spend.

Second, Musk need not be a party for documents of his in X's possession to be relevant. Indeed, X has already conceded that Musk is a proper custodian for several other discovery requests. *See, e.g.*, App'x 473 (pledging to produce Musk's communications with advertisers). X has not—and cannot—identify any grounds for inoculating a plaintiff organization's owner and key decisionmaker from custodial obligations merely because his name is not included in the case caption.

At every stage of this case, X has denigrated Media Matters's statements about Musk as false and malicious. *See, e.g.*, ECF No. 110 at 2 (summarizing amended complaint by alleging that Media Matters "disparaged Elon Musk in order to harm X by **falsely associating him with hateful content**") (emphasis added). Discovery is the proper mechanism to substantiate whether Musk has, in fact, associated himself with hateful content. *Cf. Falcone v. Speedway LLC*, No. CV 14-2188, 2017 WL 220326, at *6 n.4 (E.D. Pa. Jan. 19, 2017) (rejecting party's "own self-judicial and cavalier conclusion that [requested documents] have 'no relevance to this lawsuit'").[17]

---

[17] At times, X seems to dispute the relevance of its requests by characterizing the scope of this litigation in terms substantially narrower than those alleged in the amended complaint. *See, e.g.*, App'x 63–64, 73–74. "[T]he proper means for a party to abandon some, but not all, of its claims prior to trial is a motion to amend under Federal Rule of Civil Procedure 15(a)." *Dynamic CRM Recruiting Sols., L.L.C. v. UMA Educ., Inc.*, 31 F.4th 914, 924 (5th Cir. 2022); *cf. PrinterOn Inc. v. BreezyPrint Corp.*, 93 F. Supp. 3d 658, 711 (S.D. Tex. 2015) (recognizing it is common for

### C.     The Court should overrule X's objections to RFA Nos. 82 and 83.

Defendants have asked X to admit the accuracy of transcriptions of Musk's remarks in other litigation.[18] Here, X does not dispute the clear relevancy of Musk's remarks, but it nonetheless engages in all manner of unjustified contortions to avoid admitting the obvious. Rule 36 does not permit this gamesmanship.

"If a matter is not admitted" in response to a request for admission, "the answer must specifically deny it or state in detail why the answering party cannot truthfully admit or deny it." Fed. R. Civ. P. 36(a)(4). "A denial must fairly respond to the substance of the matter; and when good faith requires that a party qualify an answer or deny only a part of a matter, the answer must specify the part admitted and qualify or deny the rest." *Id.* A party may *not* respond that a document "speaks for itself." *VeroBlue Farms USA Inc. v. Wulf*, 345 F.R.D. 406, 424 (N.D. Tex. 2021). A party may *not* admit "to what is, in essence, the substance of the request," and then "otherwise, den[y]" the request. *United States ex rel. Bibby v. Mortg. Invs. Corp.*, 323 F.R.D. 424, 430 (N.D. Ga. 2017). And a party may *not* respond with "disingenuous, hair-splitting distinctions whose

---

claims to evolve "as litigation proceeds and as discovery and motion practice provide more information on both the law and the facts"). X is welcome to seek leave to amend its complaint to narrow the scope of its claims, but it may not narrow the scope of discovery until it does so.

[18]   RFA No. 82 asks X to "Admit that the deposition transcript available at https://www.scribd.com/document/721193667/Elon-Musk-Deposed-In-Lawsuit-For-FalselyLinking-Jewish-Man-To-Neo-Nazi-Brawl is a true and correct copy of the deposition testimony of Elon Musk on March 27, 2024, in the case *Brody v. Musk*, Case No. D-1-GN-23-006883 (Travis Co. Dist. Ct.)."

