## UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| **X CORP.**, a Nevada corporation,<br>Plaintiff,<br><br>vs.<br><br>**MEDIA MATTERS FOR AMERICA**, a<br>Washington, D.C. non-profit corporation,<br>**ERIC HANANOKI**, and **ANGELO<br>CARUSONE**,<br>Defendants. | Case No. 4:23-CV-01175-O |

### PLAINTIFF'S RESPONSE AND BRIEF IN OPPOSITION TO
### DEFENDANTS' MOTION TO COMPEL DISCOVERY RESPONSES

JUDD E. STONE II
CHRISTOPHER D. HILTON
ARI CUENIN
MICHAEL R. ABRAMS
ALEX M. DVORSCAK
CODY C. COLL
**STONE HILTON PLLC**
600 Congress Ave.
Suite 2350
Austin, TX 78701
Telephone: (737) 465-7248
judd@stonehilton.com
chris@stonehilton.com
ari@stonehilton.com
michael@stonehilton.com
alex@stonehilton.com
cody@stonehilton.com

JOHN C. SULLIVAN
**S|L Law PLLC**
610 Uptown Boulevard
Suite 2000
Cedar Hill, TX 75104
Telephone: (469) 523-1351
john.sullivan@the-sl-lawfirm.com

## TABLE OF CONTENTS

Table of Contents ............................................................................................................. i

Table of Authorities ......................................................................................................... ii

Introduction ...................................................................................................................... 1

Background ....................................................................................................................... 1

Legal Standard ................................................................................................................. 4

Argument and Authorities ............................................................................................... 5

    I.  Elon Musk's subjective views are irrelevant to this litigation. .......................... 6

        A.  RFP No. 26 and Interrogatory No. 6 ........................................................ 7

        B.  RFA Nos. 82 and 83 ................................................................................. 8

    II.  X's objections to Defendants' content moderation requests are reasonable .................... 10

        A.  RFP No. 13 ............................................................................................... 11

        B.  RFP No. 25 ............................................................................................... 12

        C.  RFP No. 28 ............................................................................................... 13

    III.  X appropriately answered Defendants' RFAs concerning authentication. ....................... 14

        A.  RFA No. 5 ................................................................................................. 15

        B.  RFA Nos. 9(A)-73(B) ............................................................................... 16

    IV.  Defendants' discovery requests about X's other advertisers are overbroad. ................... 17

        A.  The evidence Defendants seek in RFP Nos. 7, 17, and 33 and Interrogatory No. 8 is not relevant or proportional ..................................................................... 17

        B.  RFP No. 9 .................................................................................................. 20

Conclusion and Prayer .................................................................................................... 21

Certificate of Service ...................................................................................................... 23

# TABLE OF AUTHORITIES

**CASES**

*Adobe Sys. Inc. v. Christenson*,
  No. 2:10-CV-00422-LRH, 2011 WL 540278 (D. Nev. Feb. 7, 2011) ...................................... 8

*Burns v. Thiokol Chem. Corp.*,
  483 F.2d 300 (5th Cir. 1973) ........................................................................................... 17

*Cmedia, LLC v. LifeKey Healthcare, LLC*,
  216 F.R.D. 387 (N.D. Tex. 2003) ..................................................................................... 10

*COC Servs., Ltd. v. CompUSA, Inc.*,
  150 S.W.3d 654 (Tex. App.—Dallas 2004, pet. denied) ....................................................... 21

*Crosby v. La. Health Serv. & Indem. Co.*,
  647 F.3d 258 (5th Cir. 2011) ............................................................................................. 5

*Deutsche Bank Nat'l Trust v. Pink*,
  No. 7:18-CV-20-O-BP, 2019 WL 399533 (N.D. Tex. Jan. 31, 2019) ...................................... 4

*Devaney v. Continental Am. Ins. Co.*,
  989 F.2d 1154 (11th Cir. 1993) ........................................................................................ 16

*EEOC v. Exxon Mobil Corp.*,
  No. 23-159-SDD-RLB, 2024 WL 4249229 (M.D. La. Sep. 11, 2024) ...................................... 5

*Johnson v. Baylor Univ.*,
  188 S.W.3d 296 (Tex. App.—Waco 2006, pet. denied) ......................................................... 21

*SEC. v. Kiselak Capital Grp., LLC*,
  No. 4:09-cv-256-A, 2012 WL 369450 (N.D. Tex. Feb. 3, 2012) ........................................... 16

*State ex rel. Kander v. Green*,
  462 S.W.3d 844 (Mo. Ct. App. 2015) .................................................................................. 7

*Teel v. Deloitte & Touche LLP*,
  No. 3:15-CV-2593-G, 2015 WL 9478187 (N.D. Tex. Dec. 29, 2015) .................................... 11

*United States v. Bansal*,
  663 F.3d 634 (Fed. Cir. 2011) .......................................................................................... 15

*Westfall v. Luna*,
  No. 4:15-CV-874-O, 2019 WL 13441761 (N.D. Tex. Aug. 30, 2019) ..................................... 4

