UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| X CORP.,<br>              Plaintiff,<br><br>   v.<br><br>MEDIA MATTERS FOR AMERICA, et al.,<br>              Defendants. | Civil Action No. 4:23-cv-01175-O |

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF MOTION TO COMPEL
DISCOVERY RESPONSES**

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................. 1

ARGUMENT .......................................................................................................................... 1

I.    Objections to discovery about Elon Musk should be overruled. ........................................ 1

    A.    The Court should overrule objections to RFP No. 26 and Interrogatory No. 6. ........... 2

    B.    The Court should compel amended responses to RFA Nos. 82 and 83. ...................... 4

II.    Objections to discovery about content moderation should be overruled. ............................ 5

    A.    X's objections to relevancy are improper. ..................................................................... 5

    B.    X's objections to burden are improper. ......................................................................... 6

III.    Objections to authenticating posts on the platform should be overruled. ........................... 7

IV.    Objections to discovery about advertisers that discontinued their relationship with X should be overruled. ........................................................................................................... 9

CONCLUSION ....................................................................................................................... 10

CERTIFICATE OF SERVICE ............................................................................................... 12

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Cranberg v. Consumers Union of U.S., Inc.*,
  756 F.2d 382 (5th Cir. 1985) ...................................................................................................1

*Dondi Props. Corp. v. Com. Sav. & Loan Ass'n*,
  121 F.R.D. 284 (N.D. Tex. 1988) .............................................................................................3

*House v. Giant of Md., LLC*,
  232 F.R.D. 257 (E.D. Va. 2005) ...............................................................................................4

*Janvey v. Alguire*,
  No. 3:09-CV-724-N-BQ, 2018 WL 11362638 (N.D. Tex. Oct. 17, 2018) ...............................6

*Samsung Elecs. Am., Inc. v. Yang Kun Chung*,
  321 F.R.D. 250 (N.D. Tex. 2017) .........................................................................................3, 6

*Thalheim v. Eberheim*,
  124 F.R.D. 34 (D. Conn. 1988) .................................................................................................8

**Other Authorities**

5th Cir. Pattern Jury Instr. Civ. 3.3 (2020) ......................................................................................9

Fed. R. Civ. P. 36(a) .......................................................................................................................4

Christopher Barrie, *Did the Musk takeover boost contentious actors on Twitter?*,
  Harv. Kennedy Sch. Misinformation Rev. (Aug. 29, 2023). ....................................................3

*Musk fires outsourced content moderators who track abuse on Twitter*, CBS News
  (Nov. 14, 2022) .........................................................................................................................3

Sheila Dang, *Elon Musk curses out advertisers who left X over antisemetic content*,
  Reuters (Nov. 30, 2023) ............................................................................................................3

**INTRODUCTION**

Over the course of two full months of conferrals, X was dismissive of its discovery obligations—it ignored the legal authorities laid out by Defendants in deficiency letter after deficiency letter, and it obstinately stood on objections wherever it perceived the requested evidence to be especially damaging to its claims. Only now—in its response to Defendants' motion to compel—does X concede simple facts that should never have been in dispute, "disclaim" some of its most spurious allegations, and appear willing to negotiate the scope of requests that it challenges. Still, however, X fails to budge from objections that are baseless, and, in many instances, contradicted by its own pleading, briefing, and other discovery responses. For the reasons that follow, the motion to compel should be granted.

**ARGUMENT**

**I.    Objections to discovery about Elon Musk should be overruled.**

X continues to play games about discovery. X now asserts that it "is not suing over statements about Musk." Pl.'s Resp. to Mot. at 6, ECF No. 121 ("Resp."). The operative complaint, however, alleges otherwise. *See, e.g.*, Am. Compl. ¶¶ 6, 17, ECF No. 37. And X's response brief has more hedges than an English garden. Immediately after X "disclaims" allegations about Defendants' Musk-related statements, for example, it returns to characterizing those statements as "evidence of Defendants' actual malice." Resp. at 6. Are these allegations disclaimed, or not? X cannot avoid discovery by obfuscating the contours of its claims. So long as these allegations remain in the operative complaint, Defendants are entitled to discovery that would tend to prove the truthful and factual basis for their statements. *Cf. Cranberg v. Consumers Union of U.S., Inc.*, 756 F.2d 382, 388 (5th Cir. 1985) ("[T]ruth is an absolute defense in defamation actions.").

