**UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |
|---|---|
| **X CORP.**, a Nevada corporation,<br>　　　　Plaintiff,<br><br>　　vs.<br><br>**MEDIA MATTERS FOR AMERICA**, a<br>Washington, D.C. non-profit corporation,<br>**ERIC HANANOKI**, and **ANGELO<br>CARUSONE**,<br>　　　　Defendants. | Case No. 4:23-CV-01175-O |

## APPENDIX

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　**Pages**

1.  Complaint,
    *Media Matters for Am., et al. v. X Corp., et al.*,
    No. 3:25-cv-02397 (N.D. Cal. filed March 10, 2025) ...................................Appx 002-041

2.  Notice of Motion for a Preliminary Injunction; Memorandum of Points and
    Authorities in Support of Motion for a Preliminary Injunction,
    *Media Matters for Am., et al. v. X Corp., et al.*,
    No. 3:25-cv-02397 (N.D. Cal. filed March 11, 2025) ...................................Appx 043-074

3.  X Terms of Service,
    Effective: November 15, 2024 ......................................................................Appx 076-092

Dated: March 17, 2025.                    Respectfully submitted.

                                          */s/ Christopher D. Hilton*
                                          Judd E. Stone II
                                            Texas Bar No. 24076720
                                          Christopher D. Hilton
                                            Texas Bar No. 24087727
                                          Ari Cuenin
                                            Texas Bar No. 24078385
                                          Michael R. Abrams
                                            Texas Bar No. 24087072
                                          Alex M. Dvorscak
                                            Texas Bar No. 24120461
                                          Cody C. Coll
                                            Texas Bar No. 24116214
                                          **STONE HILTON PLLC**
                                          600 Congress Ave.
                                          Suite 2350
                                          Austin, TX 78701
                                          Telephone: (737) 465-7248
                                          judd@stonehilton.com
                                          chris@stonehilton.com
                                          ari@stonehilton.com
                                          michael@stonehilton.com
                                          alex@stonehilton.com
                                          cody@stonehilton.com

                                          John C. Sullivan
                                            Texas Bar No. 24083920
                                          **S|L LAW PLLC**
                                          610 Uptown Boulevard, Suite 2000
                                          Cedar Hill, TX 75104
                                          Telephone: (469) 523-1351
                                          Facsimile: (469) 613-0891
                                          john.sullivan@the-sl-lawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that this document was served on all counsel for record on March 17, 2025,

via the Court's CM/ECF system.

                                          */s/ Alexander M. Dvorscak*
                                          Alexander M. Dvorscak

2

# TAB 1

JUSTIN A. NELSON (TX SBN 24034766)*
jnelson@susmangodfrey.com
MATTHEW BEHNCKE (TX SBN 24069355)*
mbehncke@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
*pro hac vice forthcoming

KATHERINE M. PEASLEE (CA SBN 310298)
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
kpeaslee@susmangodfrey.com

AMANDA BONN (CA SBN 270891)
abonn@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

*Attorneys for Plaintiff Media Matters for America*
*(Additional parties and counsel listed with signature)*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, ANGELO CARUSONE, and ERIC HANANOKI | Case No. 3:25-cv-02397 |
| Plaintiffs, | **COMPLAINT** |
| vs. | **DEMAND FOR JURY TRIAL** |
| X CORP., TWITTER INTERNATIONAL UNLIMITED CO., and TWITTER ASIA PACIFIC PTE. LTD. | |
| Defendants. | |

## INTRODUCTION

1.      Plaintiff Media Matters for America ("Media Matters") seeks to enforce its contractual right for *this Court* to hear the claims that X Corp. has brought against it in multiple jurisdictions around the world. X brought these suits as punishment for Media Matters' truthful reporting that ads appeared next to white-supremacist content on the X platform. Immediately after Media Matters published that reporting, Elon Musk—Chairman of X—proclaimed that his company was about to file a "thermonuclear" lawsuit against Media Matters in retaliation. And indeed it did. In fact, using the artifice of foreign affiliates, X filed three separate lawsuits around the world. But X did not honor its very own Terms of Service. X's Terms of Service governing the conduct at issue in X's lawsuits contain a mandatory forum selection clause requiring that "***All disputes related to these Terms or the Services will be brought solely in the federal or state courts located in San Francisco County, California, United States***." None of the lawsuits X filed were filed in this county. Rather, X initiated a vendetta-driven campaign of libel tourism, spanning three jurisdictions in three countries, all arising from the same conduct: Media Matters' use of X's platform in accordance with X's Terms of Service and its truthful reporting on the results.

2.      This proliferation of claims over a single course of conduct, in multiple jurisdictions, is abusive. It is consistent with Musk's promise to unleash a punitive "thermonuclear" response upon Plaintiffs for having dared to publish an article Musk did not like. It is also a breach of contract. X drafted its forum selection clause, yet refuses to abide by its terms in order to maximize harm. Plaintiffs bring this breach of contract claim to enforce their rights under that clause.

3.      Media Matters is a Washington, D.C. based organization dedicated to monitoring, analyzing, and correcting misinformation in the U.S. media. Plaintiff Angelo Carusone serves as Media Matters' President and CEO. Plaintiff Eric Hananoki is a Senior Investigative Reporter for Media Matters and for the past decade has specialized in reporting on extremism—including white nationalism, antisemitism, and neo-Nazi rhetoric—in the public square. For years, Plaintiffs have regularly published material that is critical of powerful figures, politicians, and elected officials.

4.      After Musk purchased the social media company Twitter—which he subsequently rebranded as "X"—in late 2022, the company's advertising revenue plummeted. Plaintiffs and other

media outlets published multiple articles on what was a major national news story: the disturbing rise of violent and extremist rhetoric on the platform after Elon Musk's takeover. Musk himself appeared to endorse extremist views and conspiracy theories, making a series of increasingly erratic and conspiracy-addled comments.

5.    Advertisers and users fled in droves. By October 2023, media outlets reported that X's ad revenue had dropped by 53% in the year after Musk purchased Twitter, while monthly users had dropped by 15%. In response, Musk lashed out—not against the violent and extremist rhetoric exploding on X, but against the organizations calling attention to these issues on the world's leading platform for real-time communication and agenda-setting.

6.    Musk has continually tried to blame others for this loss in revenue since his takeover. In July 2023, Musk filed suit in this District against the non-profit Center for Countering Digital Hate ("CCDH"), alleging that the Center "cherry-pick[ed] from the hundreds of millions of posts made each day on X and falsely claim[ed] it had statistical support showing the platform is overwhelmed with harmful content"; further alleging that X had suffered "at least tens of millions of dollars in harm" as a result of advertisers leaving; and citing the very same forum selection clause at issue in this case as justification for venue. *X Corp. v. Center for Countering Digital Hate*, No. 23-cv-03836 (N.D. Cal.) (Dkt 10, Amended Complaint at Paragraphs 1, 5, and 16). These allegations foreshadow those he would eventually level at Media Matters—another non-profit that dared to publish accurate but unflattering information about content on X. Judge Breyer dismissed X Corp.'s complaint against CCDH, stating that the case was "about punishing the Defendants for their speech." *X Corp. v. Ctr. for Countering Digital Hate, Inc*., 724 F. Supp. 3d 948, 955 (N.D. Cal. 2024). In September 2023, Musk threatened to sue the Anti-Defamation League ("ADL") for likewise supposedly causing a drop in advertising revenue when the ADL reported about the growing prevalence of hate speech on X.

7.    Recognizing advertisers' concerns that they did not want their ads to appear next to extremist rhetoric, X attempted to undertake steps that supposedly would allow advertisers to control where their ads appeared. In August 2023, X announced a partnership with Integral Ad Science that would provide advertisers with greater control. In the press release announcing the

partnership, the CEO of Integral Ad Science declared that with this new technology, "marketers can ensure their campaigns prioritize only quality inventory that is brand safe and suitable."[1] The CEO of X, Linda Yaccarino, stated: "At X, balancing free expression and platform safety is our number one priority—and we are proving these two things are not at odds." She further claimed that "[g]rowing our partnership with IAS offers brands a new level of protection and transparency as they continue to grow on X."[2]

8.      As Media Matters and other outlets soon reported, however, these advertising controls were not functioning effectively. Hananoki published a series of articles for Media Matters specifically about X's apparent inability to protect its advertisers from appearing alongside extremist content, despite X's repeated promises that it would do just that. This series included an article published on November 16, 2023, when Musk was facing media backlash resulting from his apparent endorsement on X of a fringe conspiracy theory that postulates that Jewish people have a "hatred against whites" and support "flooding the[] country" with "hordes of minorities."[3]

9.      In the November 16 article, Hananoki reported that at the same time Musk appeared to endorse this antisemitic conspiracy theory, X was permitting the placement of advertisements next to pro-Nazi or other extremist content. The article published several examples, such as this image of an advertisement for Oracle appearing next to an image of Adolf Hitler:



---

[1] Press Release, *IAS Announces Exclusive, First to Market Partnership with X to Provide Pre-Bid Brand Safety and Suitability* (Aug. 8, 2023), https://investors.integralads.com/news-releases/news-release-details/ias-announces-exclusive-first-market-partnership-x-provide-pre.

[2] *Id.*

[3]      @elonmusk,    X.com    (Nov.    15,    2023    12:49    PM), https://x.com/elonmusk/status/1724908287471272299.

10.    Rather than acknowledge that his own conduct and his decision to allow extremist content to run rampant on X was driving advertisers away (and revenue down), Musk continued to blame others.  He turned his sights to Media Matters.

11.    On November 18, 2023, Musk threatened "a thermonuclear lawsuit against Media Matters" in response to the November 16 article.[4] Musk's post embeds a list of purported "facts" about Media Matters' use of the X Platform, claiming that Media Matters used X in a "contrived" way in an effort to generate anomalous content/advertisement pairings. *Id*. Musk did not, however, deny that the pairings featured in the article actually occurred. In other words, it did not—and still does not—deny the report's truth.

12.    Nevertheless, as promised, Musk's company X Corp. filed a lawsuit in federal court against Media Matters and Hananoki on November 20, 2023, later amending to add Carusone. X Corp. filed in the Northern District of Texas, despite no connection between the case and that district. X Corp. is a Nevada company that was, at the time, headquartered in San Francisco, California. Media Matters and Hananoki are residents of D.C. and Maryland. Hananoki did not do any research in or otherwise travel to Texas for his article, he did not speak to anyone in Texas in the process of preparing the article, and Texas is not referenced in the article. X Corp.'s decision to file there was nothing more than an additional element of harassment in an already abusive and punitive lawsuit. It was also a violation of the X Terms of Service operative at that time, which require that the lawsuit be filed in San Francisco County, California.

13.    While this first suit was harassment enough—and has cost Media Matters millions of dollars to defend—it was only the start of Musk's globetrotting litigation campaign against Media Matters. When an X user posted, "X Corp. has filed a lawsuit against Media Matters," Musk responded, "The first of many." [5]

---

[4] *See* @elonmusk, X.com (Nov. 18, 2023, 2:01 AM), https://perma.cc/X4HN-PLJ4.
[5]    @elonmusk,    X.com    (Nov.    20,    2023    4:28    PM), https://x.com/elonmusk/status/1726759570754670667.

COMPLAINT - 4

**Appx 006**



14.     True to his word, in the weeks and months following the Texas suit, X filed copycat suits in Ireland and Singapore through its subsidiaries Twitter International Unlimited Company and Twitter Asia Pacific Pte. Ltd., respectively, as part of a global campaign of intimidation. Those suits allege the exact same conduct as the Texas suit and, like that suit, could only properly have been brought in California. Media Matters has consistently contested venue and personal jurisdiction in all three of X's filed cases.

15.     Musk has reiterated that these suits are part of his personal campaign against Media Matters. As he stated at an X Townhall,

> Media Matters is an evil propaganda machine. . . . ***We are suing them in every country that they operate***. And we will pursue not just the organization, but anyone funding that organization. I want to be clear about that. Anyone funding that

organization, we will pursue them. So Media Matters is an evil propaganda machine. They can go to hell. I hope they do.[6]

Of course, Media Matters only "operate[s]" out of Washington, D.C.—making this worldwide campaign, and the need for Media Matters to defend itself in countries where it has no presence at all, all the more oppressive and harassing.

16.    Media Matters has been forced to defend itself in three different venues, none of them proper—and has spent millions of dollars doing so.  In view of X's multi-pronged attack on Media Matters in retribution for Plaintiffs' truthful reporting on their findings following legitimate use of the X Platform, Plaintiffs seek declaratory and injunctive relief from this Court, as well as damages for the injury they have suffered as a consequence of Defendants' breach of contract. Plaintiffs intend to very shortly seek a preliminary injunction enjoining further prosecution of the X Entities' pending litigation against Media Matters in Ireland and Singapore.[7]

17.    Democracy depends on free speech that holds the powerful accountable. X's worldwide campaign of intimidation seeks to punish Media Matters for exercising its core First Amendment rights on a matter of public importance. This Court should stop X's antics and enforce the forum selection clause that X itself drafted.

**PARTIES**

18.    Plaintiff Media Matters for America ("Media Matters") is a not-for-profit research center and media watchdog dedicated to comprehensively monitoring, analyzing, and correcting misinformation in the media. Media Matters routinely investigates political extremism on media platforms in the United States and publishes articles and commentary on public figures who endorse or espouse such rhetoric. It has been incorporated under the laws of, and has had its principal place of business in, the District of Columbia since its founding over twenty years ago.

---

[6] Lindsay Kornick, "Elon Musk calls Media Matters 'evil propaganda machine' ahead of lawsuit," FOXBusiness (December 10, 2023), https://www.foxbusiness.com/media/elon-musk-calls-media-matters-evil-propaganda-machine-lawsuit.

[7] Plaintiffs do not now seek such relief with regard to X Corp.'s prosecution of its pending Texas litigation. Rather, Plaintiffs have a pending motion to transfer venue in that court pursuant to 28 U.S.C. § 1404 and § 1406—based, in part, on the forum selection clause at issue in this case.

COMPLAINT - 6

**Appx 008**

19.     Plaintiff Angelo Carusone is the CEO and President of Media Matters. Carusone resides in Washington, D.C.

20.     Plaintiff Eric Hananoki is a Senior Investigative Reporter at Media Matters. Hananoki resides in Maryland, just outside of Washington, D.C. Hananoki generally researched and wrote his articles, including the November 16 article, from his residence in Maryland.

21.     Defendant X Corp. is a Nevada corporation currently headquartered in Bastrop, Texas. At the time of the events giving rise to this complaint, X Corp. was headquartered in San Francisco, California, where it took the actions giving rise to Plaintiffs' breach of contract claim. A large number of X employees and executives continue to be located in the Northern District of California.[8] X Corp. owns and operates the social media platform "X." Elon Musk is chairman of X Corp.

22.     Defendant Twitter International Unlimited Company ("TIUC") is an Irish company with a registered address in Dublin, Ireland. It is a subsidiary of X Corp. TIUC claims to operate the X Platform, which is owned by X Corp., in the European Union, United Kingdom, and European Free Trade Association ("EFTA") states. Ex. B ¶20.

23.     Defendant Twitter Asia Pacific Pte. Ltd. ("TAP") is a company incorporated in Singapore with a registered address in Singapore. TAP is a subsidiary of X Corp. and is the representative of X in the Asia Pacific region.

## <u>JURISDICTION</u>

24.     This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1) and § 1332(a)(2) because it is a civil action between citizens of different states and of foreign states, and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiffs seek damages in the amount of their attorneys' fees and costs for defending against Defendants' improperly filed litigation, which amount is in the millions of dollars.[9] Furthermore,

---

[8] Kurt Wagner, "Elon Musk's X to close San Francisco office, relocate workers," Bloomberg (Aug. 6, 2024), https://www.mercurynews.com/2024/08/06/musks-x-to-close-san-francisco-office-relocate-workers/.

[9] The Terms of Service contain a damages cap that purports to limit a user's damages to $100. However, this limitation, which restricts a user to $100 dollars with no potential for a remedy that would make them whole but which allows X to sue a user for millions (as it has done in this

Defendants' pending international lawsuits, as to which Media Matters intends to promptly move for an anti-suit injunction, seek at least tens of millions of dollars from Media Matters, placing that amount in controversy as well. *Cisco Sys., Inc. v. GTEC*, No. 10-CV-04960-EJD, 2011 WL 13253336, at *2 (N.D. Cal. Sept. 27, 2011). This Court has authority to grant Plaintiffs declaratory, injunctive, and other relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the Court's own legal and equitable powers. It also has supplemental jurisdiction over any state law claims derived from a common nucleus of operative fact. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349 (1988); 28 U.S.C. § 1367.

25.     This Court has personal jurisdiction over X Corp. because the Terms of Service at issue in this case ("TOS"), to which X Corp. is a party, provide for litigation in this District. *Chan v. Soc'y Expeditions, Inc.*, 39 F.3d 1398, 1406 (9th Cir. 1994). Attached hereto as Exhibit A is a true and correct copy of the TOS in effect at the time X filed its litigation against Media Matters. Furthermore, at the time of the conduct at issue in this case, X Corp. was headquartered in this District in San Francisco, California. Indeed, X has admitted in judicial pleadings that San Francisco is where X created, hosted, and maintained its platform that forms the basis of X's claims. *See* Twitter Motion to Dismiss or Transfer, *Doshier v. Twitter*, No. 4:18-cv-700-KGB (E.D. Ark. Sept. 28, 2018) ("X Doshier Motion"), ECF 4 at 2–3 & ECF 4-5 ¶3. X also admitted that it created and maintained its advertising platforms in California. *Id*. Similarly, X has admitted that both its user and advertiser agreements were drafted and updated by employees in California. *Id*. And, upon information and belief, the decision to file litigation in Texas and to direct the filings in foreign jurisdictions was made in California.

26.     This Court has personal jurisdiction over each of Twitter International Unlimited Co. and Twitter Asia Pacific Pte. Ltd. because they are third party beneficiaries of the TOS at issue in this case and are bound by its forum selection clause providing for litigation in this district. *TAAG Linhas Aereas de Angola v. Transamerica Airlines, Inc.*, 915 F.2d 1351, 1354 (9th Cir. 1990). Personal jurisdiction over TIUC and TAP is additionally appropriate because they are bound by the

---

case), is unconscionable and unenforceable. This discrete limitation is properly severed in accordance with the agreement's severance provision.

forum selection clause contained in the TOS as parties that are "closely related to the contractual

relationship." *Manetti–Farrow, Inc. v. Gucci Am., Inc*., 858 F.2d 509, 514 n. 5 (9th Cir. 1988).

27.     The Court also has personal jurisdiction over TIUC and TAP because they are alter

egos of X Corp. TIUC, TAP, and X. Corp. share a unity of ownership and interest: Each of TIUC

and TAP are subsidiaries of X Corp., which is turn part of X Holdings. Elon Musk is chairman of

X Corp. and majority owner of X Holdings. Upon information and belief, based on Twitter's public

financial reporting prior to Musk's taking the company private in 2022, TIUC and TAP's profits

and losses roll up to X Corp. Twitter U.S.'s previous SEC filings account for earnings made by its

foreign subsidiaries (including Twitter Asia Pacific Pte. Ltd., Twitter UK, and Twitter International

Unlimited Co.). Those filings show that cash holdings of the parent include cash held by foreign

subsidiaries. Furthermore, both TIUC and TAP have asserted in their respective foreign

proceedings against Media Matters that they are synonymous with X and that they represent the X

Platform owned and maintained by X Corp. in their respective regions. Ex. B (TIUC Complaint) at

¶¶20–21; Ex. C (TAP Complaint) at ¶¶12–13. According to TIUC and TAP, any reporting that

defames the "X Platform"—which is owned and operated in the U.S. by X Corp.—necessarily

defames <u>them</u>. Ex. B, ¶¶20–21; Ex. C, ¶¶12–15.  TIUC and TAP assert claims for "defamation,"

despite the fact that the November 16 article never mentions either entity. Their claims rely on the

notion that the identities of "TIUC" and "TAP" are completely interchangeable with that of "X."

28.     The evidence further supports treating TIUC and TAP as alter egos of X Corp.

because, upon information and belief, TIUC and TAP filed their actions against Media Matters

under the direction and control of X Corp. Musk himself announced as much: when a user on X

posted on November 20, 2023, that "X Corp. has filed a lawsuit against Media Matters," Musk

responded, "The first of many."[10] Just a few weeks later, as part of an X Townhall, Musk said, "*We

are suing them in every country that they operate*. And we will pursue not just the organization,

but anyone funding that organization. I want to be clear about that. Anyone funding that

---

[10]     @elonmusk,    X.com    (Nov.    20,    2023    4:28    PM),
https://x.com/elonmusk/status/1726759570754670667.

organization, we will pursue them."[11] Musk's announcement that X Corp.'s lawsuit in Texas was "[t]he first of many" and his subsequent admission that "we" are suing Media Matters worldwide— and may file more suits against both Media Matters and its donors—demonstrates that the lawsuits nominally filed by TAP and TIUC are in fact suits on behalf of Musk and X Corp. Musk's promise of worldwide litigation came just three days after TIUC served a summons on Media Matters in its Ireland litigation; three days after TAP sent a demand letter threatening to sue Media Matters in Singapore; and nine days before Twitter UK sent a demand letter similarly threatening suit.

29.    Treating TIUC and TAP as alter egos of X Corp. is consistent with public evidence demonstrating Elon Musk's total and direct control over both X Corp. and its foreign subsidiaries. For instance, Musk reportedly directed the dramatic changes in staffing and content moderation that followed his 2022 takeover of the company formerly known as Twitter.[12] Musk personally sent an email to all staff telling them they would need to either commit to his "extremely hardcore" vision for the company or be laid off.[13] Musk has reportedly involved himself in individual decisions about which specific accounts to allow or suspend,[14] as well as operational details such as how public media accounts should be labeled.[15] Musk's direction is not limited to the domestic X Corp. entity, but reportedly also includes X Corp.'s foreign subsidiaries: Musk's email informing workers that they could either accept a new "hardcore" culture or be fired went not only to U.S. employees of X Corp., but to employees of TIUC—and, upon information and belief, TAP

---

[11] Lindsay Kornick, FOXBusiness, "Elon Musk calls Media Matters 'evil propaganda machine' ahead of lawsuit," (December 10, 2023), https://www.foxbusiness.com/media/elon-musk-calls-media-matters-evil-propaganda-machine-lawsuit (emphasis added).

[12] *See, e.g.*, Michelle Toh, "Elon Musk says he's cut about 80% of Twitter's staff," CNN (April 12, 2023), https://www.cnn.com/2023/04/12/tech/elon-musk-bbc-interview-twitter-intl-hnk/index.html.

[13] Pete Syme, "Elon Musk sent a midnight email telling Twitter staff to commit to an 'extremely hardcore' work schedule — or get laid off with 3 months' severance," Business Insider (November 16, 2022), https://www.businessinsider.com/elon-musk-twitter-staff-commit-extremely-hardcore-work-laid-off-2022-11.

