**UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| **X CORP.**, a Nevada corporation,<br>　　　　*Plaintiff,*<br><br>　　　vs.<br><br>**MEDIA MATTERS FOR AMERICA**, a<br>Washington, D.C. non-profit corporation,<br>**ERIC HANANOKI**, and **ANGELO**<br>**CARUSONE**,<br>　　　　*Defendants.* | Case No. 4:23-CV-01175-O |

**PLAINTIFF'S RESPONSE AND BRIEF IN OPPOSITION TO
DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO COMPEL DISCOVERY**

**TABLE OF CONTENTS**

Table of Contents.................................................................................................................. i

Table of Authorities ............................................................................................................. ii

Introduction.......................................................................................................................... 1

Argument and Authorities.................................................................................................... 2

    I.    The User Discovery Defendants Seek is Either Cumulative, Nonexistent, or
        Statutorily Protected........................................................................................... 2

        A.  The Stored Communications Act prohibits disclosure of users' posts. ........................ 2

              1.    The SCA's lawful-consent exception does not apply to the posts Defendants
                    seek. ................................................................................................................... 3

              2.    Section 2702(b)(5)'s permissive self-protection exception does not apply............ 8

        B.  Defendants are not entitled to cumulative or nonexistent discovery. .......................... 9

              1.    No documents exist that are responsive to RFP 80.............................................. 10

              2.    X has sufficiently responded to Request No. 81.................................................. 12

    II.   Defendants Are Not Entitled to Redundant, Irrelevant Discovery on Unrelated
       Advertising Declines........................................................................................... 13

    III.  Pursuant to the Parties' ESI Order, Defendants Have No Right to Demand
       Identification of Linked Documents. ................................................................... 15

    IV. X Has Fully Answered Defendants' Interrogatory No. 16 and Cannot Identify
       Documents that Do Not Exist. ............................................................................. 17

Conclusion ......................................................................................................................... 17

Certificate of Service ......................................................................................................... 19

**TABLE OF AUTHORITIES**

CASES

*Briggs v. OS Rest. Servs., LLC*,
   No. 2:18-CV-8457-JAK AFMX, 2019 WL 7195620 (C.D. Cal. Sept. 10, 2019) ...................... 5

*Cole v. Collier*,
   No. 4:14-CV-1698, 2020 WL 2813454 (S.D. Tex. May 28, 2020) ................................... 12, 15

*Crispin v. Christian Audigier, Inc.*,
   717 F. Supp. 2d 965 (C.D. Cal. 2010) ................................................................... 4

*Ehling v. Monmouth-Ocean Hosp. Serv. Corp.*,
   961 F. Supp. 2d 659 (D.N.J. 2013) ....................................................................... 4

*El Paso Disposal, LP v. Ecube Labs Co.*,
   No. EP-24-CV-00097-KC, 2024 WL 4806498 (W.D. Tex. Nov. 15, 2024) ........................... 13

*Facebook, Inc. v. Superior Court*,
   4 Cal. 5th 1245 (2018) ................................................................................... 4, 5

*GoForIt Entm't, LLC v. Digimedia. com, L.P.*,
   No. 3:08-CV-2011-D, 2010 WL 11618676 (N.D. Tex. Jan. 22, 2010) ................................ 12

*In re Akhmedova*,
   No. 20-MC-80156-VKD, 2020 WL 6891828 (N.D. Cal. Nov. 24, 2020) ................................ 8

*In re Core Commc'ns, Inc.*,
   No. 17-00258-ELG, 2022 WL 18028102 (Bankr. D.D.C. Dec. 30, 2022) ............................. 11

*In re Subpoena Duces Tecum to AOL, LLC*,
   550 F. Supp. 2d 606 (E.D. Va. 2008) ..................................................................... 2

*In re Subpoena Served on Affiliated Foods, Inc.*,
   No. 2:21-MC-3-Z, 2021 WL 4439796 (N.D. Tex. Sept. 28, 2021) ................................... 13

*Li v. Walsh*,
   No. 16-CV-81871, 2023 WL 11981206 (S.D. Fla. May 19, 2023) .................................... 6

*Lopez v. Don Herring Ltd.*,
   327 F.R.D. 567 (N.D. Tex. 2018) ....................................................................... 10

*Mason v. Pulliam*,
   557 F.2d 426 (5th Cir. 1977) ............................................................................ 5

*McElvy v. Southwestern Corr., LLC*,
   No. 3:19-CV-1264-N, 2022 WL 1050312 (N.D. Tex. Apr. 7, 2022) .................................. 11

*McGinley v. Luv N' Care, Ltd.*,
   No. CV 17-0821, 2019 WL 13218251 (W.D. La. May 6, 2019) ...................................... 10

*Negro v. Superior Court*,
   230 Cal. App. 4th 879 (2014), *as modified* (Nov. 18, 2014) ...................................... 5

*Open Cheer & Dance Championship Series, LLC v. Varsity Spirit, LLC*,
  No. 2:23-CV-155-Z, 2025 WL 592484 (N.D. Tex. Feb. 24, 2025) ......................................... 12

*Painter v. Robertson,*
  185 F.3d 557 (6th Cir. 1999)................................................................................................... 5

