UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

X CORP., a Nevada corporation,

    Plaintiff,

    v.

MEDIA MATTERS FOR AMERICA, a
Washington, D.C. non-profit corporation,
ERIC HANANOKI, and ANGELO
CARUSONE,

    Defendants.

Case No. 4:23-cv-01175-O

**APPENDIX OF EXHIBITS ACCOMPANYING DEFENDANTS' REPLY IN
SUPPORT OF MOTION TO COMPEL X TO REMOVE IMPROPER REDACTIONS**

Pursuant to Local Rule 7.1(i), Defendants Media Matters for America, Eric Hananoki,

and Angelo Carusone attach this Appendix of Exhibits Accompanying Defendants' Reply in

Support of Motion to Compel X to Remove Improper Redactions:

| Exhibit | Description | Appendix Page Number |
|---|---|---|
| 1 | Crispin v. Christian Audigier, Inc., 717 F. Supp.2d 965 (2010) | 2 |
| 2 | XCORP_1871434 | 25 |
| 3 | XCORP_1871479 | 35 |
| 4 | XCORP_1978297 | 42 |
| 5 | XCORP_2081903 | 44 |
| 6 | XCORP_2878344 | 52 |
| 7 | XCORP_2880531 | 60 |
| 8 | Email to Stone Hilton regarding discovery disputes, dated March 23, 2026. | 68 |
| 9 | Email to Stone Hilton regarding discovery disputes, dated March 24, 2026. | 70 |

Dated: April 6, 2026.

Respectfully submitted,

/s/  *Justin A. Nelson*
Richard B. Roper, III
VARTABEDIAN HESTER & HAYNES LLP
301 Commerce St., Suite 2200
Fort Worth, Texas 76102
Telephone: (817) 309-9092
richard.roper@vhh.law

Justin A. Nelson
State Bar No. 24034766
Matthew Behncke
State Bar No. 24069355
Alexandra Foulkes Grafton *(admitted PHV)*
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone:  (713) 651-9366
Fax:  (713) 654-6666
jnelson@susmangodfrey.com
mbehncke@susmangodfrey.com
afoulkesgrafton@susmangodfrey.com

Katherine M. Peaslee
SUSMAN GODFREY L.L.P.
401 Union Street, Suite #3000
Seattle, WA 98101
Telephone:  (206) 516-3880
Facsimile:  (206) 505-3811
kpeaslee@susmangodfrey.com

Dwight P. Bostwick
Shawn P. Naunton
ZUCKERMAN SPAEDER LLP
485 Madison Ave., 19th Floor
New York, NY 10022
Telephone: (212) 704-9600
Facsimile: (202) 822-8106
dbostwick@zuckerman.com
snaunton@zuckerman.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I certify that on April 6, 2026, a true and correct copy of Defendants' Appendix of Exhibits Accompanying Defendants' Second Motion to Compel X to Remove Improper Redactions  was properly served on counsel of record via electronic filing in accordance with the USDC, Northern District of Texas Procedures for Electronic Filing.

/s/ *Alexandra Foulkes Grafton*

Alexandra Foulkes Grafton

# EXHIBIT 1

717 F.Supp.2d 965
United States District Court, C.D. California.

Buckley H. CRISPIN, an individual, Plaintiff,

v.

CHRISTIAN AUDIGIER, INC., a California corporation; Nervous Tattoo, Inc., a California corporation, Shop on Stage, Inc., a California corporation, Christian Audigier, an individual; 3A Watch, LLC, a California limited liability company, Radiance Jewelry, Inc., a California corporation; Chromebones, a business entity of unknown form, Revolution Eyewear, Inc., a California corporation, CA Beverages, LLC, a California limited liability company, JR 93 Inc., a California corporation; New Wave Fragrances, a business entity of unknown form; Le Marais LLC, a California limited liability company; Mood Signatures LLC, a California limited liability company; HTP Enterprise Trading, a California company of unknown form; Sea and Sure LLC, a California limited liability company; Tattoo Drink, Inc., a California corporation; Tattoo Air Fresh, Inc., a California corporation; and Does 1–10, inclusive, Defendants.

Case No. CV 09–09509 MMM (JEMx)
|
May 26, 2010.

**Synopsis**
**Background:** Artist brought action against licensees, alleging breach of oral license to use his artwork in garments, along with other claims including claim for copyright infringement. Licensees served subpoenas duces tecum on four third-party businesses, including social networking websites. Artist moved to quash subpoenas. The District Court, John E. McDermott, United States Magistrate Judge, denied motion. Artist moved for reconsideration.

**Holdings:** The District Court, Margaret M. Morrow, J., held that:

[1] artist had standing to move to quash subpoena;

[2] private messaging and email webmail services constituted electronic communication services (ECS) under Stored Communications Act (SCA);

[3] web hosting website and social networking websites were ECS providers under the SCA; and

[4] webmail and private messaging services were not subject to subpoena duces tecum.

Motion granted in part, reversed in part, vacated in part, and remanded.

West Headnotes (15)

**[1]** **United States Magistrate Judges** 🔑 Pretrial and other preliminary matters in general
**United States Magistrate Judges** 🔑 Dispositive orders, rulings on merits, and dismissal in general
**United States Magistrate Judges** 🔑 Discovery

A magistrate judge has authority to hear matters that are not dispositive of a claim or defense, including discovery motions. Fed.Rules Civ.Proc.Rule 72, 28 U.S.C.App.(2006 Ed.).

13 Cases that cite this headnote

**[2]** **United States Magistrate Judges** 🔑 Clear error, manifest error, or contrary to law in general

The clearly erroneous standard, which applies to a magistrate judge's findings of fact, is significantly deferential, requiring a definite and firm conviction that a mistake has been committed.

109 Cases that cite this headnote

**[3]** **United States Magistrate Judges** 🔑 Clear error, manifest error, or contrary to law in general

The "contrary to law standard" permits independent review of purely legal determinations by the magistrate judge. Fed.Rules Civ.Proc.Rule 72, 28 U.S.C.App. (2006 Ed.).

86 Cases that cite this headnote

**[4]** **United States Magistrate Judges** 🔑 Affirmance
**United States Magistrate Judges** 🔑 Remand, recommital, or referral back to magistrate judge

Acting as an appellate court, District Court has power to affirm, modify, vacate, set aside or reverse a magistrate judge's order and may remand the cause and direct the entry of such appropriate judgment, decree or order, or require such further proceedings as may be just under the circumstances.

24 Cases that cite this headnote

**[5]** **Telecommunications** 🔑 Data breaches; hacking

Under the Stored Communications Act, a person who does not provide an electronic communication service (ECS) or a remote communication service (RCS) can disclose or use with impunity the contents of an electronic communication unlawfully obtained from electronic storage. 18 U.S.C. § 2702(a).

32 Cases that cite this headnote

**[6]** **Witnesses** 🔑 Persons entitled to seek quashal; standing

An individual has a personal right in information in his or her profile and inbox on a social networking website and his or her webmail email

inbox, sufficient to confer standing to move to quash a subpoena seeking such information.

138 Cases that cite this headnote

**[7]** **Witnesses** 🔑 Persons entitled to seek quashal; standing

Artist suing licensees for breach of oral license agreement had standing to bring motion to quash subpoenas, served by licensees on social networking websites where artist held accounts, which sought basic subscriber information from artist's account as well as all communications to and from artist that referred to licensees and alleged sublicensees.

69 Cases that cite this headnote
More cases on this issue

**[8]** **Witnesses** 🔑 Subpoena duces tecum in general

Stored Communications Act does not authorize service of a civil subpoena duces tecum. 18 U.S.C.A. § 2703(e).

4 Cases that cite this headnote

**[9]** **Telecommunications** 🔑 Data breaches; hacking

Private messaging and email webmail services provided by social networking websites and web hosting website constituted "electronic communication services" (ECS) under Stored Communications Act (SCA).

26 Cases that cite this headnote

**[10]** **Telecommunications** 🔑 Data breaches; hacking

Stored Record Act's (SCA) definition of an electronic communication service (ECS) provider was intended to reach private electronic bulletin board systems (BBS); a completely public BBS does not merit protection under the SCA. 18 U.S.C.A. §§ 2510(15), 2711.

9 Cases that cite this headnote

**[11]    Telecommunications** 🔑 Data breaches; hacking

Web hosting website and social networking websites were "electronic communication service (ECS) providers" under the Stored Communications Act (SCA), where websites provided services, such as posting messages on an account holder's "wall" and leaving comments on an account holder's web page, that account holder could limit access to. 18 U.S.C.A. §§ 2510(15), 2711.

2 Cases that cite this headnote

**[12]    Telecommunications** 🔑 Data breaches; hacking

In considering webmail email services provided by web hosting website and social networking websites, under Stored Communications Act (SCA), such websites act as "electronic communication storage (ECS) providers" in respect to messages that have not yet been opened, and operate as "remote communication services (RCS) providers" in respect to messages that have been opened and retained on the website by the account holder. 18 U.S.C.A. §§ 2510(17)(A), 2702(a)(2), 2711(2).

11 Cases that cite this headnote

**[13]    Telecommunications** 🔑 Data breaches; hacking

Social networking sites function as "electronic communication service (ECS) providers," under Stored Communications Act (SCA), with respect to "wall" postings and comments posted on an account holder's web page, and such communications are in electronic storage; a passive decision not to delete such communications after they have been read by the account holder renders the communication stored for backup purposes on the website, as defined by the SCA. 18 U.S.C.A. § 2510(17).

39 Cases that cite this headnote

**[14]    Telecommunications** 🔑 Data breaches; hacking

Social networking sites function as "remote communication service (RCS) providers," under Stored Communications Act (SCA), with respect to "wall" postings and comments posted on an account holder's web page, although the communications are stored for display purposes; both are accessible to a limited set of users selected by the account holder and are stored for the account holder on a page provided by the website, and the display function is a necessary part of providing a mechanism to retrieve the stored communications. 18 U.S.C.A. § 2711(2).

**[15]    Witnesses** 🔑 Documents; subpoena duces tecum

Webmail and private messaging services provided on social networking and website hosting websites were not subject to subpoena duces tecum under the Stored Communications Act (SCA); such messages were not readily accessible to the general public, and therefore, were inherently private. 18 U.S.C.A. § 2703(e).

4 Cases that cite this headnote
More cases on this issue

**Attorneys and Law Firms**

 **\*968** Scott A. Burroughs, Stephen M. Doniger, Doniger Burroughs APC, Culver City, CA, for Plaintiff.

Michael A. Bowse, Browne Woods George LLP, Los Angeles, CA, J. Joseph Connolly, III, John M. Moscarino, Moscarino & Connolly LLP, Los Angeles, CA, for Defendants.

ORDER GRANTING PLAINTIFF'S MOTION FOR REVIEW OF MAGISTRATE JUDGE'S DECISION RE PLAINTIFF'S MOTION TO QUASH SUBPOENA

MARGARET M. MORROW, District Judge.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Buckley Crispin filed this action on December 29, 2009 against Christian Audigier, Christian Audigier, Inc. ("CAI"), and their various sublicensees.[1] On March 19, 2010, Crispin filed a first amended complaint.[2] Crispin alleges that between November 2005 and January 2006, he granted Audigier and CAI an oral license to use certain of his works of art in a limited manner in connection with the manufacture of certain types of garments.[3] The agreement purportedly required Audigier and CAI to pay a specified sum for the right to reproduce each work of art on street-wear apparel and also required that they include Crispin's logo on each garment.[4] Crispin alleges that Audigier and CAI have not only failed to include his logo on a substantial quantity of apparel bearing his artwork, but at times they attributed the artwork to another artist or to Audigier himself.[5] Crispin alleges that Audigier and CAI also violated his rights by sublicensing his artwork without obtaining his consent. He asserts that the artwork has now been used on jewelry, watches, shoes, pet accessories, luggage, sunglasses, swimwear, denim, wine bottles, and a variety of other products that are purportedly outside the scope of the limited oral license.[6]

[1]    Plaintiff's Complaint for: 1. Breach of Contract; 2. Direct, Contributory, & Vicarious Copyright Infringement; 3. Breach of the Implied Covenant of Good Faith and Fair Dealing; 4. Declaration of Rights as to Artwork; 5. Constructive Trust ("Complaint"), Docket No. 1 (Dec. 29, 2009).

