**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| **X CORP.**, <br><br>    *Plaintiff*, <br><br>  v. <br><br> **MEDIA MATTERS FOR AMERICA,** *et al.*, <br><br>    *Defendants.* | **Civil Action No. 4:23-cv-01175-O** <br> **FILED UNDER SEAL** |

**DEFENDANTS' OPPOSITION TO X'S SCA SUPPLEMENT**

**Table of Contents**

INTRODUCTION.................................................................................................................1

BACKGROUND ................................................................................................................3

LEGAL STANDARD .......................................................................................................4

ANALYSIS.........................................................................................................................4

    I.      The SCA does not protect the withheld posts because the posts do not satisfy § 2702(a)'s storage conditions...............................................4

    II.     Provider status is only the start; posts configured to be public do not meet the SCA's storage requirements............................................5

    III.    Even if the SCA applies to public-configured posts, the lawful-consent exception (§2702(b)(3)) allows production..........................................10

    IV.    The Provider-Protection Exception (§ 2702(b)(5)) independently supports production.............................................................................18

    V.     X's litigation conduct and selective disclosures confirm disclosure is appropriate. ...........................................................................................22

CONCLUSION ................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*,
    793 F.3d 822 (8th Cir. 2015) ......................................................................................20

*Badgerow v. Walters*,
    596 U.S. 1 (2022)........................................................................................................16

*Bank of U.S. v. Owens*,
    27 U.S. 527 (1829)......................................................................................................24

*Cobra Pipeline v. Gas Natural*,
    132 F. Supp. 3d 945 (N.D. Ohio 2015)................................................................11, 12

*Council on American–Islamic Relations Action Network, Inc. v. Gaubatz*,
    793 F. Supp. 2d 311 (D.D.C. 2011) .......................................................................14, 15

*Crispin v. Christian Audigier, Inc.*,
    717 F.Supp.2d 965 (C.D. Cal. 2010) ...............................................11, 12, 15, 16

*Doe v. City of San Diego*,
    2013 WL 2338713 (S.D. Cal. 2013) ...........................................................................27

*Ehling v. Monmouth-Ocean Hosp. Serv. Corp.*,
    961 F. Supp. 2d 659 (D.N.J. 2013) .......................................................................12, 15

*Facebook, Inc. v. Superior Court (Hunter)*,
    4 Cal. 5th 1245 (Cal. 2018).......................................................................... *passim*

*Flagg v. City of Detroit*,
    252 F.R.D. 346 (E.D. Mich. 2008) ................................................................12, 25, 26

*Freedman v. America Online, Inc.*,
    325 F. Supp. 2d 638 (E.D. Va. 2004) .........................................................................15

*Hately v. Watts*,
    917 F.3d 770 (4th Cir. 2019) ......................................................................................12

*In re Akhmedova*,
    2020 WL 6891828 (N.D. Cal. Nov. 24, 2020) ...........................................................16

*In re Facebook, Inc. Consumer Privacy User Profile Litigation*,
    402 F. Supp. 3d 767 (N.D. Cal. 2019) .......................................................................17

*In re Irish Bank Resolution Corp.*,
   559 B.R. 627 (Bankr. D. Del. 2016) ........................................................................21

*In re Path Network, Inc.*,
   703 F. Supp. 3d 1046 (N.D. Cal. 2023) ...................................................................22

*In re Subpoena Duces Tecum to AOL*,
   LLC, 550 F. Supp. 2d 606 (E.D. Va. 2008) .............................................................26

*In re United States for an Ord. Pursuant to 18 U.S.C. § 2705(b)*, 289 F. Supp. 3d
   at 208 .......................................................................................................................10

*Li v. Walsh*,
   No. 16-CV-81871, 2023 WL 11981206 (S.D. Fla. May 19, 2023) ..........................23

*Low v. LinkedIn Corp.*,
   900 F.Supp.2d 1010 (N.D. Cal. 2012) .....................................................................10

*Meta Platforms, Inc. v. D.C.*,
   301 A.3d 740 (D.C. 2023) ..............................................................................7, 17, 25

*Meyer v. Mittal*,
   No. 3:21-CV-00621-HZ, 2023 WL 3004761 (D. Or. Apr. 17, 2023) ......................19

*Mintz v. Mark Bartelstein & Associates, Inc.*,
   885 F. Supp. 2d 987 (C.D. Cal. 2012) .....................................................................22

*Negro v. Superior Court*,
   179 Cal. Rptr. 3d 215 (Ct. App. 2014) .................................................................21, 23

*O'Grady v. Superior Ct.*,
   139 Cal. App. 4th 1423 (2006) ........................................................................7, 9, 26

*People v. Harris*,
   36 Misc. 3d 868, 949 N.Y.S.2d 590 (Crim. Ct. 2012) ..................................... *passim*

*Rainsy v. Facebook, Inc.*,
   311 F. Supp. 3d 1101 (N.D. Cal. 2018) ...................................................................27

*Republic of Gambia v. Facebook, Inc.*,
   575 F. Supp. 3d 8 (D.D.C. 2021) ..............................................................13, 21, 23

*Rosenow v. Facebook, Inc.*,
   No. 19-CV-1297, 2024 WL 5265312 (S.D. Cal. Mar. 25, 2024) ...............17, 18, 26

*Russello v. United States*,
   464 U.S. 16 (1983) ..................................................................................................16

iv

*Sams v. Yahoo! Inc.*,
   713 F.3d 1175 (9th Cir. 2013) ..................................................................................19

*Shenwick v. Twitter, Inc.*,
   2018 WL 833085 (N.D. Cal. Feb. 7, 2018) ..................................................9, 15, 27

*Snap Inc. v. Superior Court*,
   No. S286267 (Cal.) ..........................................................................................11, 13, 14

*Suraju v. Yahoo!, Inc.*,
   No. 22-mc-8007, 2022 WL 3365086 ..........................................................................26

*Theofel v. Farey-Jones*,
   359 F.3d 1066 (9th Cir. 2004) ..................................................................................12

*United States v. Contreras*,
   905 F.3d 853 (5th Cir. 2018) ....................................................................................19

*United States v. Councilman*,
   418 F.3d 67 (1st Cir. 2005)........................................................................................27

*United States v. Ho*,
   94 F.3d 932 (5th Cir. 1996) ......................................................................................21

*United States v. Martin*,
   2015 WL 4463934 (D. Ariz. July 21, 2015) ..................................................9, 15, 27

*United States v. Meregildo*,
   883 F. Supp. 2d 523 (S.D.N.Y. 2012)..................................................................19, 22

*United States v. Post*,
   997 F. Supp. 2d 602 (S.D. Tex. 2014) ......................................................................19

*United States v. Weber*,
   599 F. Supp. 3d 1025 (D. Mont. 2022)......................................................................20

*United States v. Williams*,
   898 F.3d 323 (3d Cir. 2018)................................................................................18, 21

*Viacom International Inc. v. YouTube Inc.*,
   253 F.R.D. 256 (S.D.N.Y. 2008................................................................15, 17, 18

*Vista Mktg., LLC v. Burkett*,
   812 F.3d 954 (11th Cir. 2016) ........................................................................10, 14, 20

