UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| X CORP., a Nevada corporation,<br><br>    Plaintiff,<br><br>    v.<br><br>MEDIA MATTERS FOR AMERICA, a Washington, D.C. non-profit corporation, ERIC HANANOKI, and ANGELO CARUSONE,<br><br>    Defendants. | Case No. 4:23-cv-01175-O<br>FILED UNDER SEAL |

## APPENDIX OF EXHIBITS ACCOMPANYING DEFENDANTS' OPPOSITION TO X'S SCA SUPPLEMENT

Pursuant to Local Rule 7.1(i), Defendants Media Matters for America, Eric Hananoki, and Angelo Carusone attach this Appendix of Exhibits Accompanying Defendants' Opposition to X's SCA Supplement:

| Exhibit | Description | Appendix Page Number |
|---|---|---|
| 1 | X's Terms of Service | 1 |
| 2 | Snap Inc.'s Petition for Review, filed August 5, 2024, Supreme Court of California, Case No. S286267 | 22 |
| 3 | Petitioner Snap Inc.'s Reply Brief, filed January 24, 2025, Supreme Court of California, Case No. S286267 | 119 |
| 4 | X's Privacy Policy | 161 |
| 5 | Captures of 15 X Accounts from Request for Production 79 | 176 |
| 6 | Plaintiff's Responses and Objections to Defendant's First Set of Requests for Productions, dated June 12, 2024. | 376 |
| 7 | XCORP_0296736, marked Confidential | 398 |
| 8 | XCORP_1147275, marked Highly Confidential - Attorneys' Eyes Only | 420 |
| 9 | XCORP_1205352, marked Highly Confidential - Attorneys' Eyes Only | 422 |

| Exhibit | Description | Appendix Page Number |
|---------|-------------|---------------------|
| 10 | Letter from Plaintiff's Counsel to Defendants' Counsel, dated May 28, 2025 | 434 |
| 11 | XCORP_1871423, marked Highly Confidential - Attorneys' Eyes Only | 439 |
| 12 | XCORP_0172179, marked Confidential | 451 |
| 13 | XCORP_2136240, marked Highly Confidential - Attorneys' Eyes Only | 459 |
| 14 | XCORP_2060872, marked Highly Confidential - Attorneys' Eyes Only | 619 |
| 15 | XCORP_1932712, marked Confidential | 829 |
| 16 | XCORP_1932705, marked Confidential | 838 |
| 17 | XCORP_2900983, marked Confidential | 846 |
| 18 | XCORP_1936357, marked Confidential | 849 |
| 19 | XCORP_0497370, marked Confidential | 851 |
| 20 | XCORP_1927949, marked Confidential | 854 |

Dated: May 11, 2026.                    Respectfully submitted,

*/s/  Alexandra Foulkes Grafton*
Richard B. Roper, III
VARTABEDIAN HESTER & HAYNES LLP
301 Commerce St., Suite 2200
Fort Worth, Texas 76102
Telephone: (817) 309-9092
richard.roper@vhh.law

Justin A. Nelson
State Bar No. 24034766
Matthew Behncke
State Bar No. 24069355
Alexandra Foulkes Grafton *(admitted PHV)*
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone:  (713) 651-9366
Fax:  (713) 654-6666
jnelson@susmangodfrey.com
mbehncke@susmangodfrey.com
afoulkesgrafton@susmangodfrey.com

Katherine M. Peaslee
SUSMAN GODFREY L.L.P.
401 Union Street, Suite #3000

Seattle, WA 98101
Telephone:  (206) 516-3880
Facsimile:  (206) 505-3811
kpeaslee@susmangodfrey.com

Dwight P. Bostwick
Shawn P. Naunton
ZUCKERMAN SPAEDER LLP
485 Madison Ave., 19th Floor
New York, NY 10022
Telephone: (212) 704-9600
Facsimile: (202) 822-8106
dbostwick@zuckerman.com
snaunton@zuckerman.com

*Attorneys for Defendants*
*Media Matters for America,*
*Angelo Carusone, and*
*Eric Hananoki*

## CERTIFICATE OF SERVICE

I certify that on May 11, 2026, a true and correct copy of the foregoing was properly served on counsel of record via electronic filing in accordance with the USDC, Northern District of Texas Procedures for Electronic Filing.

*/s/ Alexandra Foulkes Grafton*
Alexandra Foulkes Grafton

# EXHIBIT 1



# X Terms of Service

## Summary of our Terms

These Terms of Service ("Terms") are part of the User Agreement – a legally binding contract governing your use of X. **You should read these Terms of Service ("Terms") in full, but here are a few key things you should take away:**

- **You will see advertising on the platform:** In exchange for accessing the Services, X and our third-party providers and partners may display advertising to you.

- **When posting Content and otherwise using the Services, you must comply with this User Agreement and Applicable Law:** You are responsible for your use of the Services and your Content. You must comply with this User Agreement, its incorporated policies, and all applicable laws.

- **You must abide by the Services' acceptable use terms:** You may not access the Services in any way other than through the currently available, published interfaces that we provide. For example, this means that you cannot scrape the Services without X's express written permission, try to work around any technical limitations we impose, or otherwise attempt to disrupt the operation of the Services.

- **We have broad enforcement rights:** X reserves the right to take enforcement actions against you if you do violate these terms, such as, for example, removing your Content, limiting visibility, discontinuing your access to X, or taking legal action. We may also suspend or terminate your account for other reasons, such as prolonged inactivity, risk of legal exposure, or commercial inviability.

- **There are Intellectual Property Licenses in these Terms:** You retain ownership and rights to any of your Content you post or share, and you provide us with a broad, royalty-free license to make your Content available to the rest of the world and to let others do the same. Conversely, we provide you a license to use the software we provide as part of the Services, such as the X mobile application, solely for the purpose of enabling you to use and enjoy the benefit of the Services.

- **Your use of the Services is at your own risk:** We provide the Services on an "AS IS" and "AS AVAILABLE" basis, and we disclaim all warranties, responsibility, and liability to you or

App. 002



others to the extent permitted by law. You may be exposed to offensive or harmful content posted by other users. The Services may change from time to time, and we may limit or terminate availability of the Services or particular features to you or other users at any time.

- **You have remedies and redress mechanisms, but our liability is limited:** You have a right to terminate this agreement at any time by deactivating your account and discontinuing use of the Services. Note that we will not be liable for certain types of damages as described in the agreement, and in any event, our aggregate liability shall not exceed the greater of $100 USD or the amount you paid us, if any, in the past six months for the Services giving rise to the claim. Further, if you believe that your Content has been copied in a way that constitutes copyright infringement, the reporting process is detailed in these Terms. If you are a recipient of the X Service in the European Union, you may challenge certain decisions we make under the Digital Services Act (Regulation (EU) 2022/2065) via our internal process or via out-of-court dispute settlement as described here.

Please also note that these Terms incorporate our Privacy Policy (https://x.com/privacy) as well as other terms applicable to your use of the Services and your Content. Finally, these Terms may vary depending on where you live, but in any case, you must be at least 13 years old to use X.

---

**If you live outside the European Union, EFTA States, or the United Kingdom, including if you live in the United States,** the X User Agreement comprises these Terms of Service, our Privacy Policy, our Rules and Policies, and all incorporated policies.

**If you live in the European Union, EFTA States, or the United Kingdom,** the X User Agreement comprises these Terms of Service, our Privacy Policy, our Rules and Policies, and all incorporated policies.

---

# X Terms of Service

## If you live outside the European Union, EFTA States, or the United Kingdom, including if you live in the United States

These Terms of Service ("Terms") govern your and other users' access to and use of our services, including our various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, commerce services, and our other covered services

App. 003

X

([https://help.x.com/rules-and-policies/x-services-and-corporate-affiliates](https://help.x.com/rules-and-policies/x-services-and-corporate-affiliates)) that link to these Terms (collectively, the "Services"), and any information, text, links, graphics, photos, audio, videos, or other materials or arrangements of materials uploaded, downloaded or appearing on the Services (collectively referred to as "Content"). By using the Services you agree to be bound by these Terms.

These Terms are an agreement between you and X Corp., which provides X and the Services, with its registered office at 865 FM 1209, Building 2, Bastrop, TX 78602 U.S.A. The words "we," "us," and "our" mean X Corp.

# 1. Who May Use the Services

You may use the Services only if you agree to form a binding contract with us and are not a person barred from receiving services under the laws of the applicable jurisdiction. In any case, you must be at least 13 years old to use the Services. If you are (i) accepting these Terms and/or using the Services, which constitutes acceptance of these Terms, or (ii) accepting these Terms in order to authorize the use of the Services on behalf of a minor (being any person under the age of majority in any given country), company, organization, government, or other legal entity, you represent and warrant that you are authorized to do so or, as the case may be, have the authority to bind such minor and/or entity to these Terms. The words "you" and "your" as used in these Terms shall refer either to the person accepting these Terms or such minor (as defined in (i)) and/or the entity referenced in (ii), as applicable.

# 2. Privacy

Our Privacy Policy ([https://x.com/privacy](https://x.com/privacy)) describes how we handle the information you provide to us when you use the Services. You understand that through your use of the Services you consent to the collection and use (as set forth in the Privacy Policy) of this information, including the transfer of this information to the United States, Ireland, and/or other countries for storage, processing and use by us and our affiliates.

# 3. Content on the Services

You are responsible for your use of the Services and for any Content you provide, including compliance with applicable laws, rules, and regulations. You should only provide Content that you are comfortable sharing with others.

App. 004



Any use or reliance on any Content or materials posted via the Services or obtained by you through the Services is at your own risk. We do not endorse, support, represent or guarantee the completeness, truthfulness, accuracy, or reliability of any Content or communications posted via the Services or endorse any alleged facts or opinions expressed via the Services. You understand that by using the Services, you may be exposed to Content that might be offensive, harmful, inaccurate or otherwise inappropriate, or in some cases, postings that have been mislabeled or are otherwise deceptive. All Content is the sole responsibility of the person who originated such Content. We may not monitor or control the Content posted via the Services and, we cannot take responsibility for such Content.

We reserve the right to remove Content that violates the User Agreement, including for example, copyright or trademark violations or other intellectual property misappropriation, impersonation, unlawful conduct, or harassment. Information regarding specific policies and the process for reporting or appealing violations can be found in our Help Center (https://help.x.com/rules-and-policies/x-report-violation#specific-violations and https://help.x.com/managing-your-account/suspended-x-accounts).

If you believe that your Content has been copied in a way that constitutes copyright infringement, please report this by visiting our Copyright reporting form (https://help.x.com/forms/dmca) or contacting our designated copyright agent at:

X Corp.
Attn: Copyright Agent
865 FM 1209, Building 2
Bastrop, TX 78602
Reports: https://help.x.com/forms/dmca
Email: copyright@x.com

## Your Rights and Grant of Rights in the Content

You retain your rights to any Content you submit, post or display on or through the Services. What's yours is yours — you own your Content (and your incorporated audio, photos and videos are considered part of the Content).

By submitting, posting or displaying Content on or through the Services, you grant us a worldwide, non-exclusive, royalty-free license (with the right to sublicense) to use, copy, reproduce, process, adapt, modify, publish, transmit, display, upload, download, and distribute such Content in any and all media or distribution methods now known or later developed, for any purpose. For clarity, these rights include, for example, curating, transforming, and translating. This license authorizes us to make your Content available to the rest of the world and to let others do the same. You agree that

App. 005

this license includes the right for us to (i) analyze text and other information you provide and to otherwise provide, promote, and improve the Services, including, for example, for use with and training of our machine learning and artificial intelligence models, whether generative or another type; and (ii) to make Content submitted to or through the Services available to other companies, organizations or individuals, including, for example, for improving the Services and the syndication, broadcast, distribution, repost, promotion or publication of such Content on other media and services, subject to our terms and conditions for such Content use. Such additional uses by us, or other companies, organizations or individuals, is made with no compensation paid to you with respect to the Content that you submit, post, transmit or otherwise make available through the Services as the use of the Services by you is hereby agreed as being sufficient compensation for the Content and grant of rights herein.

We have an evolving set of rules for how ecosystem partners can interact with your Content on the Services. These rules exist to enable an open ecosystem with your rights in mind. You understand that we may modify or adapt your Content as it is distributed, syndicated, published, or broadcast by us and our partners and/or make changes to your Content in order to adapt the Content to different media.

You represent and warrant that you have, or have obtained, all rights, licenses, consents, permissions, power and/or authority necessary to grant the rights granted herein for any Content that you submit, post or display on or through the Services. You agree that such Content will not contain material subject to copyright or other proprietary rights, unless you have necessary permission or are otherwise legally entitled to post the material and to grant us the license described above.

# 4. Using the Services

Please review our Rules and Policies, which are part of the User Agreement and outline conduct that is prohibited on the Services. You may use the Services only in compliance with these Terms and all applicable laws, rules and regulations. X takes enforcement actions when Content or user behavior is in violation of our Rules and Policies or in relation to sensitive media. You can review X's enforcement options and how you can appeal our enforcement decision here.

The Services evolve constantly. As such, the Services may change from time to time, at our discretion. We may stop (permanently or temporarily) providing the Services or any features within the Services to you or to users generally. We also retain the right to create limits on use and storage at our sole discretion at any time. We may also remove or refuse to distribute any Content on the Services, limit distribution or visibility of any Content on the service, suspend or terminate users, and reclaim usernames without liability to you.

App. 006

X

In consideration for our granting you access to and use of the Services, you agree that we and our third-party providers and partners may place advertising on the Services or in connection with the display of Content or information from the Services whether submitted by you or others. We also reserve the right to access, read, preserve, and disclose any information as we reasonably believe is necessary to (i) satisfy any applicable law, regulation, legal process or governmental request; (ii) enforce the Terms, including investigation of potential violations hereof; (iii) detect, prevent, or otherwise address fraud, security or technical issues; (iv) respond to user support requests; or (v) protect the rights, property or safety of X, its users and the public. We do not disclose personally-identifying information to third parties except in accordance with our Privacy Policy.

Certain services or features may be offered on X for which additional terms and conditions may apply in connection with your use of those services. By using or paying for any of these additional services, you agree to any additional terms applicable to those services, and those additional terms become part of our agreement with you. If any of the applicable additional terms conflict with these Terms, the additional terms will prevail while you are using those services to which they apply.

If you use paid features of the Services, you agree to the applicable Terms for Paid Services (https://legal.x.com/purchaser-terms.html).

If you use developer features of the Services, including but not limited to X for Websites (https://developer.x.com/docs/x-for-websites), X Cards (https://developer.x.com/docs/x-for-websites/cards/overview/abouts-cards), Public API (https://developer.x.com/docs), or Sign in with X (https://docs.x.com/resources/fundamentals/authentication/guides/log-in-with-x), you agree to our Developer Agreement (https://developer.x.com/developer-terms/agreement) and Developer Policy (https://developer.x.com/developer-terms/policy). If you want to reproduce, modify, create derivative works, distribute, sell, transfer, publicly display, publicly perform, transmit, or otherwise use the Services or Content on the Services, you must use the interfaces and instructions we provide, except as permitted through the Services, these Terms, or the terms provided on https://developer.x.com/developer-terms. Otherwise, all such actions are strictly prohibited. If you are a security researcher, you are required to comply with the rules of our Vulnerability Reporting Program (https://hackerone.com/x). The requirements set out in the preceding paragraph may not apply to those participating in our Vulnerability Reporting Program.

If you use advertising features of the Services, you agree to our Master Services Agreement (https://ads.x.com/terms).

App. 007



## Your Account

You may need to create an account to use the Services. You are responsible for safeguarding your account, so use a strong password and limit its use to this account, and use two-factor authentication via an authenticator app or security key. We cannot and will not be liable for any loss or damage arising from your failure to comply with the above.

You can control most communications from the Services. We may need to provide you with certain communications, such as service announcements and administrative messages. These communications are considered part of the Services and your account, and you may not be able to opt-out from receiving them. If you added your phone number to your account and you later change or deactivate that phone number, you must update your account information to help prevent us from communicating with anyone who acquires your old number.

## Your License to Use the Services

We give you a personal, worldwide, royalty-free, non-assignable and non-exclusive license to use the software provided to you as part of the Services. This license cannot be assigned, gifted, sold, shared or transferred in any other manner to any other individual or entity without X's express written consent. This license has the sole purpose of enabling you to use and enjoy the benefit of the Services as provided on X, in the manner permitted by these Terms.

The Services are protected by copyright, trademark, and other laws of both the United States and other countries. Nothing in the Terms gives you a right to use the X name or any of the X trademarks, logos, domain names, other distinctive brand features, and other proprietary rights. All right, title, and interest in and to the Services (excluding Content provided by users) are and will remain our and our licensors' exclusive property. Any feedback, comments, or suggestions you may provide regarding X, or the Services is entirely voluntary and we will be free to use such feedback, comments or suggestions as we see fit and without any obligation to you.

## Misuse of the Services

You also agree not to misuse the Services, for example, by interfering with them or accessing them using a method other than the interface and the instructions that we provide. You agree that you will not work around any technical limitations in the software provided to you as part of the Services, or reverse engineer, decompile or disassemble the software, except and only to the extent that applicable law expressly permits. You may not do any of the following while accessing or using the Services: (i) access, tamper with, or use non-public areas of the Services, our computer systems, or the technical delivery systems of our providers; (ii) probe, scan, or test the vulnerability of any

App. 008



system or network or breach or circumvent any security or authentication measures; (iii) access or search or attempt to access or search the Services by any means (automated or otherwise) other than through our currently available, published interfaces that are provided by us (and only pursuant to the applicable terms and conditions), unless you have been specifically allowed to do so in a separate agreement with us (NOTE: crawling or scraping the Services in any form, for any purpose without our prior written consent is expressly prohibited); (iv) forge any TCP/IP packet header or any part of the header information in any email or posting; (v) in any way use the Services to send altered, deceptive or false source-identifying information; (vi) engage in any conduct that violates our Platform Manipulation and Spam Policy or any other Rules and Policies, including our Misuse of Reporting Features Policy; or (vii) interfere with, or disrupt, (or attempt to do so), the access of any user, host or network, including, without limitation, sending a virus, overloading, flooding, spamming, mail-bombing the Services, or by scripting the creation of Content in such a manner as to interfere with or create an undue burden on the Services. It is also a violation of these Terms to facilitate or assist others in violating these Terms, including by distributing products or services that enable or encourage violation of these Terms.

## Ending These Terms

You may end your legal agreement with us at any time by deactivating your accounts and discontinuing your use of the Services. See https://help.x.com/managing-your-account/how-to-deactivate-x-account for instructions on how to deactivate your account and the Privacy Policy for more information on what happens to your information.

We may suspend or terminate your account or cease providing you with all or part of the Services at any time if we reasonably believe: (i) you have violated these Terms or our Rules and Policies, (ii) you create risk or possible legal exposure for us; (iii) your account should be removed due to unlawful conduct; (iv) your account should be removed due to prolonged inactivity; or (v) our provision of the Services to you is no longer commercially viable. We will make reasonable efforts to notify you by the email address associated with your account or the next time you attempt to access your account, depending on the circumstances. To the extent permitted by law, we may also terminate your account or cease providing you with all or part of the Services for any other reason or no reason at our convenience. In all such cases, the Terms shall terminate, including, without limitation, your license to use the Services, except that the following sections shall continue to apply: 2, 3, 5, 6, and the misuse provisions of Section 4 ("Misuse of the Services"). If you believe your account was terminated in error you can file an appeal following the steps found in our Help Center (https://help.x.com/forms/account-access/appeals). For the avoidance of doubt, these Terms survive the deactivation or termination of your account.

App. 009

# 5. Disclaimers and Limitations of Liability

## The Services are Available "AS-IS"

Your access to and use of the Services or any Content are at your own risk. You understand and agree that the Services are provided to you on an "AS IS" and "AS AVAILABLE" basis. The "X Entities" refers to X Corp., its parents, affiliates, related companies, officers, directors, employees, agents, representatives, partners, and licensors. Without limiting the foregoing, to the maximum extent permitted under applicable law, THE X ENTITIES DISCLAIM ALL WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NON-INFRINGEMENT. The X Entities make no warranty or representation and disclaim all responsibility and liability for: (i) the completeness, accuracy, availability, timeliness, security or reliability of the Services or any Content; (ii) any harm to your computer system, loss of data, or other harm that results from your access to or use of the Services or any Content; (iii) the deletion of, or the failure to store or to transmit, any Content and other communications maintained by the Services; and (iv) whether the Services will meet your requirements or be available on an uninterrupted, secure, or error-free basis. No advice or information, whether oral or written, obtained from the X Entities or through the Services, will create any warranty or representation not expressly made herein.

## Limitation of Liability

NOTWITHSTANDING ANY OTHER TERMS TO THE CONTRARY, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THE X ENTITIES SHALL NOT BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES, RELIANCE OR ANY LOSS OF PROFITS OR REVENUES, WHETHER INCURRED DIRECTLY OR INDIRECTLY, OR ANY LOSS OF DATA, USE, GOODWILL, OR OTHER INTANGIBLE LOSSES, RESULTING FROM (i) YOUR ACCESS TO OR USE OF OR INABILITY TO ACCESS OR USE THE SERVICES; (ii) ANY CONDUCT OR CONTENT OF ANY USER OR THIRD PARTY ON THE SERVICES, INCLUDING WITHOUT LIMITATION, ANY DEFAMATORY, OFFENSIVE OR ILLEGAL CONDUCT OF OTHER USERS OR THIRD PARTIES; (iii) ANY CONTENT OBTAINED FROM THE SERVICES; OR (iv) UNAUTHORIZED ACCESS, USE OR ALTERATION OF YOUR TRANSMISSIONS OR CONTENT. IN NO EVENT SHALL THE AGGREGATE LIABILITY OF THE X ENTITIES EXCEED THE GREATER OF ONE HUNDRED U.S. DOLLARS (U.S. $100.00) OR THE AMOUNT YOU PAID US, IF ANY, IN THE PAST SIX MONTHS FOR THE SERVICES GIVING RISE TO THE CLAIM. THE LIMITATIONS OF THIS SUBSECTION SHALL APPLY TO ANY THEORY OF LIABILITY, WHETHER BASED ON WARRANTY, CONTRACT, STATUTE, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, AND WHETHER OR NOT THE X ENTITIES HAVE BEEN INFORMED OF THE POSSIBILITY OF ANY SUCH DAMAGE, AND EVEN IF A REMEDY SET FORTH HEREIN IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE.

𝕏

BY AGREEING TO THESE TERMS OR USING THE SERVICES, YOU AGREE, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, THAT THE X ENTITIES ARE NOT RESPONSIBLE OR LIABLE TO YOU OR OTHERS FOR THE ACTIONS OR CONDUCT OF USERS AND THIRD PARTIES ON THE SERVICES, OR FOR ANY CONTENT USERS AND THIRD PARTIES SHARE ON THE SERVICES, INCLUDING OFFENSIVE, DEFAMATORY, ILLEGAL OR OTHER OBJECTIONABLE CONTENT.

## Liquidated Damages

Protecting our users' data and our system resources is important to us. You further agree that, to the extent permitted by applicable law, if you violate the Terms, or you induce or facilitate others to do so, in addition to all other legal remedies available to us, you will be jointly and severally liable to us for liquidated damages as follows for requesting, viewing, or accessing more than 1,000,000 posts (including reply posts, video posts, image posts, and any other posts) in any 24-hour period - $15,000 USD per 1,000,000 posts. You agree that these amounts are (i) a reasonable estimate of our damages; (ii) not a penalty; and (iii) not otherwise limiting of our ability to recover from you or others under any legal or equitable theory or claim, including but not limited to statutory damages and/or equitable relief. You further agree that repeated violations of these Terms will irreparably harm and entitle us to injunctive and/or other equitable relief, in addition to monetary damages.

# 6. General

We may revise these Terms from time to time. The changes will not be retroactive, and the most current version of the Terms, which will always be at https://x.com/tos, will govern our relationship with you. We will try to notify you of material revisions, for example via a service notification or an email to the email associated with your account. By continuing to access or use the Services after those revisions become effective, you agree to be bound by the revised Terms.

The laws of the State of Texas, excluding its choice of law provisions, will govern these Terms and any dispute that arises between you and us, notwithstanding any other agreement between you and us to the contrary. All disputes related to these Terms or the Services, including without limitation disputes related to or arising from other users' and third parties' use of the Services and any Content made available by other users and third parties on the Services, will be brought exclusively in the U.S. District Court for the Northern District of Texas or state courts located in Tarrant County, Texas, United States, and you consent to personal jurisdiction in those forums and waive any objection as to inconvenient forum. Without prejudice to the foregoing, you agree that, in its sole discretion, X may bring any claim, cause of action, or dispute we have against you in any competent court in the country in which you reside that has jurisdiction and venue over the claim. To the extent permitted by law, you also waive the right to participate as a plaintiff or class member in any

App. 011

𝕏

purported class action, collective action or representative action proceeding.

If you are a federal, state, or local government entity in the United States using the Services in your official capacity and legally unable to accept the controlling law, jurisdiction or venue clauses above, then those clauses do not apply to you. For such U.S. federal government entities, these Terms and any action related thereto will be governed by the laws of the United States of America (without reference to conflict of laws) and, in the absence of federal law and to the extent permitted under federal law, the laws of the State of Texas (excluding choice of law).

You and X agree that you must initiate any proceeding or action within one (1) year of the date of the occurrence of the event or facts giving rise to a dispute that is arising out of or related to these Terms. Otherwise, to the extent permitted by applicable law, you forever waive the right to pursue any claim or cause of action, of any kind or character, based on such events or facts, and such claims or causes of action are permanently barred.

In the event that any provision of these Terms is held to be invalid or unenforceable, then that provision will be limited or eliminated to the minimum extent necessary, and the remaining provisions of these Terms will remain in full force and effect. Our failure to enforce any right or provision of these Terms will not be deemed a waiver of such right or provision.

The X User Agreement is written in English but is made available in multiple languages through translations. X strives to make the translations as accurate as possible to the original English version. However, in case of any discrepancies or inconsistencies, the English language version of the X User Agreement shall take precedence. You acknowledge that English shall be the language of reference for interpreting and constructing the terms of the X User Agreement.

If you have any questions about these Terms, please contact us.

**Effective:** November 15, 2024

Archive of Previous Terms

App. 012

# X Terms of Service

## If you live in the European Union, EFTA States, or the United Kingdom

These Terms of Service ("Terms") govern your and other users' access to and use of the services, including our various websites, SMS, APIs, email notifications, applications, buttons, widgets, ads, commerce services, and our other covered services (https://help.x.com/rules-and-policies/x-services-and-corporate-affiliates) that link to these Terms (collectively, the "Services"), and any information, text, links, graphics, photos, audio, videos, or other materials or arrangements of materials uploaded, downloaded or appearing on the Services (collectively referred to as "Content"). By using the Services you agree to be bound by these Terms.

These Terms are an agreement between you and X Internet Unlimited Company (Co. number 503351, VAT number IE9803175Q), an Irish company, which provides X and the Services, with its registered office at One Cumberland Place, Fenian Street Dublin 2, D02 AX07 Ireland. The words "we," "us," and "our," mean X Internet Unlimited Company.

---

# 1. Who May Use the Services

You may use the Services only if you agree to form a binding contract with us and are not a person barred from receiving services under the laws of the applicable jurisdiction. In any case, you must be at least 13 years old to use the Services. If you are (i) accepting these Terms and/or using the Services, which constitutes acceptance of these Terms, or (ii) accepting these Terms in order to authorize the use of the Services on behalf of a minor (being any person under the age of majority in any given country), company, organization, government, or other legal entity, you represent and warrant that you are authorized to do so or, as the case may be, have the authority to bind such minor and/or entity to these Terms. The words "you" and "your" as used in these Terms shall refer either to the person accepting these Terms or such minor (as defined in (i)) and/or the entity referenced in (ii), as applicable.

# 2. Privacy

Our Privacy Policy (https://x.com/privacy) describes how we handle the information you provide to us when you use the Services. You understand that through your use of the Services you consent to

App. 013

the collection and use (as set forth in the Privacy Policy) of this information, including the transfer of this information to the United States, Ireland, and/or other countries for storage, processing and use by us and our affiliates.

# 3. Content on the Services

You are responsible for your use of the Services and for any Content you provide, including compliance with applicable laws, rules, and regulations. You should only provide Content that you are comfortable sharing with others.

Any use or reliance on any Content or materials posted via the Services or obtained by you through the Services is at your own risk. We do not endorse, support, represent or guarantee the completeness, truthfulness, accuracy, or reliability of any Content or communications posted via the Services or endorse any alleged facts or opinions expressed via the Services. You understand that by using the Services, you may be exposed to Content that might be offensive, harmful, inaccurate or otherwise inappropriate, or in some cases, postings that have been mislabeled or are otherwise deceptive. Content recommendations are made based on a combination of factors: how you engage with the Services, the topics you have indicated that you are interested in, and what other users who share your similar interests like. Adjustments can be made in your settings, and additional information can be found in our Help Center (https://help.x.com/resources/recommender-systems). All Content is the sole responsibility of the person who originated such Content. We may not monitor or control the Content posted via the Services and, we cannot take responsibility for such Content.

We reserve the right to remove Content that violates the User Agreement, including for example, copyright or trademark violations or other intellectual property misappropriation, impersonation, unlawful conduct, or harassment. Information regarding specific policies and the process for reporting or appealing violations can be found in our Help Center (https://help.x.com/rules-and-policies/x-report-violation and https://help.x.com/managing-your-account/suspended-x-accounts).

If you believe that your Content has been copied in a way that constitutes copyright infringement, please report this by visiting our Copyright reporting form (https://help.x.com/forms/dmca) or contacting our designated copyright agent at:

X Corp.
Attn: Copyright Agent
865 FM 1209, Building 2
Bastrop, TX 78602

App. 014



Reports: https://help.x.com/forms/dmca
Email: copyright@x.com

## Your Rights and Grant of Rights in the Content

You retain your rights to any Content you submit, post or display on or through the Services. What's yours is yours — you own your Content (and your incorporated audio, photos and videos are considered part of the Content).

By submitting, posting or displaying Content on or through the Services, you grant us a worldwide, non-exclusive, royalty-free license (with the right to sublicense) to use, copy, reproduce, process, adapt, modify, publish, transmit, display, upload, download, and distribute such Content in any and all media or distribution methods now known or later developed, for any purpose. For clarity, these rights include, for example, curating, transforming, and translating. This license authorizes us to make your Content available to the rest of the world and to let others do the same. However, if you have chosen via our features to limit the distribution of your Content to a restricted community, we will respect that choice. You also agree that this license includes the right to analyze text and other information you provide with the view to improve the Services. You agree that this license includes the right for us to (i) provide, promote, and improve the Services, including, for example, for use with and training of our machine learning and artificial intelligence models, whether generative or another type; and (ii) to make Content submitted to or through the Services available to other companies, organizations or individuals, including, for example, for improving the Services and the syndication, broadcast, distribution, repost, promotion or publication of such Content on other media and services, subject to our terms and conditions for such Content use. Such additional uses by us, or other companies, organizations or individuals, is made with no compensation paid to you with respect to the Content that you submit, post, transmit or otherwise make available through the Services as the use of the Services by you is hereby agreed as being sufficient compensation for the Content and grant of rights herein.

We have an evolving set of rules for how ecosystem partners can interact with your Content on the Services. These rules exist to enable an open ecosystem with your rights in mind. You understand that we may modify or adapt your Content as it is distributed, syndicated, published, or broadcast by us and our partners and/or make changes to your Content in order to adapt the Content to different media.

You represent and warrant that you have, or have obtained, all rights, licenses, consents, permissions, power and/or authority necessary to grant the rights granted herein for any Content that you submit, post or display on or through the Services. You agree that such Content will not contain material subject to copyright or other proprietary rights, unless you have necessary

App. 015

permission or are otherwise legally entitled to post the material and to grant us the license described above.

# 4. Using the Services

Please review our Rules and Policies, which are part of the User Agreement and outline conduct that is prohibited on the Services. You may use the Services only in compliance with these Terms and all applicable laws, rules and regulations. X takes enforcement actions when Content or user behavior is in violation of our Rules and Policies or in relation to sensitive media. You can review X's enforcement options and how you can appeal our enforcement decision here.

The Services evolve constantly. As such, the Services may change from time to time, at our discretion. We may stop (permanently or temporarily) providing the Services or any features within the Services to you or to users generally. We also retain the right to create limits on use and storage at our sole discretion at any time. We may also remove or refuse to distribute any Content on the Services, limit distribution or visibility of any Content on the service, suspend or terminate users, and reclaim usernames if it is appropriate, including for the following reasons: (i) protecting the Services or our users; (ii) compliance with applicable laws or orders from competent authorities; (iii) breach of these Terms or our Rules and Policies or third parties' intellectual property or other rights; (iv) if you or your Content exposes us, other users or any third party to legal or regulatory risk; and/or (v) your prolonged inactivity.

In consideration for our granting you access to and use of the Services, you agree that we and our third-party providers and partners may place advertising on the Services or in connection with the display of Content or information from the Services whether submitted by you or others. We also reserve the right to access, read, preserve, and disclose any information as we reasonably believe is necessary to (i) satisfy any applicable law, regulation, legal process or governmental request; (ii) enforce the Terms, including investigation of potential violations hereof; (iii) detect, prevent, or otherwise address fraud, security or technical issues; (iv) respond to user support requests; or (v) protect the rights, property or safety of X, its users and the public. We do not disclose personally-identifying information to third parties except in accordance with our Privacy Policy.

Certain services or features may be offered on X for which additional terms and conditions may apply in connection with your use of those services. These additional terms are accessible from our sites and applications dedicated to these services or features. By using or paying for any of these additional services, you will have to agree to any additional terms applicable to those services, and those additional terms will then also become part of our agreement with you. If any of the applicable additional terms conflict with these Terms, the additional terms will prevail while you are using those services to which they apply.

App. 016

If you use paid features of the Services, you agree to the applicable Terms for Paid Services (https://legal.x.com/purchaser-terms.html).

If you use developer features of the Services, including but not limited to X for Websites (https://developer.x.com/docs/x-for-websites), X Cards (https://developer.x.com/docs/x-for-websites/cards/overview/abouts-card), Public API (https://developer.x.com/docs), or Sign in with X (https://docs.x.com/resources/fundamentals/authentication/guides/log-in-with-x), you agree to our Developer Agreement (https://developer.x.com/developer-terms/agreement) and Developer Policy (https://developer.x.com/developer-terms/policy). If you want to reproduce, modify, create derivative works, distribute, sell, transfer, publicly display, publicly perform, transmit, or otherwise use the Services or Content on the Services, you must use the interfaces and instructions we provide, except as permitted through the Services, these Terms, or the terms provided on https://developer.x.com/developer-terms. Otherwise, all such actions are strictly prohibited. If you are a security researcher, you are required to comply with the rules of our Vulnerability Reporting Program (https://hackerone.com/x). The requirements set out in the preceding paragraph may not apply to those participating in our Vulnerability Reporting Program.

If you use advertising features of the Services, you agree to our Master Services Agreement (https://ads.x.com/terms).

## Your Account

You may need to create an account to use the Services. You are responsible for safeguarding your account, so use a strong password and limit its use to this account, and use two-factor authentication via an authenticator app or security key. We cannot and will not be liable for any loss or damage arising from your failure to comply with the above.

You can control most communications from the Services. We may need to provide you with certain communications, such as service announcements and administrative messages. These communications are considered part of the Services and your account, and you may not be able to opt-out from receiving them. If you added your phone number to your account and you later change or deactivate that phone number, you must update your account information to help prevent us from communicating with anyone who acquires your old number.

## Your License to Use the Services

We give you a personal, worldwide, royalty-free, non-assignable and non-exclusive license to use the software provided to you as part of the Services. This license cannot be assigned, gifted, sold, shared or transferred in any other manner to any other individual or entity without X's express

App. 017

written consent. This license has the sole purpose of enabling you to use and enjoy the benefit of the Services as provided on X, in the manner permitted by these Terms.

The Services are protected by copyright, trademark, and other laws of both the United States and other countries. Nothing in the Terms gives you a right to use the X name or any of the X trademarks, logos, domain names, other distinctive brand features, and other proprietary rights. All right, title, and interest in and to the Services (excluding Content provided by users) are and will remain our and our licensors' exclusive property. Any feedback, comments, or suggestions you may provide regarding X, or the Services is entirely voluntary and we will be free to use such feedback, comments or suggestions as we see fit and without any obligation to you.

## Misuse of the Services

You also agree not to misuse the Services, for example, by interfering with them or accessing them using a method other than the interface and the instructions that we provide. You agree that you will not work around any technical limitations in the software provided to you as part of the Services, or reverse engineer, decompile or disassemble the software, except and only to the extent that applicable law expressly permits. You may not do any of the following while accessing or using the Services: (i) access, tamper with, or use non-public areas of the Services, our computer systems, or the technical delivery systems of our providers; (ii) probe, scan, or test the vulnerability of any system or network or breach or circumvent any security or authentication measures; (iii) access or search or attempt to access or search the Services by any means (automated or otherwise) other than through our currently available, published interfaces that are provided by us (and only pursuant to the applicable terms and conditions), unless you have been specifically allowed to do so in a separate agreement with us (NOTE: crawling or scraping the Services in any form, for any purpose without our prior written consent is expressly prohibited); (iv) forge any TCP/IP packet header or any part of the header information in any email or posting; (v) in any way use the Services to send altered, deceptive or false source-identifying information; (vi) engage in any conduct that violates our Platform Manipulation and Spam Policy or any other Rules and Policies, including our Misuse of Reporting Features Policy; or (vii) interfere with, or disrupt, (or attempt to do so), the access of any user, host or network, including, without limitation, sending a virus, overloading, flooding, spamming, mail-bombing the Services, or by scripting the creation of Content in such a manner as to interfere with or create an undue burden on the Services. It is also a violation of these Terms to facilitate or assist others in violating these Terms, including by distributing products or services that enable or encourage violation of these Terms.

## Ending These Terms

You may end your legal agreement with us at any time by deactivating your accounts and discontinuing your use of the Services. See

X

[https://help.x.com/managing-your-account/how-to-deactivate-x-account](https://help.x.com/managing-your-account/how-to-deactivate-x-account) for instructions on how to deactivate your account and the Privacy Policy for more information on what happens to your information.

We may suspend or terminate your account or cease providing you with all or part of the Services at any time if we reasonably believe: (i) you have violated these Terms or our Rules and Policies; (ii) you create risk or possible legal exposure for us; (iii) your account should be removed due to unlawful conduct; (iv) your account should be removed due to prolonged inactivity; or (v) our provision of the Services to you is no longer commercially viable. We will make reasonable efforts to notify you by the email address associated with your account or the next time you attempt to access your account, depending on the circumstances. In all such cases, the Terms shall terminate, including, without limitation, your license to use the Services, except that the following sections shall continue to apply: 2, 3, 5, 6, and the misuse provisions of Section 4 ("Misuse of the Services"). If you believe your account was terminated in error you can file an appeal following the steps found in our Help Center ([https://help.x.com/forms/account-access/appeals](https://help.x.com/forms/account-access/appeals)). For the avoidance of doubt, these Terms survive the deactivation or termination of your account.

# 5. Limitations of Liability

By using the Services you agree that X Internet Unlimited Company, its parents, affiliates, related companies, officers, directors, employees, agents representatives, partners and licensors, liability is limited to the maximum extent permissible in your country of residence.

## Liquidated Damages

Protecting our users' data and our system resources is important to us. You further agree that, to the extent permitted by applicable law, if you violate the Terms, or you induce or facilitate others to do so, in addition to all other legal remedies available to us, you will be jointly and severally liable to us for liquidated damages as follows for requesting, viewing, or accessing more than 1,000,000 posts (including reply posts, video posts, image posts, and any other posts) in any 24-hour period - €15,000 EUR per 1,000,000 posts. You agree that these amounts are (i) a reasonable estimate of our damages; (ii) not a penalty; and (iii) not otherwise limiting of our ability to recover from you or others under any legal or equitable theory or claim, including but not limited to statutory damages and/or equitable relief. You further agree that repeated violations of these Terms will irreparably harm and entitle us to injunctive and/or equitable relief, in addition to monetary damages.

App. 019

𝕏

# 6. General

We may revise these Terms from time to time. The changes will not be retroactive, and the most current version of the Terms, which will always be at https://x.com/tos, will govern our relationship with you. Other than for changes addressing new functions or made for legal reasons, we will notify you 30 days in advance of making effective changes to these Terms that impact the rights or obligations of any party to these Terms, for example via a service notification or an email to the email associated with your account. By continuing to access or use the Services after those revisions become effective, you agree to be bound by the revised Terms.

To the extent permitted by law, all disputes related to these Terms or the Services, including without limitation disputes related to or arising from other users' and third parties' use of the Services and any Content made available by other users and third parties on the Services, will be brought exclusively before a competent court in Ireland without regard to conflict of law provisions and will be governed by Irish law, notwithstanding any other agreement between you and us to the contrary. Without prejudice to the foregoing, you agree that, in its sole discretion, X may bring any claim, cause of action, or dispute we have against you in any competent court in the country in which you reside that has jurisdiction and venue over the claim. To the extent permitted by law, you also waive the right to participate as a plaintiff or class member in any purported class action, collective action or representative action proceeding.

You and X agree that you must initiate any proceeding or action within one (1) year of the date of the occurrence of the event or facts giving rise to a dispute that is arising out of or related to these Terms. Otherwise, to the extent permitted by applicable law, you forever waive the right to pursue any claim or cause of action, of any kind or character, based on such events or facts, and such claims or causes of action are permanently barred.

In the event that any provision of these Terms is held to be invalid or unenforceable, then that provision will be limited or eliminated to the minimum extent necessary, and the remaining provisions of these Terms will remain in full force and effect. Our failure to enforce any right or provision of these Terms will not be deemed a waiver of such right or provision.

The X User Agreement is written in English but is made available in multiple languages through translations. X strives to make the translations as accurate as possible to the original English version. However, in case of any discrepancies or inconsistencies, the English language version of the X User Agreement shall take precedence. You acknowledge that English shall be the language of reference for interpreting and constructing the terms of the X User Agreement.

If you have any questions about these Terms, please contact us.

App. 020

𝕏

**Effective:** November 15, 2024

Archive of Previous Terms

---

# EXHIBIT 2

Supreme Court of California
Jorge E. Navarrete, Clerk and Executive Officer of the Court
Electronically RECEIVED on 8/5/2024 4:30:37 PM

Supreme Court of California
Jorge E. Navarrete, Clerk and Executive Officer of the Court
Electronically FILED on 8/5/2024 by Gabriela Muca, Deputy Clerk

**FILED WITH PERMISSION**

# STAY REQUESTED

## No. S286267

## IN THE SUPREME COURT OF CALIFORNIA

SNAP, INC.,
*Petitioner,*

vs.

THE SUPERIOR COURT OF THE STATE OF CALIFORNIA,
FOR THE COUNTY OF SAN DIEGO,
*Respondent,*

ADRIAN PINA et al.,
*Real Parties in Interest.*

METEA PLATFORMS, INC.,
*Petitioner,*

vs.

THE SUPERIOR COURT OF THE STATE OF CALIFORNIA,
FOR THE COUNTY OF SAN DIEGO,
*Respondent,*

ADRIAN PINA et al.,
*Real Parties in Interest.*

After a Decision by the Court of Appeal,
Fourth Appellate District, Division 1, Case Nos. D083446,
D083475
San Diego Superior Court, Dept. 21, Case Nos. SCN429787,
SCN429787
Honorable Daniel F. Link, Judge Presiding, (760) 201-8021

**PETITION FOR REVIEW**
**IMMEDIATE STAY REQUESTED OF THE SUPERIOR
COURT'S AUGUST 2, 2024 *EX PARTE* ORDER TO PRODUCE
SUBPOENAED RECORDS *IN CAMERA* BY AUGUST 5, 2024**

*Orin S. Kerr (CSB No. 319808) orin@orinkerr.com
LAW OFFICE OF ORIN S. KERR
334 Law Building, Berkeley, CA 94720 Telephone: 510.664.5257

App. 023

David W. Feder (*application for admission pro hac vice pending*)
dfeder@fenwick.com
FENWICK & WEST LLP
902 Broadway, 18th Floor
New York, NY 10010-6035
Telephone: 212.430.260

Tyler G. Newby (CSB No. 205790)
tnewby@fenwick.com
Ryan Kwock (CSB No. 336414)
rkwock@fenwick.com
FENWICK & WEST LLP
555 California Street, 12th Floor
San Francisco, CA 94104
Telephone: 415.875.2300

Janie Yoo Miller (CSB No. 312715)
jmiller@fenwick.com
Esther Galan (CSB No. 335763)
egalan@fenwick.com
FENWICK & WEST LLP
730 Arizona Avenue, 1st Floor
Santa Monica, CA 90401
Telephone: 310.554.5400

Brian A. Sutherland
(CSB No. 248486)
brian.sutherland@calg.com
Greg Wolff (CSB No. 78626)
greg.wolff@calg.com
COMPLEX APPELLATE
LITIGATION GROUP LLP
96 Jessie Street
San Francisco, CA 94105
Telephone: 415.649.6700

*Attorneys for Petitioner*
SNAP INC.

2

App. 024

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..........................................................5

ISSUE PRESENTED FOR REVIEW ...........................................9

INTRODUCTION ........................................................................9

STATEMENT OF THE CASE ..................................................... 13

    I.    THE STORED COMMUNICATIONS ACT.............. 13

    II.    FACTUAL BACKGROUND AND
           PROCEDURAL HISTORY.................................... 16

           A.    Snapchat.......................................... 16

           B.    Real Party In Interest Adrian Pina. ............... 17

           C.    Procedural History............................ 18

WHY REVIEW IS WARRANTED ............................................. 20

    I.    THE COURT OF APPEAL'S ERRONEOUS
         INTERPRETATION WILL HAVE
         SIGNIFICANT PUBLIC CONSEQUENCES........... 21

           A.    The Decision Guts the Primary Federal
                Statute that Shields Private Electronic
                Communications from Disclosure................... 21

           B.    If This Court Does Not Grant Review,
                California Courts Will Be Deluged with
                Subpoenas. ....................................... 25

           C.    The Court of Appeal's Decision
                Undermines Platform Safety and User
                Security.......................................... 27

    II.    CALIFORNIA COURTS NEED
         IMMEDIATE GUIDANCE IN APPLYING
         THE BUSINESS MODEL THEORY ........................ 29

App. 025

**TABLE OF CONTENTS**
(Continued)

Page

III.   THE COURT OF APPEAL'S SHARP DEPARTURE FROM PRIOR PRECEDENT WARRANTS THIS COURT'S REVIEW. ................... 31

    A.   The Court of Appeal's Interpretation of The SCA's ECS Protections Conflicts with Precedent from the Ninth and Fourth Circuits. ............................................... 31

    B.   The Court of Appeal's "Business Model" Theory Is a Novel Departure from Prevailing Understandings of the SCA. ............................................................. 34

IV.   THE COURT OF APPEAL'S DECISION IS WRONG .................................................................... 36

    A.   Snap Is Prohibited from Disclosing Content Held in Electronic Storage, even if Snap Accesses the Same Content for an Unenumerated Purpose. .......................................................... 36

    B.   Snap Is Prohibited from Disclosing Content Stored on Behalf of Its Users. ........... 39

A STAY IS WARRANTED ............................................................ 40

CONCLUSION ........................................................................... 41

CERTIFICATE OF WORD COUNT ............................................. 42

PROOF OF SERVICE ................................................................. 43

4

App. 026

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Andersen Consulting v. UOP* (N.D.Ill. 1998)
991 F.Supp.1041 ....................................................... 26

*Anzaldua v. Northeast Ambulance and Fire Protection
District* (8th Cir. 2015)
793 F.3d 822 ........................................................... 31

*Hately v. Watts* (4th Cir. 2019)
917 F.3d 770 ............................................... 15, 33, 36

*In re U.S.* (D.Or. 2009)
665 F.Supp.2d 1210 ................................................ 25

*Konop v. Hawaiian Airlines, Inc.* (9th Cir. 2002)
302 F.3d 868 ........................................................... 38

*Theofel v. Farey-Jones* (9th Cir. 2004)
359 F.3d 1066 ...................................... 32, 33, 36, 38

*United States v. Bychak*
(S.D.Cal., May 12, 2022, No. 18-CR-4683-GPC)
[2022 WL 1524736] ................................................ 24

*United States v. Peterson*
(W.D.Mo., July 18, 2023, No. 22-00196-01-CR-W-DGK)
[2023 WL 5920869], *report and recommendation adopted*
(W.D.Mo., September 11, 2023,
No. 4:22-CR-0166-DGK-02) [2023 WL 5918310] ..................... 30

*United States v. Warshak* (6th Cir. 2010)
631 F.3d 266 ........................................................... 24

**CALIFORNIA CASES**

*Facebook, Inc. v. Superior Court (Hunter)* (2018)
4 Cal.5th 1245 [233 Cal.Rptr.3d 77, 417 P.3d 725].......... *passim*

App. 027

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

*Facebook, Inc. v. Superior Court* (*Touchstone*) (2020)
  10 Cal.5th 329, 361 [233 Cal.Rptr.3d 77,
  471 P.3d 38]......................................................................*passim*

*Hassell v. Bird* (2018)
  5 Cal.5th 522 [234 Cal.Rptr.3d 867, 420 P.3d 776]................. 16

*In re Brandy R.* (2007)
  150 Cal.App.4th 607 [58 Cal.Rptr.3d 456] .............................. 40

*Juror Number One v. Superior Court* (2012)
  206 Cal.App.4th 854 [142 Cal.Rptr.3d 151] ........................... 38

*Negro v. Superior Court* (2014)
  230 Cal.App.4th 879 [179 Cal.Rptr.3d 215] ........................... 29

*Ng v. Superior Court* (1992)
  4 Cal.4th 29 [13 Cal.Rptr.2d 856, 840 P.2d 961]..................... 40

*People v. Lewis* (2021)
  11 Cal.5th 952 [281 Cal.Rptr.3d 521, 491 P.3d 309].............. 37

*Stewart v. Hurt* (1937)
  9 Cal.2d 39 [68 P.2d 726]........................................................ 41

*Unzipped Apparel, LLC v. Bader* (2007)
  156 Cal.App.4th 123 [67 Cal.Rptr.3d 111] .............................. 24

### OTHER STATE CASES

*State v. Johnson* (Tenn. Crim. App. 2017)
  538 S.W.3d 32........................................................................ 30

App. 028

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

**FEDERAL STATUTES**

18 U.S.C.
§ 2510(15) ................................................................ 14
§ 2510(17) ................................................................ 15
§ 2510(17)(A)-(B) ..................................................... 36
§ 2523 ...................................................................... 35
§§ 2701-2712 ........................................................... 11
§ 2702(a)(1) .......................................................*passim*
§ 2702(a)(2) ............................................... 13, 15, 38, 39
§ 2702(b)(8) ............................................................. 35
§ 2702(c)(6) ............................................................. 18

**STATE STATUTES**

Code Civ. Proc., § 1985.6 .............................................. 24

Penal Code, § 1326, subd. (c) ........................................ 26

**OTHER AUTHORITIES**

2 LaFave et. al., Criminal Procedure (4th ed. 2020)
§ 4.8(b) ............................................................ 15, 25, 34

Carr & Bellia, Law of Electronic Surveillance
(1st ed. 2024) § 4:97 ................................................... 34

*Information for Law Enforcement*, Privacy, Safety, and
Policy Hub <https://bit.ly/46ARWge>
[as of Aug. 2, 2024] ..................................................... 23

Jeffrey Gottfried, *Americans' Social Media Use,*
(Jan. 31, 2024) Pew Research Center
<http://bit.ly/4d5B5od> [as of Aug, 2, 2024] ................... 10

Kerr, Computer Crime Law (5th ed. 2022) ..................... 34

*Learn About How Snap Uses Data,* Snapchat Support
<https://bit.ly/3AasstM> [as of Aug. 2, 2024] ................ 28

App. 029

## TABLE OF AUTHORITIES
### (Continued)

Page(s)

*Privacy By Product*, Privacy, Safety, and Policy Hub
<https://bit.ly/3WuPyTq> [as of Aug. 2. 2024] .................. 22, 23

*Privacy Policy* (Feb. 26, 2024) Privacy, Safety, and Policy
Hub <https://bit.ly/46wZFvw> [as of Aug. 2, 2024] .......... 17, 23

Sen. Rep. No. 99-541, 2d Sess. ................................................ 13, 14

Snap Inc. Form 10-Q (Aug. 2, 2024)
<https://bit.ly/3SAwBxA>, pp. 28-29
[as of Aug. 2, 2024]............................................................. 10, 22

Snap Inc. Terms of Service (Feb. 26, 2024)
<https://bit.ly/3yA5HyV> [as of Aug. 2, 2024]......................... 17

*Snapchat Ads Transparency,* Privacy, Safety, and Policy
Hub <https://bit.ly/4dum3YI> [as of Aug. 2, 2024] ................. 27

*Testimony of Evan Spiegel Co-Founder and CEO, Snap Inc.*
(January 2023), Hearing before the United States
Senate Committee on the Judiciary
<https://bit.ly/3YACvTj> [as of Aug. 2, 2024]......................... 28

Woods & Swire, *The CLOUD Act: A Welcome Legislative
Fix for Cross-Border Data Problems* (Feb. 6, 2018) ............... 35

App. 030

**TO THE HONORABLE CHIEF JUSTICE GUERRERO AND ASSOCIATE JUSTICES OF THE CALIFORNIA SUPREME COURT:**

Petitioner Snap Inc. ("Snap") respectfully petitions this Court for review of the published opinion of the Court of Appeal, Fourth Appellate District, Division One, in *Snap, Inc. et al. v. Superior Court of San Diego County* (July 23, 2024, No. D083446) (hereafter "Opinion" or "Opn."), a copy of which is attached as Attachment A. Snap had no opportunity to petition the Court of Appeal for a rehearing because its Opinion was issued with immediate finality. (Opn. at p. 45.) As explained below, Snap requests a stay of trial court proceedings pending this Court's review.

## ISSUE PRESENTED FOR REVIEW

Are the contents of electronic communications maintained by a service provider such as Petitioner Snap Inc. protected from disclosure under the privacy protections of the Stored Communications Act, (18 U.S.C. § 2702(a)), or does the service provider's "business model" eliminate those privacy protections?

## INTRODUCTION

The specific issue in this case was expressly left open by a prior decision of this Court. (See *Facebook, Inc. v. Superior Court (Touchstone)* (2020) 10 Cal.5th 329, 361 [233 Cal.Rptr.3d 77, 471 P.3d 38].) In her *Touchstone* concurrence, Chief Justice Cantil-Sakauye introduced a "business model theory" of the federal Stored Communications Act ("SCA"), under which the contents of communications held by electronic communications providers

9

App. 031

were exempt from the ban on disclosure under Section 2702(a). (18 U.S.C. § 2702(a).)  The Court unanimously recognized that the issues raised by the business model theory are "important" and "unresolved." (*Touchstone, supra,* 10 Cal.5th at pp. 338, 361.)  Justice Cuéllar added that, "in the appropriate case, courts ought to take up" the "crucial matter of how broadly to read the SCA." (*Id.* at p. 373 (conc. opn. of Cuéllar, J.).)

The Court of Appeal accepted this Court's "invitation" to consider the business model theory of the SCA—and essentially adopted it in its entirety. (Opn. at p. 37.)  In so doing, the Court misconstrued the SCA to negate its privacy protection for most electronic communications in the United States.  For the majority of Americans who use services like Facebook, Instagram, and Snap's platform Snapchat—and related services, like email and text messaging—the SCA's crucial privacy protections have just evaporated by judicial interpretation.

This case is about the privacy of those electronic communications.  According to the Pew Research Center, approximately 27% of adults in the United States use Snapchat, 68% of adults use Facebook, and 47% of adults use Instagram.[1] As of August 2, 2024, Snapchat has 432 million global daily active users, with approximately 100 million users in North America.[2]  But nothing in the Court of Appeal's Opinion limits

---

[1] (Jeffrey Gottfried, *Americans' Social Media Use,* (Jan. 31, 2024) Pew Research Center <http://bit.ly/4d5B5od> [as of Aug, 2, 2024].)

[2] (Snap Inc. Form 10-Q (Aug. 2, 2024) <https://bit.ly/3SAwBxA>, pp. 28-29 [as of Aug. 2, 2024].)

App. 032

the application to only these providers–the ruling will also eviscerate privacy protections for other services like web-based email and text messaging.

The SCA, (18 U.S.C. §§ 2701-2712), is the federal law that protects the privacy of electronic communications containing personal messages, photos, and videos. It does two main things. First, the SCA prevents the government from compelling access to contents of electronic communications or non-content records without proper legal process—including, in some cases, requiring a search warrant. (See *id.* § 2703.) Second, the SCA blocks providers from disclosing the contents of users' communications unless a specific exception to the disclosure bar applies. (See *id.* § 2702.)

These two parts of the SCA work together, protecting our virtual spaces just like our physical ones. As with physical homes, the government cannot force its way in without a warrant. And the companies that hold our communications must protect them from outside access unless specific exceptions apply, like a warrant. Put simply, the SCA provides the legal walls that keep our internet accounts private. (See generally *Facebook, Inc. v. Superior Court (Hunter)* (2018) 4 Cal.5th 1245, 1262-63 [233 Cal.Rptr.3d 77, 417 P.3d 725].)

Review is justified for four reasons.

*First*, whether the business model theory is viable has statewide and national importance. Adopting the theory would eliminate the core privacy protection that most Americans rely on for their electronic communications. Although Congress enacted

11

App. 033

the SCA in 1986 and amended it several times since, the business model theory entered the realm of judicial consideration for the first time in 2020 with Chief Justice Cantil-Sakauye's *Touchstone* concurrence. No court has ever adopted it as binding law until now. And its consequences are vast—resetting the existing balance between privacy protection, on the one hand, and platform integrity and public safety, on the other. This Court should determine whether the business model theory is viable, not the court below.

*Second*, this Court should not wait for a future opportunity to rule on the business model theory. The scope of the Court of Appeal's ruling is unclear. Does it apply only to Meta and Snap? What about email services like Gmail or Yahoo? Or messaging platforms like WhatsApp and Discord? Can providers avoid the ruling by changing their terms of service, and if so, what new language is needed? By failing to provide clear answers about how far the business theory extends, the Court of Appeal's ruling leaves trial courts, providers, and the public unable to determine the SCA's basic privacy rules.

*Third*, the Court of Appeal's reasoning departs sharply from the prevailing judicial understanding of the SCA. It conflicts with federal precedent articulating an expansive understanding of when the SCA protects the content of electronic communications from disclosure. And the appellate court dispatches, in a single footnote, numerous decisions where the question of whether content held by providers is protected by the SCA was so settled and unexceptional that it did not warrant

12

analysis. (Opn. at p. 39, fn.17.) This includes *Hunter*, where this Court said it had "no reason to question" that Facebook was subject to the SCA. (*Hunter, supra*, 4 Cal.5th at p. 1268.) Now, nearly 40 years after the SCA's enactment and decades of legal scrutiny, the Court of Appeal effectively says these decisions were wrong.

*Fourth*, the business model theory is wrong as a matter of statutory interpretation. The Opinion misconstrues the plain language of one provision, (18 U.S.C. § 2702(a)(2)), and invents a limitation not found in the text of the other, (18 U.S.C. § 2702(a)(1)). This is logically inconsistent and contrary to the overarching privacy-protection purpose of the SCA.

STATEMENT OF THE CASE

## I.  THE STORED COMMUNICATIONS ACT

Congress enacted the SCA in 1986 "to protect privacy interests in personal and proprietary information," while also providing avenues for law enforcement to access such information when needed. (Sen. Rep. No. 99-541, 2d Sess., p. 3-5.). The Senate Judiciary Committee report urging enactment recognized that "computers are used extensively today for the storage and processing of information." (*Id.* at p. 3). It reasoned that, when individuals store their private information and communications on computers managed by third-party providers, they should not lose the Fourth Amendment protections that would apply to physical records stored at home. (See *ibid.*) "Congress was concerned that 'the significant privacy protections that apply to homes in the physical world may not apply to "virtual homes" in

13

cyberspace,' and hence 'tried to fill this possible gap with the SCA.'" (*Hunter*, *supra*, 4 Cal.5th at p. 1263, citation omitted.) To avoid rapid obsolescence, Congress designed the SCA to apply prospectively to advancements in communications technology. (Sen. Rep. No. 99-541, 2d Sess., p. 5.)

In *Hunter*, this Court reviewed the SCA's legislative history and discerned three major themes "repeatedly emphasized by the bill authors":

> (1) protecting the privacy expectations of citizens, (2) recognizing the legitimate needs of law enforcement, and (3) encouraging the use and development of new technologies (with privacy protection being the primary focus).

(*Hunter*, *supra*, 4 Cal.5th at p. 1263.)

Congress prohibited two types of providers from disclosing the contents of their users' communications. The first type of provider is an "electronic communication service" ("ECS"), which is any service that enables users to send or receive electronic communications. (18 U.S.C. § 2510(15).) The second is a "remote computing service" ("RCS") which is the "provision to the public of computer storage or processing services by means of an electronic communications system." (*Id.* § 2711.) An ECS provides messaging or communications; an RCS provides storage and processing. Both types of providers hold private electronic communications on customers' behalf; under the SCA, neither may disclose them, subject to enumerated exceptions.

The prohibitions, however, differ between the two. An ECS cannot divulge "the contents of a communication while in electronic storage by that service." (18 U.S.C. § 2702(a)(1).)

14

App. 036

"Electronic storage" is "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof" and "any storage of such communication by an [ECS] for purposes of backup protection." (18 U.S.C. § 2510(17).) An RCS cannot disclose "the contents of any communication which is carried or maintained on that service" "solely for the purpose of providing storage or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents of any such communications for purposes of providing any services other than storage or computer processing." (*Id.* § 2702(a)(2).)

When the SCA was enacted in 1986, providers typically were an ECS *or* an RCS. Now, providers generally allow users to store large amounts of their personal messaging data on the servers of internet providers. Accordingly, it is common for user contents to be protected under both the ECS *and* RCS rules of statutory privacy protection. (See *Hately v. Watts* (4th Cir. 2019) 917 F.3d 770, 789-93.) If a particular communication is protected under either the ECS or RCS rules—or both—then Section 2702(a) prohibits disclosure of user communications unless a specific exception to the disclosure in Section 2702(b)-(c) applies.[3]

For decades, providers and their customers depended on these provisions to safeguard privacy interests in communications by protecting them from disclosure. Congress has not amended the SCA to supersede judicial decisions

---

[3] (See 2 LaFave et. al., Criminal Procedure (4th ed. 2020) § 4.8(b).)

15

App. 037

upholding the SCA's default nondisclosure provisions. And, before the Court of Appeal's Opinion, no court had ever held that the SCA's protections hinge on a provider's particular business model. This judicial track record and congressional acquiescence is telling, see *Hassell v. Bird* (2018) 5 Cal.5th 522, 547 [234 Cal.Rptr.3d 867, 420 P.3d 776], and has engendered reliance, including by Snap. This Court should confirm which understanding of the SCA controls.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Snapchat.

Snapchat is a camera and electronic communications application designed for people aged 13 and over. Snapchat users primarily use the app to communicate with close friends and family by sending and receiving messages, photos, and short videos. Snapchat is at heart a visual messaging application, designed for private communications, that encourages creative interactions with friends and family. It is, in many ways, an updated, dynamic version of text messaging.

Snapchat messages auto-delete by default. Users may choose to save communications sent or received through the "Chat" functionality—such as text, photos, videos, and audio notes ("Chats"). Users may also save photos or videos taken with the in-app "Camera" functionality ("Snaps"). Snap maintains saved content on its servers. If a user does not save Chats or Snaps within a certain timeframe, Snap deletes the content. In general, Snap retains content after the default-delete period only if the user chooses to save it.

App. 038

Snap does not mine, analyze, or share the content of its users' private communications to provide targeted advertising.[4] However, Snapchat users grant Snap permission to access their communications for other reasons. They agree Snap may access and review their content "at any time and for any reason," including to identify "content [that] violates [Snapchat's] Terms or any applicable law," "protect the safety of [Snapchat] users, and others," "investigate, remedy, and enforce potential Terms violations," and "detect and resolve any fraud or security concerns."[5] Users also permit Snap to store, use, and analyze content to improve its services and research and develop new ones.[6]

### B. Real Party In Interest Adrian Pina.

Real Party in Interest Adrian Pina ("Pina") is charged with murder, attempted murder, and felony possession of a firearm, arising from two shootings on December 26, 2021. (Opn. at p. 4.) Pina's brother Samuel Pina died during one of them. (*Id.* at p. 2.) Pina plans to argue he acted in self-defense and seeks to prove his brother's violent propensity through content in his brother's stored communications. (*Id.* at p. 15.)

---

[4] (*Privacy Policy* (Feb. 26, 2024) Privacy, Safety, and Policy Hub <https://bit.ly/46wZFvw> [as of Aug. 2, 2024].)

[5] (Snap Inc. Terms of Service (Feb. 26, 2024) <https://bit.ly/3yA5HyV> [as of Aug. 2, 2024].)

[6] (*Id.*)

17

App. 039

## C.  Procedural History.

In October 2023, Snap received a subpoena from Pina seeking "[a]ny and all account information, including posts, photos, and messages" in Samuel Pina's Snapchat account.  (Opn. at p. 5.)  Snap responded by letter the same day, objecting, among other things, that the SCA prohibited disclosure of content in response to a defense subpoena.  The trial court held a hearing on Snap's objections to the subpoena, but Snap had no notice of the hearing and did not appear.

Snap thereafter received a second subpoena from Pina and an order from the trial court directing Snap to produce "[a]ll records" in Samuel Pina's Snapchat account ("Production Order").  (Opn. at p. 5.)  The Production Order required Snap to produce the subpoenaed records before or appear at a status conference on January 8, 2024.  The Production Order explained the Superior Court had determined at the prior hearing that Pina had good cause for the subpoenaed records.

Snap timely produced responsive non-content records, as the SCA has an explicit exception allowing disclosure of non-content records to non-government entities.  (See 18 U.S.C. § 2702(c)(6).)  Snap withheld the contents of electronic communications, however.  Snap moved to modify the Production Order and quash in part the subpoena, objecting, among other grounds, that the SCA prohibited disclosure of content.

Just hours before the hearing, the Deputy Public Defender representing Pina emailed an opposition brief to Snap, which

18

App. 040

raised the business model theory and Chief Justice Cantil-Sakauye's *Touchstone* concurrence.

At the January 2024 status conference, Pina did not raise the business model theory. The trial court recognized Pina had briefed the theory but asked no questions about it or about Snap's business functionality. The trial court ordered Snap to comply with the Production Order in full. It found the Public Defender's Office qualified as a "governmental entity" under the SCA. It also found "probable cause, specifically[,] that this is relevant information." It rejected Snap's SCA arguments, concluding that "all the other arguments and constitutional protections fall by the wayside once . . . a court finds probable cause, which I have." The trial court did not consider the business model theory at all in reaching its conclusion.

Following this ruling, Snap filed a petition for writ of mandate in the Court of Appeal to challenge the Production Order and the Court of Appeal stayed all trial court proceedings. Thus, Snap has not produced the subpoenaed contents. The Court of Appeal consolidated Snap's writ proceeding with one initiated by Meta Platforms Inc. ("Meta"). After briefing by the parties, the Court of Appeal heard the writ petition on July 11, 2024.

In its Opinion issued a few weeks later, the Court of Appeal upheld the Production Order. It endorsed the business model theory, holding that Snap's and Meta's "business models," "under which they access their customer's data for their own business purposes, excludes them from the limitations imposed on the

19

App. 041

disclosure of information by the [SCA]." (Opn. at p. 2.) The Court of Appeal ordered: "Let a peremptory writ issue directing respondent court to set aside its order of January 8, 2024, and issue a modified order directing petitioners to produce the subpoenaed information in camera to the respondent court for it to determine whether the material should be produced to Pina's defense counsel." (*Id.* at p. 45.)

### WHY REVIEW IS WARRANTED

It is difficult to overstate what is at stake here: whether the primary federal statute that protects billions of private electronic communications will continue to deliver the privacy protections the vast majority of Americans depend on. In *Touchstone*, this Court recognized the importance of deciding whether the SCA prohibits providers from disclosing their customers' communications to third parties. It recognized this issue was not resolved in *Hunter*, *supra*, 4 Cal.5th 1245, and expressly left it unresolved in *Touchstone*, *supra*, 10 Cal.5th at p. 361. In her concurrence, Chief Justice Cantil-Sakauye declared this issue "deserves to be addressed when a similar issue arises in analogous future litigation." (*Touchstone*, *supra*, 10 Cal.5th at p. 373.) Justice Cuéllar similarly urged that "courts ought" to take up "the crucial matter of how broadly to read the SCA" in a future case. (*Id.* at p. 373 (conc. opn. of Cuéllar, J.).) *This* is that future case.

20

## I.    THE COURT OF APPEAL'S ERRONEOUS INTERPRETATION WILL HAVE SIGNIFICANT PUBLIC CONSEQUENCES.

The Court of Appeal's erroneous interpretation of the SCA threatens to: (a) upset the privacy expectations of millions of consumers; (b) burden the courts; and (c) imperil public safety. Congress did not intend these outcomes, which are inconsistent with the SCA's text and purpose. Review is necessary to avoid the adverse consequences of the Court of Appeal's statutory interpretation.

### A.    The Decision Guts the Primary Federal Statute that Shields Private Electronic Communications from Disclosure.

Americans' personal electronic communications remain private in large part because of Section 2702's disclosure bar. Section 2702 is the linchpin of electronic communications privacy law because it prevents providers from disclosing user contents absent a specific exception.

By enacting the SCA in 1986, Congress recognized the public's privacy interests in then-emerging forms of electronic communications. It established a default prohibition on the disclosure of private communications, Section 2702(a), subject to the exceptions enumerated in Section 2702(b). As technology advanced, this prohibition was universally understood to apply to newer forms of communication, like email, text messages, and social media posts. Congress did not disturb that prevailing understanding in subsequent amendments to the SCA.

The Court of Appeal's re-interpretation of the SCA exposes billions of private communications to compelled production by

21

App. 043

mere subpoena—including civil subpoenas. Users entrusted those communications to providers with the understanding they would be held subject to protections from disclosure to third parties. This Court should decide whether those users did so under a mistaken interpretation that the SCA, as commonly understood, would protect them.

Snapchat allows users to securely and privately transmit and store electronic communications with other users, precisely the type of electronic service Congress envisioned the SCA would cover. Millions of Californians use Snapchat every day.[7]

Snapchat users generally expect their communications will remain private. User privacy and agency are central tenets of Snapchat. As Snap's "Privacy By Product" web page explains:

> Saving Snaps was designed with privacy in mind. You control whether your Snaps can be saved within Snapchat. Set the Snap time to no time limit to allow a Snap to be saved. You can always delete any message you've sent, including Snaps that have been saved in Chat. Just press and hold to unsave. When you save a Snap, either before or after sending, it can become part of your Memories. When your friend saves a Snap you send them, it can become part of their Memories. Check out the Memories section below for more detailed information about Memories.[8]

It also provides:

> Snaps and Chats are private and delete by default, including Voice and Video Chats between you and your friends — meaning we don't scan their content to

---

[7] (Snap Inc. Form 10-Q (Aug. 2, 2024) <https://bit.ly/3SAwBxA>, pp. 28-29 [as of Aug. 2, 2024].)

[8] (*Privacy By Product*, Privacy, Safety, and Policy Hub <https://bit.ly/3WuPyTq> [as of Aug. 2. 2024].)

App. 044

personalize your experience, make recommendations, or show you ads. This means we don't know what you're Chatting or Snapping except in limited, safety-related circumstances (for example, if we receive a report of content that is flagged for violating our Community Guidelines, or to help keep spammers from sending you malware or other harmful content), or unless you ask us to (for example, if you use our Voice Chat Transcription feature).[9]

Snap informs its users that it will "share information about your activity as necessary" to "comply with any valid legal process, governmental request, or applicable law, rule, or regulation."[10] It explains disclosure "is generally governed by the [SCA]," which "mandates that we disclose certain Snapchat account records only in response to specific types of legal process, including subpoenas, court orders, and search warrants."[11] Snap honors its commitment to user privacy by following its non-disclosure obligations under the SCA, including by challenging subpoenas from private litigants seeking user content. If the decision stands, and stored communications lack protection under Section 2702(a), Snap would be compelled to comply with third-party requests and disclose user content without user consent—and in many cases without the user even having the opportunity to object to the wide scale production of their content.

_____

[9] (*Id.*)

[10] (*Privacy Policy* (Feb. 26, 2024) Privacy, Safety, and Policy Hub <https://bit.ly/46wZFvw> [as of Aug. 2, 2024].)

[11] (*Information for Law Enforcement*, Privacy, Safety, and Policy Hub <https://bit.ly/46ARWge> [as of Aug. 2, 2024].)

The Opinion's effects on user privacy are not confined to Snap users in California. As a California corporation, Snap requires domestication of subpoenas seeking records for actions outside California. (Code Civ. Proc., § 1985.6.). The Opinion will govern those subpoenas too, because any motion to quash will be filed in California court and litigated under California law. (See *Unzipped Apparel, LLC v. Bader* (2007) 156 Cal.App.4th 123, 128-30 [67 Cal.Rptr.3d 111] (applying California law to adjudicate out-of-state subpoena domesticated in California, because "California law governs discovery disputes that arise in [California] courts").)

This Court should clarify when and in what circumstances users relinquish their privacy interests in stored communications. The Court of Appeal held that, "[i]f Snap's users allow it to use their content for other purposes, they do not have the expectation of privacy contemplated by the SCA." (Opn. at p. 41.) But courts have held users do not forfeit Fourth Amendment privacy protections by authorizing providers to access their communications. (See *United States v. Warshak* (6th Cir. 2010) 631 F.3d 266, 287 (explaining court was "convinced that some degree of routine access is hardly dispositive with respect to the privacy question"); *United States v. Bychak* (S.D.Cal., May 12, 2022, No. 18-CR-4683-GPC) [2022 WL 1524736, at *6] ("limited monitoring does not alone defeat a privacy expectation in some materials").) Congress passed the SCA to "expand"—not diminish—"the protections of the Fourth Amendment to new forms of communication and data storage."

24

App. 046

(*In re U.S.* (D.Or. 2009), 665 F.Supp.2d 1210, 1220.)  Users deserve consistency to make informed choices about where and how they store communications they intend to keep private.

The Court of Appeal's decision throws into flux the privacy expectations of millions of Snapchat users, contrary to the plain language, stated purpose, and prior prevailing understanding of the SCA.  This Court should determine quickly whether it is correct.

> **B.     If This Court Does Not Grant Review, California Courts Will Be Deluged with Subpoenas.**

The crucial role of Section 2702 is readily seen in the context of civil litigation.  Imagine a typical lawsuit.  The parties, bitter at each other, now have the subpoena power.  Many litigants would be eager to direct subpoenas to providers used by their opponents to access their emails, text messages, pictures, and videos.  The statutory bar of Section 2702 traditionally prevents this.  Because communications are protected under the ECS and RCS rules, providers invoke the Section 2702 bar to refuse compliance with civil discovery subpoenas,[12] and the litigants must seek the records elsewhere.  Under the business model theory, however, the default privacy wall erected by Section 2702 would be torn down, and California's courts will be burdened by the litigation of countless subpoena disputes.

This is only the tip of the privacy iceberg.  Consider the privacy practices of network providers exempt from the

---

[12] (See LaFave, *supra*, § 4.8(h) (citing cases).)

25

Section 2702 bar, like those that do not make services available to the public. For example, in *Andersen Consulting v. UOP* (N.D.Ill. 1998) 991 F.Supp.1041, a private company hired consultants and gave them email accounts on its private email server. When the relationship soured, the company contacted the press and released embarrassing emails the consultants had written. The emails were soon splashed across the pages of the *Wall Street Journal*. The disclosure was legal, a court ruled, because Section 2702 expressly exempts providers that do not provide services to the public. (See *id.* at pp. 1042-43.)

Traditionally, the Section 2702 bar has prevented service providers from making disclosures such as those in *Andersen Consulting*. Under the business model theory, however, that would no longer be true as a matter of law. Of course, Snap is committed to protecting the privacy of its users. But not every provider is as scrupulous about protecting its users' privacy as Snap. And an enforceable subpoena would leave Snap with no choice, putting it in an impossible position.

The Court of Appeal's decision will open the subpoena floodgates in civil and criminal litigation. California courts should expect a substantial increase in time devoted to third-party subpoenas in prosecutions. Criminal defendants with little incentive *not* to subpoena providers will trigger motions to quash and good cause hearings. If providers are compelled to produce, the lower courts will more regularly act as evidentiary gatekeepers under Penal Code § 1326, subd. (c). (*Touchstone,* 10 Cal.5th at p. 344.) They will receive often-voluminous account

26

contents and review them to determine which portions to provide to the issuer. California's lower courts, already overburdened, will be even more taxed by increased production review.

### C. The Court of Appeal's Decision Undermines Platform Safety and User Security.

The Court of Appeal's decision provides that if service providers store messages for any reason other than merely backup, then the provider is outside the scope of the SCA. Many providers' terms of service, including Snap's, permit providers to access those communications for important safety purposes–such as scanning messages to catch transmission of child sexual abuse material. This Opinion below therefore forces providers to choose between (1) accessing content to remove bad actors and protect their communities, and (2) *not* accessing content to preserve the application of the SCA's disclosure bar. The effect may be to drive bad actors to platforms that choose the latter, secure in the knowledge the provider will *not* access their communications to detect wrongdoing. The Opinion sends the wrong message on safety, precisely when providers face intense scrutiny about whether and how they should protect their users and the public.

Snap's public safety program illustrates what hangs in the balance. Snap does not monetize private user content or communications, or sell or share user data with third parties for advertising purposes.[13] Snap accesses private user content and communications only to enforce its Terms of Service and

_____

[13] (See *Snapchat Ads Transparency,* Privacy, Safety, and Policy Hub <https://bit.ly/4dum3YI> [as of Aug. 2, 2024].)

Community Guidelines by identifying, preventing, and responding to wrongdoing.[14]  For example, Snap scans image and video uploads to Snapchat for known child sexual abuse material and reports such content to the National Center for Missing and Exploited Children.  Snap identifies and responds to reports of content involving unlawful drug activities, disables offending accounts, bans associated devices, and makes law enforcement referrals.[15]  Snap also responds to reports of content involving terror threats, bullying, and other problematic behavior in violation of Snap's Community Guidelines.  In 2023 alone, Snap made over 690,000 reports of suspected child sexual abuse material to the appropriate authorities, resulting in more than 1,000 arrests, and "removed more than 2.2 million pieces of drug-related content, disabled the 705,000 related accounts, and blocked the devices associated with those accounts from using Snapchat."[16]  Virtually all other commercial electronic communications providers do some version of the same activity to secure their platforms, remove wrongdoers, and protect their users and the public.

The Court of Appeal's decision forces providers to abandon such efforts or otherwise face liability under the SCA for

---

[14] (*Learn About How Snap Uses Data,* Snapchat Support <https://bit.ly/3AasstM> [as of Aug. 2, 2024].)

[15] (*Testimony of Evan Spiegel Co-Founder and CEO, Snap Inc.* (January 2023), Hearing before the United States Senate Committee on the Judiciary <https://bit.ly/3YACvTj> [as of Aug. 2, 2024].)

[16] (*Id.*)

protecting user content against disclosure. This Court should decide now whether the SCA genuinely compels that choice to be made.

## II.    CALIFORNIA COURTS NEED IMMEDIATE GUIDANCE IN APPLYING THE BUSINESS MODEL THEORY

The Court of Appeal's endorsement of the business model theory embarks on a tectonic shift after nearly 40 years without a business model theory of the SCA. But the Opinion also leaves the scope and application of this novel theory surprisingly unclear—impacting countless providers and the users they serve. If the business model theory is to be the law in California courts, this Court should grant review to provide much-needed guidance to the California courts on how to interpret and apply it.

The Court of Appeal's decision is frustratingly ambiguous as to its scope and application. We know, by its holding, that its reasoning applies to Snap and Meta, as long as they retain their current terms of service. But the decision does not say what steps Snap can take, especially in terms of changing its terms of service going forward, to restore the privacy protections that the Court of Appeal's decision eliminates.

The Court of Appeal's decision also leaves open how it applies to the endless array of other services and providers that make up the modern internet economy. Before the decision, it was well understood that the SCA applied to providers of email services and online messaging platforms. (See, e.g., *Negro v. Superior Court* (2014) 230 Cal.App.4th 879, 889 [179 Cal.Rptr.3d 215] (applying the SCA to private messaging services (email));

29

App. 051

*State v. Johnson* (Tenn. Crim. App. 2017) 538 S.W.3d 32, 69 ("[T]he SCA is applicable to communications shared on social media websites."); *United States v. Peterson* (W.D.Mo., July 18, 2023, No. 22-00196-01-CR-W-DGK) [2023 WL 5920869, at *7], *report and recommendation adopted,* (W.D.Mo., September 11, 2023, No. 4:22-CR-0166-DGK-02) [2023 WL 5918310]  (generally describing Snap as an ECS in confirming that the SCA applies to Snap).)  Under the Court of Appeal's decision, however, email, text, and other private content held by these providers would no longer be covered under the SCA.

The Opinion is also unclear about what conduct nullifies SCA protection under the business model theory.  It states only that "maintain[ing] that content for their own business purposes" or "their own profit-driven purposes" took Snap and Meta outside the SCA's disclosure bar.  (Opn. at p. 38-39.)  That provides no clarity to providers and users about what "purposes" comply with the SCA.  Although the Court of Appeal's decision appears grounded against "profit-driven purposes," (see *Id.* at p. 39) that leaves unclear what non-profit-driven purposes providers can pursue while maintaining protection against disclosure under the SCA.

As Chief Justice Cantil-Sakauye's concurrence in *Touchstone* suggests:

> It would seem that protection against malware and viruses, etc., might be viewed as reasonably necessary to ensure the safety and integrity of any computer system, and in that sense, such monitoring and resulting measures to counteract malware might well be found to fall within a narrower definition of

30

App. 052

> 'computer processing,' even if that same term would not broadly encompass the sharing with third party advertisers of mined and analyzed information about content.

(*Touchstone, supra*, 10 Cal.5th 329, 372 fn.14 (conc. opn. of Cantil-Sakauye, C.J.).)  With that in mind, this Court should provide immediate guidance about agreements between providers and their users, and how authorization affects protection under the SCA.

By failing to provide any clear answer to how far the business model theory extends, the Court of Appeal's ruling leaves the Superior Courts, providers, and the public unable to determine the basic rules of internet privacy under the SCA. Clarification by this Court is necessary to understand the effect of this major shift.

## III. THE COURT OF APPEAL'S SHARP DEPARTURE FROM PRIOR PRECEDENT WARRANTS THIS COURT'S REVIEW.

The Court of Appeal's ruling conflicts with preexisting understandings of the SCA in two ways.  First, its reasoning that there is no ECS protection for the subpoenaed content conflicts with Ninth Circuit and Fourth Circuit precedent.  Second, and more broadly, its reasoning as to Section 2702(a) protections is a novel departure from settled understandings of the SCA.

### A. The Court of Appeal's Interpretation of The SCA's ECS Protections Conflicts with Precedent from the Ninth and Fourth Circuits.

There is a significant body of caselaw in federal and state courts on the scope of the SCA's ECS protections.  (See *Anzaldua v. Northeast Ambulance and Fire Protection District* (8th Cir.

31

2015) 793 F.3d 822, 840-42 (summarizing caselaw).)  The key question is the meaning of the phrase "for purposes of backup protection of such communication" in Section 2510(17)(B).  This interpretation is crucial because a provider holding a communication "for purposes of backup protection" protects that communication under the ECS rules, prohibiting disclosure under Section 2702(a)(1) because it is in "electronic storage."  But whose "purpose" matters—the provider's or the user's?  And how do the protections apply if there are multiple purposes?

In *Theofel v. Farey-Jones* (9th Cir. 2004) 359 F.3d 1066, the Ninth Circuit adopted a broad view of the SCA's ECS protections by ruling that either party's purpose is sufficient to protect the communication under the "electronic storage" definition.  The issue in *Theofel* was whether previously opened emails stored with an internet service provider were in "electronic storage" because they were held "for purposes of backup protection" under Section 2510(17)(B).  (See *id.* at p. 1075, citation omitted.)  The Ninth Circuit concluded that they were.  The ordinary meaning of "backup protection," the Ninth Circuit ruled, covers "any backup purpose."  (*Id.* at p. 1076.)  This broad view of the SCA's protections was justified, the Ninth Circuit reasoned, because "nothing in the Act requires that the backup protection be for the benefit of the ISP rather than the user."  (*Id.* at p. 1075.)

Under the Ninth Circuit's reasoning in *Theofel*, all stored messages held by a service provider in an internet account are ordinarily protected under the ECS rules.  (See *Theofel, supra*, at pp. 1075-76.)  Because a user's purpose in keeping a backup

32

triggers the "electronic storage" definition, the Section 2702 bar applies and prevents disclosure of messaging contents unless a specific exception applies. (See *ibid.*)

The Fourth Circuit agreed with the Ninth Circuit, adopting a similarly broad view of the phrase "for purposes of backup protection," in *Hately, supra,* 917 F.3d 770. *Hately* ruled that emails held in storage by a web-based email provider are stored for purposes of backup protection "because that is a feature users desire." (*Id.* at p. 794.) Specifically, storing email "afford[ed] the user a place to store messages the user does not want destroyed." (*Id.* at 793.) Because the purpose of email storage was for the user's backup, it was stored for purposes of backup protection under the statute. (*Ibid.*)

In its Opinion below, the Court of Appeal below took a very different approach. It reasoned that a provider storing contents for "profit-driven purposes" eliminates the SCA's protection. This was so, the Court of Appeal reasoned, because a company's purpose to store user contents "for their own business purposes" has the effect of "bring[ing] the content outside the SCA's plain definition of ECS provider." (Opn. at p. 39.) In other words, the only purpose that matters, in determining what counts as "purposes of backup protection," Section 2510(17)(B), is the *provider's* purpose. And if a company has multiple purposes in storing the data, the existence of a business purpose—among other purposes—eliminates protection. The result is a very narrow interpretation of ECS protections, in which a provider's

33

business purpose eliminates the statute's protections for content messages. (*Id.* at pp. 38-39.)

The difference is stark. Under the Fourth Circuit and Ninth Circuit rule, contents held by an ECS provider are broadly protected from disclosure. Under the ruling below, the same contents are not protected.

### B. The Court of Appeal's "Business Model" Theory Is a Novel Departure from Prevailing Understandings of the SCA.

The "business model" theory is a novel development. It is so novel that it has not even been part of the rich legislative debates over the SCA. Prominent treatises and casebooks that detail the SCA at length, and which cover the specific rules of the Section 2702 bar, do not even mention it.[17] As the Court of Appeal recognized, whether content held by providers is protected by the SCA has been considered so settled in the affirmative that it did not warrant analysis. (Opn. at p. 39, fn.17.) This includes *Hunter*, where this Court said it had "no reason to question" that Facebook was subject to the SCA. 4 Cal. 5th at 1268.

Notably, Congress recently enacted major legislation amending the SCA that would have been redundant under the Court of Appeal's interpretation. The Clarifying Lawful Overseas Use of Data (CLOUD) Act of 2018 creates a specific exception to the Section 2702 bar that allows providers to comply with foreign court orders if a country has been pre-approved by the Attorney

---

[17] (See, e.g., LaFave, *supra*, § 4.8; Carr & Bellia, Law of Electronic Surveillance (1st ed. 2024) § 4:97; Kerr, Computer Crime Law (5th ed. 2022) pp. 712-56.)

34

General. (See 18 U.S.C. § 2702(b)(8)) (permitting disclosure "to a foreign government pursuant to an order from a foreign government that is subject to an executive agreement that the Attorney General has determined and certified to Congress satisfies [S]ection 2523"); (18 U.S.C. § 2523) (providing the procedure for Attorney General certification).)

As the extensive debate over the CLOUD Act shows, these provisions were enacted because Section 2702 was understood to block U.S. providers from complying with foreign government court orders.[18] The CLOUD Act offered a limited, nuanced, and carefully-drafted way around the Section 2702 bar on disclosure.[19] Under the Court of Appeal's ruling, however, this important legislation was not actually needed. The Section 2702 bar did not apply in the first place. But, as far as Snap can discern, no one involved in the passage of the CLOUD Act ever mentioned this possibility in any of the debates over the need for this new exception.

---

[18] (See Woods & Swire, *The CLOUD Act: A Welcome Legislative Fix for Cross-Border Data Problems,* (Feb. 6, 2018) Lawfare <https://bit.ly/3LQWKEs> [as of Aug. 2, 2024] [noting that the law "removes a number of blocking features—those provisions of American law that prevent American providers from complying with lawful foreign law enforcement requests, which are the sources of enormous frustration for American providers and foreign law enforcement alike"].)

[19] (See *id.*)

## IV.    THE COURT OF APPEAL'S DECISION IS WRONG

### A.    Snap Is Prohibited from Disclosing Content Held in Electronic Storage, even if Snap Accesses the Same Content for an Unenumerated Purpose.

The Court of Appeal interpreted Section 2702(a)(1) to apply very narrowly as a bar to disclosure by ECS providers.  Under its ruling, an ECS provider is barred from disclosing user contents only when it stores contents for the sole purpose of temporary or backup storage.  (Opn. at pp. 38-39.)  This limitation does not exist in the statute.  And the Court of Appeal cites no precedent for its novel limiting construction.

Section 2702(a)(1) provides that "a person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service."  The statute defines "electronic storage" as "(A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication." (18 U.S.C. § 2510(17)(A)-(B).)

As cases like *Theofel* and *Hately* recognize, the phrase "for purposes of backup protection" is broad.  Americans routinely use the internet to store their most private communications.  They store their messages and photos in the cloud, or with social media services, because they want to be able to access a copy of those files should they need it.  In other words, they store that copy "for backup purposes." (*Hately*, *supra*, 917 F.3d at p. 793 (holding

36

that web-based email is in "electronic storage" because it gives users "a place to store messages the user does not want destroyed").)

The Court of Appeal invented a new limit on the SCA's protections: If a provider holds user contents at least in part for "their own profit-driven purposes," then those contents are not being held for purposes of backup protection. (Opn. at p. 39.) But this test is unworkable. Providers covered by the Section 2702 bar—the commercial providers that provide services "to the public"—are mostly for-profit companies. Most are public companies with publicly-traded stock. Trying to divine the true purpose of a corporation's storing of a user's file, and eliminating privacy protection if the corporation is acting to turn a profit, does not align with the purpose of the SCA to protect user privacy.

The Court of Appeal's rationale also has no support in the plain language of the statute. The SCA sets no limit on the number of reasons an ECS provider might hold content before it loses SCA coverage. The only textual requirement in Section 2702(a)(1) is that the provider must hold the communications in electronic storage—meaning, temporary or backup storage. It does not say "solely" or "only" electronic storage. Congress plainly knew how to insert that type of limiting language. It did so in the very next subsection: Section 2702(a)(2) contains the limiter "solely." The inconsistent interpretive methodology alone commends review by this Court. (See *People v. Lewis* (2021), 11 Cal.5th 952, 961-62

37

App. 059

[281 Cal.Rptr.3d 521, 491 P.3d 309], citation omitted ("statutory sections relating to the same subject must be harmonized, both internally and with each other").)

The Court of Appeal relied on *Juror Number One v. Superior Court*, (2012) 206 Cal.App.4th 854 [142 Cal.Rptr.3d 151]. (Opn. at p. 38.) There, the Third District said, "only copies of electronic communications held by the ECS pending initial delivery to the addressee or held thereafter for backup purposes are protected." (*Id.* at p. 861.) That formulation is consistent with the statute: *only* content held in electronic storage is protected by the SCA. But that is very different from the Court of Appeal's construction: content that is held by providers for *only* non-profit purposes is protected by the SCA.[20]

The Court of Appeal also cites *Konop v. Hawaiian Airlines, Inc.* (9th Cir. 2002) 302 F.3d 868, 875, which held "Congress wanted to protect electronic communications that are configured to be private, such as email and private electronic bulletin boards." This general observation from the Ninth Circuit is uncontroversial. But the more important point is that, two years after *Konop*, the Ninth Circuit interpreted "electronic storage" in *Theofel v. Farey-Jones*, and that interpretation is inconsistent with the Opinion's interpretation. (See, *supra,* Part III.A.) In addition, the Court of Appeals overlooks that, unlike Section

---

[20] To the extent the Court of Appeal and the *Touchstone* concurrences seem animated primarily by a concern about targeted advertising, this Court should consider in deciding whether to grant review that Snap does not access *private user content or communications* for advertising purposes.

38

App. 060

2702(a)(2), protection under § 2702(a)(1) does not turn on "authorization." (See Opn. at p. 39.) It turns on the type of storage the content is actually in. Whether its users *authorize* Snap to access their content for purposes other than electronic storage is irrelevant under Section 2702(a)(1).

### B.    Snap Is Prohibited from Disclosing Content Stored on Behalf of Its Users.

This Court should also review the Court of Appeal's interpretation of Section 2702(a)(2), which eliminates SCA protection of communications stored by an RCS authorized by its users to access their content for purposes other than storage and processing. (Opn. at p. 40-41.) As with its treatment of Section 2702(a)(1), the court offers no authority supporting its novel reading of Section 2702(a)(2), the effect of which is to strip privacy protections from stored communications.

According to the Court of Appeal, "under the plain language of Section 2702(a)(2), because Snap and Meta are not maintaining communications 'solely for the purpose of providing storage or computer processing services' to their users, the SCA does not preclude them from disclosing the material sought by Pina's subpoenas." (Opn. at p. 40.)

The key issue is the interpretation of Section 2702(a)(2)(B), which the Court of Appeals recognized was "not 'a model of clarity.'" (Opn. at p. 41) (citing *Touchstone, supra*, 10 Cal.5th at p. 365 (conc. opn. of Cantil-Sakauye, C.J.)). Yet, rather than proceed with caution, it announced a sweeping new interpretation that removes SCA protection from billions of stored communications. And it did so without citing any

precedent or grappling with interpretive questions raised by the parties. Among other things, the court misconstrued Snap's textual reading as saying content held solely for storage or processing is subject to the SCA only if the user *does* authorize access for other purposes. (Opn. at p. 40.) Snap's position was just the opposite. It also ignored the argument that accessing content for platform integrity and trust and safety is inherent in providing storage and computer processing, and so not a separate purpose at all.

## A STAY IS WARRANTED

This Court should grant a stay to ensure that trial court proceedings remain stayed pending review in this Court. The trial court ordered the production of subpoenaed documents by January 18, 2024. The Court of Appeal granted a stay of the order compelling production of subpoena documents, but then stated in its disposition that "[t]he stay issued by this court on January 24, 2024 is vacated on August 2, 2024 and this decision is final forthwith." (Opn. at p. 45.) Although the peremptory writ of mandate has not issued and is not effective until proceedings in this Court conclude (*Ng v. Superior Court* (1992) 4 Cal.4th 29, 33-35 [13 Cal.Rptr.2d 856, 840 P.2d 961]), the trial court entered an *ex parte* Order on August 2, 2024, a copy of which is attached as Attachment B, ordering Snap to "produce the subpoenaed records *in camera*" to the court by "August 5, 2024."

If the trial court concludes that the Court of Appeal has vacated the stay of trial proceedings and that a writ petition does not otherwise stay proceedings (*In re Brandy R.* (2007)

40

150 Cal.App.4th 607, 609-610 [58 Cal.Rptr.3d 456]), it may conclude that it has inherent authority to revisit its order, even if the peremptory writ has not issued, and then compel production for *in camera* inspection.  This would impede and interfere with review by this Court, given that Snap claims that such production would violate federal law, and the trial court would have compelled such violation before this Court had an opportunity to review the question presented.

Thus, to preserve appellate jurisdiction (see *Stewart v. Hurt* (1937) 9 Cal.2d 39, 41 [68 P.2d 726]), avoid confusion, and prevent irreparable harm arising from the production of private electronic communications, this Court should stay proceedings in the trial court pending the completion of this Court's review.

## CONCLUSION

Based on the importance of questions presented, as well as authorities discussed in the foregoing which show a need for consideration by this Court, Snap respectfully seeks review.

Dated: August 5, 2024                    LAW OFFICE OF ORIN S. KERR


                                         By: */s/ Orin Kerr*
                                              Orin Kerr


                                         FENWICK & WEST LLP


                                         By: */s/ David W. Feder*
                                              David W. Feder (*pro hac vice application pending*)

                                          Attorneys for Petitioner
                                          SNAP INC.

41

App. 063

App. 064

## CERTIFICATE OF WORD COUNT

In accordance with California Rules of Court Rule 8.504(d)(1), I certify that exclusive of this certification and the other exclusions reference in Rule of Court 8.204(c)(3), this PETITION FOR REVIEW contains 7,918 words, including footnotes, as determined by the word count of the computer used to prepare this brief.

Dated: August 5, 2024                    LAW OFFICE OF ORIN S. KERR

                                         By: /s/ Orin Kerr
                                             Orin Kerr

                                         FENWICK & WEST LLP

                                         By: /s/ David W. Feder
                                             David W. Feder (*pro hac vice application pending*)

                                          Attorneys for Petitioner
                                          SNAP INC.

## PROOF OF SERVICE

I certify that on August 5, 2024, I electronically filed **PETITIONER SNAP INC.'S PETITION FOR REVIEW** with the Clerk of the Court using the TrueFiling system which will be served by operation of the Court's electronic filing system to all parties below:

Summer Stephan
District Attorney
Linh Lam
Deputy District Attorney
Chief, Appellate & Training
Division
Karl Husoe
Deputy District Attorney
330 W. Broadway, Suite 860
San Diego, CA 92101
Email: karl.husoe@sdcda.org
*Counsel for The People,*
*Real Party in Interest*

David Jarman
Office of San Diego County
District Attorney
North County Regional Center
325 S. Melrose Drive, Suite 5000
Vista, CA 92081
Email: david.jarman@sdcda.org

*Counsel for The People,*
*Real Party in Interest*

Paul Rodriguez
Public Defender
Office of the Primary Public
Defender
Troy A. Britt
451 A. Street, Suite 900
San Diego, CA 92101
Email:
troy.britt@sdcounty.ca.gov

*Counsel for Real Party in*
*Interest*
*Adrian Pina*

Nadine Valdecini
San Diego County Department of
the Public Defender
451 A Street, Suite 900
San Diego, CA 92101
Email:
nadine.valdecini@sdcounty.ca.gov

*Counsel for Real Party in Interest*
*Adrian Pina*

43

App. 065

Julie Schwartz
Ryan Mrazik
John R. Tyler
Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101
Email:
jschwartz@perkinscoie.com
namlani@perkinscoie.com
rmrazik@perkinscoie.com
rtyler@perkinscoie.com

Natasha Amlani
Perkins Coie LLP
1888 Century Park East
Suite 1700
Los Angeles, CA 90067

*Counsel for Petitioner*
*Meta Platforms, Inc.*

Joshua S. Lipshutz
Gibson, Dunn & Crutcher LLP
One Embarcadero Center, # 2600
San Francisco, CA 94111
Email:
jlipshutz@gibsondunn.com

Michael J. Holecek
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071
Email:
mholecek@gibsondunn.com

Natalie J. Hausknecht
Gibson, Dunn & Crutcher LLP
1801 California Street
Suite 4200
Denver, CO 80202
Email:
nhausknecht@gibsondunn.com

*Counsel for Petitioner*
*Meta Platforms, Inc.*

Additionally, a copy of **PETITIONER SNAP, INC.'S PETITION FOR REVIEW** will be served by U.S. Mail to the following addresses:

> Honorable Daniel Link
> Superior Court of California
> County of San Diego
> 325 S. Melrose Drive
> Department 21
> Vista, CA
> Email:  appeals.central.sdcourt.ca.gov

44

Court of Appeal, Fourth Appellate
District, Division One
750 B Street, Suite 300
San, Diego, CA 92101

Dated: August 5, 2024            LAW OFFICE OF ORIN S. KERR

                                 By: /s/ Orin Kerr
                                     Orin Kerr

                                 FENWICK & WEST LLP

                                 By: /s/ David W. Feder
                                     David W. Feder (*pro hac vice*
                                     *application pending*)

                                  Attorneys for Petitioner
                                  SNAP INC.

App. 067

# Attachment A

Filed 7/23/24

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| SNAP, INC., | D083446 |
| Petitioner, | (San Diego County Super. Ct. No. SCN429787) |
| v. | |
| THE SUPERIOR COURT OF SAN DIEGO COUNTY, | |
| Respondent; | |
| ADRIAN PINA et al., | |
| Real Parties in Interest. | |
| METG PLATFORMS INC., | D083475 |
| Petitioner, | (San Diego County Super. Ct. No. SCN429787) |
| v. | |
| THE SUPERIOR COURT OF SAN DIEGO COUNTY, | |
| Respondent; | |
| ADRIAN PINA et al., | |
| Real Parties in Interest. | |

1

App. 069

ORIGINAL PROCEEDINGS on petitions for writs of mandate. Daniel F. Link, Judge. Relief denied in part and granted in part, peremptory writ issued modifying order.

Fenwick & West, Tyler G. Newby, Janie Yoo Miller, Esther D. Galan, and David W. Feder for Petitioner Snap, Inc.

Perkins Coie, Julie E. Schwartz, Natasha Amlani, Michel C. Bleicher, and Ryan Mrazik for Petitioner Meta Platforms, Inc.

Paul Rodriguez, Public Defender, Troy A. Britt, Deputy Public Defender, for Real Party in Interest Adrian Pina.

Summer Stephen, District Attorney, Linh Lam and Karl Husoe, Deputy District Attorneys for Real Party in Interest The People.

This writ proceeding presents a question of first impression that was raised but not decided by the California Supreme Court in *Facebook, Inc. v. Superior Court* (2020) 10 Cal.5th 329 (*Touchstone*): Whether the business models of social media companies like Meta, Inc. (Meta) and Snap, Inc. (Snap), under which they access their customer's data for their own business purposes, excludes them from the limitations imposed on the disclosure of information by the Stored Communications Act (18 U.S.C. § 2701 et seq., SCA or the Act[1]). As we shall explain, we conclude that the companies' ability to access and use their customers' information takes them outside the strictures of the Act.

Adrian Pina, real party in interest, was charged with the murder of his brother, Samuel, and the attempted murder of another man, and currently awaits trial on the charges. Last September, Pina's defense counsel issued

---

[1]    All further section citations are to title 18 of the United States Code unless otherwise indicated.

App. 070

criminal defense subpoenas to Snap, the corporation which operates Snapchat, and Meta, the corporation that operates Facebook and Instagram, seeking social media posts and other communications made by Samuel on those platforms in the two years prior to his death. Pina seeks this material because he believes it may contain information relevant to his defense, specifically showing Samuel's violent character.

After Snap sent a letter to Pina's counsel indicating it would not provide the requested information and Meta ignored the initial subpoena, the trial court issued an order directing compliance by a hearing set for January 8, 2024. This prompted Snap to file a motion to quash the subpoena, asserting its compliance with it was precluded by the SCA. Meta filed a motion to quash during the January 8, 2024 hearing. At the conclusion of that hearing, the court denied both motions.

Snap and Meta promptly petitioned this court for writs of mandate staying the trial and vacating the trial court's order. In response, we issued an order to show cause, stayed the trial court proceedings, and consolidated the two petitions. Among other arguments, Snap and Meta assert the trial court's order requiring them to disclose the requested communications and data to Pina is precluded by the SCA and that the trial court failed to make the good cause findings required for this pretrial discovery under *Touchstone*.

We agree with Pina that the trial court conducted a sufficient analysis of good cause, that the facts presented by Pina supported the court's determination that good cause existed, and that because the business models of Snap and Meta provide them with the ability to access and use the information sought by Pina, the SCA does not foreclose production of that information. However, we agree with Pina that the material should not be disclosed directly to him. Rather, under Penal Code section 1326,

3

subdivision (d), the material should first be produced to the trial court in camera for the court to determine whether the material is relevant to Pina's defense and if it should be produced to him.

FACTUAL AND PROCEDURAL BACKGROUND

Pina is charged with murder (Pen. Code, § 187), attempted murder (*id.,* §§ 664, 187), and possession of a firearm by a felon (*id.,* § 29800). The murder and firearm charges relate to the shooting death of Samuel that took place on December 26, 2021. The attempted murder charge relates to a shooting incident involving another victim that is alleged to have occurred earlier the same day. During the preliminary hearing on December 7, 2022, Samuel's girlfriend testified that Samuel and Pina shared the gun used in his murder. She also stated she had posted a picture of Samuel with another gun on her Snapchat account, and that the photo might be saved in her "Snapchat memories."

During pretrial discovery, the prosecution provided Pina's defense counsel with an extraction of data from Samuel's cell phone. According to Pina's counsel, the extraction contained over 100,000 PDF pages and was not in a format that allowed for viewing of the raw data or navigation through the phone's contents. On October 20, 2023, defense counsel brought a partially successful motion to compel, and was permitted to view the phone at the Oceanside Police Department. The phone contained videos of fights and suggested gang affiliation, and showed there was data on the phone that was not previously provided to Pina's defense counsel. This resulted in an additional court order to "re-extract" Samuel's cell phone data and provide the full contents, including its raw data, to Pina's counsel. The defense received the data on November 16, 2023.

4

The information defense counsel viewed on the cell phone also prompted Pina's counsel to believe that Samuel's social media accounts might contain relevant evidence to support Pina's defense. On September 26 and 28, 2023, respectively, Pina issued subpoenas duces tecum to Snap and Meta to compel the corporations to bring to court or produce to the defense the contents of Samuel's social media accounts on or by October 20, 2023. The subpoena to Snap called for the production of "any and all account information, including posts, photos, and messages ...." The subpoena to Meta called for the production of "[a]ll records associated with Samuel's account including basic subscriber records as well as stored contents of the account, including timeline posts, messages, phone calls, videos, location information, and information from 1/1/2020 to December 31, 2021."

In response to the subpoena, on October 16, 2023, Snap sent a letter to defense counsel objecting and stating it would not produce any records. Meta did not respond to the subpoena. On December 8, 2023, the trial court signed an order directing both corporations to produce the records, which, on December 12, 2023, defense counsel served on Snap and Meta with new versions of the subpoenas.[2] The production was ordered by January 8, 2024, and a hearing was set for the same date.

On December 29, 2023, Snap filed a motion to modify in part, and quash in part the subpoena. Snap agreed to produce basic subscriber information, but asserted it could not provide any additional information because doing so was prohibited by the SCA. Meta did not file any response

---

[2]    The subpoena to Snap was updated to request: "(1) All records associated with Samuel Pina's account, including basic subscriber records as well as stored (2) contents of the account including posts, photos, messages, phone calls, videos, location information, and (3) information from 1/1/2020 to December 31, 2021." The subpoena to Meta was unchanged.

App. 073

to the subpoena before the January 8, 2024 hearing date, but did submit a motion to vacate, modify, or quash Pina's subpoena during the hearing. Like Snap, Meta asserted the communications and data sought by Pina were protected by the SCA, as well as the Revised Uniform Fiduciary Access to Digital Assets Act (Prob. Code, § 870 et seq.). Meta also argued that Pina had not shown good cause for the requested information. Specifically, it argued Pina had not shown any relationship between the requested information and his defense, or that he could not obtain the information from other sources. Finally, Meta argued it was deprived of due process because it had no record of receiving Pina's first subpoena and thus had no opportunity to object.

Also on the date of the hearing, Pina filed an opposition to Snap's motion to quash. Pina, citing *Touchstone, supra*, 10 Cal.5th 329, asserted Snap did not fall within the purview of the SCA because its terms of service require users to agree to allow Snap to retain and use the information they put on Snapchat for its own business purposes. Pina also asserted his right to prepare his defense, specifically to show Samuel's violent nature, outweighed any privacy concern of Samuel.

At the hearing, the trial court indicated it was inclined to deny both Snap's and Meta's motions. The court noted Snap's and Meta's arguments, and Pina's assertion that the communications at issue were not protected by the SCA because the corporations "mine data" and use it for profit. The court was also concerned with the lopsided nature of Snap and Meta's position, noting "the problem I'm having ... let's say that this subpoena came from the prosecution or ... from a law enforcement agency, hypothetically [the] San Diego Police Department, or just this court ... would you have filed a motion to quash?" Snap's and Meta's counsel both responded they would have

6

complied with a valid search warrant for the same information. The prosecutor stated she did not oppose Pina's request for this information. She also stated, however, that she was not willing to seek the information herself because the "Oceanside Police Department ha[d] conducted [its] investigation," the prosecution had the evidence it needed and was ready to proceed to trial, and Pina was conducting a "fishing expedition" to try to paint Samuel "in a negative light, as a violent person."

The court then stated it had already determined by its prior order compelling the production that the information sought was relevant and that there was probable cause for the information. Snap's counsel responded that probable cause was not the proper standard for the court to consider, and instead the court was required to assess good cause under the factors set forth in *Touchstone*. The court agreed and then specifically discussed those factors, finding the material sought was not publicly available, there was no other way for Pina to obtain the material, and that Pina had shown a plausible justification for the material based on the information he submitted from Samuel's cell phone, which had been provided to the defense by the Oceanside police. Pina's counsel noted that Snap had not argued that good cause for the subpoena was lacking in its motion to quash, instead relying entirely on the SCA, and that the information submitted by Pina in support of his opposition to the motion showed good cause.

Meta's counsel then requested a continuance of the hearing to allow it to receive opposition to its motion filed that day, which Pina's counsel had yet to receive. Like Snap, Meta also argued the SCA precluded it from providing the communications and data sought by Pina. The trial court stated it understood counsel's arguments, but was finding sufficient probable cause existed and denied both motions to quash. The court ordered the production

7

of the information by January 18, 2024. On January 12, 2024, Snap filed a motion to stay the production pending the resolution of its forthcoming petition for a writ of mandate. The court granted the motion extending the deadline to produce the information to February 2, 2024.

Snap filed its petition for writ of mandate in this court on January 17, 2024, and Meta filed its petition on January 19, 2024. We then issued an order staying the proceedings in the trial court and requesting informal responses from real parties in interest Pina and the District Attorney. After receiving the informal responses, we consolidated the two cases, issued an order to show cause, and set deadlines for the filing of the real parties' return and the petitioners' reply briefs.

DISCUSSION

In their petitions, both Snap and Meta argue that the trial court's order denying their motions to quash was flawed because Pina did not establish good cause for the subpoenaed material. The District Attorney sides with the corporate third parties, asserting the court failed to conduct an adequate analysis under *Touchstone*. Pina argues that the court's analysis was sufficient, and the court did not err in finding he established good cause for the material, which he argues may contain information helpful to his defense.

Snap and Meta also assert that the production of the requested material is precluded by the SCA. The District Attorney responds that these entities are not covered by the SCA in this case, and they have presented insufficient evidence to establish they constitute electronic communication service (ECS), or remote computing service (RCS) providers as defined by that law. Pina also asserts that Snap and Meta do not qualify as ECS or RCS providers and, therefore, the SCA does not prevent production of the requested material. He also contends that the SCA would be

8

App. 076

unconstitutional if it were applied in this case because it would violate his equal protection, due process, and fair trial rights.

I

*Law Governing a Motion to Quash a Subpoena Duces Tecum*

*Touchstone, supra,* 10 Cal.5th 329, provides a helpful starting point. There, the Supreme Court set forth the relevant statutes and case law that relate to the issuance of criminal subpoenas.[3] "Under Penal Code section 1326, subdivision (a), various officials or persons—including defense counsel, and any judge of the superior court—may issue a criminal subpoena duces tecum, and, unlike civil subpoenas, there is no statutory requirement of a " 'good cause' " affidavit before such a subpoena may be issued. [Citations.] It is important to note, however, that such a criminal subpoena does not command, or even allow, the recipient to provide materials directly to the requesting party. Instead, under subdivision [(d)] of section 1326, the sought materials must be given *to the superior court* for its in camera review so that it may 'determine whether or not the [requesting party] is entitled to receive the documents.' (Pen. Code, § 1326, subd. [(d)]; see also *People v. Blair* (1979) 25 Cal.3d 640, 651 [such materials cannot legally be given directly to the requesting party].)" (*Touchstone,* at pp. 343–344.)

"Although no substantial showing is required to *issue* a criminal subpoena duces tecum, as explained below, in order to *defend* such a

---

3    Meta argues that because the California Electronic Communication Privacy Act (Pen. Code, § 1546 et seq., CalECPA) requires *the government* to obtain a search warrant in order to compel it to turn over content, that statute entirely forbids a defendant in a criminal trial from obtaining such information. This is not an accurate assertion of the law. Rather, as we shall discuss, criminal defendants have the opportunity to obtain discovery of relevant information to their defense through the procedure set forth in Penal Code section 1326.

subpoena against a motion to quash, the subpoenaing party must at that point establish good cause to acquire the subpoenaed records.  In other words, as we have observed, at the motion to quash stage the defendant must show 'some cause for discovery other than "a mere desire for the benefit of all information." ' " (*Touchstone, supra,* 10 Cal.5th at p. 344; see also *People v. Madrigal* (2023) 93 Cal.App.5th 219, 256 (*Madrigal*) ["To acquire the materials, the defendant must make a showing of good cause—that is, specific facts justifying discovery."].)  " ' "[T]he good cause requirement embodies a 'relatively low threshold' for discovery." ' ... An accused is entitled to any ' "pretrial knowledge of any unprivileged evidence, or information that *might lead to the discovery of evidence,* if it appears reasonable that such knowledge will assist him in preparing his defense....' " ' " (*Id.,* at pp. 256–257, italics added.)

To determine whether good cause has been established, the *Touchstone* court looked to the seven factors set forth in *City of Alhambra v. Superior Court* (1988) 205 Cal.App.3d 1118 (*Alhambra*).  " '[T]he trial court ... must consider and balance' [these seven factors] when 'deciding whether the defendant shall be permitted to obtain *discovery* of the requested material.' "4 (*Touchstone, supra,* 10 Cal.5th at p. 344.)  First, the defendant must show a " ' "plausible justification" ' " for acquiring documents from a third party [citations] by presenting specific facts demonstrating that the subpoenaed documents are admissible or might lead to admissible evidence that will reasonably ' "assist [the defendant] in preparing his defense." ' " (*Touchstone,* at p. 345.)  The defendant is not permitted to go on "an impermissible

---

4    "For convenience," the *Touchstone* court referred "to these seven considerations as the '*Alhambra* factors.' " (*Touchstone, supra,* 10 Cal.5th at p. 347.)  We do the same.

10

' "fishing expedition." ' " (*Ibid.*)  This factor is the "most significant" of the seven.  (*Id.* at p. 345, fn. 6.)

Second, the material sought must be "adequately described and not overly broad." (*Touchstone, supra,* 10 Cal.5th at p. 346.)  Third, the court must consider if "the material [is] 'reasonably available to the ... entity from which it is sought (and *not* readily available to the defendant from other sources)." (*Ibid.*)  Fourth, the court must consider whether "production of the requested materials violate a third party's 'confidentiality or privacy rights' or intrude upon 'any protected governmental interest.' " (*Ibid.*)  Fifth, the request must be timely, and not premature.  (*Id.* at p. 347.)  Sixth, the court must consider whether "the 'time required to produce the requested information ... [would] necessitate an unreasonable delay of defendant's trial.' " (*Ibid.*)  And finally, the court must assess whether " 'production of the records containing the requested information ... place[s] an unreasonable burden on the [third party].' " (*Ibid.*)

We review the trial court's decision denying a motion to quash a criminal subpoena for abuse of discretion.  (*Pitchess v. Superior Court* (1974) 11 Cal.3d 531, 534.)

## II

### *The Trial Court Did Not Abuse Its Discretion by Finding Good Cause*

#### A

##### *Snap's and Meta's Due Process Rights Were Not Violated*

As an initial matter, we reject Snap's and Meta's assertions that their due process rights were violated by the trial court's denial order.  In its petition, Snap takes issue with the trial court's December 8, 2023 order requiring it to comply with Pina's subpoena and argues the court erred by proceeding ex parte.  After receiving the initial subpoena, dated September

11

26, 2023, calling for a response or production of the requested information by October 20, 2023, Snap sent a letter to Pina's counsel indicating it would not comply. Snap, however, did not file a motion to quash the subpoena, the only available method to avoid compliance, prior to the December 8, 2023 hearing. (See Code Civ. Proc., § 1987.1 [setting forth procedure to quash subpoena duces tecum]; *City of Los Angeles v. Superior Court* (2003) 111 Cal.App.4th 883, 888 ["In general, the procedural remedy against a defective subpoena duces tecum ... is a motion to quash, vacate, recall, or modify the subpoena."].) Thereafter, Snap filed its motion to quash and was provided with opportunity to argue its position at the January 8, 2024 hearing.

Meta also contends that the trial court impinged on its due process rights by not affording it the opportunity to provide further briefing on a shortened briefing schedule as it requested. Unlike Snap, Meta did not respond at all to the initial subpoena served by Pina.[5] In addition, after receiving the second subpoena accompanied by the court's December 8, 2023 order, Meta failed to act promptly. Meta retained counsel, who contacted Pina's defense counsel just five days before the January 8, 2024 hearing. It asserts that during that conversation, Pina's counsel agreed Meta could file its motion to quash on January 8, 2024.

At the hearing, Meta's attorney, Micheal C. Bleicher, stated that he requested a continuance from Pina's counsel to see if they could work out an informal resolution. Bleicher stated that Pina's counsel responded she could not agree to a continuance but they "agreed that Meta could file a response to the subpoena and order by January 8, today." Bleicher stated his

---

5    Meta's counsel asserted in her declaration in support of Meta's motion to quash that "Meta does not have any record of receiving" the initial subpoena issued by Pina.

12

"understanding was that today's hearing, as far as Meta [was] concerned, would be an opportunity to explain to the court that Meta was appearing in response to the subpoena and order, to state these objections, and to work out an abbreviated briefing schedule so that Meta could receive the defendant's opposition to its motion before" its substance was addressed. The court denied this request, repeating its finding that good cause for the subpoena had been shown and denied both motions to quash.

We reject Snap's assertion that the court's December 8, 2023 relevance finding was improper because Snap did not appear at the hearing on that date. Rather, we agree with Pina that Snap's decision to rest on its letter, rather than bring a motion to quash after receiving the initial subpoena, bars this argument. Likewise, Meta's failure to act in a timely manner bars its argument that it was deprived of due process. Further, Snap filed its motion and received opposition, and, as Pina points out, Snap and Meta were both provided the opportunity to make a record at the hearing without constraint.

B

*Good Cause Supports the Trial Court's Denial of the Motions to Quash*

Meta, Snap, and the District Attorney contend the trial court made an inadequate record concerning its good cause finding. We disagree. As Snap asserts, when a defendant seeks information via a subpoena duces tecum from a third party that is challenged by a motion to quash he "must make a showing of good cause—that is, specific facts justifying discovery." (*Madrigal, supra,* 93 Cal.App.5th at p. 256.) Further, the trial court must "create a record that facilitates meaningful appellate review. ... [A] trial court should, at a minimum, articulate orally, and have memorialized in the reporter's transcript, its consideration of the relevant factors." (*Touchstone,*

13

App. 081

*supra*, 10 Cal.5th at p. 358.)  Contrary to Meta's and Snap's assertions, this relatively low bar was satisfied by the trial court here.

We do agree with the petitioners that the probable cause standard cited at points by the trial court during the January 8, 2024 hearing was not the correct one.  The court, struck by the petitioners' concession that they would not object to providing the material to law enforcement in response to a valid search warrant, referred several times to the probable cause standard applied in that context.[6]  This was not the correct standard for the defense subpoenas at issue.  However, the court itself noted at the outset of the hearing the correct standard and that it was required to assess the *Alhambra* factors.  And, once Meta's counsel pointed out that standard, the court articulated its determination under the *Alhambra* factors, stating explicitly it had considered the factors and found good cause existed for the subpoenaed material.  Its explanation satisfied *Touchstone*'s requirement that the court "articulate orally, and have memorialized in the reporter's transcript, its consideration of the relevant factors." (*Touchstone*, 10 Cal.5th at p. 358; see also *In re Marriage of Askmo* (2000) 85 Cal.App.4th 1032, 1040 ["Code of Civil Procedure section 632 requires the trial court to issue a statement of decision 'upon the trial of a question of fact' when it receives a request therefor by a party appearing at trial.  In general, however, section 632 applies when there has been a trial followed by a judgment. [Citation.]  It does not apply to an

---

6    Under this test, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him ... there is a fair probability that contraband or evidence of a crime will be found in a particular place.  And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... [concluding]' that probable cause existed." (*Illinois v. Gates* (1983) 462 U.S. 213, 238–239.)

14

order on a motion. ... This is true even if the motion involves an evidentiary hearing and the order is appealable."].)

Turning to the *Alhambra* factors, we also agree with Pina that the court did not abuse its discretion and reasonably concluded good cause exists for the subpoenaed materials. "We first consider whether defense counsel demonstrated a 'plausible justification' for acquiring the documents. This is the 'most significant' consideration, and 'should be given prominence.' " (*Madrigal, supra*, 93 Cal.App.5th at p. 258.) The trial court concluded that a plausible justification existed based on the information obtained from Samuel's phone and his girlfriend's testimony at the preliminary hearing. The court stated the information obtained from Samuel's phone showed "the victim could potentially have some violent tendencies, which may or may not be relevant at trial which ... does satisfy that plausible justification."

The evidence submitted by Pina in support of his opposition to the motion to quash showed a photograph of Samuel with the gun used in the shooting, suggesting that Samuel's social media accounts might contain similar material that could support Pina's defense, either if he acted in self-defense during an altercation with his brother or to show that Samuel had a violent character. Samuel's girlfriend, in fact, stated that she took a picture of Samuel holding a gun that was posted on Snapchat. These facts supported the court's finding that the requested material could be relevant to Pina's defense and could contain admissible evidence about Samuel's character. (*Touchstone, supra*, 10 Cal.5th at p. 348 [" ' "A showing ... that the defendant cannot readily obtain the information through his own efforts will ordinarily entitle him to pretrial knowledge of any unprivileged evidence, or information that might lead to the discovery of evidence, if it appears reasonable that such knowledge will assist him in preparing his defense...." ' "], italics

15

omitted.) This conclusion was reasonable, and not an abuse of the court's discretion.

Indeed, as Meta points out in its petition, the prosecutor "conceded at the hearing that this material *could* be relevant, exculpatory evidence that the prosecution has an obligation to obtain via search warrant" and that "if the prosecution did so, the material could be discoverable." Further, all parties agreed at the hearing that had the prosecution obtained a search warrant for the same material, there would be probable cause to support the warrant. While the two standards are arguably not identical, they bear strong similarities, and certainly a finding of probable cause (which was conceded by the petitioners) suggests the existence of good cause in the context of a defense subpoena.

Snap argues that plausible justification for material from its platform does not exist, and the defense is on an impermissible "fishing expedition," because the exhibits submitted by the defense in opposition to its motion to quash contained only photographs from Meta's platforms. However, as stated, the preliminary hearing transcript shows that Samuel's girlfriend indicated there were photographs on Snapchat that showed him with a gun. This evidence was sufficient to show a plausible justification to obtain the requested material from Snap.

The next *Alhambra* factor requires the court to assess whether the request is "adequately described and not overly broad." (*Touchstone, supra,* 10 Cal.5th at p. 346.) Snap and Meta contend the material sought by the subpoenas is not sufficiently narrow because it seeks all content from Samuel's accounts over a two-year period. Pina responds that without access to Samuel's accounts it is not possible to draft a more narrow or specific request. Further, Pina points to the trial court's statement that defense

16

"focused in on specific data, which very well could exist, since we've already been through the phone and realized there's some matter there that could be relevant."

The requested material is somewhat broad. However, as Pina notes, there is no way to narrow the request because the contents of the accounts are not known.[7] As Pina concedes, the proper procedure is for the material to be produced to the court for an in camera inspection so that its relevance can be further considered by the trial court before the material is produced to Pina. We agree with Pina that the trial court's decision that this factor does not prevent disclosure was appropriate in these circumstances.[8]

We also reject Snap's assertion that the sixth, fourth, and seventh *Alhambra* factors favored granting its motion to quash. Snap argues the request is untimely because Samuel's girlfriend's testimony at the preliminary hearing that she posted a photo of Samuel on her Snapchat account took place on December 7, 2022, more than ten months before the

_____

[7] At oral argument, Snap and Meta took issue with the two-year period set forth in the subpoenas. We cannot say, however, as a matter of law that this timeframe is overbroad.

[8] The two cases cited by Snap, which involve far broader requests than the ones at issue here, do not persuade us otherwise. (See *People v. Serrata* (1976) 62 Cal.App.3d 9, 15 [holding trial court did not abuse its discretion by quashing a subpoena calling "for the production of 'literally millions of pieces of paper' which were located at IBM plants throughout the world and which constituted the work product of numerous teams of experts and scientists who had devoted as much as four or five years to the development of the sixteen complex computer devices which were the subject of the subpoenas"]; and *Lemelle v. Superior Court* (1978) 77 Cal.App.3d 148, 166–167 [order granting motion to quash subpoena seeking 10 years of all crime and arrest reports made by two police officers was overly broad and burdensome, especially in light of order granting other similar discovery to defendant].)

17

App. 085

subpoenas were issued. However, the record shows that Pina's public defender was pursuing discovery in this case over the course of 2023, including working to obtain the contents of Samuel's cell phone from the Oceanside Police Department. It wasn't until the fall of 2023 that Pina's counsel received additional evidence from that phone suggesting Samuel's social media content might contain additional relevant information. This record does not show the court's finding that the request was timely is an abuse of discretion.

The fourth *Alhambra* factor, whether the requested material violates individual privacy rights or intrudes on a protected government interest, also does not support reversal of the court's order denying the petitioners' motions to quash. With respect to privacy, Snap points to the SCA. As we shall explain, however, we conclude the SCA does not apply to this case because the information sought is not the type of private information to which that law applies. Given this conclusion, we are left only with the privacy concerns of Samuel and the third parties that he interacted with. Samuel is deceased and we agree with Pina that any privacy interest that remains with respect to Samuel's interest is outweighed by Pina's interest to discover information that is potentially relevant to his defense. Further, as stated, because the statutes governing the production of this information allow for the material to be produced only to the trial court for a determination of its relevance, any privacy concern is significantly mitigated. Accordingly, we agree with Pina that this factor does not show the court's order was an abuse of discretion.

Finally, with respect to the final *Alhambra* factor (whether the request is unreasonably burdensome to the nonparty), the only burden Snap cites in its petition is its potential civil liability under the SCA. The SCA does impose civil liability for violations of the Act. (§ 2707.) However, as Snap

18

App. 086

recognizes, the law contains a safe harbor for good faith reliance on a court order requiring disclosure. (§ 2707(e)(1).) There is no question that the safe harbor applies in this case.

Only Meta's petition specifically addresses the third *Alhambra* factor, whether "the material [is] 'reasonably available to the ... entity from which it is sought (and *not* readily available to the defendant from other sources).' " (*Touchstone, supra*, 10 Cal.5th at p. 346.) Meta argues the court failed to adequately assess this factor or consider whether Pina could obtain Samuel's Instagram or Facebook content from another user Samuel interacted with, a "legacy contact" for Facebook,[9] or another person with access to Samuel's account. At the January 8, 2024 hearing, however, the court explicitly found that there was no other source for Pina to obtain this information, and no "legacy contact" for Samuel. In response, Meta made no argument to counter this finding and in its petition, despite being the repository for the material at issue, does not indicate whether a legacy contact exists.

Particularly in light of the length of time since Samuel's death, we agree with Pina that the trial court's determination that the material at issue is not available from other sources was a reasonable finding, and not an abuse of the court's discretion. As with the other *Alhambra* factors, this factor also supports the court's conclusion that Pina provided good cause for the information sought in his subpoenas to Snap and Meta that may contain information relevant to Pina's defense to the murder of his brother.

---

9    Meta explains that " '[a] legacy contact is someone you choose to look after your main profile if it's memorialized after you've passed away. If you add a legacy contact, that person will be able to make decisions about your main profile once it is memorialized.' "

19

C

*Procedure for Disclosure*

As discussed, the procedure for Pina to obtain this information does not require Snap and Meta to produce the material directly to Pina. Rather, under "subdivision [(d)] of section 1326, the sought materials must be given to the superior court for its in camera review so that it may 'determine whether or not the [requesting party] is entitled to receive the documents.' (Pen. Code, § 1326, subd. [(d)]; see also *People v. Blair* (1979) 25 Cal.3d 640, 651 [such materials cannot legally be given directly to the requesting party].)" (*Touchstone, supra*, 10 Cal.5th at p. 344.) Accordingly, we direct the trial court to issue a modified order requiring the petitioners to provide the requested material to the trial court for its consideration of whether or not the material should be provided to Pina as relevant to his defense.

III

*The SCA Does Not Apply to the Subpoenaed Material*

A

*Touchstone, supra*, 10 Cal.5th 329, identified another critical issue now placed squarely before this court: Whether these social media companies' "business model[s] place[ them] outside key provisions of the SCA and render[ them] subject to an enforceable state subpoena." (*Id.* at p. 360.) In *Touchstone*, a defendant charged with attempted murder issued a subpoena to Facebook seeking all of the victim's "Facebook communications (including restricted posts and private messages), and a related request that Facebook preserve all such communications." (*Id.* at p. 342.) The defendant, Lance Touchstone, supported the subpoena "by offering a *sealed* declaration describing and quoting certain public Facebook posts made by [the victim] after the shooting that, defendant asserted, revealed [the victim's] violent

20

App. 088

general musings." (*Id.* at p. 342.) "The trial judge ordered Facebook to comply with the subpoena or appear in court to address any objection to it and to preserve the account and related stored communications." (*Ibid.*)

Facebook then moved to quash the subpoena. The trial court denied the motion, "finding good cause for the subpoena" based on Touchstone's sealed declaration and a subsequent, second sealed declaration containing additional public Facebook posts. (*Touchstone, supra,* 10 Cal.5th at p. 355.) However, "[n]either the reporter's transcript of the hearing, nor the resulting minute order, reflect[ed] that the court expressly considered and balanced the most relevant *Alhambra* factors." (*Id.* at pp. 355–356.)

Like Meta and Snap in this case, Facebook filed a petition for writ of mandate seeking to overturn the trial court's order. The Court of Appeal reversed the trial court's decision, rejecting the defendant's claims that to "the extent the SCA allows Facebook to block his subpoena, the Act must be found to violate his federal Fifth Amendment due process rights, along with his Sixth Amendment rights of confrontation, cross-examination, and counsel—and hence [that] the SCA is unconstitutional as applied to him." (*Touchstone, supra,* 10 Cal.5th at p. 338.) In the Supreme Court, the defendant advanced the same constitutional arguments. (*Ibid.*)

The Supreme Court, however, identified significant problems with the underlying record. In particular, the documents that had been filed under seal in the trial court presented an incomplete picture of the factual basis for the material sought by the defendant from Facebook. (*Touchstone, supra,* 10 Cal.5th at pp. 339–341.) Further, because it sealed the subpoena, the trial court had proceeded on an ex parte basis, without the full participation of the prosecution or the subpoenaed third party. (*Ibid.*) The Supreme Court concluded this procedure called into question the veracity of the assertions

21

App. 089

that had been made by the defendant in the underlying proceedings. (*Id.* at p. 341.) In addition, and critically, the Supreme Court held that the trial court had failed to conduct the proper analysis to determine good cause. It held "the trial court below abused its discretion when ruling on the motion to quash by failing to apply the seven-factor *Alhambra* test," and remanded the matter "to afford the trial court an opportunity to consider the good cause issue anew, this time with full participation by all three parties." (*Id.* at p. 359.)

The *Touchstone* court, thus, did not reach the constitutional issues asserted by the defendant concerning the SCA. (*Touchstone, supra*, 10 Cal.5th at p. 359.) The Supreme Court, however, did *address*, but not decide, the issue of "whether [Facebook] is covered and bound by the SCA." (*Id.* at p. 360.) The defendant and prosecutor there, as here, jointly argued "that Facebook's business model places it outside key provisions of the SCA and renders it subject to an enforceable state subpoena." (*Ibid.*) They asserted that Facebook's Terms of Service and Data Policy constitute a "business model of mining its users' communications content, analyzing that content, and sharing the resulting information with third parties to facilitate targeted advertising," which "precludes it from qualifying as an entity subject to the SCA." (*Ibid.*)

Facebook responded by suggesting the court's opinion in *Facebook, Inc. v. Superior Court* (2018) 4 Cal.5th 1245 (*Hunter*), and decisions in other prior litigation, had resolved the question and determined that Facebook operates as a provider of either ECS or RCS under the SCA. (*Touchstone, supra*, 10 Cal.5th at p. 360.) The Supreme Court, however, rejected this assertion, stating that in *Hunter*, it "undertook no substantive analysis concerning whether the entities in that case (including Facebook) provide ECS or RCS

22

with regard to the communications there at issue.  Because (1) prior decisions had found or assumed that Facebook and analogous social media entities provide *either* ECS or RCS with regard to the type of sought posts and/or messages at issue in those prior cases and in *Facebook* (*Hunter*), and (2) neither party in *Facebook* (*Hunter*) contested the issue, [the court] stated that [it] saw 'no reason to question [that] threshold determination.' ([*Hunter, supra,*] 4 Cal.5th at p. 1268.)  Accordingly, [the court] assumed, but did not decide, that Facebook provided either ECS or RCS with regard to the communications sought—and hence was covered by the Act's general ban on disclosure of content by any entity providing those services." (*Touchstone*, at pp. 360–361.)  The Supreme Court stated explicitly, it "did not consider whether, under the business model theory..., Facebook provides either ECS or RCS, or neither, under the Act" and that "potentially dispositive issue remain[ed] unresolved." (*Id.* at p. 361.)

Of great importance here, in a concurring opinion, then Chief Justice Cantil-Sakauye wrote separately to specifically "explore [the business model] theory in greater depth because, in [her] view, it deserve[d] additional and focused attention, perhaps on remand in [the present] case or at least in other similar future litigation." (*Touchstone, supra*, 10 Cal.5th at p. 361 (conc. opn. of Cantil-Sakauye, C. J.).)  The concurrence outlines the contours of the business model argument advanced by the defense and district attorney, Facebook's response, and the applicable statutory language of the SCA. (*Id.* at pp. 363–366.)

Meta's Terms of Service for Facebook, of which we take judicial notice in this case, provide:  "Instead of paying to use Facebook and the other products and services we offer, by using the Meta Products covered by these Terms, you agree that we can show you personalized ads and other

23

App. 091

commercial and sponsored content that businesses and organizations pay us to promote on and off Meta Company Products. We use your personal data, such as information about your activity and interests, to show you personalized ads and sponsored content that may be more relevant to you." (Facebook, Terms of Service <www.facebook.com/legal/terms> (revised July 26, 2022) [as of July 23, 2024], archived at <https://perma.cc/5A49-85MR>, pt. 2, *How our services are funded*.) Moreover, the terms provide: "We need certain permissions from you to provide our services: [¶] .... [¶] [T]o provide our services we need you to give us some legal permissions (known as a 'license') to use this content. ... [¶] Specifically, when you share, post, or upload content that is covered by intellectual property rights on or in connection with our Products, you grant us a non-exclusive, transferable, sub-licensable, royalty-free, and worldwide license to host, use, distribute, modify, run, copy, publicly perform or display, translate, and create derivative works of your content (consistent with your privacy and application settings). This means, for example, that if you share a photo on Facebook, you give us permission to store, copy, and share it with others (again, consistent with your settings) such as Meta Products or service providers that support those products and services." (*Id.*, at pt. 3, Your commitments to Facebook and our community, pt. 3.3, *The permissions you give us*, pt. 3.3.1, *Permission to use content you create and share*.)

Meta's Data Policy for Facebook, which we also take judicial notice of, states: " 'We collect the content, communications and other information you provide when you use our Products, including when you ... message or communicate with others. This can include information in or about the content you provide ... Our systems automatically process content and communications you and others provide to analyze context ... . [¶] ... [¶] We

24

App. 092

also receive and analyze content, communications and information that other people provide when they use our Products.' ([Facebook, Data Policy <www.facebook.com/full_data _use_policy> (revised Apr. 19, 2018) (as of Aug. 10, 2020)], at pt. I, W*hat kinds of information do we collect?/ Things you and others do and provide/ Information and content you provide/ Things others do and information they provide about you*.)" (*Touchstone, supra,* 10 Cal.5th at pp. 362–363, fn. 3. (conc. opn. of Cantil-Sakauye, C. J.).)

"Facebook's Data Policy further explains it employs users' mined and analyzed content to facilitate various services, including to '[p]rovide, personalize, and improve our Products. [¶] ... and make suggestions for you' by showing users 'personalize[d] ads, offers, and other sponsored content.' ([Facebook, Data Policy <www.facebook.com/full_data _use_policy> (revised Apr. 19, 2018) (as of Aug. 10, 2020)], at pt. II, *How do we use this information?/ Provide, personalize and improve our Products/ Ads and other sponsored content.*) In that regard, Facebook relates, it shares information about its users' content with 'third-party partners ... which [in turn] makes it possible to operate our companies and provide free services to people around the world.' (*Id.*, at pt. III, *How is this information shared?/ Sharing with Third-Party Partners.*) Facebook states that it 'do[es]n't *sell* any of your information to anyone,' but instead '[s]har[es] with,' 'work[s] with,' and 'provide[s]' that information to 'third-party partners.' (*Ibid.*, italics added.) Specifically, for some partners, it supplies 'aggregated statistics and insights that help people and businesses understand how people are engaging with their posts ... and other content.' (*Id.*, at pt. III, *Partners who use our analytics services.*) And for advertisers, Facebook explains: 'We provide ... reports about the kinds of people seeing their ads and how their ads are performing ... .' (*Id.*, at pt. III, *Sharing with Third-Party*

25

App. 093

*Partners/Advertisers*.)  At the same time, Facebook stresse[d]: '[W]e don't share information that personally identifies you (information such as your name or email address that by itself can be used to contact you or identifies who you are) unless you give us permission.  For example, we provide general demographic and interest information to advertisers (for example, that an ad was seen by a woman between the ages of 25 and 34 who lives in Madrid and likes software engineering) to help them better understand their audience. We also confirm which Facebook ads led you to make a purchase or take an action with an advertiser.' " (*Touchstone, supra*, 10 Cal.5th at p. 363, fn. 3. (conc. opn. of Cantil-Sakauye, C. J.).)  The concurrence also noted that "Facebook does not contest that it mines, analyzes, and shares with third party advertisers information about content found in, among other things, its users' communications—including restricted posts and private messages."[10] (*Id.* at pp. 362–363.)

The concurrence then provides an explanation of the relevant provisions of the SCA, explaining that under the Act, "ECS is defined as 'any service which provides to users thereof the ability to send or receive wire or electronic communications.' (§ 2510(15) [incorporated into the SCA by § 2711(1)].)  Section 2702(a)(1), directs that an '*entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while* [*the communication is*] *in electronic storage by that service.*' (Italics added.)  'Electronic storage' is defined in section 2510(17), as '(A) *any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof*; and [¶] (B) *any storage of such communication by an electronic communication service for purposes of backup protection of such*

---

10    Likewise, Meta does not contest this fact in the present case.

26

App. 094

communication.' (Italics added.)" (*Touchstone, supra*, 10 Cal.5th at p. 364 (conc. opn. of Cantil-Sakauye, C. J.).)

"RCS, by contrast, is defined as 'the provision to the public of computer storage or processing services by means of an electronic communications system.' (§ 2711(2).) Section 2702(a)(2)'s introductory language directs that an '*entity providing remote computing service to the public shall not knowingly divulge to any person or entity the contents of any communication which is carried or maintained on that service*' when certain conditions are met. (Italics added.)" (*Touchstone, supra*, 10 Cal.5th at p. 364 (conc. opn. of Cantil-Sakauye, C. J.).) "The next parts of section 2702(a)(2) describe the conditions that will trigger the duty of an entity providing RCS to 'not knowingly divulge' the contents of any communication carried or maintained by that entity. ... [T]he first condition set out in subsection (a)(2)(A) [states]: the 'carried or maintained' communication must be 'on behalf of, and received by means of electronic transmission from ... a subscriber or customer of such service.' " (*Ibid.*)

The opinion then explains, "[i]t is the second condition set out in section 2702(a)(2)(B) that lies at the center of the business model argument advanced by defendant and the district attorney. Under section 2702(a)(2)(B), the prohibition on disclosure by an entity that provides RCS applies only if the communication is carried or maintained on the service "*solely for the purpose of providing storage or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents of any such communications for purposes of providing any services other than storage or computer processing.*' (Italics added.)" (*Touchstone, supra*, 10 Cal.5th at p. 365 (conc. opn. of Cantil-Sakauye, C. J.).)

27

App. 095

The concurring opinion notes, "[t]his crucial passage is hardly a model of clarity. It appears to express two related conditions in order to qualify as a communication held by an entity that provides RCS: (1) the user's data must be transmitted to the provider 'solely for the purpose of providing storage or computer processing services'; *and* (2) the entity must 'not [be] authorized to access the contents of any such communications for purposes of providing any services other than storage or computer processing.' (§ 2702(a)(2)(B); see, e.g., Robison, Note, *Free at What Cost?: Cloud Computing Privacy Under the Stored Communications Act* (2010) 98 Geo. L.J. 1195, 1213–1214 ... [so construing the statute].) Based on this language, the author of the cited law journal and other commentators have argued that if the entity *is* 'authorized to access the contents of any such communication for purposes of providing any services *other than* storage or computer processing' (§ 2702(a)(2)(B), italics added)—that is, for the purposes of providing any services *in addition* to storage or computer processing—the Act's bar on disclosure is inapplicable. In other words, these commentators reason, such an entity would not be acting as an RCS that is, in turn, generally barred from disclosing communications content—and hence the entity would be subject to a viable subpoena duces tecum." (*Touchstone, supra,* 10 Cal.5th at pp. 365–366 (conc. opn. of Cantil-Sakauye, C. J.), fn. omitted.)

The concurring opinion then implores the United States Congress to update the then 34-year old, outdated law, which was adopted prior to the advent of the internet and long before the social media platforms at issue here came into existence. (*Touchstone, supra,* 10 Cal.5th at p. 366 (conc. opn. of Cantil-Sakauye, C. J.).) The opinion quotes from cases and scholarly literature over the past two decades expressing frustration with the SCA's failure to account for changes in technology and opines that "[b]ecause

28

Congress has not acted to alter the relevant provisions of the SCA despite the pleas of courts and commentators that it do so, litigants and judges have no option but to apply the Act's outdated definitions to the evolved and still developing technology and entities of today." (*Id.* at p. 368.)

After outlining the arguments of the parties, which are similar to those made here, and repeating the majority opinion's conclusion that whether Facebook falls within the ambit of the SCA's protections remains an open question, Chief Justice Cantil-Sakauye provided her tentative assessment of policy arguments made by Facebook in support of its position that the SCA barred it from producing any information in response to a criminal defense subpoena. (*Touchstone, supra,* 10 Cal.5th at p. 371.) In particular, Facebook asserted it should be afforded status as an ECS or RCS because "concluding otherwise would (1) unduly disrupt and impair technological innovation, (2) disappoint users' settled privacy expectations, and (3) frustrate its ability to protect against malware." (*Id.,* at p. 371 (conc. opn. of Cantil-Sakauye, C. J.).)

While noting "[t]he first two contentions certainly should give a court pause before holding that Facebook and similar entities fall outside section 2702(a)," the concurrence predicts "for practical marketplace reasons, it may be doubted that such a holding would likely lead to such disruptions or voluntary disclosures by most Internet entities, absent legal compulsion." (*Touchstone, supra,* 10 Cal.5th at pp. 371–372 (conc. opn. of Cantil-Sakauye, C. J.).) Additionally, the concurrence noted it was not "likely that law enforcement actors would attempt to compel entities to disclose users' communications with, as Facebook asserts in its briefing, 'a mere subpoena' " since "other laws and authority already protect against that." (*Ibid.*) "Finally," she stated, "as a matter of policy, a holding finding Facebook to lie

29

outside the SCA might have the beneficial effect of spurring long-needed congressional adjustment of the outdated Act, as repeatedly advocated by courts and commentators."[11]  (*Ibid.*)

B

Because we agree with Pina that the trial court conducted a sufficient good cause analysis, and that good cause supports the subpoenaed material, we are faced with the question *Touchstone*'s concurring opinions asked our state's lower courts to address.  We must decide whether the SCA applies in this circumstance to preclude discovery of the social media material subpoenaed by Pina.  In their petitions, Snap and Meta maintain that the SCA allows production of material in a criminal case only when it is requested by a government entity as defined by the Act and that the public defender does not meet this definition.

In response, Pina and the District Attorney both contend that neither Snap nor Meta qualify under the SCA's definition of ECS or RCS, and thus they cannot prevent disclosure of the subpoenaed material on that basis.  In its reply brief, Snap argues that under the statute's plain language, the SCA is applicable here and also that the real parties' interpretation of the statute

---

11  Writing in a separate concurrence, former Justice Cuéllar noted the importance of the issue now before us, i.e. "the crucial matter of how broadly to read the SCA—and, in particular, whether it protects Facebook and similar entities from the duty to honor valid subpoenas issued by our state courts," and implored lower courts "to take up [this] very question." (*Touchstone, supra*, 10 Cal.5th at p. 373 (conc. opn. of Cuéllar, J.).)  In his concurrence, Justice Cuéllar noted that courts "should endeavor to discern whether Congress's purpose in enacting the SCA encompassed protecting communications held by social media companies such as Facebook" and that "[t]he companies storing ever-expanding troves of data about our lives," as well as the people of California, "would surely benefit from greater clarity about the full extent of [those companies'] responsibility to honor a valid subpoena." (*Id.* at p. 374.)

30

would lead to absurd results by stripping the users of its platform of the privacy protections the SCA was designed to create.  Further, it asserts that the real parties' interpretation would "negatively impact [the] providers['] ability to protect their users and platforms by identifying wrongdoing, removing illicit content, and when appropriate, reporting responsible individuals to law enforcement...."  In its reply, Meta argues the issue was not sufficiently raised in the trial court and thus should not be considered in its writ petition and, alternatively, the SCA applies to preclude disclosure of the material subpoenaed by Pina.

1. *The SCA*

"Congress enacted the Electronic Communications Privacy Act in 1986. (ECPA; Pub.L. No. 99-508 (Oct. 21, 1986), 100 Stat. 1848, 1860.)  Title I of that law, amending the prior 'Wiretap Act,' addresses the interception of wire, oral, and electronic communications.  (§§ 2510–2521.)  Title II of the law, set out in chapter 121, is often referred to as the [SCA].  It addresses unauthorized access to, and voluntary and compelled disclosure of, such communications and related information.  (§§ 2701–2712.)" (*Hunter, supra,* 4 Cal.5th at p. 1262.)

"Prior to the ECPA's enactment, the respective judiciary committees of the House of Representatives and the Senate prepared detailed reports concerning the legislation.  Each explained that the main goal of the ECPA in general, and of the SCA in particular, was to update then existing law in light of dramatic technological changes so as to create a 'fair balance between the privacy expectations of citizens and the legitimate needs of law enforcement.' (H.R.Rep. No. 99-647, 2d Sess., p. 19 (1986) (hereafter House Report); see also Sen. Rep. No. 99-541, 2d Sess., p. 3 (hereafter Senate Report) [speaking of protecting both 'privacy interests in personal proprietary

31

information' and 'the Government's legitimate law enforcement needs'].) Each report also highlighted a related objective: to avoid discouraging the use and development of new technologies. These three themes—(1) protecting the privacy expectations of citizens, (2) recognizing the legitimate needs of law enforcement, and (3) encouraging the use and development of new technologies (with privacy protection being the primary focus)—were also repeatedly emphasized by the bill authors in their debate remarks. As this history reveals, and as a leading commentator on the SCA has explained, Congress was concerned that 'the significant privacy protections that apply to homes in the physical world may not apply to "virtual homes" in cyberspace,' and hence 'tried to fill this possible gap with the SCA.'" (*Hunter, supra,* 4 Cal.5th at pp. 1262–1263, fns. omitted.)

" 'The [SCA] reflects Congress's judgment that users have a legitimate interest in the confidentiality of communications in electronic storage at a communications facility. Just as trespass protects those who rent space from a commercial storage facility to hold sensitive documents, [citation], the [SCA] protects users whose electronic communications are in electronic storage with an ISP or other electronic communications facility.'" (*Juror Number One v. Superior Court* (2012) 206 Cal.App.4th 854, 860 (*Juror Number One.*)

"The SCA addresses two classes of service providers, those providing electronic communication service (ECS) and those providing remote computing service (RCS)." (*Juror Number One, supra,* 206 Cal.App.4th at p. 860.) "An ECS is 'any service which provides to users thereof the ability to send or receive wire or electronic communications.' (18 U.S.C. § 2510(15); see 18 U.S.C. § 2711(1).) An RCS provides 'computer storage or processing

services by means of an electronic communications system.'  (18 U.S.C. § 2711(2).)"  (*Id.* at pp. 860–861.)

Subject to certain conditions and exceptions, the SCA prohibits "ECS's from knowingly divulging to any person or entity the contents of a communication while in 'electronic storage' (§ 2702(a)(1)) and prohibits RCS's from knowingly divulging the contents of any communication 'which is carried or maintained on that service' (*id.*, § 2702(a)(2))."  (*Juror Number One, supra,* 206 Cal.App.4th at p. 861.)  In addition, "[i]f an entity does not act as a provider of ECS or RCS with regard to a given communication, the entity is not bound by any limitation that the SCA places on the disclosure of that communication—and hence the entity cannot rely upon the SCA as a shield against enforcement of a viable subpoena seeking that communication."  (*Touchstone, supra,* 10 Cal.5th at p. 363 (conc. opn. of Cantil-Sakauye, C. J.).)

As stated, the SCA prohibits an ECS "from divulging 'the contents of a communication while in electronic storage by that service.'[12]  (18 U.S.C. § 2702(a)(1).)  However[, as discussed in the *Touchstone* concurrence,] the term 'electronic storage' has a limited definition under the SCA.  It covers '(A) any *temporary, intermediate storage* of a wire or electronic communication *incidental to the electronic transmission* thereof; and (B) any storage of such communication by an electronic communication service *for purposes of backup* protection of such communication.'  (18 U.S.C. § 2510(17), [italics

---

12    Section 2702(a)(1) states that, subject to specified exceptions set forth in subdivisions (b) and (c), "a person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service."  (§ 2702(a)(1).)

33

added].)[13] Thus, only copies of electronic communications held by the ECS pending initial delivery to the addressee or held thereafter for backup purposes are protected." (*Juror Number One, supra*, 206 Cal.App.4th at p. 861.)

Similarly, "[a]n RCS is prohibited from divulging the content of any electronic transmission that is carried or maintained on its service 'solely for the purpose of providing storage or computer processing services to [the] subscriber or customer, if the provider is not authorized to access the contents of any such communications for purposes of providing any services other than storage or computer processing.' (18 U.S.C. § 2702(a)(2)(B).)"[14] (*Juror Number One, supra*, 206 Cal.App.4th at pp. 861–862.) "Thus, if the service *is* authorized to access the customer's information for other purposes, such as to provide targeted advertising, [as Chief Justice Cantil-Sakauye

---

13    Under section 2711(1), the terms defined in the Wiretap Act (§§ 2510–2521) of the ECPA at section 2510 are given the same definitions for purposes of the SCA.

14    Section 2702(a)(2) states, subject to specified exceptions set forth in subdivisions (b) and (c), that "a person or entity providing remote computing service to the public shall not knowingly divulge to any person or entity the contents of any communication which is carried or maintained on that service– [¶] (A) on behalf of, and received by means of electronic transmission from (or created by means of computer processing of communications received by means of electronic transmission from), a subscriber or customer of such service; [¶] (B) solely for the purpose of providing storage or computer processing services to such subscriber or customer, if the provider is not authorized to access the contents of any such communications for purposes of providing any services other than storage or computer processing ...."

34

suggests in *Touchstone*,] SCA protection may be lost."[15]  (*Juror Number One, supra*, 206 Cal.App.4th at p. 862.)

The next two subsections of section 2702—(b) and (c)—list the exceptions to the general prohibitions on disclosure by ECS and RCS providers that are contained in subsection (a).  "Subsection (b) describes eight circumstances under which a provider 'may divulge the contents of a communication.'  (§ 2702(b).)  As relevant here, subparts (1) through (3) of subsection (b) permit disclosure: (1) 'to an addressee or intended recipient of such communication or an agent of such addressee or intended recipient' (§ 2702(b)(1)); (2) pursuant to section 2703, which, as described below, permits a 'governmental entity' to compel a covered provider to disclose stored communications by search warrant, subpoena or court order; [or] (3) 'with the *lawful consent of the originator or an addressee or intended recipient* of such communication, or the subscriber in the case of [a] remote computing service.' " (*Hunter, supra*, 4 Cal.5th at p. 1265.)  Subsection (c) of section 2702 "describes [seven] circumstances under which a covered provider may divulge non-content information—that is, any 'record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications ...).' " (*Ibid.*)

In *Hunter, supra*, 4 Cal.5th 1245, the Supreme Court examined the legislative history of the disclosure exceptions in section 2702.  The court found that the 1986 house report on the legislation "indicated its understanding that with regard to electronic communications configured by the user to be accessible to the public, a covered service provider would be

_____

[15]    Section 2702(a)(3), again subject to the same exceptions of subdivisions (b) and (c), "bars any service provider from knowingly divulging any non-content 'record or other information pertaining to a subscriber to or customer' to any governmental entity." (*Hunter, supra*, 4 Cal.5th at p. 1265.)

35

free to divulge those communications under section 2702(b)(3)'s lawful consent exception." (*Id.* at p. 1268.)  In reaching this conclusion, the court looked to the house report's analysis indicating that consent could be implied both by a "user's act of posting publicly, and/or by a user's acceptance of a provider's terms of service: 'Consent may ... flow from a *user having had a reasonable basis for knowing that disclosure or use may be made with respect to a communication, and having taken action that evidences acquiescence to such disclosure or use—e.g., continued use of such an electronic communication system.*' ([H.R.Rep. No. 99-647, 2d Sess., p. 19 (1986) (hereafter House Rep.)], italics added.)" (*Hunter, supra*, 4 Cal.5th at pp. 1267–1268.)

"The report explained that '[a]nother type of *implied consent* might be inferred from the very nature of the electronic transaction.  For example, a subscriber who places a communication on a computer "electronic bulletin board," with a reasonable basis for knowing that such communications are freely made available to the public, should be considered to have given consent to the disclosure or use of the communication.' (..., italics [omitted].) Moreover, the report continued, 'If conditions governing disclosure or use are spelled out in the rules of an electronic communication service, and those rules are available to users or in contracts for the provision of such services, it would be appropriate to imply consent on the part of a user to disclosures or uses consistent with those rules.' " (*Hunter, supra*, 4 Cal.5th at p. 1268.)

2. *Application of the SCA to the Material Subpoenaed by Pina*

As an initial matter, it is not clear from the record developed on the writ petitions whether Samuel's Facebook, Instagram, and Snapchat accounts were configured as public or private.  To the extent they were configured by him as public, that information is unquestionably subject to the

36

App. 104

user consent exception under section 2702(b)(3) of the SCA, as set forth in *Hunter, supra,* 4 Cal.5th at p. 1274, and should be produced to the trial court and identified by Meta and Snap as public. (*Ibid.* ["communications configured by a social media user to be public fall withing section 2702(b)(3)'s lawful consent exception, presumptively permitting disclosure by a provider"].)

Separate from the settled issue of public verses private communications, Pina argues that Snap and Meta do not qualify as ECS or RCS providers because they "do not provide temporary or intermediate storage of communications incidental to its transmission, nor do[ they] store that communication merely for backup purposes." Pina asserts that, "as evidenced by their own terms of service and privacy policy, Snap Inc. and Meta Platforms Inc. retain and utilize user communication content for their own business purposes and to enhance services offered on the platforms." Therefore, Pina contends, the SCA does not apply to the material sought by his subpoenas. The District Attorney also argues that the SCA does not apply, asserting that Snap and Meta failed to present any evidence to support their assertion that the law precludes them from producing the subpoenaed material.

Pina accepts the invitation of the *Touchstone* concurring opinions to argue that the business model of these companies brings them outside the limitations of disclosure created by the SCA. We are persuaded by this argument. The statutes at issue, which notably were " 'enacted before the advent of the World Wide Web in 1990 and before the introduction of the web browser in 1994,' " by their terms do not apply when the provider of ECS or RCS is accessing the user's content for purposes other than facilitating

37

App. 105

communications or storing the content as backup for the user. (*Juror Number One, supra,* 206 Cal.App.4th at p. 861.)

First, with respect to ECS, as *Juror Number One* explained, "only copies of electronic communications held by the ECS [provider] pending initial delivery to the addressee or held thereafter for backup purposes are protected." (*Juror Number One, supra,* 206 Cal.App.4th at p. 861.) Specifically, section 2702(a)(1) of the SCA prohibits a provider of ECS from divulging the contents of an electronic communication while the provider holds that content in "electronic storage" for its users. (§ 2702(a)(1).) However, as discussed, the SCA explicitly limits the definition of "electronic storage" for purposes of the protection afforded by section 2702(a)(1) to "*temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof*" or "any storage of such communication by an electronic communication service *for purposes of backup protection of such communication.*" (§ 2510(17), italics added.)

Here, neither Snap nor Meta refute Pina's assertion that—while their platforms do store the content of their user's communications incidentally to transmission and for purposes of backup for its users—they also maintain that content for their own business purposes.[16] Snap and Meta contend that because the content is stored for both reasons, the SCA precludes disclosure

---

16    Facebook's terms of service and privacy policy set forth in the concurring opinion in *Touchstone* are the same ones at issue in this case. As Snapchat explains in its reply brief in this court, citing to its terms of service and privacy policy, "Snapchat users grant Snap permission to access their communications" for reasons in addition to providing storage and computer processing services, including agreeing that "Snap may access and review their content 'at any time and for any reason,' " and to "permit Snap to store, use, and analyze content to improve the services provided and to research and develop new ones."

in this circumstance.  However, the underlying policy purpose of the SCA, to give privacy protections to the users of ECS providers who intend for their communication to be private, is belied where, as here, the users have given the providers authorization to access and use their content for their own business purposes.  (See *Konop v. Hawaiian Airlines, Inc.* (9th Cir. 2002) 302 F.3d 868, 875 [concluding, based on the SCA's legislative history, that "Congress wanted to protect electronic communications that are configured to be private, such as email and private electronic bulletin boards"].)  This dual purpose brings the content outside the SCA's plain definition of ECS provider because the content is held and used by Snap and Meta for their own profit-driven purposes.[17]

---

[17]    Meta cites to a series of cases it contends have "held or assumed" that "the SCA covers Facebook or similar services."  As explained in the concurrence in *Touchstone*, however, none of these cases addressed the specific argument advanced here, that the social media companies' business models—which require their users to authorize the companies to access their communications—bring the services outside the definitions of ECS and RCS providers set forth in the SCA.  (See *Hunter, supra,* 4 Cal.5th at p. 1268 [seeing "no reason to question" that the SCA covers Facebook content]; *Negro v. Superior Court* (2014) 230 Cal.App.4th 879, 889, 901–904 [applying the SCA to private email (Gmail account administered by Google, Inc.) and rejecting Google's contention that the SCA barred civil discovery from an ECS provider where consent was provided by users]; *Crispin v. Christian Audigier, Inc.* (C.D. Cal. 2010) 717 F.Supp.2d 965, 989–991 [finding social media services like Facebook and MySpace are covered by the SCA, but not considering the argument that access by the providers could eliminate that status]; *Ehling v. Monmouth-Ocean Hosp. Serv. Corp.* (D.N.J. 2013) 961 F.Supp.2d 659, 667 [finding the SCA applies to Facebook posts in context of civil lawsuit asserting violation of the SCA by the plaintiff's employer; not considering Facebook's access to users content]; *Viacom Int'l Inc. v. YouTube Inc.* (S.D.N.Y. 2008) 253 F.R.D. 256, 264 [finding the SCA applies to videos on YouTube that are configured to be private]; *State v. Johnson* (Tenn. Crim. App. 2017) 538 S.W.3d 32, 69 [stating in dicta, after finding it lacked

39

Similarly, and slightly more clearly, section 2702(a)(2) precludes "a person or entity" that provides RCS from disclosing the content of its users' communications in situations where the content is maintained by the provider on behalf of its users "*solely* for the purpose of providing storage or computer processing services" to the user and "if the provider is not authorized to access the contents ... for purposes of providing any services other than storage or computer processing ...." (§ 2702(a)(2)(A)–(B).)  Here, Snap and Meta concede that they do not provide RCS solely for purposes of providing storage or processing services, and they concede that their terms of service authorize them to access the contents for their own business purposes.  Thus, under the plain language of section 2702(a)(2), because Snap and Meta are not maintaining communications "solely for the purpose of providing storage or computer processing services" to their users, the SCA does not preclude them from disclosing the material sought by Pina's subpoenas.  (§ 2702(a)(2)(B).)

In its reply brief, Snap presents a different interpretation of this statutory language.  Snap argues that under section 2702(a)(2)(B) "the only time that SCA protection for a communication depends on whether it is held 'solely for the purpose of providing storage or computer processing services,' is *if* the user has *not* given the provider authorization to access those communications for any other reason." Thus, it asserts, if the communication is held solely for the purpose of providing storage or processing, it is protected only if the user has given the provider authorization to access it for another reason—here, Snap's users have agreed to allow Snap to access their communications " 'at any time for any reason' " , including "to identify

_____

jurisdiction in the case before it, that the SCA is applicable to communications shared on social media websites].)

40

content [that] violates [its] terms or any applicable law' " and "to store, use, and analyze content to improve the services provided and to research and develop new ones."

While the statutory language at issue is certainly not "a model of clarity," Snap's interpretation makes little sense. (*Touchstone, supra*, 10 Cal.5th at p. 365 (conc. opn. of Cantil-Sakauye, C. J.).) If Snap's users allow it to use their content for other purposes, they do not have the expectation of privacy contemplated by the SCA. The interpretation that we adopt and that Pina advances is logical and supported by its legislative history showing a policy to protect *private* communications. Accordingly, the statute limits its privacy protections to situations where the provider is facilitating private communication or storing private information for its users, not when it is accessing and using content for its own purposes. "In other words," the entity is not acting as an RCS that is "barred from disclosing communications content—and hence the entity [is] subject to a viable subpoena duces tecum." (*Ibid.*)

Snap also argues that the real parties' interpretation of the SCA yields absurd results because it "exclude[s] broad swaths of communications from the privacy protections Congress intended to confer" and "significantly undermine[s], if not destroy[s], providers' ability to protect their users and platforms by identifying and taking action against users who are engaged in harmful and/or illegal conduct." Snap also asserts that Pina's interpretation would "strip the privacy protections that Congress designed the statute to create from an astronomical number of stored communications held by numerous providers and upon which both providers and users of those services have come to rely." Snap, however, does not explain what exactly the disastrous consequences would be, or how the platform would no longer

41

be able to protect its users or itself from harmful conduct.  It is Snap and Meta's decision to access its users' communications that brings it outside the disclosure limitations of SCA, and neither provides a concrete explanation as to why their failure to comply with the statute's requirements should be overlooked.

Similarly, Snap also argues that failing to apply the SCA to these communications is contrary to public policy because it would "negatively impact providers' ability to protect their users and platforms by identifying wrongdoing, removing illicit content, and, when appropriate, reporting responsible individuals to law enforcement, unless providers and users alike are willing to forego SCA protection for their users' communications." However, Snap does not explain why any legal obligations that exist with respect to reporting wrongdoing or removing illicit content would be altered by a conclusion that they are not acting as an ECS or RCS provider under the SCA.

Instead, Snap argues that if it is not an ECS or RCS provider, then it "would no longer be obligated under the SCA to preserve accountholder data pursuant to the requests of law enforcement and could no longer be bound by nondisclosure orders that prohibit them from disclosing the existence of legal process seeking user account data."  Even if the SCA does not apply to Snap and Meta, however, they are still required to comply with search warrants, law enforcement subpoenas, and court orders requiring the preservation of documents or other data or directing nondisclosure of a warrant or subpoena. Further, if they are not prohibited from disclosure by the SCA, Snap, Meta,

42

App. 110

and other social media companies like them, can voluntarily disclose wrongdoing to authorities.[18]

Meta also asserts an additional argument. Turning the concept of forfeiture on its head, Meta argues that whether the SCA applies to it is not properly before this court because neither it nor Pina raised the issue in the trial court. Meta's assertion that Pina was obligated to address the application of the SCA is not well taken; he was under no requirement to address a federal statute he maintains is not applicable to the corporate entities he subpoenaed. Further, Meta's failure to timely respond to the initial subpoena and subsequent court order by filing a motion to quash prior to the January 8, 2024 hearing, if anything, constitutes a forfeiture of Meta's argument that the SCA bars it from complying with the court's order. (See *Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 548 [" ' "New theories of defense, just like new theories of liability, may not be asserted for the first time on appeal." ' "].) Finally, as Meta points out in its own reply brief, it *did* address the application of the SCA to Pina's subpoena in the motion to quash it filed on January 8, 2024.

In sum, we agree with Pina that the SCA does not apply in this particular circumstance to bar Snap and Meta's compliance with Pina's subpoenas based on these third parties' ability to access and use their users' content. We emphasize, however, that our conclusion that the SCA does not protect the communications at issue here does not mean the third party is authorized generally to publicize the information provided to them by their

---

18    Snap also argues that the trial court's order requiring it to comply with Pina's subpoena violates the supremacy clause. However, because we conclude that the federal statute is not appliable to Snap and Meta in the circumstances presented here, there is no conflict of law to which the supremacy clause applies. Accordingly, we do not reach Snap's argument.

43

users. Rather, their own contractual agreements with users govern the terms of their use of that information. As the *Touchstone* concurring opinion notes—in response to Facebook's argument "that if disclosure is not prohibited by the SCA, a 'provider could choose to disclose a communication to anyone'[—]"an entity that became known for disclosing its users' communications on its own, without legal compulsion, would not long survive in the market—and hence would refrain from doing so in the first place." (*Touchstone, supra,* 10 Cal.5th at p. 372, fn. 12 (conc. opn. of Cantil-Sakauye, C. J.).)

Further, as that concurrence also points out, it is also not "likely that law enforcement actors would attempt to compel entities to disclose users' communications with ... 'a mere subpoena'; other laws and authority already protect against that." (*Touchstone, supra,* 10 Cal.5th at p. 372.) Specifically, "California's Electronic Communications Privacy Act (Pen. Code, § 1546 et seq.) generally requires a warrant or comparable instrument to acquire such ... communication [and] *precludes use of a subpoena* 'for the purpose of investigating or prosecuting a criminal offense.'" (*Touchstone,* at p. 372, fn. 13, citing Pen. Code, § 1546.1, subd. (b)(1)–(5).) And, "federal case law requires a search warrant, instead of a mere subpoena or court order, before a governmental entity may obtain private electronic communications." (*Touchstone,* at p. 372, fn. 13.)

We recognize the import of this decision and do not take lightly the policy arguments presented by Snap and Meta. However, we conclude that the plain language of the SCA provisions at issue and the legislative history

44

App. 112

behind them establish that the disclosure limitations contained in the Act do not apply to the material at issue here.[19]

### DISPOSTITION

The petitions of Snap, Inc. and Meta, Inc. for writ relief are denied in part and granted in part. Let a peremptory writ issue directing respondent court to set aside its order of January 8, 2024, and issue a modified order directing petitioners to produce the subpoenaed information in camera to the respondent court for it to determine whether the material should be produced to Pina's defense counsel. The stay issued by this court on January 24, 2024 is vacated on August 2, 2024 and this decision is final forthwith.

McCONNELL, P. J.

WE CONCUR:

HUFFMAN, J.

CASTILLO, J.

---

[19]     Because we decide this case based on the SCA, we decline to reach the constitutional issues raised by Pina in response to the petitions. (See *Hunter, supra*, 4 Cal.5th at p. 1275, fn. 31 ["we are guided by the familiar principle that we should address and resolve statutory issues prior to, and if possible, instead of, constitutional questions [citation], and that 'we do not reach constitutional questions unless absolutely required to do so to dispose of the matter before us' "].)

45

App. 113

# Attachment B

**F I L E D**
Clerk of the Superior Court

## SUPERIOR COURT OF CALIFORNIA
### County of San Diego

AUG 0 2 2024

By: L. Lubsen

DATE:  August 2, 2024                    DEPT. 21

HONORABLE DANIEL F. LINK,
                       JUDGE

CLERK:
L. Lubsen

---

SCN429787              THE PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff,

vs.

OCT110                 PINA, ADRIAN,  Defendant

---

### EXPARTE

Court orders NONPARTY SNAP and META to produce the subpoenaed records in camera to Judge Daniel F. Link, Department 21 to determine whether the material should be produced to defense.  Please supply the documents by the end of business day August 5th, 2024, directly to Department 21.

DANIEL F. LINK

-ll-

Page 1 of 1

App. 115

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | FOR COURT USE ONLY |
|---|---|
| ☐ CENTRAL DIVISION, CENTRAL COURTHOUSE, 1100 UNION ST., SAN DIEGO, CA 92101<br>☐ CENTRAL DIVISION, HALL OF JUSTICE, 330 W. BROADWAY, SAN DIEGO, CA 92101<br>☐ CENTRAL DIVISION, KEARNY MESA, 8950 CLAIREMONT MESA BLVD., SAN DIEGO, CA 92123<br>☐ CENTRAL DIVISION, JUVENILE COURT, 2851 MEADOW LARK DR., SAN DIEGO, CA 92123<br>☐ EAST COUNTY DIVISION, 250 E. MAIN ST., EL CAJON, CA 92020<br>☒ NORTH COUNTY DIVISION, 325 S. MELROSE DR., VISTA, CA 92081<br>☐ NORTH COUNTY DIVISION, JUVENILE COURT, 325 S. MELROSE DR., VISTA, CA 92081<br>☐ SOUTH COUNTY DIVISION, 500 3RD AVE., CHULA VISTA, CA 91910 | **F I L E D**<br>Clerk of the Superior Court<br><br>AUG 02 2024<br><br>By: L. Lubsen |
| PLAINTIFF(S)/PETITIONER(S)<br>PEOPLE | |
| DEFENDANT(S)/RESPONDENT(S)<br>PINA, ADRIAN | JUDGE: DANIEL F. LINK<br>DEPT. 21 |
| **CLERK'S CERTIFICATE OF SERVICE BY MAIL** | CASE NUMBER<br>SCN429787 |

I certify that I am not a party to the above-entitled cause, that I placed a copy of the following document(s): EX PARTE ORDER FOR PRODUCTION OF SUBPOENAED DOCUMENTS

VIA Email

in ~~a sealed envelope addressed to the parties shown with postage prepaid, and deposited it in the United States mail at~~
☐ Chula Vista ☐ El Cajon ☐ San Diego ☒ Vista, California.

### NAME & ADDRESS

Tyler G. Newby, Esq.
Tnewby@fenwick.com

Janie Yoo Miller, Esq.
jmiller@fenwick.com

David W. Feder, Esq.
dfeder@fenwick.com

Esther D. Galan, Esq.
egalan@fenwick.com

Julie E. Schwartz, Esq.
JSchwartz@perkinscoie.com

Micheal C. Bleicher, Esq.
MBleicher@perkinscoie.com

### NAME & ADDRESS

Natasha Amlani, Esq.
NAmlani@perkinscoie.com

Ryan Mrazik, Esq.
RMrazik@perkinscoie.com

DDA David Jarman
DPD Nadine Valdecini

Date: August 2, 2024

Clerk of the Superior Court

by _L. Lubsen_ , Deputy

App. 116

Supreme Court of California
Jorge E. Navarrete, Clerk and Executive Officer of the Court
Electronically FILED on 8/5/2024 by Gabriela Muca, Deputy Clerk

**STATE OF CALIFORNIA**
Supreme Court of California

## *PROOF OF SERVICE*

**STATE OF CALIFORNIA**
Supreme Court of California

Case Name: **SNAP v. S.C. (PINA)**
Case Number: **S286267**
Lower Court Case Number: **D083446**

1. At the time of service I was at least 18 years of age and not a party to this legal action.

2. My email address used to e-serve: **orin@orinkerr.com**

3. I served by email a copy of the following document(s) indicated below:

Title(s) of papers e-served:

| Filing Type | Document Title |
|---|---|
| PETITION FOR REVIEW (FEE PREVIOUSLY PAID) | Petition for Review - Immediate Stay Requested of the Superior Court's August 2, 2024 Ex Parte Order to Produce Subpoenaed Records in Camera by August 5, 2024s |

Service Recipients:

| Person Served | Email Address | Type | Date / Time |
|---|---|---|---|
| Tyler Newby<br>Fenwick & West LLP<br>205790 | tnewby@fenwick.com | e-Serve | 8/5/2024 4:30:37 PM |
| Ryan Mrazik<br>Perkins Coie LLP | rmrazik@perkinscoie.com | e-Serve | 8/5/2024 4:30:37 PM |
| Troy Britt<br>Office of the Primary Public Defender<br>190879 | troy.britt@sdcounty.ca.gov | e-Serve | 8/5/2024 4:30:37 PM |
| Julie Schwartz<br>Perkins Coie LLP<br>260624 | jschwartz@perkinscoie.com | e-Serve | 8/5/2024 4:30:37 PM |
| Joshua Lipshutz<br>Gibson, Dunn & Crutcher, LLP<br>242557 | jlipshutz@gibsondunn.com | e-Serve | 8/5/2024 4:30:37 PM |
| Karl Husoe<br>San Diego District Attorney<br>261097 | karl.husoe@sdcda.org | e-Serve | 8/5/2024 4:30:37 PM |
| Nadine Valdecini-Arnold<br>San Diego Primary Public Defender | nadine.valdecini@sdcounty.ca.gov | e-Serve | 8/5/2024 4:30:37 PM |
| Janie Miller<br>Fenwick and West LLP<br>312715 | jmiller@fenwick.com | e-Serve | 8/5/2024 4:30:37 PM |
| David Feder<br>Fenwick & West LLP | dfeder@fenwick.com | e-Serve | 8/5/2024 4:30:37 PM |
| Natasha Amlani<br>Perkins Coie<br>322979 | namlani@perkinscoie.com | e-Serve | 8/5/2024 4:30:37 PM |
| Orin Kerr | orin@orinkerr.com | e- | 8/5/2024 4:30:37 |

App. 117

| Law Offices of Orin S. Kerr<br>319808 | | Serve | PM |

This proof of service was automatically created, submitted and signed on my behalf through my agreements with TrueFiling and its contents are true to the best of my information, knowledge, and belief.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

8/5/2024
Date

/s/Orin Kerr
Signature

Kerr, Orin (319808)
Last Name, First Name (PNum)

Law Offices of Orin S. Kerr
Law Firm

App. 119

# EXHIBIT 3

Supreme Court of California
Jorge E. Navarrete, Clerk and Executive Officer of the Court
Electronically RECEIVED on 1/24/2025 8:29:53 PM

Supreme Court of California
Jorge E. Navarrete, Clerk and Executive Officer of the Court
Electronically FILED on 1/24/2025 by M. Chang, Deputy Clerk

## No. S286267

## IN THE SUPREME COURT OF CALIFORNIA

SNAP INC., *Petitioner*,

v.

SUPERIOR COURT OF SAN DIEGO COUNTY, *Respondent*;

ADRIAN PINA et al., *Real Parties in Interest.*

_____

META PLATFORMS, INC., *Petitioner*,

v.

SUPERIOR COURT OF SAN DIEGO COUNTY, *Respondent*;

ADRIAN PINA et al., *Real Parties in Interest.*

After a Decision by the Court of Appeal,
Fourth Appellate District, Div. 1, Case Nos. D083446, D083475
San Diego Superior Court, Dept. 21, Case Nos. SCN429787
Honorable Daniel F. Link, Judge Presiding, (760) 201-8021

## PETITIONER SNAP INC.'S REPLY BRIEF

MUNGER TOLLES & OLSON LLP
*L. ASHLEY AULL (CSB NO. 257020)
ashley.aull@mto.com
350 South Grand Avenue, 50th Flr.
Los Angeles, CA 90071-3426
Telephone: 213.683.9100

FENWICK & WEST LLP
DAVID W. FEDER, *Pro Hac Vice*
dfeder@fenwick.com
902 Broadway, 18th Flr.
New York, NY 10010-6035
Telephone: 212.430.2600

ATTORNEYS FOR PETITIONER SNAP INC.

*Additional counsel listed on signature block*

App. 120

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................ 8

ARGUMENT ............................................................................. 10

I.    The SCA Applies To Snap Users' Communications. .......... 10

    A.    The SCA's ECS provisions apply. ........................... 10

        1.    Pina attacks the statutory definition and settled interpretation of "electronic storage" without providing any alternative interpretation. ............................ 11

        2.    The People's excessive-license copyright theory lacks any plausible anchor to the statutory text. .......................... 14

    B.    The SCA's RCS provisions also apply....................... 17

        1.    Pina repeats the business model theory without engaging with Snap's arguments. ...................................................... 18

        2.    The People focus on "benefits" or "consideration" to service providers, without any connection to the statutory text................................................. 19

    C.    Pina, the People, and the business model theory all make the SCA's exceptions irrelevant............................................................. 20

II.    Pina And The People Ask This Court To Radically Depart From Decades Of Precedent And Gut Privacy On The Internet. .................................................. 22

    A.    Holding the SCA does not apply here would radically depart from decades of precedent and contradict legislative intent. ............................ 23

2

B. The People's emphasis on encrypted services reflects how deeply they misinterpret the SCA. ................................................................ 25

III. Pina's And The People's Remaining Arguments Provide No Basis To Affirm.................................................. 27

A. The People's burden argument is wrong and irrelevant. ............................................................... 28

B. Pina's evidentiary privilege argument is forfeited and contrary to the SCA's text. .................. 29

C. Pina's constitutional arguments are unripe and incorrect. ......................................................... 30

1. Under both forfeiture rules and avoidance principles, this Court should not address Pina's constitutional claims.............................................................. 30

2. Pina's constitutional challenge fails on the merits. ...................................................... 32

CONCLUSION............................................................................. 34

CERTIFICATE OF COMPLIANCE............................................. 36

PROOF OF SERVICE ................................................................. 37

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Anzaldua v. NE Ambulance & Fire Prot. Dist.*
(8th Cir. 2015) 793 F.3d 822...................................................... 13

*Chambers v. Mississippi*
(1972), 410 U.S. 284.......................................................... 32, 33

*Crispin v. Christian Audigier, Inc.*
(C.D. Cal. 2010) 717 F.Supp.2d 965................................. 17, 23

*Davis v. Alaska*
(1974) 415 U.S. 308................................................................ 34

*Ehling v. Monmouth-Ocean Hosp. Serv. Corp.*
(D.N.J. 2013) 961 F.Supp.2d 659 ............................................ 23

*Facebook, Inc. v. Wint*
(D.C. 2019) 199 A.3d 625........................................................ 32

*Gonzales v. Uber Techs., Inc.*
(N.D. Cal. Sept. 26, 2018, No. 17-CV-02264-JSC)
2018 WL 4616266 ................................................................... 17

*Hately v. Watts*
(4th Cir. 2019) 917 F.3d 770................................. 12, 13, 14, 17

*Leocal v. Ashcroft*
(2004) 543 U.S. 1.................................................................... 12

*MAI Systems Corp. v. Peak Computer, Inc.*
(9th Cir. 1993) 991 F.2d 511................................................... 14

*Montana v. Egelhoff*
(1996) 518 U.S. 37.......................................................... 32, 33

*In re Path Network, Inc.*
(N.D. Cal. 2023) 703 F.Supp.3d 1046 ..................................... 23

4

*Theofel v. Farey-Jones*
(9th Cir. 2004) 359 F.3d 1066..............................................*passim*

*United States v. Glenn*
(N.D. Ohio 2022), 341 F.R.D. 217 ........................................... 32

*United States v. Warshak*
(6th Cir. 2010) 631 F.3d 266................................................... 13

*Van Buren v. United States*
(2021) 593 U.S. 374............................................................... 20

*Viacom Int'l Inc. v. Youtube Inc.*
(S.D.N.Y. Jul. 2, 2008) 253 F.R.D. 256 ............................ 18, 23

*Wardius v. Oregon*
(1973) 412 U.S. 470.......................................................... 32, 33

**California Cases**

*Barrett v. Rosenthal*
(2006) 40 Cal.4th 33.............................................................. 23

*Coral Constr., Inc. v. City & Cnty. of San Francisco*
(2010), 50 Cal.4th 315.......................................................... 17

*Delaney v. Superior Court*
(1990) 50 Cal.3d 785 ............................................................ 34

*Dynamex Operations W. v. Superior Court*
(2018) 4 Cal.5th 903............................................................. 29

*Evans v. Superior Court*
(1974) 11 Cal.3d 617 ............................................................ 33

*Facebook, Inc. v. Superior Court*
(2017) 15 Cal.App.5th 729 ("*Facebook*") ........................... 32, 33

*Facebook, Inc. v. Superior Court*
(2018) 4 Cal.5th 1245 ("*Hunter*")............................. 8, 20, 21, 31

*Facebook, Inc. v. Superior Court*
(2020) 10 Cal.5th 329 ("*Touchstone*")............................ 9, 28, 31

5

*Juror Number One v. Superior Court*
  (2012) 206 Cal.App.4th 854 ..................................................... 23

*Lopez v. Ledesma*
  (2022) 12 Cal.5th 848............................................................... 29

*Lunsted v. Super. Ct. of Riverside Cnty.*
  (2024) 318 Cal.Rptr.3d 795 ..................................................... 28

*Negro v. Superior Court*
  (2014) 230 Cal.App.4th 879..................................................... 23

*People v. Ledesma*
  (1997) 16 Cal.4th 90................................................................. 24

*Stone v. Alameda Healthy Sys.*
  (2024) 16 Cal.5th 1040...................................................... 29, 30

**Statutes**

18 U.S.C.
  § 2510(15) ................................................................................ 11
  § 2510(17) ........................................................................... 11, 15
  § 2510(17)(B) ................................................................. 8, 11, 16
  § 2523....................................................................................... 24
  § 2702(a) ............................................................................ 27, 30
  § 2702(a)(1)............................................................... 8, 10, 11, 26
  § 2702(a)(2) ............................................................... 8, 17, 19, 26
  § 2702(a)(2)(B)............................................................. 18, 19, 20
  § 2702(b) ........................................................................ 20, 22, 30
  § 2702(b)(3) ............................................................................. 21
  § 2702(b)(5) ............................................................................. 22
  § 2702(b)(6) ............................................................................. 22
  § 2702(b)(7) ............................................................................. 22
  § 2702(b)(8) ............................................................................. 24
  § 2703....................................................................................... 30
  § 2703(b)(1)(B)(i) .................................................................... 30

**Other Authorities**

H.R.Rep. No. 99-647, 2d Sess. (1986) .......................................... 23

6

Data Stored Abroad: Ensuring Lawful Access and
    Privacy Protection in the Digital Era, Hearing
    Before the House Com. on the Judiciary, 115th
    Cong., 1st Sess. (2017) ............................................................. 25

Cambridge Dictionary (2025)
    <https://dictionary.cambridge.org/dictionary/englis
    h/incidental> [as of Jan. 24, 2025] .......................................... 16

*Congress Enacts the Clarifying Lawful Overseas Use
    of Data (Cloud) Act, Reshaping U.S. Law
    Governing Cross-Border Access to Data*, 112 Am. J.
    Int'l L. 487 (2018)....................................................................... 24

Federal Bureau of Investigation, *Warrant-Proof
    Encryption and Lawful Access*
    <https://www.fbi.gov/about/mission/lawful-access>
    [as of Jan. 24, 2025] .................................................................. 27

Google LLC, Privacy Policy (Sept. 16, 2024)
    <https://policies.google.com/privacy> [as of Jan.
    24, 2025] ...................................................................................... 26

Kerr, *A User's Guide to the Stored Communications
    Act, and a Legislator's Guide to Amending it*, 72
    Geo. Wash. L. Rev 1208 (2004) ............................................... 12

Snap Inc., *Privacy Policy* (Feb. 26, 2024) Privacy,
    Safety, and Policy Hub
    <https://values.snap.com/privacy/privacy-policy>
    [as of Jan. 24, 2025] .................................................................. 19

Snap Inc., *Snapchat Ads Transparency*, Privacy,
    Safety, and Policy Hub
    <https://values.snap.com/privacy/ads-privacy> [as
    of Jan. 24, 2025] ......................................................................... 19

Yahoo Inc., Privacy Policy (Dec. 2024)
    <https://legal.yahoo.com/us/en/yahoo/privacy/index
    .html> [as of Jan. 24, 2025].................................................... 26

7

## INTRODUCTION

The Answer briefs are remarkable for what they omit: any argument defending the Court of Appeal's "business model theory" under the Stored Communication Act's text. That text supports neither the business model theory nor the new, alternative theories for affirmance that Pina and the People put forward.

The SCA applies to Snap and to the communications at issue. Snap provides an electronic communications service and stores users' communications—if users choose to do so—"for purposes of backup protection." (18 U.S.C. §§ 2510(17)(B), 2702(a)(1).) That alone means that, under the SCA's plain text, the communications Pina seeks are protected from disclosure. Snap also provides a remote computing service, "solely for the purpose of providing storage" to users. (18 U.S.C. § 2702(a)(2).) As a consequence of both the ECS and RCS provisions, Snap cannot divulge the contents of its users' communications unless one of the SCA's exceptions applies. None applies here.

Pina and the People's arguments are irreconcilable with the SCA's text at both a superficial level and a deep one. There is no business model exception in the SCA's text. The exceptions the SCA *does* recognize—including the consent exception—allow service providers to access users' content and share it with third parties under certain circumstances, without eliminating all privacy protections under the Act. (*Facebook, Inc. v. Superior Court* (2018) 4 Cal.5th 1245, 1263 ("*Hunter*").)

8

To hold the SCA does not apply here would also mark a radical departure from decades of precedent and legislative history—affecting services far beyond Snap and Meta.  Neither Pina nor the People dispute that federal courts have applied the SCA to service providers like Meta and Snap for decades.  Congress has also amended the SCA time and again, never disturbing users' now-well-settled expectations of privacy.  Pina and the People do not attempt to ground their arguments in any of this precedent or legislative history; they ask this Court to ignore it, in favor of theories no court has ever adopted before.

The Answer briefs' novel (and largely forfeited) arguments—about copyright law, burden shifting, evidentiary privileges, and constitutional issues—do not change the result.  The People have never previously raised their byzantine copyright argument about "excessive licenses," which has no anchor in the SCA's text.  (See *infra* § I.A.2.)  The People also forfeited their argument about who bears the burden to establish that the SCA applies, and that argument contradicts *Facebook, Inc. v. Superior Court* (2020) 10 Cal.5th 329 ("*Touchstone*").  (See *infra* § III.A.)  Decades of precedent as well as the statutory text contradict Pina's argument that the SCA does not apply to any subpoena.  (See *infra* § III.B.)  And constitutional avoidance principles foreclose Pina's constitutional challenge—which ignores the facts of this case, as well as longstanding precedent holding that criminal defendants have no right to pre-trial third-party discovery.  (See *infra* § III.C.)

9

The SCA protects the longstanding privacy expectations of Snap's and Meta's users, and it prevents those service providers from disclosing the victim's communications in this case. Pina and the People's failure to defend the business model theory— and resort to other novel, complex, and forfeited theories—speaks volumes. The Court should reverse.

## ARGUMENT

### I. THE SCA APPLIES TO SNAP USERS' COMMUNICATIONS.

Under the plain text of the SCA, Snap is both an ECS provider and an RCS provider. The business model theory relies on statutory text that simply does not exist. And Pina and the People's effort to limit the SCA's text in other ways—by narrowing the definition of "electronic storage," or under a novel "excessive-license" copyright theory—similarly fail. They also ignore the SCA's exceptions, which are irreconcilable with their narrow view of the SCA's scope.

#### A. The SCA's ECS provisions apply.

The statute's ECS provisions protect communications Snap sends and stores for its users, because Snap is an "entity providing an electronic communication service to the public," which cannot "knowingly divulge . . . the contents of a communication while in electronic storage by that service[.]" (18 U.S.C. § 2702(a)(1).)

There is no dispute that Snap is an "entity providing an electronic communication service." (See Snap Br. at pp. 28-29.) Under the SCA, an "electronic communication service" is a "service which provides to users thereof the ability to send or

10

receive wire or electronic communications." (18 U.S.C. § 2510(15).) Snap satisfies that definition.

The communications at issue here are also in "electronic storage," because they have been stored for "purposes of backup protection[.]" (18 U.S.C. §§ 2510(17)(B), 2702(a)(1).) The Act defines "electronic storage" as "(A) any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof; and (B) any storage of such communication by an electronic communication service for purposes of backup protection of such communication." (18 U.S.C. § 2510(17).) Snap stores its users' communications (if at all) "for purposes of backup protection"—only if users affirmatively elect to do so. (Snap Br. at pp. 31-32.)

Nothing in these ECS provisions depends on a provider's purpose at all—much less its business purpose. The text is unqualified: if a customer uses an "electronic communications service" (like Snap and Meta) to keep communications in "electronic storage" (including "for purposes of backup protection") the SCA's protections apply. (Snap Br. at pp. 29-37.)

1.    **Pina attacks the statutory definition and settled interpretation of "electronic storage" without providing any alternative interpretation.**

Pina offers no definition of "electronic storage" that would exclude Snap users' backed-up communications; he simply insists that the settled definition of "electronic storage" is wrong. (Pina Br. at pp. 29-33.)

For 20 years, federal courts have applied a definition of "electronic storage" that the SCA's text compels, recognizing that

11

communications a user stores for backup purposes are in "electronic storage."  (See, e.g., *Theofel v. Farey-Jones* (9th Cir. 2004) 359 F.3d 1066, 1075; *Hately v. Watts*, (4th Cir. 2019) 917 F.3d 770, 796-97.)  Contrary to Pina's suggestion, it makes no difference that *Theofel* and *Hately* were civil cases.  (Pina Br. at p. 30.)  Statutes are interpreted consistently whether in the criminal or noncriminal context.  (*Leocal v. Ashcroft* (2004) 543 U.S. 1, 12.)  Even the Court of Appeal accepted the definition these cases applied, concluding that Snap "store[s] the content of [its] user's communications incidentally to transmission and for purposes of backup for its users."  (Opn. at p. 38.)

Pina offers no alternative definition, but he insists that the settled one is wrong—saying that one commentator and other courts have criticized the lead federal cases.  (Pina Br. at pp. 29-33.)  For example, Pina cites a 20-year-old law review article by Professor Kerr (who is indeed one of Snap's lawyers in this case).  That article posited that the definition of "backup protection" *Theofel* adopted must be overbroad because it meant that communications might be covered by both the ECS and RCS provisions simultaneously.  (Pina Br. at pp. 31-32 [citing Kerr, *A User's Guide to the Stored Communications Act, and a Legislator's Guide to Amending it*, 72 Geo. Wash. L. Rev 1208 (2004)].)

In the years since Professor Kerr published the article Pina cites, federal courts have persuasively rejected his criticism and its logic.  In *Hately*, the Court addressed in detail the reasons for its interpretation of the phrase "backup protection," explaining

12

that under "the plain language of the [SCA] [and] the statute's legislative history . . . entities *can* simultaneously function as both an [ECS] and [RCS]," and so there is no basis to narrow the definition of ECS to avoid communications that the RCS provisions cover. (*Hately*, *supra*, 917 F.3d at p. 789 [italics added]; *id.* at p. 789, fn.5 [addressing Professor Kerr's article].) Pina does not acknowledge this analysis in *Hately*. (Cf. Pina Br. at p. 30, fn.4 [asserting that *Hately* "does not add anything"].)

Over the past 20 years, the understanding of "backup protection" applied by *Theofel* and *Hately* has remained the predominant view. (Pina Br. at pp. 29-33.) Pina cites decisions of the Sixth and Eighth Circuit Courts of Appeal that he claims were "critical" of *Theofel*. (*Id.* at p. 33 [citing *United States v. Warshak* (6th Cir. 2010) 631 F.3d 266, 291, and *Anzaldua v. NE Ambulance & Fire Prot. Dist.* (8th Cir. 2015) 793 F.3d 822, 842].) But *Warshak* merely held that *Theofel* was not binding precedent in the Sixth Circuit for purposes of whether a warrant that violated the Fourth Amendment should merit exclusion of evidence under the good faith exception to the exclusionary rule. (*Warshak*, *supra*, 631 F.3d at p. 291.) *Anzaldua* did not disagree with *Theofel*, but rather held that the communications in that case were not held for backup purposes under *Theofel*'s interpretation of "electronic storage." (*Anzaldua*, *supra*, 793 F.3d at p. 842.)

That is not to say that courts have been unanimous in agreeing as to exactly what constitutes "electronic storage" under all circumstances and facts—which is unsurprising given the

13

unique fact scenarios presented in these cases.  But Pina fails to identify any definition of "electronic storage" or explain why Snap's communications are not held in such storage; and he fails to cite any case that he actually contends is on point, much less one that suggests the SCA's plain language (as applied by *Theofel* and *Hately*) should not apply.

### 2.   The People's excessive-license copyright theory lacks any plausible anchor to the statutory text.

The People also make no attempt to defend the Court of Appeal's business model theory on its terms.  Instead, they craft a new theory: that Snap receives a license to users' copyrighted communications as consideration for the use of its services, and this "excessive license" defeats any SCA protection.  (People Br. at pp. 14-24.)  This is a made-up analysis of a made-up test.  It does not affect Snap users' protections under the SCA.

As a general matter, it is unsurprising that service providers' terms of service include copyright licenses.  Cases hold that even *de minimis* uses of copyrighted content—including temporary copies made in computer memory during viewing or loading—can potentially implicate protected rights.  (See, e.g., *MAI Systems Corp. v. Peak Computer, Inc.* (9th Cir. 1993) 991 F.2d 511, 518-19.)  As a result, Snap requires users to grant a license to "host, store, cache, use, display, reproduce, modify, adapt, edit, publish, analyze, transmit, and distribute . . . content."  (AE-269.)  Snap explicitly states, however, that "[t]his license is for the purpose of operating, developing, providing,

14

promoting, and improving the Services and researching and developing new ones." (*Ibid.*)

The People's effort to ground their theory in the SCA's text is hopeless. (People Br. at pp. 26-28, 32.) Nothing in the ECS provisions supports the idea that a user's grant of a limited license to Snap—however the People characterize it—nullifies privacy protections. (*Ibid.*) Again, the SCA applies to communications in "electronic storage," defined as (A) "any temporary, intermediate storage . . . incidental to" the transmission of an electronic communication, and (B) "any storage of such communication . . . for purposes of backup protection of such communication." (18 U.S.C. § 2510(17).)

The People focus on "intermediate" and "incidental to," under Section 2510(17)(A)—arguing that Snap and Meta users' communications are never in "intermediate" storage (because the companies are not "mere intermediaries," but instead are "parties to a contract between all users who use their services") and that storage is not "incidental to" transmission (because storage is not "merely by chance"). (People Br. at pp. 28-32.) The People also argue that, because the communications never satisfy the definition of "temporary, intermediate storage" under Section 2510(17)(A), they also cannot be "stored for backup purposes" under Section 2510(17)(B). (*Ibid.*)

This construction of Section 2510(17)(A) makes no sense. *First,* the term "incidental to" does not mean "by chance" under

15

Section 2510(17)(A); it means "connected with."[1]  No ECS provider stores communications "by chance"—users choose to use those services, and those services are designed to store messages "temporar[ily]" during transmission.  Rationally, the SCA protects communications stored by an ECS provider *in connection with* transmission from one user to another.  *Second,* "intermediate storage," under Section 2510(17)(A) is not an "intermediary requirement," which depends on the contractual relationship between service providers and their users.  Under the SCA, the term "intermediate" modifies "storage": the text refers to "intermediate storage"—that is, staged between two ends—not a type of service provider that is a mere "intermediary."  (18 U.S.C. § 2510(17)(B).)  The People's argument relies on a definition they have rewritten and a semantically tortured reading of the statutory language.

Section 2510(17)(A)'s "intermediate" and "incidental to" requirements are also irrelevant, because the communications at issue here were stored for backup purposes under Section 2510(17)(B).  Subsection (B) applies to any storage of a wire or electronic communication "for purposes of backup protection of such communication."  (18 U.S.C. § 2510(17)(B).)  That definition is not limited to communications that were initially in "temporary, intermediate storage . . .  incidental to . . . transmission[.]  (*Ibid.*; *Theofel*, *supra*, 359 F.3d at p. 1076.)

---

[1]  (Cambridge Dictionary (2025) <https://dictionary.cambridge.org/dictionary/english/incidental> [as of Jan. 24, 2025].)

16

Although Subsection (B) uses the term "such communication," this is shorthand for the "type of communication" the statute previously referenced: "a wire or electronic communication." (*Theofel*, *supra*, 359 F.3d at p. 1076.)  "Such communication" is not limited to both the type of communication *and* the type of temporary storage that 2510(17)(A) discusses.  (*Hately*, *supra*, 917 F.3d at p. 787; *Gonzales v. Uber Techs., Inc.* (N.D. Cal. Sept. 26, 2018, No. 17-CV-02264-JSC) 2018 WL 4616266, at \*2 [quoting *Theofel*, *supra*, 359 F.3d at 1076]; see also *Crispin v. Christian Audigier, Inc.* (C.D. Cal. 2010) 717 F.Supp.2d 965, 983.) Although "lower federal courts' decisions" are not binding, the Court affords them "'great weight' when they reflect a consensus[.]"  (*Coral Constr., Inc. v. City & Cnty. of San Francisco* (2010), 50 Cal.4th 315, 329-30 [collecting cases].)

The plain text of the ECA provisions applies here, and the Court need go no further to reverse.  The Court should not ignore the statute's language and upset settled federal precedent, much less endorse the People's unsupported "excessive-license" theory.

## B. The SCA's RCS provisions also apply.

Independently, Snap also provides "remote computing services," meaning its users' communications are protected from disclosure under Section 2702(a)(2).  That provision prohibits the disclosure of communications maintained by an RCS provider "solely for the purpose of providing storage or computer processing services to [the RCS provider's] subscriber or customer, if the provider is not authorized to access the contents of any such communications for purposes of providing any

17

App. 136

services other than storage or computer processing." (18 U.S.C. § 2702(a)(2)(B); Snap Br. at pp. 38-45.)

Storage is the sole "service" that Snapchat provides to users with respect to communications "maintained" on its service after they are initially sent. Snap's terms emphasize that "most messages—like Snaps and Chats—sent in Snapchat will be automatically deleted by default from our servers . . . unless you've changed your default settings or decide to save something." (AE-295.) The terms reference no type of service—besides storage—that Snap provides its users with respect to messages they "decide to save." (Snap Br. at p. 44.)

### 1. Pina repeats the business model theory without engaging with Snap's arguments.

Pina makes no attempt to engage with Snap's RCS arguments. Like the Court of Appeal, Pina recites reasons Snap may access user content that are ancillary to providing a storage service, including "to enhance services offered on the platform" and "to provide, personalize, and improve [its] advertising services." (Pina Br. at pp. 36-37.) But Snap still maintains communications solely for the purpose of providing storage services *to users*. Snap's access—to which users consent—enables Snap to offer and improve those storage service. RCS protection does not evaporate if "authorization to access" private content is "granted in connection with defendants' provision of alleged storage services." (*Viacom Int'l Inc. v. Youtube Inc.* (S.D.N.Y. Jul. 2, 2008) 253 F.R.D. 256, 264 & fn. 8.)

Pina's arguments about Snap's use of content "to facilitate targeted advertising" are both factually incorrect and legally

18

irrelevant.  (Pina Br. at p. 38.)  Snap does not mine, analyze, or share the content of users' private communications to provide targeted advertising.  (AE-284-299.[2])  But even if it did, advertising is not a distinct service a communication or social media company provides to "a subscriber or customer"; receiving advertising is the means by which those users fund the service. The SCA does not discriminate against free, ad-supported services.  So long as an RCS "maintains" a subscriber or customer's communications "solely for the purpose of providing storage or computer processing services *to such subscriber or customer*," the service's profit model is irrelevant.  (18 U.S.C. § 2702(a)(2)(B) [italics added].)

### 2.   The People focus on "benefits" or "consideration" to service providers, without any connection to the statutory text.

The People's "excessive-license" copyright theory does not work any better for RCS provisions than it does for ECS provisions.  In a spin on the same argument Pina raises, the People argue that Snap and Meta's copyright licenses demonstrate that they store communications for their own benefit and "not solely for the customer."  (People Br. at pp. 32-33.)  That ignores the statutory text.  Section 2702(a)(2) does not

---

[2]  (Snap Inc., *Privacy Policy* (Feb. 26, 2024) Privacy, Safety, and Policy Hub <https://values.snap.com/privacy/privacy-policy> [as of Jan. 24, 2025]; Snap Inc., *Snapchat Ads Transparency*, Privacy, Safety, and Policy Hub <https://values.snap.com/privacy/ads-privacy> [as of Jan. 24, 2025].)

19

turn on whether or how Snap benefits; it turns on whether Snap maintains communications "solely for the purpose of providing storage or computing services to [its] subscriber[s] or customer[s]." (18 U.S.C. § 2702(a)(2)(B).)

The People's focus on "consideration" Snap receives from its users also does not affect what kind of "service" Snap provides. (People Br. at p. 32.) Under the SCA, there is nothing disqualifying about the type of "consideration" a service provider receives in exchange for providing covered remote-computing service. (18 U.S.C. § 2702(a)(2)(B).)

### C.  Pina, the People, and the business model theory all make the SCA's exceptions irrelevant.

Pina and the People also fail to reconcile their arguments with the SCA's exceptions. A statute should be read as a whole to avoid "inconsistencies with the design and structure." (*Van Buren v. United States* (2021) 593 U.S. 374, 390 [alteration and citation omitted].) Neither Pina nor the People have done that. (Snap Br. at pp. 46-50.)

As this Court has explained, the SCA contains two sets of provisions that work together to govern the scope of what communications Snap may disclose and why and when it may do so. (See *Hunter*, *supra*, 4 Cal.5th at p. 1263.) Section 2702(a) is a broad threshold provision that prohibits disclosure of *all* communications within its scope—"even public" communications. (*Id.* at p. 1273.) Section 2702(b) then contains specific exceptions, reflecting circumstances when disclosure is permitted. (See 18 U.S.C. § 2702(b).)

20

The Court of Appeal, Pina, and the People all narrowly construe Section 2702(a) in a way that would render several of these exceptions superfluous.  For example, Section 2702(b)(3)—the consent exception—provides that a user's communications may be disclosed with his or her consent.  Consent must be "lawful" and obtained from an appropriate party, but there is no other requirement.  (18 U.S.C. § 2702(b)(3).)  The *reason* for consent is irrelevant.  (*Ibid.*)  There is no limitation on the type of person or entity a user can "consent" to share with.  (*Ibid.*)  And there is no limitation on the number of people or entities a user can consent to share with.  (*Ibid.*)  To the contrary: even if a user consents to share communications with a *very broad* group of people, that does not eliminate all protection under the SCA—Section 2702(a) still prohibits disclosure to others.  (*Hunter*, *supra*, 4 Cal.5th at p. 1281.)

The consent exception is irreconcilable with both the business model theory and the People's "excessive-license" theory.  Under both theories, if a user consents to share the content of their communications with particular third parties (advertisers) or for a particular reason (as "consideration"), then the SCA does not apply; all protection under Section 2702(a) ends.  But the SCA recognizes that users *can* consent to "divulge the contents of a communication," without losing all protection under the statute.  (18 U.S.C. § 2702(b)(3)).  As *Hunter* held: even when a user consents to allow thousands of people to view the content of a communication, Section 2702(a) still protects the user's privacy

21

and prohibits disclosure of the communication to others.  (See *Hunter*, *supra*, 4 Cal.5th at p. 1281; Snap Br. at pp. 47-49.)

Other exceptions are equally incompatible with Pina's and the People's arguments.  The People distill their argument to this: that all ECS storage must be "necessary to effectuate delivery between the users of the communication services." (People Br. at p. 28.)  But the SCA's exceptions recognize that an ECS provider may access communications to protect its own property interests (18 U.S.C. § 2702(b)(5)), to identify and report child pornography (*id.* § 2702(b)(6)), and to provide data to law-enforcement agencies (*id.* § 2702(b)(7)).  None of these forms of access are "necessary to effectuate delivery," under the People's test.  (People Br. at p. 28.)

Pina has only an atextual response to the SCA's exceptions: that none "allow[s] the companies to profit from those disclosures."  (Pina Br. at pp. 38-39.)  That is not true.  None of the SCA's exceptions impose any profit-based limitations.  (See generally 18 U.S.C. § 2702(b).)  The SCA's exceptions—like the SCA as a whole—are indifferent to service providers' business model.

## II.    PINA AND THE PEOPLE ASK THIS COURT TO RADICALLY DEPART FROM DECADES OF PRECEDENT AND GUT PRIVACY ON THE INTERNET.

As Snap explained in its Opening Brief, the business model theory would gut privacy protections on the internet, contravening decades of settled precedent on which users have relied.  Neither Pina nor the People deny these consequences; they encourage the Court to embrace them.

22

### A. Holding the SCA does not apply here would radically depart from decades of precedent and contradict legislative intent.

For years, courts have consistently applied the SCA to content held by service providers like Snap. (See, e.g., *Negro v. Superior Court* (2014) 230 Cal.App.4th 879, 889, 901-904 [Gmail]; *Crispin, supra,* 717 F.Supp.2d at pp. 987-991 [Myspace]; *Ehling v. Monmouth-Ocean Hosp. Serv. Corp.* (D.N.J. 2013) 961 F.Supp.2d 659, 669 [Facebook]; *Viacom Int'l Inc., supra,* 253 F.R.D. at p. 264 [YouTube]; *In re Path Network, Inc.* (N.D. Cal. 2023) 703 F.Supp.3d 1046, 1067 [Discord].) Pina relies on a single line of dicta in a case from 2012 that, he claims, foretold the business model theory. (Pina Br. at pp. 29-33.) But that case focused on the question of whether the SCA would apply when disclosure was sought from a user instead of a service provider; that issue has no bearing here. (See *Juror Number One v. Superior Court* (2012) 206 Cal.App.4th 854.)

The People and Pina recognize that the result they are seeking is radical, disruptive, and contrary to settled precedent. (People Br. at p. 30.) This is contrary to the Court's typical practice that "where the decisions of the lower federal courts on a federal question are 'both numerous and consistent,' we should hesitate to reject their authority." (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 58.) And it is especially problematic for a statute that protects users' expectations of privacy—and that Congress passed to *eliminate* "legal uncertainty" about privacy protections on the internet. (H.R.Rep. No. 99-647, 2d Sess. (1986) at p.19).

23

Settled authority is particularly relevant here because although Congress "had the opportunity, it made no alterations to reflect a different intent." (*People v. Ledesma* (1997) 16 Cal.4th 90, 100-01.) "When a statute has been construed by the courts, and the Legislature thereafter reenacts that statute without changing the interpretation put on that statute by the courts, the Legislature is presumed to have been aware of, and acquiesced in, the courts' construction of that statute." (*Ibid.* [citation omitted].) Congress has amended the SCA ten times since its enactment in 1986 without disturbing Section 2702 or limiting coverage for users of ubiquitous ad-supported services. (Snap Br. at pp. 51-52.)

Neither Pina nor the People address the significance of these amendments. One of the starkest examples is the Clarifying Lawful Overseas Use of Data ("CLOUD") Act, which amended the SCA in 2018. (Snap Br. at p. 52.) The CLOUD Act "create[d] a framework that allows U.S. service providers to disclose U.S.-stored data to certain foreign countries pursuant to lawful foreign orders." (*Ibid.* [quoting *Congress Enacts the Clarifying Lawful Overseas Use of Data (Cloud) Act, Reshaping U.S. Law Governing Cross-Border Access to Data*, 112 Am. J. Int'l L. 487 (2018) p. 487 [citation omitted]]; see 18 U.S.C. §§ 2702(b)(8), 2523.) Hearings about the CLOUD Act included testimony that advertising-backed providers "like Google and

24

Facebook" were covered by the SCA.[3]  If the business model theory were correct, the CLOUD Act would have been largely unnecessary: Section 2702(a) would not have barred ad-supported services "like Google and Facebook" from disclosing their users' content to anyone—including foreign governments.

The People insist that the CLOUD Act "adds nothing to the analysis, since state law does not leave a gap in providing the same protections"—but this misses the point.  (People Br. at p. 48.)  The history of the CLOUD Act makes clear that Congress understood Section 2702(a) to apply to entities like Snap and Meta.  The scope of state law (which Congress is unlikely to have considered at all, and which varies state to state) says nothing about Congress's intent.  In any event, as Meta explains, the People are wrong about these state-law protections.  (Meta Reply at p. 15, fn.3.)

### B.    The People's emphasis on encrypted services reflects how deeply they misinterpret the SCA.

Adopting the business model theory would also gut privacy protections on the internet, undermining the very purpose of the SCA.  Nearly ubiquitous online services require users to agree to terms of service that allow some access to the content of communications.  Google, for example, "use[s] automated systems that analyze your content to provide you with things like customized search results, personalized ads, or other features

---

[3]  (See Data Stored Abroad: Ensuring Lawful Access and Privacy Protection in the Digital Era, Hearing Before the House Com. on the Judiciary, 115th Cong., 1st Sess., at p. 48 (2017).)

25

tailored to how you use our services."[4]  Yahoo similarly "analyzes and stores all communications content . . . to deliver, personalize and develop relevant features, content, advertising, and Services."[5]  The business model theory would eliminate SCA protection for users of these services.  The People do not disagree; their response is that their theory would not remove SCA protection from *all* online service providers, just most of them.  (People Br. at pp. 35-42.)

The People's examples of services that merit SCA protection—end-to-end encrypted services, including Apple iMessage, Signal, Telegram, and WhatsApp—demonstrate how deeply they have misinterpreted the SCA.  (People Br. at pp. 35-42.)  If the SCA prohibits disclosure only of end-to-end encrypted messages, it is a nullity.  As a technological matter, providers of end-to-end encrypted services cannot "divulge . . . the contents of a communication" at all, with or without the SCA.  (18 U.S.C. § 2702(a)(1)-(2).)  Because messages are encrypted, "no one but the sender and receiver(s) can access" them (People Br. at p. 37 (iMessage)); "they can never be shared or viewed by anyone but [the sender] and the intended recipients" (*id.* at p. 38 (Signal)); and the services have "no ways of deciphering the actual information" (*id.* at p. 39 (Telegram)).  The FBI has itself

---

[4]  (Google LLC, Privacy Policy (Sept. 16, 2024) <https://policies.google.com/privacy> [as of Jan. 24, 2025].)

[5] (Yahoo Inc., Privacy Policy (Dec. 2024) <https://legal.yahoo.com/us/en/yahoo/privacy/index.html> [as of Jan. 24, 2025].)

identified such encryption as "warrant-proof," making providers "unable to deliver information to law enforcement" even when "compelled by court-authorized process."[6]

It is senseless to interpret the SCA to apply only to the "contents of [] communication[s]" that services cannot technologically "divulge" to begin with.  (18 U.S.C. § 2702(a).)  As Snap's Opening Brief explained, Congress passed the SCA to protect communications that third-party service providers *could* access and use.  (Snap Br. at pp. 16-19.)  That access was what defeated traditional Fourth Amendment protection and made the SCA necessary.  (*Ibid.*)  It cannot be that the statute applies *only* where providers have no such access.

## III.   PINA'S AND THE PEOPLE'S REMAINING ARGUMENTS PROVIDE NO BASIS TO AFFIRM.

The Court should not address Pina's and the People's remaining arguments—about burden, evidentiary privileges, or the Constitution—because they are forfeited or beyond the scope of this Court's review.  The Court of Appeal affirmed the trial court on a single ground: that under the "business model" theory, the SCA—including its ECS and RCS provisions—does not apply to Meta and Snap.  (Opn. at pp. 38-40.)  The Court should reverse that holding without reaching new, alternative arguments. Those arguments are appropriate for development, if at all, on remand.

---

[6] (See Federal Bureau of Investigation, *Warrant-Proof Encryption and Lawful Access* <https://www.fbi.gov/about/mission/lawful-access> [as of Jan. 24, 2025].)

27

### A. The People's burden argument is wrong and irrelevant.

The People's argument that Snap and Meta bear the burden of showing the SCA applies is irrelevant—because there are no facts disputed on the current record—but also incorrect. (People Br. at p. 25).

It is Pina's burden to demonstrate "good cause" and the legality of his subpoenas. In a criminal case, the defendant—as the issuing party—bears the burden of showing good cause for the issuance of subpoena. (See, e.g., *Touchstone*, *supra*, 10 Cal.5th at p. 337; *Lunsted v. Super. Ct. of Riverside Cnty.* (2024) 318 Cal.Rptr.3d 795, 802.) The issuing party has the burden to establish, among other things, whether "production of the requested materials [would] violate a third party's 'confidentiality or privacy rights[.]'" (*Touchstone*, *supra*, 10 Cal.5th at p. 346.) Elsewhere in their brief, the People correctly agree that "if federal law (such as the SCA) prohibits the issuance of a criminal defense subpoena, then a trial court would lack the statutory authority to issue the subpoena in the first instance." (People Br. at p. 49.)

The People attempt to analogize the SCA to other confidentiality provisions or evidentiary privileges, but they ignore the case that squarely applies: *Touchstone*. (*Touchstone*, *supra*, 10 Cal.5th at p. 344.) None of the other cases the People cite dealt with a motion to quash for lack of good cause—much less a criminal statute that prohibited disclosure of third-party confidential information. (People Br. at p. 49.)

28

### B.    Pina's evidentiary privilege argument is forfeited and contrary to the SCA's text.

Pina's argument that a court cannot quash *any* subpoena based on the SCA—because the statute does not create an "implied evidentiary privilege"—is also forfeited and wrong. (Pina Br. at pp. 40-48.)

Pina has consistently disputed the SCA's application to the specific communications stored by Snap and Meta, but he has never disputed the much broader proposition that the SCA applies to subpoenas. This Court "normally do[es] not consider any issue that could have been but was not timely raised in the briefs filed in the Court of Appeal." (*Lopez v. Ledesma* (2022) 12 Cal.5th 848, 866 [citation omitted].) It also declines to address arguments "not raised in the petition for review or [the] answer [to that petition]." (*Stone v. Alameda Healthy Sys.* (2024) 16 Cal.5th 1040, 1051, fn. 5; see also *Dynamex Operations W. v. Superior Court* (2018) 4 Cal.5th 903, 916, fn. 5.) The Court should not depart from these practices to review Pina's argument.

Pina's argument also relies on a rule that does not exist; and even if it did, the SCA would satisfy it. Pina argues that, absent an exceptionally clear statement, this Court must presume that a statutory disclosure bar does *not* apply to subpoenas. (Pina Br. at pp. 42-43.) But as Meta explains in its reply, courts—including this one—have repeatedly applied the SCA to criminal subpoenas. (Meta Reply at pp. 21-23.) No court has endorsed Pina's arguments.

29

The SCA is also perfectly clear: it prohibits service providers from "knowingly divulg[ing] to any person or entity the contents of a communication while in electronic storage by that service" unless an exception applies (18 U.S.C. § 2702(a), (b)), and it describes the type of legal process necessary for a "government entity" to obtain those communications under the relevant exception (*id.* § 2703). The statute is plain: a governmental entity can use a "subpoena" to obtain communications or related records—though in other cases, even the government must obtain a warrant. (*Id.* § 2703(b)(1)(B)(i).) As a matter of federal law, the SCA identifies what forms of process are and are not permitted. Pina nevertheless interprets it not to authorize a motion to quash obviously improper efforts to obtain communications.

### C.    Pina's constitutional arguments are unripe and incorrect.

This Court should also decline Pina's invitation to adjudicate facial constitutional challenges that none of the lower courts reached and Pina failed to preserve for review by this Court. (Pina Br. at pp. 48-59). The argument provides no basis to affirm.

#### 1.    Under both forfeiture rules and avoidance principles, this Court should not address Pina's constitutional claims.

This Court should not address Pina's constitutional claims, which he failed to develop or preserve for this Court's review. The Court of Appeal expressly declined to reach any constitutional issues (Opn. at p. 45, fn.19), and Pina failed to raise them in an answer to Snap's petition for review. (See *Stone*, *supra*, 16 Cal.5th at p. 1051, fn. 5.) This Court need not and should not addresses these issues in the first instance.

30

In general, this Court does "not reach constitutional questions unless absolutely required to do so to dispose of the matter"—and there is no record of necessity here. (*Hunter*, *supra*, 4 Cal.5th at p. 1275, fn. 31 [citation omitted].)

Pina served extremely broad subpoenas on both Snap and Meta, seeking "[a]ll records associated with" the victim's "account[s] . . . including timeline posts, messages, phone calls, videos, location information, and information from 1/1/2020 to December 31, 2021." (Opn. at 5.) There is nothing—and certainly no finding by the trial court—establishing that this material was essential to Pina's defense. The trial court did not even find "good cause" for Pina's subpoena, concluding only that there was "probable cause." (*Id.* at p. 14.) Pina served these broad subpoenas even though he already had the entire contents of his brother's cell phone and the capacity to seek information from other sources—including his brother's girlfriend, whose *own* Snapchat post is the only reference to any potentially relevant Snapchat material in the entire record. (AE-24-25; AE-239.)

Procedurally, there may also be other avenues available to Pina that could eliminate the need for any constitutional analysis. In general, user contents should be sought in the first instance—not directly from a service provider, but from the sender or recipient of a communication. Courts must "adequately consider defendant's ability to obtain the material from other sources, such as the messages' recipients." (See *Touchstone*, *supra*, 10 Cal.5th at p. 356.) There is no record that Pina has ever attempted to do that, despite the information about former

31

contacts he likely obtained from his victim's phone.  If this Court reverses—as it should—the trial court can consider alternative mechanisms for Pina to obtain the requested content.

> **2.    Pina's constitutional challenge fails on the merits.**

Pina's constitutional arguments also, once again, contradict precedent.  "[T]here is no general constitutional right to discovery in a criminal case." (*Facebook, Inc. v. Superior Court* (2017) 15 Cal.App.5th 729, 739 ("*Facebook*") [cleaned up].)  As the United States Supreme Court has explained, the due process clause guarantees the right to a fair trial, but that guarantee does not include a fundamental constitutional right to discover and introduce all relevant evidence.  (See *Montana v. Egelhoff* (1996) 518 U.S. 37, 51–56.)  As a result, every court to consider criminal defendants' constitutional challenges to the SCA have rejected them.  (See *United States v. Glenn* (N.D. Ohio 2022), 341 F.R.D. 217, 222; *Facebook, Inc. v. Wint* (D.C. 2019) 199 A.3d 625, 629 [collecting cases]; *Facebook, supra,* 15 Cal.App.5th at p. 739.)

Whether applying procedural rules in any given case rises to the level of a constitutional violation is also "highly case-specific." (*Egelhoff, supra*, 518 U.S. at p. 52.)  As the cases Pina cites reflect, this case-specific analysis applies even when courts analyze potential due process violations *at trial*, resulting from the exclusion of essential defense evidence.  (See, e.g., *Chambers v. Mississippi* (1972), 410 U.S. 284; *Wardius v. Oregon* (1973) 412 U.S. 470.)  The Supreme Court has specifically recognized *Chambers* as "an exercise in highly case-specific error correction." (*Egelhoff, supra*, 518 U.S. at p. 52.)  In *Egelhoff*, the Court held:

32

"the holding of *Chambers*—if one can be discerned from such a fact-intensive case—is certainly not that a defendant is denied" due process whenever "'critical evidence' favorable to him is excluded[.]" (*Ibid.* [citation omitted].)

Pina does not explain with specificity how his trial would be fundamentally unfair unless he can mine his victim's communication and social media accounts. Instead, Pina seeks a sweeping holding that "a statute cannot lawfully foreclose a criminal defendant from obtaining information while simultaneously providing an avenue for discovery for law enforcement." (Pina Br. at p. 54.) But "[a] criminal prosecution is in no sense a symmetrical proceeding." (*Facebook, supra*, 15 Cal.App.5th at p. 744 [cleaned up].) Many investigative tools are exclusively a government function, and "not available to the defendant": the ability to arrest suspects, search private property, and wiretap telephones, among others. (*Id.* at p. 745.)

Neither *Wardius* nor *Evans v. Superior Court* (1974) 11 Cal.3d 617 supports the categorical rule Pina seeks to establish. *Wardius* invalidated a state law that required criminal defendants—but not the government—to disclose witnesses in advance of trial; even then, the case recognized that, in general, "the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded[.]" (*Wardius, supra*, 412 U.S. at p. 474.) And *Evans* did not identify or apply any constitutional rule; it held only that a trial court had the "discretion" to order a lineup procedure a defendant sought. (*Evans, supra*, 11 Cal.3d at p. 625.) Neither of these cases

33

involved defendants' effort to compel third-party discovery—nor did *Davis v. Alaska* (1974) 415 U.S. 308, which addressed a defendant's right to obtain materials in the *state*'s possession.

Pina also overreads *Delaney v. Superior Court* (1990) 50 Cal.3d 785, in which the Court compelled reporters to testify—despite the general "shield law" protecting reporters from disclosing unpublished information—about an arrest they had witnessed in public.  The Court emphasized that the reporters were "not being asked to breach a confidence or to disclose sensitive information.  All that is being required of them is to accept the civic responsibility imposed on all persons who witness alleged criminal conduct." (*Id.* at p. 816.)  And *Delaney* did not involve a defense subpoena at all: the prosecution called the reporters to testify.  (*Id.* at p. 794.)

Precedent does not establish a constitutional right for Pina to obtain pretrial third-party discovery—certainly not on the record presented here.

## CONCLUSION

Snap respectfully asks this Court to reverse—directing the Court of Appeal to grant the petition for writ of mandate and issuing a peremptory writ of mandate directing the trial court to quash the subpoenas issued by counsel for real party in interest Adrian Pina.  At minimum, the Court should reverse the Court of Appeal's decision and remand for further proceedings.[7]

---

[7] Snap agrees with Meta that this Court may also remand for the trial court to address the good-cause factors for issuance of a criminal subpoena without reaching the scope of the SCA.  (Meta Reply at pp. 30-32.)

34

Dated: January 24, 2025               Respectfully Submitted,


                                      */s/ L. Ashley Aull*


*L. Ashley Aull (CSB No. 257020)      David W. Feder, *Pro Hac Vice*
ashley.aull@mto.com                   dfeder@fenwick.com
MUNGER, TOLLES & OLSON LLP            FENWICK & WEST LLP
350 South Grand Avenue                902 Broadway, 18th Floor
Los Angeles, CA 90071                 New York, NY 10010-6035
Telephone: 213.683.9500               Telephone: 212.430.260

J. Max Rosen (CSB No. 310789)         Tyler G. Newby (CSB No. 205790)
max.rosen@mto.com                     tnewby@fenwick.com
MUNGER, TOLLES & OLSON LLP            Ryan Kwock (CSB No. 336414)
560 Mission Street, 27th Floor        rkwock@fenwick.com
San Francisco, CA 94105               FENWICK & WEST LLP
Telephone: 415.512.4000               555 California Street, 12th Floor
                                      San Francisco, CA 94104
Brian A. Sutherland                   Telephone: 415.875.2300
(CSB No. 248486)
brian.sutherland@calg.com             Janie Y. Miller (CSB No. 312715)
Greg Wolff (CSB No. 78626)            jmiller@fenwick.com
greg.wolff@calg.com                   Esther Galan (CSB No. 335763)
COMPLEX APPELLATE LITIGATION          egalan@fenwick.com
GROUP LLP                             FENWICK & WEST LLP
96 Jessie Street                      730 Arizona Avenue, 1st Floor
San Francisco, CA 94105               Santa Monica, CA 90401
Telephone: 415.649.6700               Telephone: 310.554.5400

                                      Orin S. Kerr (CSB No. 319808)
                                      orin@orinkerr.com
                                      LAW OFFICE OF ORIN S. KERR
                                      559 Nathan Abbott Way
                                      Stanford, CA 94305
                                      Telephone: 650.498.8125


          *Attorneys for Petitioner Snap Inc.*


                         35

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 8.204 of the California Rules of Court, the attached **Petitioner Snap Inc.'s Reply Brief** is proportionally spaced, has a typeface of 13 points or more, and contains 6,599 words, including footnotes, according to the word processing program used to create the brief.

Dated: January 24, 2025          _/s/ L. Ashley Aull_
                                  L. Ashley Aull

## PROOF OF SERVICE

I certify that on January 24, 2025, I electronically filed **PETITIONER SNAP INC.'S REPLY BRIEF** with the Clerk of the Court using the TrueFiling system which will be served by operation of the Court's electronic filing system to all parties below:

Summer Stephan
District Attorney
Linh Lam
Deputy District Attorney
Chief, Appellate & Training
Division
Karl Husoe
Deputy District Attorney
330 W. Broadway, Suite 860
San Diego, CA  92101
Email: karl.husoe@sdcda.org
*Counsel for The People,*
*Real Party in Interest*

David Jarman
Office of San Diego County
District Attorney
North County Regional Center
325 S. Melrose Drive, Suite 5000
Vista, CA  92081
Email: david.jarman@sdcda.org
*Counsel for The People,*
*Real Party in Interest*

Paul Rodriguez
Public Defender
Office of the Primary Public
Defender
Troy A. Britt
451 A. Street, Suite 900
San Diego, CA  92101
Email:
troy.britt@sdcounty.ca.gov
*Counsel for Real Party in*
*Interest*
*Adrian Pina*

Nadine Valdecini
San Diego County Department of
the Public Defender
451 A Street, Suite 900
San Diego, CA  92101
Email:
nadine.valdecini@sdcounty.ca.gov
*Counsel for Real Party in Interest*
*Adrian Pina*

37

App. 156

Julie Schwartz
Ryan Mrazik
John R. Tyler
Perkins Coie LLP
1201 Third Avenue, Suite 4900
Seattle, WA  98101
Email:
jschwartz@perkinscoie.com
rmrazik@perkinscoie.com
rtyler@perkinscoie.com

Natasha Amlani
Perkins Coie LLP
1888 Century Park East
Suite 1700
Los Angeles, CA 90067
Email:
namlani@perkinscoie.com

*Counsel for Petitioner*
*Meta Platforms, Inc.*

Joshua S. Lipshutz
Gibson, Dunn & Crutcher LLP
One Embarcadero Center, # 2600
San Francisco, CA 94111
Email:
jlipshutz@gibsondunn.com

Michael J. Holecek
Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071
Email:
mholecek@gibsondunn.com

Natalie J. Hausknecht
Gibson, Dunn & Crutcher LLP
1801 California Street
Suite 4200
Denver, CO 80202
Email:
nhausknecht@gibsondunn.com

*Counsel for Petitioner*
*Meta Platforms, Inc.*

Dated: January 24, 2025          */s/ L. Ashley Aull*
                                 L. Ashley Aull

38

Supreme Court of California
Jorge E. Navarrete, Clerk and Executive Officer of the Court
Electronically FILED on 1/24/2025 by M. Chang, Deputy Clerk

**STATE OF CALIFORNIA**
Supreme Court of California

## *PROOF OF SERVICE*

**STATE OF CALIFORNIA**
Supreme Court of California

Case Name: **SNAP v. S.C. (PINA)**
Case Number: **S286267**
Lower Court Case Number: **D083446**

1. At the time of service I was at least 18 years of age and not a party to this legal action.

2. My email address used to e-serve: **ashley.aull@mto.com**

3. I served by email a copy of the following document(s) indicated below:

Title(s) of papers e-served:

| Filing Type | Document Title |
|---|---|
| BRIEF | 2025 01 24 Petitioner's Reply Brief |

Service Recipients:

| Person Served | Email Address | Type | Date / Time |
|---|---|---|---|
| Joshua Lipshutz<br>Gibson, Dunn & Crutcher, LLP<br>242557 | jlipshutz@gibsondunn.com | e-Serve | 1/24/2025<br>8:29:53 PM |
| Ryan Kwock<br>Fenwick & West LLP | rkwock@fenwick.com | e-Serve | 1/24/2025<br>8:29:53 PM |
| Jacob Snow<br>ACLU of Northern California<br>270988 | jsnow@aclunc.org | e-Serve | 1/24/2025<br>8:29:53 PM |
| J. Rosen<br>Munger, Tolles & Olsonm LLP<br>310789 | max.rosen@mto.com | e-Serve | 1/24/2025<br>8:29:53 PM |
| Efaon Cobb<br>ACLU Foundations of San Diego and Imperial Counties | efaon@hcl-lawfirm.com | e-Serve | 1/24/2025<br>8:29:53 PM |
| Ari Holtzblatt<br><br>354631 | Ari.Holtzblatt@wilmerhale.com | e-Serve | 1/24/2025<br>8:29:53 PM |
| Tyler Newby<br>Fenwick & West LLP<br>205790 | tnewby@fenwick.com | e-Serve | 1/24/2025<br>8:29:53 PM |
| Ryan Mrazik<br>Perkins Coie LLP | rmrazik@perkinscoie.com | e-Serve | 1/24/2025<br>8:29:53 PM |
| Troy Britt<br>San Diego County Office of the Public Defender<br>190879 | troy.britt@sdcounty.ca.gov | e-Serve | 1/24/2025<br>8:29:53 PM |
| Brian Sutherland<br>Complex Appellate Litigation Group LLP<br>4728929 | brian.sutherland@calg.com | e-Serve | 1/24/2025<br>8:29:53 PM |
| Alex Harris<br>Gibson, Dunn & Crutcher LLP | aharris@gibsondunn.com | e-Serve | 1/24/2025<br>8:29:53 PM |

| | | | |
|---|---|---|---|
| Julie Schwartz<br>Perkins Coie LLP<br>260624 | jschwartz@perkinscoie.com | e-Serve | 1/24/2025<br>8:29:53 PM |
| Nomi Conway<br>Freshfields Bruckhaus Deringer<br>335526 | nomi.conway@freshfields.com | e-Serve | 1/24/2025<br>8:29:53 PM |
| Karl Husoe<br>San Diego County District Attorney<br>261097 | karl.husoe@sdcda.org | e-Serve | 1/24/2025<br>8:29:53 PM |
| Maria Rodriguez<br>McDermott Will & Emery LLP<br>194201 | mcrodriguez@mwe.com | e-Serve | 1/24/2025<br>8:29:53 PM |
| Neil Sawhney<br>American Civil Liberties Union of Northern California<br>300130 | nsawhney@aclunc.org | e-Serve | 1/24/2025<br>8:29:53 PM |
| Jonathan Schneller<br>O'Melveny & Myers LLP<br>291288 | jschneller@omm.com | e-Serve | 1/24/2025<br>8:29:53 PM |
| L. Aull<br>Munger, Tolles & Olson LLP<br>257020 | ashley.aull@mto.com | e-Serve | 1/24/2025<br>8:29:53 PM |
| Janie Miller<br>Fenwick & West LLP<br>312715 | jmiller@fenwick.com | e-Serve | 1/24/2025<br>8:29:53 PM |
| David Feder<br>Fenwick & West LLP<br>4557203 | dfeder@fenwick.com | e-Serve | 1/24/2025<br>8:29:53 PM |
| Orin Kerr<br>Law Office of Orin S. Kerr<br>319808 | orin@orinkerr.com | e-Serve | 1/24/2025<br>8:29:53 PM |
| F. Mario Trujillo<br>Electronic Frontier Foundation<br>352020 | mario@eff.org | e-Serve | 1/24/2025<br>8:29:53 PM |
| Gregory Wolff<br>Complex Appellate Litigation Group LLP<br>78626 | Greg.wolff@calg.com | e-Serve | 1/24/2025<br>8:29:53 PM |
| Natasha Amlani<br>Perkins Coie<br>322979 | namlani@perkinscoie.com | e-Serve | 1/24/2025<br>8:29:53 PM |

This proof of service was automatically created, submitted and signed on my behalf through my agreements with TrueFiling and its contents are true to the best of my information, knowledge, and belief.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

1/24/2025

Date

/s/L. Ashley Aull

Signature

App. 159

Aull, L. Ashley (257020)
Last Name, First Name (PNum)

Munger, Tolles & Olson LLP
Law Firm

# EXHIBIT 4

# X Privacy Policy

## Before you scroll, read this

It's really hard to make everyone happy with a Privacy Policy. Most people who use X want something short and easy to understand. While we wish we could fit everything you need to know into a post, our regulators ask us to meet our legal obligations by describing them all in a lot of detail.

With that in mind, we've written our Privacy Policy as simply as possible to empower you to make informed decisions when you use X by making sure you understand and have control over the information we collect, how it's used, and when it's shared.

So if you skip reading every word of the Privacy Policy, at least know this:

**X is a public platform**

**Learn what's viewable & searchable**

**We collect some data about you**

**Learn what we collect & how**

**Affiliate services may have their own policies**

**Learn about affiliates**

**We use your data to make X better**

**Learn how we make your info work**

**You can control your experience**

**Learn how to update your settings**

**If you have questions about how we use data, just ask**

**Learn how to contact us**

App. 162



# 1. Information We Collect

The information we collect when you use X falls into three categories.

## 1.1 Information you provide us.

To use some of our products and services you need to have an account, and to create an account, you need to provide us certain information. Likewise, if you use our paid products and services, we cannot provide them to you without getting payment information. Basically, certain information is necessary if you want to use many of our products and services.

- **Personal accounts.** If you create an account, you must provide us with some information so that we can provide our services to you. This includes a display name (for example, "Creators"); a username (for example, @XCreators); a password; an email address or phone number; a date of birth; your display language; and third-party single sign-in information (if you choose this sign-in method). You can also choose to share your location in your profile and posts, and to upload your address book to X to help find people you may know. Your profile information, which includes your display name and username, is always public, but you can use either your real name or a pseudonym. And remember, you can create multiple X accounts, for example, to express different parts of your identity, professional or otherwise.
- **Professional Accounts.** If you create a [Professional Account](), you also need to provide us with a professional category, and may provide us with other information, including street address, contact email address, and contact phone number, all of which will always be public.
- **Payment information.** In order to purchase ads or other offerings provided as part of our paid products and services you will need to provide us payment information, including your credit or debit card number, card expiration date, CVV code, and billing address.
- **Preferences.** When you set your preferences using your [settings](), we collect that information so that we can respect your preferences.
- **Biometric information.** Based on your consent, we may collect and use your biometric information for safety, security, and identification purposes.
- **Job applications / recommendations.** We may collect and use your personal information (such as your biographical information, employment history, educational history, employment preferences, skills and abilities, and job search activity and engagement, in addition to the information we already collect as disclosed in the "Information we collect when you use X" section of our Privacy Policy below) to recommend potential jobs to you, to share with potential employers when you apply

App. 163



for a job, to enable connections for professional opportunities, and to show you more relevant advertising.

## 1.2 Information we collect when you use X.

When you use our services, we collect information about how you use our products and services. We use that information to provide you with products and services, to help keep X more secure and respectful for everyone, and more relevant to you.

**Usage information.** We collect information about your activity on X, including:

- Posts and other content you post (including the date, application, and version of X) and information about your broadcast activity (e.g., Spaces), including broadcasts you've created and when you created them, your lists, bookmarks, and Communities you are a part of.
- Your interactions with other users' content, such as reposts, likes, bookmarks, shares, downloads, replies, if other users mention or tag you in content or if you mention or tag them, and broadcasts you've participated in (including your viewing history, listening, commenting, speaking, and reacting).
- How you interact with others on the platform, such as people you follow and people who follow you, metadata related to Encrypted Messages, and when you use Direct Messages, including the contents of the messages, the recipients, and date and time of messages.
- If you communicate with us, such as through email, we will collect information about the communication and its content.
- We collect information on links you interact with across our services (including in our emails sent to you).

**Purchase and payments.** To allow you to make a payment or send money using X features or services, including through an intermediary, we may receive information about your transaction such as when it was made, when a subscription is set to expire or auto-renew, and amounts paid or received.

**Device information.** We collect information from and about the devices you use to access X, including:

- Information about your connection, such as your IP address, browser type, and related information.
- Information about your device and its settings, such as device and advertising ID, operating system, carrier, language, memory, apps installed, and battery level.
- Your device address book, if you've chosen to share it with us.

**Location information.** When you use X, we collect some information about your approximate location to provide the service you expect, including showing you relevant ads. You can also choose to share your current precise location or places where you've previously used X by enabling these settings in your account.

App. 164

𝕏

**Inferred identity.** We may collect or receive information that we use to infer your identity as detailed below:

- When you sign into X on a browser or device, we will associate that browser or device with your account. Subject to your settings, we may also associate your account with browsers or devices other than those you use to sign into X (or associate your signed-out device or browser with other browsers or devices or X-generated identifiers).
- When you provide other information to X, including an email address or phone number, we associate that information with your X account. Subject to your settings, we may also use this information in order to infer other information about you and/or your identity, for example by associating your account with hashes of email addresses that share common components with the email address you have provided to X.
- When you access X and are not signed in, we may infer your identity based on the information we collect.

**Log information.** We may receive information when you view content on or otherwise interact with our products and services, even if you have not created an account or are signed out, such as:

- IP address and related information; browser type and language; operating system; the referring webpage; access times; pages visited; location; your mobile carrier; device information (including device and application IDs); search terms and IDs (including those not submitted as queries); ads shown to you on X; X-generated identifiers; and identifiers associated with cookies. We also receive log information when you click on, view, or interact with links on our services, including when you install another application through X.

**Advertisements.** When you view or interact with ads we serve on or off X, we may collect information about those views or interactions (e.g., watching a video ad or preroll, clicking on an ad, interacting with reposts of or replies to an ad).

**Cookies and similar technologies.** Like many websites, we use cookies and similar technologies to collect additional website usage data and to operate our services. Cookies are not required for many parts of our products and services such as searching and looking at public profiles. You can learn more about how we use cookies and similar technologies here.

**Interactions with our content on third-party sites.** When you view our content on third-party websites that integrate X content, such as embedded timelines or post buttons, we may receive log information that includes the web page you visited.

## 1.3 Information we receive from third parties.

When you use other online products and services, they may share information about that usage with us.

App. 165



**Ad partners, developers, and publishers.** Our ad and business partners share information with us such as browser cookie IDs, X-generated identifiers, mobile device IDs, hashed user information like email addresses, demographic or interest data, and content viewed or actions taken on a website or app. Some of our ad partners, particularly our advertisers, also enable us to collect similar information directly from their website or app by integrating our advertising technology. Information shared by ad partners and affiliates or collected by X from the websites and apps of ad partners and affiliates may be combined with the other information you share with X and that X receives, generates, or infers about you described elsewhere in this Privacy Policy.

**Other third parties, account connections, and integrations.** We may receive information about you from third parties who are not our ad partners, such as other X users, developers, and partners who help us evaluate the safety and quality of content on our platform, our corporate affiliates, and other services you link to your X account. You may choose to connect your X account to your account on another service, and that other service may send us information about your account on that service.

# 2. How We Use Information

Breaking down how we use the information we collect is not simple because of the way the systems that bring our services to you work. For example, the same piece of information may be used differently for different purposes to ultimately deliver a single service. We think it's most useful to describe the five main ways we use information and if you have questions that are not answered, you can always contact us. Here we go:

## 2.1 Operate, improve, and personalize our services.

We use the information we collect to provide and operate X products and services. We also use the information we collect to improve and personalize our products and services so that you have a better experience on X, including by showing you more relevant content and ads, suggesting people and topics to follow, enabling and helping you discover affiliates, third-party apps, and services. We may use the information we collect and publicly available information to help train our machine learning or artificial intelligence models for the purposes outlined in this policy.

We may use the information we collect from accounts of other services that you choose to connect to your X account to provide you features like cross-posting or cross-service authentication, and to operate our services.

We use your contact information to help others find your account if your settings permit, including through third-party services and client applications.

App. 166

𝕏

We use your information to provide our advertising and sponsored content services subject to your settings, which helps make ads on X more relevant to you. We also use this information to measure the effectiveness of ads and to help recognize your devices to serve you ads on and off of X. Some of our ad partners also enable us to collect similar information directly from their website or app by integrating our advertising technology. Information shared by ad partners and affiliates or collected by X from the websites and apps of ad partners and affiliates may be combined with the other information you share with X and that X receives, generates, or infers about you, as described elsewhere in our Privacy Policy.

## 2.2  Foster safety and security.

We use information we collect to provide for the safety and security of our users, our products, services, and your account. This includes verifying your identity, authenticating your account, estimating or verifying your age as may be required under law, and defending against fraud, unauthorized use, and illegal activity. We also use the information to evaluate and affect the safety and quality of content on X - this includes investigating and enforcing our policies and terms, as well as applicable law.

## 2.3 Measure, analyze and make our services better.

We use the information we collect to measure and analyze the effectiveness of our products and services and to better understand how you use them in order to make them better.

## 2.4 Communicate with you about our services.

We use the information we collect to communicate with you about our products and services, including about product updates and changes to our policies and terms. If you're open to hearing from us, we may also send you marketing messages from time to time.

## 2.5 Research.

We use information you share with us, or that we collect to conduct research, surveys, product testing, and troubleshooting to help us operate and improve our products and services.

App. 167



# 3. Sharing Information

You should know the ways we share your information, why we share it, and how you can control it. There are five general ways we share your information.

## 3.1 When you post and share.

**With the general public**. You are directing us to disclose that information as broadly as possible. X content, including your profile information (e.g., name/pseudonym, username, profile pictures), is available for viewing by the general public. The public does not need to be signed in to view some content on X. They may also find X content off of X: for example, from search query results on Internet search engines or videos downloaded and reshared elsewhere (depending on your settings).

**With other X users.** Depending on your settings, and based on the X products and services you use, we share:

- Your interactions with X content of other users, such as replies, and people you follow.
- Content you send to a specific X user, such as through Direct Messages. Please keep in mind that if you've shared information like Direct Messages or protected posts with someone else who accesses X through a third-party service, the information may be shared with the third-party service.

**With partners.** Depending on your settings, we also provide certain third parties with information to help us offer or operate our products and services. You can learn more about these partnerships in our Help Center. You can control whether X shares your personal information with these partners by using the "Data sharing with business partners" option in your Privacy and Safety settings. (This setting does not control sharing described elsewhere in this Privacy Policy, such as when we share information with our service providers, or through partnerships other than as described in this Help Center article.)

## 3.2 With third parties and third-party integrations.

**With service providers.** We may share your information with our service providers that perform functions and provide services on our behalf, including payment services providers who facilitate payments; service providers that host our various blogs and wikis; service providers that help us understand the use of our services; applicant tracking system providers to send and receive applicant and job data to potential employers; service providers supporting age assurance solutions; and those that provide fraud detection services.

App. 168



**With advertisers.** Advertising revenue enables us to provide our products and services. Advertisers may learn information from your engagement with their ads on or off X. For example, if you click on an external link or ad on our services, that advertiser or website operator might figure out that you came from X, along with other information associated with the ad you clicked, such as characteristics of the audience it was intended to reach and other X-generated identifiers for that ad. They may also collect other personal information from you, such as cookie identifiers, or your IP address.

**Third-party content and integrations.** We share or disclose your information with your consent or at your direction, such as when you authorize a third-party web client or application to access your account or when you direct us to share your feedback with a business. Similarly, to improve your experience, we work with third-party partners to display their video content on X or to allow cross-platform sharing. When you watch or otherwise interact with content from our video or cross-platform sharing partners, they may receive and process your personal information as described in their privacy policies. For video content, you can adjust your autoplay settings if you prefer that content not to play automatically.

**Third-party collaborators.** Depending on your settings, or if you decide to share your data, we may share or disclose your information with third parties. If you do not opt out, in some instances the recipients of the information may use it for their own independent purposes in addition to those stated in X's Privacy Policy, including, for example, to train their artificial intelligence models, whether generative or otherwise.

**Through our APIs.** We use technology like APIs and embeds to make public X information available to websites, apps, and others for their use, for example, displaying posts on a news website or analyzing what people say on X. We generally make this content available in limited quantities for free and charge licensing fees for large-scale access. We have standard terms that govern how this information can be used, and a compliance program to enforce these terms. But these individuals and companies are not affiliated with X, and their offerings may not reflect updates you make on X. For more information about how we make public data on X available to the world, visit https://developer.x.com.

## 3.3 When required by law, to prevent harm, or in the public interest.

We may preserve, use, share, or disclose your information if we believe that it is reasonably necessary to:

- comply with a law, regulation, legal process, or governmental request;
- protect the safety of any person, protect the safety or integrity of our platform, including to help prevent spam, abuse, or malicious actors on our services;

App. 169



- explain why we have removed content or accounts from our services (e.g., for a violation of our Rules);
- address fraud, security, or technical issues; or
- protect our rights or property, or the rights or property of those who use our services.

We may also use different signals and your data to infer, preserve, use, share, or disclose your age and identity information in order to comply with regulatory requirements as well as for safety, security, fraud, know-your-customer, know-your-business, and identity verification, as the case may be. We may also share or disclose your age and identity information with our partners, service providers, and others for these purposes.

## 3.4 With our affiliates.

We may share information amongst our affiliates to provide our products and services.

## 3.5 As a result of a change in ownership.

We may share, sell, or transfer information about you in connection with a merger, acquisition, reorganization, sale of assets, or bankruptcy. This Privacy Policy will apply to your personal information that is shared with (before and after the close of any transaction) or transferred to the new entity.

# 4. How Long We Keep Information

We keep different types of information for different periods of time, depending on how long we need to retain it in order to provide you with our products and services, to comply with our legal requirements and for safety and security reasons. For example:

- We keep your profile information, such as your display name, user name, password and email address for the duration of your account. We cannot provide you with our products and services without retaining this information.
- We keep your usage information, such as the content you post, your interactions with other users' content and how you interact with others on the platform for the duration of your account or until such content is removed.
- We keep your payment information, including your credit or debit card number and billing address for the duration you use our paid products and services. Records of transactions will be kept for longer, in accordance with applicable law.
- If you communicate with us, such as through email, we will keep information about the communication and its content for up to 18 months, unless it is necessary for us to retain it for a longer period to comply with our legal obligations or to exercise or defend our legal rights.
- We generally collect device information, location information, inferred identity information and log information using cookies. We keep cookies and information collected using

App. 170

X

- cookies for up to 13 months. You can learn more about how we use cookies and similar technologies here.
- We keep information about your views or interactions with ads on or off X, as well as how you interact with our content on third-party sites for up to 12 months.
- We keep information shared by ad and business partners for up to 12 months.
- Where you violate our Rules and your account is suspended, we may keep the identifiers you used to create the account (such as your email address or phone number) indefinitely to prevent repeat policy offenders from creating new accounts.

We may need to keep certain information longer than our policies specify in order to comply with legal requirements and for safety and security reasons. For example:

- **To comply with a law, regulation, legal process, or governmental request.** Including in order to adhere to a legally appropriate preservation request made by law enforcement. You can read more about law enforcement access here.
- **In connection with legal claims, litigation, and regulatory matters.** Including where it is reasonably necessary to retain information relating to your account in order to defend X against legal claims.
- **To maintain the safety and security of our products and services.** Including where it is necessary to store your information longer in order to investigate and fight abuse on our products and services.

Remember public content can exist elsewhere even after it is removed from X. For example, search engines and other third parties may retain copies of your posts longer, based upon their own privacy policies, even after they are deleted or expire on X. You can read more about search visibility here.

# 5. Take Control

## 5.1 Access, correction, and portability.

You can access, correct, or modify the information you provided to us by editing your profile and adjusting your account settings.

- You can learn more about the information we have collected or inferred about you in Your X Data and request access to additional information here.
- You can download a copy of your information, such as your posts, by following the instructions here.

To protect your privacy and maintain security, we take steps to verify your identity before granting you access to your personal information or complying with a deletion, portability, or other related request. We may, in certain situations, reject your request for access, correction, or portability, for example, we may reject access where you are unable to verify your identity.

App. 171



## 5.2 Deleting your information.

If you follow the instructions here, your account will be deactivated and your data will be queued for deletion. When deactivated, your X account, including your display name, username, and public profile, will no longer be viewable on X.com, X for iOS, and X for Android. For up to 30 days after deactivation it is still possible to restore your X account if it was accidentally or wrongfully deactivated.

## 5.3 Objecting to, restricting, or withdrawing your consent.

You can manage your privacy settings and other account features here. If you change your settings it may take some time for your choices to be fully reflected throughout our systems. You may also notice changes in your X experience or limitations in your ability to access certain features depending on the settings you've adjusted. You may also manage additional settings when interacting with certain content and features on different parts of the platform, such as whether a Space is recorded, or whether videos you upload are downloadable by others.

## 5.4 Authorized agent requests.

To submit a request related to access, modification, or deletion of your information, or someone else's information if you are their authorized agent, you may also contact us as specified in the How To Contact X section of our Privacy Policy below. We may require you to provide additional information for verification.

# 6. Your Rights And Ours

We provide X to people all over the world and provide many of the same privacy tools and controls to all of our users regardless of where they live. However, your experience may be slightly different than users in other countries to ensure X respects local requirements.

## 6.1 We have specific legal bases to use your information.

X has carefully considered the legal reasons it is permitted to collect, use, share and otherwise process your information. If you want to dig in to learn more and better understand the nuances, we'd encourage you to check out this additional information about data processing. And no, we don't sell your personal information.

App. 172



## 6.2 We move your data to make X work for you.

Just as you use X to seamlessly participate in global conversations with people in countries all over the world, X must move information across borders and to different countries around the world to support the safe and reliable service you depend on. For example, if you live in Europe and are having a conversation with someone in the United States, information has to move between those countries to provide that experience – it's what you expect from us.

We also use data centers and cloud providers, and engage our affiliates and third-party partners and service providers located in many parts of the world to help us provide our services. Before we move data between countries we look at the risks that may be presented to the data and rely on standard contractual clauses (SCCs), where applicable, to ensure your data rights are protected. To request a copy of the SCCs, please contact us here. If data will be shared with a third party, we require them to maintain the same protections over your data that we provide directly.

X is a participant in the EU-US Data Privacy Framework (DPF), the Swiss-US DPF and the UK Extension to the EU-US DPF. X complies with the DPF Principles for all its processing of personal data received from the European Union, Switzerland and the UK, in reliance on the EU-US DPF, Swiss-US DPF and UK Extension to the EU-US DPF, respectively. If you have an inquiry or complaint related to our participation in the DPF, please contact us here. As part of our participation in the DPF, if you have a dispute with us about our adherence to the DPF Principles, we will seek to resolve it through our internal complaint resolution process, alternatively through the US-based independent dispute resolution body JAMS, and under certain conditions, through the DPF Arbitration Process following the procedures and subject to the conditions described in Annex 1 to the DPF Principles. DPF participants are subject to the investigatory and enforcement powers of the US Federal Trade Commission and other authorized statutory bodies. Under certain circumstances, participants may be liable for the transfer of personal data from the EU, Switzerland and the UK to third parties outside the EU, Switzerland and the UK. Learn more about the EU-US DPF, the Swiss-US DPF and the UK Extension to the EU-US DPF here.

# 7. X's Audience

Our services are not directed to children, and you may not use our services if you are under the age of 13. You must also be old enough to consent to the processing of your personal data in your country (in some countries we may allow your parent or guardian to do so on your behalf). We do not knowingly collect personal information from children under 13. If you become aware that your child has provided us with personal information without your consent, please contact us here. If we become aware that a child under 13 has provided us

App. 173



with personal information, we take steps to remove such information and terminate the child's account. You can find additional resources for parents and teens [here](#).

# 8. Changes To This Privacy Policy

The most current version of this Privacy Policy governs our processing of your personal data and we may revise this Privacy Policy from time to time as needed.

If we do revise this Privacy Policy and make changes that are determined by us to be material, we will provide you notice and an opportunity to review the revised Privacy Policy before you continue to use X.

# 9. General

The X Privacy Policy is written in English but is made available in multiple languages through translations. X strives to make the translations as accurate as possible to the original English version. However, in case of any discrepancies or inconsistencies, the English language version of the X Privacy Policy shall take precedence. You acknowledge that English shall be the language of reference for interpreting and constructing the terms of the X Privacy Policy.

# 10. How To Contact X

We want to hear from you if you have thoughts or questions about this Privacy Policy. You can contact us via our [Privacy Policy Inquiries](#) page or by writing to us at the appropriate address below. Information about our handling of California Consumer Privacy Act (CCPA) requests is available [here](#). Information about our handling of "Consumer Health Data" and associated requests as defined under Washington State's My Health My Data Act and other similar state laws is available [here](#). For Oregon residents, more information about our handling of personal information described in this Privacy Policy and associated requests and appeals under Oregon's Consumer Privacy Act (OCPA) is available [here](#).

If you live in the United States or any other country outside of the European Union, EFTA States, or the United Kingdom, the data controller responsible for your personal data is X Corp., with an address of:

**X Corp.**
**Attn: Privacy Policy Inquiry**
**865 FM 1209, Building 2**
**Bastrop, TX 78602**

App. 174

𝕏

If you live in the European Union, EFTA States, or the United Kingdom, the data controller responsible for your personal data is X Internet Unlimited Company, with an address of:

**X Internet Unlimited Company**
**Attn: Data Protection Officer**
**One Cumberland Place, Fenian Street**
**Dublin 2, D02 AX07 IRELAND**

If you live in Switzerland, you can also contact our appointed representative at the following address:

**X Switzerland GmbH**
**Attn: Data Protection Officer**
**c/o Wasag Treuhand AG**
**Normannenstrasse 8**
**Postfach 783**
**3018 Bern, SWITZERLAND**

If you wish to raise a concern about our data processing practices, you have the right to do so with your local supervisory authority or X Internet Unlimited Company's lead supervisory authority, the Irish Data Protection Commission, using the contact details listed on their website.

**Effective:** January 15, 2026

View previous policies

App. 175

# EXHIBIT 5

PageVault

| | |
|---|---|
| Document title: | Nick, A Dissident Briton (@CaratacusNick) / X |
| Capture URL: | https://x.com/CaratacusNick |
| Page loaded at (UTC): | Mon, 11 May 2026 22:09:24 GMT |
| Capture timestamp (UTC): | Mon, 11 May 2026 22:09:32 GMT |
| Capture tool: | 3.20.3 |
| Collection server IP: | 18.208.107.81 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/139.0.0.0 Safari/537.36 |
| Operating system: | linux x64 (Node v20.18.0) |
| PDF length: | 25 |
| Capture ID: | 7vhrX6tFQ3DRbkzyWBBW5g |
| Display Name: | tlopez |

PDF REFERENCE #:     x2LtgGq7H7SwXU4h6BEY3r

App. 177

**Nick, A Dissident Briton**
70K posts

**New to X?**

Sign up now to get your own personalized timeline!

G  Sign up with Google

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service | Privacy Policy | Cookie Policy |
Accessibility | Ads info | More ⋯ | © 2026 X Corp.

Follow

**Nick, A Dissident Briton**
@CaratacusNick

Blood is, was & eternally will be thicker than water.

I do not believe the current thing

⊚ Yoo Kay, The Clown Country    📅 Joined November 2022 ›

**1,963** Following    **2,041** Followers

Posts        Replies        Media

📌 Pinned

**Nick, A Dissident Briton** @CaratacusNick · Jun 4, 2025    ⋯
For information purposes only

Highlighting the people who helped me form the opinions and views I currently have about certain things

First up is former Harvard Professor Noel Ignatiev

"The goal of abolishing the white race is, on its face, so desirable that some may find it hard to believe that it could incur any opposition other than from committed white supremacists...
Make no mistake about it: we intend to keep bashing the dead white males, and the live ones, and the females too, until the social construct known as *the white race* is destroyed."
(Professor Noel Ignatiev: *Harvard Magazine* - September-October 2002)

💬 5        🔁 23        ♡ 45        ᵢₗᵢ 4.1K        🔖 ⬆

**Nick, A Dissident Briton** @CaratacusNick · Jul 15, 2023    ⋯
What kind of sociopath looks at this and thinks we need tower blocks full of Somalians and Bangladeshis

Seriously what kind of backward, self loathing, levels of xenophiliac sociopathy are we talking here? t.co/Rv3u56plL2

This Post is from an account that no longer exists. Learn more

💬 84        🔁 793        ♡ 7.7K        ᵢₗᵢ 460K        🔖 ⬆

**Nick, A Dissident Briton** @CaratacusNick · May 21, 2023    ⋯



**Don't miss what's happening**
People on X are the first to know.

Log in        Sign up

Document title: Nick, A Dissident Briton (@CaratacusNick) / X
Capture URL: https://x.com/CaratacusNick
Capture timestamp (UTC): Mon, 11 May 2026 22:09:32 GMT

Page 1 of 24

App. 178



𝕏    ←    **Nick, A Dissident Briton**    **Follow**
70K posts

**New to X?**

Sign up now to get your own personalized timeline!

G  Sign up with Google

  Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service | Privacy Policy | Cookie Policy |
Accessibility | Ads info | More ⋯    © 2026 X Corp.

○ 54    ⟲ 374    ♡ 944    ᴫ 23K    ⊓ ⬆

**Nick, A Dissident Briton** @CaratacusNick · May 24, 2023    ⋯
Replying to @Kingbingo_
One offended a certain powerful group

One didn't

○ 18    ⟲ 10    ♡ 663    ᴫ 43K    ⊓ ⬆

**Nick, A Dissident Briton** @CaratacusNick · Jan 1, 2024    ⋯
"To destroy a people, you must first sever their roots" - Aleksander Solzhenitsyn

 "The most effective way to destroy people is to deny and obliterate their own understanding of their history." – George Orwell

Such revisionism isn't harmless or "inclusive"

It's insidious

**Paul Embery** ✓ @PaulEmbery · Dec 31, 2023
BBC One currently showing its adaptation of The Famous Five: 'The Curse of Kirrin Island', which is set in 1940s Cornwall. So naturally the main character, George, is mixed-race. #RelentlessMoralLecture

○ 16    ⟲ 214    ♡ 505    ᴫ 14K    ⊓ ⬆

**Don't miss what's happening**
People on X are the first to know.

Log in

Document title: Nick, A Dissident Briton (@CaratacusNick) / X
Capture URL: https://x.com/CaratacusNick
Capture timestamp (UTC): Mon, 11 May 2026 22:09:32 GMT
Page 3 of 24

App. 180

X    ←    **Nick, A Dissident Briton**    Follow
70K posts

💬 16    🔁 214    ♡ 505    📊 14K    🔖 ⬆️

**Nick, A Dissident Briton** @CaratacusNick · Apr 15, 2025    ···
Replying to @AndreasKoureas_
Destroyed Germany
Destroyed much of France, Italy
Spread Bolshevism to half of Europe
Got millions of Europeans killed

You are a caricature

💬 2    🔁 2    ♡ 236    📊 2.2K    🔖 ⬆️

**Nick, A Dissident Briton** @CaratacusNick · Nov 2, 2024    ···
Why in fuck we tolerate foreigners racially abusing us in our own fucking country I shall never fucking know

> 🌀 James Cleverly🇬🇧 ✓ @JamesCleverly · Nov 2, 2024
> Male, pale, and stale.
>
> Labour really do need to sort themselves out. x.com/conservatives/...

💬 2    🔁 31    ♡ 224    📊 4.5K    🔖 ⬆️

**Nick, A Dissident Briton** @CaratacusNick · May 26, 2023    ···



💬    🔁 11    ♡ 213    📊 1.7K    🔖 ⬆️

**Nick, A Dissident Briton** @CaratacusNick · Feb 4, 2024    ···
Replying to @Boudica_Buddug and @Real_Rossi
The account pushing raceless borderless nationless globalism

That's who

💬 2    🔁 2    ♡ 189    📊 1.7K    🔖 ⬆️

**Nick, A Dissident Briton** @CaratacusNick · Jun 30, 2025    ···

**New to X?**
Sign up now to get your own personalized timeline!

G  Sign up with Google

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service | Privacy Policy | Cookie Policy |
Accessibility | Ads info | More ··· | © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up

**Nick, A Dissident Briton**
70K posts

**Follow**

**New to X?**
Sign up now to get your own personalized timeline!

G  Sign up with Google

🍎  Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service  |  Privacy Policy  |  Cookie Policy  |
Accessibility  |  Ads info  |  More ···  © 2026 X Corp.

**Nick, A Dissident Briton** @CaratacusNick · Jun 30, 2025
Replying to @johnmcternan and @EdwardHobden
Rishi Sunak is clearly not English

As for London, in your head is Gdansk still German even though they all got replaced by Poles?

Q 2        ↿⇃ 2        ♡ 218        ⅰⅰⅰ 2.2K        🔖 ↑

**Nick, A Dissident Briton** @CaratacusNick · Nov 23, 2023
We've lived a long period of time with no Darwinian pressure

It's led to millions like this who have no idea at all as to the reality of history, human nature & power dynamics

When Ponzi Scheme that is Western economies finally collapses, they're going to find out real fast

> 🌳 Conall ▼ ⚑ @Antifa_VP · Nov 23, 2023
> The Irish far-right are truly disgusting cretins.
>
> Using an attack on children to push their racist agenda, based on rumours created by themselves.
> ...

Q 5        ↿⇃ 29        ♡ 183        ⅰⅰⅰ 7.7K        🔖 ↑

**Nick, A Dissident Briton** @CaratacusNick · Mar 1, 2024
Black man murders = Raised fist
White man stickers = Two years in jail

Something seriously wrong with you

Q        ↿⇃ 6        ♡ 180        ⅰⅰⅰ 1.9K        🔖 ↑

**Nick, A Dissident Briton** @CaratacusNick · May 5, 2024
If you still have any liking or admiration for Winston Churchill

Take two minutes and watch this

> Rolland Schuut ✓ @rollandschoot · Apr 22, 2024
> Dam is wide open. Please share.
>
> ▶

Q 7        ↿⇃ 61        ♡ 170        ⅰⅰⅰ 5.7K        🔖 ↑

**Nick, A Dissident Briton** @CaratacusNick · Sep 29, 2023
Replying to @archaeologymag

**Don't miss what's happening**
People on X are the first to know.

Log in        Sign up

Document title: Nick, A Dissident Briton (@CaratacusNick) / X
Capture URL: https://x.com/CaratacusNick
Capture timestamp (UTC): Mon, 11 May 2026 22:09:32 GMT
Page 5 of 24

X &larr; **Nick, A Dissident Briton**    Follow
70K posts

**Nick, A Dissident Briton** @CaratacusNick · Sep 29, 2023   ···
Replying to @archaeologymag
Yes because Scotland is one of those places where you need dark skin to protect from the constant sunshine

We see you, globalist frauds

💬 2    🔁 6    ♡ 166    ᵢₗₗ 2.2K    🔖 ⬆

**Nick, A Dissident Briton** @CaratacusNick · Aug 4, 2024   ···
Replying to @IanDunt
Millions of never consented to foreigners have been forced on us

Crimes of the worst kind committed against us

Crimes are covered up by police/government

Government takes our taxes and hands it to foreigners

And you claim "no legitimate concerns"? You're clearly mental

💬 1    🔁 8    ♡ 162    ᵢₗₗ 2.3K    🔖 ⬆

**Nick, A Dissident Briton** @CaratacusNick · Feb 21, 2023   ···
Replying to @RhonddaBryant
Come on the Bryant, explain to us all why we should be happy to be ethnically replaced

Show us when you asked for consent to do this?

💬 1    🔁 4    ♡ 157    ᵢₗₗ 1K    🔖 ⬆

**Nick, A Dissident Briton** @CaratacusNick · Dec 27, 2023   ···
The Boomer clings to the lie of "we needed immigrants" like a drowning man clings to a life raft

This country didn't lose that many in WW2 compared to others, and none of them "needed" immigrants

Windrush wasn't invited and was never needed

£10 POMS proves you wrong

> 🖼 **GT maximo** @GrahamTanner121 · Dec 27, 2023
> Replying to @Hilton15Hilton
> I'm 65 and that 1950's film is not what it was like. That was the gentrified part of London, certainly not a part I lived in. Without immigration, this country after the devastation of WW11, it would not have coped. Take your rose tinted glasses off.

💬 11    🔁 24    ♡ 137    ᵢₗₗ 5.6K    🔖 ⬆

**Nick, A Dissident Briton** @CaratacusNick · Mar 27, 2024   ···
You're correct, something has changed

White men and women are fed up with being the constant target of various other ethnic groups. Especially when it's our kids being targeted

Did everyone really think identity politics for all except Whites was going to last forever?

> 🖼 **Seth Dillon** ✓ 🏴 @SethDillon · Mar 27, 2024

**New to X?**
Sign up now to get your own personalized timeline!

G Sign up with Google

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service | Privacy Policy | Cookie Policy | Accessibility | Ads Info | More ··· © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.
Log in     Sign up



Document title: Nick, A Dissident Briton (@CaratacusNick) / X
Capture URL: https://x.com/CaratacusNick
Capture timestamp (UTC): Mon, 11 May 2026 22:09:32 GMT
Page 7 of 24

App. 184





**Nick, A Dissident Briton**

70K posts

**Follow**

Here are 9 powerful predictors of where your society is going. Ready?
1. Demography is destiny
2. Demography is destiny
3. Demography is destiny
4. Demography is destiny...

💬 3      🔁 16      ♡ 109      ᵢₗᵢ 2.2K          🔖 ⬆

**Nick, A Dissident Briton** @CaratacusNick · Apr 10, 2023          ···

Not a single one of them died to import endless foreigners

YOU insult them daily with your traitorous globalism

💬          🔁          ♡ 94      ᵢₗᵢ 1.5K          🔖 ⬆

**Nick, A Dissident Briton** @CaratacusNick · May 14, 2024          ···

There is no Magic Dirt

Indians in UK behave like Indians in India

Because they're Indians

> **Nick Buckley MBE** ✔ @NickBuckleyMBE · May 13, 2024
> I don't want to live like this. I've been to India, it's a shit hole. In this country we politely queue up and ensure an orderly boarding.

💬 3      🔁 22      ♡ 119      ᵢₗᵢ 1.8K          🔖 ⬆

**Nick, A Dissident Briton** @CaratacusNick · Apr 15, 2025          ···
Replying to @AndreasKoureas_
If Winston Churchill had any interest in saving Western Civilisation he'd have stayed out of the war

Or sided with Germany against Bolshevism

You're just another pollical creature, not a historian

**world war to defend**

In wartime, truth is s
she should always b
bodyguard

— *Winston Chu*

**New to X?**

Sign up now to get your own personalized timeline!

G    **Sign up with Google**

🍎    **Sign up with Apple**

**Create account**

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service | Privacy Policy | Cookie Policy | Accessibility | Ads info | More ··· © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in      Sign up

Document title: Nick, A Dissident Briton (@CaratacusNick) / X
Capture URL: https://x.com/CaratacusNick
Capture timestamp (UTC): Mon, 11 May 2026 22:09:32 GMT

Page 10 of 24

App. 187







### Nick, A Dissident Briton
70K posts

**Follow**

fragile ego that offends. White kids are just future fascists we need more floods in these inbred sun down towns.

> 🧑 Karie K. ✔ @kariecupcake · Jul 6
> My heart breaks for the families who have tragically lost their little girls. I am praying for everyone who perished in the Texas flash flood. I can't fathom the grief. 💔🙏

💬 14     🔁 39     ♡ 112     ᐧ�.ᐧ 15K     🔖 ⬆

**Nick, A Dissident Briton** @CaratacusNick · Apr 16, 2025 ⋯
Replying to @pmberkeley and @kenzietuff
USA was 89% White in 1970, near all rest being Black

USA wasn't ever a "long diverse nation"

Why do you support the diversity and migration policies demanded by international finance and the billionaire class?

💬 1     🔁 1     ♡ 97     ᐧ�.ᐧ 872     🔖 ⬆

**Nick, A Dissident Briton** @CaratacusNick · Apr 29, 2024 ⋯
Replying to @daveatherton @jimmytwhu and @BellaWallerstei
For years she called us xenophobes, racists, Nazis, Little Englanders etc etc

As soon as her in-group was effected she changed her mind

Too little, too late and too self interested

💬 1     🔁 5     ♡ 89     ᐧ�.ᐧ 2.1K     🔖 ⬆

**Nick, A Dissident Briton** @CaratacusNick · May 5, 2025 ⋯
Replying to @BlacktownUSA and @ramzpaul
USA for one

101st Division of US Army with fixed bayonets forced Blacks onto Whites

Every single White country is being forced flooded with a tsunami of Africans

You're fucking clueless

💬 1     🔁 1     ♡ 91     ᐧ.ᐧ 633     🔖 ⬆

**Nick, A Dissident Briton** @CaratacusNick · Apr 14, 2025 ⋯
Replying to @kloppo79 and @Steve_Laws_
Is there a particular reason why you support the immigration policies of international finance, banksters and billionaires?

Are you foreign?

💬 1     🔁 3     ♡ 106     ᐧ.ᐧ 1.7K     🔖 ⬆

**Nick, A Dissident Briton** @CaratacusNick · Sep 24, 2023 ⋯
It shows how brainwashed most people still are that we put the traitor Winston Churchill on our money & voted him "Greatest Briton"

He was a liar & paid for warmonger who bankrupted/destroyed Britain
x.com/jo_mobley11/st...

This Post is from a suspended account. Learn more

💬 4     🔁 23     ♡ 81     ᐧ.ᐧ 3.4K     🔖 ⬆

**New to X?**

Sign up now to get your own personalized timeline!

G  Sign up with Google

🍎 Sign up with Apple

**Create account**

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service | Privacy Policy | Cookie Policy | Accessibility | Ads info | More ⋯ | © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in     Sign up



Document title: Nick, A Dissident Briton (@CaratacusNick) / X
Capture URL: https://x.com/CaratacusNick
Capture timestamp (UTC): Mon, 11 May 2026 22:09:32 GMT



**Nick, A Dissident Briton**
70K posts

Follow

Oh that's right we don't have one and Jewish pressure groups are the centre of ensuring there can't be one

I don't care Nigel, I really don't care

> **Nigel Farage MP** ✓ 🔁 @Nigel_Farage · May 8, 2024
> This is shocking. Jews are being forced out of normal life.
> x.com/joe_roberts01/...

○ 1    ⟲ 14    ♡ 93    ⋯ 1.9K    🔖 ⬆

**Nick, A Dissident Briton** @CaratacusNick · Mar 20, 2023    ⋯
Replying to @TPointUK
Be quiet

Gatekeeping shills and globalist frauds

○    ⟲    ♡ 77    ⋯ 783    🔖 ⬆

**Nick, A Dissident Briton** @CaratacusNick · Apr 5, 2023    ⋯
Replying to @jessphillips and @MailOnline
Oh so you can see trials for "grooming" when you want to

Just not when the rapists are Asian, Muslim or Pakistani

Typical anti White Labour MP

○ 1    ⟲ 12    ♡ 93    ⋯ 939    🔖 ⬆

**Nick, A Dissident Briton** @CaratacusNick · Mar 11, 2023    ⋯
The "Nazi War Machine" literally had Gott Mitt Uns on their uniform

It was the Bolsheviks who were godless

> 🎖 **Peter Hitchens** ✓ @ClarkeMicah · Mar 11, 2023
> Nobody seems to know one crucial fact. The Nazis were very Left-wing.
> They hated Christianity and deliberately set children against their
> parents. They imposed penal taxes on the middle class and attracted
> Communists to their ranks. mailplus.co.uk/edition/commen... via
> @mailplus

○ 11    ⟲ 6    ♡ 69    ⋯ 7.7K    🔖 ⬆

**Nick, A Dissident Briton** @CaratacusNick · Apr 1, 2025    ⋯
Replying to @PaulGolding
Zionist Containment Right doesn't like Homeland

Interesting

○    ⟲ 1    ♡ 80    ⋯ 1.3K    🔖 ⬆

**Nick, A Dissident Briton** @CaratacusNick · Jan 15, 2024    ⋯
Replying to @Kwajotweneboa @Merciansaltmine and
@JACKGUYANDERTON
So what if you were born here

Bits of paper given by the state can be replaced or withdrawn at any time

Just requires the political will, a will which is growing with each passing day

○ 1    ⟲    ♡ 83    ⋯ 1.5K    🔖 ⬆

**Nick, A Dissident Briton** @CaratacusNick · Jul 11, 2024    ⋯

New to X?

Sign up now to get your own personalized timeline!

G  Sign up with Google

🍎  Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service | Privacy Policy | Cookie Policy | Accessibility | Ads info | More ··· © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up

Document title: Nick, A Dissident Briton (@CaratacusNick) / X
Capture URL: https://x.com/CaratacusNick
Capture timestamp (UTC): Mon, 11 May 2026 22:09:32 GMT

Page 15 of 24



Document title: Nick, A Dissident Briton (@CaratacusNick) / X
Capture URL: https://x.com/CaratacusNick
Capture timestamp (UTC): Mon, 11 May 2026 22:09:32 GMT
Page 16 of 24

App. 193



Document title: Nick, A Dissident Briton (@CaratacusNick) / X
Capture URL: https://x.com/CaratacusNick
Capture timestamp (UTC): Mon, 11 May 2026 22:09:32 GMT



## Nick, A Dissident Briton
70K posts

**Follow**

### New to X?
Sign up now to get your own personalized timeline!

**G** Sign up with Google

 Sign up with Apple

**Create account**

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service | Privacy Policy | Cookie Policy |
Accessibility | Ads info | More ⋯ | © 2026 X Corp.

Idea we need foreigners here to cook is so ridiculous it's now become a right wing meme

What's the total destruction of social trust so you can get some Indian slop

💬 1    ↻ 1    ♡ 61    📊 1.3K    🔖 ⬆

**Nick, A Dissident Briton** @CaratacusNick · Aug 5, 2024    ⋯
At no point in any UK political manifesto did any party state they were going to allow in millions of people

UK public has never been asked nor ever consented to "diversity" nor demographic change

You talk dishonest nonsense x.com/markpack/statu...

> You're unable to view this Post because this account owner limits who can view their Posts. Learn more

💬 3    ↻ 15    ♡ 85    📊 2K    🔖 ⬆

**Nick, A Dissident Briton** @CaratacusNick · Apr 26, 2024    ⋯
WTF is this whackjob?

"2nd Generation Holocaust Survivor" 🤡

### Mark Mitchener
@markofagenius

Former Head of Drama ( secondary)for 40 years. 2nd generation Holocaust survivor. Fan of Southampton FC. I tweet my thoughts. No dm's please.

📍 Southampton, England    📅 Joined May 2017
**6,446** Following    **6,456** Followers

💬 10    ↻ 16    ♡ 75    📊 1.7K    🔖 ⬆

**Nick, A Dissident Briton** @CaratacusNick · Sep 16, 2024    ⋯
Replying to @HoodedClaw1974
So you're not patriots then

You're just another form of globalist

💬 3    ↻    ♡ 68    📊 477    🔖 ⬆

**Nick, A Dissident Briton** @CaratacusNick · Oct 8, 2023    ⋯
Seeing so many Englishman more concerned with Jews & Israel than their own demographic and country

Cucked

💬 3    ↻ 10    ♡ 67    📊 2.5K    🔖 ⬆

**Nick, A Dissident Briton** @CaratacusNick · Feb 16, 2025    ⋯
Replying to @wurzel260654 and @HISTORY
Did they put them in the Bear & Eagle cage?

### Don't miss what's happening
People on X are the first to know.

Log in

Document title: Nick, A Dissident Briton (@CaratacusNick) / X
Capture URL: https://x.com/CaratacusNick
Capture timestamp (UTC): Mon, 11 May 2026 22:09:32 GMT
Page 19 of 24



**Nick, A Dissident Briton**
70K posts

Follow

Did they put them in the Bear & Eagle cage?

Any mini baby lampshades?

💬 1          🔁          ♡ 74          📊 1.5K          🔖 📤

**Nick, A Dissident Briton** @CaratacusNick · Nov 23, 2023

How stupid/ideological do you have to be to actually think 10 million more people doesn't create delays?

10 million who've never paid in to system, for which no extra infrastructure was built

Really what kind of delusion are we talking here?

> 🔵 **Claire** ✓ @clairebubblepop · Nov 23, 2023
>
> Omg Farage blaming migrants on people unable to get a GP appointment. Is he for real? The reason people are unable to get GP appointments is coz of 13yrs of Tory austerity, Tories losing £Bills from useless PPE, Tories losing £100B's in Westminster blackhole. Not migrants... WTF?

💬 12          🔁 26          ♡ 71          📊 1.4K          🔖 📤

**Nick, A Dissident Briton** @CaratacusNick · Oct 2, 2024
Replying to @Granty58 and @Steve_Laws_
Yes the African born in Camden

So in your head Rudyard Kipling is a famous Indian writer? Joanna Lumley is a famous Indian actress?

💬 1          🔁 1          ♡ 67          📊 947          🔖 📤

**Nick, A Dissident Briton** @CaratacusNick · Sep 16, 2024
Imagine letting in more immigrants than even Tony Blair, after repeatedly promising to do the opposite

> 🔵 **Conservatives** ✓ @Conservatives · Sep 16, 2024
>
> Imagine letting someone buy your glasses for you.

💬 1          🔁 15          ♡ 79          📊 2.4K          🔖 📤

**Nick, A Dissident Briton** @CaratacusNick · Jul 5, 2025
Replying to @Miss_Snuffy
We do not wish to be ethically replaced in our own lands, just like everyone else

We were never asked

We have never consented

You posted a boasting picture of a class comprised entirely of replacement migrants

What on earth did you expect?

💬 1          🔁 11          ♡ 71          📊 852          🔖 📤

**Nick, A Dissident Briton** @CaratacusNick · Oct 10, 2023
You advocate for mass immigration & multiculturalism to my homeland, now you whine about it

Get stuffed

**New to X?**

Sign up now to get your own personalized timeline!

G  Sign up with Google

🍎 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service | Privacy Policy | Cookie Policy | Accessibility | Ads info | More ··· | © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in          Sign up

Document title: Nick, A Dissident Briton (@CaratacusNick) / X
Capture URL: https://x.com/CaratacusNick
Capture timestamp (UTC): Mon, 11 May 2026 22:09:32 GMT

Page 20 of 24

App. 197





**Nick, A Dissident Briton**
70K posts

**Follow**

That generation voted repeatedly for mass immigration, massive state spending & "diversity"

Now they pay the price of their virtue signalling

💬 13     🔁 3     ♥ 74     📊 2.8K     🔖 ⬆️

**Nick, A Dissident Briton** @CaratacusNick · Jun 25, 2023
Replying to @RScowler @SerenaJB3 and 4 others
No, YOU are the blip

We hold the views of 99.99999999999999% of all people who have ever lived

The suicidal desire to hand over your homeland is only something in the last 30 years

💬 1     🔁 4     ♥ 61     📊 928     🔖 ⬆️

**Nick, A Dissident Briton** @CaratacusNick · Jun 21, 2024
Replying to @RyLiberty
Nope, not anymore

Feeding Africa just results in ever more Africans who now invade everywhere else

💬     🔁 1     ♥ 64     📊 600     🔖 ⬆️

**Nick, A Dissident Briton** @CaratacusNick · Sep 3, 2024
Israel isn't an ally, it never has been

It has killed scores of British soldiers, if not 100s

I've no idea why so many supposed conservatives and right wingers have such a devoted love for some random country in the Middle East

It's totally bizarre

> **Sophie Corcoran** ✓ @sophielouisecc · Sep 2, 2024
> I feel an enormous sense of shame as a British person seeing our country Betray Israel – a key ally of ours.
>
> This government is embarrassing us internationally  day after day

💬 10     🔁 16     ♥ 72     📊 4.2K     🔖 ⬆️

**Nick, A Dissident Briton** @CaratacusNick · Aug 16, 2024
Empire gone
Borders opened
Bankrupt
Gold reserves gone
World reserve currency gone
Spread of communism

Yeah we own him so much

> **Andreas Koureas FRAS FRSA ...**    @AndreasKoure... · Jul 11, 2024
> We owe everything to this old lion.

**New to X?**

Sign up now to get your own personalized timeline!

G Sign up with Google

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service | Privacy Policy | Cookie Policy | Accessibility | Ads info | More ··· © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in     Sign up



Document title: Nick, A Dissident Briton (@CaratacusNick) / X
Capture URL: https://x.com/CaratacusNick
Capture timestamp (UTC): Mon, 11 May 2026 22:09:32 GMT

App. 200

# Nick, A Dissident Briton

70K posts

**Follow**

**New to X?**

Sign up now to get your own personalized timeline!

**G** Sign up with Google

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service  |  Privacy Policy  |  Cookie Policy  |
Accessibility  |  Ads info  |  More ···  © 2026 X Corp.

Thinks he owns the road

---

**Jeremy Vine | Here, on Tiktok, Insta ...** ✓ @theJer... · Feb 27, 2023

Replying to @theJeremyVine

Just getting ahead of all the "HE OBvioUSLy CoULDnT SEE YOu" replies, this was me leaving the house this morning

[video]

💬 71    ⟲ 5    ♡ 71    ıl 88K    🔖 ⬆

---

**Nick, A Dissident Briton** @CaratacusNick · Nov 24, 2022

Conservative Party never had any intention of lowering immigration & it's not as if they ever hid this fact

David Cameron for over a decade said they'd lower it to "tens of thousands" yet never did

Theresa May then signed UN Gobal Compact on Migration

**Matt Goodwin** ✓ @GoodwinMJ · Nov 24, 2022

Taking back control? Net migration in Britain just soared to 504,000 - the highest level in the entire postwar era and smashing the previous record of 329,000 in 2015

💬 4    ⟲ 25    ♡ 67    ıl    🔖 ⬆

---

**Nick, A Dissident Briton** @CaratacusNick · Oct 13, 2024

Replying to @skinnjes

So what

Geography of birth doesn't change your DNA

Two White Norwegians have a baby in Beijing, so in your left wing head that baby is Han?

Stupid

💬 3    ⟲ 3    ♡ 63    ıl 1.1K    🔖 ⬆

---

**Nick, A Dissident Briton** @CaratacusNick · Jul 29, 2023

Replying to @AmyElli0ttDunne @SerenaJB3 and 3 others

"Germans should be masters of their own house" is what they actually said

After the war this morphed in to "Germans are the master race" something they never said

Sadly so many uneducated people still believe the lie

---

**Don't miss what's happening**
People on X are the first to know.

Log in     Sign up

---

Document title: Nick, A Dissident Briton (@CaratacusNick) / X
Capture URL: https://x.com/CaratacusNick
Capture timestamp (UTC): Mon, 11 May 2026 22:09:32 GMT

Page 24 of 24

PageVault

| | |
|---|---|
| Document title: | Karl Radl (@KarlRadl) / X |
| Capture URL: | https://x.com/KarlRadl |
| Page loaded at (UTC): | Mon, 11 May 2026 22:11:00 GMT |
| Capture timestamp (UTC): | Mon, 11 May 2026 22:11:06 GMT |
| Capture tool: | 3.20.3 |
| Collection server IP: | 18.208.107.81 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/139.0.0.0 Safari/537.36 |
| Operating system: | linux x64 (Node v20.18.0) |
| PDF length: | 25 |
| Capture ID: | j3L1SyAvo8XxokRumA6Kaa |
| Display Name: | tlopez |

PDF REFERENCE #:     4AEwMwnf3takRyqjSshoNK

App. 202



Document title: Karl Radl (@KarlRadl) / X
Capture URL: https://x.com/KarlRadl
Capture timestamp (UTC): Mon, 11 May 2026 22:11:06 GMT

Page 1 of 24



Document title: Karl Radl (@KarlRadl) / X
Capture URL: https://x.com/KarlRadl
Capture timestamp (UTC): Mon, 11 May 2026 22:11:06 GMT







Document title: Karl Radl (@KarlRadl) / X
Capture URL: https://x.com/KarlRadl
Capture timestamp (UTC): Mon, 11 May 2026 22:11:06 GMT



**Karl Radl** 135.8K posts    Follow

○ 116    ⟲ 1K    ♡ 18K    ılı 905K

**Karl Radl** @KarlRadl · Mar 19, 2025
Never deleting this app. 😂

H/T @iansmithfitness

○ 574    ⟲ 1.4K    ♡ 18K    ılı 966K

**Karl Radl** @KarlRadl · Sep 10, 2025
Soon.

**New to X?**
Sign up now to get your own personalized timeline!

G  Sign up with Google

🍎 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and
Privacy Policy, including Cookie Use.

Terms of Service  |  Privacy Policy  |  Cookie Policy  |
Accessibility  |  Ads info  |  More ···   © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up

Document title: Karl Radl (@KarlRadl) / X
Capture URL: https://x.com/KarlRadl
Capture timestamp (UTC): Mon, 11 May 2026 22:11:06 GMT
Page 6 of 24

App. 208

## Karl Radl
135.8K posts

**Follow**

**New to X?**

Sign up now to get your own personalized timeline!

G Sign up with Google

 Sign up with Apple

**Create account**

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service | Privacy Policy | Cookie Policy | Accessibility | Ads info | More ⋯    © 2026 X Corp.

○ 146    ⟲ 1K    ♡ 17K    ᴵˡᵎ 215K    🔖 ⬆

**Karl Radl** @KarlRadl · Nov 7, 2025
For the record Jeremy Godfrey is jewish.

And yes that is a real photo of him.

> **Wall Street Mav** ✓ @WallStreetMav · Nov 6, 2025
> This is Jeremy Godfrey, head of censorship in Ireland and chairman of the Media Commission.
>
> Jeremy Godfrey spent the majority of his career in China and is now the censorship czar....

○ 579    ⟲ 1.8K    ♡ 17K    ᴵˡᵎ 327K    🔖 ⬆

**Karl Radl** @KarlRadl · Mar 13, 2025
I've never met an honest jew.

> **Eyal Yakoby** ✓ @EYakoby · Mar 13, 2025
> I've never met an intelligent Nazi.
>
> **Stew Peters**
> @realstewpeters
>
> I've never met a poor jew.

**Don't miss what's happening**
People on X are the first to know.

Log in    **Sign up**

Document title: Karl Radl (@KarlRadl) / X
Capture URL: https://x.com/KarlRadl
Capture timestamp (UTC): Mon, 11 May 2026 22:11:06 GMT

Page 7 of 24

App. 209



Document title: Karl Radl (@KarlRadl) / X
Capture URL: https://x.com/KarlRadl
Capture timestamp (UTC): Mon, 11 May 2026 22:11:06 GMT



New to X?

Sign up now to get your own personalized timeline!

G  Sign up with Google

🍎  Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service | Privacy Policy | Cookie Policy |
Accessibility | Ads info | More ⋯  © 2026 X Corp.

**Karl Radl**
135.8K posts

Follow

○ 187    ⟲ 1.9K    ♡ 17K    ᵢₗᵢ 315K    ⛉ ⤒

**Karl Radl** @KarlRadl · Sep 5, 2024    ⋯
You are Indian.

Ireland is for the Irish.

England is for the English.

Scotland is for the Scottish.

Wales is for the Welsh.

Fuck off back to your subcontinent and take your subversive opinions with you.

> **Narinder Kaur** ✓ @narindertweets · Sep 5, 2024
> This is DISGUSTING.
> I DETEST what the Irish are becoming right now.
> Fck Ireland. I hate you and your racism. x.com/lil_doza/statu...

○ 426    ⟲ 814    ♡ 14K    ᵢₗᵢ 1M    ⛉ ⤒

**Karl Radl** @KarlRadl · Sep 5, 2025    ⋯
Capitalism
- Jewish Billionaires own the land
- Jewish Billionaires own the factories
- Jewish Billionaires own the majority of the wealth

Communism
- Jewish Commissars own the land
- Jewish Commissars own the factories
- Jewish Commissars own the majority of the wealth

Show more

> **Power to the People** ☭ 🌾 ✓ @ProudSocialist · Sep 5, 2025
> Capitalism:
> - Bill Gates owns the land
> - BlackRock owns the factories
> - Billionaires own majority of wealth
> ...

○ 151    ⟲ 2K    ♡ 15K    ᵢₗᵢ 561K    ⛉ ⤒

**Karl Radl** @KarlRadl · Aug 5, 2025    ⋯
The so-called 'Gas Chamber' at Mauthausen is literally a fucking shower room with a 'Gaskammer' sign stuck on the wall.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up





Document title: Karl Radl (@KarlRadl) / X
Capture URL: https://x.com/KarlRadl
Capture timestamp (UTC): Mon, 11 May 2026 22:11:06 GMT



Document title: Karl Radl (@KarlRadl) / X
Capture URL: https://x.com/KarlRadl
Capture timestamp (UTC): Mon, 11 May 2026 22:11:06 GMT
Page 12 of 24

App. 214



Document title: Karl Radl (@KarlRadl) / X
Capture URL: https://x.com/KarlRadl
Capture timestamp (UTC): Mon, 11 May 2026 22:11:06 GMT

# Karl Radl
135.8K posts

**Follow**

**Karl Radl** @KarlRadl · Sep 18, 2024  ···
Hitler personally fought in one war (unlike Nioh), led Germany in several victorious wars (Poland, France, Yugoslavia, Norway etc) and was then defeated by an unprecedent coalition of enemies and then defamed repeatedly for things he never actually did.

> **Nioh Berg** 🏴 ✿ ✓ @NiohBerg · Sep 13, 2024
> Hitler fought one war, lost, and shot himself.
>
> Stew Peters ✓
> @realstewpeters
>
> Visionary leadership.
>
> MEIN KAMPF
> Volume Two
> ADOLF HITLER

💬 264    🔁 565    ♡ 7.6K    ‖ 709K    🔖 ⬆

**Karl Radl** @KarlRadl · Jul 30, 2025  ···
Race isn't defined by skin colour you absolute moron.

> **Nick Cruse** 🥋 ✓ @SocialistMMA · Jul 30, 2025
> White supremacists are seriously trying to tell me these mfs are NOT white 😂
>
> Imagine your brain being this broken  x.com/SocialistMMA/s...

💬 189    🔁 298    ♡ 8.4K    ‖ 301K    🔖 ⬆

**New to X?**
Sign up now to get your own personalized timeline!

**G  Sign up with Google**

**🍎  Sign up with Apple**

**Create account**

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service  |  Privacy Policy  |  Cookie Policy  |
Accessibility  |  Ads info  |  More ···   © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up





Document title: Karl Radl (@KarlRadl) / X
Capture URL: https://x.com/KarlRadl
Capture timestamp (UTC): Mon, 11 May 2026 22:11:06 GMT

**Karl Radl**
135.8K posts

**Follow**

Netanyahu, whose real name is Mileikowsky, is also Polish.

Benny Gantz is Romanian.

673      558      8.4K      277K

**Karl Radl** @KarlRadl · Nov 2, 2025
And that he turned out to be yet another jewish paedophile.

**Merissa Hansen** @merissahansen17 · Nov 2, 2025
It's really quite amazing how quick everyone has memory holed the whole George Zinn thing

**New to X?**

Sign up now to get your own personalized timeline!

G **Sign up with Google**

 **Sign up with Apple**

**Create account**

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service  |  Privacy Policy  |  Cookie Policy  |
Accessibility  |  Ads info  |  More ···  © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in      Sign up

Document title: Karl Radl (@KarlRadl) / X
Capture URL: https://x.com/KarlRadl
Capture timestamp (UTC): Mon, 11 May 2026 22:11:06 GMT

App. 218

𝕏     ←     **Karl Radl**
                   135.8K posts                                          Follow

**New to X?**

Sign up now to get your own personalized timeline!

G     Sign up with Google

     Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and
Privacy Policy, including Cookie Use.

Terms of Service  |  Privacy Policy  |  Cookie Policy  |
Accessibility  |  Ads info  |  More ···     © 2026 X Corp.

54          ↺ 681          ♡ 8.2K          �archives 89K          🔖 ⬆

**Karl Radl** @KarlRadl · Mar 17, 2025                           ···
Simple reasons we know the 'Holocaust' is nonsense:

A) The lack of direct evidence in the documentation. Very little
documentation is provided to argue the case and what little that is
provided is indirect/uses alleged 'code words'.

134          ↺ 681          ♡ 7.1K          �archives 411K          🔖 ⬆

**Karl Radl** @KarlRadl · Feb 23, 2025                           ···
Jews will often try and tell you the Babylonian Talmud Tractate Gittin 56b-
57a doesn't say that 'Jesus is boiling excrement' and refers to 'someone
else" but this is a lie.

It does.

84          ↺ 485          ♡ 6.6K          �archives 243K          🔖 ⬆

**Karl Radl** @KarlRadl · Mar 6, 2025                            ···
You've probably never heard of Rabbi Israel Weingarten but in 2009 he was
convicted and imprisoned in New York for raping his 9-10 year old daughter
in every orifice on a daily basis then beating her for 'seducing her' in the late
1990s in Manchester in Britain.



252          ↺ 1.8K          ♡ 6.2K          �archives 153K          🔖 ⬆

**Karl Radl** @KarlRadl · Apr 21, 2025                           ···
I woke my wife - a devout Catholic - up to tell her that Pope Francis had
finally kicked the bucket and we are going to open a bottle of nice
champagne that she had been keeping for this occasion later.

Rot in hell you traitorous leftist bastard.

449          ↺ 534          ♡ 6.4K          �archives 233K          🔖 ⬆

**Don't miss what's happening**
People on X are the first to know.                    Log in     Sign up



# Karl Radl

135.8K posts

**Follow**

Rot in hell you traitorous leftist bastard.

💬 449　🔁 534　♡ 6.4K　📊 233K　🔖　↥

**Karl Radl** @KarlRadl · Jul 31, 2025　...

I am sure that 'Nuremberg' won't mention the '20,000 jews murdered by atomic bomb' in a specially constructed Potemkin village outside of Auschwitz that was mentioned as factual by US Chief Justice Robert Jackson at the Nuremberg Trials. x.com/movieweb/statu...

This post is unavailable.

💬 188　🔁 427　♡ 6.6K　📊 459K　🔖　↥

**Karl Radl** @KarlRadl · Feb 23, 2025　...

Now as a little teaser 'Europa: The Last Battle' (Corrected and Expanded Edition) will be released this year.

Not just me working on it but a bunch of others.

💬 239　🔁 652　♡ 5.9K　📊 224K　🔖　↥

**Karl Radl** @KarlRadl · Oct 1, 2025　...

Aren't we leaving out a key detail about who Pruitt is?

**Chay Bowes** ✓ @BowesChay · Sep 30, 2025

One man is behind one third of all english language articles on Wikipedia.

Steven Pruitt has made over 6 million edits on Wikipedia and written 35,000 articles. ...

💬 205　🔁 787　♡ 6.5K　📊 244K　🔖　↥

**Karl Radl** @KarlRadl · Sep 24, 2025　...

Cool it with the anti-Semitic remarks. x.com/SpeechUncut/st...

This post is unavailable.

💬 40　🔁 332　♡ 6.4K　📊 73K　🔖　↥

**New to X?**

Sign up now to get your own personalized timeline!

G  Sign up with Google

🍎  Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service | Privacy Policy | Cookie Policy |
Accessibility | Ads info | More ··· | © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up

Document title: Karl Radl (@KarlRadl) / X
Capture URL: https://x.com/KarlRadl
Capture timestamp (UTC): Mon, 11 May 2026 22:11:06 GMT



Document title: Karl Radl (@KarlRadl) / X
Capture URL: https://x.com/KarlRadl
Capture timestamp (UTC): Mon, 11 May 2026 22:11:06 GMT



New to X?

Sign up now to get your own personalized timeline!

G    Sign up with Google

    Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service | Privacy Policy | Cookie Policy | Accessibility | Ads info | More ··· © 2026 X Corp.

Document title: Karl Radl (@KarlRadl) / X
Capture URL: https://x.com/KarlRadl
Capture timestamp (UTC): Mon, 11 May 2026 22:11:06 GMT



Document title: Karl Radl (@KarlRadl) / X
Capture URL: https://x.com/KarlRadl
Capture timestamp (UTC): Mon, 11 May 2026 22:11:06 GMT



**Karl Radl**
135.8K posts

Follow

**Karl Radl** @KarlRadl · Aug 12, 2025
Confirmed as a member of the tribe.

> **MichaeloKeeffe** ✔ @Mick_O_Keeffe · Aug 10, 2025
> This is Jeremy Godfrey, head of censorship in Ireland and chairman of the Media Commission.
>
> He decides what you're allowed to see on the Internet.

💬 237    🔁 483    ♡ 5.5K    📊 90K

💬 64    🔁 438    ♡ 5.5K    📊 426K

**Karl Radl** @KarlRadl · Sep 9, 2024
In honour of your self-admitted jewishness Paul:

'The Holocaust isn't real folks. It's not even original fiction.' t.co/GAfJnFAlEL

> This Post is from an account that no longer exists. Learn more

💬 34    🔁 204    ♡ 5.1K    📊 153K

**Karl Radl** @KarlRadl · Jul 20, 2025
You might not of heard of Renee Hoberman – a jewish social worker/child therapist in New York – who has recently pleaded guilty to distributing extreme child pornography (including that involving babies) but I've covered her in my latest article at the blog in my bio.

**New to X?**
Sign up now to get your own personalized timeline!

G  Sign up with Google

  Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service | Privacy Policy | Cookie Policy | Accessibility | Ads info | More ··· © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up

Document title: Karl Radl (@KarlRadl) / X
Capture URL: https://x.com/KarlRadl
Capture timestamp (UTC): Mon, 11 May 2026 22:11:06 GMT



Document title: Karl Radl (@KarlRadl) / X
Capture URL: https://x.com/KarlRadl
Capture timestamp (UTC): Mon, 11 May 2026 22:11:06 GMT



**Karl Radl**
135.8K posts

Follow

Nazi.

💬 80    🔁 288    ♡ 5.1K    ᴧ 106K    🔖 ⬆

**Karl Radl** @KarlRadl · Sep 27, 2025    ···

Visibility limited: this Post may violate X's rules against Hateful Conduct. Learn more

View

💬 38    🔁 563    ♡ 5.6K    ᴧ 85K    🔖 ⬆

**Karl Radl** @KarlRadl · Dec 14, 2024    ···
The shoes... think of the shoes! x.com/Cristhi7148696...

This post is unavailable.

💬 112    🔁 140    ♡ 5K    ᴧ 331K    🔖 ⬆

**Karl Radl** @KarlRadl · Sep 25, 2025    ···
This is a complete lie.

The truth - which was revealed a few days later by the airline - was that it was because the jews were vandalising the life jackets under the seats and the drop-down passenger air masks.

Then they shrieked anti-Semitism when rightly booted off the plane
x.com/MemeKingc/stat...

This post is unavailable.

💬 45    🔁 574    ♡ 5.4K    ᴧ 76K    🔖 ⬆

**Karl Radl** @KarlRadl · Dec 8, 2024    ···
Jews. x.com/elonmusk/statu...

This post is unavailable.

💬 41    🔁 322    ♡ 4.7K    ᴧ 88K    🔖 ⬆

**Karl Radl** @KarlRadl · Jul 2, 2025    ···
You've probably heard of the claim that the jew John von Neumann 'invented' modern computer architecture and the 'Von Neumann Machine', but did you know he and his friend Herman Goldstine stole both from two non-jewish scientists in 1944/1945?

**New to X?**

Sign up now to get your own personalized timeline!

G Sign up with Google

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service  |  Privacy Policy  |  Cookie Policy  |
Accessibility  |  Ads info  |  More ···  © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up

Document title: Karl Radl (@KarlRadl) / X
Capture URL: https://x.com/KarlRadl
Capture timestamp (UTC): Mon, 11 May 2026 22:11:06 GMT

🔒 PageVault

| | |
|---|---|
| Document title: | Profile / X |
| Capture URL: | https://x.com/TalkRadioDeity |
| Page loaded at (UTC): | Mon, 11 May 2026 22:10:05 GMT |
| Capture timestamp (UTC): | Mon, 11 May 2026 22:10:06 GMT |
| Capture tool: | 3.20.3 |
| Collection server IP: | 18.208.107.81 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/139.0.0.0 Safari/537.36 |
| Operating system: | linux x64 (Node v20.18.0) |
| PDF length: | 2 |
| Capture ID: | fCZ4MoRWu2Q3mnRFKyahcX |
| Display Name: | tlopez |

X     ←     Profile

**New to X?**

Sign up now to get your own personalized timeline!



G  Sign up with Google

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

# Account suspended

X suspends accounts which violate the X Rules

Something went wrong. Try reloading.

C Retry

Terms of Service | Privacy Policy | Cookie Policy | Accessibility | Ads info | More ⋯  © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in     Sign up

Document title: Profile / X
Capture URL: https://x.com/TalkRadioDeity
Capture timestamp (UTC): Mon, 11 May 2026 22:10:06 GMT

App. 228

🔒 PageVault

| | |
|---|---|
| Document title: | Profile / X |
| Capture URL: | https://x.com/Paddy_Whiteman |
| Page loaded at (UTC): | Mon, 11 May 2026 22:08:48 GMT |
| Capture timestamp (UTC): | Mon, 11 May 2026 22:08:48 GMT |
| Capture tool: | 3.20.3 |
| Collection server IP: | 13.221.148.71 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/139.0.0.0 Safari/537.36 |
| Operating system: | linux x64 (Node v20.18.0) |
| PDF length: | 2 |
| Capture ID: | anGQ552WRPeQYT7PTqBLAe |
| Display Name: | tlopez |

 ← **Profile**

**Account suspended**

X suspends accounts which violate the X Rules



New to X?

Sign up now to get your own personalized timeline!

G  Sign up with Google

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Something went wrong. Try reloading.

C Retry

Terms of Service | Privacy Policy | Cookie Policy | Accessibility | Ads info | More ⋯  © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in     Sign up

Document title: Profile / X
Capture URL: https://x.com/Paddy_Whiteman
Capture timestamp (UTC): Mon, 11 May 2026 22:08:48 GMT

Page 1 of 1

**PageVault**

| | |
|---|---|
| Document title: | The Celtic Clan (@Correction2016) / X |
| Capture URL: | https://x.com/Correction2016 |
| Page loaded at (UTC): | Mon, 11 May 2026 22:09:29 GMT |
| Capture timestamp (UTC): | Mon, 11 May 2026 22:09:34 GMT |
| Capture tool: | 3.20.3 |
| Collection server IP: | 13.221.148.71 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/139.0.0.0 Safari/537.36 |
| Operating system: | linux x64 (Node v20.18.0) |
| PDF length: | 21 |
| Capture ID: | ewN777pvZTBHQtu45rpFx2 |
| Display Name: | tlopez |

PDF REFERENCE #:        scpCgrcdSARwLRmjTgcWUd

# The Celtic Clan
136.6K posts

**New to X?**

Sign up now to get your own personalized timeline!

G Sign up with Google

Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service | Privacy Policy | Cookie Policy | Accessibility | Ads info | More ⋯ © 2026 X Corp.

Follow

## The Celtic Clan
@Correction2016

⊙ The Celtic Empire    📅 Joined November 2015 ›

**4,729** Following    **26.8K** Followers

| Posts | Replies | Media |

📌 Pinned

**The Celtic Clan** @Correction2016 · Jan 5, 2019    ⋯



○ 75    ⟲ 246    ♡ 1.4K    ᴵ�01    🔖 ⬆

**The Celtic Clan** @Correction2016 · Dec 28, 2024    ⋯
Post-WWII it became all about destroying white nations.

○ 195    ⟲ 724    ♡ 7.7K    ᴵ01 109K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Jul 26, 2024    ⋯
White men are being convinced to believe white women hate them.

○ 1.1K    ⟲ 459    ♡ 7.2K    ᴵ01 944K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Aug 26, 2024    ⋯

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up

## The Celtic Clan
136.6K posts

**Follow**

🗨 1.1K    ↕ 459    ♡ 7.2K    ⅈⅼⅈ 944K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Aug 26, 2024    ···
It's a bit confusing as to why Nigerians move to Ireland?

🗨 985    ↻ 334    ♡ 6.8K    ⅈⅼⅈ 403K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Apr 20, 2023    ···
A black family with their black slave, Liberia.

🗨 297    ↻ 1.6K    ♡ 6K    ⅈⅼⅈ 340K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Nov 14, 2024    ···
What was the first law put in place by the Bolsheviks?

🗨 185    ↻ 540    ♡ 4.8K    ⅈⅼⅈ 312K    🔖 ⬆

**The Celtic Clan** @Correction2016 · May 4, 2023    ···
We didn't come to Earth to babysit the African people.

🗨 255    ↻ 664    ♡ 4.3K    ⅈⅼⅈ 308K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Jan 6, 2024    ···
White people should not have non-White leaders.

🗨 184    ↻ 364    ♡ 3.4K    ⅈⅼⅈ 141K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Jul 27, 2023    ···
Adolf Hitler was not obsessed with the blue-eyed blonde Aryan. His enemies created that false narrative hence one can assume they are the ones obsessed with blue-eyed blondes. Accusatory inversion is their signature.

🗨 112    ↻ 272    ♡ 2.7K    ⅈⅼⅈ 153K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Oct 19, 2023    ···
After WWII it was decided that there can be no homogenous White nations.

🗨 93    ↻ 364    ♡ 2.4K    ⅈⅼⅈ 86K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Sep 19, 2024    ···

**New to X?**
Sign up now to get your own personalized timeline!

🅖 Sign up with Google

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service  |  Privacy Policy  |  Cookie Policy  |
Accessibility  |  Ads info  |  More ···    © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up



**The Celtic Clan**
136.6K posts

**Follow**

AND'S DEQA DHAHLAC IS FIRST
CAN MAYOR OF ANY U.S. CITY

NEW
AMERICA
LEAD

Join our
create a
that work

**New to X?**

Sign up now to get your own personalized timeline!

**G** Sign up with Google

**** Sign up with Apple

**Create account**

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service  |  Privacy Policy  |  Cookie Policy  |
Accessibility  |  Ads info  |  More ···    © 2026 X Corp.

💬 393    🔁 335    ❤️ 2.1K    📊 398K    🔖  ⬆️

**The Celtic Clan** @Correction2016 · Feb 10, 2024    ···
America is 58% White. We need to become at least 90% again, even then there were problems.

💬 344    🔁 162    ❤️ 1.8K    📊 150K    🔖  ⬆️

**The Celtic Clan** @Correction2016 · Mar 18, 2024    ···
The out of Africa theory is a psyop.

💬 118    🔁 152    ❤️ 1.9K    📊 151K    🔖  ⬆️

**The Celtic Clan** @Correction2016 · Aug 19, 2023    ···
I don't even know why White men would join the American military? What are they even fighting for at this point?

💬 248    🔁 205    ❤️ 1.9K    📊 94K    🔖  ⬆️

**The Celtic Clan** @Correction2016 · Apr 17, 2022    ···
Weird how Christians haven't read the Talmud. Which means they have no idea what is happening to them.

💬 134    🔁 327    ❤️ 1.7K    📊    🔖  ⬆️

**The Celtic Clan** @Correction2016 · Aug 17, 2024    ···
How did the Aryans become the world's scapegoat?

💬 357    🔁 119    ❤️ 1.6K    📊 89K    🔖  ⬆️

**The Celtic Clan** @Correction2016 · Apr 30, 2024    ···
Everything they claim happened to them actually happened to the German people.

💬 57    🔁 227    ❤️ 1.6K    📊 44K    🔖  ⬆️

**The Celtic Clan** @Correction2016 · Aug 8, 2024    ···
I'm getting Bolshevik vibes coming out of the UK.

💬 65    🔁 112    ❤️ 1.6K    📊 39K    🔖  ⬆️

**The Celtic Clan** @Correction2016 · Sep 26, 2023    ···
Hey dumbasses, it's not the "Nazis" running the global world order.

💬 90    🔁 158    ❤️ 1.5K    📊 76K    🔖  ⬆️

**The Celtic Clan** @Correction2016 · Feb 27, 2024    ···
When are Whites going to take their own side?

💬 136    🔁 160    ❤️ 1.5K    📊 47K    🔖  ⬆️

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up

Document title: The Celtic Clan (@Correction2016) / X
Capture URL: https://x.com/Correction2016
Capture timestamp (UTC): Mon, 11 May 2026 22:09:34 GMT

Page 4 of 20

App. 235

𝕏    ←    **The Celtic Clan**    [Follow]
136.6K posts

💬 136    🔁 160    ♡ 1.5K    ᯤ 47K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Feb 20, 2024    ···
I feel bad for America. Without a White majority it's going to turn into a really shitti country.

💬 167    🔁 135    ♡ 1.5K    ᯤ 67K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Aug 27, 2024    ···
"It's the Irish people's job to care for poor foreigners." Where did that idea derive from?

💬 205    🔁 99    ♡ 1.5K    ᯤ 32K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Jan 6, 2024    ···
Replying to @AfricanHub_
Learn how to build a bridge.

💬 19    🔁 22    ♡ 1.5K    ᯤ 115K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Feb 28, 2024    ···
The backlash received in regards to Whites coming together as a people is quite eye-opening.

💬 54    🔁 113    ♡ 1.3K    ᯤ 74K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Mar 23, 2023    ···
White people don't have a clue that we've been targeted for elimination for many decades now.

💬 135    🔁 206    ♡ 1.4K    ᯤ 64K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Jul 26, 2024    ···
In history, white women were enslaved in both Jewish and Muslim societies. You want to abandon us now?

💬 201    🔁 140    ♡ 1.3K    ᯤ 77K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Jan 8, 2024    ···



💬 78    🔁 133    ♡ 1.2K    ᯤ 65K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Oct 13, 2023    ···
What is the common denominator?
1/ Russian genocide
2/ German genocide
3/ White genocide

**New to X?**
Sign up now to get your own personalized timeline!

[G] Sign up with Google

[🍎] Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service  |  Privacy Policy  |  Cookie Policy  |
Accessibility  |  Ads info  |  More ···    © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

[Log in]  [Sign up]

X    ←    **The Celtic Clan**    [Follow]
136.6K posts

1/ Russian genocide
2/ German genocide
3/ White genocide
4/ Palestinian genocide

💬 179    🔁 225    ♡ 1.3K    ᴸᴸᴸ 77K    🔖 ⬆

**New to X?**

Sign up now to get your own personalized timeline!

G  Sign up with Google

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service | Privacy Policy | Cookie Policy |
Accessibility | Ads info | More ⋯  © 2026 X Corp.

**The Celtic Clan** @Correction2016 · Sep 14, 2023    ⋯
No other race on Earth loves animals the way White people do.

💬 121    🔁 130    ♡ 1.3K    ᴸᴸᴸ 62K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Feb 18, 2024    ⋯
My sister lives in central Maine. She went to the local grocery store today and reported back to me that all of sudden the management is entirely Indian.

💬 165    🔁 190    ♡ 1.3K    ᴸᴸᴸ 256K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Sep 27, 2024    ⋯
After WWII ended Europeans all got targeted just like the Germans were and still are.

💬 26    🔁 129    ♡ 1.2K    ᴸᴸᴸ 21K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Jul 15, 2023    ⋯
A town of 438 resident of Unity, Maine will be forced to take in 600 migrants. The state is strong arming them.

💬 121    🔁 232    ♡ 1.3K    ᴸᴸᴸ 92K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Nov 14, 2024    ⋯
Replying to @Ethosrevival
Who were the Bolsheviks and what did they do to the Russian people.

💬 18    🔁 34    ♡ 1.3K    ᴸᴸᴸ 33K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Apr 11, 2024    ⋯
Debating what Aryan means with Hindus was a total waste of my time.

💬 170    🔁 85    ♡ 1.1K    ᴸᴸᴸ 195K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Apr 4, 2023    ⋯
Who decided to make America non-White?

💬 380    🔁 137    ♡ 1.1K    ᴸᴸᴸ 66K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Jan 8, 2024    ⋯
"Who side are you on, the Ukrainians or Russians?" I'm on the side of Whites not killing each other like we did during WWII.

💬 83    🔁 116    ♡ 1.1K    ᴸᴸᴸ 39K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Jun 13, 2024    ⋯
Punishment for blasphemy: The Saxons were subjected to Christianity by forced conversion. Yet no pastors or any christian scholars would bring up this infamous massacre that was caused in the name of Christianity.



**Don't miss what's happening**
People on X are the first to know.

[Log in]    [Sign up]

Document title: The Celtic Clan (@Correction2016) / X
Capture URL: https://x.com/Correction2016
Capture timestamp (UTC): Mon, 11 May 2026 22:09:34 GMT

Page 6 of 20

App. 237



𝕏    ← **The Celtic Clan**
         136.6K posts                                          **Follow**

White people have to notice by now that they are dismantling Western culture and heritage in every White country. Have we no pride, no sense of survival?

💬 87        ⟲ 208        ♡ 1.1K        ‖ 37K            🔖 ↥

**The Celtic Clan** @Correction2016 · Jan 1, 2024        ···
Our job is to secure the future of White children. You are either on board with this or not.

💬 62        ⟲ 151        ♡ 1K          ‖ 36K            🔖 ↥

**The Celtic Clan** @Correction2016 · Dec 24, 2023      ···
I don't want to be black pilled but this destruction happening is the West is truly taking a toll on me.

💬 115       ⟲ 70         ♡ 1K          ‖ 72K            🔖 ↥

**The Celtic Clan** @Correction2016 · May 10, 2023      ···
Europeans built America.

💬 64        ⟲ 84         ♡ 980         ‖ 32K            🔖 ↥

**The Celtic Clan** @Correction2016 · Dec 27, 2022      ···
Ukrainian female refugees: We were trafficked to Israel in order to become sex slaves. iuvmarchive.org/en/article/ukr…

💬 93        ⟲ 572        ♡ 1K          ‖ 88K            🔖 ↥

**The Celtic Clan** @Correction2016 · Aug 11, 2023      ···
White people are in a war for survival and they don't even know they're in a war.

💬 61        ⟲ 135        ♡ 960         ‖ 26K            🔖 ↥

**The Celtic Clan** @Correction2016 · Aug 7, 2024       ···
The war on Aryans is an ancient battle. How far back does it go? I'm not really sure yet.

💬 69        ⟲ 54         ♡ 882         ‖ 29K            🔖 ↥

**The Celtic Clan** @Correction2016 · Sep 4, 2023       ···
The plan was to end the White man long before WWII began.

💬 45        ⟲ 104        ♡ 905         ‖ 32K            🔖 ↥

**The Celtic Clan** @Correction2016 · Sep 22, 2023      ···
The Kalergi plan to end the White race was written long before Adolf Hitler came to power.

**New to X?**
Sign up now to get your own personalized timeline!

G  **Sign up with Google**

  **Sign up with Apple**

**Create account**

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service  |  Privacy Policy  |  Cookie Policy  |
Accessibility  |  Ads info  |  More ···  © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.                    Log in    Sign up

X    ←    **The Celtic Clan**    Follow
136.6K posts

~~The Kalergi plan to end the White race was written long before Adolf Hitler~~
came to power.

💬 25    ↻ 143    ♡ 911    ᵢₗᵢ 38K    🔖 ↥

**The Celtic Clan** @Correction2016 · May 8, 2023    ...
Everybody is ok with a Black only country, like Liberia.
But establish a White only country, it triggers the global powers.

💬 57    ↻ 114    ♡ 852    ᵢₗᵢ 26K    🔖 ↥

**The Celtic Clan** @Correction2016 · May 9, 2023    ...
The music industry wants White boys to hate their race.

💬 97    ↻ 67    ♡ 820    ᵢₗᵢ 32K    🔖 ↥

**The Celtic Clan** @Correction2016 · Apr 15, 2023    ...
Whites are the only race that turn on their own. Why is that?

💬 334    ↻ 69    ♡ 846    ᵢₗᵢ 73K    🔖 ↥

**The Celtic Clan** @Correction2016 · Mar 19, 2025    ...
The mere fact that Europeans are totally unaware of what the ram horns
adorned on the hero, Alexander the Great, indicates a lost knowledge.



💬 45    ↻ 87    ♡ 947    ᵢₗᵢ 91K    🔖 ↥

**The Celtic Clan** @Correction2016 · Jul 7, 2023    ...
The Republican Party is Zionism.
The Democrat Pary is Communism.
Guess who they both serve?

💬 127    ↻ 119    ♡ 810    ᵢₗᵢ 38K    🔖 ↥

**The Celtic Clan** @Correction2016 · Sep 16, 2023    ...
1.4 billion people live in India.
1.4 billion people live in China.
White people are around 800 million world-wide.

CHINA

**New to X?**

Sign up now to get your own personalized timeline!

    **G** Sign up with Google

🍎 Sign up with Apple

**Create account**

By signing up, you agree to the Terms of Service and
Privacy Policy, including Cookie Use.

Terms of Service  |  Privacy Policy  |  Cookie Policy  |
Accessibility  |  Ads info  |  More ···    © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up

Document title: The Celtic Clan (@Correction2016) / X
Capture URL: https://x.com/Correction2016
Capture timestamp (UTC): Mon, 11 May 2026 22:09:34 GMT

Page 9 of 20

### The Celtic Clan
136.6K posts

**Follow**

**New to X?**

Sign up now to get your own personalized timeline!

G  Sign up with Google

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service  |  Privacy Policy  |  Cookie Policy  |
Accessibility  |  Ads info  |  More ···  © 2026 X Corp.

💬 69    🔁 125    ♡ 829    ᒥᥣᥣ 46K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Mar 19, 2023    ···
The term "black Irish" refers to persons of Irish descent who are supposed to be descendants of the 15th century Spanish Armada, having dark hair and or eyes. The term is used among people of Irish descent. It sometimes confuses people since it doesn't refer to dark skin color.

💬 74    🔁 121    ♡ 867    ᒥᥣᥣ 62K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Jan 10, 2024    ···
A lot of these pro-White looking accounts aren't actually White. More so lately.

💬 96    🔁 58    ♡ 762    ᒥᥣᥣ 61K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Apr 30, 2023    ···
Why is it mostly White people getting attacked in the streets?

💬 210    🔁 85    ♡ 777    ᒥᥣᥣ 36K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Jul 27, 2023    ···
Blue-eyed blondes are their target. Why do they hate so much? It's a clue for any researcher.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up



**The Celtic Clan**
136.6K posts

Follow

☐ 68    ↻ 75    ♡ 813    ᴵᥱ 38K

**The Celtic Clan** @Correction2016 · Sep 27, 2024    ···
There have been attempts to unite our people. The propaganda prevents that from going forward. Plus the map is limited in scope.

**Celtic Nations**

Alba/Scotland
Éire/Ireland
Ellan Vannin/Isle of Man
Cymru/Wales
Kernow/Cornwall
Breizh/Brittany
Galiza/Galicia
Asturies/Asturias
Norte Portugal/Northern Portugal
Llíon/Leon
Cantabria

☐ 91    ↻ 272    ♡ 844    ᴵᥱ 394K

**The Celtic Clan** @Correction2016 · May 7, 2024    ···
He is proud of genociding the German people.

**Hananya Naftali** ✓ @HananyaNaftali · May 6, 2024
The Nazis were defeated.

We know how the story ends with those who come to destroy the Jewish people.

**New to X?**

Sign up now to get your own personalized timeline!

G   Sign up with Google

🍎 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service | Privacy Policy | Cookie Policy |
Accessibility | Ads info | More ··· © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up

# The Celtic Clan
136.6K posts

**Follow**

0:03

💬 57    🔁 62    ♡ 746    ᵢₗᵢ 35K    🔖 ↥

**New to X?**

Sign up now to get your own personalized timeline!

G    Sign up with Google

    Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service  |  Privacy Policy  |  Cookie Policy  |
Accessibility  |  Ads info  |  More ···   © 2026 X Corp.

**The Celtic Clan** @Correction2016 · Aug 26, 2023    ···
When will White Americans start taking their own side?

💬 72    🔁 93    ♡ 741    ᵢₗᵢ 23K    🔖 ↥

**The Celtic Clan** @Correction2016 · Dec 21, 2023    ···
Whites weren't born on Earth to take care of foreign people, just like they weren't born on Earth to care for us.

💬 25    🔁 74    ♡ 753    ᵢₗᵢ 18K    🔖 ↥

**The Celtic Clan** @Correction2016 · Jan 7, 2024    ···
Solution to Whites becoming a minority: Orania is South Africa's white only town. The town was founded with the goal of creating a stronghold for the Afrikaner minority group, the Afrikaans language and the Afrikaner culture through the creation of an all-White Afrikaner state.

💬 59    🔁 127    ♡ 759    ᵢₗᵢ 50K    🔖 ↥

**The Celtic Clan** @Correction2016 · Dec 22, 2023    ···
Sun Wheels.

💬 19    🔁 64    ♡ 710    ᵢₗᵢ 29K    🔖 ↥

**The Celtic Clan** @Correction2016 · Jul 19, 2024    ···

**Don't miss what's happening**
People on X are the first to know.

Log in

Document title: The Celtic Clan (@Correction2016) / X
Capture URL: https://x.com/Correction2016
Capture timestamp (UTC): Mon, 11 May 2026 22:09:34 GMT    Page 12 of 20

**New to X?**

Sign up now to get your own personalized timeline!

G  Sign up with Google

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service | Privacy Policy | Cookie Policy | Accessibility | Ads info | More ··· © 2026 X Corp.

**The Celtic Clan**
136.6K posts

Follow

**The Celtic Clan** @Correction2016 · Jul 19, 2024
Our people did not begin with the Old Testament mythology.

💬 38    ↻ 67    ♡ 723    📊 33K

**The Celtic Clan** @Correction2016 · Feb 29, 2024
"We the People" was coined when America was White.

💬 42    ↻ 64    ♡ 677    📊 25K

**The Celtic Clan** @Correction2016 · Jul 8, 2023
They won't stop with the swastika.

Norway Olympic ski team under fire for sweater's symbol used by Nazi Germany - National | Globalnews.ca globalnews.ca/news/3997432/n...

💬 123    ↻ 83    ♡ 700    📊 49K

**The Celtic Clan** @Correction2016 · Sep 30, 2024
They burned down the Library of Alexandria to eliminate ancient history.

💬 49    ↻ 86    ♡ 724    📊 236K

**The Celtic Clan** @Correction2016 · Oct 25, 2024
Yazīdī are found found primarily in northern Iraq, southeastern Turkey, northern Syria, the Caucasus region, and parts of Iran.

💬 37    ↻ 84    ♡ 722    📊 48K

**The Celtic Clan** @Correction2016 · Sep 7, 2024
White folks are beginning to realize just how much we've been abused by government.

💬 20    ↻ 61    ♡ 662    📊 8.8K

**The Celtic Clan** @Correction2016 · Sep 16, 2022
On 5 February 1952 the UK was 99.7% White.

💬 16    ↻ 39    ♡ 604    📊

**The Celtic Clan** @Correction2016 · May 12, 2023
There is an actual 'final solution' operating on Earth today to eliminate the White race.

💬 50    ↻ 89    ♡ 659    📊 31K

**The Celtic Clan** @Correction2016 · Jun 17, 2023
How did she get into Sweden?

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up

𝕏    ←    **The Celtic Clan**    **Follow**
136.6K posts

The Celtic Clan @Correction2016 · Jun 17, 2023    ···
How did she get into Sweden?

BARBARA LERNER SPECTRE
Founding Director, Paideia Stockholm

💬 77    ↻ 88    ♡ 647    ⅲ 45K    🔖 ⬆

**New to X?**
Sign up now to get your own personalized timeline!

**G  Sign up with Google**

**🍎  Sign up with Apple**

**Create account**

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service  |  Privacy Policy  |  Cookie Policy  |
Accessibility  |  Ads info  |  More ···  © 2026 X Corp.

**The Celtic Clan** @Correction2016 · May 4, 2023    ···
Replying to @Correction2016
It's been imposed on the White race without our consent. I'm so tired of this giving our power and precious time and labor to a foreign tribe. It's not our responsibility in the first place.

💬 26    ↻ 38    ♡ 650    ⅲ 29K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Feb 12, 2024    ···
The time to reclaim America is now. The Alpha generation is already a minority, at 48% White.

💬 62    ↻ 58    ♡ 605    ⅲ 31K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Jul 15, 2023    ···
Rural towns are going to be bombarded with migrants. It's the plan.

💬 65    ↻ 71    ♡ 641    ⅲ 25K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Sep 1, 2024    ···
White genocide stems out of Abrahamic religion.

💬 73    ↻ 80    ♡ 605    ⅲ 26K    🔖 ⬆

**The Celtic Clan** @Correction2016 · May 7, 2023    ···
It's crazy to me that Americans think we can vote our way out of this.

💬 92    ↻ 81    ♡ 609    ⅲ 21K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Feb 9, 2023    ···
White people are so lost. No wonder we've allowed our lands to be stolen.

💬 38    ↻ 59    ♡ 638    ⅲ 23K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Jan 10, 2024    ···
WWIII will finish off the White men.

💬 306    ↻ 86    ♡ 571    ⅲ 56K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Sep 3, 2023    ···
Are we being conquered or have we already been conquered?

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up

𝕏    ← **The Celtic Clan**    **Follow**
136.6K posts

**The Celtic Clan** @Correction2016 · Sep 3, 2023    ···
Are we being conquered or have we already been conquered?

💬 248    ⟲ 75    ♡ 604    ᐧᨒᨒᨒ 43K    🔖 ↥

**The Celtic Clan** @Correction2016 · Sep 18, 2023    ···
They aren't even hiding the fact anymore that they are behind the Africanization of Europe.

💬 22    ⟲ 88    ♡ 611    ᐧᨒᨒᨒ 19K    🔖 ↥

**The Celtic Clan** @Correction2016 · May 29, 2023    ···
The European race is worth saving.

💬 27    ⟲ 59    ♡ 570    ᐧᨒᨒᨒ 18K    🔖 ↥

**The Celtic Clan** @Correction2016 · May 2, 2023    ···
Do Trump supporters know about the Weimar Republic? It seems to me they don't have a clue, as most Americans don't have any idea what's going down.

💬 130    ⟲ 65    ♡ 555    ᐧᨒᨒᨒ 39K    🔖 ↥

**The Celtic Clan** @Correction2016 · Oct 19, 2023    ···
Blaming Adolf Hitler for every abuse we are experiencing today is a trick by those not wanting for us to discover the Truth.

💬 33    ⟲ 101    ♡ 596    ᐧᨒᨒᨒ 16K    🔖 ↥

**The Celtic Clan** @Correction2016 · Sep 9, 2023    ···
The global population is 8.1 billion people. Whites are around 10% of that number. We deserve to exist.

💬 33    ⟲ 76    ♡ 588    ᐧᨒᨒᨒ 18K    🔖 ↥

**The Celtic Clan** @Correction2016 · Sep 25, 2023    ···
There are only two choices.

💬 22    ⟲ 68    ♡ 572    ᐧᨒᨒᨒ 16K    🔖 ↥

**The Celtic Clan** @Correction2016 · Nov 30, 2022    ···
Whites are only 8% of the global population. If we don't become race realist out time on Earth is over.

💬 52    ⟲ 93    ♡ 554    ᐧᨒᨒᨒ    🔖 ↥

**The Celtic Clan** @Correction2016 · Mar 15, 2023    ···
White fathers won't even go after the non-Whites that kill their daughters. This is how deep it goes. I would kill anybody that did harm to my daugher, but no it goes without an ounce of vengence.

**New to X?**
Sign up now to get your own personalized timeline!

🅖 **Sign up with Google**

 **Sign up with Apple**

**Create account**

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service  |  Privacy Policy  |  Cookie Policy  |
Accessibility  |  Ads info  |  More ···  © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up

Document title: The Celtic Clan (@Correction2016) / X
Capture URL: https://x.com/Correction2016
Capture timestamp (UTC): Mon, 11 May 2026 22:09:34 GMT

Page 15 of 20


App. 246

### The Celtic Clan
136.6K posts

**Follow**

White fathers won't even go after the non-Whites that kill their daughters. This is how deep it goes. I would kill anybody that did harm to my daugher, but no, it goes without an ounce of vengence.

💬 64    ♻ 58    ♡ 567    ‖ 33K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Feb 17, 2023    ···
By the end of the Viking period, around 1050, most Vikings were Christians.

💬 60    ♻ 73    ♡ 555    ‖ 60K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Jul 1, 2023    ···
The Kalergi plan.

💬 94    ♻ 84    ♡ 541    ‖ 34K    🔖 ⬆

**The Celtic Clan** @Correction2016 · Sep 9, 2023    ···
Whiteness is beautiful. That's why they hate it.

**New to X?**

Sign up now to get your own personalized timeline!

**G** Sign up with Google

 Sign up with Apple

**Create account**

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service  |  Privacy Policy  |  Cookie Policy  |
Accessibility  |  Ads info  |  More ···   © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up

Document title: The Celtic Clan (@Correction2016) / X
Capture URL: https://x.com/Correction2016
Capture timestamp (UTC): Mon, 11 May 2026 22:09:34 GMT

App. 247



**New to X?**

Sign up now to get your own personalized timeline!

G  Sign up with Google

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service  |  Privacy Policy  |  Cookie Policy  |
Accessibility  |  Ads info  |  More ···  © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up



**The Celtic Clan**
136.6K posts

**Follow**

The Celtic Clan @Correction2016 · Nov 5, 2024
The Celtic swastika was once big time.

Q 5        ↻ 60        ♡ 543        ᐧᕵᐧ 13K

**New to X?**

Sign up now to get your own personalized timeline!

**G** Sign up with Google

 Sign up with Apple

**Create account**

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service  |  Privacy Policy  |  Cookie Policy  |
Accessibility  |  Ads info  |  More ···    © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in        Sign up



𝕏    ←    **The Celtic Clan**
                136.6K posts                                              Follow

**The Celtic Clan** @Correction2016 · Nov 5, 2024          ...
The Celtic swastika was once big time.

○ 5          ⇄ 60          ♡ 543          ᴧ 13K          🔖 ⬆

**New to X?**

Sign up now to get your own personalized timeline!

G  Sign up with Google

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and
Privacy Policy, including Cookie Use.

Terms of Service  |  Privacy Policy  |  Cookie Policy  |
Accessibility  |  Ads info  |  More ···    © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.                    Log in    Sign up



**The Celtic Clan**
136.6K posts

Follow

**The Celtic Clan** @Correction2016 · Nov 5, 2024
The Celtic swastika was once big time.

💬 5          🔁 60          ♡ 543          📊 13K

**New to X?**
Sign up now to get your own personalized timeline!

Sign up with Google

Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service | Privacy Policy | Cookie Policy |
Accessibility | Ads info | More ··· © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up

PageVault

| | |
|---|---|
| Document title: | Profile / X |
| Capture URL: | https://x.com/HISTinGrayscale |
| Page loaded at (UTC): | Mon, 11 May 2026 22:08:30 GMT |
| Capture timestamp (UTC): | Mon, 11 May 2026 22:08:31 GMT |
| Capture tool: | 3.20.3 |
| Collection server IP: | 44.201.202.122 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/139.0.0.0 Safari/537.36 |
| Operating system: | linux x64 (Node v20.18.0) |
| PDF length: | 2 |
| Capture ID: | cL8bEjSsU81fcyfVmKvBiz |
| Display Name: | tlopez |

𝕏    ←    Profile

## Account suspended

X suspends accounts which violate the X Rules



**New to X?**

Sign up now to get your own personalized timeline!

G  Sign up with Google

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Something went wrong. Try reloading.

↻ Retry

Terms of Service  |  Privacy Policy  |  Cookie Policy  |
Accessibility  |  Ads info  |  More ···  © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up

Document title: Profile / X
Capture URL: https://x.com/HISTinGrayscale
Capture timestamp (UTC): Mon, 11 May 2026 22:08:31 GMT

App. 253

**PageVault**

| | |
|---|---|
| Document title: | Profile / X |
| Capture URL: | https://x.com/The_National1 |
| Page loaded at (UTC): | Mon, 11 May 2026 22:08:12 GMT |
| Capture timestamp (UTC): | Mon, 11 May 2026 22:08:13 GMT |
| Capture tool: | 3.20.3 |
| Collection server IP: | 44.201.202.122 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/139.0.0.0 Safari/537.36 |
| Operating system: | linux x64 (Node v20.18.0) |
| PDF length: | 2 |
| Capture ID: | iTbB8J2oSdewn1A2Qvw8k5 |
| Display Name: | tlopez |

PDF REFERENCE #:    2Av6Z7VYVoMv1PKKKQs4mJ

App. 254

 ← **Profile**

## Account suspended

X suspends accounts which violate the X Rules

**New to X?**

Sign up now to get your own personalized timeline!



G  Sign up with Google

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Something went wrong. Try reloading.

C Retry

Terms of Service | Privacy Policy | Cookie Policy | Accessibility | Ads info | More ⋯  © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up

Document title: Profile / X
Capture URL: https://x.com/The_National1
Capture timestamp (UTC): Mon, 11 May 2026 22:08:13 GMT
Page 1 of 1

App. 255

| | |
|---|---|
| Document title: | The Sonny Thomas Show™ □ □ (@SonnyThomasShow) / X |
| Capture URL: | https://x.com/SonnyThomasShow |
| Page loaded at (UTC): | Mon, 11 May 2026 22:09:35 GMT |
| Capture timestamp (UTC): | Mon, 11 May 2026 22:09:36 GMT |
| Capture tool: | 3.20.3 |
| Collection server IP: | 32.193.247.243 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/139.0.0.0 Safari/537.36 |
| Operating system: | linux x64 (Node v20.18.0) |
| PDF length: | 2 |
| Capture ID: | eywnUc4AZJnfyRoEaQbFLu |
| Display Name: | tlopez |





## The Sonny Thomas Show™ 🎙️ 🔥
@SonnyThomasShow

Odinist, Jeffersonian Republican,radio host,music promoter, Thor's Day Nights #OHIOFirst #1A #2A #EFIT #StopWhiteGenocide #SaveTheBoer #FreePalestine🇵🇸

📍 Great Sovereign STATE of OHIO    🔗 ResolutionRDO.org
📅 Joined August 2011 ›

1,846 Following    1,020 Followers

Posts          Replies          Media

# @SonnyThomasShow hasn't posted

When they do, their posts will show up here.

Don't miss what's happening
People on X are the first to know.

Log in    Sign up

Document title: The Sonny Thomas Show™ □  □   (@SonnyThomasShow) / X
Capture URL: https://x.com/SonnyThomasShow
Capture timestamp (UTC): Mon, 11 May 2026 22:09:36 GMT

Page 1 of 1

App. 257

PageVault

| | |
|---|---|
| Document title: | Profile / X |
| Capture URL: | https://x.com/neuralvarez |
| Page loaded at (UTC): | Mon, 11 May 2026 22:09:14 GMT |
| Capture timestamp (UTC): | Mon, 11 May 2026 22:09:15 GMT |
| Capture tool: | 3.20.3 |
| Collection server IP: | 32.193.247.243 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/139.0.0.0 Safari/537.36 |
| Operating system: | linux x64 (Node v20.18.0) |
| PDF length: | 2 |
| Capture ID: | fYL89TB8DRq9WW9anXmLzj |
| Display Name: | tlopez |

 ← **Profile**

## This account doesn't exist

Try searching for another.



**New to X?**

Sign up now to get your own personalized timeline!

G Sign up with Google

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Something went wrong. Try reloading.

C Retry

Terms of Service | Privacy Policy | Cookie Policy | Accessibility | Ads info | More ⋯ © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up

Document title: Profile / X
Capture URL: https://x.com/neuralvarez
Capture timestamp (UTC): Mon, 11 May 2026 22:09:15 GMT
Page 1 of 1

App. 259

🔒 PageVault

| | |
|---|---|
| Document title: | ☐ ƒɑsнʏ ƒяäuℓɛıη☐    (@TheeCeltic) / X |
| Capture URL: | https://x.com/TheeCeltic |
| Page loaded at (UTC): | Mon, 11 May 2026 22:08:52 GMT |
| Capture timestamp (UTC): | Mon, 11 May 2026 22:08:53 GMT |
| Capture tool: | 3.20.3 |
| Collection server IP: | 32.193.247.243 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/139.0.0.0 Safari/537.36 |
| Operating system: | linux x64 (Node v20.18.0) |
| PDF length: | 2 |
| Capture ID: | th6ffoGuAyJPuRbAc3DfMh |
| Display Name: | tlopez |

PDF REFERENCE #:        gR6wxE8DpYAM28hvBaRGp6

App. 260





I'm not fat

**New to X?**

Sign up now to get your own personalized timeline!

G    Sign up with Google

    Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service   |   Privacy Policy   |   Cookie Policy   |
Accessibility   |   Ads info   |   More ⋯    © 2026 X Corp.

🏝️*ƒasʜʏ ƒʀäʋℓεıŋ*🏝️ 🔒
@TheeCeltic

Follow

738 posts

sσмεтıмεs ρεσρℓε ∂σŋ'т ωαŋт тσ ʜεαʀ тʜε тʀʋтʜ вε¢αʋsε тʜεʏ ∂σŋ'т ωαŋт тʜεıʀ ıℓℓʋsıσŋ ∂εsтʀσʏε∂. ~ƒʀıε∂ʀı¢ʜ ŋıεтzs¢ʜε • main acct: @celtic_fraulein

⊙ South Of The Mason Dixon    📅 Joined September 2023 >

**359** Following    **402** Followers

# These posts are protected

Only approved followers can see @TheeCeltic's posts. To request access, click Follow. Learn more

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up

🔒 **PageVault**

| | |
|---|---|
| Document title: | ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ™ (@1776Diva) / X |
| Capture URL: | https://x.com/1776Diva |
| Page loaded at (UTC): | Mon, 11 May 2026 22:09:59 GMT |
| Capture timestamp (UTC): | Mon, 11 May 2026 22:10:06 GMT |
| Capture tool: | 3.20.3 |
| Collection server IP: | 44.201.113.217 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/139.0.0.0 Safari/537.36 |
| Operating system: | linux x64 (Node v20.18.0) |
| PDF length: | 30 |
| Capture ID: | fvWyc49aTpq6AqqZ32FYtf |
| Display Name: | tlopez |

PDF REFERENCE #:    mep5XsfkaBrTbDqdnKjs4A

App. 262



Document title: ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ™ (@1776Diva) / X
Capture URL: https://x.com/1776Diva
Capture timestamp (UTC): Mon, 11 May 2026 22:10:06 GMT

Page 1 of 29



Document title: □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ ™ (@1776Diva) / X
Capture URL: https://x.com/1776Diva
Capture timestamp (UTC): Mon, 11 May 2026 22:10:06 GMT    Page 2 of 29

App. 264





Document title: ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ™ (@1776Diva) / X
Capture URL: https://x.com/1776Diva
Capture timestamp (UTC): Mon, 11 May 2026 22:10:06 GMT
Page 4 of 29

App. 266



Document title: □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ ™ (@1776Diva) / X
Capture URL: https://x.com/1776Diva
Capture timestamp (UTC): Mon, 11 May 2026 22:10:06 GMT                                    Page 5 of 29





Document title: □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ ™ (@1776Diva) / X
Capture URL: https://x.com/1776Diva
Capture timestamp (UTC): Mon, 11 May 2026 22:10:06 GMT                                    Page 7 of 29



Document title: ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ™ (@1776Diva) / X
Capture URL: https://x.com/1776Diva
Capture timestamp (UTC): Mon, 11 May 2026 22:10:06 GMT



Document title: ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ™ (@1776Diva) / X
Capture URL: https://x.com/1776Diva
Capture timestamp (UTC): Mon, 11 May 2026 22:10:06 GMT

App. 271





Document title: ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ™ (@1776Diva) / X
Capture URL: https://x.com/1776Diva
Capture timestamp (UTC): Mon, 11 May 2026 22:10:06 GMT



Document title: □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ ™ (@1776Diva) / X
Capture URL: https://x.com/1776Diva
Capture timestamp (UTC): Mon, 11 May 2026 22:10:06 GMT                    Page 12 of 29





Document title: □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ ™ (@1776Diva) / X
Capture URL: https://x.com/1776Diva
Capture timestamp (UTC): Mon, 11 May 2026 22:10:06 GMT
Page 14 of 29



Document title: □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ ™ (@1776Diva) / X
Capture URL: https://x.com/1776Diva
Capture timestamp (UTC): Mon, 11 May 2026 22:10:06 GMT

App. 277





Document title: □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ ™ (@1776Diva) / X
Capture URL: https://x.com/1776Diva
Capture timestamp (UTC): Mon, 11 May 2026 22:10:06 GMT
Page 17 of 29

App. 279



Document title: □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ ™ (@1776Diva) / X
Capture URL: https://x.com/1776Diva
Capture timestamp (UTC): Mon, 11 May 2026 22:10:06 GMT

App. 280







Document title: ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ™ (@1776Diva) / X
Capture URL: https://x.com/1776Diva
Capture timestamp (UTC): Mon, 11 May 2026 22:10:06 GMT









Document title: ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ™ (@1776Diva) / X
Capture URL: https://x.com/1776Diva
Capture timestamp (UTC): Mon, 11 May 2026 22:10:06 GMT    Page 25 of 29



Document title: ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ☐ ™ (@1776Diva) / X
Capture URL: https://x.com/1776Diva
Capture timestamp (UTC): Mon, 11 May 2026 22:10:06 GMT
Page 26 of 29



Document title: □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ □ ™ (@1776Diva) / X
Capture URL: https://x.com/1776Diva
Capture timestamp (UTC): Mon, 11 May 2026 22:10:06 GMT





![PageVault logo]

| | |
|---|---|
| Document title: | Profile / X |
| Capture URL: | https://x.com/KeepEuropeWhite |
| Page loaded at (UTC): | Mon, 11 May 2026 22:08:42 GMT |
| Capture timestamp (UTC): | Mon, 11 May 2026 22:08:43 GMT |
| Capture tool: | 3.20.3 |
| Collection server IP: | 44.201.113.217 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/139.0.0.0 Safari/537.36 |
| Operating system: | linux x64 (Node v20.18.0) |
| PDF length: | 2 |
| Capture ID: | doZyzVApczywTzyk6nM1oc |
| Display Name: | tlopez |

 ← Profile

**New to X?**

Sign up now to get your own personalized timeline!

G Sign up with Google

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Something went wrong. Try reloading.

↻ Retry

Terms of Service | Privacy Policy | Cookie Policy | Accessibility | Ads info | More ⋯ © 2026 X Corp.

# This account doesn't exist

Try searching for another.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up

Document title: Profile / X
Capture URL: https://x.com/KeepEuropeWhite
Capture timestamp (UTC): Mon, 11 May 2026 22:08:43 GMT

Page 1 of 1

App. 293

![Page Vault logo]

| | |
|---|---|
| Document title: | Vidar Odensson ☐   ☐   (@OdenssonV) / X |
| Capture URL: | https://x.com/OdenssonV |
| Page loaded at (UTC): | Mon, 11 May 2026 22:09:01 GMT |
| Capture timestamp (UTC): | Mon, 11 May 2026 22:09:07 GMT |
| Capture tool: | 3.20.3 |
| Collection server IP: | 67.202.25.166 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/139.0.0.0 Safari/537.36 |
| Operating system: | linux x64 (Node v20.18.0) |
| PDF length: | 27 |
| Capture ID: | mNEBodaJskv1LTih5tZJkT |
| Display Name: | tlopez |

PDF REFERENCE #:     gL9evUZtKKcBKpwrJtF66m

App. 294



Document title: Vidar Odensson ☐    ☐    (@OdenssonV) / X
Capture URL: https://x.com/OdenssonV
Capture timestamp (UTC): Mon, 11 May 2026 22:09:07 GMT

Page 1 of 26



Document title: Vidar Odensson ☐  ☐   (@OdenssonV) / X
Capture URL: https://x.com/OdenssonV
Capture timestamp (UTC): Mon, 11 May 2026 22:09:07 GMT



Document title: Vidar Odensson □    □    (@OdenssonV) / X
Capture URL: https://x.com/OdenssonV
Capture timestamp (UTC): Mon, 11 May 2026 22:09:07 GMT





Document title: Vidar Odensson □    □    (@OdenssonV) / X
Capture URL: https://x.com/OdenssonV
Capture timestamp (UTC): Mon, 11 May 2026 22:09:07 GMT



Document title: Vidar Odensson □   □    (@OdenssonV) / X
Capture URL: https://x.com/OdenssonV
Capture timestamp (UTC): Mon, 11 May 2026 22:09:07 GMT



Document title: Vidar Odensson ☐ ☐ (@OdenssonV) / X
Capture URL: https://x.com/OdenssonV
Capture timestamp (UTC): Mon, 11 May 2026 22:09:07 GMT



Document title: Vidar Odensson □    □    (@OdenssonV) / X
Capture URL: https://x.com/OdenssonV
Capture timestamp (UTC): Mon, 11 May 2026 22:09:07 GMT
Page 8 of 26

App. 302

**Vidar Odensson** 🇸🇪    Follow
16.9K posts

**Vidar Odensson** 🇸🇪 @OdenssonV · Mar 30, 2024    ...
Below is a screenshot sent to me from an account, showing a successful report against me for hateful conduct.
The image next to it is a screenshot of the actual "hateful" post.

This is who our enemies are. Never forget it.

Report · March 28, 2024
**You submitted a report for hateful conduct**
View Rule

Vidar Odensson 🇸🇪 @OdenssonV · Feb 2
You will find someone:    Hide
https://t.co/KCSvbtlZOE

VIOLATION FOUND
We locked @OdenssonV's account for breaking our hateful conduct rule. We found they broke our hateful conduct rule through different reports we received about their behavior.

They can't post, repost, or Like content, and we'll ask them to remove the reported content if they want to regain full access to

💬 20        ↺ 72        ♡ 270        📊 8.4K        🔖 ↥

**Vidar Odensson** 🇸🇪 @OdenssonV · Mar 1, 2025    ...
She looks like this because her parents didn't race mix.

💬 16        ↺ 34        ♡ 296        📊 28K        🔖 ↥

**Vidar Odensson** 🇸🇪 @OdenssonV · Feb 19, 2025    ...
White Nations for White Folk

**New to X?**
Sign up now to get your own personalized timeline!

G    Sign up with Google

    Sign up with Apple

    Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service | Privacy Policy | Cookie Policy | Accessibility | Ads info | More ··· © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up

Document title: Vidar Odensson □    □    (@OdenssonV) / X
Capture URL: https://x.com/OdenssonV
Capture timestamp (UTC): Mon, 11 May 2026 22:09:07 GMT

Page 9 of 26

App. 303







**Vidar Odensson** 🇸🇪
16.9K posts

Follow

**Vidar Odensson** 🇸🇪 @OdenssonV · Jan 5, 2025
Racism is good.

🗨 3    ↻ 20    ♡ 222    ᴸᶦ 8.5K

**Vidar Odensson** 🇸🇪 @OdenssonV · Mar 19, 2025
She looks like this because her parents didn't race mix.

🗨 8    ↻ 37    ♡ 233    ᴸᶦ 29K

**Vidar Odensson** 🇸🇪 @OdenssonV · Jun 22, 2025
Race mixing is genocide

**New to X?**

Sign up now to get your own personalized timeline!

G    Sign up with Google

    Sign up with Apple

    Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service | Privacy Policy | Cookie Policy |
Accessibility | Ads info | More ··· © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up

Document title: Vidar Odensson ☐  ☐    (@OdenssonV) / X
Capture URL: https://x.com/OdenssonV
Capture timestamp (UTC): Mon, 11 May 2026 22:09:07 GMT



Document title: Vidar Odensson ☐    ☐    (@OdenssonV) / X
Capture URL: https://x.com/OdenssonV
Capture timestamp (UTC): Mon, 11 May 2026 22:09:07 GMT

App. 308

# Vidar Odensson 🇸🇪

16.9K posts

**Follow**

**Vidar Odensson** 🇸🇪 @OdenssonV · Feb 28, 2025    ⋯

Racism is Good.



💬 3        🔁 23        ♡ 211        ╎╎┃ 17K        🔖 ⬆

**Vidar Odensson** 🇸🇪 @OdenssonV · Aug 12, 2025    ⋯

Racism is good.

💬 5        🔁 25        ♡ 234        ╎╎┃ 6.2K        🔖 ⬆

**Vidar Odensson** 🇸🇪 @OdenssonV · Apr 12, 2024    ⋯

Don't race mix.

## New to X?

Sign up now to get your own personalized timeline!

**G** Sign up with Google

 Sign up with Apple

**Create account**

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service | Privacy Policy | Cookie Policy | Accessibility | Ads info | More ⋯    © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up

Document title: Vidar Odensson ☐    ☐     (@OdenssonV) / X
Capture URL: https://x.com/OdenssonV
Capture timestamp (UTC): Mon, 11 May 2026 22:09:07 GMT

Vidar Odensson 🇸🇪

16.9K posts

Follow

**New to X?**

Sign up now to get your own personalized timeline!

Vidar Odensson 🇸🇪 @OdenssonV · Apr 12, 2024

Don't race mix.

♡ 15    ⟲ 38    ♡ 200    ılıl 3.1K    🔖 ⬆

Vidar Odensson 🇸🇪 @OdenssonV · Jul 8, 2025

Date your own kind.

♡ 1    ⟲ 20    ♡ 232    ılıl 2.6K    🔖 ⬆

Vidar Odensson 🇸🇪 @OdenssonV · Jul 12, 2025

Race mixing kills this.

G Sign up with Google

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service | Privacy Policy | Cookie Policy | Accessibility | Ads info | More ··· © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up

Document title: Vidar Odensson ☐    ☐    (@OdenssonV) / X
Capture URL: https://x.com/OdenssonV
Capture timestamp (UTC): Mon, 11 May 2026 22:09:07 GMT

App. 310

**Vidar Odensson** 🇸🇪
16.9K posts

Follow

Race mixing kills this.

**New to X?**

Sign up now to get your own personalized timeline!

G Sign up with Google

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service | Privacy Policy | Cookie Policy |
Accessibility | Ads info | More ⋯ | © 2026 X Corp.

💬 5    🔁 23    ♡ 231    📊 2.6K    🔖 ⬆️

**Vidar Odensson** 🇸🇪 @OdenssonV · Feb 27, 2025    ⋯
Europe for Europeans

💬 2    🔁 10    ♡ 214    📊 20K    🔖 ⬆️

**Vidar Odensson** 🇸🇪 @OdenssonV · Jun 10, 2025    ⋯
Racism is good.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up



Document title: Vidar Odensson □    □    (@OdenssonV) / X
Capture URL: https://x.com/OdenssonV
Capture timestamp (UTC): Mon, 11 May 2026 22:09:07 GMT

**Vidar Odensson** 🇸🇪
16.9K posts

Follow

Racism is Good.

❤️ 3    ↻ 17    ♡ 225    ᴸᴸ 2.5K    🔖 ⬆️

**Vidar Odensson** 🇸🇪 @OdenssonV · Oct 3, 2024
Replying to @KILLTOPARTY
Being married to a woman in the military was his first mistake.

❤️ 4    ↻ 1    ♡ 238    ᴸᴸ 3.2K    🔖 ⬆️

**Vidar Odensson** 🇸🇪 @OdenssonV · Sep 18, 2024
Sweden's "nationalist" party, SD, gives millions of kronor to the jewish think tank Paideia, created by the infamous jewess Barbara Spectre.

I repeat, SD as a party is no friend of the Swedish people and there is no political solution.

RADICAL: Alexander Christiansson (SD) and the government parties' cultural policy representatives presented the investment in Barbara Specter's left-wing radical activist center in a joint debate article in SvD.    © County Council House/Commons, PRIVATE

## SD gives nine million to Barbara Specter

Published 18 September 2024 at 11:47

**New to X?**

Sign up now to get your own personalized timeline!

G  Sign up with Google

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service  |  Privacy Policy  |  Cookie Policy  |
Accessibility  |  Ads info  |  More ···   © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up

Document title: Vidar Odensson ☐   ☐   (@OdenssonV) / X
Capture URL: https://x.com/OdenssonV
Capture timestamp (UTC): Mon, 11 May 2026 22:09:07 GMT

Page 19 of 26



Document title: Vidar Odensson ☐  ☐  (@OdenssonV) / X
Capture URL: https://x.com/OdenssonV
Capture timestamp (UTC): Mon, 11 May 2026 22:09:07 GMT



Document title: Vidar Odensson ▢   ▢     (@OdenssonV) / X
Capture URL: https://x.com/OdenssonV
Capture timestamp (UTC): Mon, 11 May 2026 22:09:07 GMT
Page 21 of 26

App. 315



Document title: Vidar Odensson ☐   ☐    (@OdenssonV) / X
Capture URL: https://x.com/OdenssonV
Capture timestamp (UTC): Mon, 11 May 2026 22:09:07 GMT



Document title: Vidar Odensson ☐    ☐    (@OdenssonV) / X
Capture URL: https://x.com/OdenssonV
Capture timestamp (UTC): Mon, 11 May 2026 22:09:07 GMT

Page 23 of 26

App. 317



Document title: Vidar Odensson □    □    (@OdenssonV) / X
Capture URL: https://x.com/OdenssonV
Capture timestamp (UTC): Mon, 11 May 2026 22:09:07 GMT





**Vidar Odensson** 🇸🇪
16.9K posts

**Follow**

**New to X?**

Sign up now to get your own personalized timeline!

🅖 Sign up with Google

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service | Privacy Policy | Cookie Policy |
Accessibility | Ads info | More ⋯    © 2026 X Corp.

💬 1    🔁 29    ♡ 201    📊 2.5K

**Vidar Odensson** 🇸🇪 @OdenssonV · Jul 21, 2024    ⋯
Race mixing is evil.

💬 3    🔁 21    ♡ 169    📊 3.8K

**Vidar Odensson** 🇸🇪 @OdenssonV · Jul 6, 2025    ⋯
She looks like this because her parents didn't race mix.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up

Document title: Vidar Odensson □    □    (@OdenssonV) / X
Capture URL: https://x.com/OdenssonV
Capture timestamp (UTC): Mon, 11 May 2026 22:09:07 GMT

![PageVault logo]

| | |
|---|---|
| Document title: | Profile / X |
| Capture URL: | https://x.com/o7CW_Schneiders |
| Page loaded at (UTC): | Mon, 11 May 2026 22:09:25 GMT |
| Capture timestamp (UTC): | Mon, 11 May 2026 22:09:26 GMT |
| Capture tool: | 3.20.3 |
| Collection server IP: | 67.202.25.166 |
| Browser engine: | Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/139.0.0.0 Safari/537.36 |
| Operating system: | linux x64 (Node v20.18.0) |
| PDF length: | 2 |
| Capture ID: | coMPSQMzpkB2QhsMJLGTEu |
| Display Name: | tlopez |

PDF REFERENCE #:    sEzwjK1UTZbKT2gtHiUhLV

App. 321

← Profile



**This account doesn't exist**

Try searching for another.

**New to X?**

Sign up now to get your own personalized timeline!

G Sign up with Google

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Something went wrong. Try reloading.

C Retry

Terms of Service | Privacy Policy | Cookie Policy |
Accessibility | Ads info | More ⋯  © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up

Document title: Profile / X
Capture URL: https://x.com/o7CW_Schneiders
Capture timestamp (UTC): Mon, 11 May 2026 22:09:26 GMT

App. 322

**PageVault**

| | |
|---|---|
| Document title: | Kevin - WE THE PEOPLE☐   (@bambkb) / X |
| Capture URL: | https://x.com/bambkb |
| Page loaded at (UTC): | Mon, 11 May 2026 22:02:00 GMT |
| Capture timestamp (UTC): | Mon, 11 May 2026 22:03:47 GMT |
| Capture tool: | 10.80.0 |
| Collection server IP: | 54.145.42.72 |
| Browser engine: | Mozilla/5.0 (X11; Linux x86_64) AppleWebKit/537.36 (KHTML, like Gecko) @page-vault/browser/10.80.0 Chrome/144.0.7559.236 Safari/537.36 |
| Operating system: | Linux (Node 24.14.0) |
| PDF length: | 53 |
| Capture ID: | eVMArYpm8o7yzZwdBwARHz |
| Display Name: | tlopez |







Document title: Kevin - WE THE PEOPLE☐    (@bambkb) / X
Capture URL: https://x.com/bambkb
Capture timestamp (UTC): Mon, 11 May 2026 22:03:47 GMT

Page 3 of 52



**Kevin - WE THE PEOPLE**🦁✔
92.2K posts                                    Follow

COVID was premeditated. It was murder. It was active terrorism by a state against the world. Let's just call it what it is and not pretend there was some complex explanation behind this......
Show more



💬 440      🔁 11K      ❤️ 23K      📊 301K        🔖 ↗

**Kevin - WE THE PEOPLE**🦁✔  @bambkb · Aug 25, 2023  ⋯
🚨🚨🚨● Dr Masanori Fukushima, Professor Emeritus at Kyoto University is furious and absolutely goes OFF on the government about the #Covid #Vaccine :

"These #Vaccine injured people cry themselves to sleep at night, while you try and HIDE information!! This is a case of DRUG
Show more



💬 356      🔁 11K      ❤️ 20K      📊 852K        🔖 ↗

**Kevin - WE THE PEOPLE**🦁✔  @bambkb · Aug 26, 2023  ⋯
🚨🚨🚨They are using the same strategy in Canada with the #WildFires as they did in #Lahaina

Police are blocking people from leaving the area that's on fire

Police are blocking people from coming in to help

Listen to these people BEG to help others, while police shuts them
Show more

**New to X?**
Sign up now to get your own personalized timeline!

G  Sign up with Google

  Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service  |  Privacy Policy  |  Cookie Policy  |
Accessibility  |  Ads info  |  More···  © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.                    Log in    Sign up



Document title: Kevin - WE THE PEOPLE☐    (@bambkb) / X

Capture URL: https://x.com/bambkb

Capture timestamp (UTC): Mon, 11 May 2026 22:03:47 GMT

Page 5 of 52

App. 328







Don't miss what's happening
People on X are the first to know.

Log in    Sign up



Document title: Kevin - WE THE PEOPLE☐    (@bambkb) / X

Capture URL: https://x.com/bambkb

Capture timestamp (UTC): Mon, 11 May 2026 22:03:47 GMT

Page 9 of 52



**Kevin - WE THE PEOPLE**🦁✓
92.2K posts

Follow

**New to X?**

Sign up now to get your own personalized timeline!

G  Sign up with Google

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service | Privacy Policy | Cookie Policy
Accessibility | Ads info | More ··· © 2026 X Corp.

👥 **Readers added context they thought people might want to know**  →

This video has been circulating online widely and is a digitally altered video.

Here is the original:
tiktok.com/@saucedofamily...

Here is a version where Joe Biden sniffs the child loudly also digitally altered:
t.co/bMiPXQbb1B

News links
apnews.com/article/fact-c....

dailymail.co.uk/news/article-1...

Context is written by people who use X, and appears when rated helpful by others.  Find out more.

💬 951        ⟲ 11K        ♡ 16K        ᯤ 1.3M        🔖 ⬆

**Kevin - WE THE PEOPLE**🦁 ✓ @bambkb · Sep 7, 2022        ···
Two weeks before the pandemic started, the government (NIAID) and MODERNA signed a confidential agreement regarding COVID VACCINES, how did they know!!??

Anthony Fauci has to answer some questions!
#vaccine #vaccineinjury #vaccinedeaths



**Don't miss what's happening**
People on X are the first to know.

Log in        Sign up



**Don't miss what's happening**
People on X are the first to know.

Log in   Sign up

Document title: Kevin - WE THE PEOPLE□   (@bambkb) / X
Capture URL: https://x.com/bambkb
Capture timestamp (UTC): Mon, 11 May 2026 22:03:47 GMT

Page 11 of 52



Document title: Kevin - WE THE PEOPLE☐    (@bambkb) / X
Capture URL: https://x.com/bambkb
Capture timestamp (UTC): Mon, 11 May 2026 22:03:47 GMT          Page 12 of 52











Document title: Kevin - WE THE PEOPLE☐    (@bambkb) / X
Capture URL: https://x.com/bambkb
Capture timestamp (UTC): Mon, 11 May 2026 22:03:47 GMT





Document title: Kevin - WE THE PEOPLE☐    (@bambkb) / X
Capture URL: https://x.com/bambkb
Capture timestamp (UTC): Mon, 11 May 2026 22:03:47 GMT

Page 19 of 52

App. 342





### Kevin - WE THE PEOPLE🦁 ✔
92.2K posts

**New to X?**

Sign up now to get your own personalized timeline!

G  Sign up with Google

 Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service  |  Privacy Policy  |  Cookie Policy
Accessibility  |  Ads info  |  More···  © 2026 X Corp.

**Follow**

dog dewormer, FENBENDAZOLE :

"I was diagnosed with stage 4 cancer - A highly aggressive plasmacytoid carcinoma cancer"

"I was told that I had 6 months to live and there was NOTHING I can do!! No chemo, no radiation

Show more



💬 242      🔁 5K      🤍 11K      📊 1.1M

**Kevin - WE THE PEOPLE**🦁 ✔ @bambkb · Sep 8, 2023      ···
🚨🚨🚨Just a friendly reminder :

South Africa 🇿🇦 just released the #Covid #Vaccine contract with #Pfizer that all our governments are so DESPERATELY trying to hide from us🧐

Do you guys know what this contract states about the #Covid #Vaccine :

(1) Efficacy = UNKNOWN

(2)
Show more

💬 281      🔁 7.1K      🤍 11K      📊 1.1M

**Kevin - WE THE PEOPLE**🦁 ✔ @bambkb · Aug 3, 2023      ···
🚨🚨🚨The Rothschild are the true owners of this planet, did you guys know that?🧐

Do you know that, president Putin kicked them out of Russia 🇷🇺 after he paid off the Central bank loans??

It's really NOT hard to understand why, Russia 🇷🇺 is depicted as 'public enemy #1' by the
Show more



**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up





App. 346







Document title: Kevin - WE THE PEOPLE☐   (@bambkb) / X
Capture URL: https://x.com/bambkb
Capture timestamp (UTC): Mon, 11 May 2026 22:03:47 GMT

Page 26 of 52



**Kevin - WE THE PEOPLE**🦁 ✓
92.2K posts

Follow

284     ⟳ 5.3K     ♡ 10K     ᵈⁱᵈ 473K     🔖 ⬆

**Kevin - WE THE PEOPLE**🦁 ✓ @bambkb · Aug 25, 2023     ···
🚨🚨🚨Before he died, Professsor and noble prize winner, Dr. Luc Montagnier expressed concerns that #Covid was artificially created and modified :

"This was a professional Job, a meticulous one - They even added an HIV sequence in there! This is not normal!! this was a
Show more



155     ⟳ 5.7K     ♡ 10K     ᵈⁱᵈ 419K     🔖 ⬆

**Kevin - WE THE PEOPLE**🦁 ✓ @bambkb · Sep 9, 2023     ···
🚨🚨🚨Holy shit😳

This man claims that 🇲🇽 Mexico is now paying for the border wall, because they know the USA 🇺🇸 is finished :

"Mexico knows that the dollar is going to collapse soon, so they don't want anyone running back across the border when the USA 🇺🇸 collapses"😳😳
Show more



**New to X?**

Sign up now to get your own personalized timeline!

G  Sign up with Google

  Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service    Privacy Policy    Cookie Policy
Accessibility    Ads info    More ···    © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in     Sign up





Document title: Kevin - WE THE PEOPLE☐    (@bambkb) / X
Capture URL: https://x.com/bambkb
Capture timestamp (UTC): Mon, 11 May 2026 22:03:47 GMT

Page 29 of 52

App. 352



**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up



X    ←    **Kevin - WE THE PEOPLE**🦁✓    **Follow**
92.2K posts

**Assassination Agenda**

▶

MOSCOW, Russia - Edward Snowden, NSA whistleblower and fugitive, released documents Tuesday to Internet Chronicle reporters proving that the High Frequency Active Auroral Research Program, or HAARP, is definitely engaged in a program of assassination and mind control.

*EMERGENCY UPDATE: Snowden has revealed an incoming global* *cataclysm.*

While the military-press-industrial complex has routinely asserted that the Alaska-based HAARP is only meant to study natural phenomena in earth's ionosphere, Snowden has managed

💬 223        🔁 5.9K        ♡ 9.4K        �III 1.4M        🔖 ⬆

**Kevin - WE THE PEOPLE**🦁 ✓ @bambkb · Jul 31, 2023        ⋯
🚨🚨🚨Who is Barack Obama? Former FBI agent, John D'Souza explains:👇😳

"In 2008 something unbelievable happened for us in the FBI - We were getting lots of rumours about this 'HIGH LEVEL' asset that worked for SEVERAL intelligence agencies at once!!! This person went on to
Show more

TG: @FightQBall
TS: @8CueBall

▶

Obama: 'Renegade'
'culmination of so many of cabal plans'
'mission to destroy US from within'

💬 280        🔁 6.4K        ♡ 9.2K         III 1.1M        🔖 ⬆

**Kevin - WE THE PEOPLE**🦁 ✓ @bambkb · May 27, 2024        ⋯
🚨🚨🚨Morgan Vague discovered a bacteria that can eat plastic and turn it into harmless enzymes 🔥

It's probably one of the most important discoveries EVER and she should've probably won 'person of the year' for this.

She ended up losing to Greta Thunberg 🐵

Our governments
Show more

**New to X?**

Sign up now to get your own personalized timeline!

G    Sign up with Google

    Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service | Privacy Policy | Cookie Policy |
Accessibility | Ads info | More ··· | © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in        Sign up

Document title: Kevin - WE THE PEOPLE☐    (@bambkb) / X
Capture URL: https://x.com/bambkb
Capture timestamp (UTC): Mon, 11 May 2026 22:03:47 GMT                    Page 32 of 52



Document title: Kevin - WE THE PEOPLE☐    (@bambkb) / X
Capture URL: https://x.com/bambkb
Capture timestamp (UTC): Mon, 11 May 2026 22:03:47 GMT

App. 356



Document title: Kevin - WE THE PEOPLE☐    (@bambkb) / X
Capture URL: https://x.com/bambkb
Capture timestamp (UTC): Mon, 11 May 2026 22:03:47 GMT



Document title: Kevin - WE THE PEOPLE☐    (@bambkb) / X
Capture URL: https://x.com/bambkb
Capture timestamp (UTC): Mon, 11 May 2026 22:03:47 GMT
Page 35 of 52



Document title: Kevin - WE THE PEOPLE☐    (@bambkb) / X
Capture URL: https://x.com/bambkb
Capture timestamp (UTC): Mon, 11 May 2026 22:03:47 GMT

App. 359



Document title: Kevin - WE THE PEOPLE☐    (@bambkb) / X
Capture URL: https://x.com/bambkb
Capture timestamp (UTC): Mon, 11 May 2026 22:03:47 GMT
Page 37 of 52

App. 360



Document title: Kevin - WE THE PEOPLE☐    (@bambkb) / X
Capture URL: https://x.com/bambkb
Capture timestamp (UTC): Mon, 11 May 2026 22:03:47 GMT
Page 38 of 52







Document title: Kevin - WE THE PEOPLE☐     (@bambkb) / X
Capture URL: https://x.com/bambkb
Capture timestamp (UTC): Mon, 11 May 2026 22:03:47 GMT

Page 41 of 52







Document title: Kevin - WE THE PEOPLE□   (@bambkb) / X
Capture URL: https://x.com/bambkb
Capture timestamp (UTC): Mon, 11 May 2026 22:03:47 GMT

𝕏

← **Kevin - WE THE PEOPLE**🦁✔
92.2K posts

**Follow**

**New to X?**

Sign up now to get your own personalized timeline!

G  Sign up with Google

  Sign up with Apple

Create account

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service  |  Privacy Policy  |  Cookie Policy  |
Accessibility  |  Ads info  |  More···  © 2026 X Corp.

🇨🇦 OBGYN with 43 years of experience @jathorpmfm explains the devastating consequences of COVID vaccination👇 :

"I don't know if there is any other physician in the country that sees as many patients as I do by ultrasound, so I know what's going on. I've seen death and
Show more



💬 232      🔁 6.2K      ♥ 8K      📊 592K      🔖 ⬆

**Kevin - WE THE PEOPLE**🦁 ✔ @bambkb · Jun 13, 2024      ···
🚨⭐ This amazing human being and nurse that takes care of children was fired for asking :

"Who is going to report these cases of MYOCARDITIS in children to VAERS?"

She also claims that there was an unspoken rule about not discussing COVID vaccine injuries at her workplace.
Show more



💬 156      🔁 4.8K      ♥ 7.9K      📊 214K      🔖 ⬆

**Kevin - WE THE PEOPLE**🦁 ✔ @bambkb · Sep 16, 2023      ···
🚨🚨🚨A dog dewormer, Fenbendazole cured this man of stage 4 cancer :

"The cancer had spread to my neck, my liver, my pancreas, my bladder, my bones, it was EVERYWHERE!!!"😳

"My odds of survival were less than 1% and my life expectancy was about 3 months"😳😳

Could
Show more

**Don't miss what's happening**
People on X are the first to know.

Log in      Sign up

Document title: Kevin - WE THE PEOPLE☐    (@bambkb) / X
Capture URL: https://x.com/bambkb
Capture timestamp (UTC): Mon, 11 May 2026 22:03:47 GMT

Page 45 of 52











Document title: Kevin - WE THE PEOPLE☐    (@bambkb) / X
Capture URL: https://x.com/bambkb
Capture timestamp (UTC): Mon, 11 May 2026 22:03:47 GMT    Page 50 of 52

App. 373



**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up



**Kevin - WE THE PEOPLE**🦁✓    **Follow**
92.2K posts

**Kevin - WE THE PEOPLE**🦁 ✓ @bambkb · Sep 18, 2023    ···
🚨🚨🚨 Have you guys heard about, 'predictive programming'?

I've never really watched, the X-Files BUT the accurate prediction of this clip that I'm about to show you in comparison to what's happening today is astonishing and really quite disturbing to watch :

"you and everyone
Show more



💬 310    ↻ 4.2K    ♡ 7.3K    ‖ 1M    🔖 ⬆



**New to X?**
Sign up now to get your own personalized timeline!

**G** Sign up with Google

🍎 Sign up with Apple

**Create account**

By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use.

Terms of Service | Privacy Policy | Cookie Policy |
Accessibility | Ads info | More··· © 2026 X Corp.

**Don't miss what's happening**
People on X are the first to know.

Log in    Sign up

Document title: Kevin - WE THE PEOPLE☐    (@bambkb) / X
Capture URL: https://x.com/bambkb
Capture timestamp (UTC): Mon, 11 May 2026 22:03:47 GMT
Page 52 of 52

# EXHIBIT 6

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

X CORP.,
                Plaintiff,

        vs.                                    Case No. 4:23-cv-01175-O

MEDIA MATTERS FOR AMERICA, et al.
                Defendants.

PLAINTIFF'S RESPONSES AND OBJECTIONS
TO DEFENDANTS' FIRST SET OF REQUESTS FOR PRODUCTION

Pursuant to Federal Rule of Civil Procedure 34, Plaintiff X Corp. serves its Responses and

Objections to Defendants' First Set of Requests for Production on Defendants Media Matters for

America, Eric Hananoki, and Angelo Carusone, by and through their counsel of record, on June

12, 2024.

App. 377

Dated: June 12, 2024

Respectfully submitted.

*/s/ Christopher D. Hilton*
Judd E. Stone II
Texas Bar No. 24076720
Christopher D. Hilton
Texas Bar No. 24087727
Ari Cuenin
Texas Bar No. 24078385
Alexander M. Dvorscak
Texas Bar No. 24120461
**STONE | HILTON PLLC**
1115 W. Slaughter Lane
Austin, TX 78748
Telephone: (737) 465-3897
judd@stonehilton.com
chris@stonehilton.com
ari@stonehilton.com
alex@stonehilton.com

John C. Sullivan
Texas Bar No. 24083920
**S|L LAW PLLC**
610 Uptown Boulevard, Suite 2000
Cedar Hill, TX 75104
Telephone: (469) 523-1351
Facsimile: (469) 613-0891
john.sullivan@the-sl-lawfirm.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that this document was served on counsel for Defendants via email on June 12, 2024, pursuant to counsel's agreement to accept service via electronic means.

*/s/ Alexander M. Dvorscak*
Alexander M. Dvorscak

2

App. 378

**INSTRUCTIONS**

X will produce documents responsive to each of Defendants' requests on a rolling basis as if the request in question was rewritten to remove the objectional portion of the request, in accordance with X's objections and response. X will only produce documents in its possession, custody, and control that it is able to locate after a reasonable search and only upon the court's entry of a protective order in the above-captioned action. X will not search for or produce public documents or documents in the possession of third parties. X will not produce any privileged documents, which will be withheld and logged, if required, in accordance with the Parties' agreements regarding privilege. Production of documents pursuant to these requests does not bear on the admissibility of any document, and X expressly reserves the right to object to the documents' admissibility.

**RESPONSES AND OBJECTIONS**

**REQUEST FOR PRODUCTION NO. 1**: All documents and communications related to or describing X's algorithm, the X systems and processes, as that term is used in Plaintiff's First Amended Complaint, ECF No. 37, that, among other things, determines what content is presented to each X user, including any and all prior versions previously used by X.

**OBJECTIONS:** X objects that this request is unduly burdensome and disproportionate to the needs of the case because it improperly seeks the production of all documents related to X's algorithm without limitation to documents relevant to this litigation, which only concerns X's algorithm insofar as Defendants were able to manipulate it into creating highly misleading screenshots. X has myriad, complex algorithms for thousands of unique purposes and functions that bear no relationship to the claims or defenses in this matter, but the request sweeps them in regardless. X further objects as the request calls for the production of highly sensitive and

3

confidential information (the suggestion algorithm) that constitutes a trade secret, the disclosure of which could be highly negative and destructive to X's commercial position in the marketplace of social media companies. The request is also disproportionate and unduly burdensome because it is not limited to specific individuals who have relevant knowledge and as such is likely to require the production of irrelevant documents.

**RESPONSE:** X is willing to meet and confer with Defendants concerning the production of X's timeline algorithm and will search for and produce documents related to Defendants' manipulation of the timeline algorithm, including non-privileged internal communications and documents related to X's investigation concerning the manipulation of its timeline algorithm, if any, after conferring with Defendants on the limited set of custodians who are likely to possess relevant knowledge.

**REQUEST FOR PRODUCTION NO. 2**: All documents and communications related to the November 16, 2023 Article and/or the November 17, 2023 Article, including the activity and statements discussed therein.

**OBJECTIONS:** X objects that the request is unduly burdensome and disproportionate to the needs of the case because it is not limited to specific individuals who have relevant knowledge and as such is likely to require the production of irrelevant documents.

**RESPONSE:** X will search for and produce documents responsive to this request after conferring with Defendants on the limited set of custodians who are likely to possess relevant knowledge.

**REQUEST FOR PRODUCTION NO. 3**: All documents and communications describing any policies and practices X uses to identify Disputed Content on the Platform.

4

App. 380

**OBJECTIONS:** X objects that this request is unduly burdensome and disproportionate to the needs of the case because as worded, it potentially encompasses documents and communications to and from every employee of the company, at every level; communications with hundreds of millions of users regarding the terms and conditions and policies governing posts on the platform; and communications related to posts and content that has nothing to do with the content referenced in Defendants' Articles but which might conceivably fall under Defendants' broad definition of "Disputed Content" without having any relevance to the claims in this case. X also objects to the extent the request could be interpreted as calling for the production of confidential and highly sensitive source code that is a trade secret, disclosure of which could be highly negative and destructive to X's commercial position in the marketplace of social media companies.

**RESPONSE:**    X's    content    moderation    policies    are    publicly    available    at https://help.x.com/en/rules-and-policies/x-rules. X will also search for and produce any prior versions of those policies that have been in effect since April 2021.

**REQUEST FOR PRODUCTION NO. 4**: All documents and communications concerning content moderation on the Platform.

**OBJECTIONS:** X objects that this request is unduly burdensome and disproportionate to the needs of the case because it potentially encompasses documents from every employee of the company, at every level; communications with hundreds of millions of users regarding the terms and conditions and policies governing posts on the platform; and communications related to posts and content that has nothing to do with the content referenced in Defendants' Articles but which might conceivable fall under Defendants' broad definition of "Disputed Content" without having any relevance to the claims in this case. X also objects to the extent the request could be interpreted

5

as calling for the production of confidential and highly sensitive source code that is a trade secret, disclosure of which could be highly negative and destructive to X's commercial position in the marketplace of social media companies.

**RESPONSE:** X's content moderation policies are publicly available at https://help.x.com/en/rules-and-policies/x-rules. X will also search for and produce any prior versions of those policies that have been in effect since April 2021. X will additionally produce all communications related to content moderation on the platform that also relate to the Articles after conferring with Defendants on the limited set of custodians who are likely to possess relevant knowledge.

**REQUEST FOR PRODUCTION NO. 5**: All documents and communications, including screenshots, reflecting or referring to Disputed Content on the Platform.

**OBJECTIONS:** X objects that this request is unduly burdensome and disproportionate to the needs of the case because it potentially encompasses documents from every employee of the company, at every level; communications with potentially hundreds of millions of users regarding the terms and conditions and policies governing posts on the platform; and would require the review and production of one of the billions of posts and content made during the relevant time period that has nothing to do with the content referenced in Defendants' Articles but which might conceivable fall under Defendants' broad definition of "Disputed Content" without having any relevance to the claims in this case. X further objects that many users' posts on the Platform are public, and so are equally available to Defendants as they are to X.

**RESPONSE:** X will search for and produce the "Disputed Content" that is specifically referenced in the Articles. X will additionally produce all communications related to the "Disputed Content"

App. 382

referred to in the Articles after conferring with Defendants on the limited set of custodians who are likely to possess relevant knowledge.

**REQUEST FOR PRODUCTION NO. 6**: All documents and communications, including draft and completed contracts, agreements, and memoranda of understanding, describing or showing evidence of existing or prospective business relationships between X and any of the advertisers referenced in the Amended Complaint or identified in response to Interrogatories 1 and 4 in Defendants' First Set of Interrogatories.

**OBJECTIONS:** X objects to the scope of the request because the drafts and pre-contractual documents of contracts which were later executed are irrelevant to X's claims for interference with the executed contracts. X also objects because the request is unduly burdensome and disproportionate to the needs of the case for calling for the production of all communications with hundreds of thousands of advertisers including the production of communications which predate the publication of the Article by months or years, and which are not relevant to Defendants' interference with their business relationship with X. The request is also unduly burdensome and disproportionate to the needs of the case as it is not limited to specific individuals who have relevant knowledge and as such is likely to require the production of irrelevant documents.

**RESPONSE:** X will search for and produce all executed contracts between X and any of the advertisers referenced in X's response to Interrogatory 1 and 4 in existence on November 16, 2023. X will additionally produce communications relating to the Articles and/or an advertiser's decision to cease or reduce spending on the X platform between itself and the advertisers listed in X's response to Interrogatory 1 and 4 from November 16, 2023 to present after conferring with Defendants on a limited set of custodians who are likely to possess relevant knowledge.

7

**REQUEST FOR PRODUCTION NO. 7**: All communications with X's past, present, or potential advertisers regarding their decision to advertise or not to advertise on the Platform, including but not limited to all communications reflecting the reasoning behind their decision to advertise or not to advertise on the Platform.

**OBJECTIONS:** X objects because the request is unduly burdensome and disproportionate to the needs of the case for calling for the production of all communications with advertisers including the production of communications which predate the publication of the Article by months or years, and which are not relevant to Defendants' interference with their business relationship with X. X further objects because communications with past advertisers who were not advertisers at the time of the Article are irrelevant to X's claim that Defendants interfered with its current and prospective advertisers through Defendants' tortious conduct. The request is also overly broad and unduly burdensome as it is not limited to specific individuals who have relevant knowledge and as such is likely to require the production of irrelevant documents.

**RESPONSE:** X will search for and produce communications relating to the Articles and/or any decision to cease or reduce spending on the X platform by the advertisers listed in X's response to Interrogatory 4 from November 16, 2023, to present, after conferring with Defendants on a limited set of custodians who are likely to possess relevant knowledge.

**REQUEST FOR PRODUCTION NO. 8**: All documents and communications discussing or mentioning Media Matters, Mr. Hananoki, and/or Mr. Carusone.

**OBJECTIONS:** X objects that this request is unduly burdensome and disproportionate to the needs of the case because many of the documents and communications possessed by X that would

8

be responsive to the request as written are likely to be subject to attorney-client privilege and would therefore require an expensive and unduly burdensome privilege review. The request is also overly broad and unduly burdensome as it is not limited to specific individuals who have relevant knowledge and as such is likely to require the production of irrelevant documents. Moreover, the request calls for the production of documents which are not relevant to the claims and defenses at issue: what X employees think about or have discussed about Defendants is not probative to the accuracy of Defendants so-called reporting or their interference with third-party advertisers.

**RESPONSE:** X will search for and produce all documents and communications that refer to the November 16 and 17 Articles published by Media Matters and the TV appearances of Carusone after conferring with Defendants on the limited set of custodians who are likely to possess relevant knowledge.

**REQUEST FOR PRODUCTION NO. 9**: All documents or communications showing X's business revenue generated from advertisements on the Platform in monthly installments or any term in which X maintains these records from April 14, 2021, to the present.

**OBJECTIONS:** X objects that this request is unduly burdensome and disproportionate to the needs of the case as the communications of X employees regarding the advertising revenue is not relevant to the damages X seeks in this case which can be determined solely based on the financial records themselves. The request is also overly broad because it is not limited to specific individuals who have relevant knowledge and as such is likely to require the production of irrelevant documents. X further objects because this request seeks information that could be more easily and less burdensomely addressed in response to an interrogatory.

9

**RESPONSE:** X will search for and produce documents sufficient to show the revenue that X generates from the advertisers listed in X's response to Interrogatory 4 on a monthly basis from April 14, 2021, to the present.

**REQUEST FOR PRODUCTION NO. 10**: All documents and communications regarding Your connection with or presence in the jurisdiction of the U.S. District Court for the Northern District of Texas.

**OBJECTIONS:** X objects that this request is unduly burdensome and disproportionate to the needs of the case because it is not limited to specific individuals who have relevant knowledge and as such is likely to require the production of irrelevant documents.

**RESPONSE:** X will search for and produce documents reflecting communications with advertisers located within the Northern District of Texas who were affected by Defendants' tortious conduct, including but not limited to AT&T, after conferring with Defendants on the limited set of custodians who are likely to possess relevant knowledge.

**REQUEST FOR PRODUCTION NO. 11**: All communications with any elected or appointed public official, including but not limited to Texas Attorney General Ken Paxton and Missouri Attorney General Andrew Bailey, their staff, employees, and/or representatives regarding Media Matters, Mr. Hananoki, Mr. Carusone, and/or any of the allegations made in the Amended Complaint.

**OBJECTIONS**: X objects that this request is unduly burdensome and disproportionate to the needs of the case because is not limited to specific individuals who have relevant knowledge and as such is likely to require the production of irrelevant documents.

10

**RESPONSE**: X will search for and produce documents responsive to this request after conferring with Defendants on the limited set of custodians who are likely to possess relevant knowledge.

**REQUEST FOR PRODUCTION NO. 12**: All documents and communications regarding the removal or destruction of the personal or business physical cellular phone in the possession of X's owner, Elon Musk, or the removal, discontinuation, or otherwise termination of Musk's personal or business cellular phone service, since November 2023.

**OBJECTIONS:** X objects that this request is an improper fishing expedition. Elon Musk is not a plaintiff or defendant in this litigation, and any cell phone that he possesses or did possess has no bearing on the claims or defenses asserted here. X also objects because the request is harassing in so far as it seeks to attack Musk personally and suggests he did something improper without any evidence to support such an accusation and without any claim to which his cell phone would be relevant.

**RESPONSE:** X will not search for or produce documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 13**: All documents and communications regarding payments made to X users related to X's revenue sharing programs, including their Subscription Creators and Creator Ads Revenue Sharing programs.

**OBJECTIONS:** X objects that this request is unduly burdensome and disproportionate to the needs of the case because it potentially encompasses seeks all communications with X's users that participate in the X's creator revenue sharing programs as well as all internal communications about the program and managing that program, little to none of which is relevant to the claims and defenses in this case.

**RESPONSE:** X's policies governing the Creator Subscriptions and Ads Revenue Sharing programs are available at https://help.x.com/en/using-x/creator-ads-revenue-sharing. X will not produce documents regarding the payment amounts made to X users related to X's revenue sharing programs, as those payments are not relevant to this litigation.

**REQUEST FOR PRODUCTION NO. 14**: All documents and communications describing available means on X for users to control or change the advertisements they see on the Platform, including any filters for advertisements that can be used for new and existing users of the Platform.

**OBJECTIONS:** X objects that this request is unduly burdensome and disproportionate to the needs of the case because it seeks to capture all communications and documents related to how advertisements are viewed on the Platform without any appropriate limiting criteria. X also objects that the request is unduly burdensome because the Platform is publicly accessible, and thus, Defendants can observe for themselves which mechanisms are available to users of the Platform. X additionally objects because the request could be interpreted to call for the production of confidential and highly sensitive source code that is a trade secret, disclosure of which could be highly negative and destructive to X's commercial position in the marketplace of social media companies. The request is also overly broad and unduly burdensome as it is not limited to specific individuals who have relevant knowledge and as such is likely to require the production of irrelevant documents.

**RESPONSE:** X will search for and produce its policies and documents made available to users of the Platform regarding how users can control or change the advertisements they see on the Platform. X will additionally produce all documents and communications related to the manipulation of X's algorithm and the advertisements that were published in the Defendants'

12

Articles after conferring with Defendants on the limited set of custodians who are likely to possess relevant knowledge.

**REQUEST FOR PRODUCTION NO. 15**: Documents sufficient to show X's organizational structure, including Board membership, leadership structure, and that of any affiliated or related entities.

**OBJECTIONS:** X objects as the request is vague in so far as it refers to "X" generally pursuant to a broad defined term, rather than to any one specific legal entity. X will interpret this request as if it was limited solely to X Corp. X further objects that if the request is not limited to just X Corp., then it is overly broad and unduly burdensome, as the organizational structure of the various corporate affiliates have no relevance on any claim or defense in this litigation.

**RESPONSES:** X will search for and produce documents sufficient to show the organizational structure of X Corp.

**REQUEST FOR PRODUCTION NO. 16**: Documents sufficient to identify individuals, representatives, or employees responsible for or involved with content moderation on the Platform, including individuals, representatives, or employees responsible for or involved with developing policies for content moderation on the platform.

**OBJECTIONS:** X objects as the identity of individuals involved with content moderation on the Platform is not relevant to the claims or defenses at issue in this litigation as it is not probative as to either the accuracy of Defendants' so-called reporting or to their interference with X's advertisers. X also objects because the request is vague as the individuals involved in content moderation changes over time and the request does not state a time that Defendants are interested

13

in—X will accordingly interpret this request as calling for the production of documents sufficient to identify the content moderation team as it existed on November 16, 2023 when the Article was published. X further objects because this request seeks information that could be more easily and less burdensomely addressed in response to an interrogatory.

**RESPONSE:** X will produce documents sufficient to identify the individuals responsible for developing its content moderation policies as of November 16, 2023.


**REQUEST FOR PRODUCTION NO. 17**: All documents or communications regarding the cessation, suspension, termination, or otherwise discontinuance of a business or transactional relationship between X and its advertisers.

**OBJECTIONS**: X objects because the request is unduly burdensome and disproportionate to the needs of the case for calling for the production of all communications with advertisers including the production of communications which predate the publication of the Article by months or years, and which are not relevant to Defendants' interference with their business relationship with X. X further objects because communications with past advertisers who were not advertisers at the time of the Article are irrelevant to X's claim that Defendants interfered with its current and prospective advertisers through Defendants' tortious conduct. The request is also unduly burdensome and disproportionate to the needs of the case because is not limited to specific individuals who have relevant knowledge and as such is likely to require the production of irrelevant documents.

**RESPONSE**: X will search for and produce documents relating to the advertisers listed in X's response to Interrogatory 4, from November 16, 2023 to present, that are responsive to this request after conferring with Defendants on the limited set of custodians who are likely to possess relevant knowledge.

14

**REQUEST FOR PRODUCTION NO. 18**: All documents concerning, and communications with, any public relations, advertising, marketing, communications, or similar firm, group, or business that You have contracted with, or that you have contacted in any capacity in connection with the November 16, 2023 Article or the November 17, 2023 Article.

**OBJECTIONS**: X objects that this request is unduly burdensome and disproportionate to the needs of the case because it is not limited to specific individuals who have relevant knowledge and as such is likely to require the production of irrelevant documents.

**RESPONSE**: X will search for and produce responsive documents, if any, after conferring with Defendants on a limited set of custodians who are likely to possess relevant knowledge.

**REQUEST FOR PRODUCTION NO. 19**: All documents and communications related to or reflecting Your knowledge or understanding of Media Matters's business operations, strategies, partnerships, staff, donors, directors, reporting, or day-to-day activities.

**OBJECTIONS**: X objects that this request constitutes an improper fishing expedition because what X knows or understands about Media Matters is not probative as to the truth of Defendants' so-called reporting or their interference with X's advertisers. Moreover, Defendants have no defense in which X's state of mind is an element. X thus objects that any responsive documents would be irrelevant.

**RESPONSE**: X will not search for or produce documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 20**: All documents and communications related to or reflecting X's Board's knowledge or understanding of Media Matters's business operations, strategies, partnerships, staff, donors, directors, reporting, or day-to-day activities.

**OBJECTIONS**: X objects that this request constitutes an improper fishing expedition because what X knows or understands about Media Matters is not probative as to the truth of Defendants' so-called reporting or their interference with X's advertisers. Moreover, Defendants have no defense in which X's state of mind is an element. X thus objects that any responsive documents would be irrelevant.

**RESPONSE**: X will not search for or produce documents responsive to this request.


**REQUEST FOR PRODUCTION NO. 21**: All documents and communications related to or reflecting X's employees' knowledge or understanding of Media Matters's business operations, strategies, partnerships, staff, donors, directors, reporting, or day-to-day activities.

**OBJECTIONS**: X objects that this request constitutes an improper fishing expedition because what X knows or understands about Media Matters is not probative as to the truth of Defendants' so-called reporting or their interference with X's advertisers. Moreover, Defendants have no defense in which X's state of mind is an element. X thus objects that any responsive documents would be irrelevant.

**RESPONSE**: X will not search for or produce documents responsive to this request.


**REQUEST FOR PRODUCTION NO. 22:** All documents and communications related to or reflecting X's advertisers' and agencies' involvement in or knowledge or understanding of Media

16

App. 392

Matters's business operations, strategies, partnerships, staff, donors, directors, reporting, or day-to-day activities.

**OBJECTIONS**: The request is unduly burdensome and disproportionate to the needs of the case because it is not limited to specific individuals who have relevant knowledge and as such is likely to require the production of irrelevant documents.

**RESPONSE**: X will produce documents responsive to this request after conferring with Defendants on the limited set of custodians who are likely to possess relevant knowledge.

**REQUEST FOR PRODUCTION NO. 23**: All internal documents and communications with or about media organizations, reporters, or journalists regarding reporting about X, its employees, its directors, or Elon Musk.

**OBJECTIONS**: X objects that this request is unduly burdensome and disproportionate to the needs of the case because it seeks the production of documents of irrelevant documents. Defendants cannot establish that it is appropriate to require X to search for all communications with the media without limitation to the subjects at issue in this litigation. The request is also unduly burdensome and disproportionate in that it is not limited to specific individuals who have relevant knowledge and as such is likely to require the production of irrelevant documents.

**RESPONSE**: X will search for and produce documents about Media Matters, Hananoki, and Carusone after conferring with Defendants on the limited set of custodians who are likely to possess relevant knowledge.

**REQUEST FOR PRODUCTION NO. 24**: All documents and communications demonstrating a connection between the November 16, 2023 Article, the November 17, 2023 Article, and/or Mr.

17

Carusone's November 26, 2023 interview statements and the withdrawal or attempted withdrawal of any of X's advertisers from the Platform.

**OBJECTIONS**: X objects because the request is unduly burdensome and disproportionate to the needs of the case for calling for the production of all communications with advertisers without limiting to the advertisers who form the basis of X's claims against Defendants. The request is also unduly burdensome and disproportionate to the needs of the case because is not limited to specific individuals who have relevant knowledge and as such is likely to require the production of irrelevant documents.

**RESPONSE**: X will search for and produce documents relating to the advertisers listed in X's response to Interrogatory 4, from November 16, 2023 to present, that are responsive to this request.

**REQUEST FOR PRODUCTION NO. 25**: All documents and communications related to X suspending or terminating user accounts on the Platform, including but not limited to the processes by which such suspended or terminated user accounts are or have been reinstated.

**OBJECTIONS**: X objects because the request is unduly burdensome and disproportionate to the needs of the case because it requests the production of a large quantity of documents which are not relevant to X's claims in this litigation as the suspense, termination, or reinstation of any user on the Platform is not probative to either the accuracy of Defendants' so-called reporting or Defendants' interference with X's advertisers. The request is overly broad and unduly burdensome as it is not limited to specific individuals who have relevant knowledge and as such is likely to require the production of irrelevant documents.

**RESPONSE**: X will search for and produce summary analytics showing the number of users suspended on the Platform during the requested time period as well as public documents reflecting X's policies for suspending, terminating, and reinstating users' accounts.

**REQUEST FOR PRODUCTION NO. 26**: All documents and communications related to Elon Musk's activity on the X platform, including Musk's engagement with Disputed Content on the Platform, and any allegations that Musk has violated X's user agreement, terms of service, rules and policies, or content moderation policies.

**OBJECTIONS**: X objects that this request is harassing and a fishing expedition. Musk's actions on the Platform are not probative to the accuracy of Defendants' so-called reporting or Defendants' interference with X's advertisers. Musk is not a plaintiff and there is no allegation that he is the alter ego of Plaintiff.

**RESPONSE**: X will not search for or produce documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 27**: All documents and communications related to the manner in which "views," as that term is used on social media platforms, meaning a measure of how many times a visitor on a social media platform engages with certain content, are generated on X.

**OBJECTIONS**: X objects because the request is unduly burdensome and disproportionate to the needs of the case because communications regarding how X calculates "views" encompasses a large number of highly irrelevant documents that is not probative to the accuracy of Defendants' so-called reporting or their interference with X's advertisers. X also objects because the request is not limited to specific individuals who have relevant knowledge and as such is likely to require

19

the production of irrelevant documents. X further objects because this request seeks information that could be more easily and less burdensomely addressed in response to an interrogatory. X additionally objects to the extent the request could be interpreted as calling for the production of confidential and highly sensitive source code related to the calculation of views that is a trade secret, disclosure of which could be highly negative and destructive to X's commercial position in the marketplace of social media companies.

**RESPONSE**: X will search for and produce documents sufficient to understand how X calculates views on the Platform.

**REQUEST FOR PRODUCTION NO. 28**: All documents and communications related to the termination or suspension of any current or former employee of X for reasons related to content moderation or Disputed Content on X.

**OBJECTIONS**: X objects that this request constitutes an improper fishing expedition because whether any employee was terminated for reasons related to content moderation is not an element of any claim or defense that either party has asserted and is not probative to determining either the accuracy of Defendants' so-called reporting or their interference with X's advertisers.

**RESPONSE**: X will not search for or produce documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 29**: All public statements made by Musk—including but not limited to public statements made on the Platform, on other social media platforms, and in media interviews—as to Jewish people, Muslim people, Black people, Hispanic or Latino people, women, members of the LGBTQIA+ community, immigrants, non-English speakers, Asian

20

people, and/or indigenous people, and any documents and communications regarding those statements.

**OBJECTIONS**: X objects that this request is harassing, unduly burdensome, and disproportionate to the needs of the case. Musk's statements on the Platform or elsewhere are not probative to the accuracy of Defendants' so-called reporting or Defendants' interference with X's advertisers. Musk is not a plaintiff and there is no allegation that he is the alter ego of Plaintiff. X also objects because the request calls for the production of public statements that are equally available to Defendants as they are to X.

**RESPONSE**: X will not search for or produce documents responsive to this request.


**REQUEST FOR PRODUCTION NO. 30**: All documents and communications identified in response or related to any response provided to Defendants' Requests for Admission or Interrogatories.

**OBJECTIONS**: None.

**RESPONSE**: X will search for and produce documents responsive to this request.

# EXHIBIT 7

# FILED UNDER SEAL

# EXHIBIT 8

# FILED UNDER SEAL

# EXHIBIT 9

# FILED UNDER SEAL

App. 434

# EXHIBIT 10

# STONE HILTON

May 28, 2025

Matt Behncke
Susman Godfrey LLP
1000 Louisiana St., Suite 5100
Houston, Texas 77002
mbehncke@susmangodfrey.com

*via e-mail*

**RE: X's Response to Defendants' Discovery Correspondence**

Counsel,

I am writing to provide a formal written response to your email dated May 6, 2025 and subsequent correspondence. We hope that this response will help aid in our ongoing discussions.

**Interrogatories:**

*With respect to Interrogatory No. 16*, X conducted a reasonable investigation and was unable to identify a specific document responsive to the question posed. Accordingly, X provided a narrative response explaining the filter in X's source code that limits ads to newly created accounts. It is unclear what additional information Defendants are seeking that was not provided in X's response; if more information is requested, Defendants should specifically state what they are looking for or serve an additional interrogatory.

*With respect to Interrogatory No. 21*, X disagrees with Defendants' contention that the Court's January 3, 2025 Order, ECF No. 135 ("Court's Order") requires a response that is different than the response originally provided. Specifically, X disagrees that questions regarding advertising revenue in the aggregate are relevant or are an appropriate topic for discovery. Indeed, the Court sustained an objection on this basis in the same order cited by Defendants in their correspondence. ECF No. 135 at 9. Further, if this interrogatory is directed at determining why advertisers left the platform, X has already identified hundreds of documents in response to Defendants' Interrogatory No. 8. To the extent that this interrogatory is instead an attempt to gain discovery into unrelated lawsuits, including *X Corp. v. World Federation of Advertisers, et al.*, this is improper, and X would instead direct Defendants to the pleadings docketed for Case 7:24-cv-00114-O, which describe the basis of those claims.

**Requests for Production:**

*With respect to RFP 79,* X maintains its objections to producing the posts from the identified users. If Defendants seek the public posts from these users, they can simply log onto X and gather any posts they believe are relevant to this dispute without imposing the burden or cost

on X. Further, federal law, including the Electronic Communications Privacy Act, 18 U.S.C. §§ 2510 et seq., the Stored Communications Act, 18 U.S.C. §§ 2701 et seq. ("SCA"), prevents X from providing user posts. As stated in X's objections and response, the SCA does not permit private parties to compel production of the content of a user's electronic communications from service providers such as X Corp. by service of a subpoena or court order, and there is no exception for civil discovery demands. 18 U.S.C. §§ 2702(a)(1), (2); 2702(b)(1)-(9); *see also Suzlon Energy Ltd. v. Microsoft Corp.*, 671 F.3d 726, 730 (9th Cir. 2011) (holding that non-governmental entities may not obtain communications content with a civil discovery demand because it would "invade[] the specific interests that the [SCA] seeks to protect."); *Republic of Gambia v. Facebook, Inc.*, 575 F. Supp. 3d 8, 16 (D.D.C. 2021) (holding that the SCA prohibits disclosure in civil discovery of social media pages and associated communications, including deleted communications); *Optiver Australia Pty. Ltd. v. Tibra Trading Pty. Ltd.*, 2013 WL 256771, at \*1 (N.D. Cal. 2013) ("By now it is well-established that civil subpoenas…are subject to the prohibitions of the Stored Communications Act."); *O'Grady v. Superior Court*, 139 Cal. App. 4th 1423, 1441-47 (2006) (holding that the SCA bars civil litigants from obtaining communications content from a service provider).

With respect to *RFP 80 and 89,* X already confirmed in its responses that it conducted a reasonable search and there were no responsive documents to Request Nos. 80 and 89. X cannot produce documents which do not exist.

With respect to *RFP 81,* X is already committed to providing Defendants with the information sought by this request, including whether the specified users participated in the program and the amount that X paid these creators. To demand all documents relating to these accounts and associated payments is overbroad and would not be relevant to establishing or refuting the falsity of Defendants' statements. This includes many documents which would be routine or automated communications. Likewise, X cannot see how it would be necessary or appropriate to produce documents reflecting these third parties' payment or banking information. X also reminds Defendants that federal law prohibits X from producing documents reflecting user communications (*see* SCA discussion above). However, X invites Defendants to describe the specific relevance of any additional documents sought by Defendants so that X can determine if there is potential for compromise or an alternative way to narrow the request.

With respect to *RFP 82–83,* X has specifically identified what it is willing to produce in response to these requests pursuant to its objections. If Defendants have specific concerns with either the responses or the objections, please provide additional detail so that X can evaluate the concerns.

With respect to *RFP 86–87 and 98,* X maintains its objections regarding the production of documents about its litigation against CCDH and disagrees that the Court's Order mandates otherwise. X's own internal investigation related to CCDH's conduct, which was related to the unauthorized access and scraping of X that formed the basis of X's complaint, is not relevant to this dispute. If these Requests are limited to determining whether CCDH caused the advertisers at



App. 436

issue in this litigation to pause their advertising, then X is already producing all documents concerning why advertisers paused or left the platform in response to Request No. 7, amongst others. Defendants' email does not clarify what additional, responsive documents that Defendants are looking for that are not responsive to the documents X is already producing in response to Defendants' 109 other requests. X further reiterates its objection that many of the documents responsive to the request as written are privileged. X invites Defendants to provide a potential compromise if there is a targeted set of otherwise non-responsive documents that it believes are relevant and limited to information reasonably calculated to lead to admissible evidence.

*With respect to RFP 88,* X has repeatedly objected to requests that target Musk—including in response to Defendants' motion to compel—and X will not repeat all of those objections here. To the extent that Musk's Dealbook comments relate to an advertisers' decision to advertise on the platform these documents are already being produced in response to Request No. 7, among other requests. Defendants' correspondence did not articulate what other documents they are seeking that would not be also responsive to Defendants' 109 other requests. Likewise, Defendants have not articulated why those otherwise non-responsive documents that do not relate to an advertisers' decision to advertise on the platform would be relevant.

*With respect to RFP 92,* as stated in its response, X is willing to confer regarding appropriate limiting criteria to Defendants' broad request. As an initial matter, X is willing to produce all Jira tickets that reference both brand safety and the advertisers it has identified as relevant. X invites Defendants to consider that proposal or to otherwise propose a narrowed version of this request, limited to information reasonably calculated to lead to relevant, admissible evidence, in the hope of achieving a compromise.

*With respect to RFP 93*, because broad minutes touch on many topics unrelated to this litigation, X added a materiality qualifier to make the request more proportional. To clarify, X will produce all board meetings that discuss brand safety to a substantive degree and only intends to withhold board minutes where there is an inconsequential mention of brand safety but where the minutes do not reflect any substantive discussion.

**Custodians:**

As Defendants are well aware, discovery remains ongoing, and X's document production is not complete. With respect to X's October 4, 2024 custodian list, X intends to amend its custodian list to also include the following individuals:

- Adnrew Duval
- Avantika Mankar
- Elizabeth ("Lizzie") Palumbo
- Kylie McRoberts
- Laurant Buanec
- Rob Pietsch
- Yale Cohen



App. 437

X does not intend to add the following individuals to X's custodian list or its disclosures. If Defendants disagree with this decision, please provide a written explanation that sets out your position over which the parties can confer:

- Elyana Thierry
- Jeff Carlton

With respect to Joe Benarroch, he is a former employee. Nevertheless, X has listed him as a custodian, conducted a reasonable search, and produced responsive documents. This production remains ongoing.

*    *    *    *    *

As stated at the conclusion of all of Plaintiff's discovery letters, X takes its discovery obligations seriously. We remain committed to addressing your questions and, if possible, avoiding or amicably resolving any discovery disputes without the need for judicial intervention.

We look forward to discussing the compromises that we have suggested herein. Please do not hesitate to let us know if you have any questions regarding the issues addressed in this or any previous letter.

Sincerely,

*/s/ Alexander M Dvorscak*
Alexander M. Dvorscak
Stone Hilton PLLC
alex@stonehilton.com
(737) 465-3897

CC:
All counsel of record



App. 438

# EXHIBIT 11

# FILED UNDER SEAL

# EXHIBIT 12

# FILED UNDER SEAL

# EXHIBIT 13

# FILED UNDER SEAL

# EXHIBIT 14

# FILED UNDER SEAL

# EXHIBIT 15

# FILED UNDER SEAL

# EXHIBIT 16

# FILED UNDER SEAL

App. 846

# EXHIBIT 17

# FILED UNDER SEAL

# EXHIBIT 18

# FILED UNDER SEAL

# EXHIBIT 19

# FILED UNDER SEAL

# EXHIBIT 20

# FILED UNDER SEAL