RFA No. 83 asks X to "Admit that during his deposition on March 27, 2024, in the case *Brody v. Musk*, Case No. D-1-GN-23-006883 (Travis Co. Dist. Ct.), Mr. Musk testified: 'I believe my posting has really remained unchanged before and after the acquisition. The—and going back to the sort of self-inflicted wounds, the Kevlar shoes, I think that—I've probably done—I may have done more to financially impair the company than to help it, but certainly I—I do not guide my posts by what is financially beneficial but what I believe is interesting or important or entertaining to the public.'"

unarticulated goal is unfairly to burden an opposing party." *Thalheim v. Eberheim*, 124 F.R.D. 34, 35 (D. Conn. 1988). "Requests for admission are not games of 'Battleship' in which the propounding party must guess the precise language coordinates that the responding party deems answerable." *House v. Giant of Md., LLC*, 232 F.R.D. 257, 262 (E.D. Va. 2005).

X flouts each of these rules and requirements. First, it objects "to the extent [RFA No. 82] is interpreted as calling for a legal conclusion as to the admissibility of the linked document." App'x 393. That objection is not responsive to the request; Media Matters asked whether Musk said the words as transcribed in the link—either he did, or he did not. X cannot refuse to answer on the basis of admissibility. *See* Fed. R. Civ. P. 26(b)(1) ("Information within this scope of discovery need not be admissible in evidence to be discoverable."). Next, X objects "that the link provided is not in the control of X and may be removed or changed without X's knowledge." App'x 393. But X's response says that "the transcript of the deposition is publicly available." *Id.* Is the publicly available transcript different than the one Media Matters identified? X plays coy. Is the transcript that Media Matters identified true and correct? That is the question posed, and it is unclear whether X admits the transcript's accuracy.

Nor may X object "that the transcript of the March 27, 2024 deposition speaks for itself." *Id.* As Media Matters has reminded X, App'x 453, this objection is flatly impermissible. *See, e.g.*, *VeroBlue Farms USA Inc*, 345 F.R.D. at 424 ("'Stating that a document speaks for itself avoids the purpose of requests for admission, i.e., narrowing the issues for trial,' and '[i]f a request seeks an admission about a quotation or paraphrase of text, the responding party must answer, object (on grounds other than speaks for itself), or properly allege and support a lack of knowledge.'" (citation omitted)); *Langley v. Dep't of Interior*, No. 99-2653, 2001 WL 946367, at *2 (E.D. La. Aug. 20, 2001) (similar). X concludes its response by stating "The remainder of the request is denied."

App'x 393. What remainder? The response completely lacks the specificity that Rule 36 requires, as it remains altogether impossible to tell what has been admitted and what has been denied. That obfuscation is inconsistent with X's discovery obligations.

X's objections and response to RFA No. 83 suffer the same flaws. X objects that the transcript "speaks for itself," which is not permitted; it interjects an objection about "the admissibility of the statement at issue," which is not permitted; and it admits that a deposition occurred on the stated date in the stated case, but it denies the "remainder of the request"—which is not permitted. App'x 393–94; App'x 483. The Court should compel X to provide intelligible, specific responses to these requests for admission.

## II.     X's objections to discovery about content moderation on X's platform should be overruled.

X's objections to discovery about its content moderation efforts are inappropriate for many of the same reasons that its Musk-based objections are inappropriate—X haled Defendants into federal court for making allegedly false statements about these topics, yet now X refuses to provide documents in its possession that are relevant to the question of whether those statements were true.

X's amended complaint puts in dispute whether advertisers are "safe while Elon Musk controls X." Am. Compl. ¶ 6. Media Matters has opined that they are not, which X characterizes as a "false and malicious claim[]." *Id.* Although Media Matters's "expressions of opinion are not actionable," *Teel v. Deloitte & Touche LLP*, No. 3:15-CV-2593-G, 2015 WL 9478187, at *4 (N.D. Tex. Dec. 29, 2015), Media Matters can further rebut X's allegation by showing that its opinion was informed by true events. For example, X's social media platform is more likely to have become unsafe for the reputations of mainstream corporate brands if, while under Musk's control, X reinstated accounts known to publish vile falsehoods (such as the notion that family members of Sandy Hook shooting victims were actors in a hoax), shared advertising revenue with these