*X v. World Fed. of Advertisers*,
  No. 7:24-cv-00114-O (N.D. Tex.) ..................................................................................... 20

## RULES

Fed. R. Civ. P. 26(b)(1)..................................................................................................... 10

Fed. R. Civ. P. 26(b)(2)(C)(i) ............................................................................................. 4

Fed. R. Civ. P. 37(a) .......................................................................................................... 4

Fed. R. Civ. P. 37(a)(5)(A)(ii) .......................................................................................... 15

Fed. R. Evid. 901 .............................................................................................................. 15

## INTRODUCTION

For months, Defendants Media Matters for America, Angelo Carusone, and Eric Hananoki have been demanding X's compliance with unreasonable discovery requests while ignoring their own obligations under the Federal Rules. X has agreed to produce, and is producing, discovery on the parties' claims and defenses—on Defendants and the dissemination of their tortious articles; on the veracity (or lack thereof) and aftermath of those articles; on brand protections available on the X platform; and more. X has made a fulsome production already totaling tens of thousands of documents, many of which are highly relevant or commercially sensitive. Many thousands of documents more are forthcoming. Put simply, X has taken its discovery commitments seriously, even as Defendants evade and defer theirs—to the point of defying court orders.

But even in discovery there is a limit. For example, some of Defendants' requests seek to elicit sensitive and irrelevant details about X's owner, non-party Elon Musk, on the grounds that X has put Musk's entire "worldview" in dispute. Mot. at 8. Not so: because X is claiming defamation of X—*not* Musk—only Musk's public remarks and beliefs could have any possible bearing on advertisers' actions. Other requests are equally untethered to the real issues in the case or exceed the scope of permissible discovery and impose exorbitant costs on X to collect, review, and produce documents. At bottom, Defendants' document demands read like a muckraker's wish list—small wonder, given their business. But this is discovery in civil litigation that their own conduct precipitated. Defendants are not entitled to a "scoop," just information related to the parties' claims and defenses. Their motion should be denied.

## BACKGROUND

In November 2023, Media Matters falsely claimed that it had uncovered antisemitic and hateful content organically being paired with advertisers' posts on X's platform. Am. Compl. (ECF No. 37). Media Matters published the first defamatory article on November 16, with an additional

article appearing the following day. *Id.* ¶¶ 3, 46. Carusone, Media Matters' president, further amplified his outlet's false claims by appearing on national television to personally repeat and reiterate the disparaging reporting that Media Matters had falsely and maliciously manufactured and claiming this was the typical X user experience. *Id.* ¶ 17. Motivated in part by Defendants' personal animosity towards X's new owner Elon Musk, the November articles were the culmination of a years-long campaign by Media Matters to prevent Musk from taking over X and then, once those efforts failed, to destroy X's commercial relationships so that Musk's purchase of X would end up a pyrrhic victory. *Id.* ¶ 46.

Defendants' tortious scheme worked. In response to the articles, numerous advertisers paused or reduced advertising on X or left the X platform, both domestically and internationally, because they incorrectly believed Defendants' false and misleading reporting. *Id.* ¶¶ 61-64. Major advertisers, including IBM and Intel, emailed X through their representatives to state that they had "paused all X activity due to the below article" referring to Defendants' November 16 Article. Pl's App'x at 22-28. In response to this tortious conduct, X sued Defendants to restore the damage to X's bottom line, stop Media Matters from disseminating further lies about X, and correct the public misperceptions caused by the articles. Am. Compl. ¶ 65-88.

Defendants' actions affected many of X's advertisers. After a factual investigation, however, X has, to date, focused on six specific advertisers and the fracture of their business relationships with X. Defs.' App'x at 072. These were Apple, AT&T, ESPN, IBM, Intel, and Siemens. *Id.* X estimates that damages from these advertisers alone exceed $100,000,000. *Id.* 418.

Defendants served their first set of discovery requests in May 2024. Defs.' App'x at 010, 023, 032. Their most recent set of discovery was served on October 23, 2024. All told, Defendants have served 63 requests for production, 13 interrogatories, and 126 requests for admission. Defs.'

App'x at 003-033, 076-182, 367-389.

X fully responded to Defendants' discovery requests in accordance with the Federal Rules of Civil Procedure. Defs.' App'x at 034-075, 183-366, 390-413. For each request, X carefully evaluated the request, objected where appropriate, and provided a response that detailed exactly what documents it intended to search for and produce. Each time, X worked in good faith not to simply object or deny responses to Defendants' overly broad and unduly burdensome requests, but to conduct a reasonable balancing test, identifying which parts of each request sought relevant information proportional to the needs of the case and promising to search for and produce those identified documents.