In complaining that discovery is "just more Media Matters harassment of Musk under the auspices of federal litigation," Resp. at 6, X seems to forget who initiated this lawsuit. After

1

advertisers fled Musk's social media platform in light of his increasingly offensive remarks and apparent mismanagement, X Corp. lashed out *at Defendants* with a series of spurious claims memorialized in its amended complaint.[1] Specifically, X alleges as "false and malicious" Defendants' statements that "[n]o advertiser is safe while Elon Musk controls X," and that extremist content is seemingly "a reflection of [Musk's] own worldview." Am. Compl. ¶¶ 6, 17; *see also id.* ¶ 37. X explicitly incorporated these allegations into its business disparagement claim. *Id.* ¶ 73. And X has framed these allegations as core to its case at every stage.[2] In sum, X put the truth of Media Matters's statements about Musk directly at issue in federal litigation. And an important part of such litigation is discovery, where allegations are tested against evidence.

### A. The Court should overrule objections to RFP No. 26 and Interrogatory No. 6.

X does not dispute that Musk's posts and internal commentary about those posts are relevant to whether extremist content reflects his worldview. Nor can there be any dispute that communications related to Musk's activity on the platform, including his engagement with extremist content, is relevant to, for instance: X's attitude toward brand safety (for example, whether Musk told employees concerned about brand safety to "Go f--- yourself," as he did to

---

[1] X's response brief continues the invective, accusing Media Matters of "go[ing] to the lengths of dishonesty" due to a "distaste for Musk and his perceived beliefs." Resp. at 7. These repugnant smears require rebuttal, and Defendants can do so with evidence in X's possession.

[2] *See, e.g.*, Pl.'s Resp. to Mot. to Dismiss at 1, ECF No. 45 (summarizing allegations that "Media Matters echoed the false narrative that X's brand-safety measures could not be trusted and that advertising on X would never be safe with Mr. Musk as its owner"); *id.* at 2 (highlighting that Media Matters "asserted in numerous public statements that the X platform cannot be 'safe' while it is owned by Elon Musk"); Pl.'s Reply in Supp. of its Mot. to Compel at 10, ECF No. 64 (attempting to justify discovery related to non-party Media Matters employee on basis of employee's accusation that Musk endorsed antisemitic content and statement that "[n]o advertiser is safe while Elon Musk controls X"); Pl.'s Opp'n to Mot. to Certify Immediate Appeal at 1–2, ECF No. 110 (summarizing allegations that Media Matters asserted in public statements that the platform "cannot be 'safe' while it is owned by Elon Musk, disparaged Elon Musk in order to harm X by falsely associating him with hateful content").

2

advertisers[3]); X's operationalization of that attitude (whether engineers are expected to boost visibility of contentious actors favored by Musk[4]); and X's internal understanding of Musk's impact on advertisers (whether employees understood Musk's activity to cause advertisers to leave[5]). It would be especially damning if accounts spewing hateful content were evading brand safety controls because they were *Musk's own accounts* and thus subject to privileged treatment by his employees. Moreover, because a company acts through its principals and agents, a jury could reasonably impute Musk's beliefs—and actions consistent with those beliefs—to X.

Turning from its relevancy objection, X proceeds to argue that complying with RFP No. 26 would require a "Herculean effort," appearing to object based on burden. Resp. at 7–8. X failed to raise this objection in its amended responses, however, *see* Defs.' Appendix at 63–64, ECF No. 115 ("Defs.' App'x"), and so the objection is forfeited. *See Samsung Elecs. Am., Inc. v. Yang Kun Chung*, 321 F.R.D. 250, 283 (N.D. Tex. 2017) (Horan, M.J.). X similarly complains that "finding search terms" and conducting "a company-wide search" "would be impracticable," Resp. at 7–8, but these objections are also new and thus forfeited. In any event, if X had requested assistance with search terms over the multiple months of conferrals, Defendants would have been happy to provide them.[6] It never did so. And X has already been warned that it may not object on the basis

---

[3] Sheila Dang, *Elon Musk curses out advertisers who left X over antisemetic content*, Reuters (Nov. 30, 2023), https://www.reuters.com/technology/elon-musk-curses-out-advertisers-who-left-x-over-antisemitic-content-2023-11-29.