[14] Nikki McCann Ramirez, "Elon 'Free Speech' Musk Un-Suspends Accounts of Journalists Who Criticized Him," Rolling Stone (Dec. 17, 2022), https://www.rollingstone.com/music/music-news/elon-musk-twitter-journalists-banned-1234648351/.

[15] Mike Wendling, "Musk on hate speech, Twitter lay-offs and sleeping in the office," BBC (April 12, 2023), https://www.bbc.co.uk/news/live/world-us-canada-65247272?page=2.

employees—as well.[16] *Business Insider* reported that "Musk is closing many international Twitter offices as he continues to cut costs and try find ways the company can make money."[17] According to a Reuters report, the Musk-directed cuts included workers in Twitter's Dublin and Singapore offices—that is, TIUC and TAP, respectively.[18]

### DIVISIONAL ASSIGNMENT

30.    Pursuant to Local Rule 3-2(c), this case is properly assigned to the San Francisco Division because the TOS between the parties provide that "All disputes related" to those Terms or the services provided by X Corp. "will be brought solely in the federal or state courts located in San Francisco County, California, United States." This case is also properly assigned to the San Francisco Division because it arises from conduct that occurred in San Francisco County. X Corp. drafted and updated the relevant TOS from its headquarters in San Francisco County and, upon information and belief, X Corp.'s decision to file litigation in violation of those TOS and to direct its foreign subsidiaries to do likewise was made at its headquarters in San Francisco.

### VENUE

31.    Venue is proper in this district because the TOS between the parties provide that "All disputes" related to those Terms or the services provided by X Corp. "will be brought solely in the federal or state courts located in San Francisco County, California, United States." Venue is also proper in this District under 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claim occurred in this District.

---

[16] Rob Davies and Gordan Deegan, "Ex-Twitter worker wins £470,000 for unfair dismissal over Musk 'hardcore' email," The Guardian (Aug. 13, 2024), https://www.theguardian.com/technology/article/2024/aug/13/musk-ordered-to-pay-x-employee-470000-for-unfair-dismissal.

[17] Kali Hays, "Twitter is closing or getting kicked out of many international offices as Elon Musk skips rent and dramatically shrinks operations," Business Insider (Jan. 11, 2023), https://www.businessinsider.com/elon-musk-twitter-layoffs-closing-international-offices-singapore-europe-2023-1.

[18] Reuters, "Twitter Cuts More Staff Overseeing Global Content Moderation," (Jan. 7, 2023), https://www.reuters.com/technology/twitter-further-cuts-staff-overseeing-global-content-moderation-bloomberg-news-2023-01-07/; *See also* Aaron Drapkin, "Musk Fires Twitter Staff Policing Hate Speech and Misinformation," Tech.co (Jan. 9, 2023), https://tech.co/news/musk-fires-misinformation-team (reporting on firing of Dublin and Singapore employees).

# FACTUAL ALLEGATIONS

**I.    Plaintiffs' research and reporting**

32.    Since its founding in 2004, Media Matters has been dedicated to monitoring and correcting misinformation, including by publishing its own investigatory research and reporting on its website.

33.    Angelo Carusone is Chairman and President of Media Matters. Carusone frequently provides opinions about extremism, online toxicity, and the underlying structures fueling their rise. He is also a resource for journalists writing about disinformation and the ways technology platforms are addressing the issue. Carusone regularly speaks on brand safety in advertising.

34.    Hananoki has worked at Media Matters since 2007 and is currently a Senior Investigative Reporter. Previously, Hananoki worked as a Researcher, Senior Researcher, Research Fellow, and Investigative Reporter at Media Matters. In his more than 17 years at the organization, Hananoki has researched and written countless reports and articles, including on public figures who espouse violent, extreme, or racist views.

35.    As part of his work at Media Matters, Hananoki has been reporting on X/Twitter for years. His coverage of X increased in 2023 due to a marked increase in extremist rhetoric on the platform after Musk took ownership, a disturbing trend widely reported on in the media, including by outlets other than Media Matters.

**II.    Elon Musk purchases X and slashes its content-moderation infrastructure.**

36.    On October 27, 2022, Elon Musk completed his purchase of the social media platform then known as Twitter. Musk subsequently renamed the social media platform "X," though it also continues to operate at its traditional twitter.com web address. Both before and after acquiring ownership of X, Musk frequently referred to the platform as a "digital town square" or "de facto town square" for public discussion.[19]

---

[19] Douglas Yeung, *The 'Digital Town Square' Problem*, TheRANDBlog (Jan. 13, 2023), https://www.rand.org/pubs/commentary/2023/01/the-digital-town-square-problem.html.

37.    Almost immediately after his takeover, Musk began laying off key executives and content moderators at X responsible for removing hate speech and other violent rhetoric.[20] Indeed, within his first few months of ownership, Musk laid off approximately 80% of the company's staff, including its former CEO, general counsel, policy chief, and head of trust and safety.[21] He downsized or eliminated critical areas of the company responsible for overseeing policy, trust and safety, communications, and ethical AI, among others.[22] These deep workforce cuts raised questions among U.S. lawmakers and regulators about the social media platform's ability to safely respond to security and privacy threats, misinformation, and hate speech—matters of significant public concern in view of Musk's claim that the platform should serve as a digital town square.[23] Lawmakers similarly expressed concern that, in the wake of Musk's ownership, the platform had ceased to comply with two consent decrees it had entered into with the Federal Trade Commission concerning safeguards for personal data and privacy.[24]

38.    Musk also eliminated existing products and policies—many of which served to protect users from misinformation and violent content—under the auspices of promoting "free

---

[20] *See* Brian Fung & Clare Duffy, *How a single year of Elon Musk turned Twitter into a husk of its former self*, CNN (Oct. 27, 2023), https://www.cnn.com/2023/10/27/tech/elon-musk-twitter-x-one-year-changes/index.html. [hereinafter "*A single year of Elon Musk turned Twitter into a husk*"]; *see also Musk fires outsourced content moderators who track abuse on Twitter*, MoneyWatch, CBS News (Nov. 14, 2022), https://www.cbsnews.com/news/elon-musk-twitter-layoffs-outsourced-content-moderators/.

[21] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 18.

[22] *Id.*; *see also* Rohan Goswami, *X CEO Linda Yaccarino explains reason for getting rid of Twitter name*, CNBC (Aug. 10, 2023), https://www.cnbc.com/2023/08/10/x-corp-ceo-linda-yaccarino-says-she-has-autonomy-under-elon-musk.html.

[23] Brian Fung*, First on CNN: US senators question Twitter's privacy compliance under Elon Musk*, CNN (June 5, 2023), https://www.cnn.com/2023/06/05/tech/twitter-compliance-musk-senators/index.html; *see also* Brian Fung, *Elon Musk should be forced to testify on X's 'chaotic environment,' US regulator tells court*, CNN (Sept. 12, 2023), https://www.cnn.com/2023/09/12/tech/elon-musk-testify-privacy-probe/index.html.

[24] *See* Makena Kelly, *Republicans defend Elon Musk in FTC's Twitter probe*, The Verge (July 14, 2023), https://www.theverge.com/2023/7/14/23794363/elon-musk-twitter-ftc-lina-khan-republicans; *see also* Cat Zakrzewski, *Musk may have violated FTC privacy order, new court filing shows*, The Washington Post (Sept. 12, 2023), https://www.washingtonpost.com/technology/2023/09/12/elon-musk-consent-order-ftc/.

speech."[25] He reinstated suspended accounts of known white supremacists and conspiracy theorists while suspending the accounts of journalists who tracked his private air travel.[26]

39.     Unsurprisingly, after the elimination of 80% of X's staff and the dismantling of much of X's content moderation infrastructure, extremist and racist rhetoric surged on X in the wake of Musk's takeover. Less than a month into Musk's ownership, the Brookings Institute reported that the platform had seen a "surge in hateful language" following Musk's purchase, including "a nearly 500% increase in use of the N-word in the 12-hour window immediately following the shift of ownership to Musk."[27] Similarly, within the first week of his ownership, use of the word "Jew" increased fivefold, with tweets that were antisemitic receiving the most engagement.[28] Academic researchers in the School of Communication and Media at Montclair State University published a report describing how "Hate Speech Spike[d] on Twitter After Elon Musk Acquire[d] the Platform."[29]

40.     Less than two months after Musk's takeover, The New York Times reported the following about the rising hate speech on the platform:

- "Before Elon Musk bought Twitter, slurs against Black Americans showed up on the social media service an average of 1,282 times a day. After the billionaire became Twitter's owner, they jumped to 3,876 times a day."

- "Slurs against gay men appeared on Twitter 2,506 times a day on average before Mr. Musk took over. Afterward, their use rose to 3,964 times a day."

---

[25] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 18.

[26] *Id.*

[27] Rashawn Ray and Joy Anyanwu, *Why is Elon Musk's Twitter takeover increasing hate speech?*, Brookings (Nov. 23, 2022), https://www.brookings.edu/articles/why-is-elon-musks-twitter-takeover-increasing-hate-speech/.

[28] *Id.*

[29] *Hate Speech Spikes on Twitter After Elon Musk Acquires the Platform, Montclair State University,* (Nov. 1, 2022), https://www.montclair.edu/school-of-communication-and-media/wp-content/uploads/sites/20/2022/11/Montclair-State-SCM-Study-Increases-in-Twitter-Hate-Speech-After-Elon-Musks-Acquisition.pdf.

- "[A]ntisemitic posts referring to Jews or Judaism soared more than 61 percent in the two weeks after Mr. Musk acquired the site."[30]

41.    A broad array of media outlets extensively reported on this disturbing trend in Musk's self-described "digital town square."

42.    This spike in hateful rhetoric on X caught the attention of the platform's advertisers, many of whom promptly ceased advertising on the platform in the months after Musk took over. Since "the early days of Musk's takeover, many of Twitter's largest advertisers—including the likes of General Mills and the Volkswagen Group—paused their spending over concerns about X's layoffs, content moderation capabilities and general uncertainty about the platform's future."[31]

43.    The pullback of the company's largest advertisers led to sharp drops in its revenue. In July 2023, Musk reported "a 50% decline in ad revenue and heavy debt load," while in September, he reported that advertising revenue in the U.S. was "still down 60%."[32]

44.    More alarming still to X's advertisers was the fact that, after Musk's steep downsizing of company staff, media outlets reported on a flood of hateful and violent rhetoric on the platform—and which reportedly began appearing increasingly often alongside companies' advertising—creating a perceived association between their brands and vile hate speech. X's inability to control the appearance of extremist and violent rhetoric alongside its advertisers precipitated a broader exodus of advertisers from the platform.

45.    Indeed, the media writ large consistently reported for over a year on X and Musk's advertiser' reactions to changes on the X platform, advertisers' concerns over content moderation, and instances of brand placement next to hateful content. Some examples include:

---

[30] Sheera Frenkel and Kate Conger, *Hate Speech's Rise on Twitter Is Unprecedented, Researchers Find*, N.Y. Times (Dec. 2, 2022), https://www.nytimes.com/2022/12/02/technology/twitter-hate-speech.html.

[31] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 18; *see also* Alberto Chiumento, et al., *Advertisers react to Twitter's new ownership*, Reuters (Nov. 18, 2022), https://www.reuters.com/technology/advertisers-react-twitters-new-ownership-2022-11-03/; Alan Ohnsman, *GM, Ford Say They Aren't Running Twitter Ads As They Assess Changes Under Elon Musk*, Forbes (Oct. 28, 2022), https://www.forbes.com/sites/alanohnsman/2022/10/28/gm-ford-say-they-arent-running-twitter-ads-as-they-assess-changes-under-elon-musk/.

[32] *A single year of Elon Musk turned Twitter into a husk*, *supra* note 18.

- Reuters, "Advertisers react to Twitter's new ownership" (Nov. 18, 2022), https://www.reuters.com/technology/advertisers-react-twitters-new-ownership-2022-11-03/.

- The Washington Post, "Amazon, Uber, Snap ads appear on Twitter pages of white nationalists restored by Musk," Faiz Siddiqui (Dec. 6, 2022), https://www.washingtonpost.com/technology/2022/12/06/twitter-ads-elon-musk/.

- ARS Technica, "Twitter running major brands' ads with extremist tweets—until they get flagged," Ashley Belanger (Dec. 7, 2022), https://arstechnica.com/tech-policy/2022/12/amazon-among-brands-whose-ads-appeared-in-white-nationalist-twitter-feeds/.

- The Verge, "Twitter advertisers aren't happy with ads appearing on pages of white nationalists," Jon Porter (Dec. 7, 2022), https://www.theverge.com/2022/12/7/23497928/twitter-advertisers-brand-safety-unbanned-accounts-white-nationalists.

- Center for Countering Digital Hate, "Toxic Twitter: How Twitter Generates Millions in Ad Revenue by Bringing Back Banned Accounts," (Feb. 9, 2023), https://counterhate.com/wp-content/uploads/2023/02/Toxic-Twitter_FINAL.pdf.

- The Washington Post, "Extremist influencers are generating millions for Twitter, report says," Taylor Lorenz (Feb. 9, 2023), https://www.washingtonpost.com/technology/2023/02/09/twitter-ads-revenue-suspended-account/.

- The Kansas City Star, "Mizzou ad appears on racist X page as social media site faces concerned advertisers," Jonathan Shorman (Oct. 10, 2023), https://www.kansascity.com/news/politics-government/article280309284.html.

- Business Insider, "Disney, Microsoft, the NBA Had Twitter Ads Next to Neo-Nazi Propaganda," Katherine Tangalakis-Lippert (June 18, 2023), https://www.businessinsider.com/disney-microsoft-nba-twitter-ads-next-to-neo-nazi-propaganda-2023-6.

- The N.Y. Post, "Disney, Microsoft ads on Twitter show up next to neo-Nazi propaganda as advertisers return: report," Shannon Thaler (June 19, 2023), https://nypost.com/2023/06/19/disney-microsoft-ads-on-twitter-show-up-next-to-neo-nazi-propaganda-report/.

46.     None of these articles cited or otherwise indicated that they relied on research or reporting performed by Media Matters, Carusone, or Hananoki.

**III.    Plaintiffs participated in the national conversation regarding extremist content on X.**

47.     As part of its long-running mission to document and report on extremist political rhetoric in the media, Media Matters began investigating, researching, and reporting on the rise in political extremism and bigotry on X after Musk's changes to the platform. Hananoki, as a Senior Investigative Reporter whose beat included political extremism, was often assigned this work.

48.     Media Matters' research and reporting echoed what was being reported widely elsewhere—that the platform was continuing to permit the placement of advertisements alongside extremist content. Plaintiffs thus joined in ongoing national conversations about an important news story: the surge of hateful and violent rhetoric in America's supposed "digital town square."

49.     Hananoki's research and reporting sometimes looked specifically at what advertisements X's increasingly extremist user base might see on the platform. Following ordinary journalistic investigative practices, Hananoki used an existing X research account—created and used for research well before Musk's takeover and solely for Hananoki's work on behalf of Media Matters—to see what advertising X's computer algorithm would allow to be placed next to white nationalist content. His research confirmed that the platform's system was continuing to permit advertisements next to such content.

50.     Hananoki published some of his findings, along with a handful of examples, in an article on November 16, 2023. Ex. D. That article, entitled "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content," also reported on Musk's apparent endorsement of a widespread antisemitic conspiracy theory—that Jewish people are seeking to promote "hatred against whites" and are

seeking to "flood[] the[] country" with "hordes of minorities"—which drew widespread condemnation and was extensively covered in the media.[33]

51.    Hananoki's article included screenshots of six advertisements from major corporate entities appearing with at least nine posts from X users. For example, below are images of an advertisement for Oracle appearing with a quote from Adolf Hitler, as well as an advertisement for the Bravo television network next to a post praising Hitler's Nazi Party, which were included in his article:



52.    Hananoki did not say in his article that X, or anyone associated with X, was intentionally placing advertisements next to such violent or fringe content. He simply reported truthfully that despite claiming otherwise, the platform permitted the placements of advertisements from some of the nation's biggest advertisers next to posts that touted Hitler or the Nazi party—which the platform's algorithm obviously did, as illustrated by the examples he cited. *See* Ex. D.

---

[33] *See, e.g.*, David Goldman, "Elon Musk agrees with antisemitic X post that claims Jews 'push hatred' against White people," CNN (Nov. 17, 2023), https://www.cnn.com/2023/11/15/media/elon-musk-antisemitism-white-people/index.html.

53.     Hananoki researched, fact-checked, and drafted the November 16 article in accordance with Media Matters' policies and standards, using similar methods to those he has used throughout his long career in journalism, and mirroring common journalistic practices.

54.     Hananoki published his article at a time when X was reassuring advertisers that its platform was safe. On August 10, 2023, X Corp. CEO Linda Yaccarino appeared on CNBC and stated that "by all objective metrics, X is a much healthier and safer platform than it was a year ago. Since acquisition, we have built brand safety and content moderation tools that have never existed before at this company."[34] As she told her interviewer, with respect to "lawful but awful" content, brands "are protected from the risks of being next to that content."[35] The evidence presented in Hananoki's article undermined this claim—and triggered Musk's rage.

## IV.   Musk promises "thermonuclear" litigation against Media Matters in an effort to recast blame for lost advertising revenue.

55.     On November 18, Musk posted on X a promise to file "a thermonuclear lawsuit against Media Matters" in response to the November 16 article.[36] The post received hundreds of thousands of likes and comments, and tens of thousands of reposts. *Id.*



Elon Musk ✓ ✕
@elonmusk                                          Subscribe   ...

The split second court opens on Monday, X Corp will be filing a thermonuclear lawsuit against Media Matters and ALL those who colluded in this fraudulent attack on our company

56.     Musk attached a message to the post referencing Hananoki's November 16 article and accusing Media Matters of manipulating X's algorithm to artificially force the placement of ads next to extremist content.[37] Musk's diatribe focused on Media Matters' use of the X platform

---

[34] CNBC Television, *X Corp. now a much healthier and safer platform than a year ago, says Linda Yaccarino* (Aug. 10, 2023), https://www.youtube.com/watch?v=NUqtBkiuRKs&t=14s.

[35] *Id.*

[36] @elonmusk, X.com (Nov. 18, 2023, 2:01 AM), https://perma.cc/X4HN-PLJ4.

[37] *Id.*

to supposedly create a "contrived" scenario in which advertisements appeared next to extremist

content:

**Here are the facts on *Media Matters'* research:**

- To manipulate the public and advertisers, *Media Matters* created an alternate account and curated the posts and advertising appearing on the account's timeline to misinform advertisers about the placement of their posts. These contrived experiences could be applied to any platform.
- Once they curated their feed, they repeatedly refreshed their timelines to find a rare instance of ads serving next to the content they chose to follow. Our logs indicate that they forced a scenario resulting in **13 times** the number of ads served compared to the median ads served to an X user.
- Of the **5.5 billion ad impressions** on X that day, **less than 50 total ad impressions** were served against all of the organic content featured in the *Media Matters* article.
  - For one brand showcased in the article, one of its ads ran adjacent to a post 2 times and that ad was seen in that setting by only two users, one of which was the author of the *Media Matters* article.
  - For another brand showcased in the article, two of its ads served adjacent to 2 posts, 3 times, **and that ad was only seen in that setting by one user, the author of the *Media Matters* article.**
- *Media Matters'* article also highlights nine posts they believe should not be allowed on X. Upon evaluation, only one of the nine organic posts featured in the article violated our content policies, and we've taken action on it under our Freedom of Speech, Not Reach enforcement approach.

57.   Musk's November 18 post made no mention of the year-long parade of reports and

documentation illustrating this endemic problem with the architecture of the X platform.

## V.   X Corp. files a retaliatory lawsuit in the Northern District of Texas.

58.   On November 20, 2023, Musk's company X Corp. made good on Musk's promise:

It filed a lawsuit naming Media Matters and Hananoki as defendants in federal court in the Northern

District of Texas, alleging claims for Interference with Contract, Business Disparagement, and

Interference with Prospective Economic Advantage. *X Corp. v. Media Matters for America et al.*,

No. 4:23-cv-1175 (N.D. Tex), Dkt. 1. On February 2, 2024, X Corp. filed an amended complaint

adding Carusone as a defendant. Ex. E (*X Corp. v. Media Matters for America et al.*, No. 4:23-cv-

1175 (N.D. Tex), Dkt. 37).

59.   X Corp. chose to file its lawsuit in the Northern District of Texas despite the fact

that, at the time, it was headquartered in San Francisco and the defendants (Media Matters,

Carusone, and Hananoki) are residents of Washington, D.C. and Maryland.

60.   X Corp.'s lawsuit alleges that Media Matters "knowingly and maliciously

manufactured side-by-side images depicting advertisers' posts on X Corp.'s social media platform

beside Neo-Nazi and white-nationalist fringe content," and that it "designed" these images as part of a "media strategy to drive advertisers from the platform and destroy X Corp." Ex. E, ¶7.

61.    According to X Corp., this was part of an ideological crusade on behalf of Media Matters and its President, Carusone. X Corp. alleges that "Carusone made Media Matters' strategy plain: pressure advertisers into leaving the platform if Twitter, now X, did not capitulate to Media Matters' censorship demands." *Id.* ¶34.

62.    X claims that in order to generate the advertisement-content pairings upon which Media Matters reported, Media Matters "created utterly extraordinary and manufactured circumstances that no organic user would undertake" and "deliberately misused the X platform to induce the algorithm to pair racist content with popular advertisers' brands" in order to mislead readers. According to X Corp., this "manipulation" of the platform, and Media Matters truthful reporting on its results, "harmed X Corp.'s business relationships and advertising contracts with numerous companies" by creating the impression that such pairing regularly occur on X Corp.'s platform. *Id.*, ¶ 8.

63.    X Corp. breaks down Media Matters' supposed "manipulation" of the platform, echoing the claims made by Musk just days before. Specifically, it claims:

> Media Matters accessed accounts that had been active for at least 30 days, bypassing X's ad filter for new users. Media Matters then exclusively followed a small subset of users consisting *entirely* of accounts in one of two categories: those known to produce extreme, fringe content, and accounts owned by X's big-name advertisers. The end result was a feed precision-designed by Media Matters for a single purpose: to produce side-by-side ad/content pairings that it could screenshot in an effort to alienate advertisers.

*Id.* ¶ 9. In other words, X conceded that depending on what content a user follows and how long they've had their account, they might see advertisements placed next to extremist content.

64.    X Corp. nevertheless expands on this description of Media Matters' supposed misconduct: "First, Media Matters set out on their attempt to evade X's content filters for new users by specifically using an account that had been in existence for more than thirty days." *Id.*  ¶51.

65.    "Next," X Corp. claims, "Media Matters set its account to follow only 30 users (far less than the average number of accounts followed by a typical active user, 219), severely limiting

COMPLAINT - 21
**Appx 023**

the amount and type of content featured on its feed. All of these users were either already known for posting controversial content or were accounts for X's advertisers. That is, 100% of the accounts Media Matters followed were either fringe accounts or were accounts for national large brands. In all, this functioned as an attempt to flood the Media Matters account with content only from national brands and fringe figures, tricking the algorithm into thinking Media Matters wanted to view both hateful content and content from large advertisers." *Id*. ¶52.