*Republic of Gambia v. Facebook, Inc.*,
  575 F. Supp. 3d 8 (D.D.C. 2021) ............................................................................................ 6

*Rosenow v. Facebook, Inc.*,
  No. 19-CV-1297-WQH-MMP, 2025 WL 951277 (S.D. Cal. Mar. 28, 2025) ....................... 4, 8

*Samsung Elecs. Am., Inc. v. Yang Kun Chung*,
  321 F.R.D. 250 (N.D. Tex. 2017) ...................................................................................... 10, 17

*Suraju v. Yahoo!, Inc.*,
  No. 22-mc-80072-SK, 2022 WL 3365086 (N.D. Cal. July 13, 2022) ...................................... 3

*Suzlon Energy Ltd. v. Microsoft Corp.*,
  671 F.3d 726 (9th Cir. 2011)................................................................................................ 3, 8

*Thompson v. Toyota Motor Sales, USA, Inc.*,
  No. SA-16-CA-00645-DAE, 2017 WL 5244561 (W.D. Tex. June 6, 2017)........................... 10

*United States v. Buckingham*,
  433 F.3d 508 (6th Cir. 2006)................................................................................................... 5

*United States v. Ho*,
  94 F.3d 932 (5th Cir. 1996)..................................................................................................... 5

*United States v. Serna*,
  No. 5:22-CR-01194-01, 2024 WL 1902759 (S.D. Tex. Jan. 31, 2024) ................................... 9

*United States v. Wagner*,
  No. 2:10-CR-00399-MMD-GWF, 2017 WL 376155 (D. Nev. Jan. 26, 2017), *aff'd*, 739
  F. App'x 440 (9th Cir. 2018)................................................................................................. 16

*VeroBlue Farms USA Inc. v. Wulf*,
  345 F.R.D. 406 (N.D. Tex. 2021) .......................................................................................... 10

*Viacom Int'l Inc. v. Youtube Inc.*,
  253 F.R.D. 256 (S.D.N.Y. 2008)......................................................................................... 3, 4

**STATUTES**

18 U.S.C. § 2510(17) ............................................................................................................... 6

18 U.S.C. § 2702(a) .................................................................................................................. 2

18 U.S.C. § 2702(a)(1)-(2).......................................................................................................... 2

18 U.S.C. § 2702(b)(1)-(9) .......................................................................................................... 2

18 U.S.C. § 2702(b)(3) ............................................................................................................... 3

18 U.S.C. § 2702(b)(3), (5)......................................................................................................... 3

18 U.S.C. § 2702(b)(5) ................................................................................................... 8

**RULES**

FED. R. CIV. P. 26(b)(2)(C) ............................................................................................. 7

FED. R. CIV. P. 26(b)(2)(C)(i) ....................................................................................... 12

**INTRODUCTION**

Having already received hundreds of thousands of documents, Defendants now demand more—not because they need it to defend this case, but because they want it all, and they want it now. This insatiable approach to discovery violates the Stored Communications Act, flouts the parties' own agreed-upon discovery protocol, and goes well beyond what is proportional to the needs of the case.

Defendants' overreaching manifests in multiple improper demands. First, Defendants seek user content (RFP 79) that the Stored Communications Act (SCA), 18 U.S.C. § 2702(a), expressly shields from disclosure. No exception permits circumventing federal privacy protections for civil discovery, no matter how "critical" Defendants claim it to be. Second, Defendants demand documents that simply do not exist (RFP 80), while refusing to accept their nonexistence. Third, Defendants seek cumulative discovery already provided in other forms (RFPs 81, 86, 98, and Interrogatory 21). Fourth, Defendants refuse to take "yes" for an answer and demand that X provide discovery that has already been provided in full (Interrogatory 16). Finally, ignoring the parties' negotiated ESI protocol, Defendants demand that X produce and identify a "key brand safety document" that X has already produced over 20 times.

This pattern—demanding every scrap of paper when voluminous discovery has already been produced, seeking years of data when the case involves specific November 2023 events and advertisers, refusing to honor agreements and a federal statute when inconvenient—seems designed to burden X through discovery rather than defend the case on its merits, and continues Defendants' "pattern of gamesmanship." ECF 190 at 9 (cleaned up). But the Federal Rules entitle Defendants only to discovery that is proportional to the needs of the case, not unlimited access to whatever information they desire without limit or compromise. Defendants' motion should be denied in its entirety.

ARGUMENT AND AUTHORITIES

**I.    The User Discovery Defendants Seek is Either Cumulative, Nonexistent, or Statutorily Protected.**

Defendants seek extensive information about the fifteen users whose posts are involved in the ad adjacencies discussed in their November 2023 Articles. They press for "all content posted" by any of the accounts (RFP 79), "all documents showing . . . advertising revenue" generated from the accounts (RFP 80), and "[a]ll documents showing the creator monetization status or any revenue shared with" the accounts (RFP 81)—and all for a multiyear period.

The SCA bars Plaintiff from producing the private and deleted user posts Defendants seek in RFP 79. Documents showing account-specific advertising revenue requested in RFP 80 do not exist. And the revenue-sharing information sought in RFP 81 has already been provided in relevant form. X has already explained all this to Defendants, yet Defendants needlessly filed this Motion anyway.