[2]    Plaintiff's First Amended Complaint for: 1. Breach of Contract; 2. Direct, Contributory, & Vicarious Copyright Infringement; 3. Breach of the Implied Covenant of Good Faith and Fair Dealing; 4. Declaration of Rights as to Artwork; 5. Constructive Trust ("First Amended Complaint"), Docket No. 43 (Apr. 2, 2010).

[3]    Crispin alleges that he licensed fifteen works including Tiger with Roses, Skull with Anchor, Heart with Anchor, Skull Flags, Skull Helmet, Winged Wheel, Eagle, Black Panther, Camo Panther, Eagle Skull, Snake Skull, and Handcuffs. (*Id.,* ¶ 26, Exh. 1.) Each of these works has been registered with the United States Copyright Office. (*Id.,* ¶ 27.)

[4]    *Id.,* ¶ 28.

[5]    *Id.,* ¶¶ 29, 31.

[6]    First Amended Complaint at 2–3.

Crispin pleads five causes of action: (1) breach of contract against CAI and Audigier; (2) copyright infringement against all defendants; (3) breach of the covenant of good faith and fair dealing against Audigier and CAI; (4) declaratory relief regarding the works of art against all defendants; and (5) constructive trust against all defendants.

On February 10, 2010, defendants served subpoenas duces tecum on four third-party businesses and social networking websites: Black Market Art Company, Facebook, Media Temple, Inc, and MySpace, **\*969** Inc.[7] The subpoenas directed to the latter three businesses sought Crispin's basic subscriber information, as well as all communications between Crispin and tattoo artist Bryan Callan, and all communications that referred or related to Audigier, CAI, the Ed Hardy brand, or any of the sublicensee defendants.[8] Audigier and CAI contend that this information is relevant in determining the nature and terms of the agreement, if any, into which Crispin and Audigier entered. The subpoena directed to Black Market Art Company sought sales information for all apparel that incorporated artwork created by Crispin and that was sold through Black Market's website. Audigier and CAI contend this information is relevant to the measure of damages should Crispin prevail on the merits.

[7]    Plaintiff's Notice of *Ex Parte* Motion and Motion for Order Staying Compliance with Defendants' Subpoenas ("Motion to Quash"), Docket No. 22 (Feb. 24, 2010) at 3.

[8]    *Id.,* Exhs. 2–4.

On February 24, 2010, Crispin filed an *ex parte* motion to quash the subpoenas that was heard by Judge John E. McDermott. Crispin raised three arguments regarding the subpoenas served on Media Temple, Facebook, and MySpace: (1) that they sought electronic communications that third-party Internet Service Providers ("ISPs")[9] are prohibited from disclosing under the Stored Communications Act ("SCA"), 18 U.S.C. § 2701(a)(1); (2) that the subpoenas were otherwise overbroad in that they required disclosure of information protected by the marital privilege, the attorney-client privilege, the trade secret doctrine, and Crispin's privacy rights; and (3) that the subpoenas sought irrelevant information because copyright ownership cannot be transferred without a writing nor may parties enter into a sublicense without a writing and communications revealing Crispin's understanding of his arrangement with CAI and

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Audigier would not change the fact that the agreement was not reduced to writing.[10]

9        "ISPs allow individuals to access accounts from which they may send and receive e-mail. The server itself may be local, or it may be wide, such as the Internet. The Internet is not a centralized system and can be thought of as a 'crazy game of connect-the-dots.' ISPs give individuals the means to send messages from individual computers via commercial e-mail programs or mail-user agents. Essentially, ISPs provide account holders the ability to send, receive, and store opened and unopened e-mails associated with the ISPs' systems, which may also be thought of as the mail servers themselves." Kimberly S. Cuccia, Note, *Have You Seen My Inbox? Government Oversteps the Fourth Amendment Again: Goodbye Telephones, Hello E-mail,* 43 Val. U.L.Rev. 671, 676–77 (2009).

10       Motion to Quash at 4–6; Plaintiff's Reply Brief in Support of its *Ex Parte* Motion and Motion for Order Staying Compliance with Defendants' Subpoenas ("Reply"), Docket No. 27 (Mar. 1, 2010); Order re Plaintiff's Motion to Quash Defendants' Third Party Subpoenas ("Order"), Docket No. 41 (Mar. 30, 2010) at 4.

Judge McDermott rejected each of Crispin's arguments. With respect to the argument that the information would be irrelevant because the Copyright Act does not permit an oral transfer of rights, Judge McDermott noted that a nonexclusive license is not a transfer of ownership and does not require a writing. He held that, because the nature of the transfer is the issue in this case and because the subpoenas seek information regarding that subject, the relevance objection was not well taken.[11]

11       Order at 5–6.

Judge McDermott concluded that the SCA did not apply because that Act reaches only electronic communication service ("ECS") providers and third-party businesses are not ECS providers as defined in the statute. Judge McDermott also concluded **\*970** that the SCA prohibits only the voluntary disclosure of information by ECS providers, not disclosure compelled by subpoena. Finally, Judge McDermott found that the SCA prohibits only the disclosure of communications held in "electronic storage" by the ECS provider, and that the materials were not in electronic storage as that term is defined in the statute.[12]

12       *Id.* at 6–9.

Judge McDermott rejected Crispin's generalized overbreadth and privacy arguments because he provided "no declaration or basis for these assertions, [did not] explain[ ] or support[ ] his trade secret argument, and the subpoenas expressly exclude[d] communications with Crispin's attorney."[13] Judge McDermott held, however, that the request for all communications between Crispin and Callan, regardless of the subject matter, was overbroad; he noted that such discovery might be an effort to gain information related to a separate lawsuit Callan filed against Audigier.

13       *Id.* at 10.

Crispin argued that the Black Market subpoena sought information regarding artwork sold through Black Market that is not the subject of this lawsuit. Judge McDermott credited Audigier's and CAI's argument that the sale of products through Black Market that are designed by Crispin but do not bear Audigier's brand would help resolve whether and to what extent sales of Audigier products bearing Crispin designs are driven by Audigier's brand or Crispin's design. He quashed two requests, which collectively sought all communications regarding Crispin or his artwork, as overbroad and not tied to claims or defenses in the lawsuit. Judge McDermott requested additional briefing regarding Black Market's payments to Crispin, noting Crispin's interest in not revealing payments he received to the general public. Judge McDermott also noted that it was not immediately obvious why Crispin's profit was relevant.[14]

14       *Id.* at 11–12.

Plaintiff has timely moved for reconsideration of Judge McDermott's decision insofar as it concludes that Media Temple, Facebook, and MySpace are not subject to the SCA.

## II. DISCUSSION

### A. Legal Standard For Review Of Magistrate Judge's Order

 [1]   A magistrate judge has authority to hear matters that are not dispositive of a claim or defense. See Fed.R.Civ.Proc. 72. These include discovery motions. See *Bhan v. NME Hospitals, Inc.,* 929 F.2d 1404, 1414 (9th Cir.1991) ("Nondispositive issues include discovery sanctions"); *Hoar v. Sara Lee Corp.,* 900 F.2d 522, 525 (2d Cir.1990) ("Matters concerning discovery generally are considered

'nondispositive' of the litigation"). Under Rule 72(a), a party may serve and file objections to a magistrate judge's order that concerns a nondispositive pretrial matter "[w]ithin 10 days after being served with a copy of the magistrate judge's order." Fed.R.Civ.Proc. 72(a); see CA CD L.R. 72–2.1 ("Any party objecting under F.R.Civ.P. 72(a) to a Magistrate Judge's ruling on a pretrial matter not dispositive of a claim or defense must file a motion for review ... within ten (10) days of an oral ruling which the Magistrate Judge indicates will not be followed by a written ruling, or within ten (10) days of service of a written ruling").

 **[2]    [3]**    Normally, a magistrate judge's order can be reversed by the district court only if it is "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A); Fed.R.Civ.Proc. 72(a); *Bhan,* 929 F.2d at 1414.  **\*971**  The clearly erroneous standard, which applies to a magistrate judge's findings of fact, is "significantly deferential, requiring 'a definite and firm conviction that a mistake has been committed.' " *Concrete Pipe & Prods. v. Constr. Laborers Pension Trust,* 508 U.S. 602, 623, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993); see *Security Farms v. International Brotherhood of Teamsters,* 124 F.3d 999, 1014 (9th Cir.1997); see also *Grimes v. City and County of San Francisco,* 951 F.2d 236, 240 (9th Cir.1991) (holding that discovery sanctions are non-dispositive pretrial matters that are reviewed for clear error under Rule 72(a)). By contrast, "[t]he 'contrary to law' standard ... permits independent review of purely legal determinations by the magistrate judge." *F.D.I.C. v. Fidelity & Deposit Co. of Md.,* 196 F.R.D. 375, 378 (S.D.Cal.2000) (citing *Haines v. Liggett Group, Inc.,* 975 F.2d 81, 91 (3d Cir.1992) ("[T]he phrase 'contrary to law' indicates plenary review as to matters of law")); see *Med. Imaging Centers of America, Inc. v. Lichtenstein,* 917 F.Supp. 717, 719 (S.D.Cal.1996) ("Section 636(b)(1) ... has been interpreted to provide for *de novo* review by the district court on issues of law").

 **[4]**    "Acting as an appellate court, this Court has the power to 'affirm, modify, vacate, set aside or reverse' the magistrate judge's order and 'may remand the cause and direct the entry of such appropriate judgment, decree or order, or require such further proceedings to be has as may be just under the circumstances.' " *United States v. Ramirez,* No. CR F 08–0239 LJO, 2008 WL 5397497, \*2 (E.D.Cal. Dec. 24, 2008) (quoting 28 U.S.C. § 2106). See also *Wolf v. Geico Insurance Co.,* 682 F.Supp.2d 197, 198 (D.R.I.2010) (vacating a magistrate judge's order staying discovery on an insurance claim pending resolution of a separate breach

of contract claim and remanding to the magistrate judge to weigh the risk of prejudice to the insurer posed by permitting discovery against the possible efficiencies to be gained).

 **B. The Stored Communications Act**

Congress passed the Stored Communications Act in 1986 as part of the Electronic Communications Privacy Act. "The SCA was enacted because the advent of the Internet presented a host of potential privacy breaches that the Fourth Amendment does not address." *Quon v. Arch Wireless Operating Co., Inc.,* 529 F.3d 892, 900 (9th Cir.2008) (citing Orin S. Kerr, *A User's Guide to the Stored Communications Act, and a Legislator's Guide to Amending It,* 72 Geo. Wash. L.Rev. 1208, 1209–13 (2004)).[15] The SCA prevents "providers" of communication services from divulging  **\*972**  private communications to certain entities and individuals. Kerr, *supra,* at 1213. It "creates a set of Fourth Amendment-like privacy protections by statute, regulating the relationship between government investigators and service providers in possession of users' private information." *Id.* at 1212. First, the statute limits the government's right to compel providers to disclose information in their possession about their customers and subscribers. 18 U.S.C. § 2703. "Although the Fourth Amendment may require no more than a subpoena to obtain e-mails, the statute confers greater privacy protection." *Kerr, supra,* at 1212–13. Second, the statute limits the right of an Internet Service Provider ("ISP") to disclose information about customers and subscribers to the government voluntarily. 18 U.S.C. § 2702.