**Statutes**

18 U.S.C. §§ 2702(a)(1), 2510(17) ..........................................................................11

18 U.S.C. § 2702(a)(2)(A)–(B)..................................................................................................11, 13

18 U.S.C. § 2702(b)(3) ................................................................................................... *passim*

18 U.S.C. § 2702(b)(5) ................................................................................................... *passim*

18 U.S.C. § 2707...........................................................................................................................29

*Electronic Communications Privacy Act of 1986, 18 U.S.C. §§ 2701–2712* ...................................9

**Rules**

FED. R. CIV. P. 26(b)(1) ...............................................................................................................10

Rule 34 ...................................................................................................................................25, 26

**Regulations**

*In re United States for an Order Pursuant to 18 U.S.C. § 2705(b)*, 289 F.Supp.3d
    201, 208...............................................................................................................................10

**Other Authorities**

H.R. Rep. No. 99-647 (1986)....................................................................................................9, 24

**INTRODUCTION**

X's argument that the Stored Communication Act ("SCA") bars production of posts responsive to Defendants' Request for Production No. 79 fails on every front. ***First***, it fails because the SCA does not apply to the publicly configured posts at issue (and, to be clear, only posts that were configured as public by users are at issue) given that they do not satisfy the conditions of § 2702(a). ***Second***, even were the SCA to apply, two statutory exceptions each separately allow for disclosure: § 2702(b)(3), which permits disclosure where the user has provided consent, and § 2702(b)(5), which permits disclosure for the protection of X's purported rights. ***Third***, X's own litigation conduct demonstrates the absurdity of its argument that the SCA somehow bars X from producing content that users themselves chose to broadcast publicly on social media: X, a sophisticated social media company with extensive litigation experience, produced these posts for years without raising the SCA. That is because the SCA does not apply.

Content users configure as public—like the content at issue here—is not what the SCA was designed to protect. Rather, Congress enacted the SCA to protect the digital equivalents of private files and correspondence, deter governmental and private snooping, and preserve core privacy interests in emerging communications systems. *See O'Grady v. Superior Ct.*, 139 Cal. App. 4th 1423, 1444–45 (2006). Individuals have no privacy interest in statements publicly posted to social media, just as they have none in something shouted in a public square—even if they later regret their shouting. Put simply, "[i]f you post a tweet, just like if you scream it out the window, there is no reasonable expectation of privacy." *People v. Harris*, 36 Misc. 3d 868, 874, 949 N.Y.S.2d 590, 595 (N.Y. Crim. Ct. 2012); *see Meta Platforms, Inc. v. D.C.*, 301 A.3d 740, 753 (D.C. 2023).

X's contrary view of the SCA lacks case support, conflicts with the statute's text, history, and purpose, and is implausible. Inferring privacy protections for content individuals willingly posted publicly on the internet for anyone in the world to see—without congressional discussion

1

or supporting statutory language—violates basic statutory interpretation. No court to consider the issue squarely has done so. This Court should not, either. As *Harris* aptly put it: "***There is no proprietary interest in your tweets, which you have now gifted to the world***. This is not the same as a private email. . . ." 949 N.Y.S.2d at 595.

X misses the point when it argues that it qualifies as a provider under the SCA: the Court must still assess whether the ***content*** at issue is protected. It is not. X posts configured to be public do not satisfy § 2702(a)(1)'s "electronic storage" requirements or § 2702(a)(2)'s "solely" and "not authorized" requirements, so they fall outside the SCA's scope.

But even were the statute to apply, two statutory exceptions independently permit disclosure. Posts that are or were publicly posted are producible under § 2702(b)(3)'s lawful-consent exception because their authors chose to disclose them publicly—that alone establishes consent. But lest there was any doubt, X's Terms of Service independently provide users' consent to X's "distribution, reposting, [and] publication" of content, for "any purpose," with no limitation to currently public posts. That too satisfies the consent requirement of § 2702(b)(3). And the posts separately fall under § 2702(b)(5), which permits disclosure necessarily incident to protecting the rights X asserts here. Content is producible if either § 2702(b)(3) or § 2702(b)(5) applies; the posts responsive to RFP 79 fall under both.

Many of the posts genuinely in dispute are ones ***X itself*** removed from the platform—by suspending accounts or deleting content for Terms violations. X does not contest that currently public posts are producible; it claims the SCA bars production only because X chose to take the content down. Under X's theory, X can unilaterally shield any content from discovery simply by removing it from its own platform. That cannot be right. Congress enacted the SCA to protect content users chose to keep private, not content the platform wants to hide.

This debate is not academic: X seeks to shield critical discovery. X alleges that having inflammatory posts appear alongside ads was "extraordinarily rare," "manufactured," "inorganic," and not something anyone would "encounter under typical, or even extraordinary, conditions." ECF 37. X now seeks to block discovery into whether such content appearing alongside ads is as rare as it claims, using the SCA as an excuse to redact the very posts at issue. X's own conduct highlights the disingenuousness of its position: for years, X applied no SCA redactions and made no SCA objections, freely producing the same content it now claims the SCA protects. X is a highly sophisticated litigant and it did not just learn about the SCA. *Harris*, 949 N.Y.S.2d at 595 (SCA dispute involving Twitter); *Shenwick v. Twitter*, Inc., 2018 WL 833085, at *2 (N.D. Cal. Feb. 7, 2018) (same); *United States v. Martin*, 2015 WL 4463934, at *4 (D. Ariz. July 21, 2015) (same). Rather, X's novel SCA position appears to be a litigation tactic to block plainly producible evidence central to the lawsuit X brought.

The statute, the caselaw, and X's own conduct all confirm that the SCA does not bar production of the publicly posted content responsive to Defendants' RFP 79.

## BACKGROUND

Congress enacted the SCA to fill a privacy gap as communications moved from paper files, letters, and telephone calls to email, remote computing, and networked services. Existing laws and Fourth Amendment doctrine proved insufficient. *See Electronic Communications Privacy Act of 1986*, Pub. L. No. 99-508, tit. II, 100 Stat. 1848, 1860–68 (codified as amended at 18 U.S.C. §§ 2701–2712). Communications and records once kept in a home, office, or locked file cabinet were stored with third-party computer operators, leaving "personal or proprietary" information exposed to unauthorized access and disclosure. *See Facebook, Inc. v. Superior Ct. (Hunter)*, 4 Cal. 5th 1245, 1262–64 (2018).

Yet the SCA is not an absolute shield. The statute reflects a "fair balance between the

3

privacy expectations of citizens and the legitimate needs of law enforcement," while encouraging new communications technologies. *Id*. at 1262–63. Congress aimed to protect digital equivalents of private files and correspondence, deter snooping, and preserve core privacy interests without discouraging emerging communications systems. *See O'Grady,* 139 Cal. App. 4th at 1444–45.

**LEGAL STANDARD**

As the Court recognized, "Plaintiff has the burden of preventing the requested discovery." ECF 288 at 9. Defendants are entitled to nonprivileged communications relevant to X's claims. FED. R. CIV. P. 26(b)(1). When X invokes the SCA as a discovery bar, it must show both that § 2702(a)'s nondisclosure provisions cover the specific withheld post and that no § 2702(b) exception permits disclosure. X cannot carry that burden.