extremist accounts, and purged many of the employees previously assigned to monitoring the platform for this repugnant content. Media Matters's requests seek precisely this information.[19] Far from a "fishing expedition," App'x 65, each of these concerns is supported by extensive public reporting.[20] And to the extent these policy and personnel decisions coincided with Musk's takeover of the platform, that would further corroborate any statements Media Matters made about Musk's role in transforming X into "a risky, unsafe platform for advertisers." Am. Compl. ¶ 4. Because documents and communications responsive to RFP Nos. 13, 25, and 28 could support Media Matters's defense that contemporaneous facts supported its reporting about content moderation on X, X's objections to these requests should be overruled. *Cf. Girl Scouts of Middle Tenn., Inc. v. Girl Scouts of the U.S. of Am.*, No. 3:21-CV-00433, 2022 WL 18638748, at *3 (M.D. Tenn. Jan. 14, 2022) (rejecting party's relevance-based refusal to produce documents related to its "own

---

[19] RFP No. 13 requests, "All documents and communications regarding payments made to X users related to X's revenue sharing programs, including their Subscription Creators and Creator Ads Revenue Sharing programs." App'x 20.

RFP No. 25 requests, "All documents and communications related to X suspending or terminating user accounts on the Platform, including but not limited to the processes by which such suspended or terminated user accounts are or have been reinstated." App'x 22.

RFP No. 28 requests "All documents and communications related to the termination or suspension of any current or former employee of X for reasons related to content moderation or Disputed Content on X." App'x 23.

[20] *See, e.g.*, *Elon Musk restores X account of conspiracy theorist Alex Jones*, AP (Dec. 10, 2023), https://apnews.com/article/alex-jones-x-account-elon-musk-90cfc990631dec5e8f337167fbe16372; Jon Porter, *Twitter advertisers aren't happy with ads appearing on pages of white nationalists*, The Verge (Dec. 7, 2022), https://www.theverge.com/2022/12/7/23497928/twitter-advertisers-brand-safety-unbanned-accounts-white-nationalists; Leila Register, *Verified pro-Nazi X accounts flourish under Elon Musk*, NBC News (Apr. 16, 2024), https://www.nbcnews.com/tech/social-media/x-twitter-elon-musk-nazi-extremist-white-nationalist-accounts-rcna145020; Priya Singh*, Elon Musk's X lays off 1,000 employees from its safety team: Report*, Business Today (Jan. 11, 2024), https://www.businesstoday.in/technology/news/story/elon-musks-x-lays-off-1000-employees-from-its-safety-team-report-412877-2024-01-11.

technology platform . . . [which] is at the heart of this case, [because] under the broad standard of relevance in discovery, most information related to it is going to be relevant").

### III.   X's objections to authenticating posts on its own platform should be overruled.

X refuses, without justification, to authenticate images of advertisements appearing next to hateful content on the X platform, including the images that Media Matters published in the November 16 and 17 articles that spawned this litigation. Because X cannot seriously argue that it is incapable of such authentication—indeed, X's amended complaint and a detailed report published on X's website confirm that X has *already* authenticated the images in the articles at issue—X instead expresses reluctance to concede "a key factual predicate of this litigation." App'x 474. This frivolous objection would thwart the entire purpose of discovery and therefore must be overruled. *Cf. Earl v. Boeing Co.*, 515 F. Supp. 3d 590, 598 (E.D. Tex. 2021) ("Discovery conducted in a manner that identifies and narrows the relevant factual considerations is of the utmost importance in our justice system to promote efficiency and demonstrate a respect to the sacrifice a call to service imposes on a summoned jury.") (cleaned up).

On November 16, 2023, Media Matters reported that "corporate advertisements have [] been appearing on pro-Hitler, Holocaust denial, white nationalist, pro-violence, and neo-Nazi accounts," and specified that "[w]e recently found ads for Apple, Bravo, Oracle, Xfinity, and IBM next to posts that tout Hitler and his Nazi Party on X." Nov. 16 Article. The article then reproduced six screenshots of advertisements appearing next to hateful content, as described. *Id.* The next day, Media Matters posted a related article noting that "X still has a problem: Since our report yesterday, we found that the company placed ads for [additional corporate brands] next to [] white nationalist hashtags" and again reproduced "examples of how those ads appeared." Nov. 17 Article. X alleges that "Media Matters knowingly and maliciously manufactured [these] side-by-side images." Am. Compl. ¶ 7; *see also, e.g.*, *id.* ¶ 46 (alleging that Media Matters's reporting was

"not true" and "X in fact has many default safeguards that *prevent* the platform from displaying content in the manner achieved by Defendants"); *id.* ¶ 48 ("In reality, Media Matters did not *find* pairings that X passively allowed on the platform."). These allegedly false statements form the basis of X's business disparagement claim. *See id.* ¶ 76.