Following its detailed responses, X has diligently engaged in document review and production. Far from Defendants' attention-seeking assertion that X has been "jamming the wheels of discovery and sabotaging its truth-seeking function," Mot. at 1, X has worked apace, far exceeding Defendants' own production efforts. *See* Correspondence from C. Hilton to A. Khanna dated September 6, 2024 (Defs.' App'x at 456-57) (observing that Defendants had produced less than 31 documents per day in the 213 days since X's requests had issued, despite claiming to have dozens of attorneys reviewing documents). X has collected documents from over 70 custodians (compared with Defendants' 18); its team of 20 reviewers have worked over 2,500 hours to produce 33,802 documents spanning 130,757 pages (compared to Defendants' 14,942 documents). *See* Pl's App'x. at 16-18, 20, 34. X is now producing documents on an approximate bi-weekly basis and plans to make another multi-thousand-document production on or around November 1.

The scope of X's production is similarly broad. X has agreed to provide virtually all non-privileged documents concerning the Defendants, their tortious articles, X's investigation into the tortious articles and Defendants' manipulation of the X platform, and the six departed advertisers

3

in its possession, custody, and control. Defs.' App'x at 467, 469, 471. X is also producing documents concerning advertiser protections on the platform (including extensive communications with numerous advertisers on this topic) and highly sensitive revenue data. *Id.* at 50-52, 58.

X has likewise taken its conferral obligations seriously. In response to Defendants' questions and concerns that they raised regarding X's responses, X amended certain of its responses and provided Defendants with four detailed letters explaining what objections it was standing on and why certain information sought by Defendants was not relevant or proportional. All told, these detailed letters spanned 24 single-spaced pages. Defs.' App'x at 455-60; 466-84; 490-92.

Defendants then filed their motion without an in-person or telephonic conference to discuss the issues that they have raised. Pl's. App'x at 4-14.

## LEGAL STANDARD

Federal Rule of Civil Procedure 37(a) governs motions to compel documents and interrogatory responses. *Westfall v. Luna*, No. 4:15-CV-874-O, 2019 WL 13441761, at *1 (N.D. Tex. Aug. 30, 2019). Discovery extends only to nonprivileged materials that are relevant and proportional to the needs of the case, considering the burden or expense of production. *Id.* It is the Court's role, upon a showing of good cause, to protect discovery recipients against "undue burden or expense." FED. R. CIV. P. 26(b)(2)(C)(i). Indeed, the Court "must[] limit proposed discovery that it determines is not proportional." *Deutsche Bank Nat'l Trust v. Pink*, No. 7:18-CV-20-O-BP, 2019 WL 399533, at *3 (N.D. Tex. Jan. 31, 2019). Proportionality and burden are measured by such factors as "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the

proposed discovery outweighs its likely benefit." *Id.* X, as the party resisting discovery, has "submit[ed] affidavits . . . revealing the nature of the burden." *Id.* at *2 (granting motion to compel because the resisting party failed to submit any evidence at all).

When a party resisting discovery comes forward with evidence showing undue burden and disproportionality, the Court may modify discovery requests or otherwise limit discovery to alleviate that burden. *See, e.g.*, *EEOC v. Exxon Mobil Corp.*, No. 23-159-SDD-RLB, 2024 WL 4249229, at *9-11 (M.D. La. Sep. 11, 2024) (designated for publication) (limiting geographic scope of discovery). As in all discovery matters, limiting discovery is within the discretion of the district court, and only the application of an erroneous statement of law resulting in prejudice to the substantial rights of a party will be considered an error. *Crosby v. La. Health Serv. & Indem. Co.*, 647 F.3d 258, 261 (5th Cir. 2011).

## ARGUMENT AND AUTHORITIES

The claims X is pursuing in this case primarily concern false statements in two Media Matters articles. The articles claimed that "*X has been placing ads* for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content," as though the juxtaposition were commonplace or natural on the platform. Am. Compl. ¶ 46. As X's investigation revealed and as discovery in this case has confirmed, the pairings were engineered by Defendants via a deliberate override of X's advertiser protections. Ultimately, the case boils down to this: (1) whether Defendants' statements concerning X were false—and if so, whether Defendants acted with actual malice; and (2) whether the advertisers at issue cut ties with X due to those statements—and if so, the extent of the losses. X has produced thousands of pages of documents that bear on these issues: the articles and their aftermath, brand protections available to X advertisers (a quality usually described as "brand safety"), detailed revenue data showing losses from the specific advertisers, and virtually every document and communication concerning the advertisers for which X is claiming damage. The

additional information Defendants seek is immaterial to the claims and defenses at issue here, and disproportionate to the needs of the case.

I.      **Elon Musk's subjective views are irrelevant to this litigation.**

Elon Musk is not a party to the litigation. And X is not suing over statements about Musk. To the extent Defendants insist that the amended complaint must be read otherwise, X again disclaims such allegations. X's causes of action are based on Defendants' false statements about the ad pairings they contrived, as well as the objective adequacy of X's brand safety controls more generally.

Because X's claims are based on defamation of X, not Musk, and interference with X's business, probing into Musk's behaviors or beliefs is inappropriate.  X agrees that Musk is a document custodian, and like other custodians, his documents are being collected, reviewed, and produced. But the intrusive discovery Defendants seek to compel is just more Media Matters harassment of Musk under the auspices of federal litigation.