[4] Christopher Barrie, *Did the Musk takeover boost contentious actors on Twitter?*, Harv. Kennedy Sch. Misinformation Rev. (Aug. 29, 2023), https://misinforeview.hks.harvard.edu/article/did-the-musk-takeover-boost-contentious-actors-on-twitter.

[5] *See Musk fires outsourced content moderators who track abuse on Twitter*, CBS News (Nov. 14, 2022), www.cbsnews.com/news/elon-musk-twitter-layoffs-outsourced-content-moderators/.

[6] X appears to complain that the extensive conferrals preceding Defendants' motion were conducted in writing. *See* Resp. at 4. But this District expressly allows written conferrals, *see Dondi Props. Corp. v. Com. Sav. & Loan Ass'n*, 121 F.R.D. 284, 290 (N.D. Tex. 1988); X never requested an in-person conferral; and written conferrals have proven necessary to avoid the pitfalls of X's selective memory after telephonic conferrals.

that a request fails to identify a subset of custodians—its initial responses were strewn with this improper objection, requiring amended responses after Defendants explained the deficiency. *See* Defs.' App'x 428 (collecting cases). X knows the rules and is obligated to comply with them.

### B. The Court should compel amended responses to RFA Nos. 82 and 83.

RFAs are a simple proposition: The requesting party provides a statement relating to the case. Fed. R. Civ. P. 36(a)(1). The responding party then admits the statement, denies it, or explains that after a reasonable inquiry it remains unable to admit or deny. Fed. R. Civ. P. 36(a)(4). But X chose a different option not authorized by the rules—it responded with statements that have little to do with the requested admissions at all.

RFP No. 82 asks X to admit that a specified deposition transcript is true and correct. Defs.' App'x 393. X responded by "admit[ting]" that Musk gave a deposition on the identified date in the identified case, which is not what Defendants asked. *Id.* X further stated that "the transcript of the deposition is publicly available," which is also not what Defendants asked. *Id.* And then X "denied" the "remainder of the request." *Id.* Because X has not admitted any part of the request, it appears to be denying the entirety of the request on the basis that Defendants identified a copy of the transcript from a public source that may be different from the public source that X is aware of, turning the RFA into the juvenile game of "Battleship" that caselaw prohibits. *See House v. Giant of Md., LLC*, 232 F.R.D. 257, 262 (E.D. Va. 2005).

The full context further reveals the ridiculousness of X's tactic. Defendants previously asked X to produce transcripts of Musk's depositions, but X refused, *see* Defs.' App'x 401, requiring reference to public sources in RFAs about those transcripts. X may not now refuse to answer those RFAs on grounds that the public source "may be removed or changed," *id.* at 393—the entire purpose of the RFA is to confirm whether this public source has, in fact, been modified from the authentic copy in X's possession. Either the transcript that Defendants identified was

4

correct on the day that X reviewed it (requiring an admission), or it was not (warranting a denial).[7] X's refusal to answer as such is a discovery violation.[8]

Meanwhile, X's proposed amendment to its response to RFA No. 83 is no fix at all—it mirrors X's deficient response to RFA No. 82 by admitting facts other than those requested. *See* Resp. at 9. And X's retort that "Defendants could have sought clarity on the basis for X's statement 'the remainder of the request is denied,'" *id.*, is nothing short of shameless. Defendants' first deficiency letter, served on August 16, explained to X that it must "state in detail *why* it cannot truthfully admit or deny the remainder" of any request, Defs.' App'x 430–31 (emphasis added) (collecting cases); *see also id.* at 453, 487 (emphasizing this requirement in subsequent letters), and X steadfastly refused to do so until Defendants moved to compel.