66.    Then, X Corp. claims, "Media Matters' account started to alter its scrolling and refreshing activities in an attempt to manipulate inorganic combinations of advertisements and content. Media Matters' excessive scrolling and refreshing generated between 13 and 15 times more advertisements per hour than would be seen by a typical user, attempting to forcibly generate a pairing of fringe content and paid advertisements by massive repetition unlike anything that any normal user would encounter under typical, or even extraordinary, conditions." *Id*. ¶53.

67.    X Corp.'s complaint admits that, after allegedly following these steps, X Corp.'s algorithm returned the advertisement-content pairings featured in the November 16 article. *Id*. ¶54.

68.    The complaint alleges that all Plaintiffs participated in and benefitted from the alleged X platform manipulation: it alleges that Hananoki authored false articles, Media Matters and its President Carusone published the articles, and that Carusone amplified the allegedly false premise of the article in a television interview—all in furtherance of their joint, ideologically driven crusade against X.

69.    X Corp. alleges that because Media Matters reported on the results of its purportedly "forced, inauthentic" use without listing what accounts Media Matters followed or how frequently it refreshed its screen, Media Matters is liable to X Corp. for hundreds of millions of dollars in lost advertising revenue.

## VI.    <u>X continues its litigation campaign and directs its affiliates to file duplicative lawsuits abroad.</u>

70.    X Corp.'s retaliation against Plaintiffs did not end with the Texas lawsuit. Instead, in the following weeks and months, X, through its international affiliates, threatened and initiated litigation abroad over the very same use of the X platform.

**A.    Twitter Asia Pacific threatens and files suit over the same conduct alleged in the Texas Complaint.**

71.    On December 7, 2023, Singapore-based Defendant Twitter Asia Pacific ("TAP") sent Media Matters a cease and desist letter citing the November 16 article and alleging that Media Matters had manipulated the X Platform in the same set forth in X's Texas Complaint. *See* Ex. C, ¶45. The letter claimed that Media Matters had created manufactured the content-advertisement pairings that appeared in the November 16 article through its purportedly inorganic use of the X Platform, and that as a consequence TAP has lost advertising revenue of at least "USD$1,065,000." *Id*. ¶45(f)

72.    On July 23, 2024, TAP initiated suit against Media Matters in Singapore, based on Media Matters' purported manipulation of the X platform and its reporting on the results in the November 16 article. Ex. C. The suit asserts claims for Defamation and Malicious Falsehood.

73.    TAP alleges that it was defamed by the November 16 article, despite not being mentioned in the piece, because, *inter alia*, "[t]he Defamatory Statements referred and/or were understood to refer to the X Platform and [TAP]." *Id*. ¶12. According to the complaint, a reasonable reader in Singapore would understand "*[Elon Musk's] social media platform*" and "*X*" to refer to the X Platform and TAP. *Id*. (italics and brackets in original).  TAP is the X platform's client-facing entity in the Asia Pacific region. *Id*.

74.    The TAP complaint sets forth the same conduct by Media Matters alleged in the Texas complaint. Specifically, according to the TAP complaint, Media Matters "and/or" Hananoki "deliberately manufactured" the ad placements through a "scheme" consisting of multiple steps intended to "overcome the 3-layered content moderation mechanism" that X has in place. Ex. C, ¶¶28–29:

    (a) First, MM and/or Mr. Hananoki utilized an account that had been active for at least 30 days ("Decoy Account") to bypass the X Platform's additional advertisement filter for new users. This increased MM and/or Mr. Hananoki's chances of procuring X Group's major clients' advertisements on their feed.

    (b) Second, MM and/or Mr. Hananoki ensured that the Decoy Account exclusively followed a small subset of X Platform users falling into one of two categories: (i) those known to produce extreme, fringe content and (ii) X Group's major advertising clients. MM and/or Hananoki took this deliberate step to game the

algorithm set up in the X Platform's content moderation mechanism—an algorithm that the X Group had designed to protect bona fide users of the X Platform from objectionable content. To further amplify their efforts, MM and/or Mr. Hananoki set the Decoy Account to follow only 30 users (far less than the average number of accounts followed by a typical active user, i.e., 219), thus severely limiting the amount and type of content featured on their feed.

(c) Third, MM and/or Mr. Hananoki repeatedly scrolled and refreshed their unrepresentative, hand-selected feed, generating between 13 and 15 times more advertisements per hour than viewed by the average X Platform user. . . .

*Id.*, ¶29 .

75.    Like the Texas Complaint, the TAP Complaint concedes that the X Platform did in fact show the Media Matters account the ad pairings featured in the article as a consequence of the alleged use. *Id.* ¶30.

76.    The TAP Complaint states that TAP issued demands to Media Matters and Hananoki prior to bringing suit, but that "[Media Matters] and Mr. Hananoki have failed and/or refused to comply with [TAP's] Demands." *Id.* ¶46. The TAP Complaint asserts damages for Media Matters' reporting on the results of its use of X's platform amounting to "approximately USD 12,935,231." *Id.* ¶43.

77.    The parties are currently litigating Media Matters' jurisdictional challenge in Singapore, with a hearing scheduled for April 14, 2025. Media Matters has consistently contested jurisdiction and venue in Singapore. Media Matters has represented in the Singapore action that if TAP dismisses its Singapore action and refiles its claims in California, Media Matters will not assert a statute of limitation defense to those claims.

78.    Upon information and belief, TAP filed its suit against Media Matters at the direction of its parent corporation, X Corp. The TAP suit makes the same allegations set forth in X Corp.'s Texas suit; relies on internal "investigations" performed by the "X Group" that echo the investigation cited by the Texas Complaint, Ex. C, ¶29; and was first threatened shortly after X Corp. CEO Elon Musk threatened to file "thermonuclear" litigation against Media Matters in response to the November 16 article. It also makes good on Musk's promise that the Texas lawsuit filed by X Corp. was "[t]he first of many," and his representation that X is "suing [Media Matters] in every country that they operate." *See also supra*, ¶¶27–29.

**B.**   <u>**Twitter International Unlimited Co. files suit alleging the same conduct
alleged in the Texas Complaint.**</u>

79.    On December 7, 2023, Twitter International Unlimited Co. ("TIUC") served a summons on Media Matters for litigation in Ireland. Ex. F. The affidavit accompanying the summons cites the November 16 article, alleges the same use of the X Platform by Media Matters as alleged in Texas and Singapore, and asserts intended claims for defamation and malicious falsehood. It claims that TIUC has "sustained advertising revenue losses in excess of the equivalent of EUR2,000,000." *Id*. ¶29.

80.    Media Matters' November 16 article does not name TIUC. However, TIUC's Statement of Claim nevertheless alleges that the article's statements about "X" defamed TIUC because, *inter alia*:

(i)     "Twitter International is a subsidiary of X Corp.;"

(ii)    "Twitter International's identity is synonymous with that of X Corp.;" and

(iii)   "Twitter International is identified and/or identifiable as an entity responsible for the operation of the X platform"

Ex. B, ¶21.

81.    As in both the Texas and Singapore complaints, TIUC alleges that Media Matters "manipulated" the X Platform to "evade" safeguards in place for brands. According to TIUC's complaint,

> When users show interest in particular topics, ads will generate that relate to those topics. Media Matters exploited these features by using a secret existing X account, on a non-paying plan ("**the Secret Account**") precision-designed to evade normal safeguards, which manipulated the system through which posts and advertisements appear.

*Id*. ¶ 12.

82.    As in both the Texas and Singapore complaints, TIUC goes on to allege:

- Media Matters "attempted to evade X's content filters for new users, which excludes ads being served to newly created accounts as a safety measure, by specifically using an account that had been in existence for more than thirty days;"

- "It set the Secret Account to follow only 30 users (far less than the average number of accounts followed by a typical active user (219)), severely limiting the amount and type of content featured on its feed," in an "an attempt to flood the Secret Account with content only from large brands and fringe figures, tricking the algorithm into thinking that the Secret Account wanted to view both hateful content and content from large advertisers;" and

- "[A]ltered its scrolling and refreshing activities in an attempt to manipulate inorganic combinations of advertisements and content. The Secret Account's excessive scrolling and refreshing generated between 13 and 15 times more advertisements per hour than would be seen by a typical user, essentially seeking to force a situation in which a brand ad post appeared adjacent to fringe content."

*Id.* ¶¶14–15.

83.    And as in both the Texas and Singapore complaints, TIUC concedes that Media Matters' use of the X platform did in fact result in the content-advertisement pairings depicted and reported on in the November 16 article. *Id.* ¶¶12, 15.

84.    TIUC seeks damages from Media Matters for lost advertising revenue. *Id.* ¶28, p.8.

85.    The parties are currently litigating Media Matters' jurisdictional challenge in Ireland, as to which a hearing on the merits has yet to be set but is expected by May 2025. Media Matters has consistently contested jurisdiction and venue in Ireland.

86.    Upon information and belief, TIUC filed its suit against Media Matters at the direction of its parent corporation, X Corp. The suit makes the same allegations set forth in X Corp.'s Texas suit—in some instances verbatim; it repeats the same internal investigation findings; and it was filed shortly after X Corp. CEO Elon Musk threatened to file "thermonuclear" litigation against Media Matters in response to the November 16 article. And, once again, it makes good on Musk's promise that the Texas lawsuit filed by X Corp. was "[t]he first of many," and his representation that X is "suing [Media Matters] in every country that they operate." *See also supra*, ¶¶27–29.

C.    **Twitter UK Ltd. threatens suit over the same conduct alleged in the Texas Complaint.**

87.    On December 19, 2023, Twitter UK ("TUK") sent Media Matters a demand letter citing the November 16 article and threatening defamation litigation in the UK. Ex. G. Twitter UK

is a subsidiary of X Corp. that markets and sells advertising services on the X platform to advertisers in the United Kingdom.

88.    As in the complaints filed by its affiliates, TUK's demand letter claims that Media Matters manipulated the X platform by: (1) using X accounts that had existed for more than 30 days, allegedly to avoid safeguard in place for new users; (2) exclusively following a small subset of users consisting of accounts expressing far-right views and those of well-known brands; and (3) refreshing or scrolling at a higher-than-average rate to generate more advertisement/content pairings than the average user would see. *Id.* ¶13.

89.    While the demand letter threatens a claim for defamation, TUK also asserts that this conduct was "in breach of X's Platform Manipulation and Spam Policy," which is incorporated into the TOS. *Id.*

90.    Upon information and belief, TUK threatened its suit against Media Matters at the direction of its parent corporation, X Corp. The demand letter makes the same allegations set forth in X Corp.'s Texas suit, and it was sent shortly after X Corp. CEO Elon Musk threatened to file "thermonuclear" litigation against Media Matters in response to the November 16 article. And, yet again, it is consistent with Musk's own promise of multiple lawsuits against Media Matters to be filed around the world. *See also supra*, ¶¶27–29.

**VII.    The X Terms of Service contain a broad forum selection clause that governs the X Entities' cases.**

91.    Every X user must agree to X's TOS when creating an account. X itself has described the account creation process as follow:

> To create a Twitter account, a prospective user must go through an online sign up process to choose a username and provide certain other information. Before prospective users can click a button that allows them to complete the process, they are presented with a message telling them that by signing up to Twitter and creating an account, they are agreeing to Twitter's TOS. . . . The message contains a link to the TOS. [ ] While the precise language of the message may have changed over time, users have always had to affirmatively agree to the TOS before signing up for a Twitter account, and a link to the TOS was always presented to them as part of the sign up process.

X Doshier Motion at 3–4 (citations omitted). This process applied to the account at issue here.

92.    Media Matters reporter Eric Hananoki created in July 2020 the X account that generated the ad pairings discussed in the November 16 article that precipitated X's claims. In doing so, he agreed to the X TOS.  Hananoki used the account to conduct research on behalf of Media Matters. In November 2023, he accessed the account to conduct research on X, Musk, and Twitter advertisers as detailed in the November 16, 2023 article.

93.    Hananoki was a Media Matters employee acting in the scope of his employment when creating and using the X account he used for researching the November 16 article.

94.    The TOS contain a broad venue and choice-of-law clause requiring parties to bring all claims related to X's "Services" in California courts:

> The laws of the State of California, excluding its choice of law provisions, will govern these Terms and any dispute that arises between you and us. ***All disputes related to these Terms or the Services will brought solely in the federal or state courts located in San Francisco County, California, United States***, and you consent to personal jurisdiction and waive any objection as to inconvenient forum. To the extent permitted by law, you also waive the right to participate as a plaintiff or class member in any purported class action, collective action, or representative action proceeding.

Ex. A at 10 (emphasis added).

95.    The TOS broadly define "Services" to include any use of X products, including what X describes in this lawsuit as its platform: "These Terms of Service ('Terms') govern your access to and use of our various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, commerce services, and our other covered services (https://help.x.com/rules-and-policies/x-services-and-corporate-affiliates) that link to these Terms (collectively, the Services)." *Id*. at 2–3.

96.    As set forth *supra*, each of the actions filed by the X Entities rest their respective liability theories on Plaintiffs' use of the X Platform and Media Matters' alleged "manipulation" of the algorithm, "evasion" of safeguards, and "fabrication" of the advertisement-content pairings viewed by the account. Each lawsuit alleges that X investigated Plaintiffs' specific use of the platform in order to determine the information underlying their claims, and asserts that Plaintiffs improperly: (1) used "secret" accounts that had existed for more than 30 days, purportedly to avoid the safeguards X claims it has in place for new users; (2) exclusively followed a small subset of users consisting of accounts expressing far-right views and those of well-known brands in order to

"trick" the algorithm; and (3) refreshed and scrolled at a high rate to generate more advertisement/content pairings than the average user would see.

97.    The X Entities' allegations against Plaintiffs plainly "relate[] to . . . the Services." Accordingly, the forum selection clause governs their actions, and those actions should have been filed in either state or federal court in San Francisco County, California.

98.    At least as of November 26, 2023—when Carusone gave a television interview that X describes in its Texas complaint as amplifying the message in the November 16 article—Carusone was aware that Hananoki had created and used an X account for Media Matters research, including research for the November 16 , 2023 article that forms the basis of X's lawsuits. Carusone was also aware that in creating the account, Hananoki agreed to the X (then known as Twitter) Terms of Service in effect at the time he created the account. Carusone was also aware that those Terms of Service included a California venue provision.

99.    The TOS states that it is between the user and X Corp. Ex. A at 3.

100.    The TOS also contains multiple benefits expressly for the "X Entities," which it defines as "X Corp., its parents, *affiliates, related companies*, officers, directors, employees, agents, representatives, partners, and licensors." *Id*. at 9 (emphasis added). Specifically, the TOS states that:

> THE **X ENTITIES** DISCLAIM ALL WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT. The **X Entities** make no warranty or representation and disclaim all responsibility and liability for: (i) the completeness, accuracy, availability, timeliness, security or reliability of the Services or any Content; (ii) any harm to your computer system, loss of data, or other harm that results from your access to or use of the Services or any Content; (iii) the deletion of, or the failure to store or to transmit, any Content and other communications maintained by the Services; and (iv) whether the Services will meet your requirements or be available on an uninterrupted, secure, or error-free basis. No advice or information, whether oral or written, obtained from the **X Entities** or through the Services, will create any warranty or representation not expressly made herein.

*Id*. (bolding added).

101.    The TOS also contains a Limitation of Liability provision benefitting the X Entities:

THE **X ENTITIES** SHALL NOT BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, OR ANY LOSS OF PROFITS OR REVENUES, WHETHER INCURRED DIRECTLY OR INDIRECTLY, OR ANY LOSS OF DATA, USE, GOODWILL, OR OTHER INTANGIBLE LOSSES, RESULTING FROM (i) YOUR ACCESS TO OR USE OF OR INABILITY TO ACCESS OR USE THE SERVICES; (ii) ANY CONDUCT OR CONTENT OF ANY THIRD PARTY ON THE SERVICES, INCLUDING WITHOUT LIMITATION, ANY DEFAMATORY, OFFENSIVE OR ILLEGAL CONDUCT OF OTHER USERS OR THIRD PARTIES; (iii) ANY CONTENT OBTAINED FROM THE SERVICES; OR (iv) UNAUTHORIZED ACCESS, USE OR ALTERATION OF YOUR TRANSMISSIONS OR CONTENT.

*Id.* at 9–10 (bolding added).

102.    TAP and TIUC are both "affiliates" and "related companies" of X Corp. and are consequently third-party beneficiaries of the TOS such that they are bound by its forum selection clause for "All disputes related to . . . the Services" that they have with Plaintiffs. Their decision to file lawsuits in foreign jurisdictions breached their obligations under the TOS.

103.    TAP and TIUC are bound by the TOS for the separate reason that they are alter egos of X Corp., both premising their claims on the notion that TAP and TIUC are respectively synonymous with "X." Both entities represent the X Platform, which is owned and maintained by X Corp., serving as the public face of X in their respective regions. Furthermore, upon information and belief as set forth in this complaint, TAP and TIUC filed their respective lawsuits against Media Matters on behalf of X Corp.: Musk himself acknowledged that X Corp.'s suit filed in Texas was but "The first of many," and he has promised that X Corp. will sue Media Matters "in every country that they operate." X Corp. is making good on that promise through its subsidiaries TAP and TIUC. *See also supra*, ¶¶27–29.

104.    TAP and TIUC are further bound by the forum selection clause because, for all the reasons set forth above, they are closely related to the contractual relationship.

**VIII.   The X Entities' campaign against Plaintiffs is part of an ongoing attempt to shift blame for X's lost advertising review and stifle critics.**

105.    Musk's proclamation that he would pursue "thermonuclear" litigation against Plaintiffs, and the subsequent international legal campaign initiated and directed by his company X Corp., are part of Musk's broader effort to blame anyone other than himself for X's sharp decline

in advertising revenue since his takeover—and to stifle any criticism that might hurt his bottom line.

106.    Musk has in the past acknowledged the role of his own behavior on advertisers' decision to flee the X platform: In an interview with CNBC following controversial X posts in which Musk criticized George Soros—and which critics characterized as antisemitic—Musk stated, "***I'll say what I want, and if the consequence of that is losing money, so be it***."[38]

107.    In an interview with Andrew Sorkin as part of the November 29, 2023 Dealbook Summit—just over a week after X Corp. filed its suit against Media Matters—Sorkin mentioned advertisers stopping their advertising in response to Musk's posts, to which Musk stated "I hope they stop. Don't advertise. . . . If somebody's going to try to blackmail me with advertising, blackmail me with money, go fuck yourself."[39]

108.    But as X continued to bleed advertising revenue, Musk was also in need of a scapegoat—and Media Matters is but one of many.

109.    For instance, on September 4, 2023, Musk took to X claiming that the ADL, which criticized X for platforming antisemitic speech, had caused X's US advertising revenue to plummet.[40]



> **Elon Musk** @elonmusk
>
> Subscribe
>
> Our US advertising revenue is still down 60%, primarily due to pressure on advertisers by @ADL (that's what advertisers tell us), so they almost succeeded in killing X/Twitter!
>
> 10:52 AM · Sep 4, 2023 · **9M** Views

---

[38] Mike Calia, "Elon Musk: 'I'll say what I want, and if the consequence of that is losing money, so be it,'" CNBA (May 16, 2023), https://www.cnbc.com/2023/05/16/elon-musk-defends-inflammatory-tweets-ill-say-what-i-want.html.

[39] Transcript, DealBook Summit 2023 Elon Musk Interview, https://www.rev.com/transcripts/dealbook-summit-2023-elon-musk-interview-transcript.

[40] @elonmusk, X.com (Sept. 4, 2023, 10:52 AM), https://x.com/elonmusk/status/1698755938541330907.

COMPLAINT - 31

110.    That same day, Musk used his platform to threaten defamation litigation against ADL—despite numerous outlets reporting on the proliferation of antisemitic content on X.[41]



111.    In another post that day, Musk claimed the ADL "would potentially be on the hook for destroying half the value of the company, so roughly $22 billion."[42]

112.    While X did not sue ADL, another organization that dared to publicly say something Musk disliked was not so lucky. On July 31, 2023, X Corp. filed suit against the Center for Countering Digital Hate ("CCDH"), a non-profit corporation dedicated to combatting online hate speech and disinformation. Unlike this case, X filed suit in this District, referencing the forum selection clause of the Terms of Service specifying venue in San Francisco. *X Corp. v. Center for Countering Digital Hate, Inc.*, 3:23-cv-03836-LB (N.D. Cal.), ECF 1 ¶14.

113.    Aside from venue, however, the CCDH suit bears a striking resemblance to X's campaign against Media Matters. As with Media Matters, X characterizes the non-profit CCDH as an activist organization "masquerading as a research agenc[y]" that "embarked on a scare campaign to drive away advertisers from the X platform." *X Corp. v. Center for Countering Digital Hate, Inc.*, 3:23-cv-03836-LB (N.D. Cal.), ECF 1 ¶1. As with Media Matters, X alleges CCDH improperly obtained information from X's platform and then presented it without context "to make it appear as if X is overwhelmed by harmful content, and then used that contrived narrative to call for companies to stop advertising on X." *Id.* ¶2. And as with Media Matters, X attributed its lost advertising revenue to CCDH's public reporting on its use of information from the X platform—

---

[41]    @elonmusk,    X.com    (Sept.    4,    2023,    3:41    PM), https://x.com/elonmusk/status/1698828606598734225.
[42]    @elonmusk,    X.com    (Sept.    4,    2023    3:53    PM), https://x.com/elonmusk/status/1698831606943801525.

reporting X disliked. *Id*. ¶5. In his March 2024 order dismissing the case, Judge Breyer found that, "Sometimes it is unclear what is driving a litigation, and only by reading between the lines of a complaint can one attempt to surmise a plaintiff's true purpose.  Other times, a complaint is so unabashedly and vociferously about one thing that there can be no mistaking that purpose.  This case represents the latter circumstance.  This case is about punishing the Defendants for their speech." *X Corp. v. Ctr. for Countering Digital Hate, Inc*., 724 F. Supp. 3d 948, 955 (N.D. Cal. 2024).  Indeed.

114.    X has even gone so far as to sue ***advertisers themselves*** for declining to buy advertisements on X's platform.[43]

115.    X Corp.'s multiplicity of suits against Media Matters is part of a broader strategy to intimidate the media and recoup lost advertising dollars by any means possible. It has cost Media Matters millions to litigate and forced Media Matters to layoff over a dozen employees—a result that Musk has publicly celebrated. On May 23, 2024, a Media Matters employee posted on X that she had been "laid off from @mmfa, along with a dozen colleagues." The account "Libs of TikTok" (a far-right account best known for amplifying anti-LGBTQ hate speech[44]) reposted the employee's post announcing that she'd been laid off, to which Musk responded, "Karma is real."[45]

116.    Another X user posted that same day celebrating that Media Matters was "experiencing the biggest mass of layoffs, with over a dozen terminations" as a consequence of X's lawsuit, claiming that Media Matter "f'd around [and] found out." Musk responded to the post, "Yup."[46]

---

[43] *See* Associated Press, *Elon Musk's X sues advertisers over alleged 'massive advertiser boycott' after Twitter takeover* (August 6, 2024), https://apnews.com/article/x-sues-advertisers-unilever-cvs-mars-orsted-673d1ae88e9fb0ca5b170d238739453e.