**A.    The Stored Communications Act prohibits disclosure of users' posts.**

X cannot produce the non-public user content Defendants seek in their RFP 79. The SCA prohibits private parties from compelling production of the content of an account holder's electronic communications from service providers like X by service of a subpoena or court order, subject to limited exceptions not applicable here.[1] 18 U.S.C. § 2702(a)(1)-(2), (b)(1)-(9). The SCA is designed "to protect internet subscribers from having their personal information wrongfully used and publicly disclosed by 'unauthorized private parties.'" *In re Subpoena Duces Tecum to AOL, LLC*, 550 F. Supp. 2d 606, 610 (E.D. Va. 2008). There is no exception under the SCA for civil

---

[1] *See* 18 U.S.C. § 2702(a) ("[A] person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service . . . .").

2

discovery demands, even purportedly "critical" ones. *See, e.g.*, *Suzlon Energy Ltd. v. Microsoft Corp.*, 671 F.3d 726, 730 (9th Cir. 2011); *Viacom Int'l Inc. v. Youtube Inc.*, 253 F.R.D. 256, 264 (S.D.N.Y. 2008); *cf.* Mot at 4 (describing the discovery requested by Defendants as "critical").

Defendants nevertheless maintain that "all content" from these users falls under two SCA exceptions: first, that the users consented to disclosure; and second, that disclosure is "necessarily incident . . . to [X's] protection of its rights." 18 U.S.C. § 2702(b)(3), (5). Both "exceptions to the SCA are to be construed narrowly." *Suraju v. Yahoo!, Inc*., No. 22-mc-80072-SK, 2022 WL 3365086, at *4 (N.D. Cal. July 13, 2022). Neither permits disclosure here. And even if these exceptions could be read to apply to Defendants' discovery requests, Defendants' motion should still be denied because of the disproportionate burden attendant to producing these materials and their trivial-at-best relevance.

> **1.    The SCA's lawful-consent exception does not apply to the posts Defendants seek.**

Defendants argue that production of users' posts is proper under the SCA because the users consented to their disclosure by allowing them to remain public.[2] *See* Mot. at 5; 18 U.S.C. § 2702(b)(3) (allowing disclosure "with the lawful consent of the originator or an addressee or intended recipient of such communication, or the subscriber in the case of remote computing service"). But Defendants have no reason to seek publicly available posts from X, much less move to compel them: they are accessible to all via the X platform, so Defendants are free to collect them on their own. The true goal of Defendants' demand is disclosure of user data that are unavailable to the public—namely, (a) posts from protected accounts, which are viewable only to

---

[2] Though RFP 79's broad language appears to include direct messages, Defendants clarify that they are not seeking private messages sent from one account to another. *See* Mot. at 5.

the user's followers;[3] (b) posts deleted voluntarily by users and removed from view altogether;[4] and (c) posts deleted at X's direction or from suspended accounts, which are also unavailable for viewing.[5] Defendants bear the burden of proving consent. *Rosenow v. Facebook, Inc.*, No. 19-CV-1297-WQH-MMP, 2025 WL 951277, at *14 (S.D. Cal. Mar. 28, 2025). For the nonpublic and deleted posts at the heart of Defendants' demand, Defendants fail to meet their burden.

a.    Protected posts. Protected posts, like other content unavailable to the general public, are not disclosable under the SCA because the users "chose privacy settings that . . . sufficiently restrict[ their posts] that they are not readily available to the general public." *Crispin v. Christian Audigier, Inc.*, 717 F. Supp. 2d 965, 991 (C.D. Cal. 2010); *see also Viacom.*, 253 F.R.D. at 265 (S.D.N.Y. 2008) (holding that SCA prevented Viacom from accessing YouTube "videos that [users] have designated as private and chosen to share only with specified recipients"); *Ehling v. Monmouth-Ocean Hosp. Serv. Corp.*, 961 F. Supp. 2d 659, 669 (D.N.J. 2013) (finding that non-public Facebook wall posts are generally protected by the SCA). Even wide access to a "'large group' of friends or followers" does not constitute consent to disclosure. *Facebook, Inc. v. Superior Court*, 4 Cal. 5th 1245, 1281 (2018). In other words, the SCA gives these protected posts the same safeguards as the "private messages" Defendants recognize are shielded from disclosure. *See* Mot. at 5.  Accordingly, the SCA prohibits the disclosure of users' protected content.

b.    User-deleted content. Posts that users have voluntarily deleted reflect a similar lack of consent to disclosure meriting SCA protection. On the X Platform, posts can be removed at the user's discretion and by the Platform itself, or X may require that a user remove a

---

[3] *See* https://help.x.com/en/safety-and-security/public-and-protected-posts.

[4] https://help.x.com/en/using-x/delete-posts.