---

15    The fact that the statutory framework governing online communication is almost a quarter century old and has not been amended to keep pace with changes in technology since that time has not escaped the notice of legal scholars. See, e.g., William Jeremy Robison, Note, *Free at What Cost? Cloud Computing Privacy Under the Stored Communications Act,* 98 Geo. L.J. 1195, 1196 (2010) ("Despite the rapid evolution of computer and networking technology since the SCA's adoption, its language has remained surprisingly static. The resulting task of adapting the Act's language to modern technology has fallen largely upon the courts").

As Robison explains, computer networking was in its infancy in 1986. Specifically, at the time Congress passed the SCA in the mid–1980s, "personal users [had begun] subscribing to self-contained networks, such as Prodigy, CompuServe, and America Online," and "typically paid based on the amount of time they were connected to the network; unlike today's Internet users, few could

afford to spend hours casually exploring the provider's network. After connecting to the network via a modem, users could download or send e-mail, post messages on a 'bulletin board' service, or access information." Robison, *supra,* at 1198. Notably, the SCA was enacted before the advent of the World Wide Web in 1990 and before the introduction of the web browser in 1994. *Id.* As a result, the SCA "is best understood by considering its operation and purpose in light of the technology that existed in 1986. The Act is not built around clear principles that are intended to easily accommodate future changes in technology; instead, Congress chose to draft a complex statute based on the operation of early computer networks. To apply the Act to modern computing, courts need to begin by extracting operating principles from a tangled legal framework." *Id.* at 1204–05.

In contrast to the situation that obtained in the late 1980's and early 1990's, a 2008 report found that nearly 70 percent of people use web-based email, store data or photos online, or use web-based software programs. In the eighteen- to twenty-nine-year-old age group, 77 percent use web-based email. Alexander Scolnik, Note, *Protections for Electronic Communications: the Stored Communications Act and the Fourth Amendment,* 78 Fordham L.Rev. 349, 378 (2009). See also Nathaniel Gleicher, *Neither a Customer nor a Subscriber Be: Regulating the Release of User Information on the World Wide Web,* 118 Yale L.J.1945, 1945 (2009) ("Although the SCA was not intended to be 'a catch-all statute designed to protect the privacy of stored Internet communications,' it has been pressed into this role. Without the SCA to balance the interests of users, law enforcement, and private industry, communications will be subjected to a tug-of-war between the private companies that transmit them and the government agencies that seek to access them. Internet users will find themselves with little protection," quoting Kerr, *supra,* at 1214 (footnote omitted)). The Ninth Circuit has described the SCA as "a complex, often convoluted, area of the law." *United States v. Smith,* 155 F.3d 1051, 1055 (9th Cir.1998). "[T]he difficulty is compounded by the fact that the [SCA] was written prior to the advent of the Internet and the World Wide Web. As a result, the existing statutory framework is ill-suited to address modern forms of communication.... Courts have struggled to analyze problems involving modern technology within the confines of this statutory framework, often with unsatisfying results." *Konop v. Hawaiian Airlines, Inc.,* 302 F.3d 868, 874 (9th Cir.2002).

**[5]** The statute distinguishes between a remote computing service ("RCS") provider and an electronic communication service ("ECS") provider, establishing different standards

of care for each. *Quon,* 529 F.3d at 900. The SCA defines an ECS provider as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). With certain enumerated exceptions, it prohibits an ECS provider from "knowingly divulg[ing] to any person or entity the contents of a communication while in electronic storage by that service." *Id.,* §§ 2702(a)(1), (b).[16] The SCA defines **\*973** RCS as "the provision to the public of computer storage or processing services by means of an electronic communications system," *id.,* § 2711(2), and in turn defines an electronic communications system (as opposed to an electronic communication service) as "any wire, radio, electromagnetic, photooptical or photoelectronic facilities for the transmission of wire or electronic communications, and any computer facilities or related electronic equipment for the electronic storage of such communications," *id.,* § 2510(14). The SCA prohibits an RCS provider from "knowingly divulg[ing] to any person or entity the contents of any communication which is carried or maintained on that service." *Id.,* § 2702(a)(2).[17] "[A] person who does not provide an electronic communication service [or a remote communication service] can disclose or use with impunity the contents of an electronic communication unlawfully obtained from electronic storage." *Wesley College v. Pitts,* 974 F.Supp. 375, 389 (D.Del.1997) (citing 18 U.S.C. § 2702(a)).

16    An ECS provider may, for instance, divulge the contents of a communication to the addressee or intended recipient of such communication, 18 U.S.C. § 2702(b)(1), with the lawful consent of the originator or addressee of such communication, *id.,* § 2702(b)(3), "to a person employed or authorized or whose facilities are used to forward such communication to its destination," *id.,* § 2702(b)(4), as may be necessary to render service or protect the right or property of the provider of the service, *id.,* § 2702(b)(5), to the National Center for Missing and Exploited Children as required by federal statutes intended to prevent sexual exploitation or trafficking of children or criminalize the possession, creation, or transportation of child pornography, *id.,* §§ 2702(b)(6), 2258A, to a law enforcement agency if the contents were inadvertently obtained by the service provider and appear to relate to the commission to a crime, *id.,* § 2702(b)(7), to a governmental entity if the provider in good faith believes that "that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of communications relating to the emergency," *id.,* § 2702(b)(8), pursuant to a warrant if specified procedures are followed, *id.,* §§ 2702(b)(2),

2703, and as required by certain provisions of the Foreign Intelligence Surveillance Act of 1978, *id.,* §§ 2702(b)(2), 2511(2)(a).

17  An RCS provider can avail itself of all but one of the exceptions set forth in § 2702(b). An RCS provider may divulge the contents of a communication with consent of the "subscriber," while an ECS provider may divulge the contents with the lawful consent of an addressee or intended recipient of such communication. 18 U.S.C. § 2702(b)(3). Neither party has argued that Crispin, through a user agreement or otherwise, has consented to have Facebook, MySpace, or Media Temple divulge his communications.

An ECS provider is prohibited from divulging only "the contents of a communication while in electronic storage by that service." 18 U.S.C. § 2702(a)(1). "Electronic storage" is "(A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication." *Id.,* § 2510(17). By contrast, an RCS provider may not divulge the content of any communication received by electronic transmission that is carried or maintained on its service for a customer or subscriber "solely for the purpose of providing storage or computer processing services to [the] subscriber or customer, if the provider is not authorized to access the contents of [the] communications for purposes of providing ... services other than storage or computer processing." *Id.,* § 2702(a)(2).

#### C. Whether a Party May Move to Quash a Subpoena Directed to a Third Party Under the SCA

Defendants argued to Judge McDermott, and again in this court, that Crispin cannot assert the rights of Media Temple, Facebook, and MySpace, none of whom moved to quash the subpoenas directed to them. Judge McDermott did not address this issue in his decision.

"Ordinarily a party has no standing to seek to quash a subpoena issued to someone who is not a party to the action, unless the objecting party claims some personal right or privilege with regard to the documents sought." **\*974** 9A Charles Wright & Arthur Miller, Federal Practice & Procedure, § 2459 (3d ed. 2008). See also *In re REMEC, Inc. Securities Litigation,* Civil No. 04cv1948 JLS (AJB), 2008 WL 2282647, \*1 (S.D.Cal. May 30, 2008) ("As a general proposition, a party lacks standing under Federal Rules of

Civil Procedure Rule 45(c)(3) to challenge a subpoena issued to a non-party unless the party claims a personal right or privilege with respect to the documents requested in the subpoena"); *Moon v. SCP Pool Corp.,* 232 F.R.D. 633, 636 (C.D.Cal.2005) ("A party cannot object to a subpoena duces tecum served on a nonparty, but rather, must seek a protective order or make a motion to quash"); *Schmulovich v. 1161 Rt. 9 LLC,* Civil Action No. 07–597(FLW), 2007 WL 2362598, \*2 (D.N.J. Aug. 15, 2007) ("Personal rights claimed with respect to bank account records give a party sufficient standing to challenge a third party subpoena served upon financial institutions holding such information"); *Richards v. Convergys Corp.,* Nos. 2:05–CV–00790–DAK, 2:05–CV–00812 DAK, 2007 WL 474012, \*1 (D.Utah Feb. 7, 2007) ("[A] party has a personal right with respect to information contained in his personnel files sufficient to confer standing to move to quash a subpoena for his employment records served on a third party"); *Arias–Zeballos v. Tan,* No. 06 Civ. 1268(GEL)(KN), 2007 WL 210112, \*1 (S.D.N.Y. Jan. 25, 2007) ("[I]ndividuals, whose banking records are subpoenaed, have a privacy interest in their personal financial affairs that gives them standing to move to quash a subpoena served on a non-party financial institution").

**[6]  [7]**  At least two district courts have concluded that individuals have standing to move to quash a subpoena seeking personal information protected by the SCA. In *J.T. Shannon Lumber Co., Inc. v. Gilco Limber, Inc.,* Civil Action No. 2:07–CV–119, 2008 WL 3833216 (N.D.Miss. Aug. 14, 2008), the district court found that "because the documents sought by the plaintiff are the personal documents and the details of the email accounts of the defendant employees, the defendants have standing to seek to quash this subpoena as they have a personal interest in the documents sought from the internet service provider." *Id.* at \*1. The court finds *J.T. Shannon Lumber* persuasive. Specifically, it concludes that an individual has a personal right in information in his or her profile and inbox on a social networking site and his or her webmail inbox in the same way that an individual has a personal right in employment and bank records. As with bank and employment records, this personal right is sufficient to confer standing to move to quash a subpoena seeking such information. The court therefore finds that Crispin had standing to bring a motion to quash. See also *Hone v. Presidente U.S.A. Inc.,* No. 5:08–mc–80071–JF, 2008 U.S. Dist. LEXIS 55722, \*4 (N.D.Cal. July 21, 2008) (quashing, on plaintiff's motion, a subpoena delivered to Yahoo that sought emails from plaintiff's email account

because it complying with the subpoena would result in an "impermissible disclosure of information").

 **[8]**    Defendants also argue that the SCA explicitly permits the service of subpoenas duces tecum. Judge McDermott concluded that the following statutory provision permitted disclosure pursuant to subpoena:

> "No cause of action shall lie in any court against any provider of wire or electronic communication service, its officers, employees, agents, or other specified persons for providing information, facilities, or assistance in accordance with the terms of a court order, warrant, subpoena, statutory authorization, or certification under this chapter." 18 U.S.C. § 2703(e).

The statute establishes a complex scheme pursuant to which a governmental entity **\*975** can, after fulfilling certain procedural and notice requirements, obtain information from an RCS provider via administrative subpoena or grand jury or trial subpoena. 18 U.S.C. § 2703(b). It permits a governmental entity to obtain information from an ECS provider only pursuant to criminal warrant if the communication has been held by the provider for fewer than 180 days. In all other cases, the governmental entity can obtain information from an ECS provider using the subpoena procedures set forth in § 2703(b). 18 U.S.C. § 2703(a). The statute does not mention service of a civil subpoena duces tecum.

Were it accepted, defendants' argument would lead to the anomalous result that, in order to obtain information protected by the SCA, a governmental entity would have to comply with the Federal Rules of Criminal Procedure governing warrants, or for communications more than 180 days old, statutory procedures requiring notice to the subscriber before an administrative subpoena could issue, while a civil litigant could procure information simply by serving a subpoena duces tecum. Such an inference cannot be drawn on the basis of statutory silence alone. Cf. *United States v. Brown,* 333 U.S. 18, 27, 68 S.Ct. 376, 92 L.Ed. 442 (1948) ("No rule of construction necessitates our acceptance of an interpretation resulting in patently absurd consequences"). The interpretation defendants advocate, moreover, overlooks the overall import and structure of the statute, which is at heart a broad prohibition on disclosure with limited and carefully regulated exceptions. See *Food and Drug Admin. v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme. A court must therefore interpret the

statute as a symmetrical and coherent regulatory scheme and fit, if possible, all parts into an harmonious whole" (internal citations and quotations omitted)). More fundamentally, it ignores the last three words of § 2703(e). That section states that no civil liability accrues where a provider acts pursuant to a "subpoena ... *under this chapter.*" 18 U.S.C. § 2703(e) (emphasis supplied). See *General Dynamics Land Systems, Inc. v. Cline,* 540 U.S. 581, 582, 124 S.Ct. 1236, 157 L.Ed.2d 1094 (2004) ("[S]tatutory language must be read in context since a phrase gathers meaning from the words around it"). This phrase clearly references subpoenas that governmental entities are authorized under § 2703(b), not civil subpoenas duces tecum.