**ANALYSIS**

**I.**     **The SCA does not protect the withheld posts because the posts do not satisfy § 2702(a)'s storage conditions.**

X's brief skips the dispositive question.[1] To qualify as SCA-protected material, the withheld posts must satisfy Congress's storage conditions. For an ECS, content must be in "electronic storage"; for an RCS, it must be maintained "solely" for storage or computer processing for the user, and X must lack authorization to access it for any other service. *In re United States for an Order Pursuant to 18 U.S.C. § 2705(b)*, 289 F.Supp.3d 201, 208 (D.D.C. 2018); *Low v. LinkedIn Corp.*, 900 F.Supp.2d 1010, 1023 (N.D. Cal. 2012).

Public posts fail both tests. A public X post is a publication to the world, *Harris*, 949 N.Y.S.2d at 595, not a message in transit or a user backup. And X's Terms authorize it to use, copy, publish, transmit, display, distribute, and otherwise exploit user content "for any purpose,"

---

[1] Any storage-conditions arguments X makes in reply are waived as new. *See* Order, ECF 288 at 7 (citing *Allen v. Hays,* 65 F.4th 736, 746 (5th Cir. 2023)).

including advertising, recommendation, and other platform purposes. App.005 That is not storage "solely" for the subscriber, so X cannot invoke § 2702(a) as a threshold bar.

II.      **Provider status is only the start; posts configured to be public do not meet the SCA's storage requirements.**

The SCA analysis works post-by-post, not platform-by-platform. *In re United States*, 289 F. Supp. 3d at 208; *see also Vista Mktg., LLC v. Burkett*, 812 F.3d 954, 964 n.5 (11th Cir. 2016) ("[A] single service provider may act as an ECS at times and an RCS at other times."). X may provide ECS and RCS sometimes. But that does not end the relevant inquiry.

Section 2702(a)(1) applies only to communications held by an ECS "while in electronic storage," meaning temporary, intermediate storage incidental to transmission or backup protection. 18 U.S.C. §§ 2702(a)(1), 2510(17). Section 2702(a)(2) applies to an RCS only when content is maintained "solely for the purpose of providing storage or computer processing services" to the user and the provider is "not authorized" to access it for other services. 18 U.S.C. § 2702(a)(2)(A)–(B). These conditions are separate from provider status, and X bears the burden of proving them. *See* ECF 288 at 8–9.

A.  **The posts are not "in electronic storage" as required for ECS-related protection**.

A post configured to be public is not in "temporary, intermediate storage" while traveling between endpoints. *Crispin v. Christian Audigier, Inc.*, 717 F.Supp.2d 965, 988–89 (C.D. Cal. 2010). *Crispin* concluded that "in the context of a social-networking site such as Facebook or MySpace, there is no temporary, intermediate step for wall postings or comments" because "[u]nlike an email, there is no step whereby a Facebook wall posting must be opened, at which point it is deemed received." *Id*. So too here: the withheld posts need not have been "opened" by any of the billions of users who received them.

Nor is X storing user's once-public posts as "backup." The withheld posts were configured for public dissemination and are stored by X as platform content that X can display, distribute, analyze, and more, "for any purpose." *See* ECF 261-1 at 10 (citing App.094–95). Content held on those terms is not user backup subject to SCA protection, as *Snap Inc. v. Superior Court* concluded. 323 Cal. Rptr. 3d 576, 601–02 (Cal. Ct. App. 2024), *review granted*, 555 P.3d 503 (Cal. 2024).

That conclusion is well-settled for currently public posts. *Cobra Pipeline v. Gas Natural* held that data available through the user-facing website was not stored for backup protection because the website was the primary access point, not a secondary backup copy. 132 F.Supp.3d 945, 951–52 (N.D. Ohio 2015).[2]

X does not store formerly public posts for backup, either. X identifies no Term stating that it retains deleted or removed public posts for "backup protection," and "backup protection" is not a label X can simply attach to any retained archive: "the mere fact that a copy could serve as a backup does not mean it is stored for that purpose." *Theofel v. Farey-Jones*, 359 F.3d 1066, 1070 (9th Cir. 2004). Here, X's own Terms of Service make clear that it may retain user content for use in various manners and "for any purpose." ECF 261-1 at 10 (citing App.094–95).

The core backup-storage cases involved stored emails serving a preservation or retrieval function for the user. In *Theofel*, the ISP copy allowed the user to download the message again if the user's copy was lost. *Id*. at 1075. By contrast, *deleted* messages did not serve any backup purpose. *Id*. at 1070. In *Hately v. Watts*, the ISP retained webmail copies so users could preserve and re-access messages they chose not to delete. 917 F.3d 770, 793–97 (4th Cir. 2019). *Flagg v. City of Detroit* reflects the same distinction: when a provider's archive is the only available

---

[2] *Crispin* and *Ehling* considered posts that were not configured to be public. *Crispin,* at 988–89 & n.50; *Ehling v. Monmouth-Ocean Hosp. Serv. Corp.*, 961 F. Supp. 2d 659, 667–68 (D.N.J. 2013).

repository, it is more naturally storage or processing—a "virtual filing cabinet"—not a secondary backup copy. 252 F.R.D. 346, 362–63 (E.D. Mich. 2008). These cases correctly read "backup protection" to mean a secondary preservation copy connected to the user's communication or retrieval interest, not every retained provider archive. *Theofel*, 359 F.3d at 1070; *Hately*, 917 F.3d at 793–97; *see Flagg*, 252 F.R.D. at 362–63; *Cobra Pipeline*, 132 F. Supp. 3d at 951 ("A backup copy is similar to a secondary copy kept in a safety deposit box at another location."). And *Gambia* is inapposite, as it addressed deleted *private* conversations—not public posts. *Republic of Gambia v. Facebook, Inc.*, 575 F.Supp.3d 8, 8, 13–17 (D.D.C. 2021).

### B.  The posts are not maintained solely for storage or processing as required for RCS protection.

The SCA protects only content maintained "solely" for storage or computer processing services to the subscriber where the provider is not authorized to access it for other services. 18 U.S.C. § 2702(a)(2)(A)–(B). X's own Terms authorize it to use, copy, reproduce, process, adapt, modify, publish, transmit, display, upload, download, and distribute user content in any media "for any purpose." ECF 261-1 at 10 (citing App.094–95). By its own Terms, X is not limited to "solely" anything. Users' publicly posted content thus cannot fall within § 2702(a)(2).

***The caselaw supports Defendants' reading of the statute***. *Snap* is instructive. It analyzed platform terms of service in deciding whether the SCA applies,[3] and held that the SCA did not bar production where social-media providers' "ability to access and use their customers' information takes them outside the strictures of the Act." 323 Cal. Rptr. 3d at 582. It applied that rule to these

---

[3] X argued that *Snap* improperly "dismissed contrary circuit precedent in a single footnote." ECF 277 at 9. But the footnote distinguishes mostly district and state cases, not circuit precedent, and explains that none confronted the business-model argument or analyzed providers' terms of service. 323 Cal. Rptr. 3d at 602 n.17.

storage conditions: the SCA protects providers "facilitating private communication or storing private information for [their] users," not providers "accessing and using content for [their] own purposes." *Id.* at 603.