Because truth is a full defense to business disparagement, *see Broughton v. Livingston Indep. Sch. Dist.*, No. 9:08-CV-175, 2010 WL 3056862, at *10 (E.D. Tex. July 29, 2010), Media Matters can defeat X's business disparagement claim by showing that its reporting was, in fact, accurate.[21] Accordingly, Defendants requested that X admit the occurrence of advertisement and content pairings reported in Media Matters's articles, and to further admit the occurrence of similar advertisement-and-content pairings identified by users unaffiliated with Media Matters. X's blanket refusal to admit or deny these requests is impermissible.

### A.   The Court should overrule X's objections to RFA No. 5.

Media Matters's RFA No. 5 asks X to "[a]dmit that the images of advertisements next to user content reproduced in the November 16, 2023 Article and the November 17, 2023 Article are authentic reproductions of pairings that occurred on the X Platform, as opposed to Photoshopped or otherwise digitally altered images." App'x 9. X responded that it is "Unable to admit or deny." App'x 38. That answer was knowingly false. Not only is X *able* to admit that the reported pairings occurred on the X platform, X *has* admitted exactly as much on three other occasions. *First*, on November 18, 2023, immediately after the challenged articles were published, X posted on its blog

---

[21] To be sure, Defendants do not bear the burden of proving the truth of their statements; "[i]t is [Plaintiff's] burden to plead and prove" falsity. *Broughton*, 2010 WL 3056862, at *11. An admission that Defendants' reporting was true, however, would plainly foreclose X from carrying its burden.

findings of its own investigation into Media Matters's reporting.[22] X said that it reviewed internal user logs, identified the platform account that Media Matters used for its reporting, and calculated the precise number of times that users viewed the advertisement and content pairings featured in the Media Matters article. *Second*, X formally alleged these same findings in its amended complaint, again calculating the precise number of X users who viewed the pairings at issue. *See* Am. Compl. ¶ 57. *Third*, X detailed in response to Defendants' Interrogatory No. 11 the technological capabilities that enabled X to conduct such a speedy investigation after the disputed articles were published:

> X engineers accessed internal digital logs that detail activity on the X platform. The logs contain detailed information of post and ad impressions from each user on X including the order of the posts and ads seen. **Each post and ad is represented by an internal ID and X engineers identified the IDs of the ads and posts in the November 2023 Media Matters articles.** X engineers checked the digital logs using the post and ad IDs to assess how many times the ads and posts screenshotted in the November 2023 articles appeared next to each other, and which users saw those placements.

App'x 410 (emphasis added). That is, X confirmed the authenticity of each reported pairing within a day or two of the articles' publication by reviewing X's internal ID of every advertisement and post at issue—just as RFA No. 5 asks X to admit.

After Defendants offered X several opportunities to amend its RFA No. 5 response to something more truthful, X argued that "a key factual predicate of this litigation is that these advertising pairings were the result of Defendants' manipulation of X's algorithm" and "[a]ccordingly" decided to stand on its objection. App'x 474–75. The refusal to answer a request for admission *because* a truthful admission would tend to resolve a fundamental factual dispute in

---

[22] X Safety, *Stand with X to protect free speech*, X Blog (Nov. 18, 2023), https://blog.x.com/en_us/topics/company/2023/stand-with-x-to-protect-free-speech. X has pledged to produce this blog post in response to discovery requests. *See* App'x 410–12.

the litigation is outrageous.[23] Indeed, it is *explicitly forbidden* by the Federal Rules. *See* Fed. R. Civ. P. 36(a)(5) ("A party must not object solely on the ground that the request presents a genuine issue for trial."). The Court should overrule the objection, require an admission, and award attorneys' fees to Defendants for having to brief this issue. *See* Fed. R. Civ. P. 37(a)(5)(A) (requiring attorneys' fees where nondisclosure, response, or objection was not substantially justified).