Defendants' motion sows confusion on this very point. Defendants seize on allegations from the amended complaint that supposedly show Musk's centrality to the litigation, such as the fact that "Media Matters publicly represents that '[n]o advertiser is safe while Elon Musk controls X,'" and that Carusone stated that Musk "'doesn't really see a problem or at least seemingly, with a lot of this content because it's also a reflection of his own worldview.'" Mot. at 6 (citing Am. Compl. ¶¶ 6, 17). Although X considers these statements evidence of Defendants' actual malice, X's claims are based on Defendants' disparagement of *X's brand safety controls*, not on whether Defendants have defamed Musk or otherwise accurately represented Musk's opinions or "worldview." Defendants later return to the same tack, stressing that "[d]iscovery is the proper mechanism to substantiate whether Musk has, in fact, associated himself with hateful content." Mot. at 9. But again, X's claims are based on Defendants' disparagement of the X platform only,

not on what Musk has or has not "associated himself with." Defendants' distaste for Musk and his perceived beliefs is relevant only to the question of why Media Matters would go to the lengths of dishonesty that it did just to alienate X's advertisers. What matters in this litigation is not the content or truth of Musk's "worldview" (Mot. at 7), but whether Defendants' condemnation of that worldview impelled them to strike at X's advertising contracts to impose financial retribution.

### A.    RFP No. 26 and Interrogatory No. 6

Turning to Defendants' specific requests, RFP No. 26 asks for documents and communications related to Elon Musk's activity on the X platform. Defs.' App'x at 022. X agrees that Musk's public posts are discoverable. But this has never been Defendants' focus. What Defendants steadfastly insist on receiving, in their communications with X as well as in their motion, is production of any and all *internal* communications at X about Musk's posts. This information is clearly irrelevant. Internal commentary on Musk's posts bears neither on an advertiser's motivation to leave the platform, nor on X's available brand safety measures, nor on Defendants' perception of Musk. *Cf. State ex rel. Kander v. Green*, 462 S.W.3d 844, 849-52 (Mo. Ct. App. 2015) (concluding that discovery into subjective intent would "be a fishing expedition into [a responding party's] political thoughts and beliefs" when liability was based on objective measures).

Request No. 26 is even more inappropriate given X's production and the realities of discovery. X is already producing all communications with the advertisers at issue in the litigation. Those documents will include any concerns they shared with X about Musk's posts, if any exist. So Defendants will have at their disposal all documents that show each relevant advertiser's motivation and reasoning for its marketing decisions on the platform. What is more, inquiries into Musk's posts are easily addressed in depositions. In comparison, finding search terms and reviewing documents responsive to the request would be impracticable, calling for a company-

wide search of all references to Musk's posts, at a minimum—an obviously Herculean effort, and one that would not produce an iota of relevant admissible evidence bearing on a party's claims or defenses.

Defendants also seek through RFP No. 26 all accounts Musk controls, accesses, or uses to engage in activity. Defs.' App'x at 022. Again, X acknowledges that Musk's public statements are discoverable, but unless a statement is made in public and attributed to him, it could not possibly bear on a claim or defense in this litigation (*i.e.*, alternative theories of causation that Defendants may attempt to establish). Musk's public posts are often widely disseminated, reported, and evaluated. But Musk's private actions on the Platform are not attributed to him, and could not affect an advertiser's decisionmaking. The basis for this request suffers from the same misapprehension as Defendants' other Musk-centered requests: that Musk's inner, privately held beliefs somehow bear on this litigation. They don't.

**B.    RFA Nos. 82 and 83**

Defendants' criticisms of X's responses to both RFA Nos. 82 and 83 are unfounded.[1] *See* Mot. at 10-12. RFA No. 82 seeks an admission that a deposition transcript in a case to which X is not a party is true and correct. But Defendants did not produce a document to authenticate, instead including a hyperlink to the response. Defs.' App'x at 371. X has not authenticated the document because it is outside of its control. *See* Fed. R. Civ. P. 36(a)(4) (allowing responding parties to "state in detail why the answering party cannot truthfully admit or deny" an issue); *Adobe Sys. Inc. v. Christenson*, No. 2:10-CV-00422-LRH, 2011 WL 540278, at *9 (D. Nev. Feb. 7, 2011)

---

[1] Throughout their motion, Defendants reference objections X has lodged in addition to those discussed above. *See, e.g.*, Mot. at 10 (discussing X's objection that the request calls for a legal conclusion). To the extent that X does not address an objection in this response, X does not waive the objection but confirms that it is not withholding information on the basis of the objection.

(explaining that because litigants "cannot use Rule 36 to shift the burden of authenticating third party documents to the opposing party" they must present "proof of authenticity of the website information . . . in order to obligate the responding party to admit or deny the authenticity of the document or the information contained therein"). Defendants chide X for "playing coy" about whether the hyperlinked transcript differed from publicly available versions, Mot. at 11, but this accusation ignores the reality that (1) X is not a party to the case; and (2) an internet document can be modified at any time. The possibility of modification is especially true here, where the website containing the response, scribd.com, is an unvetted crowdsourced document repository with no guarantees of stability or consistency.[2] In accordance with discovery guidelines, X answered that Musk did give the deposition in question and that the transcript for that deposition is public—*i.e.*, not confidential or subject to a court order preventing its disclosure.