## II. Objections to discovery about content moderation should be overruled.

### A. X's objections to relevancy are improper.

Once again, X's theory of its own claims stretches and constricts like an accordion. The amended complaint explicitly and repeatedly defends X's social media platform as a safe place for advertisers and alleges that every insinuation by Defendants to the contrary was defamatory. *See, e.g.*, Am Compl. ¶¶ 1, 4, 6, 13, 17, 33, 39, 42, 45–47, 69–70, 72–73, 75, 79. X's response brief echoes this precise framing: "X's causes of action are based on Defendants' false statements about the ad pairings they contrived, *as well as the objective adequacy of X's brand safety controls more generally*." Resp. at 6 (emphasis added). Whether X has shared advertiser revenue with accounts

---

[7] Notably, X had no problem admitting other Musk statements by citing directly to public transcripts. *See* Defs.' App'x 39–40. Moreover, X has admitted documents provided by hyperlinks outside its control by stating that said link is a true and correct copy "as of" the date of X's response. Defs.' Suppl. Appendix at 514–15.

[8] X's objection—again, found only in its brief, and thus forfeited—that it "is not a party to the case" for which the deposition was taken, Resp. at 9, is not a valid objection. X clearly has a copy of the transcript in its possession, as indicated by its amended response proofreading the transcript quotation in RFP No. 83. *See id.* at 10.

posting hateful content, reinstated accounts that were suspended for posting hateful content, or terminated employees for raising concerns about the proliferation of hateful content would plainly be relevant to corroborating criticisms of X's safety for advertising brands. *See* Defs.' App'x 20, 22–23. Besides its request that the Court construe its claims narrowly for purposes of defensive discovery (and only for these purposes), X does not meaningfully argue otherwise.[9]

Several pages later, however, X contends that its claims "primarily concern" the alleged falsity of purported subtext in Defendants' articles about the typical experiences of organic X users. *See* Resp. at 11. But X's claims are based on what it alleges in the amended complaint, not on whatever momentary spin is most advantageous for a particular discovery dispute. Defendants have a right to clear their names of *all* of X's frivolous accusations.

### B.     X's objections to burden are improper.

X's remaining objections to these RFPs on the basis of burden also fail. Notably, prior to this briefing X has never raised a burden objection to RFP No. 28, *see* Defs.' App'x 473, and so any such assertion is forfeited. *See Samsung Elecs. Am.*, 321 F.R.D. at 283. And in defense of its objections to RFP Nos. 13 and 25, X now provides affidavits reciting statistics about paid users and suspended accounts that have (until this briefing) never been shared with Defendants over months of conferrals. Pl.'s Appendix at 34–44, ECF No. 122 ("Pl.'s App'x"). This sandbagging similarly warrants a finding that the objections have been waived. *See Janvey v. Alguire*, No. 3:09-CV-724-N-BQ, 2018 WL 11362638, at *6 (N.D. Tex. Oct. 17, 2018). At the very least, in response to RFP No. 13, X should be compelled to produce all documents and communications regarding

---

[9] X does argue that its actions cannot be relevant if they were taken *before* the challenged articles were written, *see* Resp. at 14, which makes no sense. X has put in dispute the safety of X's platform during the whole of Musk's leadership, and the dismantling of content moderation controls before the articles were written are the *most* relevant to the quality of X's brand safety controls at the time Defendants published their findings.

payments to X users who have previously been suspended for violating X's hateful content policies. And in response to RFP No. 25, X should be compelled to produce (at the very least) all documents and communications related to X suspending or terminating accounts for violations of X's hateful content policies.

**III.    Objections to authenticating posts on the platform should be overruled.**

It took the threat of attorney's fees for X to finally admit that the advertisement and content pairings reported in Defendants' articles occurred on X's platform exactly as Defendants said they did. If X had admitted this simple fact when Defendants requested that it do so back in May, the considerable expense of unproductive conferrals and motions practice on this issue could have been avoided. X's admission in its response brief makes clear that it knew exactly what the request was seeking—whether "the ad pairings occurred" as reported in Defendants' articles, Resp. at 15; or, put another way, "an admission of the ad pairing's *existence*" on the platform as reported, *id.*; or, put another way, whether the ad pairings were authentic in the sense that they "occurred on the X Platform, as opposed to [being] Photoshopped or otherwise digitally altered images," Defs.' App'x 38 (RFA No. 5). These formulations all clearly mean the same thing, and so X has no basis to affirmatively articulate the first two while disputing the third.