[44]    https://www.congress.gov/118/meeting/house/115561/documents/HHRG-118-IF16-20230328-SD069.pdf.

[45]    @elonmusk,    X.com    (May    23,    2024    5:03    PM), https://x.com/elonmusk/status/1793794871548858798?s=46.

[46]    @elonmusk,    X.com    (May    23,    2024    2:21    PM), https://x.com/stillgray/status/1793754245088653556.

117.    X Corp.'s decision to file in multiple jurisdictions across the globe is intended to chill Media Matters' reporting and drive up costs—both of which it has achieved—and it is directly foreclosed by X's own Terms of Service.

## IX.    Plaintiffs face ongoing harm.

118.    Media Matters faces imminent, ongoing harm as a consequence of being forced to defend itself on multiple fronts. It has a status conference set in less than two weeks in Ireland, at which the court will set a date to hear Media Matters' jurisdictional challenges. In Singapore, the hearing on the merits of Media Matters' jurisdictional challenge is set for April 14, 2025. Media Matters should not have to defend against attempts by X to hale Media Matters into court in foreign jurisdictions when the parties already agreed on the appropriate forum for any dispute related to X's services. That is—this Court.

119.    Media Matters, a non-profit organization, has been forced to spend millions of dollars defending against X's multiple suits. The fact that Media Matters must defend itself on multiple fronts does more than simply drive up costs: It means that Media Matters cannot focus its time and resources to mounting the best possible defense in one forum and must instead fight back piecemeal. Particularly given resource constraints, this divided approach prejudices Media Matters' ability to most effectively defend itself.

120.    X's litigation campaign against Plaintiffs has also significantly chilled Media Matters' and its employees' reporting. For instance, in the ten months preceding the lawsuit, Hananoki authored at least 16 articles critiquing Musk and/or X's approach to moderating hateful content on the platform. Since X's first lawsuit was filed, however, Hananoki has not authored any articles critiquing Musk and/or X's approach to moderating hate speech or extremist content on the X platform. He has written no articles critical of X's policies or business decisions at all since November 17, 2023, nor has he written about Musk in a single article since November 17, 2023—despite Musk being a prominent figure in national news that Hananoki would otherwise report on.

121.    X's Texas lawsuit made both Media Matters and Hananoki the target of threats and hate speech, and they have reason to fear its international suits will cause further online targeting: Media Matters is the named plaintiff in each; Hananoki is personally named as having supposedly

manipulated the X Platform in the Twitter Asia Pacific complaint; and Hananoki's research for the November 16 article forms the basis of both foreign suits. One public post on X, responding to a post by Hananoki regarding his article for Media Matters, stated: "I hope Elon sues the absolute ass out of you shameless hacks for this and it looks like he will be. Hope it was worth it."[47]   Private messages to Hananoki have included sentiments such as "PEDOPHILE FUCK WE HAVE ALL THE DOCUMENTS ON YOUR SORRY ASS" and "You're so fucked Eric! Elon is coming for you." And Media Matters received so many threats in the months following Musk's November 18 post and subsequent litigation that it was forced to increase its security for employees. The multiple pending suits around the world only increase the likelihood of further harassment.

122.    X has sought to obtain through discovery in Texas highly sensitive information from Media Matters and its reporters, including all of Hananoki's notes, drafts, source records, communications, and other documents that so much as mention X or Musk. Given the identical allegations in its foreign suits, TIUC and TAP will presumably do the same in their respective suits as well. While Hananoki did not use any confidential sources for the November 16 article, in order to avoid continuing to generate potentially discoverable information, including confidential source information, he has refrained from reporting about X and Musk. X's demands have also caused Hananoki to actively avoid communicating with or seeking out sources out of fear that they may be targeted as well. Indeed, as a consequence of X's litigation, Hananoki has largely stopped working as a Senior Investigative Reporter and his work is now primarily dedicated to defending not only himself in Texas, but also Media Matters in the multiple lawsuits X has launched around the world based on his work.

## CAUSES OF ACTION AND CLAIMS FOR RELIEF

### COUNT I

### Breach of Contract – Against X Corp. (Domestic Litigation)

123.    Plaintiffs incorporate all allegations set forth in this complaint, *supra*.

124.    The X Terms of Service ("TOS") is a valid and enforceable contract that X has in other contexts sought to enforce. Plaintiffs performed under the contract: they have used the

---

[47] @PotatoForeskins, X.com (Nov. 19, 2023, 12:23 PM ET), https://x.com/PotatoForeskins/status/1726290138312155338 [https://perma.cc/K3T4-JCYR].

account that generated the content depicted in the November 16 article in compliance with the terms set forth in the TOS, which is attached as Exhibit A.

125.    The TOS contains a forum selection clause stating, "All disputes related to these Terms or the Services will be brought solely in the federal or state courts located in San Francisco County, California, United States, and you consent to personal jurisdiction and waive any objection as to inconvenient forum." Ex. A at 10.

126.    Defendants are each bound by the TOS. X Corp. is a signatory, and TAP and TIUC are bound as third party beneficiaries, alter egos of X Corp., and as parties closely related to the contractual relationship.

127.    X Corp. breached the TOS by filing a lawsuit against Plaintiffs "related to . . . the Services" in the Northern District of Texas. *See* Ex. E.

128.    TAP breached the TOS by filing a lawsuit against Media Matters "related to . . . the Services" in Singapore. *See* Ex. C.

129.    TIUC breached the TOS by filing a lawsuit against Media Matters "related to . . . the Services" in Ireland. *See* Ex. B.

130.    Plaintiffs have suffered damages as a result of X Corp.'s breach of contract. Plaintiffs have been forced to expend millions of dollars in attorneys' fees and costs defending X Corp.'s improperly filed suit in Texas.

**COUNT II**

**Breach of Contract– Against X Corp., TIUC, and TAP (International Litigation)**

131.    Plaintiffs incorporate all allegations set forth in this complaint, *supra*.

132.    The X Terms of Service ("TOS") is a valid and enforceable contract that X has in other contexts sought to enforce. Plaintiffs performed under the contract: they have used the account that generated the content depicted in the November 16 article in compliance with the terms set forth in the TOS, which is attached as Exhibit A.

133.    The TOS contains a forum selection clause stating, "All disputes related to these Terms or the Services will be brought solely in the federal or state courts located in San Francisco

County, California, United States, and you consent to personal jurisdiction and waive any objection as to inconvenient forum." Ex. A at 10.

134.    Defendants are each bound by the TOS. X Corp. is a signatory, and TAP and TIUC are bound as third party beneficiaries, alter egos of X Corp., and as parties closely related to the contractual relationship.

135.    TAP breached the TOS by filing a lawsuit against Media Matters "related to . . . the Services" in Singapore. *See* Ex. C.

136.    TIUC breached the TOS by filing a lawsuit against Media Matters "related to . . . the Services" in Ireland. *See* Ex. B.

137.    Upon information and belief, X Corp. breached the TOS by directing TAP and TIUC to file their respective lawsuits against Media Matters, which are "related to . . . the Services," in courts outside of San Francisco County. Upon information and belief, the lawsuits filed by TAP and TIUC are part of a multi-national litigation campaign motivated by X Corp. chairman Elon Musk's vendetta against Media Matters.

138.    Plaintiffs have suffered damages as a result of Defendants' breaches of contract. Plaintiffs have been forced to expend millions of dollars in attorneys' fees and costs defending TIUC and TAP's separate lawsuits in two additional jurisdictions on two additional continents— neither of which house the forum Plaintiffs agreed to.

### COUNT III

### Declaratory Judgment related to the International Actions, 28 U.S.C. § 2201(a)

139.    Plaintiffs incorporate all allegations set forth in this complaint, *supra*.

140.    Defendants have filed multiple international suits against Media Matters, in each instance asserting allegations premised on the same single course of conduct by Plaintiffs. Specifically, TIUC has filed suit in Ireland, TAP has filed suit in Singapore, and, on information and belief, X Corp. directed the filing of both suits.

141.    The conduct alleged in these international lawsuits—that Plaintiffs allegedly manipulated the X Platform in an effort to generate specific content/advertisement pairings and

then reported on the results of that use—relates to the "Services" provided by X (as defined in the TOS) and Defendants were accordingly bound by the forum selection clause in the TOS.

142.    Despite being required to file their respective lawsuits in San Francisco County, California, Defendants instead filed their suits in different jurisdictions, including in Ireland and Singapore.

143.    An actual and imminent controversy exists between the parties over whether the forum selection clause in the TOS governs the claims asserted in Defendants' Irish and Singapore litigation.

144.    Declaratory judgement that the forum selection clause in the TOS governs the international cases filed by Defendants against Media Matters will resolve a substantial dispute between the parties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs requests that the Court enter an order or judgment against Defendants including the following:

(a) Damages against Defendants for their breaches of contract;

(b) Declaratory judgment that the claims asserted by TIUC and TAP in their respective actions against Media Matters are governed by the forum selection clause in X's Terms of Service designating courts in San Francisco County, California, as the proper venue;

(c) Injunctive relief enjoining Defendants from further prosecuting their pending actions against Media Matters in Ireland and Singapore jurisdictions; and enjoining X Corp., whether directly or through its subsidiaries, from prosecuting or initiating litigation against Media Matters arising from the same conduct alleged in the pending Ireland and Singapore complaints in jurisdictions outside of the United States; and

(d) All other relief to which Plaintiffs may be entitled at law or in equity.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

**SUSMAN GODFREY L.L.P.**

Dated: March 10, 2025

By:  /s/ Katherine M. Peaslee

JUSTIN A. NELSON (TX SBN 24034766)*
MATTHEW BEHNCKE (TX SBN 24069355)*
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
jnelson@susmangodfrey.com
mbehncke@susmangodfrey.com

KATHERINE M. PEASLEE (CA SBN 310298)
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
kpeaslee@susmangodfrey.com

AMANDA BONN (CA SBN 270891)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
abonn@susmangodfrey.com

AMER S. AHMED (NY SBN  4382040)*
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Email: aahmed@gibsondunn.com

*pro hac vice forthcoming

Attorneys for Plaintiffs Media Matters for
America, Angelo Carusone, and Eric Hananoki

TAB 2

JUSTIN A. NELSON (TX SBN 24034766)*
jnelson@susmangodfrey.com
MATT BEHNCKE (TX SBN 24069355)*
mbehncke@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
*pro hac vice

KATHERINE M. PEASLEE (CA SBN 310298)
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
kpeaslee@susmangodfrey.com

AMANDA BONN (CA SBN 270891)
abonn@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

*Attorneys for Plaintiff Media Matters for America*
*(Additional parties and counsel listed with signature)*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| MEDIA MATTERS FOR AMERICA, ANGELO CARUSONE, and ERIC HANANOKI | Case No. 3:25-cv-02397-VC |
| Plaintiffs, | **PLAINTIFFS' NOTICE OF MOTION FOR A PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION** |
| vs. | |
| X CORP., TWITTER INTERNATIONAL UNLIMITED CO., and TWITTER ASIA PACIFIC PTE. LTD. | Date:  April 17, 2025 (*request to shorten forthcoming*) |
| Defendants. | Time: 10:00 AM |
| | Place: Courtroom 4 – 17th Floor |
| | 450 Golden Gate Avenue, |
| | San Francisco, CA 94102 |

# **TABLE OF CONTENTS**

NOTICE OF MOTION ………..………………………………………………………..1

I.    INTRODUCTION ............................................................................................ 1

II.   ISSUES TO BE DECIDED .............................................................................. 3

III.  STATEMENT OF RELEVANT FACTS .......................................................... 3

      A.    Hate speech rises on X after Musk's takeover and advertisers flee........................ 3

      B.    Media Matters joins the media conversation regarding extremism on X. .............. 4

      C.    X Corp. initiates a retaliatory litigation campaign against Media
            Matters. ................................................................................................. 5

      D.    X's foreign actions repeat the same allegations as X Corp's Texas
            Complaint. ............................................................................................. 8

      E.    Media Matters reporter Hananoki agreed to the X Terms of Service. ................. 10

      F.    The Terms of Service expressly benefit X affiliates and related
            companies................................................................................................. 10

IV.   LEGAL STANDARD...................................................................................... 11

V.    ARGUMENT .................................................................................................. 12

      A.    The issues and parties here are the same as in the foreign cases .......................... 12

            1.    A valid forum selection clause exists in the TOS. ................................... 13

            2.    The issues fall under the forum selection clause....................................... 13

            3.    All of the parties in the foreign action fall under the forum
                  selection clause. ...................................................................... 16

      B.    Maintaining litigation outside this Court would frustrate this forum's
            policy, be vexatious and oppressive, and prejudice Media Matters...................... 22

      C.    The injunction's impact on comity is tolerable.................................................... 25

VI.   CONCLUSION ................................................................................................ 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Applied Med. Distribution Corp. v. Surgical Co. BV*,
    587 F.3d 909 (9th Cir. 2009)..............................................................................*passim*

*Brittain v. Twitter Inc.*,
    2019 WL 110967 (D. Ariz. Jan. 4, 2019) ............................................................ 13

*Burse v. Purdue Pharma Co.*,
    2004 WL 1125055 (N.D. Cal. May 3, 2004) ...................................................... 24

*E. & J. Gallo Winery v. Andina Licores S.A.*,
    446 F.3d 984 (9th Cir. 2006)..............................................................................*passim*

*Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*,
    328 F.3d 1122 (9th Cir. 2003)........................................................................ 18, 20

*Harris v. Cnty. of Orange*,
    682 F.3d 1126 (9th Cir. 2012)................................................................................ 18

*JH Portfolio Debt Equities, LLC v. Garnet Cap. Advisors, LLC*,
    2018 WL 6112695 (C.D. Cal. Mar. 16, 2018) ...................................................... 17

*Lewis v. Liberty Mut. Ins. Co.*,
    321 F. Supp. 3d 1076 (N.D. Cal. 2018), *aff'd*, 953 F.3d 1160 (9th Cir. 2020)...................... 13

*Lockheed Martin Corp. v. Aceworld Holdings Pty Ltd.*,
    No. 5:19-cv-04074-EJD, 2019 WL 3767553 (N.D. Cal. Aug. 9, 2019) ........................ 12, 24

*Manetti-Farrow, Inc. v. Gucci Am. Inc.*,
    858 F.2d 509 (9th Cir. 1988)........................................................................ 13, 21

*Mazal Group, LLC v. Barak*,
    2019 WL 4316244 (C.D. Cal. June 17, 2019) ...................................................... 18

*Mediterranean Enters., Inc. v. Ssangyong Corp.*,
    708 F.2d 1458 (9th Cir. 1983)................................................................................ 13

*Microsoft Corp. v. Motorola, Inc.*,
    696 F.3d 872 (9th Cir. 2012)................................................................... 2, 11, 22

*Perry v. AT&T Mobility LLC*,
    No. C 11–01488 SI, 2011 WL 4080625 (N.D. Cal. Sept. 12, 2011) .............................. 13, 14

*Philadelphia Indem. Ins. Co. v. SMG Holdings, Inc.*,
    44 Cal. App. 5th 834 (2019) ................................................................................ 20

*Pirozzi v. Fiserv Corp.*,
   668 F. Supp. 3d 968 (C.D. Cal. 2022) ...................................................... 16

*Republic of the Philippines v. Marcos*,
   862 F.2d 1355 (9th Cir. 1988)............................................................... 12

*Robles v. Schneider National Carriers, Inc.*,
   2017 WL 8232083 (C.D. Cal. Dec. 11, 2017) ......................................... 14

*Scott USA Inc. v. Patregnani*,
   2015 WL 1736496 (D. Idaho Apr. 16, 2015)........................................... 21

*TAAG Linhas Aereas de Angola v. Transamerica Airlines, Inc.*,
   915 F.2d 1351 (9th Cir. 1990)............................................................... 20

*Trans-Tec Asia v. M/V HARMONY CONTAINER*,
   435 F. Supp. 2d 1015 (C.D. Cal. 2005), *aff'd*, 518 F.3d 1120 (9th Cir. 2008)...................... 20

*Trump v. Twitter, Inc.*,
   2021 WL 8202673 (S.D. Fla Oct. 26, 2021) ...................................... 13, 16

*Trump v. Twitter, Inc.*,
   21-cv-22441 (S.D. Fla.) ........................................................................ 16

*In re Untersweser Reederei GMBH*,
   428 F.2d 888 (5th Cir. 1970)................................................................. 11

*White Knight Yacht LLC v. Certain Lloyds at Lloyd's London*,
   407 F. Supp. 3d 931 (S.D. Cal. 2019) ............................................... 16, 20

*X Corp. v. Center for Countering Digital Hate*,
   No. 23-cv-03836 (N.D. Cal.) .................................................................. 5

*X Corp. v. Ctr. for Countering Digital Hate, Inc.*,
   724 F. Supp. 3d 948 (N.D. Cal. 2024) ................................................... 23

*X Corp. v. Media Matters for America et al.*,
   No. 4:23-cv-1175 (N.D. Tex)............................................................ 6, 17

**Statutes**

28 U.S.C. § 1404 ........................................................................................ 1

28 U.S.C. § 1406 ........................................................................................ 1

**Rules**

Fed. R. Civ. P. 65(a).................................................................................... 1

**Constitional Provisions**

U.S. Const. amend. I. ................................................................................ 24

**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**

PLEASE TAKE NOTICE that on April 17, 2025,[1] at 10:00 AM, before the Honorable Vince Chhabria, Plaintiffs Media Matters for America, Angelo Carusone, and Eric Hananoki (together, "Plaintiffs") move under Federal Rule of Civil Procedure 65(a) for an order granting a preliminary injunction against Defendants X Corp., Twitter International Unlimited Co. ("TIUC"), and Twitter Asia Pacific Pte. Ltd. ("TAP") (together, "X" or "Defendants"). The Motion is based on this Notice of Motion and Motion, the supporting Memorandum, the pleadings and papers on file in this action, arguments of counsel, and any other matter that the Court may properly consider.

Media Matters respectfully requests the Court enter a preliminary injunction (1) enjoining Defendants from further prosecuting their pending actions against Media Matters in jurisdictions outside the United States, and (2) enjoining X Corp., whether directly or through its subsidiaries, from prosecuting or initiating litigation against Media Matters arising from the same conduct alleged in the Ireland and Singapore complaints in jurisdictions outside of the United States.

**MEMORANDUM AND POINTS OF AUTHORITIES**

**I.    INTRODUCTION**

X has filed three lawsuits against Media Matters—in Texas, Ireland, and Singapore—and has threatened a fourth, each premised on the *exact same conduct*: Media Matters' use of the X Platform in a way that X calls "inorganic" and "contrived," and Media Matters' subsequent reporting on that use. X's worldwide litigation campaign is harassing and retaliatory. It is also a breach of contract. The Terms of Service governing Media Matters' use of the X Platform require that "All disputes related to these Terms or the Services" be litigated in San Francisco County, California. Ex. 1 at 10.[2] Plaintiffs thus seeks injunctive relief to vindicate the forum selection clause and ensure that any foreign litigation arising from the same conduct proceeds in the proper forum.[3]

While X's cases in Ireland and Singapore were nominally filed by Twitter International

---

[1] Plaintiffs intend to promptly file a motion to shorten, requesting a hearing date of April 10, 2025, in order to set the hearing of this motion in advance of an April 14 hearing in Singapore.

[2] Cited exhibits are attached to the Declaration of K. Peaslee, concurrently filed herewith.

[3] Media Matters' present motion does not seek injunctive relief with regard to the pending Texas litigation. Rather, Plaintiffs have filed a motion pursuant to 28 U.S.C. §§ 1404 and 1406 in that matter to transfer venue to the Northern District of California. That motion is currently pending.

Unlimited Co. ("TIUC") and Twitter Asia Pacific Pte. Ltd. ("TAP"), respectively, statements from X Corp.'s chairman Elon Musk and the nearly identical nature of those suits to X Corp.'s prior suit filed in the Northern District of Texas underscore that those international cases were filed at the direction of X Corp. Accordingly, Media Matters seeks a preliminary injunction barring not only TIUC and TAP, but also X Corp., from maintaining litigation against Media Matters in foreign jurisdictions in violation of the Terms of Service and from initiating any new suits based on the same alleged conduct in foreign jurisdictions.

The Ninth Circuit has held that an anti-suit injunction is appropriate in the face of a valid forum selection clause. *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984 (9th Cir. 2006). The factors considered by courts in this circuit when issuing an anti-suit injunction against foreign litigation all weigh in favor of relief for Media Matters.

*First*, the case before this Court is dispositive of the issues in the foreign litigation and all parties to the foreign litigation are parties here. The Ninth Circuit has explained that the issues and parties need not be identical across foreign and local cases where the local case is "dispositive" of the foreign one. Rather, the relevant inquiry is whether the issues and parties in the foreign litigation are subject to a forum selection clause, rendering the foreign suit improperly filed. *Applied Med. Distribution Corp. v. Surgical Co. BV*, 587 F.3d 909, 915 (9th Cir. 2009). That is the case here.

*Second*, Media Matters can satisfy three of the so-called *Unterweser* considerations, any *one* of which is sufficient for the second prong of *Gallo*. *See Microsoft Corp. v. Motorola, Inc*., 696 F.3d 872, 881 (9th Cir. 2012). An anti-suit injunction is appropriate because United States policy favors enforcing forum selection clauses between private parties, the foreign litigation is vexatious and oppressive to Media Matters, and Media Matters is prejudiced by the foreign litigation. Any one of those factors is sufficient.

*Third*, as the Ninth Circuit has held, comity is not implicated when private parties are subject to a forum selection clause. *Applied Med. Distrib.*, 587 F.3d. at 914.

Media Matters is harmed on an ongoing basis by being required to defend itself on multiple fronts around the world. It respectfully requests that this Court grant preliminary injunctive relief.

## II.    ISSUES TO BE DECIDED

Whether this Court should grant a preliminary injunction (1) barring X Corp., TIUC, and TAP from prosecuting their pending international litigation against Media Matters; and (2) barring X Corp. from initiating or directing further international litigation, directly or through its subsidiaries, arising from the same alleged conduct.

## III.    STATEMENT OF RELEVANT FACTS

### A.  Hate speech rises on X after Musk's takeover and advertisers flee.

Elon Musk purchased X—then known as Twitter—in October 2022. Almost immediately, Musk began laying off key executives and content moderators at X responsible for removing hate speech and violent rhetoric. Ex. 2 at 4; Ex. 3 at 1. As part of the many changes Musk brought to the platform, Musk eliminated a number of existing products and policies designed to protect users from misinformation and violent content under the guise of promoting "free speech." Ex. 2 at 4. He also reinstated suspended accounts of known white supremacists and conspiracy theorists. *Id*.