[5] *See* https://help.x.com/en/managing-your-account/suspended-x-accounts.

post violating its rules before the user can post again.[6] There is good reason to conclude that when a user deletes a post, that action serves as a revocation of the user's initial consent to public disclosure. *See United States v. Buckingham*, 433 F.3d 508, 513 (6th Cir. 2006) ("It is well-settled that 'the consenting party . . . at any moment may retract his consent.'" (quoting *Painter v. Robertson,* 185 F.3d 557, 567 (6th Cir. 1999))); *cf. United States v. Ho*, 94 F.3d 932, 934 (5th Cir. 1996) (acknowledging effectiveness of withdrawal of consent); *Mason v. Pulliam*, 557 F.2d 426, 428 (5th Cir. 1977) (acknowledging that consent to search in Fourth Amendment context can be limited, qualified, or withdrawn). When a user affirmatively deletes content, the intent is clearly to render that content inaccessible. Producing or preserving deleted content in response to a discovery demand would directly contradict this privacy expectation and undermine the user's deliberate choice to remove the content from circulation. Thus, by voluntarily removing posts from public view, users demonstrate their intent to shield them from general access, aligning them with other restricted communications that are protected by the SCA. *See Facebook, Inc.*, 4 Cal. 5th 1245 at 1281 (2018) (observing argument that a "reconfiguration or deletion should be understood as a revocation of lawful consent for purposes of section 2702(b)(3)").

       c.      <u>Platform-deleted content.</u> Posts that X requires to be deleted, or that X itself deletes, and posts from suspended accounts, equally merit SCA protection. "The 'lawful consent' exception to the prohibitions of the [SCA] is not satisfied by consent that is merely constructive, implied in law, or otherwise imputed to the user by a court." *Negro v. Superior Court*, 230 Cal. App. 4th 879, 889 (2014), *as modified* (Nov. 18, 2014); *Briggs v. OS Rest. Servs., LLC*, No. 2:18-CV-8457-JAK AFMX, 2019 WL 7195620, at *4 (C.D. Cal. Sept. 10, 2019) ("[T]he SCA requires

---

[6]   *See*   https://help.x.com/en/using-x/delete-posts;   https://help.x.com/en/rules-and-policies/enforcement-options; https://transparency.x.com/en/reports/transparency-reports.

actual consent . . . before a civil subpoena for his ESI can be enforced."); *Li v. Walsh*, No. 16-CV-81871, 2023 WL 11981206, at \*2 (S.D. Fla. May 19, 2023) ("Courts interpreting the SCA repeatedly have found that only the actual, lawful consent of the user is enough . . . ."). This requirement of actual consent reflects the SCA's foundational principle that users, not providers, retain primary control over their electronic communications. Any interpretation that dilutes this standard would undermine the statute's core privacy protections.

When platforms delete or hide posts unilaterally, users lose any opportunity to revoke their consent regarding those communications via subsequent restriction or deletion. This loss of power to control content is material, as it removes the user's ability to consent to disclosure. It would therefore at a minimum be inequitable to refuse SCA protection to content deleted by providers. *See Republic of Gambia v. Facebook, Inc.*, 575 F. Supp. 3d 8 (D.D.C. 2021). And while the court in *Gambia*, one of the only cases addressing this issue, focused on whether platform-deleted content was "stored 'for purposes of backup protection'" under the statute,[7] *see id.* at 16, it made several observations that suggest such content is protected under the SCA. *See id.* at 16 (noting that platform-deleted content is no longer in the user's control); *id.* at 15 ("If Congress wished to protect these provider-stored communications even after the *user* chose to delete them, it would make little sense for that protection to lapse when the *provider* made the decision to remove them, as occurred here. That would grant providers power inconsistent with the SCA's goal to restrict their ability to disclose user communications."). To address its goal of protecting electronic communications, SCA's protections should not disappear simply because a provider, rather than a

---

[7] Section 2702(a)(1) only applies to content in "electronic storage." "Electronic storage," in turn, is defined as: (A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (B) any storage of such communication by an electronic communication service *for purposes of backup protection* of such communication[.]" 18 U.S.C. § 2510(17) (emphasis added).

user, deleted the content.

d.    Any User Content Arguably Disclosable by Consent Would Be Unduly Burdensome to Produce and Irrelevant. And even if there were legal distinctions among posts from suspended accounts, posts from protected accounts, posts deleted by users, and posts deleted by the platform that merited disparate treatment in discovery (there are not; they are *all* protected), the practical burden of compliance would be disproportionate. FED. R. CIV. P. 26(b)(2)(C). Defendants demand "all content" from over a dozen accounts spanning multiple years. This amounts to thousands of posts. As set forth in the declaration of Jeff Carlton, X can typically ascertain whether the post remains active on the account, and whether the post was subject to enforcement action. App'x 006-07. From this data, X can extrapolate whether a particular post was likely deleted voluntarily or involuntarily. However, this analytical process cannot guarantee 100% accuracy in all cases. *Id.* Such granular determinations would consume substantial resources to produce potentially inaccurate results, undermining the utility of the entire exercise, and potentially leading to inadvertent SCA violations.