As Robison notes:

> "Among the Act's most significant, although unstated, privacy protections is the ability to prevent a third party from using a subpoena in a civil case to get a user's stored communications or data directly from an ECS or RCS provider. Courts interpret the absence of a provision in the Act for compelled third-party disclosure to be an intentional omission reflecting Congress's desire to protect users' data, in the possession of a third-party provider, from the reach of private litigants. Without this blanket immunity from subpoena in civil cases, a user's entire portfolio of stored communications and data might be fair game for an adversary." Robison, *supra,* at 1208–09 (footnote omitted).

See also *Viacom International Inc. v. Youtube Inc.,* 253 F.R.D. 256, 264 (S.D.N.Y.2008) (holding that the SCA prohibits disclosure of information pursuant to a civil subpoena because the Act "contains no exception for disclosure of such communications pursuant to civil discovery requests"); **\*976** *In re Subpoena Duces Tecum to AOL, LLC,* 550 F.Supp.2d 606, 611 (E.D.Va.2008) ("Applying the clear and unambiguous language of § 2702 to this case, AOL, a corporation that provides electronic communication services to the public, may not divulge the contents of the Rigsbys' electronic communications to State Farm because the statutory language of the [SCA] does not include an exception for the disclosure of electronic communications pursuant to civil discovery subpoenas"); *O'Grady v. Superior Court,* 139 Cal.App.4th 1423, 44 Cal.Rptr.3d 72 (2006) (emphasizing the substantial burden and expense that would be imposed on internet service providers if they were required to respond to every civil discovery subpoena issued in a civil lawsuit, noting that ISPs' routine compliance with such subpoenas might discourage users from using new media, declining to create an exception for civil discovery, and concluding that subpoenas were unenforceable under the SCA).

In short, given the fact that § 2703(e)'s reference to subpoena is modified by the phrase "under this chapter," given the overall structure and purpose of the statute, as well as § 2703(e)'s place in it, and given the supporting case law, the court concludes that § 2703(e) is not susceptible of the interpretation defendants propose, and that plaintiff has standing to move to quash the subpoenas that were issued under the SCA.

### D. Whether the Subpoenas Should Be Quashed under the SCA

The parties provided only minimal facts regarding the three third-party entities that were subpoenaed in the papers filed with Judge McDermott. In his portion of the joint stipulation, plaintiff, citing only the home web page of each company, stated: "Media Temple, Inc. is a company which provides web hosting services, *inter alia,* webmail and website content features. Facebook and MySpace, Inc., are companies which provide social networking websites that allow users to send and receive messages, through posting on user-created 'profile pages' or through private messaging services."[18] Citing only the user-generated source, Wikipedia,[19] defendant elaborated that "webmail is a service **\*977** that allows users to view email messages through a web browser while the messages remain on Media Temple's servers."[20] Defendant also noted that Facebook's user-created profile page is known as the Facebook "wall," "a space on each user's profile page that allows friends to post messages for the user to see."[21] These messages, defendant stated "can be viewed by anyone with access to the user's profile page, and are stored by Facebook so that they can be displayed on the Facebook website, not as an incident to their transmission to another place."[22] Similarly, defendant noted, MySpace has a profile page with a "comments" feature that is identical to the Facebook wall.[23]

[18]  Joint Stipulation at 14 (footnotes omitted).

[19]  It is unfortunate that the parties were unable to provide more authoritative evidence. One court recently noted the danger of relying on Wikipedia:

"Wikipedia.com [is] a website that allows virtually anyone to upload an article into what is essentially a free, online encyclopedia. A review of the Wikipedia website reveals a pervasive and, for our purposes, disturbing series of disclaimers, among them, that: (i) any given Wikipedia article 'may be, at any given moment, in a bad state: for example it could be in the middle of a large edit or it could have been recently vandalized;' (ii) Wikipedia articles are 'also subject to remarkable oversights and omissions;' (iii) 'Wikipedia articles (or series of related articles) are liable to be incomplete in ways that would be less usual in a more tightly controlled reference work;' (iv) '[a]nother problem with a lot of content on Wikipedia is that many contributors do not cite their sources, something that makes it hard for the reader to judge the credibility of what is written;' and (v) 'many articles commence their lives as partisan drafts' and may be 'caught up in a heavily unbalanced viewpoint.' " *Campbell ex rel. Campbell v. Secretary of Health and Human Services,* 69 Fed.Cl. 775, 781 (2006).

See also *Badasa v. Mukasey,* 540 F.3d 909, 910 (8th Cir.2008) (noting that Wikipedia is not a sufficiently reliable source on which to rest judicial findings for the reasons stated in *Campbell*); *Kole v. Astrue,* No. CV 08–0411–LMB, 2010 WL 1338092, *7 n. 3 (D.Idaho Mar. 31, 2010) ("At this point, it must be noted that, in support of his brief, Respondent cites to Wikipedia. While it may support his contention of what the mathematical symbols of '<' and '>' refer to, Respondent is admonished from using Wikipedia as an authority in this District again. Wikipedia is not a reliable source at this level of discourse. As an attorney representing the United States, Mr. Rodriguez should know that citations to such unreliable sources only serve to undermine his reliability as counsel"); R. Jason Richards, *Courting Wikipedia,* 44 TRIAL 62, 62 (2008) ("Since when did a Web site that any Internet surfer can edit become an authoritative source by which law students could write passing papers, experts could provide credible testimony, lawyers could craft legal arguments, and judges could issue precedents?"); James Glerick, *Wikipedians Leave Cyberspace, Meet in Egypt,* Wall St. J., Aug. 8, 2008, at W1 ("Anyone can edit [a Wikipedia] article, anonymously, hit and run. From the very beginning that has been Wikipedia's greatest strength and its greatest weakness"). Judge McDermott accepted the information, however, and the parties do not dispute it now. The court will therefore consider the evidence presented to Judge McDermott as that is the content of the record on appeal.

[20]  Joint Stipulation at 25 (emphasis omitted) (citing http:// en. wikipedia.org/wiki/web_mail). As Robison explains:

"Congress explored the category of electronic communication services, designed to transmit information and data between users, primarily through the lens of early electronic mail systems. At the time, e-mail operated through a fragmented delivery system in which communications were slowly transmitted

between the computer servers operated by e-mail providers. Each provider's servers would temporarily store an e-mail until transmitting it along to its next waypoint. After an e-mail reached its destination, the recipient would use a dial-up modem to connect to her e-mail provider and download the message to her computer; alternatively, some providers would conveniently put the messages onto paper and then deposit it in the normal postal system." *Robison, supra,* at 1205–06 (footnotes and internal quotations omitted).

Not until 1990 did the first provider begin offering direct Internet access to consumers. *Id.* at 1206 n. 78. In contrast, today "e-mail is routinely held on providers' servers for increasing periods of time, and, in some cases, even indefinitely. For example, several companies, including Google, offer free Webmail service. When Google launched its Webmail service, GMail, in 2004, it provided users with one gigabyte of storage for free. Now, just five years later, GMail users have over seven and a half gigabytes of storage available, and that amount is continually increasing. With so much space at their disposal, users are encouraged not to delete their messages, but to archive them so that they are always available and always searchable. Irrespective of the level of protection that should be afforded to these messages, this use does not comport with Congress's general perception of e-mail use when it drafted the SCA, particularly the expectation that mail would rarely be retained for more than 180 days." Scolnik, *supra,* ar 378.

21    *Id.* (quoting http://en.wikipedia.org/wiki/Facebook_features #Wall).

22    *Id.* at 25–26.

23    *Id.* at 26 (citing http://en.wikipedia.org/wiki/Myspace # comments).

Although some courts have considered the SCA's application to certain types of providers, none appears to have addressed whether social-networking sites fall within the ambit of the statute.[24] In *Quon,*[25] the **\*978** Ninth Circuit considered whether a party providing text-messaging pager services was an ECS provider or an RCS provider. The Ninth Circuit concluded that defendant provided a "service" that enabled the plaintiff and others to "send or receive ... electronic communications," namely text messages, i.e., that it was an ECS. *Quon,* 529 F.3d at 901. By contrast, an RCS provider must provide "computer storage or processing services."[26] Although **\*979** the pager service archived text messages on its server, and was therefore storing the messages, Congress contemplated that an ECS provider would provide some

storage as well. *Id.* (citing 18 U.S.C. § 2510(17), which states that an ECS provider may provide storage of communications for backup purposes and describes a temporary, intermediate storage of communications incidental to the electronic transmission thereof). The Ninth Circuit concluded that the text-messaging pager service "served as a conduit for the transmission of electronic communications from one user to another, and stored those communications 'as a "backup." ' " and as a consequence, held that it constituted an ECS provider. *Id.* at 902 (quoting *Theofel v. Farey–Jones,* 359 F.3d 1066, 1070 (9th Cir.2004)).[27]

24    Although no court appears to have decided whether a social networking site or a web hosting service is an ECS provider or an RCS provider, at least one district court entered judgment on a jury verdict in favor of the plaintiff in a civil suit alleging improper retrieval of information from MySpace. *Pietrylo v. Hillstone Restaurant Group,* No. 06–5754(FSH), 2009 WL 3128420 (D.N.J. Sept. 25, 2009). The court reviewed the trial memoranda and other available pleadings in the action, and it does not appear that any party challenged MySpace's status as a covered provider or the fact that the communication contained on MySpace's service was statutorily protected.

25    On December 14, 2009, the U.S. Supreme Court granted certiorari in *Quon. City of Ontario v. Quon,* ––– U.S. ––––, 130 S.Ct. 1011, 175 L.Ed.2d 617 (2009). The questions presented in the petition for writ of certiorari, however, relate to Fourth Amendment issues in the case, not to the SCA.

26    The terms "storage" and "processing services" are not defined in the statute. A portion of the Senate Report captioned "Remote Computer Services" reflects its understanding of RCS providers:

"In the age of rapid computerization, a basic choice has faced the users of computer technology. That is, whether to process data inhouse on the user's own computer or on someone else's equipment. Over the years, remote computer service companies have developed to provide sophisticated and convenient computing services to subscribers and customers from remote facilities. Today businesses of all sizes —hospitals, banks and many others—use remote computing services for computer processing. This processing can be done with the customer or subscriber using the facilities of the remote computing service in essentially a time-sharing arrangement, or it can be accomplished by the service provider on the basis of information supplied by the subscriber or customer. Data is most often transmitted

between these services and their customers by means of electronic communications." Electronic Communications Privacy Act of 1986, S. Rep. No. 99–541, at 10–11 (1986), 1986 U.S.C.C.A.N., pp. 3555–57.

The report provided examples that included "physicians and hospitals maintain[ing] medical files in offsite data banks." *Id.* As a consequence, in *Quon,* the Ninth Circuit noted that storage was equivalent to a "virtual filing cabinet." *Quon,* 529 F.3d at 902. At oral argument, defendants' counsel asserted that the definition of an RCS provider did not reach those providing storage services, but only those providing data processing services. Such an interpretation reads the word "storage" out of the statutory definition of an RCS provider and ignores *Quon* 's reliance on the definition when describing storage services as a "virtual filing cabinet." The court declines defendants' invitation to overlook both clear statutory text and binding Ninth Circuit precedent. The court notes that *In re Jetblue Airways Corp. Privacy Litigation,* 379 F.Supp.2d 299, 310 (E.D.N.Y.2005), cited by defendants at the hearing, is not to the contrary. There, the court analyzed whether Jetblue's online reservation system was an RCS provider and described certain data processing functions not at issue here. *Jetblue* did not consider the statute's reference to "storage" or whether the reservation system had any storage functionality.