That reasoning applies with greater force here. *Snap* involved subpoenas for social-media posts, photos, messages, videos, location information, and other account contents, and still held that the SCA's disclosure limits did not apply because providers could access and use users' content. *Id.* at 582, 584, 605. This case is narrower: RFP 79 concerns **posts configured to be public**, not private messages, and every account at issue was public in November 2023. *See* Decl. of Eric Hananoki in Supp. of Defs.' Suppl. Br. Regarding the Stored Commc'ns Act ¶¶ 4–6 ("Hananoki Decl.").

X's terms put it far beyond the line even *Snap* drew. In the petition for review signed by Professor Orin Kerr, Snap stressed that it "does not monetize private user content or communications, or sell or share user data with third parties for advertising purposes," and later argued that it "does not mine, analyze, or share the content of users' private communications to provide targeted advertising." Petition for Review at 27–28, 38 n.20; Reply Brief at 18–19, *Snap Inc. v. Superior Ct.*, No. S286267 (Cal.). 049-50, 051, 137–38. X's terms say the opposite: X may use user content "for any purpose," including AI training, promotion, syndication, broadcast, distribution, reposting, publication, and advertising "in connection with the display of Content." App.005. Professor Kerr's critique has no force here, where X's contract authorizes the revenue-generating uses that animated the *Snap* court's business-purpose analysis.

In any event, the Court need not adopt the broadest version of *Snap*'s holding; it need only apply *Snap*'s narrower point that § 2702(a) protects private communications and user storage, not public content a platform may use for its own business purposes.

8

### C.  X's cases prove Defendants' point: provider status does not mean SCA protection for every item of platform content.

*Vista Marketing* says exactly that: a provider's classification depends on "how [it is] operating in a given context." 812 F.3d at 964 n.5. *Warshak* addressed email and the SCA's compelled-disclosure rules for stored email; it did not hold that public social-media publications are in "electronic storage" or stored "solely" for the user under § 2702(a).

Nor do X's provider-status cases resolve the storage question. *Gaubatz* concerned unauthorized access to private organizational servers and turned on whether the systems provided an electronic communication service ***and*** whether the communications were in electronic storage. *Council on American–Islamic Relations Action Network, Inc. v. Gaubatz*, 793 F. Supp. 2d 311, 316-17, 333-37 (D.D.C. 2011). *Freedman* involved AOL's disclosure of subscriber records in response to defective process, not public content posted for worldwide dissemination. *Freedman v. Am. Online, Inc.*, 325 F. Supp. 2d 638, 643–44 (E.D. Va. 2004). *Shenwick* and *Martin* are likewise only provider-status or private-message cases; none analyzes X's Terms, posts configured to be public, or § 2702(a)'s "solely" limitation. *Shenwick*, 2018 WL 833085, at *2; *Martin*, 2015 WL 4463934, at *3.

X's privacy-setting cases are worse for X because they protect only communications users ***tried to keep private***. *Crispin* remanded because the record did not show whether Facebook wall posts and MySpace comments were restricted or "readily available to the general public." 717 F. Supp. 2d at 991. *Ehling* held that "non-public" Facebook posts were covered because the user chose settings limiting access to Facebook friends. 961 F. Supp. 2d at 669. *Viacom* refused disclosure of videos "designated as private," while recognizing that a user who puts a communication on a public electronic bulletin board should be treated as consenting to disclosure.

9

*Viacom Int'l Inc. v. YouTube Inc.*, 253 F.R.D. 256, 264–65 (S.D.N.Y. 2008).

Defendants are not relying on a "large group" theory, as X suggests. ECF 293 at 8. *Hunter* rejected the proposition that restricted content becomes public merely because many friends or followers can see it. 4 Cal. 5th at 1267–68, 1281. Defendants rely on public configuration, X's Terms, and, alternatively, Hananoki's status as a follower of the public accounts he followed. Hananoki Decl. ¶¶ 4, 6.

***X's reading would erase Congress's storage conditions.*** If provider status alone triggered nondisclosure, as X suggests, *see* ECF 293 at 10–12, Congress need not have defined "electronic storage" by "temporary, intermediate" transmission and "backup protection," or limited RCS to content held "solely" for storage by providers "not authorized" to access it otherwise. Congress could have written: "An ECS or RCS shall not divulge any content held by that service." It did not. *See Russello v. United States*, 464 U.S. 16, 23 (1983); *Badgerow v. Walters*, 596 U.S. 1, 8 (2022). X has argued that a provider's storage purposes are irrelevant, relying on *Crispin*. ECF 277 at 8. But *Crispin* does not say that and did not address whether storage conditions are met for content configured for unlimited public access under a sweeping commercial license. 717 F.Supp.2d at 991.[4] In any case, even if the Court disagrees and concludes the SCA's bar applies, the withheld public posts are disclosable under both § 2702(b)(3)'s lawful-consent exception and § 2702(b)(5)'s provider-protection exception.

III.     **Even if the SCA applies to public-configured posts, the lawful-consent exception (§2702(b)(3)) allows production.**

X is right that § 2702(b)(3) puts the relevant consent choice in users' hands. *See* ECF 293 at 9. Users exercised that choice by posting publicly under X's Terms authorizing X to

---

[4] *Hunter* left the storage-conditions question open. 4 Cal. 5th at 1272.

make that content available to the world and to distribute, publish, repost, and otherwise use it for any purpose. That affirmative act is lawful consent permitting disclosure.

*X's Terms of Service require users to consent to X's disclosure of their public content.* Before publicly posting, users agreed to X's Terms, granting X a license to "use, copy, reproduce, process, adapt, modify, publish, transmit, display, upload, download, and distribute" public content "in any and all media . . . for any purpose." ECF 261-1 at 12. X tells users the platform exists "to make your Content available to the rest of the world and to let others do the same." *Id*. The SCA does not prescribe a form of consent. *See In re Akhmedova*, 2020 WL 6891828, at *3 (N.D. Cal. Nov. 24, 2020). X identifies no Term limiting that consent to *currently* public content or imposing any time limit. Defendants can locate none. A license to distribute content "for any purpose" includes disclosure in litigation X initiated.

Consent via X's broad Terms suffices under § 2702(b)(3), as *Hunter* explained, 4 Cal. 5th at 1267–68. *In re Facebook, Inc., Consumer Priv. User Profile Litig*., held that users consenting to "Facebook's disclosure of information to app developers" established consent under § 2702(b)(3). 402 F. Supp. 3d 767, 798 (N.D. Cal. 2019). *Meta* likewise recognized that "users could enter into private agreements with their service providers—like agreeing to a social media site's terms of service" around consent and disclosures of information. 301 A.3d at 754 & n.8. The Court can end the inquiry here: X's Terms specifically provide the requisite consent under § 2702(b)(3).