### B.     The Court should overrule X's objections to RFA Nos. 9(A)–73(B).

Defendants' second set of requests for admission ask X to admit that X's algorithm did not prevent additional advertisements identified by users unaffiliated with Media Matters from appearing next to hateful content. App'x 82–164. As representative examples from this category of requests, RFA No. 10(A) asks X to "[a]dmit that X's algorithm did not prevent the advertisement from Jack in the Box (at username '@JackBox') from appearing next to the content contained in the screenshot" reprinted in the request and available at https://perma.cc/W3GR-3D84. App'x 83. RFA No. 10(B) asks X to "[a]dmit that the content captured in the screenshot reproduced in Request for Admission 10(A) appeared on the X platform on the date reflected in the screenshot." *Id.* X refuses to admit either part of these requests, objecting that terms like "prevent," "contained," "content," "captured in the screenshot," and "X platform" are vague; that the requests are not calculated to lead to the discovery of relevant evidence; that the requests are "compound"; and that answering the requests as written would be burdensome. App'x 192–. None of these objections has merit.

---

[23] Nor is it an excuse that the request "refers to something that Defendants created, not Plaintiff." App'x 474. X has put the truth of Media Matters's reporting in dispute, and X possesses the "internal digital logs that detail activity on the X platform." App'x 410. It can—and therefore must—confirm whether the reported pairings occurred on the X platform in the manner depicted in Media Matters's articles.

First, there is little doubt that X understands the common English words that it now acts puzzled by, as X uses these same terms in the same context in its amended complaint. *See, e.g.*, Am. Compl. ¶¶ 1–3, 5, 8, 15, 25, 37, 63, 66–67, 69–70, 72, 77, 79, 88 (referring to the "**X platform**" (bolding added)); *id.* ¶¶ 43 (alleging X applies protections "designed to **prevent** advertisements from being placed next to **content** that violates community guidelines") (bolding added); *id.* ¶ 46 ("X in fact has many default safeguards that *prevent* the platform from displaying **content** in the manner achieved by Defendants.") (bolding added); *id.* ¶ 58 ("All images [in Media Matters's reporting] **contained** *only* the ad and the controversial **content**, with all other posts absent from view.") (bolding added). X's feigned confusion about these terms should not be tolerated, especially after any ambiguity has surely been resolved through the parties' many conferrals. App'x 431, 451, 464, 487–88.

Second, the requests seek relevant information because candid answers would disprove X's allegations that pairings of advertisements and hateful content on the X platform are "extraordinarily rare." Am. Compl. ¶ 8; *see also id.* ¶ 14 ("rare and inorganic"); *id.* ¶ 55 ("exceedingly (and demonstrably) rare"); *id.* ¶ 56 ("remarkably rare combinations"). As explained, X is careful in its amended complaint to concede—as it must—that the pairings reported in Media Matters's articles did occur, and so X places all of its rhetorical weight on allegations that users unaffiliated with Media Matters would not have encountered similar adjacencies. Those allegations are false: Defendants' requests for admission compile dozens of examples where other X users who lack access to Hananoki's research account identified additional examples of

advertisements and hateful content appearing side-by-side on X. Discovery admissions authenticating these examples would therefore be directly relevant to rebutting X's allegations.[24]

Third, the requests are not compound—the intentionally separate, two-part requests seek an admission as to whether 1) X's algorithm prevented the content in the corresponding screenshot from appearing (Part A); and 2) whether the content in the screenshot appeared on the Platform on the date reflected in said screenshot (Part B). In any event, a belief that requests for admission are "compound" "does not excuse [a party's] obligation to respond to them." *People's Cap. & Leasing Corp. v. McClung*, No. 5:17-CV-484-OLG, 2017 WL 8181529, at *2 (W.D. Tex. Sept. 22, 2017).