Defendants' complaint regarding X's response to RFA No. 83 (asking for confirmation of something Musk purportedly testified to in that deposition) is even worse, as X had committed to amending its response to Defendants in correspondence dated October 9, 2023. *See* Mot. at 12; Defs.' App'x at 483. X explained that it intended to amend its response as follows:

> **AMENDED RESPONSE:** Admitted that Musk testified in a deposition on March
> 27, 2024 in connection with the case *Brody v. Musk*, Case No. D-1-GN-23-006883
> (Travis Co. Dist. Ct.). The remainder of the request is denied.

*Id.* At any point before filing its motion, Defendants could have sought clarity on the basis for X's statement "the remainder of the request is denied." If they had done so, X would have explained

---

[2] *See* What is Scribd?, *available at* https://www.scribd.com/what-is-scribd (last accessed October 23, 2024).

that the alleged quotation from the deposition is incorrectly reproduced in Defendants' discovery request and is specifically denied.

* * *

In short, although X has collected and produced documents attributable to Musk, he is not a central figure in this litigation in the way that Defendants have claimed. The Court should deny their requests for discovery into his subjective mental state and into documents that have no bearing on the parties' claims and defenses.

## II.    X's objections to Defendants' content moderation requests Are reasonable.

Defendants have served numerous requests regarding X's content moderation policies. For each, X closely evaluated each request, made objections where applicable, and provided specific responses that conduct the proportionality test required by Rule 26 and identify what responsive documents X would search for and produce. For example, in response to Request for Production No. 3, X has promised (and has largely completed) production of (1) all content moderation policies in effect on the platform; (2) all prior versions of X's content moderation rules from 2021 to present; and (3) all non-privileged communication related to content moderation on the platform that reference the Articles or the "Disputed Content" referenced in the Articles. Defs.' App'x at 046-48; 468. This properly adheres to the balance required by Rule 26 allowing for discovery into all relevant documents and communications without imposing an undue burden on X. *See* Fed. R. Civ. P. 26(b)(1); *Cmedia, LLC v. LifeKey Healthcare*, LLC, 216 F.R.D. 387, 389 (N.D. Tex. 2003) ("The Court must balance the need for discovery by the requesting party and the relevance of the discovery to the case against the harm, prejudice, or burden to the other party.").

By contrast, the requests that Defendants complain about in their motion—RFPs 13, 25, and 28, further addressed below—are overly broad and seek irrelevant information that does not

10

concern the content moderation tools that are presently in effect on the platform and otherwise are not proportional to the needs of the case.

In arguing for the relevance of their far-reaching requests, Defendants once again attempt to rewrite X's amended complaint. Mot. at 12. Instead of conducting discovery into the defamatory statements at issue, which primarily concern Defendants' publication of manipulated ad-adjacency pairings, Defendants justify their requests by reference to their own statement regarding whether advertisers are "safe while Elon Musk controls X." Mot. at 12 (citing Am. Compl. ¶ 6). But X is not suing Defendants regarding their numerous sweeping statements of distaste towards Musk and his ownership of the platform. Defendants nevertheless argue that they need evidence on whether their opinion about Musk—which, again, is not the subject of a defamation claim—is well founded. *Id.* (citing *Teel v. Deloitte & Touche LLP*, No. 3:15-CV-2593-G, 2015 WL 9478187, at \*4 (N.D. Tex. Dec. 29, 2015)). But why? Defendants' purported rationale is unconnected to the claims and defenses of either party—what is at issue in this case is not whether X is a "safe" platform in some vague and generic sense. The relevant questions are more specifically whether Defendants manipulated ad-adjacency pairings and made related statements that falsely represented X's advertising placement controls, and Defendants' state of mind in doing so. In any event, this lone statement cannot justify the expansive discovery requested by Defendants in their Requests for Production Nos. 13, 25, and 28.

## A.    RFP No. 13

Request for Production No. 13, seeking "[a]ll documents and communications regarding payments made to X users related to X's revenue sharing programs," is unmoored from the parties' claims and defenses. Defs.' App'x at 020, 470. Defendants appear to be arguing that the request is relevant because it affects whether the Platform is "safe"—again, in a vague and generic sense. Mot. at 12-13. As an initial matter, as discussed above, this case is not about whether X is "safe"

11

in some generic sense, and so their argument fails to establish the relevance of their request.  In any event, however, Defendants' argument does not follow even on its own terms—whether large accounts are paid for the engagement with their content, and how much, does not make the Platform more or less "safe," which is a function of the content moderation policies and related communications that X has already committed to producing.