Indeed, in correspondence with an advertising agency included in the appendix accompanying X's brief, the agency asked X to "help us make sense of" whether the pairings reported in Defendants' articles "[were] a threat or not," which X interpreted internally as a request to "validate the *authenticity* of the screenshots in the article." Pl.'s App'x 22 (emphasis added). X *did not* direct the agency to contact "Defendants or others with personal knowledge about the publishing of the articles on the website [who] are far better suited to authenticate the images." Resp. at 15. Just as X knew better than to draw such "disingenuous, hair-splitting distinctions"

7

with an important advertiser, it knew better than to do so in discovery. *Thalheim v. Eberheim*, 124 F.R.D. 34, 35 (D. Conn. 1988). Accordingly, an award of attorney's fees remains appropriate.

X's hair-splitting objections to the use of "authentic" in RFA No. 5 render its objections to RFA Nos. 9 through 73 all the more untenable. These RFAs adopt the very syntax that X purports to prefer, asking whether X's algorithm prevented advertisements from appearing next to hateful content, as illustrated, and whether that content "appeared on the X platform" as reflected in the screenshots. *See* Defs.' App'x 82–164. Under any reading, the information necessary to admit these requests is entirely within X's control. And the evidence is plainly relevant. Because there is no longer any dispute that the pairings Defendants reported did, in fact, occur on X's platform precisely as Defendants reported, X wagers its whole case on the claim that an "authentic user" would not have seen advertiser pairings like those that Defendants reported. *See, e.g.*, Am. Compl. ¶ 15. But a factfinder could reasonably conclude that these pairings are not as anomalous as X alleges if dozens and dozens of other users are witnessing the same breakdown in X's advertiser protections that X promised could not happen. Additionally, because the advertiser agency that X highlights in its brief emphasizes IBM's "zero tolerance policy," Pl.'s App'x 22, every additional example of the failure of X's brand safety efforts further corroborates the defense that advertisers would have left even if the articles at issue had not been published, negating the but-for standard of causation that X advocates, *see* Resp. at 20–21. X's subjective opinion of these posts' persuasive value, *see id.* at 16–17 (arguing that even if the 64 images "actually appeared on X" it "would not disprove" X's allegations), is not a basis for withholding information in discovery.

In sum, X does not get to make sweeping allegations, put Defendants through the extraordinary expense of litigation, and then respond that it does not have time to confirm whether its allegations were false. The existence of advertisement-and-hateful-content pairings for other X

8

users strikes at the core of X's claims, and, as the owner and operator of its social media platform, X is uniquely capable of confirming the existence of the identified pairings, much like it did in the speedy investigation of Defendants' articles after they were published. *See* Defs.' Br. in Supp. of Mot. at 17–20, ECF No. 114.

### IV.   Objections to discovery about advertisers that discontinued their relationship with X should be overruled.

When Defendants asked X to describe the basis for its belief that six identified advertisers left the platform because of Defendants' reporting, X emphasized that the "timing" of the advertising pause "demonstrates a link between Defendants' conduct and the advertisers' decisions." Defs.' App'x 72. On that inference, X seeks over $100 million in damages. *See* Resp. at 2. Surely Defendants have a right to pursue evidence that could support a contrary inference.