The dismantling of much of X's content moderation infrastructure had an unsurprising effect: Extremist and racist rhetoric surged on X. Less than a month into Musk's ownership, the Brookings Institute reported that the platform had seen a "surge in hateful language" in the wake of Musk's purchase, including "a nearly 500% increase in use of the N-word in the 12-hour window immediately following the shift of ownership to Musk." Ex. 3 at 1. Academic researchers at Montclair State University published a report describing how "Hate Speech Spike[d] on Twitter After Elon Musk Acquire[d] the Platform." Ex. 4 at 1. *The New York Times* likewise reported on the rise of hate speech on X following Musk's takeover. *See* Ex. 5.

The spike in hateful rhetoric on X caught the attention of companies that advertise on the platform, who understandably do not want to create an association between their brands and such content. Advertisers began to stop advertising on the platform in the months after Musk took over: CNN reported that since "the early days of Musk's takeover, many of Twitter's largest advertisers—including the likes of General Mills and the Volkswagen Group—paused their spending over concerns about X's layoffs, content moderation capabilities and general uncertainty about the platform's future." Ex. 2 at 5–6; *see also* Ex. 6.

In addition to X's abandonment of some of its prior content moderation efforts, advertisements began appearing alongside this flood of hateful and violent rhetoric—potentially creating exactly the perceived association between their brands and hate speech that advertisers hope to avoid. Indeed, media outlets including *The Washington Post*, *Ars Technica*, *The Verge*, *Business Insider*, *The New York Post*, and others have reported on the platform's failure to protect advertisers from having their brands appear next to extremist, hateful, and violent rhetoric. *See* Exs. 7–11, 16, 35. This led to a broader exodus of advertisers from the platform—and a significant drop in its revenue. In July 2023, CNN reported that, according to Musk, X had a "50% decline in ad revenue and heavy debt load." Ex. 2 at 6. In September, Musk reportedly stated that advertising revenue in the U.S. was "still down 60%." *Id.*

In August 2023, X's CEO Linda Yacccarino addressed the advertiser exodus and declining ad revenue, stating that X had taken action to protect advertisers: She assured advertisers that brands are now "protected from the risk of being next to" potentially toxic content. Ex. 12 at 4.

### B.  Media Matters joins the national conversation regarding extremism on X.

Plaintiff Media Matters for America ("Media Matters") is a not-for-profit research center and media watchdog dedicated to comprehensively monitoring, analyzing, and correcting misinformation in the media.  Ex. 13 (Carusone Decl.), ¶2. Plaintiff Angelo Carusone is President of Media Matters, and Plaintiff Eric Hananoki is a Senior Investigative Reporter. *Id.*; Ex. 14 (Hananoki Decl.), ¶2. Media Matters routinely covers both content appearing on social media and issues related to internet "brand safety"—that is, advertisers' protections from having their ads appear next to objectionable content on the internet. Ex. 13, ¶2.

As part of this coverage, Media Matters participated in the national conversation over the rise of hate speech on X and the platform's continued placement of advertisements alongside such content. Reporter Hananoki used an existing X research account that was solely for his work for Media Matters—and which he had created for research well before Musk's takeover—to follow white supremacist content and to see what advertising, if any, X's algorithm would place alongside that content. Ex. 14, ¶¶6–7. His research confirmed that the platform's system was continuing to permit advertisements next to violent and fringe content—as demonstrated in his reporting. Ex. 15.

On November 15, 2023, Musk responded to a user's post on X endorsing a conspiracy theory about Jewish communities with the comment, "You have said the actual truth." Peaslee Decl. ¶3. His post—which he later said "might be literally the worst and dumbest post I've ever done," Ex. 17 at 1—faced backlash from advertisers. *Id.*; Ex. 18 at 3 (Disney CEO on pulling ads from X).

The next day, November 16, 2023, Media Matters published an article by Hananoki entitled "As Musk endorses antisemitic conspiracy theory, X has been placing ads for Apple, Bravo, IBM, Oracle, and Xfinity next to pro-Nazi content." Ex. 15. The article included screenshots of advertisements from these companies appearing alongside pro-Nazi content. *Id.* The article subhead explained that "CEO Linda Yaccarino previously claimed that brands are 'protected from the risk of being next to' toxic posts." *Id.* The article does not claim that X was intentionally placing advertisements next to extremist or hateful content. Rather it reports truthfully, as illustrated by accurate screenshots set forth in the article, that the X platform permitted the placement of advertisements from large companies next to posts that touted Hitler or the Nazi party. This was newsworthy because X was claiming publicly that X's safety features would protect brands from having this occur. *See id.*; Ex. 12 at 3–7.

### C.  X Corp. initiates a retaliatory litigation campaign against Media Matters.

While numerous news outlets had reported on advertisers' exodus from the X Platform in response to rising hate speech, insufficient content moderation, and Musk's own conduct, *supra* pp.3–4, Musk sought to blame anyone else for the platform's declining ad revenue. Musk threatened to sue the Anti-Defamation League ("ADL") for supposedly driving away advertisers when the ADL criticized X as platforming antisemitism. *See* Peaslee Decl., ¶4. His company, X Corp., filed a lawsuit against the Center for Countering Digital Hate ("CCDH") seeking lost advertising revenue after—like Media Matters—CCDH dared publish the results of its research on the X Platform showing a rise in hate speech. *X Corp. v. Center for Countering Digital Hate*, No. 23-cv-03836 (N.D. Cal.). And, of course, Musk sought to blame X's declining revenue on Media Matters.

On November 18, Musk posted on X a promise to file "a thermonuclear lawsuit against Media Matters" in response to the November 16 article. Peaslee Decl., ¶5. His post attached a list

of "facts" about the November 16 article and accused Media Matters of manipulating X's algorithm to artificially force the placement of ads next to extremist content. *Id*.

On Monday, November 20, 2023, X Corp. made good on Musk's promise: It filed a lawsuit against Media Matters and Hananoki in federal court in the Northern District of Texas, alleging claims for Interference with Contract, Business Disparagement, and Interference with Prospective Economic Advantage. *X Corp. v. Media Matters for America et al*., No. 4:23-cv-1175 (N.D. Tex), Dkt. 1. X Corp. later amended to add Carusone as a defendant. *Id*., Dkt. 37.

X Corp.'s lawsuit alleges that Media Matters "knowingly and maliciously manufactured side-by-side images depicting advertisers' posts on X Corp.'s social media platform beside Neo-Nazi and white-nationalist fringe content," and that Media Matters "designed" these images as part of a "media strategy to drive advertisers from the platform and destroy X Corp." Ex. 19 (Texas Complaint), ¶7. According to X Corp., this activity formed part of an ideological crusade on behalf of Media Matters and its President, Carusone. *Id*. ¶34. The Complaint does not, however, deny that the content/advertisement pairings are real pairings that X placed on the Media Matters account's feed. Instead, the complaint claims that in order to generate the advertisement-content pairings upon which Media Matters reported, Media Matters "created utterly extraordinary and manufactured circumstances that no organic user would undertake" and "deliberately misused the X platform to induce the algorithm to pair racist content with popular advertisers' brands" in order to mislead readers. *Id*. ¶8. According to X Corp., Media Matters' supposed "manipulation" of the platform, and its truthful reporting on its results, "harmed X Corp.'s business relationships and advertising contracts with numerous companies." *Id*.

The Complaint breaks down the manner in which Media Matters purportedly "manufactured" circumstances that "induce[d] the algorithm" to create objectionable pairings, *id.*:

*First*, X Corp. alleges that "Media Matters set out on their attempt to evade X's content filters for new users by specifically using an account that had been in existence for more than thirty days." *Id*. ¶51.

*Second*, it alleges that "Media Matters set its account to follow only 30 users," all of which "were either already known for posting controversial content or were accounts for X's advertisers."

*Id*. ¶52. This "attempt to flood the Media Matters account with content only from national brands and fringe figures" "trick[ed] the algorithm into thinking Media Matters wanted to view both hateful content and content from large advertisers." *Id*.

*Third*, X Corp. alleges that Media Matters began to "alter its scrolling and refreshing activities in an attempt to manipulate inorganic combinations of advertisements and content." *Id.* ¶53. According to X Corp., this "generated between 13 and 15 times more advertisements per hour than would be seen by a typical user, attempting to forcibly generate a pairing of fringe content and paid advertisements." *Id*.

The complaint admits that, after Hananoki allegedly followed these steps, X Corp.'s algorithm returned the advertisement-content pairings featured in the November 16 article. *Id.* ¶54.

Musk made no secret of the fact that X Corp.'s suit was just the start of a retaliatory campaign against Media Matters. When a user on X posted that "X Corp. has filed a lawsuit against Media Matters," Musk responded, "The first of many." Peaslee Decl., ¶6. At an X Townhall on December 10, 2023, he told his audience,

> Media Matters is an evil propaganda machine. . . . ***We are suing them in every country that they operate***. And we will pursue not just the organization, but anyone funding that organization. I want to be clear about that. Anyone funding that organization, we will pursue them. So Media Matters is an evil propaganda machine. They can go to hell. I hope they do.

Ex. 20 at 1–2.

Once again, Musk was not making empty threats. Just three days prior, on December 7, 2023, X Corp.'s subsidiary in the EU and UK, Twitter International Unlimited Company ("TIUC") served a summons on Media Matters in Ireland alleging the same supposed "manipulation" of the X Platform and seeking to hold Media Matters liable for lost advertising revenue. *See* Ex. 21. That same day, X Corp.'s subsidiary in the Asia Pacific region, Twitter Asia Pacific Pte. Ltd. ("TAP") had threatened to file effectively the same suit—which it subsequently did, in July 2024. *See* Exs. 22–23 (TAP Demand and Complaint). And nine days after Musk's promise of worldwide litigation, Twitter UK ("TUK") sent Media Matters a demand letter threatening to file yet ***another*** instance of the same lawsuit. Ex. 24 (TUK Demand). TUK's letter claimed, as part of its recitation of the same conduct set forth in X's Texas Complaint, that Media Matters "deliberately, and in breach of

X's Platform Manipulation and Spam Policy, bypassed numerous safeguards that have been put in place in order to generate the content it sought in furtherance of its aims." *Id.*, ¶13. The Platform Manipulation and Spam Policy is incorporated into the X Terms of Service. Ex. 1 at 8. As of the date of this filing, TUK has not filed suit.

### D. X's foreign actions repeat the same allegations as X Corp's Texas Complaint.

The TIUC and TAP complaints each assert claims for defamation and malicious falsehood premised on Media Matters' same use of the X Platform—which TIUC claims to operate and TAP represents in their respective regions—and Media Matters' reporting on that use.

TIUC alleges that Media Matters "exploited" the features of the platform by using a "secret existing X account" to "evade normal safeguards, which manipulated the system through which posts and advertisements appear." Ex. 25, ¶12. Specifically, TIUC alleges that Media Matters:

- "[A]ttempted to evade X's content filters for new users, which excludes ads being served to newly created accounts as a safety measure, by specifically using an account that had been in existence for more than thirty days;"

- "[S]et the Secret Account to follow only 30 users (far less than the average number of accounts followed by a typical active user (219)), severely limiting the amount and type of content featured on its feed," in an "an attempt to flood the Secret Account with content only from large brands and fringe figures, tricking the algorithm into thinking that the Secret Account wanted to view both hateful content and content from large advertisers;" and

- "[A]ltered its scrolling and refreshing activities in an attempt to manipulate inorganic combinations of advertisements and content. The Secret Account's excessive scrolling and refreshing generated between 13 and 15 times more advertisements per hour than would be seen by a typical user, essentially seeking to force a situation in which a brand ad post appeared adjacent to fringe content."

*Id.* ¶¶14–15. In other words, TIUC alleges—at times verbatim—the same conduct alleged in the Texas Complaint. TIUC concedes that Media Matters' use of the platform did in fact result in the ad pairings depicted and reported on in the November 16 article. *Id.* ¶¶12, 15. TIUC seeks damages from Media Matters for lost advertising revenue that it claims resulted from the November 16 article reporting on the content generated in response to this alleged use of X's services. *Id.* ¶28, p.8.

The TAP complaint features similar allegations. Specifically, according to the TAP complaint, Media Matters "and/or" Hananoki "deliberately manufactured" the ad placements

through a "scheme" consisting of multiple steps intended to "overcome the 3-layered content moderation mechanism" that X has in place. Ex. 23, ¶28–29:

(a) First, MM and/or Mr. Hananoki utilized an account that had been active for at least 30 days ("Decoy Account") to bypass the X Platform's additional advertisement filter for new users. This increased MM and/or Mr. Hananoki's chances of procuring X Group's major clients' advertisements on their feed.

(b) Second, MM and/or Mr. Hananoki ensured that the Decoy Account exclusively followed a small subset of X Platform users falling into one of two categories: (i) those known to produce extreme, fringe content and (ii) X Group's major advertising clients. MM and/or Hananoki took this deliberate step to game the algorithm set up in the X Platform's content moderation mechanism—an algorithm that the X Group had designed to protect bona fide users of the X Platform from objectionable content. To further amplify their efforts, MM and/or Mr. Hananoki set the Decoy Account to follow only 30 users (far less than the average number of accounts followed by a typical active user, i.e., 219), thus severely limiting the amount and type of content featured on their feed.

(c) Third, MM and/or Mr. Hananoki repeatedly scrolled and refreshed their unrepresentative, hand-selected feed, generating between 13 and 15 times more advertisements per hour than viewed by the average X Platform user. . . .

Ex. 23, ¶29. As in both the Texas and Ireland complaints, TAP concedes that the X Platform did in fact show the Media Matters account the ad pairings featured in the article in response to the alleged use. *Id*. ¶30. The TAP Complaint asserts damages for Media Matters' reporting on the results of its use of X's platform amounting to "approximately USD 12,935,231." *Id*. ¶43.

While Twitter UK ("TUK") has not filed any suit against Media Matters, the demand letter Media Matters received from TUK recites the same conduct set out in the TIUC and TAP complaints and similarly threatened a defamation claim, based on Media Matters' supposed misuse of the platform in violation of X's Terms of Service. Ex. 24.

The parties are currently litigating Media Matters' jurisdictional challenges in the foreign actions. In Ireland, a status conference on March 12 will set the hearing schedule for that challenge. Ex. 13, ¶9. In Singapore, a hearing on the merits of the challenge is scheduled for April 14, 2025. Media Matters has consistently contested jurisdiction and venue in both Ireland and Singapore. *Id*. No discovery has taken place in the foreign actions. *Id*.

### E.  Media Matters reporter Hananoki agreed to the X Terms of Service.

Media Matters reporter Eric Hananoki created the X account that saw the ad pairings discussed in the November 16 article in July of 2020. Ex. 14, ¶6. In doing so, he agreed to the X Terms of Service. *Id*. Hananoki used the account to conduct research on behalf of Media Matters. *Id*., ¶7. In November 2023, acting within the scope of his employment, Hananoki accessed the account to conduct research on X, Musk, and Twitter advertisers as detailed in the November 16, 2023 article. *Id*.

The Terms of Service operative in November 2023 contain a broad forum selection clause requiring parties to bring all claims related to "X's Services" in California courts:

> The laws of the State of California, excluding its choice of law provisions, will govern these Terms and any dispute that arises between you and us. ***All disputes related to these Terms or the Services will be brought solely in the federal or state courts located in San Francisco County, California***, United States, and you consent to personal jurisdiction and waive any objection as to inconvenient forum.

Ex. 1 at 10 (emphasis added). The X Terms of Service broadly defines "Services" to include any use of X products, including what X describes in its lawsuits as its platform: "These Terms of Service ('Terms') govern your access to and use of our services, including our various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, commerce services, and our other covered services . . . that link to these Terms (collectively, the 'Services')." *Id*. at 2–3.

### F.  The Terms of Service expressly benefit X affiliates and related companies.

The X Terms of Service are between the user and X Corp. However, the TOS includes a definition of "X Entities," which is "X Corp., its parents, ***affiliates, related companies***, officers, directors, employees, agents, representatives, partners, and licensors." *Id*. at 9 (emphasis added). The TOS provides multiple benefits for the X Entities. For example, the TOS provides the following disclaimers:

> THE **X ENTITIES** DISCLAIM ALL WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT. The **X Entities** make no warranty or representation and disclaim all responsibility and liability for: (i) the completeness, accuracy, availability, timeliness, security or reliability of the Services or any Content; (ii) any harm to your computer system, loss of data, or other harm that results from your access to or use of the Services or any Content; (iii) the deletion of, or the failure to store or to transmit, any Content and other communications maintained by the Services; and (iv)

---

PLAINTIFFS' MOT. FOR PRELIMINARY INJUNCTION, CASE NO. 3:25-CV-02397-VC - 10

whether the Services will meet your requirements or be available on an uninterrupted, secure, or error-free basis. No advice or information, whether oral or written, obtained from the **X Entities** or through the Services, will create any warranty or representation not expressly made herein.

*Id.* (bolding added).

The TOS also provides a Limitation of Liability that benefits the X Entities: Specifically, the "X ENTITIES SHALL NOT BE LIABLE" for "ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, OR ANY LOSS OF PROFITS OR REVENUES . . . OR ANY LOSS OF DATA, USE, GOODWILL, OR OTHER INTANGIBLE LOSSES" resulting from a range of conduct. *Id.* at 10.

## IV.    LEGAL STANDARD

This Court's authority to enter an anti-suit injunction barring parties from maintaining foreign litigation derives from its "equitable powers." *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 989 (9th Cir. 2006). "The suitability of an anti-suit injunction involves different considerations from the suitability of other preliminary injunctions." *Id.* at 990. A party seeking an anti-suit injunction against a foreign proceeding "need not meet our usual test of a likelihood of success on the merits of the underlying claim." *Id.* at 991. Rather, a plaintiff "need only demonstrate that the factors specific to an anti-suit injunction weigh in favor of granting the injunction." *Id.*; *see Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 881 (9th Cir. 2012) (reaffirming that *Gallo* test replaces the usual preliminary injunction test in the context of foreign anti-suit injunctions).

The anti-suit injunction factors for a court to consider are: "(1) whether or not the parties and the issues are the same, and whether or not the first action is dispositive of the action to be enjoined; (2) whether the foreign litigation would frustrate a policy of the forum issuing the injunction [or another *Unterweser* factor applies];[4] and (3) whether the impact on comity would be tolerable." *Applied Med. Distrib. Corp. v. Surgical Co. BV*, 587 F.3d 909, 913 (9th Cir. 2009) (internal quotations omitted). Each of these considerations supports granting an injunction here.

It is within the discretion of the district court to accept hearsay evidence for purposes of

---

[4] The Fifth Circuit in *In re Untersweser Reederei GMBH*, 428 F.2d 888, 896 (5th Cir. 1970) identified a disjunctive list of considerations that may justify an anti-suit injunction against foreign litigation. *Microsoft*, 696 F.3d at 881–82. The second *Gallo* factor is satisfied if any one of the *Unterweser* considerations is met. *See id.*

deciding whether to issue a preliminary injunction. *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988).

## V.    ARGUMENT

Media Matters seeks a preliminary injunction (1) enjoining X Corp., TIUC, and TAP from further prosecuting their pending actions against Media Matters in foreign jurisdictions, and (2) enjoining X Corp., whether directly or through its subsidiaries, from prosecuting or initiating litigation against Media Matters arising from the same conduct alleged in the pending Ireland and Singapore complaints in jurisdictions outside of the United States. It is well within this Court's power to enjoin not just pending litigation but also prospective litigation in light of X Corp.'s threat of worldwide litigation, its filed cases, and the binding forum selection clause. *See, e.g.*, *Lockheed Martin Corp. v. Aceworld Holdings Pty Ltd.*, No. 5:19-cv-04074-EJD, 2019 WL 3767553, at *4 (N.D. Cal. Aug. 9, 2019) (enjoining prospective litigation because "[i]f the court does not issue an anti-suit injunction, Defendants may well bring the threatened claims against Lockheed in violation of the forum-selection clause."). Media Matters satisfies each of the *Gallo* factors considered by courts in this Circuit when ruling on a request for an anti-suit injunction.

### A.  The issues and parties here are the same as in the foreign cases.

The first step in determining whether an anti-suit injunction is appropriate is to determine "whether or not the parties and the issues are the same," and whether the action "is dispositive of the action to be enjoined." *Gallo*, 446 F.3d at 991. This is a functional inquiry, and neither the parties nor the issues need be identical. *Applied Med. Distrib.*, 587 F.3d at 914. In particular, the Ninth Circuit in *Applied Medical Distribution*, clarified that whether the issues are the same and whether one action is dispositive of the other are not separate inquiries, but are "interrelated requirements." 587 F.3d at 915. "[I]ssues are functionally the same if one action is dispositive of the other." *Id.* Thus, where a valid forum selection clause exists, "the crux of the functional inquiry in the first step of the [*Gallo*] analysis is to determine whether the issues are the same in the sense that <u>all the issues in the foreign action fall under the forum selection clause and can be resolved in the local action</u>." *Id.* (emphasis added); *Lockheed Martin Corp*, 2019 WL 3767553, at *4 (finding issues "functionally the same" within the meaning of *Gallo* even where no foreign litigation had

---

yet been filed because the injunction would enjoin "only claims that are subject to the forum-selection clause").

### 1.    A valid forum selection clause exists in the TOS.

"Forum selection clauses are 'presumptively valid,' and 'honored' 'absent some compelling and countervailing reason.'" *Lewis v. Liberty Mut. Ins. Co*., 321 F. Supp. 3d 1076, 1079 (N.D. Cal. 2018), *aff'd*, 953 F.3d 1160 (9th Cir. 2020) (citation omitted). "The party challenging the clause bears a heavy burden of proof and must clearly show that enforcement would be unreasonable and unjust," or that the clause is invalid. *Id*. (citation omitted).

The X TOS agreed to by Hananoki and X Corp. contains a forum selection clause requiring that "All disputes related to these Terms or the Services will be brought solely in the federal or state courts located in San Francisco County, California." Ex. 1 at 10. As the sole drafter, X Corp. cannot claim that enforcing this clause would be unreasonable or unjust. Indeed, X Corp.'s predecessor, Twitter, has itself argued that the TOS form a valid contract and has successfully enforced its forum selection clause. *See, e.g.*, *Trump v. Twitter, Inc*., 2021 WL 8202673, at *3–6 (S.D. Fla Oct. 26, 2021) (granting Twitter's motion to transfer pursuant to its forum selection clause); *see also Brittain v. Twitter Inc*., 2019 WL 110967, at *4 & n.2 (D. Ariz. Jan. 4, 2019) (same). As other courts to consider these terms have done, this Court should enforce the forum selection clause as a binding agreement between the parties.