But more importantly, this discovery is of little relevance. This litigation concerns a handful of post adjacencies occurring in November 2023 and involving specific users named in RFP 79. It does not involve the substance of the thousands of posts made by these users in the years before or after. Defendants claim that this discovery is "critical" to rebutting X's claims that Defendants' reporting was false. Mot. at 4. But the content of these users' accounts generally provides no insight into Defendants' reporting in the November Articles on specific posts and ad adjacencies—and X has agreed to produce discovery relevant to that question. To the extent Defendants seek to understand the nature of these users' widely available posts, their investigation should be directed to the public documents currently on the platform or to the users themselves,

who are not prohibited from producing their posts and communications under the SCA—not X. *See Suzlon Energy Ltd. v. Microsoft Corp.*, 671 F.3d 726, 731 (9th Cir. 2011) (inability to obtain SCA-protected documents from service provider does not affect ability to obtain documents directly from account holder); *In re Akhmedova*, No. 20-MC-80156-VKD, 2020 WL 6891828, at *1 (N.D. Cal. Nov. 24, 2020) (describing acceptable written consent to obtain nonpublic documents). And to the extent Defendants seek discovery into how X treated these particular users, X has provided information about their creator-monetization status. *See infra* I.B.2. But the content of a few user's posts over a multi-year period says nothing about X's brand safety or ad placement in the fall of 2023, and the laborious, burdensome, and inaccurate process of painstakingly reviewing SCA material is not proportional to the needs of the case.

### 2.    Section 2702(b)(5)'s permissive self-protection exception does not apply.

Using 18 U.S.C. § 2702(b)(5) as a rationale to force production of thousands of nonpublic user posts is likewise inappropriate and flips the purpose of the exception on its head. Section 2702(b)(5) *permits* X to disclose such information only if it is "necessarily incident" to protecting X's rights. The language of the statute also suggests that it is meant to be used *at the provider's discretion* for self-protection. *See* 18 U.S.C. § 2702(b)(5) (explaining that "[a] provider . . . *may* divulge the contents of a communication . . . as may be necessarily incident to the rendition of the service or to the protection of the rights or property of the provider of that service") (emphasis added). Accordingly, and as Defendants' authority demonstrates, courts applying the § 2702(b)(5) exception have usually done so in the context of a provider's limited, voluntary disclosure of child pornographer content to law enforcement or to the National Center for Missing and Exploited Children. *See Rosenow*, 2025 WL 951277, at *15 (S.D. Cal. Mar. 28, 2025)  (dismissing SCA claims against providers who disclosed private incriminating communications and child

8

pornography to federal agencies); *United States v. Serna*, No. 5:22-CR-01194-01, 2024 WL 1902759, at \*4 n.16 (S.D. Tex. Jan. 31, 2024) (observing, in deciding a motion to suppress evidence, that provider can "protect itself by disclosing the storage of child sexual abuse material" under the exception).

Such circumstances are absent here. As explained above, the user content demanded by Defendants is only marginally relevant to this dispute. Its disclosure is not valuable to the claims or defenses of *either* party—and it is certainly not "necessar[y]" to X's "protection of its rights." Moreover, disclosure would not be voluntary, but a compelled production to an opposing party. X has no plan or desire to use these documents at trial or rely on them in any way during the litigation of this case. Accordingly, section 2702(b)(5) cannot justify this involuntary production of irrelevant documents.

> **B.     Defendants are not entitled to cumulative or nonexistent discovery.**

Dissatisfied with their previous broad requests for documents on X's Creator Revenue Sharing program, *see e.g.* ECF 135 (regarding Request No. 13), Defendants served two additional requests: Request No. 80, seeking granular revenue data regarding particular X accounts; and Request No. 81, seeking all documents showing the monetization status and revenue sharing with those accounts. X responded appropriately, informing Defendants that no documents exist showing the specific revenue information sought in Request No. 80, and producing a comprehensive spreadsheet sufficient to show the information requested in Request No. 81. App'x 017-18. Defendants nevertheless moved to compel. The Court should reject Defendants' demands for these nonexistent documents as well as for every cumulative, duplicative, and irrelevant document that might reflect the payments made to the various accounts.

**1.      No documents exist that are responsive to RFP 80.**

Request No. 80 seeks "Documents showing monthly, weekly, and[/or] annual advertising revenue X generated from ads placed adjacent to content from" a list of specific accounts. *Id*. X conducted a search of its accounting records and determined that it does not track advertising revenue with the level of granularity requested by Defendants and, therefore, has no responsive documents. App'x 012-13. This should end the matter. X "cannot produce what it does not have, and so, [c]learly, the court cannot compel [a party] to produce non-existent documents." *VeroBlue Farms USA Inc. v. Wulf*, 345 F.R.D. 406, 420 (N.D. Tex. 2021) (quoting *Lopez v. Don Herring Ltd.*, 327 F.R.D. 567, 598 (N.D. Tex. 2018)); *see also Samsung Elecs. Am., Inc. v. Yang Kun Chung*, 321 F.R.D. 250, 299 (N.D. Tex. 2017) ("However incredible Samsung may find that to be, a party cannot produce what it does not have, and so, clearly, the court cannot compel a party to produce non-existent documents.") (cleaned up). The sworn testimony of Liz Carbone, who has personal knowledge regarding X's accounting records, establishes this conclusively. *Cf. McGinley v. Luv N' Care, Ltd.*, No. CV 17-0821, 2019 WL 13218251, at *4 (W.D. La. May 6, 2019) (denying motion to compel on the basis of supporting declaration averring to no responsive documents); *Thompson v. Toyota Motor Sales, USA, Inc.*, No. SA-16-CA-00645-DAE, 2017 WL 5244561, at *3 (W.D. Tex. June 6, 2017) (same).