The Senate Report also provided examples of processing information that included "businesses of all sizes transmit[ting] their records to remote computers to obtain sophisticated data processing services." S. Rep. No. 99–541, at 3, 1986 U.S.C.C.A.N. 3555, 3557. Noting that the statute had been passed in 1986, the Ninth Circuit observed that the statutory reference to processing concerned the fact that "before the advent of advanced computer processing programs such as Microsoft Excel, businesses had to farm out sophisticated processing to a service that would process the information." *Quon,* 529 F.3d at 902.

As Robison states:

"Congress created a second category covering 'remote computing services' to address third-party service providers that offered 'sophisticated and convenient computing services to subscribers and customers from remote facilities.' Buying a lot of processing or storage capacity was prohibitively expensive for many organizations in 1986. Outsourcing these functions to a service provider, however, created economies of scale that offered a sustainable cost structure for the new technology.... A company or organization that decided to outsource its computing needs would transmit its data for processing either to a third-party service provider's personnel or directly transfer it to

the provider's remote computer.... Congress included the category of [RCS] in the Stored Communications Act to ensure the privacy of data outsourced to these third-party service providers.... The requirements for RCS precisely describe the nature of the commercial relationship that existed at the time of the Act's adoption between the outsourced computing providers and their business clientele." *Robison, supra,* at 1207.

27    The Ninth Circuit could not determine whether the text messages were archived for the user or the provider, but concluded it was clear the messages were archived for backup protection in either event. *Id.*

*Quon* also found support in the Ninth Circuit's prior decision in *Theofel,* in which the court concluded that a "provider of e-mail services" was "undisputedly an ECS." *Id.* at 902 (citing *Theofel,* 359 F.3d at 1075). See also *Warshak v. United States,* 532 F.3d 521, 523 (6th Cir.2008) (holding that the statutory definition of an ECS provider includes "basic e-mail services," citing Patricia L. Bellia et al., Cyberlaw: Problems of Policy and Jurisprudence in the Information Age 584 (2d ed. 2004)), while the statutory definition of an RCS provider includes provision of "longer-term storage," citing Kerr, *supra,* at 1216); *Konop,* 302 F.3d at 879 (concluding, based on the SCA's legislative history, that "Congress wanted to protect electronic communications that are configured to be private, such as email and private electronic bulletin boards"); S. Rep. No. 99–541 at 14, 1986 U.S.C.C.A.N. 3555, 3568 ("Existing telephone companies and electronic mail companies are providers of electronic communications services"); *United States v. Weaver,* 636 F.Supp.2d 769, 770 (C.D.Ill.2009) (concluding that Microsoft, which provided email service through the Hotmail website, was both an ECS provider and an RCS provider); *Jayne v. Sprint PCS,* No. CIV S–07–2522 LKK GGH P, 2009 WL 426117, *6 (E.D.Cal. Feb. 20, 2009) (concluding that Sprint, a cell phone service provider, was an ECS provider); *Becker v. Toca,* Civil Action No. 07–7202, 2008 WL 4443050, *4 (E.D.La. Sept. 26, 2008) (noting that "[c]ourts have interpreted the statute to apply primarily to telephone companies, internet or e-mail service providers, and bulletin board services," but declining to dismiss a claim under the SCA that alleged defendant sent a virus to plaintiff's computers that infected them because it was unclear "to what extent the [virus] may have accessed or retrieved information stored with an electronic communication service provider," since the fact that plaintiff used personal and office computers in his business might qualify him as an ECS provider); *Kaufman v. Nest Seekers, LLC,* No. 05 CV 6782(GBD), 2006 WL 2807177, *6 (S.D.N.Y. Sept. 26, 2006) ("An on-line business which

provides its customers, as part of its commercial offerings, the means by which the customers may engage in private electronic communications with third-parties may constitute a **\*980** facility through which electronic communication service is provided"); *Freedman v. America Online, Inc.,* 325 F.Supp.2d 638, 644 n. 4 (E.D.Va.2004) (concluding that America Online was an ECS provider).

Judge McDermott cited *Quon* for the proposition that a company is an ECS provider if it "served as a conduit for the transmission of electronic communications from one user to another, and stored those communications as a backup for the user."[28] Applying this definition, Judge McDermott held that for Facebook, MySpace, or Media Temple to be considered ECS providers, they had to "provide internet access or operate as conduits for the transmission of data from one location to another."[29] Because the websites' messaging services are used solely for public display, he found that they did not meet this definition.

[28]    Order at 7 (quoting *Quon,* 529 F.3d at 902 (internal quotations omitted)).

[29]    *Id.*

The court concludes that, although largely sound, Judge McDermott's reading of *Quon* and the SCA is contrary to law in certain respects. First, Judge McDermott interpreted the descriptive language in *Quon* as a broadly applicable definition of an ECS provider rather than as a description of a particular type of provider, i.e., a text-messaging pager service. Treating *Quon* 's formulation as the exclusive definition of ECS provider, however, improperly limits the reach of the statute, which extends to "*any* service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15) (emphasis supplied).[30]

[30]    Although a minor discrepancy, Judge McDermott transposed the Ninth Circuit's use of the word "communication" for "data." An electronic communication is defined as "*any* transfer of signs, signals, writing, images, sounds, data, or intelligence of *any* nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system." *Id.,* § 2510(12) (emphasis supplied). As is clear, data are but one of several items that constitute communications.

Judge McDermott also found that Facebook, MySpace, or Media Temple engaged in public messaging only and concluded that this fact was dispositive. In reaching this conclusion, Judge McDermott apparently misconstrued the information plaintiff provided concerning the nature of the services the third-party companies provided. It is clear, for instance, that Media Temple provides "webmail," which is a "service that allows users to view email messages."[31] In addition plaintiff stated that both Facebook and MySpace provided "private messaging services."[32]

[31]    Order at 9.

[32]    Joint Stipulation at 14 (footnotes omitted).

**[9]**    Recognizing that all three sites provide private messaging or email services, the court is compelled to apply the voluminous case law cited above that establishes that such services constitute ECS. Moreover, the information the parties gave Judge McDermott establishes that Facebook wall postings and the MySpace comments are not strictly "public," but are accessible only to those users plaintiff selects. The court therefore finds relevant, if not controlling, the authority regarding private electronic bulletin board services ("BBS").

**[10]**    "Computer bulletin boards generally offer both private electronic mail service and newsgroups. The latter is essentially email directed to the community at large, rather than a private recipient." *MTV Networks v. Curry,* 867 F.Supp. 202, 204 n. 3 (S.D.N.Y.1994).[33] The term "computer bulletin board" evokes the traditional **\*981** cork-and-pin bulletin board on which people post messages, advertisements, or community news. *United States v. Riggs,* 739 F.Supp. 414, 417 n. 4 (N.D.Ill.1990) ("A computer bulletin board system is a computer program that simulates an actual bulletin board by allowing computer users who access a particular computer to post messages, read existing messages, and delete messages"). Court precedent and legislative history establish that the SCA's definition of an ECS provider was intended to reach a private BBS. *United States v. Steiger,* 318 F.3d 1039, 1049 (11th Cir.2003) ("Thus, the SCA clearly applies, for example, to information stored with a phone company, Internet Service Provider (ISP), or electronic bulletin board system (BBS)"); *Konop,* 302 F.3d at 875 ("The legislative history of the [SCA] suggests that Congress wanted to protect electronic communications that are configured to be private, such as email and private electronic bulletin boards"); *Steve Jackson Games, Inc. v. U.S. Secret Service,* 36 F.3d 457, 462 (5th Cir.1994)

(holding that the SCA "clearly applies" to the seizing of information on a BBS); *Becker,* 2008 WL 4443050 at *4 ("Courts have interpreted the statute to apply primarily to telephone companies, internet or e-mail service providers, and bulletin board services"); *Kaufman,* 2006 WL 2807177 at *5 ("An electronic bulletin board fits within the definition of an electronic communication service provider"); *Inventory Locator Service, LLC v. Partsbase, Inc.,* No. 02–2695 MA/V, 2005 WL 2179185, *24 (W.D.Tenn. Sept. 6, 2005) (finding that the SCA not only applied to entities that provide gateway access to the Internet, but also applied to a password-protected website containing an electronic bulletin board and a web-based forum where parties could communicate).

33      Electronic bulletin boards or BBSs are discussed in the legislative history of the SCA, although the term is not used in the statute. Thus, satisfying a precise definition of a BBS is not a prerequisite for protection. Nonetheless, it is informative that the Senate Report provided the following definition of BBSs:

"Electronic 'bulletin boards' are communications networks created by computer users for the transfer of information among computers. These may take the form of proprietary systems or they may be noncommercial systems operating among computer users who share special interests. These noncommercial systems may involve fees covering operating costs and may require special 'passwords' which restrict entry to the system. These bulletin boards may be public or semi-public in nature, depending on the degree of privacy sought by users, operators or organizers of such systems." S. Rep. No. 99–541, at 8–9, 1986 U.S.C.C.A.N. 3555, 3562–63.

Unquestionably, the case law, and in particular the Ninth Circuit's decision in *Konop,* require that the BBS be restricted in some fashion; a completely public BBS does not merit protection under the SCA. *Kaufman,* at *5 ("Only electronic bulletin boards which are not readily accessible to the public are protected under the Act"); S. Rep. No. 99–541, at 36, 1986 U.S.C.C.A.N. 3555, 3590 ("The bill does not for example hinder the development or use of 'electronic bulletin boards' or other similar services where the availability of information about the service, and the readily accessible nature of the service are widely known and the service does not require any special access code or warning to indicate that the information is private. To access a communication in such a public system is not a violation of the Act, since the general public has been 'authorized' to do so by the facility provider").

[11]    The information provided to Judge McDermott and this court, however, makes clear that Facebook permits wall messages to "be viewed by *anyone with access to the user's profile page*"; MySpace provides the "same" functionality.[34] As a consequence, there is no basis for distinguishing between a restricted-access BBS and a user's Facebook wall or MySpace comments. There similarly is no basis **\*982** for distinguishing between Media Temple's webmail and Facebook's and MySpace's private messaging, on the one hand, and traditional web-based email on the other. As a consequence, the court concludes that each of Media Temple, Facebook, and MySpace is an ECS provider.[35]

34      Order at 9 (emphasis supplied)

35      The parties dispute whether Facebook, MySpace, and Media Temple constitute services "which *provide* [ ] users the ability to send or receive electronic communications" or whether they are rather services "which *utilize* [ ] the ability to send or receive electronic communications to permit" social networking. *United States v. Standefer,* No. 06–CR–2674–H, 2007 WL 2301760, *4 (S.D.Cal. Aug. 8, 2007) (concluding that an Internet-based service that permitted customers to use the Internet to transfer ownership of gold was "not a service which *provides* users the ability to send or receive electronic communications, rather ... is a service which *utilizes* the ability to send or receive electronic communications to permit the instant transfer of gold ownership between its users"). See also *In re U.S. for an Order Authorizing Roving Interception of Oral Communications,* 349 F.3d 1132, 1140 (9th Cir.2003) (defining the term "provides" in § 2510 as it would be used "in ordinary discourse," and concluding that a company that billed and had direct dealings with customers for communication services was the provider of those services); see also *Crowley v. Cybersource Corp.,* 166 F.Supp.2d 1263, 1270 (N.D.Cal.2001) (concluding that Amazon.com, Inc., which does not independently provide electronic communication services to the public, was not a provider, but rather a user, of an electronic communication service, even though it could communicate with its customers through e-mail); cf. *United States v. Mullins,* 992 F.2d 1472, 1478 (9th Cir.1993) (an airline that provided travel agents with a computerized travel reservation system accessed through separate computer terminals was a provider of electronic communication service). After considering this authority, the court remains persuaded that Facebook, Media Temple, and MySpace provide electronic communication services. These cases appear to reflect the fact that the definition of an ECS provider

"does not encompass entities that merely use the internet to sell goods or services." *Inventory Locator Service,* 2005 WL 2179185 at *24. The goal of Facebook, Media Temple, and MySpace is not to buy or sell books, gold, or travel services. Media Temple's business purpose is to provide web-based email services, thus enabling communication. Facebook and MySpace provide an electronic venue to communicate, either one-to-one by private messaging or with a large group of friends through wall postings and comments.