*Currently public posts are undisputedly consented disclosures.* Even putting aside the consent provided by X's Terms of Service, no dispute exists as to posts that remain public today: X "agrees to produce documents that can be verified as currently public." *See* ECF No. 277 at 4. That concession tracks the settled rule; public configuration supplies lawful consent under §

11

2702(b)(3). *Hunter*, 4 Cal. 5th at 1274; *Viacom*, 253 F.R.D. at 264–65.

But X's promise works a sleight of hand. By agreeing to produce documents that "***can be verified***," X uses passive language to shift the burden to Defendants to determine whether withheld posts are currently public. It has tried that before. ECF 277 at 9 ("offering to remove redactions from any content Defendants could demonstrate was derived solely from currently public posts"). X cannot do so because the Court held that X "has the burden of preventing the requested discovery." ECF 288 at 9. X controls the platform, knows each withheld post's status, and has agreed to produce posts "that can be verified as currently public." ECF 277 at 4.

X's cited case, *Rosenow v. Facebook, Inc.*, involved private account communications disclosed to government entities after providers invoked exceptions based on platform policies addressing illegal activity; it did not involve public posts, a platform-plaintiff withholding content central to its claims, or facts uniquely within the platform's control. No. 19-CV-1297-WQH-MMP, 2025 WL 951277, at *14–15 (S.D. Cal. Mar. 28, 2025); *Rosenow v. Facebook, Inc.*, No. 19-CV-1297-WQH-MMP, 2024 WL 5265312 (S.D. Cal. Mar. 25, 2024) (same). X is wrong that *Rosenow* places a consent-specific burden on Defendants. ECF 293 at 16. X, not Defendants, has the platform records showing configuration, deletion, suspension, and visibility history. X must identify each withheld post's status to comply with its discovery obligations. *See* Order, ECF 288 at 9 (placing burden on X, as the party seeking to prevent discovery).

***Content the user configured as* public *when posted also qualifies***. The Court need not reach the issue of whether publicly posting content in the first instance provides the requisite consent for disclosure under § 2702(b)(3) given the express consent embodied in X's Terms. That said, publicly posting content to social media does provide that consent. Nothing in § 2702(b)(3) limits the exception to posts still public on the day of production, and X cites no case adopting that

rule. *See* ECF 293 at 17–20. Section 2702(b)(3) asks whether the "originator" gave "lawful consent" to disclosure; *Hunter* explains that consent is implied by public posting and use of a service whose rules disclose that the communication may be used or disclosed. 4 Cal. 5th at 1267–68, 1274.

*Viacom*'s approach is helpful. The court ordered production of videos once publicly available on YouTube but later removed for any reason—including DMCA takedowns—while separately holding that the SCA barred production of videos users had ***designated as private*** and shared only with specified recipients. 253 F.R.D. at 261, 264–65. That is Defendants' line: posts a user ***configured to be public*** are disclosable.

X's Fourth Amendment consent-revocation cases (*Ho*, *Painter*, *Williams*) are inapposite. ECF 293 at 16–17. They govern police searches, not provider disclosures under § 2702(b)(3). No court has imported their revocation doctrine into that framework. The one opinion confronting SCA revocation—*Hunter*—recognized the question but remanded for a record on configuration, reconfiguration, and deletion rather than adopting Fourth Amendment revocation rules. 4 Cal. 5th at 1286–88.[5]

Even if Fourth Amendment principles applied wholesale (they should not),[6] "[w]hen a social media user disseminates his postings and information to the public, they are not protected by the Fourth Amendment." *United States v. Meregildo*, 883 F. Supp. 2d 523, 525 (S.D.N.Y.

---

[5] *Hunter* therefore does not adopt X's current-consent rule; it remanded because the record did not show the relevant configuration, reconfiguration, and deletion history. *Id*.

[6] *Meyer v. Mittal*, No. 3:21-CV-00621-HZ, 2023 WL 3004761, at *15 (D. Or. Apr. 17, 2023) ("Although the reasonable expectation of privacy standard of ***the Fourth Amendment is not part of an SCA claim***, to the extent that it is relevant . . . ."); *see also Sams v. Yahoo! Inc.*, 713 F.3d 1175, 1179 (9th Cir. 2013) ("The SCA was enacted because the advent of the Internet presented a host of potential privacy ***breaches that the Fourth Amendment does not address***.") (emphasis added).

2012). Any user behind the implicated accounts "gave up his right to privacy in that image once he uploaded it to the internet." *United States v. Post*, 997 F. Supp. 2d 602, 605 (S.D. Tex. 2014). Others were free to screenshot, copy, share, and print the content after publication. *See Harris*, 949 N.Y.S.2d at 595.

Deletion changes none of this. *Cf. United States v. Contreras*, 905 F.3d 853, 858 (5th Cir. 2018) (finding no Fourth Amendment violation and noting that "forensic experts can frequently recover evidence of deleted files"). Even Twitter's former Privacy Policy made the point writ large: "there is no reasonable expectation of privacy for tweets that the user has made public. ***It is the act of tweeting or disseminating communications to the public that controls.*** Even when a user deletes his or her tweets there are search engines available . . . that ***hold users accountable for everything they had publicly tweeted and later deleted.***" *Harris*, 949 N.Y.S.2d at 595 (quoting Twitter's Privacy Policy).[7]

*United States v. Weber* does not help X. *Weber* was a Fourth Amendment/CyberTip case, not a civil SCA case about § 2702(b)(3) consent for public posts. 599 F. Supp. 3d 1025, 1033–38 (D. Mont. 2022). The court rejected the defendant's privacy showing because he offered no evidence whether files were public or private, posted or direct-messaged, and because Instagram's terms warned it could monitor and disclose harmful content to law enforcement. *Id.* at 1033–34. That reasoning cuts against X: Defendants seek posts from accounts configured as public, *see* Hananoki Decl. ¶¶ 4–5, and X's Terms gave notice that public content would be made available to the world and broadly licensed to X. *Weber* therefore does not protect formerly public content;

---

[7] X's current Privacy Policy says effectively the same thing: "Remember public content can exist elsewhere even after it is removed from X. For example, search engines and other third parties may retain copies of your posts longer, based upon their own privacy policies, even after they are deleted or expire on X." App.171.

it confirms that privacy analysis turns on platform terms and the user's public-exposure choice.

The SCA's text controls. Section 2702(b)(3) contains no renewed-consent requirement for previously public posts already disseminated under platform rules authorizing broad public distribution. *Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 839 (8th Cir. 2015) (emphasizing the SCA's element-by-element statutory limits); *cf. Burkett*, 812 F.3d at 962 (looking to the statutory text and provider's role in context when applying the SCA).

***X's own removal of content cannot unequivocally revoke the user's consent***. Many withheld posts are from accounts *X itself* suspended or censored for Terms-violating conduct. Of the fifteen accounts implicated by RFP 79, all but three remain public or were suspended by X itself. App.178, 202, 228, 230, 232, 253, 255, 257, 259, 261, 263, 293, 295, 322, 324.