Finally, X's objection about the burdens of authenticating these pairings is unavailing because, as discussed, X has already detailed the simple process that it has identified and executed to confirm whether specified advertisements appeared next to specified content. X merely needs to access the unique "internal ID" of the advertisement and hateful post depicted in each request and "check[] the digital logs using the post and ad IDs to assess [whether] the ads and posts screenshotted in the [discovery requests] appeared next to each other." App'x 410–11. After Media Matters published the November 2023 articles, X—according to its own statements—sleuthed the account used to view the reported pairings, confirmed the authenticity of those pairings, calculated the number of times those pairings were viewed across 5.5 billion advertisement impressions on X that day, confirmed the identity of each user who viewed the reported pairings, evaluated

---

[24] While the amended complaint goes all-in arguing that the pairings Media Matters observed were uncommon, the disputed articles reported only on the existence—rather than the typicality—of those pairings. *See generally* Nov. 16 Article, Nov. 17 Article. Thus, while the typicality of these pairings *should not* be at issue, until X concedes (or this Court orders) that liability may not be based upon a showing that Media Matters found the reported pairings only by using the X platform in a manner that "no organic user would undertake," Am. Compl. ¶ 8, Defendants are entitled to develop a factual defense against the allegations.

whether each of those pairings complied with X's content policies, drafted a report summarizing its investigation, and published that report on its blog, *all within a day or two*.[25]

Here, the task is exponentially simpler: Defendants simply ask for confirmation that pairings viewed by other users did, in fact, occur on the platform. Because X controls the platform, this information is particularly within its reach. And because X chose to bring this litigation and put the existence of advertisement-and-hateful-content pairings in dispute, it may not complain of the burden of discovery into the veracity of those allegations. The fact that X does not *want* to admit facts that undercut its allegations does not negate its Rule 36 obligation to make the "reasonable inquiry" that it was quick to undertake when it believed the findings would support its claims. Fed. R. Civ. P. 36(a)(4).

## IV.   X's objections to discovery about advertisers that discontinued their relationship with X should be overruled.

X refuses to provide information that would tend to reveal the causes and effects of many advertisers' decisions to discontinue relationships with X during the relevant timeframe. These objections, too, should be overruled.

### A.   The Court should overrule X's objections to RFP Nos. 7, 17, and 33, and Interrogatory No. 8.

A fundamental dispute in this litigation is whether Media Matters was the cause of advertisers' decisions to avoid, suspend, or terminate advertising relationships with X Corp. X has identified six advertisers that it alleges discontinued their relationships with X as a result of Media Matters's reporting and statements. App'x 71–72. But the primary evidence of this purported causation is the "timing" of the advertising pauses, which X says occurred "shortly after the

---

[25] X Safety, *Stand with X to protect free speech*, X Blog (Nov. 18, 2023), https://blog.x.com/en_us/topics/company/2023/stand-with-x-to-protect-free-speech.

publication of the November 16 article." App'x 72. That circumstantial evidence may be rebutted by other circumstantial evidence—such as communications with and about *other* advertisers that discontinued relationships with X during the relevant time period for reasons independent of Media Matters's November articles. Accordingly, RFP No. 7 requests:

> All communications with X's past, present, or potential advertisers regarding their decision to advertise or not to advertise on the Platform, including but not limited to all communications reflecting the reasoning behind their decision to advertise or not to advertise on the Platform.

RFP No. 17 requests:

> All documents or communications regarding the cessation, suspension, termination, or otherwise discontinuance of a business or transactional relationship between X and its advertisers.

RFP No. 33 requests:

> All documents and communications reflecting any individuals or entities to whom You have attributed responsibility or who You otherwise have blamed or do blame, in whole or in part, for the loss of advertisers on the Platform.