Defendants' request also fails because it is disproportional. Defendants seek the production of *every* email communication concerning *every* payment made to *any* X user who participates in the Creator Ads Revenue Sharing program. X has tens of thousands of users who participate in this program and these participants are paid every two weeks.[3] Pl.'s App'x at 38. None of these documents produced by these users and payments are relevant to the litigation. Even if Defendants were concerned about a specific user or participant in the Creator Ads Revenue Sharing programs, and Defendants could show that a specific participant was relevant—and they have not attempted to do so—*all* documents and communications related to *all* participants far exceeds any form of proportionality under Rule 26.

### B.      RFP No. 25

Defendants' Request for Production No. 25 seeks "[a]ll documents and communications related to X suspending or terminating user accounts on the Platform" from April 2021 to present. Defs.' App'x. at 022. Even after conferring on the unreasonableness of this demand, *see* Defs.' App'x at 440, 472, Defendants did nothing to limit this facially overbroad request to items relevant or proportional to the needs of the case. Of course, X has hundreds of millions of users, *see* Am. Compl. ¶ 15, almost none of which are relevant here, and Defendants make no attempt to narrow

---

[3] *See* X Revenue Sharing, *available at* https://help.x.com/en/using-x/creator-revenue-sharing (last accessed October 23, 2024).

their incredibly broad request. There is no limitation to accounts referenced in Defendants' articles, no limitation to accounts over a certain number of followers or posts, and no limitation to accounts that were terminated for hateful conduct versus any other policy violation. Indeed, despite Defendants' insistence that such documents are required to prove the existence of reinstated extremist accounts (Mot. at 12-13), which is in any event not relevant to the issues in this case, the request is not tailored to that need.

Faced with this overbroad request, X agreed to produce summary analytics showing the number of accounts suspended on X over the relevant time period. Defs.' App'x at 63. The number of suspended accounts totaled 800,387,907. Pl's App'x at 30. The analytics provided show the average number of users suspended each month, as well as the number of accounts suspended on each individual day during the time period. While X does not concede that the number of suspended accounts on the X platform in a given time period is relevant, Defendants have been provided the data.

Unsatisfied, Defendants demand "all communications regarding suspended accounts." They are now aware that suspended accounts exceed 800,000,000. If even just two documents are generated concerning a single account's suspension, Defendants would impose upon X a production burden of over one and a half billion documents, none of which have any arguable relevance to this case. This is not proportional to the needs of the litigation.

**C.    RFP No. 28**

Defendants' Request for Production No. 28 likewise seeks information that is not relevant to claims or defenses in the litigation, calling for "[a]ll documents and communications related to the termination or suspension of any current or former employees of X for reasons related to content moderation or Disputed Content on X." Defs.' App'x at 65. Decisions specific to any particular employee do not support or refute any claim or defense, and Defendants barely try to

show otherwise. *See* Mot. at 12-13. After all, the tortious articles do not defame X by referring to former employees involved in content moderation.

Even if some aspect of the termination of these X employees were relevant, Defendants' Request is overbroad and disproportionate. Request No. 28 demands *all* documents concerning employment decisions "for reasons related to content moderation or Disputed Content on X." Defs.' App'x at 023. Such a request encompasses every document about every employment decision about any employee or contractor involved in content moderation over a period of years and during a change in ownership—and may even include other employees whose termination or suspension concerned content moderation in some way. Such a request would impose upon X an unreasonably large additional collection, review, and production of documents. The request is even more unreasonable given that X has already provided less burdensome discovery regarding former employees and contractors who previously engaged in content moderation. For example, X has admitted in response to RFA 6 that "the number of content moderators contracted by X for content moderation activities fluctuates and that on May 31, 2023, X contracted with approximately 2,305 global content moderators, which is 12% lower than the 2,613 content moderators with which X contracted on October 27, 2022." Defs.' App'x at 39. Further, responding to Defendants' Request for Production No. 28 as written would require the production of documents concerning the employment decisions of hundreds of former employees or contractors who left X long before the defamatory articles were written, and which would add nothing to the litigation but additional cost and delay.

## III. X appropriately answered Defendants' RFAs concerning authentication.

Defendants take issue with X's responses to certain RFAs requesting X admit that various adjacencies of advertisements and other posts on the platform are "authentic." Mot. at 15. Their criticisms are unfounded, for two reasons. First, as to the adjacencies portrayed in Media Matters'

articles, X cannot admit the authenticity of images on a website over which it has no control (though X admits the ad pairings occurred as a result of Defendants' manipulation of the platform). Second, as to other adjacencies unrelated to the articles, they are not relevant and it is technically unfeasible to verify adjacencies on the platform weeks or months after they have appeared.

### A.    RFA No. 5

Defendants' RFA No. 5 requests that X "[a]dmit that the images of advertisements next to user content reproduced in the November 16, 2023 Article and the November 17, 2023 Article are authentic reproductions of pairings that occurred on the X Platform, as opposed to Photoshopped or otherwise digitally altered images." Defs.' App'x at 038. X admits that the ad adjacencies described in the articles occurred as a result of Defendants' manipulation of the platform, and if Defendants wish to revise or reissue their Request for Admission No. 5 to call for an admission of the ad pairing's *existence*, X would admit that the adjacencies occurred, as X has already done elsewhere. But Defendants instead ask X to vouch for the authenticity of images in their articles as reproduced on the Media Matters website. Mot. at 15-17.