Yet X objects to providing evidence of other advertisers' decisions to leave X during the relevant time period, arguing that "circumstantial evidence is unnecessary here" because, X says, it has direct evidence of causation. *Id*. at 18. First, however, X cites no basis for prejudging the relative probative value of competing evidence in resolving discovery disputes. *Cf.* 5th Cir. Pattern Jury Instr. Civ. 3.3 (2020) ("[T]he law makes no distinction between direct and circumstantial evidence[.]"). Second, none of X's "direct evidence" is cited in the interrogatory response that it served on June 19 and has yet to amend. Third, the two emails that X spotlights are from agencies purporting to speak for advertisers who purportedly identified Defendants as a reason to pause advertising—X's own "direct evidence" still requires multiple inferences that it will have to prove and Defendants are entitled to disprove. And fourth, the best evidence that X can point to relates to only two of the six advertisers that X has put at issue. *See* Resp. at 18–19 (highlighting communications attributed to IBM and Intel). That leaves four other advertisers whose departure X appears to attribute primarily—or even solely—to the timing of their pause. Decisions by peer

9

advertisers during this period will therefore be critical to inform the relevant factfinding.

X objects to RFP No. 33, which seeks documents and communications reflecting other entities whom X has blamed for the loss of advertisers, suggesting that X's litigation against other entities it blames for the loss of advertisers in the relevant time period is somehow beyond the scope of discovery. *See id.* at 20. But X's claims against other entities are precisely what makes the requested information relevant—Defendants may investigate whether X is attempting to double- or triple-dip on damages, and they may request the production of information in X's possession that would tend to shift any alleged liability from MMFA to other actors. X cannot identify any legal authority for the notion that evidence relevant to discovery in one case is somehow exempt from discovery in a related case with parallel claims.

Finally, X's defense of its objections to RFP No. 9 is, once again, inconsistent with its discovery answers. *Compare* Defs.' App'x 52, 363 (refusing to reveal its basis for calculating damages), *with* Resp. at 20 (stating it "is not seeking compensation for the decline in aggregate revenue"). There is no reason for Defendants to learn X's position for the first time in briefing after months of conferrals and when it issued discovery on precisely these issues. Further, as Defendants explained, aggregate revenue information from *all advertisers* during this period is relevant to show (along with documents responsive to RFP Nos. 7, 17, 33, and Interrogatory 8) that advertisers concerned about brand safety have been stampeding away from X ever since Musk's takeover because of a cavalcade of threats to brand safety, and so the advertisers at issue here likely would have departed regardless of Media Matters's reporting. X has no answer for this explanation of relevance.

## CONCLUSION

The Court should overrule X's objections, grant Defendants' Motion to Compel, and award attorney's fees related to RFA No. 5.

Case 4:23-cv-01175-O   Document 124   Filed 10/30/24   Page 14 of 15   PageID 3139

Dated: October 30, 2024.

Respectfully submitted,
*/s/ Andrew LeGrand*

| | |
|---|---|
| GIBSON, DUNN & CRUTCHER LLP<br>Andrew LeGrand (TX 24070132)<br>2001 Ross Avenue, Suite 2100<br>Dallas, TX 75201<br>T: (214) 698-3100<br>F: (214) 571-2960<br>alegrand@gibsondunn.com | ELIAS LAW GROUP LLP<br>Abha Khanna* (WA 42612)<br>1700 Seventh Avenue, Suite 2100<br>Seattle, WA 98101<br>T: (206) 656-0177<br>F: (206) 656-0180<br>akhanna@elias.law |
| Theodore J. Boutrous, Jr.* (CA 132099)<br>333 South Grand Avenue<br>Los Angeles, CA 90071<br>T: (213) 229-7000<br>F: (213) 229-7520<br>tboutrous@gibsondunn.com | Aria C. Branch* (DC 1014541)<br>Jacob D. Shelly* (DC 90010127)<br>Omeed Alerasool* (DC 90006578)<br>250 Massachusetts Avenue NW, Suite 400<br>Washington, DC 20001<br>T: (202) 968-4490<br>F: (202) 986-4498<br>abranch@elias.law<br>jshelly@elias.law<br>oalerasool@elias.law |
| Amer S. Ahmed* (NY 4382040)<br>200 Park Avenue<br>New York, New York 10166<br>T: (212) 351-4000<br>F: (212) 351-4035<br>aahmed@gibsondunn.com | * Admitted *pro hac vice* |

*Counsel for Defendants Media Matters for America, Angelo Carusone, and Eric Hananoki*

11

## CERTIFICATE OF SERVICE

On October 30, 2024, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Andrew LeGrand*
Andrew LeGrand