### 2.    The issues fall under the forum selection clause.

Under Ninth Circuit law, a federal court sitting in diversity jurisdiction uses federal law to determine the scope of a forum selection clause. *Manetti-Farrow, Inc. v. Gucci Am. Inc.*, 858 F.2d 509, 513 (9th Cir. 1988). The terms of the forum selection clause govern its scope. *Perry v. AT&T Mobility LLC*, No. C 11–01488 SI, 2011 WL 4080625, at *4 (N.D. Cal. Sept. 12, 2011). Bringing an action that sounds in tort rather than contract is not dispositive of whether a forum selection clause governs the issue; a forum-selection clause can be "equally applicable to contractual and tort causes of action." *Manetti-Farrow*, 858 F.2d at 514.

The Ninth Circuit gives broad scope to clauses that cover disputes "relating to" a contract. *See Mediterranean Enters., Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1464 (9th Cir. 1983) ("relating

---

PLAINTIFFS' MOT. FOR PRELIMINARY INJUNCTION, CASE NO. 3:25-CV-02397-VC - 13

to" language is broader than "arising under"). For instance, in *Robles v. Schneider National Carriers, Inc*., 2017 WL 8232083, at *3 (C.D. Cal. Dec. 11, 2017), the court found that a forum selection clause contained "broad 'relating hereto' language, which requires applying the forum-selection clause to claims beyond those just requiring the interpretation and performance of the contract." *Id*. at *3. In *Perry v. AT & T*, a party argued that the forum selection clause did not apply to her statutory claims because "the claims do not arise out of the contract, involve the interpretation of any contract terms, or otherwise require there to be a contract." 2011 WL 4080625, at *3 (citing *Narayan v. EGL, Inc*., 616 F.3d 895, 904 (9th Cir. 2010)). The court rejected that argument, stating that the Ninth Circuit had most recently explained that while forum selection clauses using the phrases "arising under," "arising out of," and "arising hereunder" should be "narrowly construed" to encompass disputes "relating to the interpretation and performance of the contract itself," the inclusion of the phrase "relating to" should lead to a "broad[er]" interpretation. *Id.* at *4 (alteration original) (quoting *Cape Flattery Ltd. v. Titan Maritime, LLC*, 647 F.3d 914, 922 (9th Cir. 2011)). That is the case here: the forum selection clause broadly applies to "All disputes **related to** these Terms or the Services," clearly expanding its scope beyond claims arising from the contract itself. Ex. 1 at 10 (emphasis added). The rest of the clause demonstrates that it is even broader than the typical "relating to" forum-selection clause because on its face, the forum selection clause applies not only to disputes related to the underlying contract, the "Terms"—but also applies even more expansively to disputes related to "the **Services**." *Id*. (emphasis added).

The foreign complaints filed by TIUC and TAP make clear that their claims "relate[] to" Media Matters' use of X's services. Neither suit contests that the November 16 article accurately depicts objectionable content/advertisement pairings that occurred on X. Rather, the crux of those complaints is that Media Matters' particular use of the services was so atypical as to generate anomalous pairings that allegedly no other user would have encountered. Specifically, TIUC claims that Media Matters "manipulated" the X Platform to avoid brand safety controls. Ex. 25, ¶12. Media Matters supposedly did so by "specifically using an account that had been in existence for more than thirty days" in order to "evade X's content filters for new users"; setting its "Secret Account to follow only 30 users" consisting of either large brands or users known for extremist content,

thereby "tricking the algorithm" into thinking Media Matters wanted to see advertisements next to objectionable content; and "altered its scrolling and refreshing activities" to increase the number of advertisements displayed and "force a situation in which a brand ad post appeared adjacent to fringe content." *Id*. ¶¶14–15. In other words, TIUC's allegations rely on a particular use of X's services.

TAP likewise premises its complaint on Media Matters' use of the platform, which TAP claims was designed to "overcome the 3-layered content moderation mechanism" that X has in place. Ex. 23, ¶28–29. It alleges that Media Matters used a "Decoy Account" that had existed for at least 30 days "to bypass the X Platform's additional advertisement filter for new users"; "exclusively followed" a limited number of fringe content and major advertisers "to game the algorithm set up in the X Platform's content moderation mechanism"; and "repeatedly scrolled and refreshed their unrepresentative, hand-selected feed" in order to generate more advertisements than the average user. *Id.*, ¶29(a)–(c). Like TIUC, TAP's claims rest on Media Matters' allegedly contrived use of the X platform.

X Corp. subsidiary Twitter UK even claimed in its demand letter to Media Matters threatening litigation that Media Matters breached the X Platform's Manipulation and Spam Policy in order to "bypass[] numerous safeguards" and "generate the content it sought in furtherance of its aims." Ex. 24 at ¶13. None of the X Entities have actually claimed a breach of that policy, which is incorporated into the TOS—perhaps in an attempt to avoid the forum selection clause that would very obviously govern such a claim. But TIUC and TAP cannot avoid that their claims are related to the services provided by X Corp. and the conduct across the litigations is consistent with what the UK letter characterizes as a breach of X's Terms.

Plaintiffs intend to use their compliance with the TOS as a defense against the claims brought by the X Entities, further underscoring those claims' relation to the Services. Despite characterizing Media Matters as having sought to "evade" safeguards and "trick" the algorithm— and despite Twitter UK's claim in its demand letter that Media Matters' conduct breached "X's Platform Manipulation and Spam Policy"—none of X's filed complaints allege that Media Matters violated the TOS. It cannot be that Plaintiffs' public reporting on real content/advertisement

---

PLAINTIFFS' MOT. FOR PRELIMINARY INJUNCTION, CASE NO. 3:25-CV-02397-VC - 15

**Appx 061**

pairings seen by Media Matters while using X's Platform in accordance with X's own Terms of Service gives rise to tort liability.

X itself has argued in other matters that its forum selection clause is not limited to contract claims but instead applies to all claims related to use of the X platform—as it must, in light of the clause's plain language. In its motion to transfer venue from Florida to California in *Trump v. Twitter, Inc*., 21-cv-22441 (S.D. Fla.), X argued that its forum-selection clause covered President Trump's constitutional and tort claims about his use of the X platform. *See* Ex. 26 at 10. X explained that "Courts have routinely held that disputes concerning a plaintiff's use of social media platforms are covered by forum selection clauses that cover claims 'relating to' a user agreement or use of the services more broadly, even those purporting to allege constitutional violations," and cited multiple cases in which courts enforced forum-selection clauses in cases involving tort claims related to social media platform use. *Id*. at 11–12.

The *Twitter v. Trump* court agreed with X. The court determined that all the claims fell "within the broad scope of the forum selection clause," that X's clause was mandatory, and that it was enforceable even against President Trump. *Trump v. Twitter, Inc*., 2021 WL 8202673, at *3–6. This Court should reach the same result.

TIUC and TAP expressly premise their complaints on Media Matters' purportedly manipulative and contrived use of the X platform, and Media Matters intends to point to its compliance with the TOS as a defense. The asserted claims plainly "relate[] to. . . the Services" X provides. The issues raised in X's foreign litigation thus fall under the forum selection clause.

### 3.    All of the parties in the foreign action fall under the forum selection clause.

The X Terms of Service purport to be between the user and X Corp. Ex. 1 at 3. The direct "user" in this instance is Hananoki. Plaintiffs, however, are all able to benefit from the TOS and its forum selection clause. They are closely related to the contractual relationship. X Corp.'s subsidiaries TIUC and TAP are likewise bound.

"Forum selection clauses can be enforced by or against a non-signatory under certain circumstances," *Pirozzi v. Fiserv Corp*., 668 F. Supp. 3d 968, 974 (C.D. Cal. 2022), including where "the non-party is 'closely related to the contractual relationship.'" *White Knight Yacht LLC*

*v. Certain Lloyds at Lloyd's London*, 407 F. Supp. 3d 931, 947 (S.D. Cal. 2019) (citation omitted); *JH Portfolio Debt Equities, LLC v. Garnet Cap. Advisors, LLC*, 2018 WL 6112695, at \*5 (C.D. Cal. Mar. 16, 2018) (collecting cases for the proposition that a non-signatory party is bound by a forum selection clause when its alleged conduct is closely related to the contract).

(a) <u>Plaintiffs are bound by the TOS</u>.  Non-signatory Media Matters is "closely related" to the contractual relationship governing Hananoki's use of the X Platform. Hananoki used the X account subject to those terms in his capacity as an employee of Media Matters, in order to conduct research for Media Matters, and ultimately reported on the results of that use in an article published by Media Matters. Ex. 14, ¶¶6–7; Ex. 15. Indeed, TIUC has alleged that it was "***Media Matters***," not Hananoki personally, that "exploited" the features of its platform by using a "secret existing X account" to "evade normal safeguards, which manipulated the system through which posts and advertisements appear," Ex. 25, ¶12. TAP has attributed the same conduct to "[Media Matters] and/or Hananoki." Ex. 23, ¶29. Neither complaint names Hananoki as a defendant.

X Corp. further alleges, in the Texas Complaint upon which the TIUC and TAP complaints are patterned, that ***all*** Plaintiffs participated in and benefitted from the alleged X platform manipulation: that Hananoki authored false articles, Media Matters and its President Carusone published the articles, and that Carusone amplified the allegedly false premise of the article in a television interview—all in furtherance of their joint, ideologically driven crusade against X. Ex.19, ¶¶2, 7–13. Accordingly, all Plaintiffs are "closely related" to Hananoki's use of X's services—that is, the subject of the contractual relationship between Hananoki and X Corp.—and can enforce X's forum-selection clause. It would be nonsensical to allow X to allege claims against Media Matters and Carusone premised on Hananoki's use of the X Platform, yet hold that Media Matters and Carusone are not "closely related" to the contract governing his Hananoki's use of the X Platform.

(b) <u>Defendants are bound by the TOS</u>. As a signatory to the TOS, X Corp. is necessarily bound by those terms and its forum selection clause. Defendants TAP and TIUC are likewise bound for at least three independent reasons: (1) they are alter egos of X Corp. with respect to this suit; (2) they are third party beneficiaries of the TOS; and (3) like Media Matters, they are "closely related" to the contractual relationship governing Hananoki's use of the X Platform.

**1.** TIUC and TAP are bound by the forum selection clause because they are, for the purposes of this suit, alter egos of X Corp. *Mazal Group, LLC v. Barak*, 2019 WL 4316244, at *2 (C.D. Cal. June 17, 2019) (non-signatory was bound by forum selection clause where the signatory and non-signatory "acted as . . . corporate alter ego[s] with respect to [the] suit"). In order to satisfy the alter ego exception to the general rule that a subsidiary and the parent are separate entities, a plaintiff must make out a *prima facie* case "(1) that there is such unity of interest and ownership that the separate personalities of the two entities no longer exist and (2) that failure to disregard their separate identities would result in fraud or injustice." *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1134–35 (9th Cir. 2003) (citations and alterations omitted). A plaintiff must show that the parent exercises such control over the subsidiary so as to "render the latter the mere instrumentality of the former." *Id.* at 1135 (citation omitted). That is the case here.

*First*, X Corp. and its foreign subsidiaries TIUC and TAP share a unity of interest and ownership. TIUC and TAP's own description of their claims and their relationship with X Corp. demonstrate the unity of interest between these companies. TIUC and TAP have asserted defamation claims against Media Matters, despite the fact that neither TIUC nor TAP is mentioned in the November 16 article. They nevertheless maintain that the article defamed them because they are "synonymous" with X and a reasonable reader would understand the article's references to "X" to refer to TIUC and TAP. Ex. 25, ¶21(ii); Ex. 23, ¶12. In other words, their claims are premised on the notion that their identities are interchangeable with "X" in Europe and the Asia Pacific regions, respectively, such that they have an identical interest in Media Matters' purportedly "manipulative" use of the X Platform and subsequent reporting on that use.

Each of TIUC and TAP are subsidiaries of X Corp., which is in turn part of X Holdings. *See* Ex. 25, ¶1; Ex. 23, ¶2. Upon information and belief, based on Twitter's most recent SEC filings prior to Musk taking the company private in 2022, TIUC and TAP's profits and losses roll up to their parent (now X Corp.). *See* Ex. 27.[5] Elon Musk is both the majority owner of X Holdings and the chairman of X Corp. and, according to numerous reports, exercises direct control over the X Entities both domestically and abroad. For instance, Musk reportedly directed the dramatic changes

---

[5] The Court "may take judicial notice of undisputed matters of public record." *Harris* v. *Cnty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012).

in staffing and content moderation that followed his 2022 takeover of the company formerly known as Twitter. Ex. 2 at 3–4. Musk personally sent an email to all staff telling them they would need to either commit to his "extremely hardcore" vision for the company or be laid off. Ex. 28. Musk's email went not only to domestic X Corp. employees, but to at least employees at TIUC as well. Ex. 29 at 1–2. Musk involves himself in individual decisions about which specific accounts to allow or suspend—including, for instance, suspending then reinstating accounts of journalists that criticized him, Ex. 30—and details like how public media accounts should be labeled, Ex. 31 at 3. And—as indicated by his personal email to international subsidiary employees—Musk's control is not limited to the domestic X entity, X Corp.: *Business Insider* reported that "Musk is closing many international Twitter offices as he continues to cut costs and try to find ways the company can make money." Ex. 32 at 1. According to a Reuters report, the Musk-directed cuts included workers in Twitter's Dublin and Singapore offices—that is, TIUC and TAP, respectively. Ex. 33 at 1–2. And, most importantly, public evidence indicates that, in his role as X Corp. chairman, Musk exercised direct control over the decision to file lawsuits against Media Matters by TIUC and TAP.

On November 18, 2023, Musk promised "thermonuclear" litigation in response to Media Matters' November 16 article. After X Corp. then filed its case against Media Matters in the Northern District of Texas, Musk proclaimed that X Corp.'s suit against Media Matters was "***[t]he first of many***." Peaslee Decl., ¶6. Less than three weeks later, Musk stated at an X Townhall that "***We*** are suing [Media Matters] in every country that they operate." Ex. 20 at 1–2 (emphasis added). He described Media Matters as an "evil propaganda machine," and in colorful terms promised to go after not only Media Matters, but also its donors. *Id*. Musk promised explosive litigation against Media Matters, and he has delivered on that promise through X Corp. in Texas and through its subsidiaries abroad. With regard to their pending suits against Media Matters, X Corp. and its subsidiaries have a complete unity of interest: all are acting at the directions of X Corp. chairman, Musk.

*Second*, failure to disregard the separate identities of X Corp. and its subsidiaries TIUC and TAP would result in injustice. Musk, through X Corp., has initiated harassing litigation against Media Matters worldwide over conduct governed by a forum selection clause that requires disputes

related to the use of X's services to be litigated in California. Allowing X Corp. to circumvent that

limitation by simply directing its subsidiaries to file copycat lawsuits in foreign jurisdictions would

work significant injustice on Media Matters.[6]

**2.** Non-signatories TIUC and TAP are also subject to the forum selection clause as third-party beneficiaries to the TOS. *TAAG Linhas Aereas de Angola v. Transamerica Airlines, Inc.*, 915 F.2d 1351, 1354 (9th Cir. 1990) (holding "a forum selection clause can restrict a third-party beneficiary to the designated forum."); *White Knight Yacht*, 407 F. Supp. 3d at 947 ("A forum selection clause may be enforced against a non-party . . . when the non-party is a third-party beneficiary of the contract with the clause."); *Trans-Tec Asia v. M/V HARMONY CONTAINER*, 435 F. Supp. 2d 1015, 1028 n.17 (C.D. Cal. 2005), *aff'd*, 518 F.3d 1120 (9th Cir. 2008) ("[U]nder well-established precedent a third-party beneficiary can be bound to the terms of a forum-selection clause contained in the contract to which it is a beneficiary" (collecting cases)); *see also Philadelphia Indem. Ins. Co. v. SMG Holdings, Inc*., 44 Cal. App. 5th 834, 841 (2019) ("Under the third party beneficiary theory, a nonsignatory may be compelled to arbitrate where the nonsignatory is a third party beneficiary of the contract.").

Both TIUC and TAP have a strong interest in how X users use X's services, regardless of where those users are located—as evidenced by their complaints against U.S.-based Media Matters premised on Media Matters' supposedly "manipulative" use of the platform. A U.S.-based user's posts on X can still be seen in TIUC and TAP's regions; activity that breaks the TOS when executed on the platform in the U.S. impacts the same platform that TIUC operates in Europe and that TAP represents in the Asia Pacific region. The contractual agreement between a user and X Corp. protects both TIUC and TAP, providing limitations on how a user can utilize the services that both TIUC and TAP represent.

The TOS governing Media Matters' use of the X platform expressly contemplate TIUC and TAP as beneficiaries, as they confer direct benefits on TIUC and TAP. Specifically, the TOS

---

[6] In the event the Court declines to find that the record sufficiently supports binding TIUC and TAP to the TOS, Plaintiffs respectfully request the opportunity to conduct jurisdictional discovery on this point. *See, e.g., Harris Rutsky*, 328 F.3d at 1135 (reversing district court's denial of jurisdictional discovery and remanding to allow development of the record).

contains multiple benefits for the "X Entities," which includes X Corp.'s "affiliates" and "related companies"—and as subsidiaries, TIUC and TAP qualify as both. For instance, the TOS provides that the X Entities disclaim warranties for everything from "merchantability" and "non-infringement," to "responsibility and liability" for harm to a user's computer or data, to liability for whether the Services meet a user's requirements or are available on a "secure, or error-free basis." Ex. 1 at 9. The TOS also purports to broadly limit TIUC and TAP's liability for various damages. *Id*. at 9–10. The contract's plain terms confer benefits on both TIUC and TAP.

The forum selection clause does not limit its application to only the direct signatories, but rather applies to "***All disputes*** related to these Terms or the Services." *Id*. at 10 (emphasis added). Given the benefits conferred by the contract on both TIUC and TAP and the breadth of the forum selection clause, both are bound by the forum selection clause.

**3.** Finally, both TIUC and TAP are bound under the "closely related" test. The Ninth Circuit has stated that where nonparties are closely related to the contractual relationship, "a range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses." *Manetti-Farrow*, 858 F.2d at 514 n.5. This "closely related" standard" is notably broader than the third-party beneficiary standard, *Scott USA Inc. v. Patregnani*, 2015 WL 1736496, at *3 (D. Idaho Apr. 16, 2015)—which, as addressed *supra*, TIUC and TAP also satisfy. As explained above, both entities assert claims based on Media Matters' use of the X platform, which is governed by the TOS. *Supra*, pp.14–15. And, as also explained above, both TIUC and TAP premise their respective defamation claims on the notion that they are interchangeable with X Corp. in their regions such that publicly reported "manipulative" use of the platform directly harms ***them***. *Supra*, p.18. TIUC and TAP's respective liabilities are released by the contract between Hananoki and X Corp., clearly "relating" them to the contractual relationship. Indeed, all of the facts demonstrating that TIUC and TAP are alter egos of X and are third-party beneficiaries of the agreement support finding them bound under the more lenient "closely related" test.

The parties are all subject to the forum selection clause as is necessary for this Court to issue a preliminary injunction preventing Defendants from initiating or further prosecuting foreign litigation against Media Matters over the conduct at issue in Defendants' pending suits.

**B. Maintaining litigation outside this Court would frustrate this forum's policy, be vexatious and oppressive, and prejudice Media Matters.**

At the second *Gallo* step, the Court considers "whether at least one of the so-called '*Unterweser* factors' applies," including "[whether the] foreign litigation . . . would (1) frustrate a policy of the forum issuing the injunction; (2) be vexatious or oppressive; (3) threaten the issuing court's *in rem* or *quasi in rem* jurisdiction; or (4) where the proceedings prejudice other equitable considerations. *Microsoft*, 696 F.3d at 881–82  (alterations in original, citation omitted).  Here, Media Matters meets at least factors one, two, and four.

The Ninth Circuit has held that allowing foreign litigation that runs contrary to a valid and enforceable forum selection clause would "frustrate a policy of the forum issuing the injunction,"— the first *Unterweser* factor—and is enough to justify an anti-suit injunction. *Gallo*, 446 F.3d at 992; *see also Applied Med. Distrib.*, 587 F.3d at 919. Indeed, "[w]ithout an anti-suit injunction in this case, the forum selection clause effectively becomes a nullity." *Gallo*, 446 F.3d at 992. The United States has a strong policy favoring enforcement of forum selection clauses, satisfying the first *Unterweser* consideration and second *Gallo* factor. *Applied Med. Distrib.*, 587 F.3d at 914.

TIUC and TAP's foreign litigation against Media Matters is also "vexatious" and "oppressive," independently satisfying the second *Gallo* factor with the second *Unterweser* factor. In *Microsoft Corp. v. Motorola Inc.*, the Ninth Circuit affirmed the district court's injunction against German litigation, and held the district did not abuse its discretion by interpreting Motorola's German lawsuit as a "procedural maneuver designed to harass Microsoft." 696 F.3d at 886. The parties were already litigating a dispute involving large portfolio of patents when Motorola sued Microsoft in Germany over two of the patents in the portfolio. *Id.* The court relied on the definition of "vexatious" from *Black's Law Dictionary* as "without reasonable or probable cause or excuse; harassing; annoying," and clarified that "litigation may have some merit and still be vexatious." *Id.* Here—putting aside that X's lawsuit has no merit in the first place—the only possible interpretation of its foreign filings is that they are designed to harass Media Matters given the existing litigation in Texas over exactly the same conduct.

X's decision to file suit in multiple international forums was *designed* to make litigation

---

more oppressive for Media Matters. X could have filed all of its lawsuits in this Court—in fact, X's own terms of service *required* it to do so. But X breached the forum-selection clause it repeatedly enforced against parties in other litigation by filing suit in the Fort Worth Division of the Northern District of Texas—a forum with no connection to the dispute. X then directed its subsidiaries to file the two international actions in places where Media Matters does not operate and has no presence, and it has threatened a third. X's actions were designed to make the litigation oppressive for Media Matters regardless of the merits or eventual outcome. And it has works: The cost to the organization has been tremendous, both financially and operationally. Ex. 13, ¶¶5–6.

Musk's own conduct has made clear that X's serial litigation is retaliation for Media Matters' reporting in its November 16 article: from his promise of a "thermonuclear lawsuit against Media Matters," to his characterization of Media Matters as "evil" and his commitment that X Corp. would engage in serial, worldwide litigation against Media Matters and its supporters. *Supra*, p.19. In response to another X post commenting that Media Matters "f'd around [and] found out," Musk gleefully posted "Yup." Peaslee Decl., ¶7. And while Musk has promised to go after Media Matters "in every country that they operate," Media Matters only "operate[s]" in Washington, D.C.—so forcing it to defend itself in Ireland and Singapore is particularly oppressive.

This is not the first time X Corp., a multi-billion-dollar company, has sought to punish a non-profit for reporting on X in a manner X did not like. In his order dismissing X Corp.'s similar lawsuit against CCDH, Judge Breyer stated,

> Sometimes it is unclear what is driving a litigation, and only by reading between the lines of a complaint can one attempt to surmise a plaintiff's true purpose. Other times, a complaint is so unabashedly and vociferously about one thing that there can be no mistaking that purpose. This case represents the latter circumstance. This case is about punishing the Defendants for their speech."