Defendants nevertheless insist that responsive documents *must* exist. *See* Mot. at 8. They do not. *See* App'x 012-13. To claim otherwise, Defendants attach two exhibits unrelated to accounting records: an automated message to users communicating a change in a different payment process and an email discussing an engineering ability to count ad impressions. Mot. at 7-9. The former does not indicate an ability to provide the information demanded—the fact that X previously paid creators for ads served in their replies does not mean that X has ever documented

the revenue generated from ads placed adjacent to certain posts. App'x 012-13.

As for the latter, this email reflects a discussion where X was able to direct its engineers—with significant time and effort—to determine the total number of recent advertisements placed next to a single, specific account. Mot. App'x 28-30. The engineers found that the number of advertisements placed next to the account was incredibly small, representing 0.000035% of impressions, contrary to the implication of an August 2023 Media Matters article. *Id.* Based on this email, Defendants assume that X *must* track advertising revenue per post, *must* possess accounting records showing the revenue for each ad placed adjacent to certain accounts, and *must* have decided to improperly withhold these records from Defendants. *See* Mot. at 8.

Defendants' assumptions are wrong. The most granular level at which X tracks revenue is by ad campaign; it does not possess documents showing revenue data by individual post. App'x 012. And the fact that X engineers could investigate the *number* of advertisements placed next to a specific account (with considerable effort) does not mean it possesses documents reflecting the *revenues* attributable to those specific advertisements. And even if X were capable of creating the bespoke revenue documents they seek, such a request would be disproportionate and improper: under the Federal Rules, X is "not required to create documents that do not exist." *See McElvy v. Southwestern Corr., LLC*, No. 3:19-CV-1264-N, 2022 WL 1050312, at *4 (N.D. Tex. Apr. 7, 2022) (denying a motion to compel seeking specific financial documents evidencing profitability, despite overruling objections to overbreadth, proportionality, and relevance, because documents showing the specifically requested categories by medical care expenditures did not exist); *see also In re Core Commc'ns, Inc.*, No. 17-00258-ELG, 2022 WL 18028102, at *5 (Bankr. D.D.C. Dec. 30, 2022) (noting that "[a] request may be overly burdensome if it directs the party to create documents that do not exist" and denying motion to compel, in part, because of "the burden upon

Verizon to create records in the format requested by Core").

### 2.    X has sufficiently responded to Request No. 81.

In response to Request No. 81, X provided a spreadsheet that concisely provides information showing "whether the listed users were participants in X's Creator Revenue Sharing program and the amount of shared revenue that the user account received from X." App'x 018. The listed users were broad, extending beyond those whose tweets appeared in Defendants' Articles or who were listed in Request No. 80, and including such irrelevant users as "@libsoftiktok." *Id.* Defendants claim this is insufficient, arguing entitlement to *all* documents, without qualification, that so much as refer to the monthly revenue received by these accounts. Mot. at 6-7. This request is "classically overbroad." *See Open Cheer & Dance Championship Series, LLC v. Varsity Spirit, LLC*, No. 2:23-CV-155-Z, 2025 WL 592484, at *3 (N.D. Tex. Feb. 24, 2025) ("Often, using 'all documents' renders a Request's scope too broad."). The additional documents sought by Defendants would necessarily be cumulative of the comprehensive spreadsheet provided and the many other requests to which X has already committed to fulfilling. Appx. 034-36, 048. In short, "the discovery sought is unreasonably cumulative or duplicative." FED. R. CIV. P. 26(b)(2)(C)(i) (limitation on cumulative discovery "must" be imposed by the Court "on motion or on its own"); *see also, e.g.*, *GoForIt Entm't, LLC v. Digimedia. com, L.P.*, No. 3:08-CV-2011-D, 2010 WL 11618676, at *2 (N.D. Tex. Jan. 22, 2010) (limiting discovery, in part, because the "discovery sought is unreasonably cumulative and duplicative of the 50 GB of information previously produced by Defendants"); *Cole v. Collier*, No. 4:14-CV-1698, 2020 WL 2813454, at *5 (S.D. Tex. May 28, 2020) (denying motion to compel because "the Court finds that these additional documents are likely cumulative information, and thus, the burden on Defendants outweighs the benefits of the additional documents").