That the three entities are ECS providers does not end the court's inquiry, however. The court must also determine whether the information sought by the subpoenas—private messages and postings—constitute electronic storage within the meaning of the statute. As will be seen, this inquiry necessitates that the court consider whether at some point the three entities act as RCS providers with respect to certain stored communications.

As noted, the statute provides two definitions of electronic storage. One definition is found in § 2510(17)(A). See 18 U.S.C. § 2510(17)(A) ("any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof"). As respects this definition, "[s]everal courts have held that [the] subsection ... covers e-mail messages stored on an ISP's server pending delivery to the recipient." *Theofel,* 359 F.3d at 1075 (citing *In re DoubleClick Inc. Privacy Litigation,* 154 F.Supp.2d 497, 511–12 (S.D.N.Y.2001) (holding that "it appears that the section is specifically targeted at communications temporarily stored by electronic communications services incident to their transmission—for example, when an email service stores a message until the addressee downloads it," and applying dictionary definitions of "temporary" and "intermediate" to find that the subsection protects only electronic communications stored "for a limited time" in the "middle" of a transmission, "i.e. when an electronic communication service temporarily stores a communication while waiting **\*983** to deliver it")); *Fraser v. Nationwide Mutual Insurance Co.,* 135 F.Supp.2d 623, 635–36 (E.D.Pa.2001) (holding that subsection (A) "covers a message that is stored in intermediate storage temporarily, after the message is sent by the sender, but before it is retrieved by the intended recipient"), aff'd in part and vacated in part on other grounds, 352 F.3d 107, 114 (3d Cir.2003) (concurring that "post-transmission" storage is not covered by subsection (A)); *Steve Jackson Games,* 36 F.3d at 461–62 (private messages stored on a bulletin board pending delivery are covered by subsection (A)). See also *United States v. Councilman,* 418 F.3d 67, 80 (1st Cir.2005) (en banc) ("The first category ...

refers to temporary storage, such as when a message sits in an e-mail user's mailbox after transmission but before the user has retrieved the message from the mail server"); *Weaver,* 636 F.Supp.2d at 771 ("Because the emails here have been opened, they are not in temporary, intermediate storage incidental to electronic transmission"). The Ninth Circuit agrees that "subsection (A) applies only to messages in 'temporary, intermediate storage,' " and has "limited that subsection's coverage to messages not yet delivered to their intended recipient." *Theofel,* 359 F.3d at 1075.[36]

[36] In his Note, Robison states that the emphasis on "temporary" locations for email messages is best explained "in light of the e-mail delivery system in place [when the SCA was passed in 1986], which required multiple service providers to store communications briefly before forwarding them on to their next destination or while awaiting download by the recipient." *Robison, supra,* at 1206. As the cases note, the modern day analogy is email in an inbox that has not yet been opened by the recipient.

A second definition of "electronic storage" is found in § 2510(17)(B). See 18 U.S.C. § 2510(17)(B) ("any storage of such communication by an electronic communication service for purposes of backup protection of such communication"). The central interpretive difficulty with respect to this definition is whether the communication was stored for "purposes of backup protection," a term that is not defined. *Fraser,* 352 F.3d at 114 (noting that the term "backup protection" is not defined in the statute or in the legislative history). In *Theofel,* assessing the storage of a message on an ISP's server after delivery, the court noted that an "obvious purpose ... is to provide a second copy of the message in the event that the user needs to download it again—if, for example, the message is accidentally erased from the user's own computer." Because this was *a* purpose of storage, the court concluded that storage served as a "backup" for the user. *Theofel,* 359 F.3d at 1075.[37] In *Quon,* the Ninth **\*984** Circuit was confronted with a vague evidentiary record, which reflected that the pager messages were "archived" on the server, but did not explain what was meant by that term. The pager service argued that its "permanent retention" of the text messages could not have been for "backup purposes" but must have been for "storage purposes."[38] The Ninth Circuit held that "archived" did not necessarily connote permanent storage, and that, under *Theofel,* messages stored on an ECS provider's server after delivery were for "backup protection." As a consequence, it held that plaintiff was entitled to

judgment as a matter of law against the pager service. *Quon,* 529 F.3d at 902–03.

37 The *Theofel* court noted that "nothing in the Act requires that the backup protection be for the benefit of the ISP rather than the user." *Id.* It also rejected the amicus argument of the United States that subsection (B)'s reference to "any storage of *such* communication" was necessarily a reference to the communications described in subsection (A). It stated:

> "The text of the statute ... does not support this reading. Subsection (A) identifies a type of communication ('a wire or electronic communication') and a type of storage ('temporary, intermediate storage ... incidental to the electronic transmission thereof"). The phrase 'such communication' in subsection (B) does not, as a matter of grammar, reference attributes of the type of storage defined in subsection (A). The government's argument would be correct if subsection (B) referred to 'a communication in such storage,' or if subsection (A) referred to a communication in temporary, intermediate storage rather than temporary, intermediate storage of a communication. However, as the statute is written, 'such communication' is nothing more than shorthand for 'a wire or electronic communication.' " *Id.*

The Ninth Circuit also concluded that the interpretation advanced by the United States would "drain[ ] subsection (B) of independent content because virtually any backup of a subsection (A) message [would] itself qualify as a message in temporary, intermediate storage." *Id.*

38 If the retention were for storage purposes, the pager service would have qualified as an RCS, and a different set of protections would have been triggered.

In response to a hypothetical argument made by the United States, the *Theofel* court reserved decision on a question relevant to this case: "A remote computing service might be the only place a user stores his messages; in that case, the messages are not stored for backup purposes." *Theofel,* 359 F.3d at 1077.[39] At least one district court has distinguished *Quon* and *Theofel,* relying in part on this language. The *Weaver* court noted that *Theofel* "relies on the assumption that users download emails from an ISP's server to their own computers." *Weaver,* 636 F.Supp.2d at 772.[40] The *Weaver* court confronted a situation not previously considered by the **\*985** Ninth Circuit. It noted that, in contrast to the non-web-based platform in *Theofel,* Microsoft's Hotmail email service was " 'web-based' and 'remote.' " *Id.* (quoting *Fischer v. Mt. Olive Lutheran Church, Inc.,* 207 F.Supp.2d 914, 917 (W.D.Wis.2002)). "Hotmail users can access their email over the web from any computer, and they do not automatically download their messages to their own computers as non-web-based email service users do." *Id.* (citing James X. Dempsey, *Digital Search & Seizure: Standards for Government Access to Communications and Associated Data,* 970 PLI/PAT 687, 707 (2009)).[41] "[I]f Hotmail users save a message, they generally leave it on the Hotmail server and return to Hotmail via the web to access it on subsequent occasions." *Id.*

39 One commentator makes a persuasive case that providers of web-based email fit within the definition of an ECS provider:

> "Web-mail users send, receive, organize, and store e-mail with their Web-mail accounts. Functionally, the Web-mail account plays the same role in the user's communicative life as would an e-mail account maintained with an ISP that is accessed via a stand-alone e-mail application like Microsoft Outlook, which resides on the user's hard drive. In fact, Web-mail is arguably a more universal communications platform (perhaps more akin to the telephone system) in that it can be accessed using any computer, regardless of through which ISP that computer happens to be connecting to the Internet.
> Concededly, Web-mail is a software application that requires an Internet connection to allow users to communicate, a connection not always provided by the operator of the Web-mail service. The same is true of instant messaging software. But to suggest that these services are not providing the ability to send and receive electronic communications because they do not provide Internet access is to focus, again, on the technological details instead of the nature of the privacy interests at stake." Matthew A. Goldberg, Comment, *The Googling of Online Privacy: Gmail, Search–Engine Histories and the New Frontier of Protecting Private Information on the Web,* 9 Lewis & Clark L.Rev. 249, 268 (2005).

The same commentator persuasively argues that a web-based email provider should be considered an RCS provider as well:

> "Computer storage—in 1986 as well as today—is a pretty clear concept. If a Web-mail provider, even one that indexes a user's mail and provides contextually relevant e-commerce services, stores e-mail for its users, the provider should be considered a provider of RCS and should be subject to the SCA." *Id.* at 270 (footnote omitted).

40 As noted, in concluding that the ISP's retention of a copy might be for backup purposes, the *Theofel* court relied on the fact that the "message [might be] accidentally erased

from the user's own computer," and therefore the server copy would be a "backup" for the user. *Theofel,* 359 F.3d at 1075. *Weaver* did not address *Quon,* but the manner in which the pagers operated suggests that messages were similarly downloaded to the pager, and the pager did not access the pager service's servers via the internet. *Quon,* 529 F.3d at 896 ("The message is then sent from the transmitting station, via a radio frequency transmission, to the recipient pager where it can be read by the user of the recipient pager").

At oral argument, defendants asserted that in order for a communication to be stored for backup purposes, it had to be stored in multiple locations. They noted, in this regard, that the messages in *Quon* had been stored in multiple locations. In *Quon,* text messages were received on a pager and also retained on the pager service's server. There is no reference in either the district or circuit court opinions to the fact that the messages were retained by the user on his pager. Indeed, given that transcripts for the pager tallied forty-six pages in length, *Quon v. Arch Wireless Operating Co., Inc.,* 445 F.Supp.2d 1116, 1126 (C.D.Cal.2006), it seems likely that many of the pager messages had been deleted from the user's pager and were stored only on the service's server. In any event, defendants' assertion that the Ninth Circuit relied on the fact that text messages were stored in more than one location Defendants misinterpret the *Quon* opinion.

41   Dempsey emphasizes that at the time the SCA was written, "many email users accessed their email by downloading it onto their personal computers." *Dempsey,* 970 PLI/PAT at 707. "That process often resulted in the deletion of the email from the computers of the service provider. Now, many users' email, especially their private as opposed to business email— including email that has been read but which still has value to the user—sits on a third party server accessible via the Web." *Id.*

"Users of web-based email systems, such as Hotmail, default to saving their messages only on the remote system. A Hotmail user can opt to connect an email program, such as Microsoft Outlook, to his or her Hotmail account and through it download messages onto a personal computer, but that is not the default method of using Hotmail. Thus, unless a Hotmail user varies from default use, the remote computing service is the only place he or she stores messages, and Microsoft is not storing that user's opened messages for backup purposes." *Id.* (footnote omitted).

Given this fact, the *Weaver* court concluded that as soon as a user opened an email message and maintained that message on the Hotmail website, Microsoft was maintaining

the message "solely for the purpose of providing storage or computer processing services to such subscriber or customer." *Weaver,* 636 F.Supp.2d at 772 (quoting 18 U.S.C. § 2703(b)(2)). Stated differently, at that point Hotmail ceased to be an ECS provider and became an RCS provider, providing remote storage service for the email. *Weaver* found that such an interpretation was supported by the SCA's legislative history. It cited the House Report, which stated:

"Sometimes the addressee, having requested and received a message, chooses to leave it in storage on the service for re-access at a later time. The Committee intends that, in leaving the message in storage, the addressee should be considered the subscriber or user from whom the system received the communication for storage, and that such communication should continue to be covered by section 2702(a)(2) [governing RCS providers]." H.R. Rep. No. 99–647, at 65 (1986).