When X removes a user's public posts, the user has no say. And X's Fourth Amendment cases (assuming they apply at all) require revocation to be "unequivocal." *See United States v. Ho*, 94 F.3d 932, 933 (5th Cir. 1996); *United States v. Williams*, 898 F.3d 323, 330 (3d Cir. 2018). X's enforcement cannot substitute for the ***user's*** unequivocal revocation of consent previously given by public posting. Nor can X's removal of public posts constitute revocation of consent if the SCA "manifestly intended to invest users with the final say regarding disclosure." *In re Irish Bank Resolution Corp.*, 559 B.R. 627, 648 (Bankr. D. Del. 2016) (quoting *Negro v. Superior Court*, 179 Cal. Rptr. 3d 215, 228 (Ct. App. 2014)); ECF 293 at 9. Congress enacted the SCA to protect content that users intended to keep private. Accepting X's position would mean that X—or any provider—could unilaterally place content beyond the reach of discovery simply by removing it from the platform. That cannot be so.

*Gambia* does not support X's "deleted equals protected" rule. That decision addressed ***private*** Facebook and Instagram pages and communications that Facebook had removed and

15

preserved on its servers, and held that those private communications were stored for backup protection and could not be disclosed. 575 F.Supp.3d at 11–17. The court did not hold that formerly public posts are protected; it set aside disputes over public information and non-content metadata. *Id.* at 16. Indeed, Facebook agreed to produce content from hundreds of accounts it had removed where that content had been publicly posted before removal. *Id.* at 11; ECF 271-1. Facebook recognized what X ignores: once public, the content was already consented to disclosure. X cites no case holding that "formerly" public posts are SCA-protected. There is none, as far as Defendants can tell. *See* ECF 261-1 at 16 n.2.

***Hananoki's status as a follower provides, at minimum, an additional and independent basis for consent as to posts delivered or made available to him while he followed the public accounts.*** Of the accounts at issue in RFP 79, Hananoki followed these: @Paddy_Whiteman; @HISTinGrayscale; @The_National1; @bambkb; @KarlRadl. Section 2702(b)(3) permits an ECS provider to disclose communications "with the lawful consent of the originator or an addressee or ***intended recipient***." 18 U.S.C. § 2702(b)(3) (emphasis added).[8] The statute is disjunctive: consent of *any single* addressee or intended recipient suffices, independent of the originator. When a user posts, X delivers that content to each follower's feed by design. The posting user knows its audience at the moment of distribution: everyone with access to the internet—possibly; but its followers—definitively.

*United States v. Meregildo* supports this conclusion. There, the court held that a user who shares restricted posts with Facebook "friends" assumes the risk that a recipient will disseminate the content further, including to law enforcement. 883 F.Supp.2d at 525–26. If an undercover agent

---

[8] But the Court need not decide whether a follower is an "addressee" or "intended recipient" of a public post, because *Hunter* supplies the dispositive rule: the originator's act of configuring the post for public access is lawful consent. 4 Cal. 5th at 1274.

who deceived a user into accepting a friend request qualifies as someone to whom content was disclosed with the user's assumed consent, then Hananoki—an actual follower who followed these public accounts without restriction, Hananoki Decl. ¶ 6—has at least an equal claim.

Hananoki's status as a follower of the accounts listed above is nothing like what the court describes in *Mintz v. Mark Bartelstein & Associates, Inc.*, 885 F. Supp. 2d 987, 993–94 (C.D. Cal. 2012). In *Mintz*, the court noted that an employer who was a complete stranger to its employee's personal texts did not "appear" to be an intended recipient because, if it were, it would already have them. *Id*. That was a factual observation about bilateral, point-to-point SMS between two people. The court never considered whether followers of a social-media account qualify as intended recipients when the platform affirmatively delivers content at the poster's direction. *In re Path Network, Inc.*, 703 F. Supp. 3d 1046, 1074 (N.D. Cal. 2023), is equally unhelpful. The "dimensions of the consent" language addressed whether a recalcitrant *account holder* actively obstructing disclosure had *impliedly consented* to production of his own communications. *Id*. That framework has no application to the independent statutory authority of a willing recipient under § 2702(b)(3), like Hananoki.

Hananoki followed the public accounts listed above when he wrote the articles and never unfollowed them. Hananoki Decl. ¶¶ 10–11. Given that, Hananoki qualifies as someone to whom content was disclosed with the user's assumed consent, and he too can grant the requisite consent for disclosure of the withheld posts under Section 2702(b)(3). He does. Hananoki Decl. ¶¶ 16–17. This is yet a third, independent basis for finding § 2702(b)(3)'s consent requirement satisfied as to those five accounts.

***X's cases say nothing to the contrary***. None addresses a situation in which a platform-plaintiff is withholding posts that users affirmatively made public and the platform's own records

17

can identify whether each withheld post was configured as public.

In *Li v. Walsh*, Yahoo objected to a subpoena for private email contents, and the court refused to deem silence or failure to object as implied consent. No. 16-CV-81871, 2023 WL 11981206, at *2–3 (S.D. Fla. May 19, 2023). Defendants do not impute consent from silence. They rely on users' affirmative publication to the world, which *Hunter* treats as lawful consent. *Republic of Gambia* likewise concerned deleted **private** Facebook and Instagram communications, not public posts. 575 F.Supp.3d at 11–17. *Negro* rejected consent "merely constructive, implied in law, or otherwise *imputed*" from a user's failure to produce private emails, but recognized that actual consent obtained through ordinary discovery takes production outside the SCA. 230 Cal. App. 4th at 889–90, 897–904 (emphasis in original). Once again, Defendants rely not on litigation default, but on conduct and contract—public posting under X's Terms—that Congress and *Hunter* treat as consent to disclosure.

## IV.    The Provider-Protection Exception (§ 2702(b)(5)) independently supports production.

X sued to protect its reputation and advertiser relationships—the very rights it asks this Court to vindicate. The posts at issue are not merely "necessarily incident" to X's lawsuit; they are the basis of X's claims. The accounts from which X refuses to produce content are the accounts posting "Neo-Nazi and white-nationalist fringe content," ECF 37 ¶ 7, that Defendants described in the reporting X now challenges. ECF 37 ¶ 12 & n.7. The withheld content thus goes to the central question in this case: whether X's reputation was harmed by false reporting, as X claims, or by accurate reporting about what actually appeared on its platform. Discovery of that content is not only "necessarily incident to" protecting X's asserted rights—X's claims simply cannot be tested without examining what could appear alongside advertisements on its platform. The content

18

is independently disclosable under § 2702(b)(5).[9]

Section 2702(b)(5) permits disclosure of content "as may be necessarily incident to the rendition of the service or to the protection of the rights or property of the provider of that service." 18 U.S.C. § 2702(b)(5). The disjunctive "**or**" creates two independent prongs: disclosure incident to rendering the service, and disclosure to protect the provider's rights or property. The legislative history confirms that "rights" and "property" include "intellectual property rights" and "the right to be free from the theft of services." H.R. Rep. No. 99-647, at 67 (1986). Those litigation-related rights presuppose legal enforcement because "there can be no civil right where there can be no legal remedy." *Bank of U.S. v. Owens*, 27 U.S. 527, 539 (1829).