And Interrogatory No. 8 asks:

> For each advertiser that ceased advertising on the Platform as of [April 14, 2023], identify the advertiser's name, the date on which they terminated their advertising relationship with X, any stated reason for terminating their relationship and, if applicable, the date on which they resumed advertising on the Platform.[26]

X blithely rewrites each of these requests to seek information about only the six advertisers that X believes left the platform because of Media Matters's reporting, arguing that information about any other advertisers would be irrelevant. App'x 50–51, 58, 358–59. That is mistaken. Because the non-MMFA-related reasons for leaving X given by or attributed to other advertisers

---

[26] These requests initially sought information dating to April 14, 2021 (for the RFPs) and January 1, 2022 (for the interrogatory), consistent with (or shorter than) the timeframe that X has defined in its own requests for production. ECF 60-1 at 11 (defining "the responsive 'time period' for these requests [a]s April 14, 2021 to the present"). In a good faith effort at compromise, Defendants reduced the responsive time period for these requests to information dating to April 14, 2023. App'x 488.

that departed during the same tumultuous period are likely to support inferences about why the six advertisers identified by X left the platform—or whether they would have left even had the November articles not been published—Defendants are entitled to review that information.

### B. The Court should overrule X's objections to RFP No. 9.

X also may not limit discovery relevant to causation and damages by withholding materials responsive to Defendants' request for "[a]ll documents or communications showing X's business revenue generated from advertisements on the Platform in monthly installments or any term in which X maintains these records from April 14, 2021, to the present." App'x 20. X's offer to produce only those documents "sufficient to show the revenue that X generates from the advertisers listed in X's response to Interrogatory 4 on a monthly basis from April 14, 2021, to the present," App'x 52, is insufficient. Contrary to X's objection, X's aggregate revenue from *all advertisers* during this period is relevant. For example, if the slope of X's monthly advertising revenue trends did not meaningfully change after the November articles were published, that could support the inference that Media Matters's reporting did not meaningfully contribute to any revenue decline at X. Similarly, it is "common practice to estimate lost future profits by examining profits earned in the comparable past." *Atlas Truck Leasing, Inc. v. First NH Banks, Inc.*, 808 F.2d 902, 904 (1st Cir. 1987). X has refused to reveal its basis for calculating damages, App'x 50–51, and so Defendants must gather all potentially relevant information to defend against and rebut X's computations. Because X's total revenue provides necessary context for X's alleged lost revenue, X may not withhold this information.

### CONCLUSION

Unless X seeks leave to amend its complaint to withdraw many of the allegations at issue, the Court should overrule X's objections and grant Media Matters's motion to compel proper productions and responses to RFP Nos. 7, 9, 13, 17, 25, 26, 28, and 33; RFA Nos. 5, 9(A)–73(B),

82, and 83; and Interrogatory Nos. 6 and 8. The Court should order amended written responses due no later than seven days after its order, and supplemental document productions due within 10 days. The Court should also award attorneys' fees related to X's refusal to appropriately answer RFA No. 5.

Dated: October 18, 2024.

Respectfully submitted,
*/s/ Andrew LeGrand*

<div style="display:flex">

GIBSON, DUNN & CRUTCHER LLP
Andrew LeGrand (TX 24070132)
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
T: (214) 698-3100
F: (214) 571-2960
alegrand@gibsondunn.com

Theodore J. Boutrous, Jr.* (CA 132099)
333 South Grand Avenue
Los Angeles, CA 90071
T: (213) 229-7000
F: (213) 229-7520
tboutrous@gibsondunn.com

Amer S. Ahmed* (NY 4382040)
200 Park Avenue
New York, New York 10166
T: (212) 351-4000
F: (212) 351-4035
aahmed@gibsondunn.com

ELIAS LAW GROUP LLP
Abha Khanna* (WA 42612)
1700 Seventh Avenue, Suite 2100
Seattle, WA 98101
T: (206) 656-0177
F: (206) 656-0180
akhanna@elias.law

Aria C. Branch* (DC 1014541)
Jacob D. Shelly* (DC 90010127)
Omeed Alerasool* (DC 90006578)
250 Massachusetts Avenue NW, Suite 400
Washington, DC 20001
T: (202) 968-4490
F: (202) 986-4498
abranch@elias.law
jshelly@elias.law
oalerasool@elias.law

* Admitted *pro hac vice*

</div>

*Counsel for Defendants Media Matters for America, Angelo Carusone, and Eric Hananoki*

**CERTIFICATE OF SERVICE**

On October 18, 2024, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Andrew LeGrand*
Andrew LeGrand