X is unable to admit that the images are "authentic" because they may have been digitally manipulated; Defendants or others with personal knowledge about the publishing of the articles on the website are far better suited to authenticate the images. *See* Fed. R. Evid. 901, *United States v. Bansal*, 663 F.3d 634, 667-68 (Fed. Cir. 2011) (concluding that testimony of a witness with personal knowledge was sufficient to authenticate screenshot images of a website). X's response was not a product of intransigence but of the realities of modern-day media manipulation. Forcing X's admission here because of Defendants' inarticulate drafting of its discovery requests—much less an award of attorneys' fees—is therefore unwarranted. *See* Fed. R. Civ. P. 37(a)(5)(A)(ii) (barring an award of attorneys' fees when the opposing party's nondisclosure was substantially justified); *SEC. v. Kiselak Capital Grp., LLC*, No. 4:09-cv-256-A, 2012 WL 369450, at *5 (N.D.

Tex. Feb. 3, 2012) ("A party's discovery conduct is found to be 'substantially justified' under Rule 37 if it is a response to a 'genuine dispute, or if reasonable people could differ as to the appropriateness of the contested action.'") (quoting *Devaney v. Continental Am. Ins. Co*., 989 F.2d 1154, 1163 (11th Cir. 1993)).

B.    **RFA Nos. 9(A)-73(B)**

Defendants reveal a similar misunderstanding of modern technology in their frustration with X's responses to RFA Nos. 9(A)-73(B). *See* Mot. at 17-20. These 128 requests for admission referred to an image and asked X to admit that the images (1) appeared on the X platform on the date reflected in the image and (2) that X's algorithm "did not prevent" the advertisement shown from appearing next to the content shown. Defs.' App'x at 82-164. As X noted its responses and objections and maintains here, the main obstacle for X to provide this information is that "it would require a significant investment in time and engineering resources to verify that any given post was shown to any particular user." Defs.' App'x at 189.

Defendants contend that since X engineers were able to determine whether the Media Matters ad adjacencies actually happened, it must be a "simple process." Mot. at 19. Hardly. As X's engineers have attested to, the process of ascertaining the authenticity of these ad pairings is anything but "simple." Pl's. App'x at 40-44.

Such a burden is especially unacceptable where, as here, the admissions are of limited utility to the parties' claims and defenses. Assuming that the 64 images referenced in the RFAs actually appeared on X, that still would not disprove that such events were "extraordinarily rare," as Defendants claim. Mot. at 18.  X presents billions of advertisement impressions per day. Pl's. App'x at 41. If 64 of several billion impressions pair inappropriate material on the same day, that represents a microscopic fraction of the advertisements served each day.  And the images referenced in the RFAs are not even from the same day, but are spread across many different

16

days. So even if these images *did* appear on the platform, their occurrence—as well as their relevance—is close to mathematical zero.

## IV.    Defendants' discovery requests about X's other advertisers are overbroad.

The purpose of discovery is to "allow the parties to develop fully and crystalize concise factual issues for trial." *Burns v. Thiokol Chem. Corp.*, 483 F.2d 300, 304 (5th Cir. 1973). Here, after conducting its investigation, X has narrowed its claims to focus on a small number of specific advertisers.[4] These have been fully disclosed to Defendants. *See* Defs. App'x at 71-72.

In their motion, Defendants fault X for reasonably limiting discovery to just those six advertisers. Defendants instead seek to burden X with the production of information regarding all of X's advertisers for all advertising campaigns—whether big, medium, or small. X currently has hundreds of thousands of advertisers, and Defendants' request targets all of them. Pl's App'x at 37. Production of irrelevant documents responsive to each and every advertiser and ad campaign would only serve to increase the cost and time associated with this litigation.

### A.    The evidence Defendants seek in RFP Nos. 7, 17, and 33 and Interrogatory No. 8 is not relevant or proportional.

Contrary to Defendants' assertions (Mot. at 21), whether and why any of X's hundreds of thousands of other advertisers discontinued relationships with X does not bear on why the six advertisers in question left the platform. In their RFP Nos. 7 and 17, Defendants seek production of all documents and communications regarding any advertiser's decision to start, stop, or pause any advertising on X's platform. Defs.' App'x at 019-020, 021. They likewise request, in

---

[4] For avoidance of doubt, X does not mean to imply or assert that Defendants' tortious conduct did not negatively affect X's other advertisers, only that X does not presently seek damages that it suffered with respect to the other advertisers that were not disclosed to Defendants in response to Defendants' Interrogatory No. 4. X reserves the right to supplement its damages with losses arising from other advertisers, and if it does so, it will produce documents from such advertisers.

Interrogatory 8, that X log, for every advertiser, each time the advertiser ever paused or stopped advertising on the platform and why. *Id.* 182.[5] Each request is egregiously overbroad, given the hundreds of thousands of advertisers on X. *See generally* Pl's. App'x at 37, 40.