*X Corp. v. Ctr. for Countering Digital Hate, Inc*., 724 F. Supp. 3d 948, 955 (N.D. Cal. 2024). X Corp. has similarly sought to punish Media Matters, and it has used international suits to do so.

Finally, the fourth *Unterswear* factor—whether the proceedings prejudice other equitable considerations—weighs in favor of an anti-suit injunction. As explained above, Media Matters has suffered and continues to suffer prejudice from litigating the same facts against the same parties all over the world in separate lawsuits with different tribunals and different schedules.

1     The harm is ongoing. In X's Northern District of Texas suit, the parties are engaged in

2    discovery. However, Media Matters cannot focus its attention there because it must simultaneously

3    defend the foreign suits: In Ireland it has a status conference March 12 to schedule argument on

4    Media Matters' objection to jurisdiction. Ex. 13, ¶9. In Singapore, Media Matters' hearing on its

5    jurisdictional challenges is April 14, 2025—when Media Matters will likely be preparing for

6    argument in Ireland. *See id*. A court in this District has held that forcing a party to defend itself in

7    multiple forums across the country results in greater prejudice than subjecting a party to an

8    inconvenient forum. *Burse v. Purdue Pharma Co.*, 2004 WL 1125055, at *2 (N.D. Cal. May 3,

9    2004). The prejudice to Media Matters is yet greater—it is defending itself all over the ***world***.

10     Meanwhile, the requested relief will not prejudice TIUC or TAP. A preliminary injunction

11    "merely enforces the forum-selection clause and will not deprive [the X Entities] of legal recourse."

12    *Lockheed Martin Corp.*, 2019 WL 3767553, at *4. And Media Matters has represented in the

13    foreign actions that it would not oppose TIUC and TAP joining X's U.S. litigation, nor would

14    Media Matters object on venue or statute of limitations grounds to TIUC and TAP refiling their

15    claims in this District. Ex. 13, ¶8.

16     Allowing Media Matters to face potential multi-national liability for truthful reporting that

17    was researched, drafted, and published from the United States, and which discusses the practices a

18    company incorporated and headquartered in the United States, implicates important First

19    Amendment concerns. The chilling effect of the mere existence of X Corp.'s suits is tremendous:

20    No media organization wants to risk the prospect of being targeted by the richest man in the world

21    and the company he directs, particularly not if it means being targeted around the world. X's

22    multiple lawsuits have certainly chilled Media Matters' own reporting. Ex. 13, ¶5; Ex. 14, ¶8–12.

23    They have forced Media Matters' personnel to spend time supporting litigation rather than

24    performing their normal roles. Ex. 13, ¶5. And Musk's online comments have made Media Matters

25    the target of threats and harassment from strangers, Ex. 13, ¶4; Ex. 14, ¶9. The ongoing international

26    suits only increase the chances of further threats in light of Musk's high profile and media coverage

27    of litigation related to his companies.

28

**C.  An injunction's impact on comity is tolerable.**

Where the other *Gallo* factors are met, a court should enjoin foreign proceedings if the impact on comity is "tolerable." Here, there is no impact at all: "where private parties have previously agreed to litigate their disputes in a certain forum, one party's filing first in a different forum would not implicate comity at all." *Applied Med. Distrib.*, 587 F.3d. at 914.

The fact that the foreign cases were filed before this action "makes no difference as to the propriety of an anti-suit injunction." *Gallo*, 446 F.3d at 994. To the contrary, giving the first-filed suit deference in the face of a forum selection clause would incentivize a party seeking to evade the forum to rush to file suit in a foreign jurisdiction and undermine the United States' sound policy favoring forum selection clauses. *Id.*

The court in *Gallo* paid special attention to the "messy, protracted, and potentially fraudulent" nature of the foreign suits at issue in affirming the district court's injunction. *Gallo*, 446 F.3d at 995. Here, too, the foreign litigation is messy and retaliatory, particularly in light of Musk's public comments vowing to sue Media Matters in as many jurisdictions as possible and "hop[ing] they do" "go to hell."  *See* Ex. 20 at 1–2. Demonstrating such extreme facts is not necessary to conclude an injunction's impact is tolerable, but these facts "tilt[] the balance 'even further in favor of granting an injunction.'" *Applied Med. Distrib.*, 587 F.3d at 922 (quoting *Gallo*, 446 F.3d at 993).

**VI.  CONCLUSION**

Media Matters respectfully requests the Court enter a preliminary injunction (1) enjoining X Corp, TIUC, and TAP from further prosecuting their pending actions against Media Matters in foreign jurisdictions, and (2) enjoining X Corp. from prosecuting or initiating litigation against Media Matters., whether directly or through its subsidiaries, arising from the same conduct as that alleged in the pending Ireland and Singapore complaints in jurisdictions outside of the United States in violation of the X Terms of Service's forum selection clause.

Dated: March 11, 2025                          **SUSMAN GODFREY L.L.P.**

                                                       By:    */s/ Justin A Nelson*
                                                       JUSTIN A. NELSON (TX SBN 24034766)*

---

PLAINTIFFS' MOT. FOR PRELIMINARY INJUNCTION, CASE NO. 3:25-CV-02397-VC - 25

MATT BEHNCKE (TX SBN 24069355)*
SUSMAN GODFREY L.L.P.
1000 Louisiana, Suite 5100
Houston, TX 77002
Telephone: (713) 651-9366
Facsimile: (713) 654-6666
jnelson@susmangodfrey.com
mbehncke@susmangodfrey.com

KATHERINE M. PEASLEE (CA SBN 310298)
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Telephone: (206) 516-3880
Facsimile: (206) 516-3883
kpeaslee@susmangodfrey.com

AMANDA BONN (CA SBN 270891)
SUSMAN GODFREY L.L.P.
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
Telephone: (310) 789-3100
Facsimile: (310) 789-3150
abonn@susmangodfrey.com

AMER S. AHMED (NY SBN  4382040)**
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-4000
Email: aahmed@gibsondunn.com

*pro hac vice
**pro hac vice forthcoming

Attorneys for Plaintiffs Media Matters for
America, Angelo Carusone, and Eric Hananoki

1

## CERTIFICATE OF SERVICE

2

3    I, Katherine M. Peaslee, pursuant to 28 U.S.C. § 1746, declare as follows:

4        1.    On March 11, 2025, Plaintiffs are serving the filed, ECF-stamped copy of the

5    foregoing Plaintiffs' Motion for a Preliminary Injunction, along with the attached

6    declaration and exhibits, on the following counsel of record for X Corp. in *X Corp.*

7    *v. Media Matters et al.*, 4:23-cv-01175-O (N.D. Tex.) via email:

8

9    John Clay Sullivan
     S|L Law PLLC
10   Email: john.sullivan@the-sl-lawfirm.com

11   Alexander Mark Dvorscak
     Stone Hilton PLLC
12   Email: alex@stonehilton.com

13   Ari Cuenin
     Stone Hilton PLLC
14   Email: ari@stonehilton.com

15
     Christopher D Hilton
16   Stone Hilton PLLC
     Email: chris@stonehilton.com
17

18   Cody C Coll
     Stone Hilton PLLC
19   Email: cody@stonehilton.com

20
     Elizabeth Joan Brown Fore
21   Stone Hilton PLLC
     Email: elizabeth@stonehilton.com
22

23   Judd E Stone , II
     Stone Hilton, PLLC
24   Email: judd@stonehilton.com

25   Michael Abrams
     Stone Hilton PLLC
26   Email: michael@stonehilton.com

27

28

---

1     2.  Plaintiffs are serving paper copies of the ECF-stamped copy of the foregoing

2     Plaintiffs' Motion for a Preliminary Injunction, along with the attached declaration

3     and exhibits, via process server on Defendants at the following addresses:

4

5     X Corp.
     c/o CT Corporation Systems

6     330 N. Brand Blvd, Suite #700
     Glendale, CA 91203

7

8     Twitter International Unlimited Co.
     c/o X Corp.

9     c/o CT Corporation Systems
     330 N. Brand Blvd, Suite #700

10     Glendale, CA 91203

11     Twitter Asia Pacific Pte. Ltd.
     c/o X Corp.

12     c/o CT Corporation Systems
     330 N. Brand Blvd, Suite #700

13     Glendale, CA 91203

14  Executed on this 11th day of March 2025, in San Francisco, California.

15
                        */s/Katherine M. Peaslee*

16                    Katherine M. Peaslee (CA SBN 310298)

17

18

19

20

21

22

23

24

25

26

27

28

---

TAB 3



# X Terms of Service

## Summary of our Terms

These Terms of Service ("Terms") are part of the User Agreement – a legally binding contract governing your use of X. **You should read these Terms of Service ("Terms") in full, but here are a few key things you should take away:**

- **You will see advertising on the platform:** In exchange for accessing the Services, X and our third-party providers and partners may display advertising to you.

- **When posting Content and otherwise using the Services, you must comply with this User Agreement and Applicable Law:** You are responsible for your use of the Services and your Content. You must comply with this User Agreement, its incorporated policies, and all applicable laws.

- **You must abide by the Services' acceptable use terms:** You may not access the Services in any way other than through the currently available, published interfaces that we provide. For example, this means that you cannot scrape the Services without X's express written permission, try to work around any technical limitations we impose, or otherwise attempt to disrupt the operation of the Services.

- **We have broad enforcement rights:** X reserves the right to take enforcement actions against you if you do violate these terms, such as, for example, removing your Content, limiting visibility, discontinuing your access to X, or taking legal action. We may also suspend or terminate your account for other reasons, such as prolonged inactivity, risk of legal exposure, or commercial inviability.

- **There are Intellectual Property Licenses in these Terms:** You retain ownership and rights to any of your Content you post or share, and you provide us with a broad, royalty-free license to make your Content available to the rest of the world and to let others do the same. Conversely, we provide you a license to use the software we provide as part of the Services, such as the X mobile application, solely for the purpose of enabling you to use and enjoy the benefit of the Services.

- **Your use of the Services is at your own risk:** We provide the Services on an "AS IS" and "AS AVAILABLE" basis, and we disclaim all warranties, responsibility, and liability to you or others to the extent permitted by law. You may be exposed to offensive or harmful content posted by other users. The Services may change from time to time, and we may limit or terminate availability of the Services or particular features to you or other users at any time.



- **You have remedies and redress mechanisms, but our liability is limited:** You have a right to terminate this agreement at any time by deactivating your account and discontinuing use of the Services. Note that we will not be liable for certain types of damages as described in the agreement, and in any event, our aggregate liability shall not exceed the greater of $100 USD or the amount you paid us, if any, in the past six months for the Services giving rise to the claim. Further, if you believe that your Content has been copied in a way that constitutes copyright infringement, the reporting process is detailed in these Terms. If you are a recipient of the X Service in the European Union, you may challenge certain decisions we make under the Digital Services Act (Regulation (EU) 2022/2065) via our internal process or via out-of-court dispute settlement as described here.

Please also note that these Terms incorporate our Privacy Policy (https://x.com/privacy) as well as other terms applicable to your use of the Services and your Content. Finally, these Terms may vary depending on where you live, but in any case, you must be at least 13 years old to use X.

---

**If you live outside the European Union, EFTA States, or the United Kingdom, including if you live in the United States,** the X User Agreement comprises these Terms of Service, our Privacy Policy, our Rules and Policies, and all incorporated policies.

**If you live in the European Union, EFTA States, or the United Kingdom,** the X User Agreement comprises these Terms of Service, our Privacy Policy, our Rules and Policies, and all incorporated policies.

---

# X Terms of Service

**If you live outside the European Union, EFTA States, or the United Kingdom, including if you live in the United States**

These Terms of Service ("Terms") govern your and other users' access to and use of our services, including our various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, commerce services, and our other covered services (https://help.x.com/rules-and-policies/x-services-and-corporate-affiliates) that link to these Terms (collectively, the "Services"), and any information, text, links, graphics, photos, audio, videos, or other materials or arrangements of materials uploaded, downloaded or appearing on the Services (collectively referred to as "Content"). By using the Services you agree to be bound by these Terms.

These Terms are an agreement between you and X Corp., which provides X and the Services, with its registered office at 865 FM 1209, Building 2, Bastrop, TX 78602 U.S.A. The words "we," "us," and "our" mean X Corp.



# 1. Who May Use the Services

You may use the Services only if you agree to form a binding contract with us and are not a person barred from receiving services under the laws of the applicable jurisdiction. In any case, you must be at least 13 years old to use the Services. If you are (i) accepting these Terms and/or using the Services, which constitutes acceptance of these Terms, or (ii) accepting these Terms in order to authorize the use of the Services on behalf of a minor (being any person under the age of majority in any given country), company, organization, government, or other legal entity, you represent and warrant that you are authorized to do so or, as the case may be, have the authority to bind such minor and/or entity to these Terms. The words "you" and "your" as used in these Terms shall refer either to the person accepting these Terms or such minor (as defined in (i)) and/or the entity referenced in (ii), as applicable.

# 2. Privacy

Our Privacy Policy (https://x.com/privacy) describes how we handle the information you provide to us when you use the Services. You understand that through your use of the Services you consent to the collection and use (as set forth in the Privacy Policy) of this information, including the transfer of this information to the United States, Ireland, and/or other countries for storage, processing and use by us and our affiliates.

# 3. Content on the Services

You are responsible for your use of the Services and for any Content you provide, including compliance with applicable laws, rules, and regulations. You should only provide Content that you are comfortable sharing with others.

Any use or reliance on any Content or materials posted via the Services or obtained by you through the Services is at your own risk. We do not endorse, support, represent or guarantee the completeness, truthfulness, accuracy, or reliability of any Content or communications posted via the Services or endorse any alleged facts or opinions expressed via the Services. You understand that by using the Services, you may be exposed to Content that might be offensive, harmful, inaccurate or otherwise inappropriate, or in some cases, postings that have been mislabeled or are otherwise deceptive. All Content is the sole responsibility of the person who originated such Content. We may not monitor or control the Content posted via the Services and, we cannot take responsibility for such Content.

We reserve the right to remove Content that violates the User Agreement, including for example, copyright or trademark violations or other intellectual property misappropriation, impersonation, unlawful conduct, or harassment. Information regarding specific policies and the process for



reporting or appealing violations can be found in our Help Center (https://help.x.com/rules-and-policies/x-report-violation#specific-violations and https://help.x.com/managing-your-account/suspended-x-accounts).

If you believe that your Content has been copied in a way that constitutes copyright infringement, please report this by visiting our Copyright reporting form (https://help.x.com/forms/dmca) or contacting our designated copyright agent at:

X Corp.
Attn: Copyright Agent
865 FM 1209, Building 2
Bastrop, TX 78602
Reports: https://help.x.com/forms/dmca
Email: copyright@x.com


# Your Rights and Grant of Rights in the Content

You retain your rights to any Content you submit, post or display on or through the Services. What's yours is yours — you own your Content (and your incorporated audio, photos and videos are considered part of the Content).

By submitting, posting or displaying Content on or through the Services, you grant us a worldwide, non-exclusive, royalty-free license (with the right to sublicense) to use, copy, reproduce, process, adapt, modify, publish, transmit, display, upload, download, and distribute such Content in any and all media or distribution methods now known or later developed, for any purpose. For clarity, these rights include, for example, curating, transforming, and translating. This license authorizes us to make your Content available to the rest of the world and to let others do the same. You agree that this license includes the right for us to (i) analyze text and other information you provide and to otherwise provide, promote, and improve the Services, including, for example, for use with and training of our machine learning and artificial intelligence models, whether generative or another type; and (ii) to make Content submitted to or through the Services available to other companies, organizations or individuals, including, for example, for improving the Services and the syndication, broadcast, distribution, repost, promotion or publication of such Content on other media and services, subject to our terms and conditions for such Content use. Such additional uses by us, or other companies, organizations or individuals, is made with no compensation paid to you with respect to the Content that you submit, post, transmit or otherwise make available through the Services as the use of the Services by you is hereby agreed as being sufficient compensation for the Content and grant of rights herein.

We have an evolving set of rules for how ecosystem partners can interact with your Content on the Services. These rules exist to enable an open ecosystem with your rights in mind. You understand that we may modify or adapt your Content as it is distributed, syndicated, published, or broadcast by us and our partners and/or make changes to your Content in order to adapt the Content to different media.



You represent and warrant that you have, or have obtained, all rights, licenses, consents, permissions, power and/or authority necessary to grant the rights granted herein for any Content that you submit, post or display on or through the Services. You agree that such Content will not contain material subject to copyright or other proprietary rights, unless you have necessary permission or are otherwise legally entitled to post the material and to grant us the license described above.

# 4. Using the Services

Please review our Rules and Policies, which are part of the User Agreement and outline conduct that is prohibited on the Services. You may use the Services only in compliance with these Terms and all applicable laws, rules and regulations. X takes enforcement actions when Content or user behavior is in violation of our Rules and Policies or in relation to sensitive media. You can review X's enforcement options and how you can appeal our enforcement decision here.

The Services evolve constantly. As such, the Services may change from time to time, at our discretion. We may stop (permanently or temporarily) providing the Services or any features within the Services to you or to users generally. We also retain the right to create limits on use and storage at our sole discretion at any time. We may also remove or refuse to distribute any Content on the Services, limit distribution or visibility of any Content on the service, suspend or terminate users, and reclaim usernames without liability to you.

In consideration for our granting you access to and use of the Services, you agree that we and our third-party providers and partners may place advertising on the Services or in connection with the display of Content or information from the Services whether submitted by you or others. We also reserve the right to access, read, preserve, and disclose any information as we reasonably believe is necessary to (i) satisfy any applicable law, regulation, legal process or governmental request; (ii) enforce the Terms, including investigation of potential violations hereof; (iii) detect, prevent, or otherwise address fraud, security or technical issues; (iv) respond to user support requests; or (v) protect the rights, property or safety of X, its users and the public. We do not disclose personally-identifying information to third parties except in accordance with our Privacy Policy.

Certain services or features may be offered on X for which additional terms and conditions may apply in connection with your use of those services. By using or paying for any of these additional services, you agree to any additional terms applicable to those services, and those additional terms become part of our agreement with you. If any of the applicable additional terms conflict with these Terms, the additional terms will prevail while you are using those services to which they apply.

If you use paid features of the Services, you agree to the applicable Terms for Paid Services (https://legal.x.com/purchaser-terms.html).

If you use developer features of the Services, including but not limited to X for Websites (https://developer.x.com/docs/x-for-websites), X Cards (https://developer.x.com/docs/x-for-websites/cards/overview/abouts-cards), Public API (https://developer.x.com/docs), or Sign in



with X (https://developer.x.com/docs/authentication/guides/log-in-with-twitter), you agree to our Developer Agreement (https://developer.x.com/developer-terms/agreement) and Developer Policy (https://developer.x.com/developer-terms/policy). If you want to reproduce, modify, create derivative works, distribute, sell, transfer, publicly display, publicly perform, transmit, or otherwise use the Services or Content on the Services, you must use the interfaces and instructions we provide, except as permitted through the Services, these Terms, or the terms provided on https://developer.x.com/developer-terms. Otherwise, all such actions are strictly prohibited. If you are a security researcher, you are required to comply with the rules of our Vulnerability Reporting Program (https://hackerone.com/x). The requirements set out in the preceding paragraph may not apply to those participating in our Vulnerability Reporting Program.

If you use advertising features of the Services, you agree to our Master Services Agreement (https://ads.x.com/terms).

# Your Account

You may need to create an account to use the Services. You are responsible for safeguarding your account, so use a strong password and limit its use to this account, and use two-factor authentication via an authenticator app or security key. We cannot and will not be liable for any loss or damage arising from your failure to comply with the above.

You can control most communications from the Services. We may need to provide you with certain communications, such as service announcements and administrative messages. These communications are considered part of the Services and your account, and you may not be able to opt-out from receiving them. If you added your phone number to your account and you later change or deactivate that phone number, you must update your account information to help prevent us from communicating with anyone who acquires your old number.

# Your License to Use the Services

We give you a personal, worldwide, royalty-free, non-assignable and non-exclusive license to use the software provided to you as part of the Services. This license cannot be assigned, gifted, sold, shared or transferred in any other manner to any other individual or entity without X's express written consent. This license has the sole purpose of enabling you to use and enjoy the benefit of the Services as provided on X, in the manner permitted by these Terms.

The Services are protected by copyright, trademark, and other laws of both the United States and other countries. Nothing in the Terms gives you a right to use the X name or any of the X trademarks, logos, domain names, other distinctive brand features, and other proprietary rights. All right, title, and interest in and to the Services (excluding Content provided by users) are and will remain our and our licensors' exclusive property. Any feedback, comments, or suggestions you may provide regarding X, or the Services is entirely voluntary and we will be free to use such feedback, comments or suggestions as we see fit and without any obligation to you.



# Misuse of the Services

You also agree not to misuse the Services, for example, by interfering with them or accessing them using a method other than the interface and the instructions that we provide. You agree that you will not work around any technical limitations in the software provided to you as part of the Services, or reverse engineer, decompile or disassemble the software, except and only to the extent that applicable law expressly permits. You may not do any of the following while accessing or using the Services: (i) access, tamper with, or use non-public areas of the Services, our computer systems, or the technical delivery systems of our providers; (ii) probe, scan, or test the vulnerability of any system or network or breach or circumvent any security or authentication measures; (iii) access or search or attempt to access or search the Services by any means (automated or otherwise) other than through our currently available, published interfaces that are provided by us (and only pursuant to the applicable terms and conditions), unless you have been specifically allowed to do so in a separate agreement with us (NOTE: crawling or scraping the Services in any form, for any purpose without our prior written consent is expressly prohibited); (iv) forge any TCP/IP packet header or any part of the header information in any email or posting; (v) in any way use the Services to send altered, deceptive or false source-identifying information; (vi) engage in any conduct that violates our Platform Manipulation and Spam Policy or any other Rules and Policies, including our Misuse of Reporting Features Policy; or (vii) interfere with, or disrupt, (or attempt to do so), the access of any user, host or network, including, without limitation, sending a virus, overloading, flooding, spamming, mail-bombing the Services, or by scripting the creation of Content in such a manner as to interfere with or create an undue burden on the Services. It is also a violation of these Terms to facilitate or assist others in violating these Terms, including by distributing products or services that enable or encourage violation of these Terms.

# Ending These Terms

You may end your legal agreement with us at any time by deactivating your accounts and discontinuing your use of the Services. See https://help.x.com/managing-your-account/how-to-deactivate-x-account for instructions on how to deactivate your account and the Privacy Policy for more information on what happens to your information.

We may suspend or terminate your account or cease providing you with all or part of the Services at any time if we reasonably believe: (i) you have violated these Terms or our Rules and Policies, (ii) you create risk or possible legal exposure for us; (iii) your account should be removed due to unlawful conduct; (iv) your account should be removed due to prolonged inactivity; or (v) our provision of the Services to you is no longer commercially viable. We will make reasonable efforts to notify you by the email address associated with your account or the next time you attempt to access your account, depending on the circumstances. To the extent permitted by law, we may also terminate your account or cease providing you with all or part of the Services for any other reason or no reason at our convenience. In all such cases, the Terms shall terminate, including, without limitation, your license to use the Services, except that the following sections shall continue to apply: 2, 3, 5, 6, and the misuse provisions of Section 4 ("Misuse of the Services"). If you believe your account was terminated in error you can file an appeal following the steps found in our Help

Appx 082



Center (https://help.x.com/forms/account-access/appeals). For the avoidance of doubt, these Terms survive the deactivation or termination of your account.