Defendants' discovery demands are especially inappropriate because they are irrelevant to any claims or defenses. X's Creator Revenue Sharing program is not on trial in this litigation; Defendants' lying about the X platform is. Contrary to Defendants' assertions, Mot. at 6-7, internal discussions about how to handle a small number of platform accounts are irrelevant unless they involve advertisers' concerns or decisions to advertise on X. Those documents are already being captured and produced. ECF No. 135 at 8; App'x 034-36. X has also committed to producing documents related to client brand safety concerns, *see* App'x 024, as well as documents concerning payments made to users of the Platform who had previously been suspended, *see* ECF No. 135 at 8. Given the breadth of these prior requests, it is exceptionally unlikely that newly captured documents, responsive only to this request, would bear on even the most tangential issue. Accordingly, X's response, limiting the request to a document "sufficient to show" the information requested by Defendants, but not "all" responsive documents, is a complete and proportional response under the Federal Rules endorsed by courts under a variety of circumstances. *E.g.*, *El Paso Disposal, LP v. Ecube Labs Co.*, No. EP-24-CV-00097-KC, 2024 WL 4806498, at *4 (W.D. Tex. Nov. 15, 2024) ("The Court finds it appropriate to modify RFP 2 as: Documents <u>sufficient to show</u>.") (emphasis in original); *In re Subpoena Served on Affiliated Foods, Inc.*, No. 2:21-MC-3-Z, 2021 WL 4439796, at *5 (N.D. Tex. Sept. 28, 2021) (quashing subpoena and commenting that a "sufficient to show" limitation was "less problematic than an 'all documents' request").

## II. Defendants Are Not Entitled to Redundant, Irrelevant Discovery on Unrelated Advertising Declines.

Defendants seek additional discovery in response to Interrogatory No. 21[8] and Request

---

[8] Defendants' Interrogatory 21 is also cumulative, duplicative, and of limited relevance for the same reasons as discussed herein with respect to Request Nos. 86 and 98. Nevertheless, X has served an amended response to the interrogatory that provides a full response, thus resolving and mooting the dispute over this interrogatory. *See* App'x. 051.

Nos. 86 and 98, all relating to other alleged causes of "lost" advertising from 2022 to present. Request No. 86 is specific to X's lawsuit against CCDH, while Request No. 98, refers to advertising losses caused by third parties more generally. Appx. App'x 20, 24-25. The Court has recognized that this information is irrelevant where it does not form the basis for any of X's claims for damages from the specific, enumerated advertisers that are relevant to this case. ECF No. 135 at 9. But for any conceivably or tangentially relevant purpose, Defendants are already receiving full productions of documents in response to other requests that cover the same documents sought by Request Nos. 86 and 98, including Request No. 7 (communications with X's advertisers), Request No. 17 (documents regarding the relationship between X and its advertisers), and Request No. 33 (documents reflecting whom X blames for lost advertising). Appx. 034-36, 048; ECF No. 135 at 8. Accordingly, the documents Defendants now seek to compel on lost advertising necessarily only include those that do *not* fall within the scope of these other broad requests.

X only seeks damages from Defendants' tortious conduct that harmed X's business relations with specific advertisers in November 2023. Any generalized revenue losses, or specific declines before November 2023 (such as those touted by Defendants, Mot. at 10), are immaterial. The Court already recognized as much in its ruling on Defendants' prior motion to compel. There, the Court sustained X's objections to producing all documents about total monthly advertising revenue, based in part on the reasoning that X is only seeking compensation for harm done to certain advertising relationships in November 2023. ECF No. 135 at 9 ("Due to the lack of relevance based on Plaintiff's damages and reduced need the Court **SUSTAINS** Plaintiff's objection to RFP No. 8."). Documents regarding X's CCDH complaint, the subject of Request No. 86, are similarly irrelevant as they relate to conduct from 2021 to early 2023 that caused harm felt in June and July 2023. *See X Corp. v. CCDH*, 3:23-cv-03836-CRB, ECF 1 (C.D. Cal. July 31,

2023). In this matter, X only seeks redress for harm caused to its advertising relationships as they existed in November 2023, not June 2023, and certainly not January 2022, as contemplated by Defendants' Requests. App'x 053.

Even if Defendants' demands were relevant, they are cumulative of other documents that X is already producing. As noted above, X is currently providing documents "reflecting any individuals or entities to whom You have attributed responsibility or who You otherwise have blamed or do blame, in whole or in part, for the loss of advertisers on the Platform," "communications with X's past, present, or potential advertisers regarding their decision to advertise or not to advertise on the Platform," and "documents or communications regarding the cessation, suspension, termination, or otherwise discontinuance of a business or transactional relationship between X and its advertisers." ECF No. 135 at 8; Appx. 034-36, 048. For a litigant looking for "other factors caused [X's] advertising exodus," Mot. at 11, this is a complete production. Indeed, Defendants' recounting of the responsive evidence it has already received, *see* Mot. at 10-11, demonstrates that they are getting precisely the discovery they sought, and their additional requests should be rejected accordingly. *E.g.*, *Cole*, 2020 WL 2813454, at *5 ("[T]he Court finds that these additional documents are likely cumulative information, and thus, the burden on Defendants outweighs the benefits of the additional documents").

III.    **Pursuant to the Parties' ESI Order, Defendants Have No Right to Demand Identification of Linked Documents.**

Defendants' assertion that X has "refused to identify" and "not produced a key document," Mot. at 11, is triply wrong. First, under the parties' negotiated agreement, X is not obligated to direct Defendants to the document at issue. Second, X *has* produced this document, multiple times over. Finally, the document is not "key" to this case.