In addition to the *Weaver* court, another district court found that an ECS provider became an RCS provider after a communication had been read and stored. In ***986*** *Flagg v. City of Detroit,* 252 F.R.D. 346, 362–63 (E.D.Mich.2008), the City of Detroit had previously used text messaging services provided by SkyTel, an ECS provider. By the time communications were accessed, however, SkyTel had ceased to be an active provider of text messaging services, although it continued to maintain a database of text messages sent. The district court found that it had become an RCS provider because it served in the capacity of a "virtual filing cabinet" for the City. *Id.*

Courts outside the Ninth Circuit and commentators have accused the Ninth Circuit of relying "on a unitary approach, under which service providers contract with their customers to provide either an ECS or an RCS, but not both." *Flagg,* 252 F.R.D. at 362. It is true that the Ninth Circuit in *Quon* reversed a district court finding that a single provider provided both ECS and RCS services to the same customer. See *Quon v. Arch Wireless Operating Co., Inc.,* 445 F.Supp.2d 1116, 1137 (C.D.Cal.2006).[42] Nonetheless, the court is puzzled by the criticism of *Theofel* as "unitary," and speculates that there may be a misapprehension of that opinion due to a quirk in its issuance. The Ninth Circuit first issued an opinion in *Theofel* in August 2003. *Theofel v. Farey–Jones,* 341 F.3d 978 (9th Cir.2003). In February 2004, the Ninth Circuit issued an order amending that opinion, which added the following language:

42   The distinction between an ECS and an RCS provider has been criticized in scholarly literature as unworkable.

*Kerr, supra,* at 1216–18 n. 61 (explaining that e-mails that are in transit or have been delivered but not opened are stored by an ECS provider, while e-mails that have been opened and left on the server, rather than saved to a hard drive and deleted from the server, are stored by an RCS provider). See also *Alyssa H. DaCunha, Comment, Txts R Safe 42 Day: Quon v. Arch Wireless and the Fourth Amendment Applied to Text Messages,* 17 Geo. Mason L.Rev. 295, 311 (2009) ("The ECS category was designed to apply to the former type of service and the RCS to the latter. However, modern communications usually combine both services, and network operators frequently provide both electronic communication services such as e-mail transmission, as well as remote computing services such as long-term storage and archiving. Thus, a network operator cannot be defined as either an RCS or an ECS in the abstract; its classification will depend on the particular characteristics of the service in question" (footnotes omitted)).

"[N]ot all remote computing services are also electronic communications services.... The government notes that remote computing services and electronic communications services are 'often the same entities,' but 'often' is not good enough to make the government's point. Even as to remote computing services that are also electronic communications services, not all storage covered by sections 2702(a)(2)(B)[43] and 2703(b)(2)(B)[44] is also covered by **\*987** section 2510(17)(B).[45] A remote computing service might be the only place a user stores his messages; in that case, the messages are not stored for backup purposes." *Theofel,* 359 F.3d at 1076–77.

[43]  "[A] person or entity providing remote computing service to the public shall not knowingly divulge to any person or entity the contents of any communication which is carried or maintained on that service ... solely for the purpose of providing storage or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents of any such communications for purposes of providing any services other than storage or computer processing."

[44]  The restriction on an RCS provider divulging a communication applies "with respect to any wire or electronic communication that is held or maintained on that service—(A) on behalf of, and received by means of electronic transmission from (or created by means of computer processing of communications received by means of electronic transmission from), a subscriber or customer of such remote computing service; and (B) solely for the purpose of providing storage or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents of any such communications for purposes of providing any services other than storage or computer processing."

[45]  "[E]lectronic storage means ... any storage of such communication by an electronic communication service for purposes of backup protection of such communication."

The passage does not state that an entity cannot be both an RCS provider and ECS provider. Rather, the *Theofel* court held no more than that the entity whose conduct was at issue in that case was not both an ECS and RCS provider; this fact rendered the government's argument that entities often are both irrelevant. The Ninth Circuit's statement that not all RCS providers are also ECS providers by implication suggests that some are. Its reference to that "remote computing services that are also electronic communications services" confirms that it believed an entity could be both an ECS and an RCS provider. Similarly, its statement that not all storage under the sections governing RCS providers is encompassed by the section governing ECS providers underscores that where an entity is both an ECS and RCS provider, which protections apply is a governed by the type of storage involved. A court in the District of Oregon has employed this approach:

> "Today, most ISPs provide both ECS and RCS; thus, the distinction serves to define the service that is being provided at a particular time (or as to a particular piece of electronic communication at a particular time), rather than to define the service provider itself." *In re U.S.,* 665 F.Supp.2d 1210, 1214 (D.Or.2009).

 **[12]**    For this reason, *Weaver* and *Flagg* do not conflict with Ninth Circuit precedent; indeed, they apply the rule set forth in *Theofel* to different factual circumstances. *Weaver, Flagg,* and *Theofel* all concerned email messages, and the court therefore finds them instructive in evaluating Media Temple's webmail service and Facebook's and MySpace's private messaging. As respects messages that have not yet been opened, those entities operate as ECS providers and the messages are in electronic storage because they fall within the definition of "temporary, intermediate storage" under § 2510(17)(A). As respects messages that have been opened and retained by Crispin, under the reasoning of *Weaver* and *Flagg,* and the dicta in *Theofel,* the three entities operate as RCS providers providing storage services under § 2702(a)(2).[46]

46    The parties proffer no evidence or argument regarding the possibility that Facebook, MySpace, or Media Temple retain copies of webmail or private messaging communications on their servers separate from the storage available to Crispin. To the extent this is true, however, such archived copies would plainly be for backup purposes as discussed in *Quon* and *Theofel.* In *Theofel,* the United States argued that the Ninth Circuit's interpretation was so broad as to render any limitation superfluous, since "any copy of a message necessarily serves as a backup to the user, the service or both." *Theofel,* 359 F.3d at 1076. The Ninth Circuit responded:

"But the mere fact that a copy *could* serve as a backup does not mean it is stored for that purpose. We see many instances where an ISP could hold messages not in electronic storage—for example, e-mail sent to or from the ISP's staff, or messages a user has flagged for deletion from the server. In both cases, the messages are not in temporary, intermediate storage, nor are they kept for any backup purpose." *Id.* (emphasis original).

While the Ninth Circuit's examples of retained messages that have not been saved for backup purposes is not exhaustive, the examples offered suggest that at most, a limited range of messages are not kept for backup purposes. Certainly, the private messages retained in plaintiff's inbox cannot be analogized to messages sent to or from the entity's staff or messages a user has flagged for deletion.

 **\*988**  The Facebook wall and MySpace comments present a distinct and more difficult question. Although many cases have emphasized in dicta that a BBS is the paradigmatic type of entity covered by the SCA, few, if any, cases have considered the question in any detail. In *Konop,* the Ninth Circuit considered a secure website containing a bulletin board on which an employee posted bulletins critical of his employer, his employer's officers, and his union. Konop maintained a list of people, mostly other employees, who were eligible to access the website. A senior management official gained access to the website through false pretenses, i.e., by convincing an employee on the approved list to grant him permission to use his name to create an account. *Konop,* 302 F.3d at 872–73. The Ninth Circuit concluded that such a secure website or private bulletin board was covered by the SCA. *Id.* at 874. The *Konop* court treated Konop's website as an ECS provider and the communication stored thereon as in electronic storage, under § 2510(17). It did not indicate whether the electronic storage was temporary and intermediate or for backup purposes. *Id.* at 879.

By contrast, the district court in *Steve Jackson Games, Inc. v. U.S. Secret Service,* 816 F.Supp. 432 (W.D.Tex.1993),

concluded, without analysis, that an electronic bulletin board was an RCS provider. *Id.* at 443.[47] See also *Inventory Locator Service,* 2005 WL 2179185 at \*24 (concluding that the definition of an ECS provider extends beyond "entities that provide gateway access to the internet" and includes a party that "operates a web-based forum in which potential buyers and sellers of airplane parts can communicate their requests to one another" and "contains an electronic bulletin board where customers can post requests or offers").

47    The Fifth Circuit affirmed on a different ground. Although it did not mention the features of the BBS that allowed for the posting of bulletins, the Fifth Circuit noted that the BBS, like Facebook and MySpace, permitted private messaging among its members, which made it an ECS provider. Because the Fifth Circuit was reviewing the sufficiency of a complaint alleging violations of the SCA under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the allegations regarding private messaging were sufficient to survive a motion to dismiss, and the Fifth Circuit was not required to address bulletin posting or the district court's RCS finding.

As noted in *Konop,* the difficulty in interpreting the statute is "compounded by the fact that the [SCA] was written prior to the advent of the Internet and the World Wide Web. As a result, the existing statutory framework is ill-suited to address modern forms of communication like [Facebook and MySpace]. Courts have struggled to analyze problems involving modern technology within the confines of this statutory framework, often with unsatisfying results." As the Ninth Circuit further observed, "until Congress brings the laws in line with modern technology, protection of the Internet and websites such as [these] will remain a confusing and uncertain area of the law." *Konop,* 302 F.3d at 874.

In *Snow v. DIRECTV, Inc.,* No. 2:04–CV–515FTM33SPC, 2005 WL 1226158 (M.D.Fla. May 9, 2005), the district court found that there could be no temporary, intermediate storage in the context of a BBS. The court noted that no one could "allege that the messages are being stored on his particular web site while waiting to be transferred to a final destination. Rather his website is the final destination for the information posted on a bulletin board." *Id.* at \*3.[48] The court finds the  **\*989**  reasoning of *Snow* persuasive; in the context of a social-networking site such as Facebook or MySpace, there is no temporary, intermediate step for wall postings or comments. Unlike an email, there is no step whereby a Facebook wall posting must be opened, at which point it is deemed received.[49] Thus, a Facebook wall posting or a

MySpace comment is not protectable as a form of temporary, intermediate storage.

48    The district court did not consider whether maintenance of such posts could be for backup purposes under § 2510(17)(B) or for storage purposes as an RCS provider. Nor did the Eleventh Circuit address such questions in reviewing the district court decision. It merely decided that plaintiff had failed to allege the BBS was maintained in a private manner.

49    The court notes plaintiff's suggestion that a Facebook wall posting or a MySpace comment can be analogized to a "mass" email sent to each of the poster's Facebook or MySpace friends. Taking this analogy forward, plaintiff apparently contends that a Facebook wall posting remains in temporary, intermediate storage until such time as each Facebook friend of the poster has accessed the poster's wall and viewed the post. Such an interpretation would unduly limit the statutory term "temporary." If a Facebook user has hundreds or thousands of Facebook friends, it is likely that no post will ever be viewed by all of them.

 [13]    Nonetheless, "[t]he legislative history of the [SCA] suggests that Congress wanted to protect electronic communications that are configured to be private, such as ... private electronic bulletin boards." *Konop,* 302 F.3d at 875. Because Facebook wall postings and MySpace comments, on the one hand, and bulletin postings on a website such as Konop's, on the other, cannot be considered to be in temporary, intermediate storage, the court interprets *Konop* as holding that the postings, once made, are stored for backup purposes. This reading of *Konop* is consistent with *Theofel* and *Quon,* which held that email messages and pager text-messages, respectively, were held for backup purposes once read.[50] Indeed, taken together, *Quon* and *Theofel,* which dealt with diverse forms of communication, i.e., email in *Theofel* and pager services in *Quon,* stand for the proposition that a user's or an ECS provider's passive decision not to delete a communication after it has been read by the user renders that communication stored for backup purposes as defined in the statute. Given the court's conclusion that the BBS communication in *Konop* could not have been in temporary, intermediate storage, it appears that the passive action of failing to delete a BBS post, which is in all material ways analogous to a Facebook wall posting or a MySpace comment, also results in that post being stored for backup purposes. As a consequence, a harmonized reading of *Konop, Theofel,* and *Quon* leads to the conclusion that Facebook and MySpace are ECS providers as respects wall postings and

comments and that such communications are in electronic storage.