**X concedes the exception is permissive and applicable.** X claims that it sued Media Matters to protect its rights and property. *See* ECF 37. It alleges interference with advertiser relationships, disparagement, reputational harm, and lost revenue. The withheld content directly tests whether the alleged harm resulted from false reporting or accurate reporting about X's platform. X concedes that the exception in § 2702(b)(5) is discretionary and "meant to be used . . . for 'self-protection.'" ECF 246 at 13. X thus admits that it can disclose SCA-protected content as necessarily incident to protecting the rights it purportedly seeks to protect in this lawsuit. And the fact that X can, at its discretion, disclose this material means that ordinary compulsory process governs production. *Hunter* and *Meta* make that sequence clear in the lawful-consent context: § 2702(b)(3) does not itself compel disclosure, but once the exception permits disclosure, the provider may not invoke the SCA as a freestanding veto. *Hunter*, 4 Cal. 5th at 1282; *Meta*, 301 A.3d at 749–50, 755.

---

[9] This is not to say the SCA's protections never apply in litigation. But X is both plaintiff and invoker of the SCA, wielding the statute to shield the same public content upon which it bases its claims. Here, the "necessarily incident" exception applies. *See Flagg*, 252 F.R.D. at 362–63.

19

The same sequence follows from § 2702(b)(5). X concedes that the provider-protection exception permits disclosure for self-protection. ECF 246 at 13. If disclosure is permitted because it is necessarily incident to protecting rights X put at issue, Rule 34—not the SCA—answers whether X must produce documents within its possession, custody, or control. *See Flagg*, 252 F.R.D. at 355, 363, 366–67.

*A provider-plaintiff cannot sue on platform content and then hide that content behind the SCA.* X's attempts to distinguish *Flagg v. City of Detroit* underscore why that case controls. X concedes that § 2702(b)(5) is "permissive" and may be invoked "at the provider's discretion for self-protection." ECF 246 at 13. X's position—that it may disclose user content when disclosure serves its interests, but the SCA forbids the same disclosure when Defendants request it—is the shell game *Flagg* rejected. 252 F.R.D. at 363. Unlike the litigant in *Flagg*, X is both platform custodian and plaintiff, suing *about the product it stores* while avoiding its discovery obligations.

X argues *Flagg* is inapposite because it involved "a municipal customer that was itself a party to the litigation and that had functional control over the messages." ECF 293 at 22. That distinction shows why *Flagg* applies *a fortiori*. *Flagg* involved compelling a party-subscriber to consent to a third-party custodian's retrieval of archived messages, a scenario with "very little case law." 252 F.R.D. at 366. Here, X is both plaintiff and custodian; the content sits on its servers. If a district court could compel a municipality to provide consent to an outside provider, this Court can order X to produce documents from its own possession. X's distinction eliminates the procedural obstacle that made *Flagg* difficult.

The *Flagg* court warned that accepting the SCA-as-discovery-shield argument "would dramatically alter discovery practice, in a manner clearly not contemplated by the existing rules or law, by permitting a party to defeat the production of electronically stored information."

252 F.R.D. at 347. X asks for more: allowing a party-provider to defeat production of electronically stored information central to a lawsuit it filed about the shielded information.

*Flagg* does not require Defendants to subpoena third parties. *Cf.* ECF 293 at 16. It chose Rule 34 precisely to avoid unresolved questions about compelling a provider directly, directing the party with control to retrieve and produce discoverable messages. 252 F.R.D. at 366–67. X has the platform records and brought the claims; its preference not to produce is no more availing than the City of Detroit's.

X's law-enforcement cases (*Rosenow*, *Sykes*) do not confine § 2702(b)(5) to child-exploitation referrals or technical security events. They show only that provider-protection interests can include platform safety, user protection, and business interests; they do not limit the exception to child-safety or criminal-reporting disclosures. *See* ECF 293 at 14–15. Nor does *Muskovich* limit the exception to routine employee access, internal technical operations, or criminal referrals. The question is whether disclosure is "necessarily incident" to protecting the provider's rights or property. X says this lawsuit protects its rights; the withheld content proves or disproves those rights; it is therefore "necessarily incident" to protecting them.

X's bystander-provider cases address a different posture. *O'Grady*, *AOL,* and *Suraju* involved subpoenas to third-party service providers with no stake in the underlying dispute and no applicable statutory exception. *O'Grady*, 139 Cal. App 4th at 1430; *AOL*, 550 F. Supp. 2d at 608; *Suraju v. Yahoo!, Inc.*, 2022 WL 3365086, at *4 (N.D. Cal. July 13, 2022); *see also In re Subpoena Duces Tecum to AOL*, LLC, 550 F. Supp. 2d 606 (E.D. Va. 2008) (same). They stand only for the uncontroversial point that the SCA has no general civil-subpoena exception. They do not decide what happens when the platform is the plaintiff, the evidence is in its possession or control, and § 2702(b)(3) or § 2702(b)(5) permits disclosure.

X's final textual argument is that "necessarily" in § 2702(b)(5) "demands a direct connection between provider disclosure and the service rendered or the right protected." ECF 293 at 23. Congress used the disjunctive "or": "necessarily incident to the rendition of the service *or* to the protection of the rights or property of the provider." X reads both prongs as one, requiring that disclosure relate to platform operations. But that cannot be so because that reading erases the second prong entirely, a result no canon of construction permits.

**V.    X's litigation conduct and selective disclosures confirm disclosure is appropriate.**

When X sued Defendants on November 20, 2023, X knew about the SCA. It has been in the books since 1986. X is a sophisticated tech company, and litigation concerning the platform's content is nothing new to it. *See, e.g.*, *Harris*, 949 N.Y.S.2d at 595 (SCA dispute involving Twitter); *Twitter*, Inc., 2018 WL 833085, at *2 (same); *Martin*, 2015 WL 4463934, at *4 (same). And, for years, X litigated this case without treating the SCA as a barrier to discovery. The following table shows how X—for years—produced hundreds of thousands of documents and included only 0–3 SCA-redacted documents. Suddenly, in 2026, X produced far fewer documents than it had produced in 2024–2025, and yet included *hundreds* of SCA-redacted documents.

| X's SCA Redactions Over Time | | | |
|---|---|---|---|
| **Year** | **2024** | **2025** | **2026** |
| **X Prod Volumes** | 1–9 | 10–37 | 38–50 |
| **Total Documents** | 72,866 | 310,942 | 270,240 |
| **Documents with SCA Redactions** | 0 | 3 | 425 |

*X invokes the SCA to block the same discovery X freely produced for years*. X's litigation conduct leaves room for only two interpretations. Either X spent years ignoring its alleged "statutory obligation to protect the people who entrust their communications to the platform,"

despite the threat of steep civil penalties, or its SCA arguments are, as Defendants have explained, "self-interested obstruction." ECF 293 at 9.[10]

The timeline speaks for itself. X sued to protect its rights and reputation. It then responded to discovery requests about user content, briefed disputes about user content, and produced thousands of documents containing user content, all without once mentioning the SCA. For example, X asserted no SCA objection to Defendants' Request for Production 25 on June 12, 2024, which sought communications relating to user accounts. App.394. X briefed the RFP 25 dispute without raising the SCA. ECF 121 at 12–13. The Court ordered production on January 3, 2025, again with no SCA objection. ECF 135. Not a word.