Even if Defendants' theory that the behavior of other advertisers would create relevant "circumstantial evidence" was correct (and it is not), Mot. at 21, it would not require the production of documents related to each and every advertiser on the platform. And more to the point, circumstantial evidence is unnecessary here. Contrary to Defendants' statements that X's "primary evidence of . . . purported causation" for the six advertisers at issue "is the 'timing' of the advertising pauses," Mot, at 20, there is ***direct*** evidence of causation linking Defendants' articles and the decisions by those advertisers to pause their X campaigns.

For example, the ad agency representative for IBM, Mica Ness of EightBar Collective, specifically stated that IBM had "paused all X activity due to the below article" referring to Defendants' November 16 Article:

---

[5] Defendants request the "advertiser's name, the date on which they terminated their advertising relationship with X, any stated reason for terminating their relationship and, if applicable, the date on which they resumed advertising on the Platform."



Pl's. App'x at 22. Similarly, an ad agency representative for Intel, Amy Siegel of Dentsu, stated that "given what has been published"—referring to Defendants' articles—Intel was "worried about being live and have paused for the time being."

Pl's. App'x at 25-28. Because X has narrowed its claims to the departure of a small number of specific advertisers, neither party needs to rely on X to produce documents which would

purportedly show "circumstantial evidence" of their torts. Instead, X can look to the direct evidence that X has already produced. Likewise, Defendants can seek direct evidence from the advertisers and agencies themselves.

In Request for Production No. 33, Defendants seek "[a]ll documents and communications reflecting any individuals or entities to whom" X blames for the loss of any advertiser on the platform. Defs.' App'x at 174. The arguments of irrelevance with respect to RFP Nos. 7 and 17 above apply with equal force here because only the specific advertiser losses that were precipitated by Defendants' actions are at issue in this litigation. But Request for Production No. 33 goes further. Left unaddressed by Defendants in their motion, this request reaches beyond this lawsuit and solicits discovery into other litigation brought by X against other defendants, including the Global Alliance for Responsible Media and others, and concerning different advertisers. *See X v. World Fed. of Advertisers*, No. 7:24-cv-00114-O (N.D. Tex.). While Defendants may want this information so that they can continue their defamatory campaign against X, documents and communications which would serve to support or refute the allegations in an entirely different lawsuit have no relevance here.

## B.    RFP No. 9

Defendants' other requests seeking information related to all advertisers, instead of the limited subset that X has placed at issue in this litigation, suffer from similar problems. Request for Production No. 9 seeks "[a]ll documents or communications showing X's business revenue generated from advertisements on the Platform" over the relevant time period. Defs.' App'x at 020. X, however, is not seeking compensation for the decline in aggregate revenue, but instead for the specific harm caused by Defendants' tortious conduct. Taking for argument's sake the idea that revenue may have dropped in the same time period for unrelated reasons, X is still able to seek compensation for the full reduction in revenue that was caused by Defendants. *See COC Servs.,*

*Ltd. v. CompUSA, Inc.*, 150 S.W.3d 654, 679 (Tex. App.—Dallas 2004, pet. denied) (describing but-for standard of causation for business disparagement); *Johnson v. Baylor Univ.*, 188 S.W.3d 296, 304 (Tex. App.—Waco 2006, pet. denied) (same). As Defendants note, X has already agreed to produce monthly advertising spending for each of the six advertisers at issue (Mot. at 22), and now has also agreed to provide a *weekly* breakdown of that revenue, which is more than sufficient.

## CONCLUSION AND PRAYER

The Court should deny Defendants' Motion to Compel.

Dated: October 25, 2024                                      Respectfully submitted.

                                                             */s/ Christopher D. Hilton*
                                                             Judd E. Stone II
                                                               Texas Bar No. 24076720
                                                             Christopher D. Hilton
                                                               Texas Bar No. 24087727
                                                             Ari Cuenin
                                                               Texas Bar No. 24078385
                                                             Michael R. Abrams
                                                               Texas Bar No. 24087072
                                                             Alex M. Dvorscak
                                                               Texas Bar No. 24120461
                                                             Cody C. Coll
                                                               Texas Bar No. 24116214
                                                             **STONE HILTON PLLC**
                                                             600 Congress Ave.
                                                             Suite 2350
                                                             Austin, TX 78701
                                                             Telephone: (737) 465-7248
                                                             judd@stonehilton.com
                                                             chris@stonehilton.com
                                                             ari@stonehilton.com
                                                             michael@stonehilton.com
                                                             alex@stonehilton.com
                                                             cody@stonehilton.com

John C. Sullivan
  Texas Bar No. 24083920
**S|L Law PLLC**
610 Uptown Boulevard, Suite 2000
Cedar Hill, TX 75104
Telephone: (469) 523-1351
Facsimile: (469) 613-0891
john.sullivan@the-sl-lawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that this document was served on all counsel for record on October 25, 2024, via the Court's CM/ECF system.

*/s/ Alexander M. Dvorscak*
Alexander M. Dvorscak