# 5. Disclaimers and Limitations of Liability

## The Services are Available "AS-IS"

Your access to and use of the Services or any Content are at your own risk. You understand and agree that the Services are provided to you on an "AS IS" and "AS AVAILABLE" basis. The "X Entities" refers to X Corp., its parents, affiliates, related companies, officers, directors, employees, agents, representatives, partners, and licensors. Without limiting the foregoing, to the maximum extent permitted under applicable law, THE X ENTITIES DISCLAIM ALL WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT. The X Entities make no warranty or representation and disclaim all responsibility and liability for: (i) the completeness, accuracy, availability, timeliness, security or reliability of the Services or any Content; (ii) any harm to your computer system, loss of data, or other harm that results from your access to or use of the Services or any Content; (iii) the deletion of, or the failure to store or to transmit, any Content and other communications maintained by the Services; and (iv) whether the Services will meet your requirements or be available on an uninterrupted, secure, or error-free basis. No advice or information, whether oral or written, obtained from the X Entities or through the Services, will create any warranty or representation not expressly made herein.

## Limitation of Liability

NOTWITHSTANDING ANY OTHER TERMS TO THE CONTRARY, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE X ENTITIES SHALL NOT BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, RELIANCE OR ANY LOSS OF PROFITS OR REVENUES, WHETHER INCURRED DIRECTLY OR INDIRECTLY, OR ANY LOSS OF DATA, USE, GOODWILL, OR OTHER INTANGIBLE LOSSES, RESULTING FROM (i) YOUR ACCESS TO OR USE OF OR INABILITY TO ACCESS OR USE THE SERVICES; (ii) ANY CONDUCT OR CONTENT OF ANY USER OR THIRD PARTY ON THE SERVICES, INCLUDING WITHOUT LIMITATION, ANY DEFAMATORY, OFFENSIVE OR ILLEGAL CONDUCT OF OTHER USERS OR THIRD PARTIES; (iii) ANY CONTENT OBTAINED FROM THE SERVICES; OR (iv) UNAUTHORIZED ACCESS, USE OR ALTERATION OF YOUR TRANSMISSIONS OR CONTENT. IN NO EVENT SHALL THE AGGREGATE LIABILITY OF THE X ENTITIES EXCEED THE GREATER OF ONE HUNDRED U.S. DOLLARS (U.S. $100.00) OR THE AMOUNT YOU PAID US, IF ANY, IN THE PAST SIX MONTHS FOR THE SERVICES GIVING RISE TO THE CLAIM. THE LIMITATIONS OF THIS SUBSECTION SHALL APPLY TO ANY THEORY OF LIABILITY, WHETHER BASED ON WARRANTY, CONTRACT, STATUTE, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, AND WHETHER OR NOT THE X ENTITIES HAVE BEEN INFORMED OF THE POSSIBILITY OF ANY SUCH DAMAGE, AND EVEN IF A REMEDY SET FORTH HEREIN IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.



BY AGREEING TO THESE TERMS OR USING THE SERVICES, YOU AGREE, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THAT THE X ENTITIES ARE NOT RESPONSIBLE OR LIABLE TO YOU OR OTHERS FOR THE ACTIONS OR CONDUCT OF USERS AND THIRD PARTIES ON THE SERVICES, OR FOR ANY CONTENT USERS AND THIRD PARTIES SHARE ON THE SERVICES, INCLUDING OFFENSIVE, DEFAMATORY, ILLEGAL OR OTHER OBJECTIONABLE CONTENT.

## Liquidated Damages

Protecting our users' data and our system resources is important to us. You further agree that, to the extent permitted by applicable law, if you violate the Terms, or you induce or facilitate others to do so, in addition to all other legal remedies available to us, you will be jointly and severally liable to us for liquidated damages as follows for requesting, viewing, or accessing more than 1,000,000 posts (including reply posts, video posts, image posts, and any other posts) in any 24-hour period - $15,000 USD per 1,000,000 posts. You agree that these amounts are (i) a reasonable estimate of our damages; (ii) not a penalty; and (iii) not otherwise limiting of our ability to recover from you or others under any legal or equitable theory or claim, including but not limited to statutory damages and/or equitable relief. You further agree that repeated violations of these Terms will irreparably harm and entitle us to injunctive and/or other equitable relief, in addition to monetary damages.

# 6. General

We may revise these Terms from time to time. The changes will not be retroactive, and the most current version of the Terms, which will always be at https://x.com/tos, will govern our relationship with you. We will try to notify you of material revisions, for example via a service notification or an email to the email associated with your account. By continuing to access or use the Services after those revisions become effective, you agree to be bound by the revised Terms.

The laws of the State of Texas, excluding its choice of law provisions, will govern these Terms and any dispute that arises between you and us, notwithstanding any other agreement between you and us to the contrary. All disputes related to these Terms or the Services, including without limitation disputes related to or arising from other users' and third parties' use of the Services and any Content made available by other users and third parties on the Services, will be brought exclusively in the U.S. District Court for the Northern District of Texas or state courts located in Tarrant County, Texas, United States, and you consent to personal jurisdiction in those forums and waive any objection as to inconvenient forum. Without prejudice to the foregoing, you agree that, in its sole discretion, X may bring any claim, cause of action, or dispute we have against you in any competent court in the country in which you reside that has jurisdiction and venue over the claim. To the extent permitted by law, you also waive the right to participate as a plaintiff or class member in any purported class action, collective action or representative action proceeding.

If you are a federal, state, or local government entity in the United States using the Services in your official capacity and legally unable to accept the controlling law, jurisdiction or venue clauses above, then those clauses do not apply to you. For such U.S. federal government entities, these



Terms and any action related thereto will be governed by the laws of the United States of America (without reference to conflict of laws) and, in the absence of federal law and to the extent permitted under federal law, the laws of the State of Texas (excluding choice of law).

You and X agree that you must initiate any proceeding or action within one (1) year of the date of the occurrence of the event or facts giving rise to a dispute that is arising out of or related to these Terms. Otherwise, to the extent permitted by applicable law, you forever waive the right to pursue any claim or cause of action, of any kind or character, based on such events or facts, and such claims or causes of action are permanently barred.

In the event that any provision of these Terms is held to be invalid or unenforceable, then that provision will be limited or eliminated to the minimum extent necessary, and the remaining provisions of these Terms will remain in full force and effect. Our failure to enforce any right or provision of these Terms will not be deemed a waiver of such right or provision.

The X User Agreement is written in English but is made available in multiple languages through translations. X strives to make the translations as accurate as possible to the original English version. However, in case of any discrepancies or inconsistencies, the English language version of the X User Agreement shall take precedence. You acknowledge that English shall be the language of reference for interpreting and constructing the terms of the X User Agreement.

If you have any questions about these Terms, please contact us.

**Effective:** November 15, 2024

Archive of Previous Terms

---

# X Terms of Service

**If you live in the European Union, EFTA States, or the United Kingdom**

These Terms of Service ("Terms") govern your and other users' access to and use of the services, including our various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, commerce services, and our other covered services (https://help.x.com/rules-and-policies/x-services-and-corporate-affiliates) that link to these Terms (collectively, the "Services"), and any information, text, links, graphics, photos, audio, videos, or other materials or arrangements of materials uploaded, downloaded or appearing on the Services (collectively referred to as "Content"). By using the Services you agree to be bound by these Terms.

These Terms are an agreement between you and Twitter International Unlimited Company (Co. number 503351, VAT number IE9803175Q), an Irish company, which provides X and the Services,



with its registered office at One Cumberland Place, Fenian Street Dublin 2, D02 AX07 Ireland. The words "we," "us," and "our," mean Twitter International Unlimited Company.

# 1. Who May Use the Services

You may use the Services only if you agree to form a binding contract with us and are not a person barred from receiving services under the laws of the applicable jurisdiction. In any case, you must be at least 13 years old to use the Services. If you are (i) accepting these Terms and/or using the Services, which constitutes acceptance of these Terms, or (ii) accepting these Terms in order to authorize the use of the Services on behalf of a minor (being any person under the age of majority in any given country), company, organization, government, or other legal entity, you represent and warrant that you are authorized to do so or, as the case may be, have the authority to bind such minor and/or entity to these Terms. The words "you" and "your" as used in these Terms shall refer either to the person accepting these Terms or such minor (as defined in (i)) and/or the entity referenced in (ii), as applicable.

# 2. Privacy

Our Privacy Policy (https://x.com/privacy) describes how we handle the information you provide to us when you use the Services. You understand that through your use of the Services you consent to the collection and use (as set forth in the Privacy Policy) of this information, including the transfer of this information to the United States, Ireland, and/or other countries for storage, processing and use by us and our affiliates.

# 3. Content on the Services

You are responsible for your use of the Services and for any Content you provide, including compliance with applicable laws, rules, and regulations. You should only provide Content that you are comfortable sharing with others.

Any use or reliance on any Content or materials posted via the Services or obtained by you through the Services is at your own risk. We do not endorse, support, represent or guarantee the completeness, truthfulness, accuracy, or reliability of any Content or communications posted via the Services or endorse any alleged facts or opinions expressed via the Services. You understand that by using the Services, you may be exposed to Content that might be offensive, harmful, inaccurate or otherwise inappropriate, or in some cases, postings that have been mislabeled or are otherwise deceptive. Content recommendations are made based on a combination of factors: how you engage with the Services, the topics you have indicated that you are interested in, and what other users who share your similar interests like. Adjustments can be made in your settings, and additional information can be found in our Help Center (https://help.x.com/resources/recommender-



systems). All Content is the sole responsibility of the person who originated such Content. We may not monitor or control the Content posted via the Services and, we cannot take responsibility for such Content.

We reserve the right to remove Content that violates the User Agreement, including for example, copyright or trademark violations or other intellectual property misappropriation, impersonation, unlawful conduct, or harassment. Information regarding specific policies and the process for reporting or appealing violations can be found in our Help Center (https://help.x.com/rules-and-policies/x-report-violation and https://help.x.com/managing-your-account/suspended-x-accounts).

If you believe that your Content has been copied in a way that constitutes copyright infringement, please report this by visiting our Copyright reporting form (https://help.x.com/forms/dmca) or contacting our designated copyright agent at:

X Corp.
Attn: Copyright Agent
865 FM 1209, Building 2
Bastrop, TX 78602
Reports: https://help.x.com/forms/dmca
Email: copyright@x.com

## Your Rights and Grant of Rights in the Content

You retain your rights to any Content you submit, post or display on or through the Services. What's yours is yours — you own your Content (and your incorporated audio, photos and videos are considered part of the Content).

By submitting, posting or displaying Content on or through the Services, you grant us a worldwide, non-exclusive, royalty-free license (with the right to sublicense) to use, copy, reproduce, process, adapt, modify, publish, transmit, display, upload, download, and distribute such Content in any and all media or distribution methods now known or later developed, for any purpose. For clarity, these rights include, for example, curating, transforming, and translating. This license authorizes us to make your Content available to the rest of the world and to let others do the same. However, if you have chosen via our features to limit the distribution of your Content to a restricted community, we will respect that choice. You also agree that this license includes the right to analyze text and other information you provide with the view to improve the Services. You agree that this license includes the right for us to (i) provide, promote, and improve the Services, including, for example, for use with and training of our machine learning and artificial intelligence models, whether generative or another type; and (ii) to make Content submitted to or through the Services available to other companies, organizations or individuals, including, for example, for improving the Services and the syndication, broadcast, distribution, repost, promotion or publication of such Content on other media and services, subject to our terms and conditions for such Content use. Such additional uses by us, or other companies, organizations or individuals, is made with no compensation paid to you with respect to the Content that you submit, post, transmit or otherwise make available through the Services as the use of the Services by you is hereby agreed as being sufficient compensation for the Content and grant of rights herein.

**Appx 087**



We have an evolving set of rules for how ecosystem partners can interact with your Content on the Services. These rules exist to enable an open ecosystem with your rights in mind. You understand that we may modify or adapt your Content as it is distributed, syndicated, published, or broadcast by us and our partners and/or make changes to your Content in order to adapt the Content to different media.

You represent and warrant that you have, or have obtained, all rights, licenses, consents, permissions, power and/or authority necessary to grant the rights granted herein for any Content that you submit, post or display on or through the Services. You agree that such Content will not contain material subject to copyright or other proprietary rights, unless you have necessary permission or are otherwise legally entitled to post the material and to grant us the license described above.

# 4. Using the Services

Please review our Rules and Policies, which are part of the User Agreement and outline conduct that is prohibited on the Services. You may use the Services only in compliance with these Terms and all applicable laws, rules and regulations. X takes enforcement actions when Content or user behavior is in violation of our Rules and Policies or in relation to sensitive media. You can review X's enforcement options and how you can appeal our enforcement decision here.

The Services evolve constantly. As such, the Services may change from time to time, at our discretion. We may stop (permanently or temporarily) providing the Services or any features within the Services to you or to users generally. We also retain the right to create limits on use and storage at our sole discretion at any time. We may also remove or refuse to distribute any Content on the Services, limit distribution or visibility of any Content on the service, suspend or terminate users, and reclaim usernames if it is appropriate, including for the following reasons: (i) protecting the Services or our users; (ii) compliance with applicable laws or orders from competent authorities; (iii) breach of these Terms or our Rules and Policies or third parties' intellectual property or other rights; (iv) if you or your Content exposes us, other users or any third party to legal or regulatory risk; and/or (v) your prolonged inactivity.

In consideration for our granting you access to and use of the Services, you agree that we and our third-party providers and partners may place advertising on the Services or in connection with the display of Content or information from the Services whether submitted by you or others. We also reserve the right to access, read, preserve, and disclose any information as we reasonably believe is necessary to (i) satisfy any applicable law, regulation, legal process or governmental request; (ii) enforce the Terms, including investigation of potential violations hereof; (iii) detect, prevent, or otherwise address fraud, security or technical issues; (iv) respond to user support requests; or (v) protect the rights, property or safety of X, its users and the public. We do not disclose personally-identifying information to third parties except in accordance with our Privacy Policy.

Certain services or features may be offered on X for which additional terms and conditions may apply in connection with your use of those services. These additional terms are accessible from our



sites and applications dedicated to these services or features. By using or paying for any of these additional services, you will have to agree to any additional terms applicable to those services, and those additional terms will then also become part of our agreement with you. If any of the applicable additional terms conflict with these Terms, the additional terms will prevail while you are using those services to which they apply.

If you use paid features of the Services, you agree to the applicable Terms for Paid Services (https://legal.x.com/purchaser-terms.html).

If you use developer features of the Services, including but not limited to X for Websites (https://developer.x.com/docs/x-for-websites), X Cards (https://developer.x.com/docs/x-for-websites/cards/overview/abouts-card), Public API (https://developer.x.com/docs), or Sign in with X (https://developer.x.com/docs/authentication/guides/log-in-with-twitter), you agree to our Developer Agreement (https://developer.x.com/developer-terms/agreement) and Developer Policy (https://developer.x.com/developer-terms/policy). If you want to reproduce, modify, create derivative works, distribute, sell, transfer, publicly display, publicly perform, transmit, or otherwise use the Services or Content on the Services, you must use the interfaces and instructions we provide, except as permitted through the Services, these Terms, or the terms provided on https://developer.x.com/developer-terms. Otherwise, all such actions are strictly prohibited. If you are a security researcher, you are required to comply with the rules of our Vulnerability Reporting Program (https://hackerone.com/x). The requirements set out in the preceding paragraph may not apply to those participating in our Vulnerability Reporting Program.

If you use advertising features of the Services, you agree to our Master Services Agreement (https://ads.x.com/terms).

## Your Account

You may need to create an account to use the Services. You are responsible for safeguarding your account, so use a strong password and limit its use to this account, and use two-factor authentication via an authenticator app or security key. We cannot and will not be liable for any loss or damage arising from your failure to comply with the above.

You can control most communications from the Services. We may need to provide you with certain communications, such as service announcements and administrative messages. These communications are considered part of the Services and your account, and you may not be able to opt-out from receiving them. If you added your phone number to your account and you later change or deactivate that phone number, you must update your account information to help prevent us from communicating with anyone who acquires your old number.

## Your License to Use the Services

We give you a personal, worldwide, royalty-free, non-assignable and non-exclusive license to use the software provided to you as part of the Services. This license cannot be assigned, gifted, sold, shared or transferred in any other manner to any other individual or entity without X's express

Appx 089



written consent. This license has the sole purpose of enabling you to use and enjoy the benefit of the Services as provided on X, in the manner permitted by these Terms.

The Services are protected by copyright, trademark, and other laws of both the United States and other countries. Nothing in the Terms gives you a right to use the X name or any of the X trademarks, logos, domain names, other distinctive brand features, and other proprietary rights. All right, title, and interest in and to the Services (excluding Content provided by users) are and will remain our and our licensors' exclusive property. Any feedback, comments, or suggestions you may provide regarding X, or the Services is entirely voluntary and we will be free to use such feedback, comments or suggestions as we see fit and without any obligation to you.

## Misuse of the Services

You also agree not to misuse the Services, for example, by interfering with them or accessing them using a method other than the interface and the instructions that we provide. You agree that you will not work around any technical limitations in the software provided to you as part of the Services, or reverse engineer, decompile or disassemble the software, except and only to the extent that applicable law expressly permits. You may not do any of the following while accessing or using the Services: (i) access, tamper with, or use non-public areas of the Services, our computer systems, or the technical delivery systems of our providers; (ii) probe, scan, or test the vulnerability of any system or network or breach or circumvent any security or authentication measures; (iii) access or search or attempt to access or search the Services by any means (automated or otherwise) other than through our currently available, published interfaces that are provided by us (and only pursuant to the applicable terms and conditions), unless you have been specifically allowed to do so in a separate agreement with us (NOTE: crawling or scraping the Services in any form, for any purpose without our prior written consent is expressly prohibited); (iv) forge any TCP/IP packet header or any part of the header information in any email or posting; (v) in any way use the Services to send altered, deceptive or false source-identifying information; (vi) engage in any conduct that violates our Platform Manipulation and Spam Policy or any other Rules and Policies, including our Misuse of Reporting Features Policy; or (vii) interfere with, or disrupt, (or attempt to do so), the access of any user, host or network, including, without limitation, sending a virus, overloading, flooding, spamming, mail-bombing the Services, or by scripting the creation of Content in such a manner as to interfere with or create an undue burden on the Services. It is also a violation of these Terms to facilitate or assist others in violating these Terms, including by distributing products or services that enable or encourage violation of these Terms.

## Ending These Terms

You may end your legal agreement with us at any time by deactivating your accounts and discontinuing your use of the Services. See https://help.x.com/managing-your-account/how-to-deactivate-x-account for instructions on how to deactivate your account and the Privacy Policy for more information on what happens to your information.

Appx 090



We may suspend or terminate your account or cease providing you with all or part of the Services at any time if we reasonably believe: (i) you have violated these Terms or our Rules and Policies; (ii) you create risk or possible legal exposure for us; (iii) your account should be removed due to unlawful conduct; (iv) your account should be removed due to prolonged inactivity; or (v) our provision of the Services to you is no longer commercially viable. We will make reasonable efforts to notify you by the email address associated with your account or the next time you attempt to access your account, depending on the circumstances. In all such cases, the Terms shall terminate, including, without limitation, your license to use the Services, except that the following sections shall continue to apply: 2, 3, 5, 6, and the misuse provisions of Section 4 ("Misuse of the Services"). If you believe your account was terminated in error you can file an appeal following the steps found in our Help Center (https://help.x.com/forms/account-access/appeals). For the avoidance of doubt, these Terms survive the deactivation or termination of your account.

# 5. Limitations of Liability

By using the Services you agree that Twitter International Unlimited Company, its parents, affiliates, related companies, officers, directors, employees, agents representatives, partners and licensors, liability is limited to the maximum extent permissible in your country of residence.

## Liquidated Damages

Protecting our users' data and our system resources is important to us. You further agree that, to the extent permitted by applicable law, if you violate the Terms, or you induce or facilitate others to do so, in addition to all other legal remedies available to us, you will be jointly and severally liable to us for liquidated damages as follows for requesting, viewing, or accessing more than 1,000,000 posts (including reply posts, video posts, image posts, and any other posts) in any 24-hour period - €15,000 EUR per 1,000,000 posts. You agree that these amounts are (i) a reasonable estimate of our damages; (ii) not a penalty; and (iii) not otherwise limiting of our ability to recover from you or others under any legal or equitable theory or claim, including but not limited to statutory damages and/or equitable relief. You further agree that repeated violations of these Terms will irreparably harm and entitle us to injunctive and/or equitable relief, in addition to monetary damages.

# 6. General

We may revise these Terms from time to time. The changes will not be retroactive, and the most current version of the Terms, which will always be at https://x.com/tos, will govern our relationship with you. Other than for changes addressing new functions or made for legal reasons, we will notify you 30 days in advance of making effective changes to these Terms that impact the rights or obligations of any party to these Terms, for example via a service notification or an email to the email associated with your account. By continuing to access or use the Services after those revisions become effective, you agree to be bound by the revised Terms.



To the extent permitted by law, all disputes related to these Terms or the Services, including without limitation disputes related to or arising from other users' and third parties' use of the Services and any Content made available by other users and third parties on the Services, will be brought exclusively before a competent court in Ireland without regard to conflict of law provisions and will be governed by Irish law, notwithstanding any other agreement between you and us to the contrary. Without prejudice to the foregoing, you agree that, in its sole discretion, X may bring any claim, cause of action, or dispute we have against you in any competent court in the country in which you reside that has jurisdiction and venue over the claim. To the extent permitted by law, you also waive the right to participate as a plaintiff or class member in any purported class action, collective action or representative action proceeding.

You and X agree that you must initiate any proceeding or action within one (1) year of the date of the occurrence of the event or facts giving rise to a dispute that is arising out of or related to these Terms. Otherwise, to the extent permitted by applicable law, you forever waive the right to pursue any claim or cause of action, of any kind or character, based on such events or facts, and such claims or causes of action are permanently barred.

In the event that any provision of these Terms is held to be invalid or unenforceable, then that provision will be limited or eliminated to the minimum extent necessary, and the remaining provisions of these Terms will remain in full force and effect. Our failure to enforce any right or provision of these Terms will not be deemed a waiver of such right or provision.

The X User Agreement is written in English but is made available in multiple languages through translations. X strives to make the translations as accurate as possible to the original English version. However, in case of any discrepancies or inconsistencies, the English language version of the X User Agreement shall take precedence. You acknowledge that English shall be the language of reference for interpreting and constructing the terms of the X User Agreement.

If you have any questions about these Terms, please contact us.

**Effective:** November 15, 2024

Archive of Previous Terms

---

**Appx 092**