First, the file Defendants seek is a "linked document"—*i.e.*, a document that is not an

attachment to another document, but referenced via hyperlink in the body of the other document. At the outset of the litigation, the parties specifically agreed that such documents "are not attachments or part of document family . . . and will not be treated as such." ECF 67 Part II.E. There is thus no obligation of either party to identify linked documents referenced in other documents, or to produce them, unless they are independently responsive.

Despite this agreement, Defendants now insist that X must specifically identify a linked document for their convenience. This demand is improper. *See United States v. Wagner*, No. 2:10-CR-00399-MMD-GWF, 2017 WL 376155, at *3 (D. Nev. Jan. 26, 2017), *aff'd*, 739 F. App'x 440 (9th Cir. 2018) (litigant has no obligation to point out key documents in its production). Having bargained for a protocol that explicitly excludes linked documents from document families and production obligations, Defendants cannot now circumvent that agreement.

Second, while Defendants insist that X has not produced the linked document it seeks, the opposite is true. The document, which is located at XCORP_0749947, was produced in February. *See* App'x 128;  App'x 121 (memorializing production). Indeed, there are *thirty* duplicates or near-duplicates of the document that have already been produced to Defendants.[9]

Finally, the document is hardly the vital investigation document Defendants suggest. It is titled "X Adjacency Controls Product Messaging Brief and FAQ," and reviews X's adjacency controls and their benefits to advertisers so that salespeople can explain their functionality to clients. App'x 128. It offers no insight into particular brand-safety issues in the autumn of 2023.

---

[9] Versions of the document are also at XCORP_0386078, XCORP_0581561, XCORP_0544577, XCORP_0121481, XCORP_0129488, XCORP_0114427, XCORP_0100683, XCORP_0126440, XCORP_0118757, XCORP_0119948, XCORP_0129191, XCORP_0114155, XCORP_0114165, XCORP_0102269, XCORP_0105912, XCORP_0124644, XCORP_0609134, XCORP_0425152, XCORP_0541192, XCORP_0468533, XCORP_0470362, XCORP_0537984, XCORP_0821812, XCORP_0814679, XCORP_0771367, XCORP_1560457, XCORP_1562634, XCORP_1568227, and XCORP_1563972.

16

In short, Defendants have asked this Court to compel a "key" contemporaneous investigation document that was neither key, nor contemporaneous, nor an investigation document, and that had been produced two dozen times.

## IV.    X Has Fully Answered Defendants' Interrogatory No. 16 and Cannot Identify Documents that Do Not Exist.

Defendants again refuse to accept that the documents they seek do not exist. X has said so in discovery responses. Its counsel has said so in correspondence. Now, X's Global Brand Safety Lead has confirmed that is so. App'x 009.

Ignoring all of the evidence, Defendants unreasonably quibble with X's response to Interrogatory No. 16, insisting that there must be some unidentified, unproduced documents which describe the functions of the filter that restricted ads to X accounts that were less than 90-days old. There are not. With no documents to identify, X described the effect of the filter and the number of accounts to which the filter applied. App'x 060. X further clarified in response to a discovery letter that it had "conducted a reasonable investigation and was unable to identify a specific document responsive to the question posed." App'x 123. Without any defensible basis, Defendants refuse to take both X and its counsel at their word. They now burden the Court, insisting that X's refusal to identify nonexistent documents is not a "real justification." Mot. at 13.  But X's Global Brand Safety Lead, Goldy Tenreiro-Braschi, avers that a reasonable search was conducted and no documents were identified. App'x 009.  Given that X cannot be compelled to produce what it does not have, *e.g.*, *Samsung Elecs.*, 321 F.R.D. at 299, the Court should decline Defendants' request.

### CONCLUSION

The Court should deny Defendants' Motion to Compel.

Dated: October 3, 2025

Respectfully submitted,

*/s/ Christopher D. Hilton*
Judd E. Stone II
Texas Bar No. 24076720
Christopher D. Hilton
Texas Bar No. 24087727
Ari Cuenin
Texas Bar No. 24078385
Michael R. Abrams
Texas Bar No. 24087072
Elizabeth Brown Fore
Texas Bar No. 24001795
Alithea Z. Sullivan
Texas Bar No. 24072376
Alex M. Dvorscak
Texas Bar No. 24120461
Cody C. Coll
Texas Bar No. 24116214
**STONE HILTON PLLC**
600 Congress Ave., Suite 2350
Austin, TX 78701
Telephone: (737) 465-3897
judd@stonehilton.com
chris@stonehilton.com
ari@stonehilton.com
michael@stonehilton.com
alex@stonehilton.com
elizabeth@stonehilton.com
alithea@stonehilton.com
cody@stonehilton.com

John C. Sullivan
  Texas Bar No. 24083920
**S|L LAW PLLC**
610 Uptown Boulevard, Suite 2000
Cedar Hill, TX 75104
Telephone: (469) 523-1351
Facsimile: (469) 613-0891
john.sullivan@the-sl-lawfirm.com

18

**CERTIFICATE OF SERVICE**

I hereby certify that this document was served on all counsel for record on October 3, 2025, via the Court's CM/ECF system.

*/s/ Alexander M. Dvorscak*