50    The court's reading is consistent with both Ninth Circuit precedent and the legislative history. Both the majority and concurrence in *Konop* noted inconsistencies in the statute. See *Konop,* 302 F.3d at 887 (Reinhardt, J., concurring) ("Because I recognize that any reading of the relevant statutory provisions raises some difficulties and introduces some inconsistencies, the question becomes: which reading is more coherent and more consistent with Congressional intent?"). While these inconsistencies may militate against making comparisons across sections, the court notes that the definition in § 2510(17)(B) omits the word "solely," which is included in the definition of an RCS provider found in § 2711(2). Although defendant suggests that storage of communications on a Facebook wall or in MySpace comments may have other purposes, including the semi-public display of information, *Theofel, Quon,* and *Konop* implicitly held that although a user may have other purposes for leaving an email in an inbox or leaving a post on his or her Facebook wall, rather than deleting the email after it has been read or deleting the Facebook wall posting after the information has become stale, one of multiple purposes may be for backup storage.

 **\*990**    [14]    In the alternative, the court holds that the Facebook and MySpace are RCS providers as respects the wall postings and comments. In *Viacom International Inc. v. YouTube Inc.,* 253 F.R.D. 256 (S.D.N.Y.2008), the district court considered the status of YouTube, which "encourage[s] individuals to upload videos to the YouTube site, where YouTube makes them available for immediate viewing by members of the public free of charge." *Id.* at 258. "YouTube.com users may override the website's default setting—which makes newly added videos available to the public—by electing to mark as 'private' the videos they post to the website." Such videos "can only be viewed by others authorized by the user who posted each of them." *Id.* at 264. The private videos whose production plaintiff sought to compel are thus analogous to the Facebook wall postings and MySpace comments defendants seek here, in that both are accessible to a limited set of users selected by the poster and are stored on a page provided by the website. The district court concluded that YouTube was an RCS provider because it provided storage services for the user, i.e., it stored the video on a web page for the benefit of the user and those the user designates. Although defendants here argue that the communications are not maintained by Facebook and MySpace "solely" for the purpose of storage because they are

also maintained for display purposes, the court has difficulty distinguishing the *YouTube* decision.

Additionally, the display purpose defendants posit is hard to separate from a storage function when the user provides access to a large number of people. This is because a storage service necessarily requires a retrieval mechanism to be useful. To retrieve communications in storage, the RCS provider must display those communications in some way. See *Flagg,* 252 F.R.D. at 359 ("[I]t is difficult to see how an archive of text messages would be of any use or value to a customer if the service provider did not also offer a mechanism for retrieving messages from this archive"). Although here a large number of users, i.e., all of plaintiff's Facebook friends, might access the storage and attendant retrieval/display mechanism, the number of users who can view the stored message has no legal significance. Indeed, basing a rule on the number of users who can access information would result in arbitrary line-drawing and likely in the anomalous result that businesses such as law firms, which may have thousands of employees who can access documents in storage, would be excluded from the statute.

As noted, the statute does not limit storage to retention for benefit of the user only. In this regard, the court analogizes to *Theofel,* where the Ninth Circuit interpreted the "for purposes of backup protection" language in § 2510(17)(B), and concluded that any backup purpose was sufficient, whether for the benefit of the email user or for the benefit of the ISP. *Theofel,* 359 F.3d at 1075. Applying this logic to the RCS definition, it does not matter that the stored Facebook wall postings and MySpace comments are available to hundreds or thousands of approved users.[51]

[51]    The purported "display" purpose cannot last indefinitely in any event. As more and more wall postings or comments are added, for instance, earlier wall postings and comments would become less accessible, as they would be displayed lower on the main page or eventually archived to separate pages to maintain the user's page or wall in an accessible or convenient format. The maintenance of these older posts, therefore, is likely not for display purposes. Defendants' argument, therefore, would unduly limit the statutory definition of an RCS provider inasmuch as it would eliminate all storage services that permit retrieval.

**\*991** At oral argument, defendants asserted that the evidentiary record developed before Judge McDermott was incomplete, in the sense that quashing the subpoena

with respect to Facebook wall postings and MySpace comments assumes that: (1) Facebook and MySpace have available privacy settings that restrict access sufficiently that it is appropriate to analogize to a private BBS; and (2) assuming privacy settings are optional, plaintiff chose privacy settings that would support a finding that his Facebook wall and MySpace comments section are sufficiently restricted that they are not readily available to the general public. 18 U.S.C. § 2511(2)(g) ("It shall not be unlawful under [the SCA] for any person ... to intercept or access an electronic communication made through an electronic communication system that is configured so that such electronic communication is readily accessible to the general public").

 **[15]**    With respect to webmail and private messaging, the court is satisfied that those forms of communications media are inherently private such that stored messages are not readily accessible to the general public. Thus, the court reverses Judge McDermott's order with respect to the Media Temple subpoena and the Facebook and MySpace subpoenas to the extent they seek private messaging. The Media Temple subpoena and those portions of the Facebook and MySpace subpoenas that sought private messaging are therefore quashed. With respect to the subpoenas seeking Facebook wall postings and MySpace comments, however, the court concludes that the evidentiary record presented to Judge McDermott is not sufficient to determine whether the subpoenas should be quashed. The only piece of evidence adduced was a Wikipedia article stating that Facebook permits wall messages to "be viewed by anyone with access to the user's profile page" and that MySpace provides the "same" functionality.[52] This information admits of two possibilities; either the general public had access to plaintiff's Facebook wall and MySpace comments, or access was limited to a few. Given that the only information in the record implied restricted access, the court concludes that Judge McDermott's order regarding this aspect of the Facebook and MySpace subpoenas was contrary to law. Because it appears, however, that a review of plaintiff's privacy settings would definitively settle the question, the court does not reverse Judge McDermott's order, but vacates it and remands so that Judge McDermott can direct the parties to develop a fuller evidentiary record regarding plaintiff's privacy settings and the extent of access allowed to his Facebook wall and MySpace comments.

[52]    Order at 9 (emphasis supplied)

## III. CONCLUSION

For the foregoing reasons, plaintiff's motion for reconsideration of Judge McDermott's order is granted. The court reverses Judge McDermott's order respecting the Media Temple subpoena and respecting so much of the Facebook and MySpace subpoenas as sought private messages. The Media Temple subpoena and the those portions of the Facebook and MySpace subpoenas that seek private messages are quashed. The court vacates Judge McDermott's order respecting so much of the Facebook and MySpace subpoenas as sought Facebook wall postings and MySpace comments, and remands for further development of the evidentiary record consistent with this order.

**All Citations**

717 F.Supp.2d 965

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 2

# FILED UNDER SEAL

# EXHIBIT 3

# FILED UNDER SEAL

# EXHIBIT 4

# FILED UNDER SEAL

# EXHIBIT 5

# FILED UNDER SEAL

# EXHIBIT 6

# FILED UNDER SEAL

# EXHIBIT 8

**Thursday, April 2, 2026 at 11:47:28 AM Central Daylight Time**

**Subject:** Re: X v. MMFA - MMFA's 9th RFP Source Code M&C 1.6.26

**Date:** Monday, March 23, 2026 at 9:50:30 AM Central Daylight Time

**From:** Alex Foulkes Grafton

**To:** Elizabeth Brown Fore, Alithea Sullivan, Matt Behncke, Michael Abrams, Tyler Lopez, Alex Dvorscak, Ari Cuenin, Chris Hilton, Cody Coll, Judd E. Stone II, XvMMFA

**CC:** Justin A. Nelson, Katy Peaslee, Haley Gratzer, Tyler Lopez, Bostwick, Dwight P., Naunton, Shawn, Clark, Miles, Rody, Dave

**BCC:** Alex Foulkes Grafton

Liz and team, it's been 180 days since Defendants first addressed X's refusal to to produce documents in response to certain source-code-related requests in Defendants' ninth set of requests for production. The parties met and conferred on October 21, 2025, via email on November 5, 2025, and again on January 6, 2026.  Our last conversation was 76 days ago, and we've not heard back from you since despite our follow up. Please let us know if X has any further update on the below by April 1.

On January 6, we agreed that the parties reached an impasse on the definition of Relevant Functionally, and a few other issues as documented in my January 6 email. We hope to be able to reach a resolution on as many open items as possible without burdening the Court and look forward to hearing form you.

Thanks,
Alex

Alexandra Foulkes Grafton
Associate Attorney | **Susman Godfrey LLP**
(832) 296-6382 ( c ) <u>Bio</u>

App. 068

# EXHIBIT 9

**Thursday, April 2, 2026 at 11:48:47 AM Central Daylight Time**

---

**Subject:** Re: MMFA - X's Advertising Revenue

**Date:** Tuesday, March 24, 2026 at 4:55:33 PM Central Daylight Time

**From:** Alex Foulkes Grafton

**To:** Caroline Merideth, Dave Finkel, Alithea Sullivan, Katy Peaslee, Cody Watson, Alex Dvorscak, Elizabeth Brown Fore, Michael Abrams, XvMMFA, John Sullivan

**CC:** Justin A. Nelson, Tyler Lopez, Naunton, Shawn, Dwight P. Bostwick, Rody, Dave, Amer S. Ahmed, Matt Behncke, Jessica Labry

Hi Caroline,

We'd be happy to adjust the call to accommodate X, so that we can discuss the issue Defendants first raised 52 days ago, and on which we've followed up multiple times since without resolution.

Your ask that Defendants specify the exact financial data we are requesting misses the point of our request entirely—and is one we have already addressed with your colleague 34 days ago during a meet and confer on February 18, 2026.

We are asking X to comply with its own disclosure obligations and its express promise to update its damages computations and supporting materials.

The specific data and information that X produces in response to that obligation is, of course, up to X. What we can say is that X's productions to date are plainly insufficient to give Media Matters a clear picture of the damages X is claiming. The advertising revenue data X produced covers only through December 4, 2023—approximately two weeks after the articles at issue— and the only advertiser-specific revenue data covering an adequate timeframe encompasses just 11 advertisers. Given that X has alleged ongoing damages from Media Matters' reporting, we suspect that X's own experts will need data that encompasses far more than 11 advertisers and that extends well beyond December 4, 2023 in order to substantiate X's claims as X has alleged them. But we are not in a position to dictate to X what its updated damages calculations and backup data should look like. That is for X to determine based on the claims it intends to prove.

What we do want is straightforward: for X to produce what it has promised—all "[f]inancial and other corporate records demonstrating the damage caused through lost advertising revenue and other damage to X Corp. caused by Defendants' [allegedly] false reporting"—so that Media Matters has a clear and current picture of the damages X is claiming, supported by the underlying data.

X should not be sitting on information that its own experts will ultimately rely upon. Under the law, Media Matters is not required to wait until expert disclosures to access this information. As courts have recognized, "a party is not required to wait until expert report deadlines to obtain another party's damages computations and is permitted to obtain that information through initial disclosures." *Associated Terminals, LLC v. Entergy Corp.*, No. CV 22-3118, 2023 WL 5529703, at *2 n.1 (E.D. La. Aug. 28, 2023); *accord Janvey v. Greenberg Traurig, LLP*, No. 3:12-CV-4641-N-BQ, 2019 WL 13175533, at *3 (N.D. Tex. Feb. 12, 2019) ("[s]imply reciting a dollar figure . . . is not enough.").

X has an obligation under the Rules to supplement its disclosures, as it promised, and it cannot withhold the factual foundation for its claims only to present it for the first time at the expert disclosure stage, leaving our experts scrambling to analyze the data and prepare responsive opinions.

We look forward to discussing further on the call. I'm available Monday between 10 AM and 1 PM CT, or Tuesday between 10 AM and 1 PM CT.  If these windows don't work for you all, just let me know some that do, and I'll make it work on my end.
Best,

Alex


Alexandra Foulkes Grafton
Associate Attorney | **Susman Godfrey LLP**
(832) 296-6382 ( c ) [Bio](Bio)

App. 071