**November 20, 2023 through April 24, 2025:** _Zero SCA redactions_. X served its first 16 productions, totaling 198,624 documents, without a single SCA redaction. Those productions included thousands of unredacted screenshots, summaries, and descriptions of user content that X now claims the SCA protects, including content from RFP 79 accounts. For, example, XCORP_0296736, in X's 8th Production served on November 16, 2024. It is a post by @Paddy_Whiteman, an account Hananoki followed, App.406, and that X permanently suspended on November 20, 2023.

**April 25, 2025:** _X redacts one document for SCA, paired with privilege_. A year and five months after suing, X redacted **one** document out of 29,902 in its 17th production. App.233–23. Every SCA redaction in that document, XCORP_1147275, was paired with an attorney-client

---

[10] X is estopped from disclaiming the very statutory exception it has been silently invoking for years. The necessary inference from X's litigation conduct is that X was relying on § 2702(b)(5)'s provider-protection exception, which permits disclosure. X cannot now disclaim the exception merely because the discovery has turned unfavorable. Once a § 2702(b) exception applies, the provider may not wield the SCA as a freestanding veto over valid discovery; instead, "disclosure requirements imposed by other law"—here, Rule 34—govern production. _Facebook, Inc. v. Pepe_, 241 A.3d 248, 258 (D.C. 2020); _Hunter_, 4 Cal. 5th at 1272.

privilege redaction. App.421.[11]

**April 26, 2025 through July 27, 2025:** *Zero SCA redactions.* X produced 59,965 more documents, none with SCA redactions. But those volumes contained screenshots, summaries, and descriptions of user content X now claims the SCA protects. For example, @Nudecaquofetasa's post selling "█████████████████████████████████████████████" produced by X on September 5, 2025 from an account that no longer exists on X's platform. App.423–33.

**July 28, 2025:** *X redacts what it already gave the press*. The first time X redacted solely on SCA grounds,[12] without also claiming privilege, was its 25th production, a **year and eight months** after X sued Defendants over user content on its platform. ECF 261-2 at Appx. 023–24. The two redacted documents ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

X says it was not relying on the § 2702(b)(5) exception for having made that disclosure to reporters. ECF at 18, 20. Instead X relies on the public post exception and now says that the redactions in its productions to Defendants were made in error because "the underlying post remains publicly accessible on X's platform." ECF 277 at 20. But the relevant @pepdownunder

---

[11] Defendants' briefing in ECF 261-1 correctly identified X's 25th production as the first production that included redactions premised solely on the SCA. *Id*. at 8. On closer inspection, Defendants also identified XCORP_1147275, which contains a tab with several redactions that say: "Redacted - AC Privilege **and SCA**." (emphasis added). App.421.

[12] X's explanation for the egregious delay in asserting an SCA objection is that "[a]lthough X had previously made productions in this case, it was only upon collecting documents responsive to RFP No. 25 that X recognized the production would include material implicating the SCA: internal records containing the substance of specific users' posts, disclosure of which could expose X to civil liability under 18 U.S.C. § 2707." ECF 277 at 7. But that explanation is puzzling at best because X had implemented SCA redactions in XCORP_1147275 as part of its **17th production**.

post does not remain publicly accessible. As support for its claim that the "underlying post remains publicly accessible," X points to a post by Nancy Levine Stearns—the reporter—that reproduced a post by @pepedownunder. *See id*. at n.7. But Stearns is the reporter. *Id*. at n.6. The "███████ ███" X discussed ██████████ are not Stearns' reports on pro-Nazi content—they are ██████ ████████████████. And the @pepedownunder post X cites as proof the content is "publicly accessible" (ECF 277 at n.7) no longer exists on X's platform.[13]

**May 28, 2025:** *X first objects in writing*. X raised the SCA as a barrier to production for the first time in a letter responding to Defendants' RFP 79, 525 days after filing a lawsuit about user content, and after producing thousands of documents depicting that content. App.435–38.

**January 9, 2026:** *X begins redacting heavily*. X did not implement SCA redactions liberally until its 38th production. Many of those belated redactions covered content X had already produced unredacted. For example, XCORP_1871423 redacts the handle of a post that appeared next to a Jack in the Box ad on November 10, 2023. App.440–49. But X had already produced that ████████ post next to the Jack in the Box ad—without redactions to the handle or any part of the post. *See* ECF 261-2 at App. 124–30. Examples like that are legion. App.452–856.

X's inconsistent conduct, untimely SCA objections, and shifting explanations for redacting information it once shared publicly with reporters suggest X itself did not—until very recently—believe it could use the SCA as a discovery shield. The simplest explanation is that the SCA cannot be used that way.

## CONCLUSION

For the foregoing reasons, the Court should overrule X's SCA-based objections and compel production of documents responsive to RFP 79.

---

[13] https://x.com/pepedownunder

Dated: May 11, 2026.                          Respectfully submitted,

                                              */s/  Alexandra Foulkes Grafton*
                                              Richard B. Roper, III
                                              VARTABEDIAN HESTER & HAYNES LLP
                                              301 Commerce St., Suite 2200
                                              Fort Worth, Texas 76102
                                              Telephone: (817) 309-9092
                                              richard.roper@vhh.law

                                              Justin A. Nelson
                                              State Bar No. 24034766
                                              Matthew Behncke
                                              State Bar No. 24069355
                                              Alexandra Foulkes Grafton *(admitted PHV)*
                                              SUSMAN GODFREY L.L.P.
                                              1000 Louisiana Street, Suite 5100
                                              Houston, Texas 77002-5096
                                              Telephone:  (713) 651-9366
                                              Fax:  (713) 654-6666
                                              jnelson@susmangodfrey.com
                                              mbehncke@susmangodfrey.com
                                              afoulkesgrafton@susmangodfrey.com

                                              Katherine M. Peaslee
                                              SUSMAN GODFREY L.L.P.
                                              401 Union Street, Suite #3000
                                              Seattle, WA 98101
                                              Telephone:  (206) 516-3880
                                              Facsimile:  (206) 505-3811
                                              kpeaslee@susmangodfrey.com

                                              Dwight P. Bostwick
                                              Shawn P. Naunton
                                              ZUCKERMAN SPAEDER LLP
                                              485 Madison Ave., 19th Floor
                                              New York, NY 10022
                                              Telephone: (212) 704-9600
                                              Facsimile: (202) 822-8106
                                              dbostwick@zuckerman.com
                                              snaunton@zuckerman.com

                                              *Attorneys for Defendants*
                                              *Media Matters for America,*
                                              *Angelo Carusone, and*
                                              *Eric Hananoki*

26

## CERTIFICATE OF SERVICE

I certify that on May 11, 2026, a true and correct copy of the foregoing was properly served on counsel of record via electronic filing in accordance with the USDC, Northern District of Texas Procedures for Electronic Filing

*/s/ Alexandra Foulkes Grafton*
Alexandra Foulkes Grafton